**No. 24-1900**

In the

# United States Court of Appeals
## For the Fourth Circuit

———————————

BABY DOE, JOHN DOE, & JANE DOE,

*Plaintiffs-Appellees,*

V.

JOSHUA MAST, STEPHANIE MAST, & RICHARD MAST,

*Defendants-Appellants.*

———————————

On Appeal from the United States District Court
for the Western District of Virginia
Honorable Norman K. Moon
Case No. 3:22-cv-00049

———————————

**OPENING BRIEF OF APPELLANTS**

———————————

John S. Moran                  David Eliezer Yerushalmi
MCGUIREWOODS LLP               AMERICAN FREEDOM LAW CENTER
Suite 500                      Suite 189
888 16th Street, NW            2020 Pennsylvania Avenue, NW
Washington, D.C. 20006         Washington, D.C. 20006
T: 202-525-0356                T: 646-262-0500

November 12, 2024

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................ 1

JURISDICTIONAL STATEMENT ....................................................... 5

ISSUES PRESENTED....................................................................... 6

STATEMENT OF THE CASE .............................................................. 6

I.     The underlying dispute. ......................................................... 8

II.    Entry of the *ex parte* Protective Order & Plaintiffs' media campaign.........14

III.   Challenges to pseudonymity and the Protective Order. ...............17

IV.    The District Court rejects challenges to the Protective Order.....................19

SUMMARY OF ARGUMENT ..............................................................20

STANDARD OF REVIEW ..................................................................21

ARGUMENT ...................................................................................21

I.     The *ex parte* Protective Order operates as a content-based prior
       restraint on speech. ............................................................21

II.    The *ex parte* Protective Order's speech restrictions are subject to strict
       scrutiny...........................................................................25

       A.    The District Court erred in applying a lower standard to *the ex
             parte* Protective Order's speech restrictions. ....................26

       B.    The District Court's analysis under the *Jacobson* standard does
             not satisfy the rigors of strict scrutiny.............................29

III.   The District Court erred in its alternative footnote holding that the *ex
       parte* Protective Order's speech restrictions meet strict scrutiny.................32

       A.    The District Court failed to make any supported finding that the
             *ex parte* Protective Order's speech restrictions further a
             compelling government interest.......................................33

       B.    The District Court failed to consider less restrictive means
             available and instead erroneously put the burden of proof on the
             Masts to do so...........................................................36

IV.     The *ex parte* Protective Order's speech restrictions are unconstitutionally vague under the First and Fifth Amendments. .................................................................................38

CONCLUSION ..................................................................................42

STATEMENT REGARDING ORAL ARGUMENT ...........................42

CERTIFICATE OF COMPLIANCE ...............................................44

CERTIFICATE OF SERVICE .........................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. United States*,
509 U.S. 544 (1993).................................................................21, 23

*Ashcroft v. Am. Civ. Liberties Union*,
535 U.S. 564 (2002).........................................................................31

*Ashcraft v. Conoco, Inc.*,
218 F.3d 288 (4th Cir. 2000) ..........................................................19

*Baggett v. Bullitt*,
377 U.S. 360 (1964).........................................................................38

*City of Boerne v. Flores*,
521 U.S. 507 (1997).........................................................................31

*Cohen v. Beneficial Loan Corp.*,
337 U.S. 541 (1949)...........................................................................5

*Doe v. Borderland Beat*,
No. 20-cv-6822 (N.D. Cal.) (October 5, 2020) ...............................37

*Doe v. Pub. Citizen*,
749 F.3d 246 (4th Cir. 2014) .......................................................1, 30

*Doe v. Stegall*,
653 F.2d 180 (5th Cir. 1981) ...........................................................30

*Gentile v. State Bar of Nevada*,
501 U.S. 1030 (1991).......................................................................41

*Hirschkop v. Snead*,
594 F.2d 356 (4th Cir. 1979) .......................................................4, 38

*James v. Jacobson*,
6 F.3d 233 (4th Cir. 1993) ...............................3, 5, 20, 29, 30, 31

*Kolbe v. Hogan*,
849 F.3d 114 (4th Cir. 2017) (en banc), *rev'd on other grounds*,
*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).................33, 34, 35

iii

*McLean v. Cent. States, Se. & Sw. Areas Pension Fund*,
    762 F.2d 1204 (4th Cir. 1985) ...........................................................19

*Minn. Voters Alliance v. Mansky*,
    581 U.S. 1 (2018)...........................................................................38

*In re Murphy-Brown, LLC*,
    907 F.3d 788 (4th Cir. 2018) ....................................................*passim*

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
    597 U.S. 1 (2022)...........................................................................34

*Norton v. High*,
    793 F. App'x 218 (4th Cir. 2020) ....................................................2

*Pippen v. Slaughter*,
    No. 20-1618, 2021 WL 5397497 (4th Cir. Nov. 18, 2021) ................2

*Reed v. Town of Gilbert, Ariz.*,
    576 U.S. 155 (2015)...............................................23, 25, 33, 35, 37

*Russe v. Harman*,
    No. 1:21-CV-00270-MR-WCM, 2021 WL 5043358
    (W.D.N.C. Oct. 29, 2021)..........................................................3, 32

*Sines v. Kessler*,
    No. 3:17-CV-00072, 2021 WL 5024543 (W.D. Va. Oct. 28, 2021)..................22

*Stone v. Univ. of Maryland Med. Sys. Corp.*,
    855 F.2d 178 (4th Cir. 1988) ............................................................1

*Under Seal v. Under Seal*,
    326 F.3d 479 (4th Cir. 2003) ............................................................5

*United States v. Masciandaro*,
    638 F.3d 458 (4th Cir. 2011), *abrogated on other grounds by N.Y.
    State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022)......................34

*United States v. McNeal*,
    818 F.3d 141 (4th Cir. 2016) ..........................................................21

**Statutes**

28 U.S.C. § 1292(a) ...................................................................5

28 U.S.C. § 1651(a) ...................................................................5

Virginia Code § 63.2-1216 ........................................................11

**Other Authorities**

Eugene Volokh, *The Law of Pseudonymous Litigation*, 73 Hastings
 L.J. 1353 (2022).............................................................24, 28

Juliet Linderman et al., *Afghan couple accuse US Marine of abducting
 their baby*, Associated Press (Oct. 20, 2022),
 https://bit.ly/4hCBPU .................................................16

*Gagging order*, Merriam-Webster.com Dictionary,
 https://www.merriam-webster.com/dictionary/gagging%20order ...................22

Melville Nimmer, *Nimmer on Freedom of Speech* § 4.03 (1984)..........................21

Rozina Ali, *How Did This Man Think He Had the Right to Adopt This
 Baby?*, The New York Times (Nov. 20, 2022),
 https://nyti.ms/3CybZ3G ...................................................16

**INTRODUCTION**

Even before Defendants were served in this litigation, the District Court tilted the playing field by issuing an *ex parte* protective order that has allowed Plaintiffs to publicly criticize Defendants Joshua and Stephanie Mast by name in the news media while the Masts are enjoined from identifying Plaintiffs to anyone without first obtaining a signed non-disclosure agreement.  Years after the Masts and Co-Defendant Richard Mast (Joshua's brother and the couple's attorney) moved to lift this ill-considered and onerous gag order, the district court refused to dissolve it. But the court failed to apply strict scrutiny, as the First Amendment requires. *See In re Murphy-Brown, LLC*, 907 F.3d 788, 797 (4th Cir. 2018) (when a prior restraint restrict speech based on its content, the restraint is "presumptively unconstitutional" and must survive strict scrutiny).  This Court should vacate the order and allow this litigation to proceed according to the ordinary presumption of public litigation.  *See Doe v. Pub. Citizen*, 749 F.3d 246, 265–66 (4th Cir. 2014) ("The right of public access springs from the First Amendment and the common-law tradition that court proceedings are presumptively open to public scrutiny . . . . [T]he right of public access . . . 'may be abrogated only in unusual circumstances.'") (quoting *Stone v. Univ. of Maryland Med. Sys. Corp.*, 855 F.2d 178, 182 (4th Cir. 1988)).

The gag order is particularly onerous because Plaintiffs have repeatedly identified *themselves* to the news media to generate substantial negative publicity

against the Masts and to falsely accuse the Masts of "kidnapping," which are the subject of the Masts' counterclaims for defamation and related torts. Indeed, Plaintiffs have identified themselves sufficiently to the Associated Press that the outlet was able to send correspondents to their home village in Afghanistan to interview family members. Meanwhile, the Masts are prohibited from "identifying" John Doe and Jane Doe *or their own adoptive daughter* to anyone who does not sign an NDA—a vague prohibition the District Court refused to clarify for over a year. In the same order appealed from below, the district court held that Joshua Mast violated the protective order when another brother—Jonathan Mast—shared family photos with a non-profit organization attempting to raise money for the Masts' legal fees and costs related to this very litigation. That ruling itself is not yet ripe for appeal, as the District Court has not imposed a sanction,[1] but it illustrates how wildly lopsided the *ex parte* protective order's speech restrictions have made this litigation.

The Court should reverse the District Court's ruling on the motions to lift or modify the protective order and direct that the *ex parte* protective order's speech restrictions be vacated.

***First***, the *ex parte* protective order operates as a content-based prior restraint on speech. Such restrictions lie at the heartland of the First Amendment, and they

---

[1] *See, e.g.*, *Pippen v. Slaughter*, No. 20-1618, 2021 WL 5397497, at *1 (4th Cir. Nov. 18, 2021); *Norton v. High*, 793 F. App'x 218, 219 (4th Cir. 2020).

are therefore "presumptively unconstitutional" and must survive strict scrutiny. *Murphy-Brown*, 907 F.3d at 797. Both Plaintiffs and the District Court refuse to see it that way, claiming instead that the speech restrictions are simply part and parcel of pseudonymous litigation. But their logic rests on a *non sequitur*. The protective order plainly acts as a prior restraint on Defendants' speech, based on the content of that speech. The fact that Plaintiffs and the District Court seek to *justify* that restriction based on the desire to permit pseudonymous litigation does not change its fundamental character.

**Second**, the *ex parte* protective order's speech restrictions are subject to strict scrutiny. The District Court held that, because the restrictions are part of pseudonymous litigation rather than a content-based prior restraint (a false dichotomy), they should be reviewed under the standard for use of pseudonymous set forth in *James v. Jacobson*, 6 F.3d 233 (4th Cir. 1993), rather than under the strict scrutiny standard as required by *Murphy-Brown*. 907 F.3d at 797. Other courts have not made this plain analytical error. *See, e.g.*, *Russe v. Harman*, No. 1:21-CV-00270-MR-WCM, 2021 WL 5043358, at *3 (W.D.N.C. Oct. 29, 2021) (assessing the plaintiffs' request for a pseudonym order under *Jacobson* and their request for a gag order under *Murphy-Brown*). By applying the *Jacobson* standard to the *ex parte* protective order's speech restrictions, the District Court permitted an unconstitutional prior restraint to stand without satisfying strict scrutiny.

3

**Third**, while the district court purported to make an alternative holding—in a single footnote—that the *ex parte* protective order's speech restrictions would satisfy strict scrutiny if it applied, its cursory analysis is plainly wrong.  The District Court suggested that the restrictions promoted safety, but its analysis falls well short of the "compelling government interest" determination required under strict scrutiny.  The District Court also failed to scrutinize whether its speech restrictions represented the "least restrictive means" of promoting a compelling government interest.  Instead, the Court improperly placed the burden on the Masts to prove some lesser restriction that would provide adequate safety.  That truncated analysis does not come close to satisfying the rigorous demands of strict scrutiny.

**Fourth and finally**, the *ex parte* protective order's speech restrictions are independently invalid because they are impermissibly vague and thus offend the First and Fifth Amendments.  *See Murphy-Brown*, 907 F.3d at 800; *Hirschkop v. Snead*, 594 F.2d 356, 370–71 (4th Cir. 1979).  It has never been clear what the protective order means by "directly or indirectly identify," *see* JA51, and despite over a year of litigation over alleged breaches, the District Court never provided clarification until very recently.  Even now, however, it remains unclear what speech will subject Defendants to sanction, and what speech will not.  That is the quintessence of unconstitutional vagueness.

4

The Court should therefore reverse the ruling below to the extent the District Court denied the motions filed by the Masts and Richard Mast to lift or modify the protective order and remand with instructions for the district court to vacate the *ex parte* protective order's speech restrictions.

## JURISDICTIONAL STATEMENT

The Court has jurisdiction over this appeal under 28 U.S.C. § 1292(a).  The Protective Order enjoined the Masts from engaging in certain speech activities, and the District Court's August 16, 2024 Opinion & Order was an order refusing to dissolve that injunction.

In the alternative, this Court also maintains jurisdiction to hear an interlocutory appeal of the non-final order below because it "falls within the familiar collateral order doctrine of *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541 (1949)." *Jacobson*, 6 F.3d at 236; *Under Seal v. Under Seal*, 326 F.3d 479, 484–85 (4th Cir. 2003).

In the further alternative, the Court should construe the appeal as a petition for a writ of mandamus pursuant to 28 U.S.C. § 1651(a).  *See Murphy-Brown*, 907 F.3d at 796; *Under Seal*, 326 F.3d at 485 n.5.

## ISSUES PRESENTED

1. Whether the District Court erred in failing to hold that the *ex parte* protective order imposed a content-based prior restraint on speech?

2. Whether the District Court erred in failing to apply strict scrutiny to the *ex parte* protective order's speech restrictions?

3. Whether the *ex parte* protective order's speech restrictions fail to satisfy strict scrutiny?

4. Whether the *ex parte* protective order's speech restrictions are impermissibly vague in violation of the First and Fifth Amendments to the United States Constitution?

## STATEMENT OF THE CASE

Joshua and Stephanie Mast ("the Masts") are loving adoptive parents who made great personal sacrifices to provide a good home for their adoptive daughter, a severely injured orphaned minor rescued by U.S. Army Rangers from a battlefield in Afghanistan. Their adoptive daughter ("the Child") has lived happily with them for the past three years along with her adoptive siblings and received the love and care she needs and deserves. The Masts also ensured that John and Jane Doe—Plaintiffs here—were evacuated from Afghanistan as it fell to the Taliban, in gratitude for their help in evacuating the Child and that John and Jane Doe made it to the United States. After the Child and the Does arrived in the United States, and

6

the Masts took custody of the Child pursuant to a Virginia adoption order, which Plaintiffs subsequently sought to reopen and set. Plaintiffs' state-court challenge to the adoption is ongoing and currently pending before the Supreme Court of Virginia. This case arises from a parallel suit Plaintiffs initiated in federal court a week before the Mast's presented their evidence in the state court litigation, asserting state-law tort claims and seeking millions of dollars in damages, including against key fact witnesses and the Mast's attorney.

In particular, this appeal concerns an *ex parte* protective order the district court issued more than two years ago on September 13, 2022, before Defendants' counsel had even entered appearances. Among other things, that *ex parte* protective order directs that Defendants are "prohibited from disclosing any information that directly *or indirectly* identifies Plaintiffs or their family members *to any person* . . . unless that person first executes a non-disclosure agreement enforceable through the contempt sanction." JA51 (emphases added). Because John Doe and Jane Doe originally purported to bring claims on behalf of the Child herself (which the District Court has since dismissed due to their lack of standing to raise them), that prohibition has included the direct or indirect "identification" of the Masts' own adoptive child.[2]

---

[2] Lest there be any doubt, the District Court's contempt finding, contained in the same August 16, 2024, Order appealed from here, purports to find that Joshua Mast violated the *ex parte* protective order when his brother Jonathan shared family photos with a non-profit foundation and thereby identified *the Child*—not John Doe or Jane Doe. JA330–334.

The Protective Order's sweeping speech restrictions have hindered the Masts from investigating the facts and circumstances surrounding their case and preparing their defense, including by preventing them from talking to key witnesses or others with vital information, unless those individuals first agree to execute an NDA. It has also made it more difficult for the Masts to raise money to fund the expensive and protracted litigation and prevented them from sharing their story about their journey to adopt (and keep) their daughter. All the while, despite the Plaintiffs' plea for anonymity, they have chosen to publicize this case and engage in a national media battle against the Masts in which they have attacked the Mast's character and made false assertions about this litigation.

## I.    The underlying dispute.

This case arises from the recovery of an infant by U.S. Special Forces off a battlefield in Afghanistan in 2019 following a raid of a foreign fighter training camp to capture or kill three Al Qaeda terrorist leaders. JA228 at ¶ 11. The Child's mother died in the engagement attempting to kill the American soldiers and severely injured the Child, leaving her for dead. JA229–230 at ¶¶ 13–16. While Afghan soldiers wanted to shoot the child because they believed she was not Afghan, Army Rangers intervened to protect her and brought her to a U.S. military hospital. JA230 at ¶ 18, JA232 at ¶ 25.

Major Joshua Mast (then Captain) met the Child while he was deployed in Afghanistan as a Marine Corps Judge Advocate, and she was being treated for her injuries in the Military Hospital system. JA232 at ¶ 25. Joshua Mast grew concerned that the Child, a foreign female infant in Afghanistan being treated in a Military Hospital under consistent rocket attack, would not have access to the medical care required to treat her injuries. JA232 at ¶ 26. Joshua Mast fought for the child's rights to safety, medical treatment, and to not be turned over to non-relatives in an objectively dangerous manner. JA232 at ¶ 28. Joshua Mast and his wife Stephanie initiated custody proceedings in the Juvenile and Domestic Relations Court of Fluvanna, Virginia (the "J&DR Court"), JA233 at ¶ 31, and ultimately obtained a final order of adoption from the Fluvanna County Circuit Court, JA241 at ¶ 60. One of the central issues in dispute is the validity of that adoption order. The District Court below correctly recognized that it lacked subject-matter jurisdiction to adjudicate that validity, *see* Mem. Op. & Order on Def. Mot. to Dismiss ("Op.") at p.4, ECF No. 455, and the issue is playing out in state court, where the Supreme Court of Virginia recently granted review.

In February 2020, over Joshua Mast's objections, the U.S. Embassy relinquished custody of the Child and she was turned over to John Doe's father, who purports to be the older half-brother of the Child's purported biological father. *See generally* JA238–241 at ¶¶ 47–58. John Doe's father obtained the child

without a DNA test or other vetting by the Americans, despite Afghan government officials requesting a DNA test. JA254–255 at ¶ 105.

Notwithstanding this setback, the Masts never gave up their care and concern for the Child. Nearly two years later, in the late summer of 2021, as the Taliban campaign swept over Afghanistan, Joshua Mast established contact with John Doe and requested he bring the Child to Kabul to fly to the United States before the country collapsed. JA242 at ¶ 61. Joshua Mast communicated with John Doe through an interpreter and understood, based on John Doe's representations, that John Doe's father was the actual person with decision-making authority over the Child. JA242 at ¶¶ 62–63. The parties here vehemently dispute the substance of these discussions. The Masts maintain that Joshua Mast was candid with John Doe from the beginning and throughout their discussions, that Joshua and Stephanie Mast had adopted the Child, that they had created a legal identity for her in the United States, and that they intended for her to live with them in the United States. JA243 at ¶ 67. Plaintiffs allege that Joshua Mast withheld these intentions.

Through the efforts of Joshua Mast and other U.S. military personnel, and based on the legal identity of the Child under the Adoption Order, John and Jane Doe were able to flee Afghanistan, notwithstanding the chaos of the U.S. withdrawal, by bringing the Child to U.S. Forces. JA244 at ¶ 69. Joshua Mast

made sure that the U.S. military did not evacuate only the Child but also that they brought John Doe and Jane Doe along so they would not be killed by the Taliban for disobeying their orders not to bring the Child to American forces. JA244 at ¶ 70. John and Jane Doe were paroled in the United States and ultimately were sent to Fort Pickett, Virginia. JA246–247 at ¶ 80. On September 3, 2021, the Masts went to Fort Pickett and took custody of the Child pursuant to the final order of adoption from the Virginia Circuit Court. JA247 at ¶ 81.

In November 2021, the Does initiated a series of legal challenges to the Masts' adoption. *See generally* JA247–256 at ¶¶ 82–108. The state court litigation is ongoing, and proceedings are stayed while the Supreme Court of Virginia considers an appeal on the application of Virginia Code § 63.2-1216. Plaintiffs have not limited their accusations against the Masts to the courtroom. On numerous occasions, both directly and through agents or intermediaries, Plaintiffs have repeated their allegations to members of the media, Joshua Mast's employer, and other third parties. JA249 at ¶ 89. They have done so to generate negative news stories about the Masts that, they hope, will influence the litigation in their favor. JA249 at ¶ 90.

Those efforts have borne fruit, as multiple news outlets have published— and continue to publish—negative stories about the Masts. *See* JA256–258 at

¶¶ 112–19. The following are just the particular examples cited in the Masts' Counterclaim Complaint, but there are many more out there:

- Associated Press, *Afghan couple accuse U.S. Marine of abducting their baby* (Oct. 20, 2022)

- Associated Press, *Afghan war orphan remans with Marine accused of abduction* (Dec. 31, 2022)

- Taliban, Official Statement (recounting that "a Marine officer Joshua Mast, has forcibly taken the only remaining child of a family martyred in their bombardment in Afghanistan from her relatives in Virginia")

- Associated Press, *U.S. Marine's adoption of Afghan war orphan voided* (March 31, 2022)

- Associated Press, *A baby was found in the rubble of a US raid in Afghanistan. But who exactly was killed and why?* (Aug. 4, 2023)

- Associated Press, *Secret records: Governments says Marine's adoption of Afghan orphan seen as abduction, must be undone* (Sept. 15, 2023)

- Associated Press, *Appeals court voids Marine's adoption of Afghan orphan; child's fate remains in limbo* (July 16, 2024)

JA256–259 at ¶¶ 109-120.

While their collateral attack on the Masts' adoption was still pending in Virginia Circuit Court, the Does initiated this federal lawsuit against the Masts; Joshua's brother, Richard, who is also one of their attorneys; Joshua's interpreter, Ahmad Osmani; and Kimberley Motley, a lawyer and advocate for women and girls in Afghanistan who had helped Joshua Mast find the Child and get in touch with John Doe. They purported to seek $20 million in damages, as well as a series

of declaratory judgments that they would take back to state court in support of their effort to invalidate the Masts' adoption.

The Masts originally filed their own motion to dismiss ("MTD") the Does' claims on October 14, 2022, and the other Defendants filed Rule 12 motions as well. *See* Op. at p.4, ECF No. 455 But the Court did not resolve those motions until nearly two years later. On July 24, 2024, the Court ruled on the motions to dismiss dismissing a substantial portion of Plaintiffs' case:

- The Court rejected the Does' effort to bring claims on behalf of the Child as "Baby Doe." *Id.* at p. 57–59.

- The Court rejected the Does' requests for declaratory relief as improper attempts to interfere with the pending proceedings in Virginia state court. *Id.* at p. 47–49.

- The Court held that the Does had failed to state any claims arising under federal law. *Id.* at p. 32–38.

- The Court applied the well-established "domestic-relations exception" to federal jurisdiction to dismiss multiple causes of action because they would have required the Court to adjudicate the Does' alleged parental rights. *Id.* at p. 44–46.

- The Does voluntarily dismissed their claims against Defendant Osmani, Notice of Voluntary Dismissal at p.1, ECF No. 460, after it became apparent that he would destroy complete diversity, Response to Motion to Quash at p.4, ECF No. 271.

As a result, all that remains of the Does' original action is a set of three state law tort claims against the Masts, Richard Mast, and Kimberley Motley. Op. at p.4–5, ECF No. 455.

On August 7, 2024, the Masts filed their Answer and a Counterclaim Complaint asserting three causes of action against the Does: defamation, intentional infliction of emotional distress, and civil conspiracy. *See* JA225–JA304. All three causes of action arise from the Does' willful dissemination of lies about the Masts and the circumstances of their adoption in an effort to cast them as kidnappers.

## II.      Entry of the *ex parte* Protective Order & Plaintiffs' media campaign.

Together with their original complaint, Plaintiffs filed a Motion for Leave to Proceed Under Pseudonyms and for Entry of a Protective Order. *See* JA47–49. In support of that motion, Plaintiffs asserted "fear . . . that they will be hurt or killed if they return to Afghanistan." Pl. Br. in Support of Mot. for Protective Order at p. 3, ECF. No. 4. Specifically, they expressed concern that they would be "perceived as having worked with the U.S.," *id.* at p. 4, or "that others in Afghanistan may . . . believe that they intentionally gave or sold [the Child] to an American family in exchange for the opportunity to live in the United States," *id.* at p. 5. They tied those fears to concerns about media attention, asserting that they "have taken care not to reveal their whereabouts or circumstances to their communities in Afghanistan," but worrying that "this case has the potential to attract media attention" and that "[a]nybody seeing a news story about this case would be likely to talk about it to other Afghans, both in the U.S. and abroad." *Id.* at p. 5. Plaintiffs further argued that

their families in Afghanistan "face the same risk of violence and reprisals that Plaintiffs do, either as their proxies or to punish Plaintiffs by harming their families." *Id.* at p. 7.

The Court granted the motion on September 13, 2022. *See* JA50–52. At that point the Court had only the benefit of Plaintiffs' presentation because no Defendant had yet entered an appearance. The Court found, based on Plaintiffs' presentation, that they had "established grounds to proceed by pseudonym and for entry of . . . a protective order." JA50–51. The Court found that Plaintiffs John and Jane Doe had "demonstrated that disclosure of Plaintiffs' identities and identifying information would pose a substantial risk to the physical safety of Plaintiffs and other innocent non-parties, in view of the age of [the Child]." JA51. The Court entered a protective order with five components:

> 1. The Defendants and their counsel and representatives are prohibited from disclosing any information that directly or indirectly identifies Plaintiffs or their family members to any person, including but not limited to the Plaintiffs' names and the locations of their residences abroad and places of birth, unless that person first executes a non-disclosure agreement enforceable through the contempt sanction. This applies to any disclosure in the course of any investigation undertaken by the Defendants, their counsel, or their other agents or representatives.

> 2. All papers filed with this Court or disseminated to any person who has not executed a non-disclosure agreement enforceable through the contempt sanction shall use the "John Doe", "Jane Doe", or "Baby Doe" pseudonyms to refer to the Plaintiffs.

3. Any papers that identify any Plaintiff either directly or indirectly shall be filed under seal, with redacted copies placed in the public files.

4. Defendants shall disclose to Plaintiffs' counsel any person to whom Defendants, their counsel or representatives, have disclosed Plaintiffs' identities, and shall provide Plaintiffs with copies of the executed non-disclosure agreements required by this Order.

5. The parties shall be permitted to notice depositions and depose witnesses and conduct other discovery using the "John Doe", "Jane Doe", and "Baby Doe" pseudonyms. In deposing any witnesses who are unacquainted with the Plaintiffs, the Doe pseudonyms shall be used. In deposing any witnesses already acquainted with the Plaintiffs, actual names may be used, but the Doe pseudonyms must be used in any transcript of those depositions.

JA51–52.

On October 20, 2022, the Associated Press published the first article about this case, as referenced above. *See* Juliet Linderman et al., *Afghan couple accuse US Marine of abducting their baby*, Associated Press (Oct. 20, 2022), https://bit.ly/4hCBPUi. In that article, Plaintiffs and their attorneys provided their version of the facts while naming the Masts (including several contentions that they have never put in any court filing). Notably, Sehla Ashai and Maya Eckstein—two of Plaintiffs' attorneys in this case—were quoted in the article. On November 10, 2022, the New York Times published an article about the case that again named the Masts, and the author of that article said that she visited Plaintiffs at their home in the summer of 2022 for them to share their version of the facts. Rozina Ali, *How Did This Man Think He Had the Right to Adopt This Baby?*, The New York Times (Nov. 20, 2022), https://nyti.ms/3CybZ3G. When requesting comment from the

Masts, the author used Plaintiffs' names and the Child's legal name given to her by the Masts and asked for the Masts to comment because:

> [This article] will be published in the *New York Times* Magazine, which means it would be fairly easy for anyone looking to find it now, or years down the line. When [the Child] gets older, and if she searches for your or your wife's name, she will likely come across this article about her adoption, and she may wonder about the absence of her parents' voice in the story.

Mot. to Amend Protective Order, Ex. 2, ECF. No. 130-2 (email from Rozina Ali requesting comment from the Masts).

After the first Associated Press article was published, the Taliban issued a statement. The Taliban stated that, "[a]ccording to information from reliable sources, a Marine officer Joshua Mast, [sic] has forcibly taken the only remaining child of a family martyred in their bombardment in Afghanistan from her relatives in Virginia and registered her as his own family member." *See* Taliban Statement; JA258 at ¶ 117.

## III.      Challenges to pseudonymity and the Protective Order.

As it became clear that Plaintiffs were using their pseudonymity and the speech restrictions in the *ex parte* protective order as a shield in an asymmetrical media war, and that it was hamstringing the Masts from investigating and preparing their defense, the Masts and Richard Mast filed motions to lift or modify the protective order. *See* Mot. to Modify Protective Order, ECF No. 130; Mot. to Vacate Protective Order, ECF No. 176. Together, they raised three principle challenges to

17

the *ex parte* protective order. First, that Plaintiffs had not met the necessary standard to proceed by pseudonyms—particularly in light of their extensive press contacts and litigation for months using their actual names, *see* Mot. to Modify Protective Order at p. 8–11, ECF No. 130; Mot. to Vacate Protective Order at p. 18–19, ECF No. 176; second, that the *ex parte* protective order's speech restrictions constitute an unconstitutional gag order that fails under strict scrutiny, *see* Mot. to Modify Protective Order at p. 12–15, ECF No. 130; Mot. to Vacate Protective Order at p. 8–17, ECF No. 176; and third, that the *ex parte* gag order's speech restrictions are unconstitutionally vague, Mot. to Vacate Protective Order at p. 17–18, ECF No. 176.[3]

The District Court did not rule on these motions for a year and a half. Nevertheless, in the meantime, Plaintiffs twice filed motions seeking to have the Masts held in contempt for purported violations based on their alleged "identification" of the Child to third parties who did not sign an NDA. *See* Emergency Mot. for Order to Show Cause, ECF No. 141; Supplemental Mot. for Order to Show Cause, ECF No. 142. In opposing these motions, the Masts both defended their conduct—which they believe in good faith did not violate the *ex parte*

---

[3] While the Masts did not raise the vagueness argument in this original motion to modify, Richard Mast did. *See* Mot. to Vacate Protective Order at p. 17–18, ECF No. 176. The Masts also raised the issue subsequently on several occasions, *see* Response to Mot. For Order to Show Cause at p. 9-10, ECF No. 154, and the district court addressed it on the merits.

protective order—and interposed their previously articulated objections to the *ex parte* protective order's speech restrictions. It is well-established that civil contempt may lie only for the violation of a "valid decree" and thus no contempt can be found where the underlying order is determined to be invalid. *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301, 302–03 (4th Cir. 2000) (movant must show the violation of the court's "valid decree"); *see also McLean v. Cent. States, Se. & Sw. Areas Pension Fund*, 762 F.2d 1204, 1210 (4th Cir. 1985) (reversing civil contempt finding where underlying order invalid).

## IV.    The District Court rejects challenges to the Protective Order.

In an Opinion and Order dated August 16, 2024 ("Opinion"), the District Court denied Defendants' motions and refused to lift the *ex parte* protective order's speech restrictions, holding that those restrictions did not constitute a "gag order"— a common term for court orders restricting parties from speaking about a case outside of court. The District Court held that it was not required to apply the strict scrutiny standard,[4] and instead that the entire Protective Order need only be assessed under this Court's *Jacobson* standard for granting leave to use pseudonyms. The Court not

---

[4] In perfunctory and footnoted dicta, the District Court further noted that even if strict scrutiny applied to the aspect of the Protective Order restricting Defendants' speech, it was satisfied in this case. *See* JA326. As discussed in this motion, the District Court's conclusory treatment of this issue is wholly insufficient to satisfy the rigorous strict scrutiny standard for multiple reasons, including because the District Court erroneously placed the burden on the Masts to satisfy the standard. *See supra* III.

only left the speech restrictions in the protective order in place, it also separately held Joshua Mast in civil contempt for violating them because his brother Jonathan shared pictures of the Masts' adoptive daughter with a non-profit foundation that was helping them raise money for their defense.

The District Court cited no precedent for its claim that it had the right to grant both forms of relief pursuant only to the *Jacobson* standard, and in doing so bootstrap a sweeping restriction on the Masts' speech without first engaging any of the constitutionally required strict scrutiny analysis. Instead, the District Court simply surmised that all pseudonym orders must implicitly come with such a speech restriction attached, otherwise such orders would have "scant (if any) utility." *See* JA314.

This appeal follows.

## SUMMARY OF ARGUMENT

This Court should correct the errors of law below and (1) reject the District Court's holding that the challenged aspects of the Protective Order are not a content-based prior restraint, (2) reject the District Court's holding that the challenged aspects of the Protective Order are not subject to strict scrutiny and could instead be reviewed under the standard articulated in *James v. Jacobson*, 6 F.3d 233, 236 (4th Cir. 1993), (3) reject the District Court's alternative conclusion that the challenged portions of the Protective Order would survive strict scrutiny under *In re Murphy-*

20

*Brown, LLC*, 907 F.3d 788, 796 (4th Cir. 2018) if it applied; (4) vacate the Protective Order; and (5) vacate the District Court's judgment finding Joshua and Johnathan Mast in civil contempt for violating the now-invalid Protective Order.

## STANDARD OF REVIEW

The District Court erred in determining that the challenged portions of the Protective Order restraining speech were not a content-based prior restraint subject to strict scrutiny and by failing to determine that the Protective Order was unconstitutional under the First and Fifth Amendments. This Court reviews these questions of law *de novo*. *United States v. McNeal*, 818 F.3d 141, 148 (4th Cir. 2016); *In re Murphy-Brown, LLC*, 907 F.3d 788, 797 (4th Cir. 2018) ("We review orders limiting First Amendment rights *de novo*.").

## ARGUMENT

I.     **The *ex parte* Protective Order operates as a content-based prior restraint on speech.**

Long settled doctrine makes clear that the First Amendment protects against prior restraints on speech, which include "judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." *See Alexander v. United States*, 509 U.S. 544, 550 (1993) (citing Melville Nimmer, *Nimmer on Freedom of Speech* § 4.03, p. 4–14 (1984)). "[C]lassic examples of prior restraints" include "court orders that actually forbid speech activities," such as temporary restraining orders and preliminary injunctions. *Id.*

Further, when prior restraints are "content-based," meaning they restrict speech based on the content of the speech, the restraints are "presumptively unconstitutional" and must survive strict scrutiny. *In re Murphy-Brown, LLC*, 907 F.3d 788, 797 (4th Cir. 2018).

Court orders restricting individuals from speaking about a case are commonly called "gag orders." *See Gagging order*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/gagging%20order. As this Court explained in *Murphy-Brown*, not only are so-called "gag orders" prior restraints on speech, they are also content-based restraints because they "inherently target speech relating to pending litigation." 907 F.3d at 797. While the Masts would argue that the term "gag order" is an accurate description of the *ex parte* protective order (as it restricts the Masts' from speaking about issues related to the case), the nomenclature used is not important. Under *Murphy-Brown*, what matters is whether the order constitutes a content-based prior restraint. *See id.* at 796. The Court must therefore look to the effect of the order, not how it is characterized, to determine whether *Murphy-Brown* applies. *See, e.g.*, *Sines v. Kessler*, No. 3:17-CV-00072, 2021 WL 5024543, at *1 (W.D. Va. Oct. 28, 2021) (where party sought a judicial order directed at parties and their counsel not to make any "extrajudicial public statements" about this litigation "until the end of trial," the court noted this was "essentially [] a gag order" and applied *Murphy-Brown* to deny it).

There can be no doubt that the *ex parte* protective order is a content-based prior restraint, not only facially but also as applied following the finding of contempt. The *ex parte* protective order provides, in relevant part:

> The Defendants and their counsel and representatives are prohibited from disclosing any information that directly or indirectly identifies Plaintiffs or their family members to any person, including but not limited to the Plaintiffs' names and the locations of their residences abroad and places of birth, unless that person first executes a non-disclosure agreement enforceable through the contempt sanction. This applies to any disclosure in the course of any investigation undertaken by the Defendants, their counsel, or their other agents or Representatives.

JA51.

The effect of this portion of the *ex parte* protective order is clear. It is a prior restraint because it "prohibit[s]" the Masts "from disclosing . . . information," *id.*, and thus is a court order that "actually forbid[s] speech activities[.]" *Alexander v. United States*, 509 U.S. 544, 550 (1993). It is content-based because it restricts speech regarding certain content, *i.e.*, "information that directly or indirectly identifies Plaintiffs," JA51, and is thus a "regulation of speech" that "applies to particular speech because of the topic." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 162–63 (2015).

Despite the clear effect of its order, the District Court held in its Opinion that the *ex parte* protective order was not a "gag order" but rather an order "allow[ing] Plaintiffs leave to proceed using pseudonyms. . .[,]" which the court said stands in

"stark contrast" to "actual 'gag orders'" like those in *Murphy-Brown* and other gag order cases. JA313. But this claim rests on the false dichotomy that its *ex parte* protective order must be either a pseudonym order or a gag order. These are entirely separate forms of relief, and a court may provide more than one form of relief in the same order. In this case, the Protective Order did two things: (1) it allowed the *Does* to be referred to via pseudonyms *in court* (*i.e.*, a pseudonym order), and (2) it prevented the *Masts* from speaking *outside of court* in public or private if that speech would disclose any information that might directly or indirectly reveal the identities of the Does or their family members (*i.e.*, a content-based speech restriction). *See* Eugene Volokh, *The Law of Pseudonymous Litigation*, 73 Hastings L.J. 1353, 1375 (2022) (explaining that "[a] pseudonymity order is not itself an injunction banning parties from revealing a pseudonymous party's true name . . . a pseudonymity order only deals with how the parties are to be referred to in court, not outside it."). Indeed, the fact that the *ex parte* protective order restricts the Masts from speaking outside of court about the identities of not just the Does but also the Does' family members, who are not parties to this case, and that it requires the Masts' to execute NDAs with any nonparties they wish to speak to about the matter, shows that the order goes much further than simply permitting litigation of the case anonymously in court.

Thus, the District Court's holding in its Opinion that the *ex parte* protective order did not contain a "gag order," *i.e.*, a content-based prior restraint on speech, was an error.

## II.    The *ex parte* Protective Order's speech restrictions are subject to strict scrutiny.

Longstanding Supreme Court precedent also requires that content-based prior restraints must be assessed under the strict scrutiny standard.  *See Murphy-Brown*, 907 F.3d at 796; *see also Reed*, 576 U.S at 163, 171 ("[C]ontent-based restrictions on speech . . . can stand only if they survive strict scrutiny[.]") (internal citation omitted).  To survive strict scrutiny, the proponent of the restraint bears the burden to demonstrate that the speech restriction both (a) furthers "a compelling public interest," and (b) is the "least restrictive means of furthering that interest." *Murphy-Brown*, 907 F.3d at 797–99 (internal quotation marks omitted); *Reed*, 576 U.S. at 171–72 (proponent's burden). Moreover, to support such orders, trial courts must undertake "adequate factual findings" and "support [such orders] with reasoning specific enough to enable the reviewing court to determine whether the order survives rigorous scrutiny." *Murphy-Brown*, 907 F.3d at 797–99 (internal quotation marks omitted).

Contrary to this longstanding precedent, the District Court held that it was not required to engage in the strict scrutiny analysis for this portion of the *ex parte* protective order. Rather, it held that the entire Protective Order, including the speech

25

restriction, could be assessed under the much less rigorous *Jacobson* standard for granting leave to proceed in court using pseudonyms. JA313–314.

### A. The District Court erred in applying a lower standard to the *ex parte* Protective Order's speech restrictions.

The District Court's primary holding appears to be that the speech restriction is necessary to give effect to its pseudonym order, and therefore it can be assessed as a sort of corollary to that order. As the District Court explained: "[i]t could be said that inherent in any order permitting a party to proceed under a pseudonym is an implicit command that the parties bound by the order not publicly disclose the pseudonymous litigant's real name . . . [a]nd an order permitting a party to use a pseudonym would be of scant (if any) utility if the opposing litigant could publicly name them." JA314. And although the District Court surmised that a speech restriction must implicitly come attached to every pseudonym order, the District Court said "it would appear the better practice" for Plaintiffs to formally ask for it first by seeking a protective order. *Id.*

The District Court's view that all pseudonym orders inherently come with a prior restraint restricting the opposing party to disclose their identities outside of court (publicly or privately), and that this means that those speech restrictions need not be assessed under the strict scrutiny standard, is fundamentally flawed on multiple levels.

26

First, the idea that pseudonym orders are of "scant (if any) utility" without a concomitant speech restriction is untrue. JA314. While the Masts' case has been the subject of major media scrutiny, and the Does claim to be in the unique position of facing a threat of retribution from a major international terrorist regime, not every case with a request for pseudonymity has such extreme facts that would garner significant national and international attention. In a non-sensational case with no public or media interest, a court could easily decide that it would be appropriate to permit a party proceed pseudonymously, for example because the party is a minor, and also determine that a speech restriction on the other parties' ability to discuss their identity is not warranted or necessary, because no media outlet would be interested in publicizing it or that there is no reason to believe that either party would want to publicize it. Therefore, the idea that no pseudonym order could stand on its own without a corresponding out-of-court speech restriction is false.

Second, while courts may issue collateral orders to give effect to their other orders, they must issue them properly, not bootstrap them. Even if it is the case that a court believes that its pseudonym order would be of little utility without a restraint on the opposing party's speech, that does not give the court the power to bypass the constitutionally required scrutiny that *must* be passed before it can wield its power to restrict a litigant's extrajudicial speech. *Murphy-Brown*, 907 F.3d at 797 ("[G]ag orders *must* survive strict scrutiny.") (emphasis added). The District Court cited no

27

case law, and the Masts are aware of none, that support that an exception exists for prior restraints related to pseudonym orders. And considering the Fourth Circuit has held that "[g]ag orders should be a last resort, not a first impulse," it cannot be squared that a gag order should automatically attach to every order allowing anonymous litigation without first engaging in proper review. *Id.* at 400.

Moreover, the practical impact of the District Court's "corollary" argument also cannot be understated. Not only would it be a thorough gutting of *Murphy-Brown* and other longstanding First Amendment precedent to hold that every pseudonym order automatically comes with a corresponding infringement on the litigant's speech rights that need not survive strict scrutiny, it would also have major implications for the ability of litigants to defend themselves in those cases. Automatically issuing sweeping prohibitions against the out-of-court disclosure of *any* information *to anyone* that could directly *or indirectly* reveal the identity of the other party without first executing an NDA will make it extremely difficult, if not impossible, for many litigants to gather information and speak to witnesses in order to prepare their case. *See* Eugene Volokh, *supra* at 1386 (explaining how requiring non-party witnesses to sign an NDA can chill their willingness to participate and collecting cases). *See also id.* at 1376 ("injunctions against parties revealing information that they already knew before filing the case . . . are generally unconstitutional prior restraints on speech and can seriously interfere with plaintiffs'

28

ability to discuss what they allege were serious wrongs done to them" and "with defendants' ability to rebut the allegations against them.").

Indeed, this is one of the primary reasons why the Masts seek to overturn the District Court's order. The Masts are hindered from speaking to potential witnesses and other parties who may have critical information related to the Masts' defense in this case and a separate case to maintain their adoption of their daughter. It also frustrates their ability to raise money for their defense, as demonstrated by the fact that they were held in civil contempt for Joshua's Masts' brother's communications with a non-profit that was considering giving the Masts a grant for their legal defense.

### B. The District Court's analysis under the *Jacobson* standard does not satisfy the rigors of strict scrutiny.

After incorrectly determining that the speech restrictions were a necessary corollary to its pseudonym order and therefore strict scrutiny was not required, the District Court assessed the entire Protective Order under only the *Jacobson* standard for issuing pseudonym orders.[5] *See James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993).

---

[5] It appears that at some earlier point in the *James* litigation, the trial court entered an order in some respects like the *ex parte* protective order in its restraint of the party's speech concerning the plaintiffs' identities. *See James v. Jacobson*, 6 F.3d 233, 235 (4th Cir. 1993). That order, however, was *not* at issue in the *James* appeal. It was neither challenged on appeal, litigated before this Court, nor even tangentially addressed by this Court. *Id.* at 236–37 (notice of appeal considered

A mere glancing comparison of these two standards reveals that *Jacobson* is a wholly insufficient substitute for strict scrutiny. *Jacobson* and its progeny concern whether a trial court may permit a litigant to proceed anonymously in court in contravention of the "general presumption of openness of judicial proceedings," which is rooted in the public's First Amendment right of access and codified in Federal Rule of Civil Procedure 10(a). *Id.* at 238; *Doe v. Stegall*, 653 F.2d 180, 185 (5th Cir. 1981). It is a balancing test that weighs the party's stated interest in proceeding anonymously against the public's interest in openness and any prejudice that anonymity would pose to the opposing party. *See Doe v. Pub. Citizen*, 749 F.3d 246, 274 (4th Cir. 2014). The balancing of these factors is committed to the trial court's discretion in managing the trial process and is reviewed on appeal only for abuse of that discretion. *See id.* at 253. In comparison, far from a discretionary matter regarding the court's management of the trial process, the decision to order a content-based prior restraint on speech is a fundamental exercise of the court's power over an individual's out of court conduct that directly implicates their

---

non-anonymity order "refusing to allow parties to proceed anonymously at trial"). What is more, that order may well have been the product of the parties' mutual agreement. *See id.* ("[A]greement was reached as to most aspects of a procedure for preserving the plaintiffs' anonymities during pretrial investigation and discovery."). In short, all that can be surmised from the existence of that similar order is that the same trial court that was deemed by this Court to have fundamentally misapprehended the law of pseudonymous litigation entered an order resembling the instant Protective Order.

constitutional rights. *See Ashcroft v. Am. Civ. Liberties Union*, 535 U.S. 564, 573 (2002). As such, content-based prior restraints, including "gag orders[,]" require a "most rigorous form of review." *Murphy-Brown*, 907 F.3d at 796. And in contrast to a discretionary balancing test like *Jacobson*, strict scrutiny is "the most demanding test known to constitutional law," and a district court's decision to restrict a litigants speech must be reviewed *de novo* by this Court. *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997); *Murphy-Brown*, 907 F.3d at 796.

Moreover, by substituting the *Jacobson* standard for strict scrutiny, the District Court fundamentally misapprehended the nature of the rights at issue. The goal of *Jacobson* is to weigh the interest of the public in accessing court proceedings and the interests of the individual seeking anonymity, with a particular focus on the risk of harm that litigating the case under their real name would pose to that individual. *See Jacobson*, 6 F.3d at 238. The focus of the strict scrutiny analysis in *Murphy-Brown*, in contrast, is on the individual whose speech is being restricted. 907 F.3d at 797. To be sure, in the *Jacobson* balancing test, one of the factors courts are supposed to consider is the prejudice that one party's anonymity would pose to the other party. *Jacobson*, 6 F.3d at 238. But the interest of that other party in having their opponent use their real names in court is distinct from, and dwarfed by, the individual's much broader and more fundamental interest in exercising their core First Amendment rights when they are outside the courtroom.

31

Further, strict scrutiny looks to whether the *government* has a compelling interest in restricting those First Amendment rights, not whether a private individual has such an interest. The *Jacobson* balancing test is therefore wholly insufficient to account for the fundamental rights and interests of the party whose speech is being restricted.

In sum, a pseudonym order and gag order are separate forms of relief and trial courts must assess them under different standards. *See, e.g.*, *Russe v. Harman*, No. 1:21-CV-00270-MR-WCM, 2021 WL 5043358, at *3 (W.D.N.C. Oct. 29, 2021) (assessing the plaintiffs' request for a pseudonym order under *Jacobson* and their request for a gag order under *Murphy-Brown*). The District Court's attempt to bootstrap a content-based speech restriction onto a separate form of relief assessed under a much less rigorous standard was a clear violation of *Murphy-Brown* and its decision must be reversed.

## III.    The District Court erred in its alternative footnote holding that the *ex parte* Protective Order's speech restrictions meet strict scrutiny.

The Court was clear that its primary ruling was that the strict scrutiny test in *Murphy-Brown* "is not the governing framework" for its order. *See* JA326-327. Nonetheless, the Court briefly concluded in a footnote that "[e]ven if strict scrutiny applicable to true 'gag orders' governed the validity of the Protective Order—and it does not—the Court would conclude that Plaintiffs have established that such standard is met." *Id.*

As explained below, this perfunctory footnote was utterly insufficient to constitute a proper analysis under the strict scrutiny standard. Under *Murphy-Brown*, the District Court must provide "reasoning specific enough to enable the reviewing court to determine whether the order survives rigorous scrutiny." 907 F.3d at 797 (internal quotation marks omitted). The District Court failed to explain how the requested relief furthered a compelling government interest or make factual findings that such interest was present in this case, and declined to assess whether it had narrowly tailored the requested relief to achieve any such interest, and, in direct violation of clear precedent, improperly placed the burden on the Masts to disprove that the standard had been met.

### A. The District Court failed to make any supported finding that the *ex parte* Protective Order's speech restrictions further a compelling government interest.

Under the strict scrutiny standard, the District Court was required to find that the restrictions on the Mast's speech furthered a "compelling governmental interest." *Reed*, 576 U.S. at 157. It did not.

The Court did not provide an analysis of whether the government has a compelling interest in the speech restrictions contained in the Protective Order. It did briefly state in a footnote that "there is a 'compelling' public interest in preserving Plaintiffs' safety and the safety of their families, who are innocent nonparties," JA326 (citing *Kolbe v. Hogan*, 849 F.3d 114, 139 (4th Cir. 2017) (en

33

banc), *rev'd on other grounds*, *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022)). But the Court's conclusory reference to *Kolbe*, which holds that "a [state's] interest in the protection of its citizenry and the public safety is . . . compelling," is not sufficient. 849 F.3d at 139. The kind of safety determined to be a compelling state interest in *Kolbe* was the safety of the public writ large from gun violence in the United States, whereas the "safety" issue asserted in this case is the individual safety of a small group of individuals with respect to potential threats from a foreign terrorist regime. Indeed, considering that the Does have been granted asylum in the United States and thus the risk of harm to them is greatly diminished, a fact the District Court acknowledged in its Opinion, JA316, the question now is whether the risk of harm to the Does' family members in Afghanistan constitutes a compelling government interest. The Court failed to address whether a potential threat to a small group of non-citizens living abroad from other non-citizens living abroad is a compelling state interest that justifies a sweeping restriction on the Masts' First Amendment rights, especially where, unlike the public safety concerns presented in *Kolbe*, this kind of safety is not rooted in the government's domestic police powers. *See generally United States v. Masciandaro*, 638 F.3d 458, 473 (4th Cir. 2011) (discussing the federal government's interest in public safety on federal lands), *abrogated on other grounds by N.Y. State Rifle & Pistol Ass'n*, 597 U.S. 1 (2022).

Further, under the strict scrutiny standard, the District Court was required to do much more than identify a theoretical notion of a compelling government interest such as "protection of [a state's] citizenry and the public safety." *Kolbe*, 849 F.3d at 139. The Court was required to make specific factual findings that such a compelling government interest exists *in this case* and that the restrictions on the Masts' speech furthers that interest. The Court declined to explain in its brief footnote which factual findings demonstrate a compelling government interest. Further, the Court's claim that a restriction on the Mast's speech is necessary to protect against these safety concerns is greatly undermined by the fact that the Does have voluntarily spoken to national media outlets[6] and that they have already been named publicly in other court proceedings.

This is not to say that the Masts discredit any concerns the Does may have about the Taliban, and of course they do not seek to undermine the Does' safety and security or that of their family members. Rather, the Masts assert that the mere notion of a safety concern does not justify *carte blanche* any and all restrictions on

---

[6] This type of underinclusive exclusion of the plaintiffs furthers the point as a matter of law that this is not a compelling interest. *See e.g.*, *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 172 (2015) ("In light of this underinclusiveness, the Town has not met its burden to prove that its Sign Code is narrowly tailored to further a compelling government interest. Because a law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited . . . the Sign Code fails strict scrutiny." (internal quotation marks and citations omitted).

the Mast's ability to exercise their constitutionally protected right to speak and defend themselves in this litigation. The Court must engage in the constitutionally required strict scrutiny analysis to determine what restrictions, if any, on the Masts' First Amendment rights are permissible.

### B. The District Court failed to consider less restrictive means available and instead erroneously put the burden of proof on the Masts to do so.

Even if the District Court were to find that the Does' stated safety concerns constitute a compelling government interest and that restricting the Masts' speech furthers that interest, "[s]trict scrutiny also demands that First Amendment restraints be narrowly tailored to serve their intended purpose." *Murphy-Brown*, 907 F.3d at 799 (internal citations omitted).

Far from narrowly tailored, the District Court imposed a sweeping restriction that prohibited the Masts from communicating with *any person* if those communications would "directly or indirectly" reveal the identity of the Does. *See* JA51. On its face, the speech prohibition contained no limitations or carve outs. Nor did the District Court consider any less restrictive measures that would permit the Masts to speak about the case and prepare their defense. For example, the District Court could have but did not consider whether to limit its speech restrictions to communications that have a reasonable likelihood of reaching the Taliban, such as communications with media outlets as opposed to communications with private individuals, or to provide a carve out for communications that are necessary for the

36

Masts to prepare their defense. *See, e.g.*, *Doe v. Borderland Beat*, No. 20-cv-6822 (N.D. Cal.) (October 5, 2020) (ordering that the Defendants were prohibited from "disclosing Plaintiff's identity to any third party unless such disclosure is necessary to defend against this action."). As discussed in the next section, the District Court's order was so broad as to include Joshua Masts' brother (who is not a party) sharing photos of the child with a non-profit group that was considering providing the Masts a legal defense grant, even though no pictures of the Does were shared nor any identifying information about them given. The District Court failed to explain how such a broad range of conduct is tailored to protect the Does safety.

Instead of assessing whether the *ex parte* protective order was narrowly tailored, the District Court erroneously shifted the burden on this issue to the Masts. As the Supreme Court has made plain, the proponent of the speech restriction bears the burden of proving that it survives strict scrutiny. *Reed*, 576 U.S. at 171–72 (holding that it was the municipality, as proponent of law imposing content-based restrictions on speech, that had burden to show law furthers a compelling governmental interest and is narrowly tailored to that end, and that law failed because municipality had "not met its burden to prove that its Sign Code is narrowly tailored to further a compelling government interest"). The District Court, however, did the exact opposite: it found that "*Defendants* have not identified any less restrictive means than those set forth in the Protective Order that would safeguard

37

such compelling safety interests. *See* Dkt. 130 at 12–13. *Thus*, Defendants'
arguments that the Protective Order fails to satisfy the strict scrutiny standard are
without merit." JA326–327 (emphases added). This alone is sufficient error to vacate
the District Court's August Order and at a minimum remand with instructions to
conduct a proper strict scrutiny analysis.

## IV.    The *ex parte* Protective Order's speech restrictions are unconstitutionally vague under the First and Fifth Amendments.

The Supreme Court and this Circuit have long held that restraints on speech
must be clearly delineated. *See Hirschkop v. Snead*, 594 F.2d 356, 371 (4th Cir.
1979). "Vague rules offend the due process clause because they deny a 'person of
ordinary intelligence a reasonable opportunity to know what is prohibited, so that he
may act accordingly.'" *Id.* at 370. When those rules "restrict expression" they also
"offend the First Amendment because they chill freedom of speech" and "[t]heir
uncertain meanings require those persons who are subject to the rule to 'steer far
wider of the unlawful zone[]' . . . than if the boundaries of the forbidden areas were
clearly marked." *Id.* at 371 (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964)).
That is why gag orders and other "restraints on speech must include 'some sensible
basis for distinguishing what may come in from what must stay out.'" *Murphy-
Brown*, 907 F.3d at 800 (quoting *Minn. Voters Alliance v. Mansky*, 581 U.S. 1, 3
(2018)).

The District Court's *ex parte* protective order is impermissibly vague under the First and Fifth Amendments because it fails to provide a reasonable basis for the Masts to discern what kind of speech will run afoul of the order. The *ex parte* Protective Order provides:

> The Defendants and their counsel and representatives are prohibited from disclosing any information that directly or indirectly identifies Plaintiffs or their family members to any person, including but not limited to the Plaintiffs' names and the locations of their residences abroad and places of birth, unless that person first executes a non-disclosure agreement enforceable through the contempt sanction. This applies to any disclosure in the course of any investigation undertaken by the Defendants, their counsel, or their other agents or Representatives.

JA51.

This sweeping prohibition raises the immediate question: what does it mean to directly or even *indirectly* identify someone? Aside from the obvious example of expressly sharing the Does real name and two other examples provided in the order of sharing the location of the Does' residence or place of birth,[7] the boundaries of this wide swath of potential information are unclear. It is unclear for example whether simply seeking to gather information from others about their adoptive daughter's biological parents would count as "indirectly identify[ing] Plaintiffs," as the familial relationship between Mr. and Mrs. Doe and the Masts' adoptive

---

[7] "Place of birth" is itself a vague term. Does "place of birth" mean the hospital, city, province, state, country or continent in which the person is born? The *ex parte* protective order does not specify.

daughter's parents is unclear (a fact which itself is just one example of why an investigation is critical to the Masts defense of their adoption case and this litigation). This is especially true given the fact that the Does have chosen to publicize their case and the Masts' identities in the media, making it impossible for the Masts to seek out information from others without their ties to this case being immediately apparent.

This Court need look no further for a perfect example of the vagueness of the term "indirectly identify[ing]" the Does than the District Court's civil contempt finding. *See* JA327–330. Prior to the District Court making that finding, it would be anyone's guess as to whether sharing a photo of an individual without providing their name, residence or place of birth would count as "indirectly" identifying them under the *ex parte* protective order. Only after the District Court decided to hold the Masts in contempt do we now know that it was apparently a violation of the *ex parte* protective order for Mr. Masts' brother to share pictures of the Masts' adoptive daughter with a non-profit foundation that was helping them raise money for their defense. On the other hand, the District Court also confirmed that it is *not* a violation of the order for Mr. Mast to share pictures with a media outlet if the pictures do not show his adoptive daughter's face. This delineation of what kinds of pictures can be shared, with whom, and in what context is nowhere explained in the court's highly vague and generalized order. Indeed, as this Court noted in *Murphy-Brown*, one of

the primary problems with vague restraints such as this one is that they "pose the risk of discriminatory or arbitrary enforcement," which the Masts argue occurred here. *Murphy-Brown*, 907 F.3d at 800 (citing *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1051 (1991)).

Another aspect of the order that is unconstitutionally vague is the prohibition on identifying the Does' family members. While the Masts are aware of the Does' identities, they cannot possibly be expected to know the identities of all individuals related to the Does, most if not all of whom presumably reside in Afghanistan or the Middle East or otherwise outside of the United States. While attempting to investigate and gather facts surrounding the circumstances of their adoptive daughter's early years living in a foreign country, the Masts are walking blind as to when they would step on the potential landmine of accidentally identifying one of the Does' many possible relations in that country. Nor does the order make clear how far out on the Mr. and Mrs. Does' family trees the prohibition goes. A gag order that "only vaguely specifie[s] who it cover[s]" and what it covers is unconstitutional. *Murphy-Brown*, 907 F.3d at 800–01 (noting that the gag order in that case did not define the term "potential witnesses" despite the fact that the "pool of potential witnesses was unimaginably large and anything but self-explanatory.").

Like the gag order in *Murphy-Brown*, this "gag order [is] unconstitutionally vague because it force[s]" the Masts to "guess at its contours[.]" 907 F.3d at 800.

As written, the Order makes it impossible for the Masts to know to which inquiries in support of their case they can make, which information they can reveal about their daughter, and even which pictures they can share of her without being subject to the District Court's contempt powers. The Order therefore must be vacated on the grounds that it violates the Masts' First and Fifth Amendment rights.

## CONCLUSION

The Masts' respectfully request that for the reasons outlined above, the Court reverse the judgment of the District Court and vacate the Protective Order and finding of Civil Contempt.

## ORAL ARGUMENT STATEMENT

Defendant-Appellants request oral argument.

Dated: November 12, 2024

Respectfully submitted,

*/s/ John S. Moran*
John S. Moran
MCGUIREWOODS LLP
Suite 500
888 16th Street, NW
Washington, D.C. 20006
T: 202-525-0356

*Counsel for Defendant-Appellants*
*Joshua Mast and Stephanie Mast*

David Eliezer Yerushalmi
AMERICAN FREEDOM LAW
CENTER
Suite 189
2020 Pennsylvania Avenue, NW
T: 646-262-0500

*Counsel for Defendant-Appellant*
*Richard Mast*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

- This brief contains 10,457 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because:

- This brief has been prepared in a proportionally spaced 14-point Times New Roman font using Microsoft Word.

*/s/ John S. Moran*
John S. Moran

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2024, the foregoing was filed with the

Clerk of the United States Court of Appeals for the Fourth Circuit using the

appellate CM/ECF system, which will also serve counsel of record.


*/s/ John S. Moran*
John S. Moran

45