No. 24-1900

## In the
# United States Court of Appeals
# For the Fourth Circuit

———————————

BABY DOE, JOHN DOE, & JANE DOE,

*Plaintiffs-Appellees,*

v.

JOSHUA MAST, STEPHANIE MAST, & RICHARD MAST,

*Defendants-Appellants.*

———————————

On Appeal from the United States District Court
for the Western District of Virginia
Honorable Norman K. Moon
Case No. 3:22-cv-00049

———————————

## JOINT APPENDIX – VOL. I (JA001-JA343)

———————————

| | |
|---|---|
| Maya M. Eckstein | John S. Moran |
| Kevin S. Elliker | MCGUIREWOODS LLP |
| Lewis F. Powell, III | Suite 500 |
| HUNTON ANDREWS KURTH, LLP | 888 16th Street, NW |
| Riverfront Plaza, East Tower | Washington, D.C. 20006 |
| 951 East Byrd Street | T: 202-525-0356 |
| Richmond, VA 23219-4074 | |
| T: 804-788-8788 | David Eliezer Yerushalmi |
| T: 804-788-8658 | AMERICAN FREEDOM LAW CENTER |
| T: 804-788-8488 | Suite 189 |
| | 2020 Pennsylvania Avenue,NW |
| | T: 646-262-0500 |
| | |
| *Counsel for Plaintiffs-Appellees* | *Counsel for Defendants-Appellants* |

November 12, 2024

# TABLE OF CONTENTS

**Page(s)**

**Volume I (pages JA001–JA343)**

District Court Docket Sheet (Case No. 3:22-cv-49) ...................................................1

Dkt. 3:
    Motion for Protective Order (Sept. 2, 2022) ...................................................47

Dkt. 26:
    Protective Order (Sept. 13, 2022) ...................................................50

Dkt. 68:
    Redacted Amended Complaint (Oct. 18, 2022) ...................................................53

Dkt. 167:
    Transcript of February 8, 2023 Hearing (Feb. 8, 2023) (Dkt. 167) ...........101

Dkt 168-1:
    Notice of Supplemental Authority: Exhibit 1 (Feb. 21, 2023)...................140

Dkt. 168-2:
    Notice of Supplemental Authority: Exhibit 2 (Feb. 21, 2023)...................143

Dkt. 188-1:
    Plaintiffs' Opposition to Richard Mast's Motion to Vacate Protective
    Order: Exhibit 1 (Mar. 17, 2023)...................................................146

Dkt. 188-2:
    Plaintiffs' Opposition to Richard Mast's Motion to Vacate Protective
    Order: Exhibit 2 (Mar. 17, 2023)...................................................149

Dkt. 270:
    Stipulation of Dismissal of Nominal Defendants (Aug. 1, 2023) .............152

Dkt. 436:
    Transcript of May 29, 2024 Hearing (May 29, 2024) ...............................157

Dkt. 467:
    Redacted Answer to Amended Complaint and Counterclaim
    against John Doe (Aug. 7, 2024)...................................................225

Dkt. 473:
    Memorandum Opinion and Order (Aug. 16, 2024)...................................305

i

Dkt. 491:

      Notice of Appeal (Sept. 16, 2024)................................................................343

APPEAL,HSD,CASREF,PROTO

# U.S. District Court
## Western District of Virginia (Charlottesville)
## CIVIL DOCKET FOR CASE #: 3:22−cv−00049−RSB−JCH

Doe et al v. Mast et al
Assigned to: District Judge Robert S. Ballou
Referred to: Magistrate Judge Joel C. Hoppe
Demand: $10,000,000
 Related Case:  3:20−cv−00009−NKM
 Case in other court:  USCA Fourth Circuit, 24−01900
Cause: 28:1332 Diversity−Personal Injury

Date Filed: 09/02/2022
Jury Demand: Both
Nature of Suit: 360 P.I.: Other
Jurisdiction: Diversity

**Plaintiff**

**Baby Doe**
*A citizen of Afghanistan currently
residing in North Carolina, by and
through Next Friends, John and Jane
Doe*

represented by **Lewis Franklin Powell , III**
Hunton & Williams LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
804−788−8488
Fax: 804−343−4560
Email: lpowell@hunton.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Maya Miriam Eckstein**
Hunton & Williams LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
804−788−8788
Fax: 804−343−4630
Email: meckstein@hunton.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sehla Ashai**
Elbially Law PLLC
704 East 15th Street, Ste 204
Plano, TX 75074
972−423−7330
Email: ashai@elbiallylaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Blair Connelly**
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
212−906−1200
Fax: 212−751−4864
Email: blair.connelly@lw.com
*ATTORNEY TO BE NOTICED*

**Damon R. Porter**
Latham & Watkins LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004−1304
202−637−2348
Fax: 202−637−2001
Email: damon.porter@lw.com
*TERMINATED: 08/07/2024*
*ATTORNEY TO BE NOTICED*

**Ehson Kashfipour**
Latham & Watkins LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004−1304
202−637−1002
Fax: 202−637−2201
Email: ehson.kashfipour@lw.com
*ATTORNEY TO BE NOTICED*

**Jeremy Carlton King**
Kirkland & Ellis, LLP
Intellectual Property
601 Lexington Avenue
New York, NY 10022
212−390−4012
Email: jeremy.king@kirkland.com
*TERMINATED: 04/30/2024*
*ATTORNEY TO BE NOTICED*

**Kevin Spencer Elliker**
Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 E. Byrd Street
Richmond, VA 23219
804−788−8200
Email: kelliker@huntonak.com
*ATTORNEY TO BE NOTICED*

**Michael Randolph Shebelskie**
Hunton Andrews Kurth LLP
Riverfront Plaza − East Tower
951 East Byrd Street
Richmond, VA 23219
804−788−8716
Fax: 804−788−8218
Email: mshebelskie@huntonak.com
*ATTORNEY TO BE NOTICED*

**Sherli M. Furst**
Hunton Andews Kurth LLP
200 Park Avenue
New York, NY 10166
212−309−1163
Fax: 212−309−1100
Email: sfurst@huntonak.com
*TERMINATED: 01/27/2023*
*ATTORNEY TO BE NOTICED*

**Zachary L. Rowen**
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
212−906−1200
Fax: 212−751−4864
Email: zachary.rowen@lw.com
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**John Doe**
*citizen of Afghanistan and legal*
*guardian of Baby Doe*

represented by  **Lewis Franklin Powell , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Maya Miriam Eckstein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sehla Ashai**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Blair Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Damon R. Porter**
(See above for address)
*TERMINATED: 08/07/2024*
*ATTORNEY TO BE NOTICED*

**Ehson Kashfipour**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeremy Carlton King**
(See above for address)
*TERMINATED: 04/30/2024*
*ATTORNEY TO BE NOTICED*

**Kevin Spencer Elliker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Randolph Shebelskie**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sherli M. Furst**
(See above for address)
*TERMINATED: 01/27/2023*
*ATTORNEY TO BE NOTICED*

**Zachary L. Rowen**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Jane Doe**
*citizen of Afghanistan and legal
guardian of Baby Doe*

represented by  **Lewis Franklin Powell , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Maya Miriam Eckstein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sehla Ashai**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Blair Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Damon R. Porter**
(See above for address)
*TERMINATED: 08/07/2024*
*ATTORNEY TO BE NOTICED*

**Ehson Kashfipour**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeremy Carlton King**
(See above for address)
*TERMINATED: 04/30/2024*
*ATTORNEY TO BE NOTICED*

**Kevin Spencer Elliker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Randolph Shebelskie**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sherli M. Furst**
(See above for address)
*TERMINATED: 01/27/2023*
*ATTORNEY TO BE NOTICED*

**Zachary L. Rowen**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Joshua Mast**                    represented by    **Francis J. Aul**
McGuireWoods LLP
888 16th Street N.W., Ste. 500
Black Lives Matter Plaza
Washington, DC 20006
202−857−1713
Email: faul@mcguirewoods.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Savage Moran**
McGuireWoods LLP
888 16th St. N.W., Suite 500
Washington, DC 20006
202−525−0356
Email: jmoran@mcguirewoods.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Lee Francisco**
First & Fourteenth PLLC
800 Connecticut Ave NW, Suite 300
Washington, DC 20006
202−998−1978
Email: michael@first−fourteenth.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JA004**

**<u>Defendant</u>**

**Stephanie Mast**                                    represented by    **Francis J. Aul**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Savage Moran**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Lee Francisco**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**Richard Mast**                                      represented by    **David Eliezer Yerushalmi**
American Freedom Law Center
2020 Pennsylvania Avenue NW, Suite 189
Washington, DC 20006
646−262−0500
Email: dyerushalmi@americanfreedomlawcenter.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard L. Mast , Jr.**
1540 Insurance Lane
Charlottesville, VA 22911
540−404−1781
Fax: 540−301−0021
Email: rlmast@protonmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Edward Scott Lloyd**
Lloyd Law Group, PLLC
15 Chester Street
Front Royal, VA 22630
540−823−1110
Email: scott@lloydlg.com
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**Kimberley Motley**                                  represented by    **Michael Roger Hoernlein**
Alston & Bird LLP
Vantage South End
1120 South Tryon Street, Suite 300
Charlotte, NC 28203−6818
704−444−1041
Fax: 704−444−1111
Email: michael.hoernlein@alston.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sidney Webb**
Alston & Bird
2200 Ross Ave, Ste 2300
Dallas, TX 75201
214−922−3470

Email: sidney.webb@alston.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Thomas William Davison**
Alston and Bird LLP
950 F Street NW
Washington, DC 20004
202−239−3933
Fax: 202−654−4913
Email: tom.davison@alston.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Samantha Lynn Van Winter**
Alston & Bird
Environmental & Land Use
950 F St NW
Washington DC, DC 20004
401−569−7707
Email: samantha.vanwinter@alston.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Ahmad Osmani**
*TERMINATED: 07/30/2024*

represented by **Brennan Tyler Brooks**
Law Office of B. Tyler Brooks, PLLC
PO Box 10767
Greensboro, NC 27204
336−707−8855
Fax: 336−900−6535
Email: btb@btylerbrookslawyer.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard Dean Boyer**
Boyer Law Firm, PLLC
P.O. Box 10953
Lynchburg, VA 24506
434−401−2093
Fax: 434−239−3651
Email: rickboyerlaw@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**United States Secretary of State**
**Anthony Blinken**
*Nominal Defendant*
*TERMINATED: 08/01/2023*

represented by **Kathryn L. Wyer**
United States Department of Justice − Civil
Division
1100 L Street, NW, Room 12014
Washington, DC 20005
202−616−8475
Fax: 202−616−8470
Email: kathryn.wyer@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**United States Secretary of Defense**
**General Lloyd Austin**
*Nominal Defendant*
*TERMINATED: 08/01/2023*

represented by **Kathryn L. Wyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Interested Party Related Case**

| | | |
|---|---|---|
| **Pipe Hitter Foundation, Inc.** | represented by | **Caitlin Parry Contestable**<br>Chalmers, Adams, Backer & Kaufman LLC<br>441 N. Lee Street, Ste. 300<br>Alexandria, VA 22314<br>678−940−1050<br>Email: ccontestable@chalmersadams.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Dan Backer**<br>Chalmers, Adams, Backer & Kaufman LLC<br>441 N Lee Street, Suite 300<br>Alexandria, VA 22314<br>202−210−5431<br>Fax: 202−478−0750<br>Email: dbacker@chalmersadams.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Counter Claimant**

| | | |
|---|---|---|
| **Stephanie Mast** | represented by | **Francis J. Aul**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **John Savage Moran**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Michael Lee Francisco**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Counter Claimant**

| | | |
|---|---|---|
| **Joshua Mast** | represented by | **Francis J. Aul**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **John Savage Moran**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Michael Lee Francisco**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

V.

**Counter Defendant**

| | | |
|---|---|---|
| **Jane Doe**<br>*citizen of Afghanistan and legal*<br>*guardian of Baby Doe* | represented by | **Lewis Franklin Powell , III**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Maya Miriam Eckstein** |

**JA007**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sehla Ashai**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Blair Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Damon R. Porter**
(See above for address)
*TERMINATED: 08/07/2024*
*ATTORNEY TO BE NOTICED*

**Ehson Kashfipour**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeremy Carlton King**
(See above for address)
*TERMINATED: 04/30/2024*
*ATTORNEY TO BE NOTICED*

**Kevin Spencer Elliker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Randolph Shebelskie**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sherli M. Furst**
(See above for address)
*TERMINATED: 01/27/2023*
*ATTORNEY TO BE NOTICED*

**Zachary L. Rowen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Counter Defendant</u>**

**John Doe**
*citizen of Afghanistan and legal guardian of Baby Doe*

represented by **Lewis Franklin Powell , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Maya Miriam Eckstein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sehla Ashai**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Blair Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JA008**

**Damon R. Porter**
(See above for address)
*TERMINATED: 08/07/2024*
*ATTORNEY TO BE NOTICED*

**Ehson Kashfipour**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeremy Carlton King**
(See above for address)
*TERMINATED: 04/30/2024*
*ATTORNEY TO BE NOTICED*

**Kevin Spencer Elliker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Randolph Shebelskie**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sherli M. Furst**
(See above for address)
*TERMINATED: 01/27/2023*
*ATTORNEY TO BE NOTICED*

**Zachary L. Rowen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Richard Mast**      represented by      **David Eliezer Yerushalmi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard L. Mast , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Edward Scott Lloyd**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Jane Doe**      represented by      **Lewis Franklin Powell , III**
*citizen of Afghanistan and legal*
*guardian of Baby Doe*
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Maya Miriam Eckstein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sehla Ashai**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JA009**

**Blair Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Damon R. Porter**
(See above for address)
*TERMINATED: 08/07/2024*
*ATTORNEY TO BE NOTICED*

**Ehson Kashfipour**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeremy Carlton King**
(See above for address)
*TERMINATED: 04/30/2024*
*ATTORNEY TO BE NOTICED*

**Kevin Spencer Elliker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Randolph Shebelskie**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sherli M. Furst**
(See above for address)
*TERMINATED: 01/27/2023*
*ATTORNEY TO BE NOTICED*

**Zachary L. Rowen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Defendant**

**John Doe**
*citizen of Afghanistan and legal*
*guardian of Baby Doe*

represented by **Lewis Franklin Powell , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Maya Miriam Eckstein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sehla Ashai**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Blair Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Damon R. Porter**
(See above for address)
*TERMINATED: 08/07/2024*
*ATTORNEY TO BE NOTICED*

**Ehson Kashfipour**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeremy Carlton King**
(See above for address)
*TERMINATED: 04/30/2024*
*ATTORNEY TO BE NOTICED*

**Kevin Spencer Elliker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Randolph Shebelskie**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sherli M. Furst**
(See above for address)
*TERMINATED: 01/27/2023*
*ATTORNEY TO BE NOTICED*

**Zachary L. Rowen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Kimberley Motley**                represented by **Michael Roger Hoernlein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sidney Webb**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas William Davison**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Samantha Lynn Van Winter**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Jane Doe**                represented by **Lewis Franklin Powell , III**
*citizen of Afghanistan and legal*                (See above for address)
*guardian of Baby Doe*                *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Maya Miriam Eckstein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sehla Ashai**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Blair Connelly**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Damon R. Porter**
(See above for address)
*TERMINATED: 08/07/2024*
*ATTORNEY TO BE NOTICED*

**Ehson Kashfipour**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeremy Carlton King**
(See above for address)
*TERMINATED: 04/30/2024*
*ATTORNEY TO BE NOTICED*

**Kevin Spencer Elliker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Randolph Shebelskie**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sherli M. Furst**
(See above for address)
*TERMINATED: 01/27/2023*
*ATTORNEY TO BE NOTICED*

**Zachary L. Rowen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Counter Defendant</u>**

**John Doe**
*citizen of Afghanistan and legal guardian of Baby Doe*

represented by **Lewis Franklin Powell , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Maya Miriam Eckstein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sehla Ashai**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Blair Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Damon R. Porter**
(See above for address)
*TERMINATED: 08/07/2024*
*ATTORNEY TO BE NOTICED*

**Ehson Kashfipour**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeremy Carlton King**
(See above for address)

*TERMINATED: 04/30/2024*
*ATTORNEY TO BE NOTICED*

**Kevin Spencer Elliker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Randolph Shebelskie**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sherli M. Furst**
(See above for address)
*TERMINATED: 01/27/2023*
*ATTORNEY TO BE NOTICED*

**Zachary L. Rowen**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/02/2022 | 1 | COMPLAINT against Joshua Mast, Richard Mast, Stephanie Mast, Kimberley Motley, Ahmad Osmani (Filing & Administrative fee $ 402 receipt number 30003849.), filed by Jane Doe, Baby Doe, John Doe. (Attachments: # 1 Civil Cover Sheet)(dg) |
| 09/02/2022 | 2 | Summons Issued as to Joshua Mast, Richard Mast, Stephanie Mast, Kimberley Motley, Ahmad Osmani. (Attachments: # 1 Summons Issued, # 2 Summons Issued, # 3 Summons Issued, # 4 Summons Issued)(dg) |
| 09/02/2022 | 3 | MOTION for Leave to File *and Proceed under Pseudonyms and for Entry of a Protective Order* by Baby Doe, Jane Doe, John Doe. (Eckstein, Maya) |
| 09/02/2022 | 4 | Brief / Memorandum in Support re 3 MOTION for Leave to File *and Proceed under Pseudonyms and for Entry of a Protective Order* . filed by Baby Doe, Jane Doe, John Doe. (Attachments: # 1 Exhibit EX A−FILED UNDER SEAL, # 2 Exhibit EX B−FILED UNDER SEAL, # 3 Text of Proposed Order Protective Order, # 4 Exhibit EX D−FILED UNDER SEAL)(Eckstein, Maya) |
| 09/02/2022 | 5 | NOTICE by Baby Doe, Jane Doe, John Doe re 4 *Notice of Filing Exhibits A,B,D under seal* (Eckstein, Maya) |
| 09/02/2022 | 6 | MOTION to Seal *Exhibits A,B,D*, MOTION to Seal Document 5 Notice (Other) by Baby Doe, Jane Doe, John Doe. (Attachments: # 1 Text of Proposed Order Proposed Order to Seal)(Eckstein, Maya) |
| 09/02/2022 | 7 | Brief / Memorandum in Support re 6 MOTION to Seal *Exhibits A,B,D* MOTION to Seal Document 5 Notice (Other) . filed by Baby Doe, Jane Doe, John Doe. (Eckstein, Maya) |
| 09/06/2022 | 8 | Proposed Summons for Lloyd Austin by Baby Doe, Jane Doe, John Doe (Eckstein, Maya) |
| 09/06/2022 | 9 | Proposed Summons for Antony Blinken by Baby Doe, Jane Doe, John Doe (Eckstein, Maya) |
| 09/06/2022 | 10 | MOTION for *Jeremy King* to Appear Pro Hac Vice. Filing fee $ 100, receipt number AVAWDC−4024963. by Baby Doe, Jane Doe, John Doe. (Attachments: # 1 Affidavit Declaration of King, # 2 Text of Proposed Order Proposed Order)(Eckstein, Maya) |
| 09/06/2022 | 11 | MOTION for *Sherli Furst* to Appear Pro Hac Vice. Filing fee $ 100, receipt number AVAWDC−4024976. by Baby Doe, Jane Doe, John Doe. (Attachments: # 1 Affidavit Declaration of Furst, # 2 Text of Proposed Order Proposed Order)(Eckstein, Maya) |
| 09/06/2022 | 12 | MOTION for *Sehla Ashai* to Appear Pro Hac Vice. Filing fee $ 100, receipt number AVAWDC−4025197. by Baby Doe, Jane Doe, John Doe. (Attachments: # 1 Affidavit Declaration of Ashai, # 2 Text of Proposed Order Proposed Order)(Eckstein, Maya) |

| 09/07/2022 | 13 | Electronic Summons Issued as to United States Secretary of Defense General Lloyd Austin, United States Secretary of State Anthony Blinken NOTICE TO COUNSEL: Please print copies of the electronically issued summons for each defendant as necessary to effectuate service under Fed. R. Civ. P. 4. (Attachments: # 1 Summons Issued)(dg) |
| --- | --- | --- |
| 09/08/2022 | 14 | ORDER granting 6 Motion to Seal. Signed by Senior Judge Norman K. Moon on 09/08/2022. (dg) |
| 09/08/2022 | 15 | Sealed Document − Exhibits A, B, D to Plaintiffs' Brief in Support of Motion for Leave to Proceed Under Pseudonyms and for Entry of Protective Order. (Attachments: # 1 Exhibit B, # 2 Exhibit D)(dg) |
| 09/12/2022 | 16 | RETURN of service of Lloyd Austin on 09/08/2022 upon Angie Taylor(Eckstein, Maya) |
| 09/12/2022 | 17 | RETURN of service of Antony Blinken on 09/08/2022 upon Angie Taylor(Eckstein, Maya) |
| 09/12/2022 | 18 | RETURN of service of Richard Mast on 09/06/2022 upon Richard Mast(Eckstein, Maya) |
| 09/12/2022 | 19 | RETURN of service of Ahmad Osmani on 09/06/2022 upon Ahmad Osmani(Eckstein, Maya) |
| 09/12/2022 | 20 | ORAL ORDER: Upon consideration of the motion of Jeremy King to appear pro hac vice, and finding the requirements for pro hac vice admission have been satisfied and for good cause shown, the Court grants the motion. Dkt. 10. Jeremy King may appear and practice pro hac vice in this matter as counsel for Plaintiffs. See W.D. Va. Gen. R. 6(d). Entered by Senior Judge Norman K. Moon on 09/12/2022. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(dg) |
| 09/12/2022 | 21 | ORAL ORDER: Upon consideration of the motion of Sherli Furst to appear pro hac vice, and finding the requirements for pro hac vice admission have been satisfied and for good cause shown, the Court grants the motion. Dkt. 11. Sherli Furst may appear and practice pro hac vice in this matter as counsel for Plaintiffs. See W.D. Va. Gen. R. 6(d). Entered by Senior Judge Norman K. Moon on 09/12/2022. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(dg) |
| 09/12/2022 | 22 | ORAL ORDER: Upon consideration of the motion of Sehla Ashai to appear pro hac vice, and finding the requirements for pro hac vice admission have been satisfied and for good cause shown, the Court grants the motion. Dkt. 12. Sehla Ashai may appear and practice pro hac vice in this matter as counsel for Plaintiffs. See W.D. Va. Gen. R. 6(d). Entered by Senior Judge Norman K. Moon on 09/12/2022. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(dg) |
| 09/12/2022 | 23 | First NOTICE of Appearance by Sehla Ashai on behalf of All Plaintiffs (Ashai, Sehla) |
| 09/13/2022 | 24 | RETURN of service of Joshua Mast on 09/02/2022 upon Joshua Mast(Eckstein, Maya) |
| 09/13/2022 | 25 | RETURN of service of Stephanie Mast on 09/02/2022 upon Stephanie Mast(Eckstein, Maya) |
| 09/13/2022 | 26 | PROTECTIVE ORDER. Plaintiffs' motion for leave to proceed under a pseudonym and for entry of the protective order will be and hereby is GRANTED. Dkt. 3. Signed by Senior Judge Norman K. Moon on 09/13/2022. (dg) |
| 09/13/2022 | 27 | RETURN of service of Kimberley Motley on 09/07/2022 upon Kimberley Motley(Eckstein, Maya) |
| 09/14/2022 | 28 | NOTICE of Appearance by Jeremy Carlton King on behalf of Baby Doe, Jane Doe, John Doe (King, Jeremy) |
| 09/15/2022 | 29 | NOTICE of Appearance by Sherli M. Furst on behalf of Baby Doe, Jane Doe, John Doe (Furst, Sherli) |
| 09/20/2022 | 30 | NOTICE of Appearance by John Savage Moran on behalf of Joshua Mast, Stephanie Mast (Moran, John) |

| 09/22/2022 | 31 | MOTION for Extension of Time to File Answer by Joshua Mast, Stephanie Mast. (Moran, John) |
|---|---|---|
| 09/23/2022 | 32 | RESPONSE in Opposition re 31 MOTION for Extension of Time to File Answer . filed by Baby Doe, Jane Doe, John Doe. (Eckstein, Maya) |
| 09/23/2022 | 33 | REPLY to Response to Motion re 31 MOTION for Extension of Time to File Answer . filed by Joshua Mast, Stephanie Mast. (Moran, John) |
| 09/23/2022 | 34 | ORAL ORDER: This Court has considered Defendants Joshua and Stephanie Masts' motion for extension of time to answer or otherwise respond to Plaintiffs' complaint, Dkt. 31, as well as Plaintiffs' opposition thereto and Defendants' reply in further support of their motion, Dkts. 32, 33. Upon review of Defendants' arguments concerning the recency of counsel's participation in the matter and their competing pre−existing obligations in other specified litigation, Dkt. 31 paras. 3, 4, the Court finds good cause has been shown for an extension to answer or otherwise respond to Plaintiffs' complaint. Accordingly, for that reason, the Court will grant in part Defendants' motion for extension. Dkt. 31. Defendants Joshua and Stephanie Masts' response deadline will be and hereby is extended until Friday, October 14, 2022. Entered by Senior Judge Norman K. Moon on 09/23/2022. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(dg) |
| 09/26/2022 | 35 | NOTICE of Appearance by Richard L. Mast, Jr on behalf of Richard Mast (Mast, Richard) |
| 09/26/2022 | 36 | MOTION for Extension of Time to File Answer by Richard Mast. (Mast, Richard) |
| 09/27/2022 | 37 | NOTICE of Appearance by Richard Dean Boyer on behalf of Ahmad Osmani (Boyer, Richard) |
| 09/27/2022 | 38 | MOTION for Extension of Time to File Answer by Ahmad Osmani. (Boyer, Richard) |
| 09/27/2022 | 39 | MOTION to Seal *Docket Numbers 10, 11, and 12* by Baby Doe, Jane Doe, John Doe. (Attachments: # 1 Text of Proposed Order)(Eckstein, Maya) |
| 09/27/2022 | 40 | NOTICE of Appearance by Thomas William Davison on behalf of Kimberley Motley (Davison, Thomas) |
| 09/27/2022 | 41 | Consent MOTION for Extension of Time to File Answer re 1 Complaint *Or Other Responsive Pleading* by Kimberley Motley. (Davison, Thomas) |
| 09/28/2022 | 42 | ORAL ORDER: Upon consideration of Defendant Kimberly Motley's motion for extension of time to file a response, finding the motion unopposed, noting the similar extensions afforded other defendants and finding good cause shown, the Court hereby GRANTS Defendant Kimberly Motley's motion for extension. Dkt. 41. Defendant Kimberly Motley shall answer or otherwise respond to Plaintiffs' complaint by October 17, 2022. Entered by Senior Judge Norman K. Moon on 09/28/2022. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(dg) |
| 09/28/2022 | 43 | ORAL ORDER: Upon consideration of Defendant Ahmad Osmani's motion for extension of time to file a response, finding the motion unopposed, noting the comparable extension afforded Defendants Joshua and Stephanie Mast, and finding good cause shown, the Court hereby GRANTS Defendant Ahmad Osmani's motion for extension. Dkt. 38. Defendant Ahmad Osmani shall answer or otherwise respond to Plaintiffs' complaint by October 14, 2022. Entered by Senior Judge Norman K. Moon on 09/28/2022. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(dg) |
| 09/28/2022 | 44 | ORAL ORDER: Upon consideration of Defendant Richard L. Mast's motion for extension of time to file a response, finding the motion unopposed, noting the comparable extension afforded Defendants Joshua and Stephanie Mast, and finding good cause shown, the Court hereby GRANTS Defendant Richard L. Mast's motion for extension. Dkt. 36. Defendant Richard L. Mast shall answer or otherwise respond to Plaintiffs' complaint by October 14, 2022. Entered by Senior Judge Norman K. Moon on 09/28/2022. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(dg) |

| | | |
|---|---|---|
| 10/05/2022 | 45 | MOTION for *B. Tyler Brooks* to Appear Pro Hac Vice. Filing fee $ 100, receipt number AVAWDC−4046726. by Ahmad Osmani. (Boyer, Richard) |
| 10/07/2022 | 46 | MOTION for *Michael R. Hoernlein* to Appear Pro Hac Vice. Filing fee $ 100, receipt number AVAWDC−4048296. by Kimberley Motley. (Attachments: # 1 Text of Proposed Order)(Davison, Thomas) |
| 10/14/2022 | 47 | ORAL ORDER: Upon consideration of the motion of Michael R. Hoernlein to appear pro hac vice, and finding the requirements for pro hac vice admission have been satisfied and for good cause shown, the Court grants the motion. Dkt. 46. Michael Hoernlein may appear and practice pro hac vice in this matter as counsel for Defendant Kimberly Motley. See W.D. Va. Gen. R. 6(d). Entered by Senior Judge Norman K. Moon on 10/14/2022. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(dg) |
| 10/14/2022 | 48 | ORAL ORDER: Upon consideration of the motion of B. Tyler Brooks to appear pro hac vice, and finding the requirements for pro hac vice admission have been satisfied and for good cause shown, the Court grants the motion. Dkt. 45. B. Tyler Brooks may appear and practice pro hac vice in this matter as counsel for Defendant Ahmad Osmani. See W.D. Va. Gen. R. 6(d). Entered by Senior Judge Norman K. Moon on 10/14/2022. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(dg) |
| 10/14/2022 | 49 | MOTION to Dismiss for Lack of Jurisdiction *and for Failure to State a Claim* by Joshua Mast, Stephanie Mast. (Moran, John) |
| 10/14/2022 | 50 | NOTICE of Appearance *as pro hac vice counsel for Defendant Ahmad Osmani* by Brennan Tyler Brooks on behalf of Ahmad Osmani (Brooks, Brennan) |
| 10/14/2022 | 51 | Brief / Memorandum in Support re 49 MOTION to Dismiss for Lack of Jurisdiction *and for Failure to State a Claim (Redacted)*. filed by Joshua Mast, Stephanie Mast. (Moran, John) |
| 10/14/2022 | 52 | MOTION to Seal *Memorandum and Supporting Exhibits* by Joshua Mast, Stephanie Mast. (Attachments: # 1 Text of Proposed Order)(Moran, John) |
| 10/14/2022 | 53 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , MOTION to Dismiss for Lack of Jurisdiction by Richard Mast. (Mast, Richard) |
| 10/14/2022 | 54 | MOTION to Seal by Richard Mast. (Attachments: # 1 Text of Proposed Order)(Mast, Richard) |
| 10/14/2022 | 55 | MOTION to Dismiss for Lack of Jurisdiction *(Personal and Subject Matter)*, MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *or for Abstention* by Ahmad Osmani. (Brooks, Brennan) |
| 10/14/2022 | 56 | Brief / Memorandum in Support re 55 MOTION to Dismiss for Lack of Jurisdiction *(Personal and Subject Matter)* MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *or for Abstention* . filed by Ahmad Osmani. (Attachments: # 1 Exhibit A − Declaration of Mr. Osmani)(Brooks, Brennan) |
| 10/17/2022 | 57 | NOTICE of Appearance by Michael Roger Hoernlein on behalf of Kimberley Motley (Hoernlein, Michael) |
| 10/17/2022 | 58 | MOTION to Dismiss for Lack of Jurisdiction *and Failure to State a Claim* by Kimberley Motley. (Attachments: # 1 Exhibit A − WFA Entity Info, # 2 Text of Proposed Order)(Davison, Thomas) |
| 10/17/2022 | 59 | Brief / Memorandum in Support re 58 MOTION to Dismiss for Lack of Jurisdiction *and Failure to State a Claim* . filed by Kimberley Motley. (Davison, Thomas) |
| 10/24/2022 | 60 | ORDER granting 52 Motion to Seal. Signed by Senior Judge Norman K. Moon on 10/24/2022. (dg) |
| 10/24/2022 | 61 | Sealed Document − Defendants Joshua and Stephanie Mast's Unredacted Memorandum in Support of their Motion to Dismiss. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7)(dg) |

| 10/24/2022 | 62 | ORDER granting 39 Motion to Seal. Signed by Senior Judge Norman K. Moon on 10/24/2022. (dg) |
|---|---|---|
| 10/24/2022 | 63 | ORDER granting 54 Motion to Seal. Signed by Senior Judge Norman K. Moon on 10/24/2022. (dg) |
| 10/24/2022 | 64 | Sealed Document − Defendant Richard Mast's Unredacted Memorandum in Support of his Motion to Dismiss. (dg) |
| 10/26/2022 | 65 | PRETRIAL ORDER (CASE REFERRED to Magistrate Judge Joel C. Hoppe as set forth herein). Signed by Senior Judge Norman K. Moon on October 26, 2022. (ca) |
| 10/27/2022 | 66 | NOTICE of Appearance by Samantha Lynn Van Winter on behalf of Kimberley Motley (Van Winter, Samantha) |
| 10/28/2022 | 67 | MOTION for *Sidney Webb* to Appear Pro Hac Vice. Filing fee $ 100, receipt number AVAWDC−4062311. by Kimberley Motley. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order)(Davison, Thomas) |
| 10/28/2022 | 68 | AMENDED COMPLAINT *REDACTED PUBLIC VERSION* against All Defendants, filed by Jane Doe, Baby Doe, John Doe. (Attachments: # 1 Exhibit 1 − FILED UNDER SEAL)(Eckstein, Maya) |
| 10/28/2022 | 69 | MOTION to Seal *Amended Complaint and Exhibit* by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order)(Eckstein, Maya) |
| 10/28/2022 | 70 | NOTICE by Baby Doe, Jane Doe, John Doe re 69 (Eckstein, Maya) |
| 11/01/2022 | 71 | ORAL ORDER taking under advisement 69 Motion to Seal. Plaintiffs' motion seeks to file under seal a proposed amended complaint and exhibit 1. Plaintiffs forwarded those documents to the Clerk's Office for sealing. Additionally, Plaintiffs forwarded two other documents for sealing—a memorandum in support of the motion to seal and an Exhibit B to the proposed amended complaint, but neither document is mentioned in the motion to seal or proposed order. Accordingly, the Court takes the motion to seal under advisement and directs the Plaintiffs to clarify what documents they seek to file under seal.. Entered by Magistrate Judge Joel C. Hoppe on 11/1/22. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(JCH) Modified on 11/1/2022 to correct docket text (dg). |
| 11/02/2022 | 72 | ORAL ORDER granting 67 MOTION for Sidney Webb to Appear Pro Hac Vice in this case. Entered by Magistrate Judge Joel C. Hoppe on 11/2/22. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(JCH) |
| 11/02/2022 | 73 | Brief / Memorandum in Support re 69 MOTION to Seal *Amended Complaint and Exhibit* . filed by Baby Doe, Jane Doe, John Doe. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Eckstein, Maya) |
| 11/02/2022 | 74 | MOTION to Seal *Motion, and Memorandum of Law In Support Of Motion, to Seal Exhibit B to Memorandum of Law In Support Of Plaintiffs' Motion to Seal Amended Complaint and Exhibit* by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order)(Eckstein, Maya) |
| 11/03/2022 | 75 | ORDER granting 69 Motion to Seal. Signed by Magistrate Judge Joel C. Hoppe on 11/03/2022. (dg) |
| 11/03/2022 | 76 | ORDER granting 74 Motion to Seal Exhibit B to the Memorandum of Law in Support of Plaintiffs' Motion to Seal. Signed by Magistrate Judge Joel C. Hoppe on 11/03/2022. (dg) |
| 11/03/2022 | 77 | Sealed Document − Amended Complaint (Attachments: # 1 Exhibit 1)(dg) |
| 11/03/2022 | 78 | Sealed Document − Exhibit B to 73 Plaintiffs' Memorandum in Support of their Motion to Seal (dg) |
| 11/04/2022 | 79 | Joint MOTION to Amend/Correct 65 Pretrial Order, Case Referred to Magistrate Judge by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order Proposed Order)(Eckstein, Maya) |

| 11/04/2022 | 80 | ORDER denying as moot 49 , 53 , 55 , 58 Defendants' Motions to Dismiss Plaintiffs' Complaint. Signed by Senior Judge Norman K. Moon on 11/04/2022. (dg) |
|---|---|---|
| 11/07/2022 | 81 | Amended PRETRIAL ORDER. Signed by Magistrate Judge Joel C. Hoppe on 11/07/2022. (dg) |
| 11/09/2022 | 82 | NOTICE of Appearance by Kathryn L. Wyer on behalf of United States Secretary of Defense General Lloyd Austin, United States Secretary of State Anthony Blinken (Wyer, Kathryn) |
| 11/09/2022 | 83 | MOTION for Extension of Time to File Answer re 68 Amended Complaint *or Otherwise Respond* by United States Secretary of Defense General Lloyd Austin, United States Secretary of State Anthony Blinken. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order)(Wyer, Kathryn) |
| 11/10/2022 | 84 | ORAL ORDER granting 83 Motion for Extension of Time to Answer re 83 MOTION for Extension of Time to File Answer re 68 Amended Complaint *or Otherwise Respond* United States Secretary of Defense General Lloyd Austin answer due 11/23/2022; United States Secretary of State Anthony Blinken answer due 11/23/2022.The Federal Defendants shall respond to the amended complaint no later than November 23, 2022. Entered by Magistrate Judge Joel C. Hoppe on 11/10/22. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(JCH) |
| 11/14/2022 | 85 | MOTION to Dismiss for Lack of Jurisdiction *and for Failure to State a Claim* by Joshua Mast, Stephanie Mast. (Moran, John) |
| 11/14/2022 | 86 | Brief / Memorandum in Support re 85 MOTION to Dismiss for Lack of Jurisdiction *and for Failure to State a Claim (Redacted)*. filed by Joshua Mast, Stephanie Mast. (Moran, John) |
| 11/14/2022 | 87 | MOTION to Seal *Memorandum and Supporting Exhibits* by Joshua Mast, Stephanie Mast. Motions referred to Judge Joel C. Hoppe. (Moran, John) |
| 11/14/2022 | 88 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , MOTION to Dismiss for Lack of Jurisdiction by Richard Mast. (Mast, Richard) |
| 11/14/2022 | 89 | MOTION to Seal *Memorandum In Support of Motion to Dismiss* by Richard Mast. Motions referred to Judge Joel C. Hoppe. (Mast, Richard) |
| 11/14/2022 | 90 | MOTION to Dismiss for Lack of Jurisdiction *and Failure to State a Claim* by Kimberley Motley. (Attachments: # 1 Exhibit A − WFA Entity Info, # 2 Text of Proposed Order)(Davison, Thomas) |
| 11/14/2022 | 91 | Brief / Memorandum in Support re 90 MOTION to Dismiss for Lack of Jurisdiction *and Failure to State a Claim* . filed by Kimberley Motley. (Davison, Thomas) |
| 11/14/2022 | 92 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , MOTION to Dismiss for Lack of Jurisdiction by Ahmad Osmani. (Attachments: # 1 Exhibit A − Declaration of Mr. Osmani)(Brooks, Brennan) |
| 11/14/2022 | 93 | Brief / Memorandum in Support re 92 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction . filed by Ahmad Osmani. (Brooks, Brennan) |
| 11/15/2022 | 94 | MOTION for *Ehson Kashfipour* to Appear Pro Hac Vice. Filing fee $ 100, receipt number AVAWDC−4073301. by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Affidavit Declaration, # 2 Text of Proposed Order Proposed Order)(Eckstein, Maya) |
| 11/15/2022 | 95 | MOTION for *Damon Porter* to Appear Pro Hac Vice. Filing fee $ 100, receipt number AVAWDC−4073310. by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Affidavit Declaration, # 2 Text of Proposed Order Proposed Order)(Eckstein, Maya) |
| 11/15/2022 | 96 | MOTION for *Zachary Rowen* to Appear Pro Hac Vice. Filing fee $ 100, receipt number AVAWDC−4073313. by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Affidavit Declaration, # 2 Text of Proposed Order Proposed Order)(Eckstein, Maya) |

| 11/15/2022 | 97 | MOTION for *Blair Connelly* to Appear Pro Hac Vice. Filing fee $ 100, receipt number AVAWDC−4073318. by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Affidavit Declaration, # 2 Text of Proposed Order Proposed Order)(Eckstein, Maya) |
| 11/16/2022 | 98 | ORAL ORDER granting 89 Motion to Seal. Defendant Richard Mast's unredacted memorandum in support of motion to dismiss shall be filed under seal. Entered by Magistrate Judge Joel C. Hoppe on 11/16/22. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(JCH) |
| 11/16/2022 | 99 | Sealed Document − Defendant Richard Mast's Unredacted Memorandum in Support of 88 Motion to Dismiss. (dg) |
| 11/16/2022 | 100 | ORDER granting 87 Motion to Seal. Signed by Magistrate Judge Joel C. Hoppe on 11/16/2022. (dg) |
| 11/16/2022 | 101 | Sealed Document − Defendants Joshua and Stephanie Mast's Unredacted Memorandum in Support of 85 Motion to Dismiss (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6)(dg) |
| 11/18/2022 | 102 | ORAL ORDER granting 97 MOTION for Blair G. Connelly to Appear Pro Hac Vice in this case. Entered by Magistrate Judge Joel C. Hoppe on 11/18/22. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(JCH) |
| 11/18/2022 | 103 | ORAL ORDER granting 96 MOTION for Zachary L. Rowen to Appear Pro Hac Vice in this case. Entered by Magistrate Judge Joel C. Hoppe on 11/18/22. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(JCH) |
| 11/18/2022 | 104 | ORAL ORDER granting 95 MOTION for Damon Ripley Porter to Appear Pro Hac Vice in this case. Entered by Magistrate Judge Joel C. Hoppe on 11/18/22. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(JCH) |
| 11/18/2022 | 105 | ORAL ORDER granting 94 MOTION for Ehson Kashfipour to Appear Pro Hac Vice in this case. Entered by Magistrate Judge Joel C. Hoppe on 11/18/22. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(JCH) |
| 11/21/2022 | 106 | NOTICE of Hearing: **(CR)   Jury Trial set for October 2 − 6 & 10 − 13, 2023** *(9 days)* **at 9:30 AM in Charlottesville before Senior Judge Norman K. Moon.** <span style="color:red">**Counsel must contact the Clerk's Office no later than five (5) business days before the scheduled trial date for your technology needs.**</span> (ca) |
| 11/22/2022 | 107 | MOTION for Extension of Time to File Answer re 68 Amended Complaint *or Otherwise Respond* by United States Secretary of Defense General Lloyd Austin, United States Secretary of State Anthony Blinken. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order)(Wyer, Kathryn) |
| 11/22/2022 | 108 | ORDER granting 107 Motion for Extension of Time to Answer. Signed by Magistrate Judge Joel C. Hoppe on 11/22/2022. (jv) |
| 11/22/2022 | 109 | NOTICE of Appearance by Blair Connelly on behalf of All Plaintiffs (Connelly, Blair) |
| 11/22/2022 | 110 | NOTICE of Appearance by Zachary L. Rowen on behalf of All Plaintiffs (Rowen, Zachary) |
| 11/22/2022 | 111 | NOTICE of Appearance by Damon R. Porter on behalf of All Plaintiffs (Porter, Damon) |
| 11/22/2022 | 112 | NOTICE of Appearance by Ehson Kashfipour on behalf of All Plaintiffs (Kashfipour, Ehson) |
| 11/28/2022 | 113 | Brief / Memorandum in Opposition re 88 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction , 85 MOTION to Dismiss for Lack of Jurisdiction *and for Failure to State a Claim*, 90 MOTION to Dismiss for Lack of Jurisdiction *and Failure to State a Claim*, 92 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction . filed by Baby Doe, Jane Doe, John Doe. (Attachments: # 1 Exhibit Exhibit 1−FILED UNDER SEAL)(Eckstein, Maya) |

| 11/28/2022 | 114 | MOTION to Seal Document 113 Brief / Memorandum in Opposition,, *Motion to Seal Exhibit 1* by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order Proposed Order)(Eckstein, Maya) |
| 11/28/2022 | 115 | Brief / Memorandum in Support re 114 MOTION to Seal Document 113 Brief / Memorandum in Opposition,, *Motion to Seal Exhibit 1* . filed by Baby Doe, Jane Doe, John Doe. (Eckstein, Maya) |
| 11/28/2022 | 116 | NOTICE by Baby Doe, Jane Doe, John Doe re 114 *Notice of Filing Exhibit 1 UNDER SEAL* (Eckstein, Maya) |
| 11/29/2022 | 118 | ORDER granting 114 MOTION to Seal Document 113 Brief / Memorandum in Opposition,, *Motion to Seal Exhibit 1.* Signed by Magistrate Judge Joel C. Hoppe on 11/29/22. (kld) |
| 12/05/2022 | 119 | Reply re 90 MOTION to Dismiss for Lack of Jurisdiction *and for Failure to State a Claim* . filed by Kimberley Motley. (Davison, Thomas) Modified on 12/6/2022 to correct associated motion (dg). |
| 12/05/2022 | 120 | REPLY to Response to Motion re 85 MOTION to Dismiss for Lack of Jurisdiction *and for Failure to State a Claim (Redacted).* filed by Joshua Mast, Stephanie Mast. (Moran, John) |
| 12/05/2022 | 121 | MOTION to Seal *Reply Brief* by Joshua Mast, Stephanie Mast. Motions referred to Judge Joel C. Hoppe. (Moran, John) |
| 12/05/2022 | 122 | REPLY to Response to Motion re 114 MOTION to Seal Document 113 Brief / Memorandum in Opposition,, *Motion to Seal Exhibit 1* . filed by Richard Mast. (Mast, Richard) |
| 12/05/2022 | 123 | MOTION to Seal *Reply Brief* by Richard Mast. Motions referred to Judge Joel C. Hoppe. (Mast, Richard) |
| 12/06/2022 | 124 | Reply re 113 Brief / Memorandum in Opposition,, . filed by Ahmad Osmani. (Brooks, Brennan) |
| 12/06/2022 | 125 | ORDER granting 121 Motion to Seal. Signed by Magistrate Judge Joel C. Hoppe on 12/06/2022. (dg) |
| 12/06/2022 | 126 | Sealed Document − Defendants Joshua and Stephanie Mast's Reply in Support of their Motion to Dismiss (dg) |
| 12/06/2022 | 127 | ORDER granting 123 Motion to Seal. Signed by Magistrate Judge Joel C. Hoppe on 12/06/2022. (dg) |
| 12/06/2022 | 128 | Sealed Document − Defendant Richard Mast's Reply in Support of his Motion to Dismiss. (dg) |
| 12/27/2022 | 129 | Rule 26(f) Agreed Written Plan by Plaintiffs Baby Doe, Jane Doe, John Doe (Eckstein, Maya) |
| 01/05/2023 | 130 | MOTION to Amend/Correct 26 Protective Order by Joshua Mast, Stephanie Mast. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Exhibit 1 − Order from Supreme Court of Virginia, # 2 Exhibit 2 − Email re News Article)(Moran, John) |
| 01/09/2023 | 131 | ANSWER to 68 Amended Complaint *(Redacted for Public Filing)* by United States Secretary of Defense General Lloyd Austin, United States Secretary of State Anthony Blinken.(Wyer, Kathryn) |
| 01/09/2023 | 132 | MOTION to Seal Document *(Unredacted Answer & Exhibit A to this Motion)* by United States Secretary of Defense General Lloyd Austin, United States Secretary of State Anthony Blinken. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order)(Wyer, Kathryn) |
| 01/10/2023 | 133 | ORDER granting 132 Motion to Seal Document. Signed by Magistrate Judge Joel C. Hoppe on 01/10/2023. (dg) |
| 01/10/2023 | 134 | Sealed Document − Exhibit A to 132 Motion to Seal Document (dg) |

| | | |
|---|---|---|
| 01/10/2023 | 135 | Sealed Document − United States Defendants' Unredacted Answer to 68 Amended Complaint (dg) |
| 01/18/2023 | 136 | NOTICE of Video−Conference Hearing on Motions: 85 MOTION to Dismiss for Lack of Jurisdiction *and for Failure to State a Claim*, 88 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction , 90 MOTION to Dismiss for Lack of Jurisdiction *and Failure to State a Claim*, and 92 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction **(CR)**   (Click on this link for guidance for participation via Zoom and Click on this link for instructions on how to listen to public hearings). **Motion Hearing set for February 8, 2023 at 2:00 PM via Zoom before Senior Judge Norman K. Moon.** (ca) |
| 01/19/2023 | 137 | Brief / Memorandum in Opposition re 130 MOTION to Amend/Correct 26 Protective Order . filed by Baby Doe, Jane Doe, John Doe. (Attachments: # 1 Exhibit FILED UNDER SEAL, # 2 Exhibit FILED UNDER SEAL, # 3 Exhibit FILED UNDER SEAL, # 4 Exhibit FILED UNDER SEAL, # 5 Exhibit FILED UNDER SEAL, # 6 Exhibit FILED UNDER SEAL, # 7 Exhibit FILED UNDER SEAL, # 8 Exhibit FILED UNDER SEAL, # 9 Exhibit FILED UNDER SEAL, # 10 Exhibit FILED UNDER SEAL, # 11 Exhibit EX. 11)(Eckstein, Maya) |
| 01/19/2023 | 138 | MOTION to Seal *Exhibits −10 in support of Plaintiffs' Opposition to Defendants' Motion to Modify Protective Order* by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order Proposed Order)(Eckstein, Maya) |
| 01/24/2023 | 139 | ORDER granting 138 Motion to Seal. Signed by Magistrate Judge Joel C. Hoppe on 01/24/2023. (dg) |
| 01/24/2023 | 140 | Sealed Document − Exhibits 1−10 of 137 Plaintiffs' Opposition to Defendants' Motion to Modify Protective Order. (Attachments: # 1 Exhibit 2, # 2 Exhibit 3, # 3 Exhibit 4, # 4 Exhibit 5, # 5 Exhibit 6, # 6 Exhibit 7, # 7 Exhibit 8, # 8 Exhibit 9, # 9 Exhibit 10)(dg) |
| 01/24/2023 | 141 | Emergency MOTION for Order to Show Cause by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order Proposed Order)(Eckstein, Maya) |
| 01/25/2023 | 142 | Supplemental MOTION for Order to Show Cause by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Eckstein, Maya) |
| 01/25/2023 | 143 | ORAL BRIEFING ORDER: This matter is before the Court on the Plaintiffs' Emergency Motion for Order to Show Cause and Supplemental Motion for Order to Show Cause. Dkts. 141 , 142 . Finding that setting the following briefing schedule would assist in the prompt resolution of this matter, the Court hereby DIRECTS the Defendants Joshua and Stephanie Mast to file any response to said motions by January 30, 2023, and Plaintiffs may file a reply in further support of their motions by February 3, 2023. The Clerk of Court is directed to schedule the motions for a hearing on February 8, 2023, which shall be heard then along with argument on the motions to dismiss. Entered by Senior Judge Norman K. Moon on January 25, 2023. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(ca) |
| 01/25/2023 | 144 | NOTICE of Video−Conference Hearing on Motions: 141 Emergency MOTION for Order to Show Cause & 142 Supplemental MOTION for Order to Show Cause : **(CR)** (Click on this link for guidance for participation via Zoom and Click on this link for instructions on how to listen to public hearings). **Motion Hearing set for February 8, 2023 at 2:00 PM via Zoom before Senior Judge Norman K. Moon.** *(*Motions set to be heard with other motions previously scheduled on same date/time in this matter.)* (ca) |
| 01/26/2023 | 145 | Joint MOTION to Amend/Correct 81 Order on Motion to Amend/Correct *(Joint Motion to Modify Amended Pretrial Order)* by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order Proposed Order)(Eckstein, Maya) |
| 01/26/2023 | 146 | MOTION to Withdraw *Motion to Withdraw Appearance of Sherli Furst* by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Eckstein, Maya) |

| | | |
|---|---|---|
| 01/26/2023 | 147 | ORAL ORDER: This matter is before the Court on the Plaintiffs' Emergency Motion for Order to Show Cause and Supplemental Motion for Order to Show Cause. Dkts. 141, 142. Finding that setting the following briefing schedule would assist in the prompt resolution of this matter, the Court hereby DIRECTS the Defendants Joshua and Stephanie Mast to file any response to said motions by January 30, 2023, and Plaintiffs may file a reply in further support of their motions by February 3, 2023. The Clerk of Court is directed to schedule the motions for a hearing on February 8, 2023, which shall be heard then along with argument on the motions to dismiss. Entered by Senior Judge Norman K. Moon on 01/26/2023. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(dg) |
| 01/26/2023 | 148 | Second Amended Pretrial Order. Signed by Magistrate Judge Joel C. Hoppe on 01/26/2023. (dg) |
| 01/26/2023 | 149 | REPLY to Response to Motion re 130 MOTION to Amend/Correct 26 Protective Order . filed by Joshua Mast, Stephanie Mast. (Moran, John) |
| 01/27/2023 | 150 | NOTICE of Appearance by Edward Scott Lloyd on behalf of Richard Mast (Lloyd, Edward) |
| 01/27/2023 | | E. Scott Lloyd, in accordance with Section B.9. of the Administrative Procedures for Filing, Signing and Verifying Pleadings and Papers by Electronic Means, a registered user is responsible for ensuring their mailing address, primary email address, and telephone number are kept up−to−date with this court by updating the information in their PACER account. To update your information, log into PACER.gov and click the Maintenance tab to Update this information with this court. (aab) |
| 01/27/2023 | 151 | MOTION for *David Yerushalmi* to Appear Pro Hac Vice. Filing fee $ 100, receipt number AVAWDC−4116661. by Richard Mast. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order)(Lloyd, Edward) |
| 01/27/2023 | 152 | ORAL ORDER granting 146 Motion to Withdraw 146 MOTION to Withdraw *Motion to Withdraw Appearance of Sherli Furst*. Sherli Furst is terminated as counsel in this case. Entered by Magistrate Judge Joel C. Hoppe on 1/27/23. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(JCH) |
| 01/27/2023 | 153 | ORAL ORDER granting 151 MOTION for David Yerushalmi to Appear Pro Hac Vice in this case. Entered by Magistrate Judge Joel C. Hoppe on 1/27/23. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(JCH) |
| 01/30/2023 | 154 | RESPONSE in Opposition re 141 Emergency MOTION for Order to Show Cause , 142 Supplemental MOTION for Order to Show Cause . filed by Joshua Mast, Stephanie Mast. (Attachments: # 1 Exhibit Declaration of Joshua Mast)(Moran, John) |
| 01/30/2023 | 155 | NOTICE of Appearance by David Eliezer Yerushalmi on behalf of Richard Mast (Yerushalmi, David) |
| 02/03/2023 | 156 | RESPONSE in Support re 141 Emergency MOTION for Order to Show Cause . filed by Baby Doe, Jane Doe, John Doe. (Attachments: # 1 Exhibit Ex.A filed under seal, # 2 Exhibit Ex.B filed under seal)(Eckstein, Maya) |
| 02/03/2023 | 157 | MOTION to Seal *Exhibits A and B to Reply Memorandum in Support of Show Cause* by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order Ex.1 Proposed Order)(Eckstein, Maya) |
| 02/08/2023 | 158 | Minute Entry for proceedings held before Senior Judge Norman K. Moon: Motion Hearing held on 2/8/2023 via ZOOM re 141 Emergency MOTION for Order to Show Cause filed by John Doe, Baby Doe, Jane Doe, 88 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction filed by Richard Mast, 142 Supplemental MOTION for Order to Show Cause filed by John Doe, Baby Doe, Jane Doe, 85 MOTION to Dismiss for Lack of Jurisdiction *and for Failure to State a Claim* filed by Stephanie Mast, Joshua Mast, 90 MOTION to Dismiss for Lack of Jurisdiction *and Failure to State a Claim* filed by Kimberley Motley, 92 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction filed by Ahmad Osmani. (Court Reporter: Lisa Blair) (ca) |

| 02/09/2023 | 159 | ORDER granting 157 Motion to Seal. Signed by Magistrate Judge Joel C. Hoppe on 02/09/2023. (dg) |
|---|---|---|
| 02/09/2023 | 160 | TRANSCRIPT REQUEST (14 calendar days Service) by Baby Doe, Jane Doe, John Doe for Hearing held on **02/08/2023** reported by Court Reporter Lisa Blair before Judge Norman Moon. *Transcript Due Deadline will be set when Financial Arrangements are made.* (Eckstein, Maya) |
| 02/09/2023 | 161 | Sealed Document − Exhibits A and B to 156 Plaintiffs' Response in Support of Motion for Order to Show Cause. (Attachments: # 1 Exhibit)(dg) |
| 02/09/2023 | 162 | MOTION to Seal Document *(based on oral motion made at Feb. 8, 2023 hearing)* by Ahmad Osmani. Motions referred to Judge Joel C. Hoppe. (Brooks, Brennan) |
| 02/10/2023 | 163 | ORDER granting 162 Motion to Seal Document. Signed by Magistrate Judge Joel C. Hoppe on 02/10/2023. (dg) |
| 02/10/2023 | 164 | Sealed Document − Exhibit to Defendant Osmani's Motion to Dismiss the Amended Complaint (dg) |
| 02/10/2023 | 165 | **Financial arrangements made** (Original) (14 calendar days Service) re 160 Transcript Request, **Transcript due by 2/24/2023.** (lmb) |
| 02/13/2023 | 166 | MOTION for Protective Order *Motion and Memorandum In Support of Motion for the Entry of Proposed Protective Order* by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Exhibit Ex.A. Protective Order)(Eckstein, Maya) |
| 02/21/2023 | 167 | THIS TRANSCRIPT NOT TO BE RELEASED. REDACTED TRANSCRIPT FILED. TRANSCRIPT of Proceedings: Motions hearing by videoconference held on **February 8, 2023** before Judge Norman K. Moon. Court Reporter/Transcriber Lisa Blair, Telephone number 434.409.4575. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vawd.uscourts.gov Redaction Request due 3/14/2023. Redacted Transcript Deadline set for 3/24/2023. Release of Redacted Transcript Restriction set for 5/22/2023. (lmb)** *Redaction notes added. Modified on 2/22/2023 (sad).* |
| 02/21/2023 | 168 | NOTICE by Baby Doe, Jane Doe, John Doe re 137 *Notice of Supplemental Authority in Support of Opposition to Defendant's Motion to Modify the Court's Protective Order* (Attachments: # 1 Exhibit Ex.1, # 2 Exhibit Ex.2)(Eckstein, Maya) |
| 02/22/2023 | 169 | Transcript Redaction Request re 167 by attorney Maya Miriam Eckstein (Eckstein, Maya) |
| 02/22/2023 | 170 | Redacted Transcript for Motion hearing by videoconference for dates of 2/8/2023 re 167 Transcript,,,, *Pursuant to Judicial Conference Policy, this transcript may be viewed at the court public terminal or purchased through the court reporter−transcriber for 90 days from the filing of the original unredacted transcript. After that date the* **Redacted Transcript** *may be obtained through PACER.* (lmb) |
| 02/27/2023 | 171 | Brief / Memorandum in Opposition re 166 MOTION for Protective Order *Motion and Memorandum In Support of Motion for the Entry of Proposed Protective Order* . filed by Richard Mast. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2 (Under Seal), # 3 Exhibit 3 (Under Seal), # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6 (Under Temp Seal), # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10 (Under Seal), # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14 (Under Seal), # 15 Exhibit 15 (Under Seal), # 16 Exhibit 16 (Under Seal), # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19 (Under Seal), # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24)(Yerushalmi, David) *Modified on 5/12/2023 to seal exhibits # 6 and 8 to doc 171 as per order at doc 216 (kld). Modified on 6/9/2023 to seal exhibit #20 per Order at doc. 229 (skm).* |
| 02/28/2023 | 172 | MOTION to Seal by Richard Mast. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order Permitting Filing Exhibits Under Seal)(Mast, Richard) |

| 02/28/2023 | 173 | Amended Exhibit *18 to Def. Richard Mast's Opp'n to Pls.' Mot. for Prot. Order previously filed under seal as Dkt. No. 171−18* by Richard Mast. (Attachments: # 1 Exhibit 18)(Yerushalmi, David) |
| 02/28/2023 | 174 | MOTION re 171 Brief / Memorandum in Opposition,,, *Seeking Order re: Requesting Docs from Fluvana County Circuit Court* by Richard Mast. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order)(Yerushalmi, David) |
| 02/28/2023 | 175 | MOTION to Seal Document *171−18* by Richard Mast. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order)(Mast, Richard) |
| 03/03/2023 | 176 | MOTION to Vacate 26 Protective Order by Richard Mast. (Attachments: # 1 Exhibit I, # 2 Text of Proposed Order)(Yerushalmi, David) |
| 03/06/2023 | 177 | REPLY to Response to Motion re 166 MOTION for Protective Order *Motion and Memorandum In Support of Motion for the Entry of Proposed Protective Order* . filed by United States Secretary of Defense General Lloyd Austin, United States Secretary of State Anthony Blinken. (Wyer, Kathryn) |
| 03/06/2023 | 178 | RESPONSE in Support re 166 MOTION for Protective Order *Motion and Memorandum In Support of Motion for the Entry of Proposed Protective Order* . filed by Baby Doe, Jane Doe, John Doe. (Attachments: # 1 Exhibit Ex. 1, # 2 Exhibit Ex. 2, # 3 Exhibit Ex. 3)(Eckstein, Maya) |
| 03/07/2023 | 179 | ORAL ORDER granting 172 Motion to Seal. Entered by Magistrate Judge Joel C. Hoppe on 3/7/23. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(JCH) |
| 03/07/2023 | 180 | ORAL ORDER granting 175 Motion to Seal Document 175 MOTION to Seal Document *171−18*. Entered by Magistrate Judge Joel C. Hoppe on 3/7/23. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(JCH) |
| 03/07/2023 | 181 | Sealed Document − Unredacted Exhibits to Defendant Richard Mast's Memorandum in Opposition to Plaintiff's Motion for Protective Order (Attachments: # 1 Exhibit 2, # 2 Exhibit 3, # 3 Exhibit 6, # 4 Exhibit 8, # 5 Exhibit 9, # 6 Exhibit 10, # 7 Exhibit 14, # 8 Exhibit 15, # 9 Exhibit 16, # 10 Exhibit 17, # 11 Exhibit 18, # 12 Exhibit 19, # 13 Exhibit 20, # 14 Exhibit 21, # 15 Exhibit 22, # 16 Exhibit 23, # 17 Exhibit 24)(dg) |
| 03/14/2023 | 182 | RESPONSE in Opposition re 174 MOTION re 171 Brief / Memorandum in Opposition,,, *Seeking Order re: Requesting Docs from Fluvana County Circuit Court* . filed by United States Secretary of Defense General Lloyd Austin, United States Secretary of State Anthony Blinken. (Attachments: # 1 Text of Proposed Order)(Wyer, Kathryn) |
| 03/14/2023 | 183 | RESPONSE in Opposition re 174 MOTION re 171 Brief / Memorandum in Opposition,,, *Seeking Order re: Requesting Docs from Fluvana County Circuit Court* . filed by Baby Doe, Jane Doe, John Doe. (Attachments: # 1 Exhibit Ex.1 Under Seal, # 2 Exhibit Ex. 2 Under Seal, # 3 Exhibit Ex. 3 Under Seal, # 4 Exhibit Ex. 4 Under Seal, # 5 Exhibit Ex. 5 Under Seal)(Eckstein, Maya) |
| 03/14/2023 | 184 | MOTION to Seal *Exhibits 1−5 to Plaintiffs' Opposition to Dkt. 174* by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order Proposed order)(Eckstein, Maya) |
| 03/14/2023 | 185 | Brief / Memorandum in Support re 184 MOTION to Seal *Exhibits 1−5 to Plaintiffs' Opposition to Dkt. 174* . filed by Baby Doe, Jane Doe, John Doe. (Eckstein, Maya) |
| 03/16/2023 | 186 | ORDER granting 184 Motion to Seal. Signed by Magistrate Judge Joel C. Hoppe on 03/16/2023. (dg) |
| 03/16/2023 | 187 | Sealed Document − Exhibits 1 through 5 of 183 Plaintiffs' Opposition to 174 Motion Requesting State Court Records (Attachments: # 1 Exhibit 2, # 2 Exhibit 3, # 3 Exhibit 4, # 4 Exhibit 5)(dg) |
| 03/17/2023 | 188 | Brief / Memorandum in Opposition re 176 MOTION to Vacate 26 Protective Order . filed by Baby Doe, Jane Doe, John Doe. (Attachments: # 1 Exhibit Ex. 1, # 2 Exhibit Ex. 2, # 3 Exhibit Ex. 3, # 4 Exhibit Ex. 4 − FILED UNDER SEAL)(Eckstein, Maya) |

| 03/17/2023 | 189 | MOTION to Seal by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order Proposed Order, # 2 Exhibit Ex.4 Filed Under Seal)(Eckstein, Maya) |
|---|---|---|
| 03/17/2023 | 190 | Brief / Memorandum in Support re 189 MOTION to Seal *Ex.4*. filed by Baby Doe, Jane Doe, John Doe. (Eckstein, Maya) |
| 03/20/2023 | 191 | ORDER granting 189 Motion to Seal. Signed by Magistrate Judge Joel C. Hoppe on 03/20/2023. (dg) |
| 03/20/2023 | 192 | Sealed Document − Exhibit 4 to 188 Plaintiffs' Brief in Opposition to Defendant Richard Mast's Motion to Vacate Protective Order. (dg) |
| 03/22/2023 | 193 | ORAL ORDER: Counsel for the Government has submitted a sealed motion to seal, but pursuant to W.D. Va. Local Rule 9(b), such motions are to be filed on the public docket though memoranda in support may be filed under seal. Pending a decision by this Court on the propriety of sealing and maintaining such document under seal, Dkt. 171 −6 shall be temporarily sealed pending filing of any motion to seal and until further Order of Court. Entered by Senior Judge Norman K. Moon on March 22, 2023. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(ca) |
| 03/24/2023 | 194 | REPLY to Response to Motion re 176 MOTION to Vacate 26 Protective Order . filed by Richard Mast. (Yerushalmi, David) |
| 03/28/2023 | 195 | NOTICE of Appearance by Melvin E Williams on behalf of Caleb Mast (Williams, Melvin) |
| 03/28/2023 | 196 | MOTION to Quash *Subpoena to Liberty University, in part,* by Caleb Mast. Motions referred to Judge Joel C. Hoppe. (Williams, Melvin) |
| 03/28/2023 | 197 | Brief / Memorandum in Support re 196 MOTION to Quash *Subpoena to Liberty University, in part,* . filed by Caleb Mast. (Attachments: # 1 Exhibit Subpoena to Liberty University (redacted), # 2 Exhibit Tweet by Ahmad, # 3 Exhibit English translation of Tweet)(Williams, Melvin) |
| 04/03/2023 | 198 | NOTICE by Baby Doe, Jane Doe, John Doe, Caleb Mast *Notice of Supplemental Authority* (Eckstein, Maya) |
| 04/04/2023 | 199 | Response re 198 Notice (Other) *of Supplemental Authority* . filed by Joshua Mast, Stephanie Mast. (Moran, John) |
| 04/11/2023 | 200 | Brief / Memorandum in Opposition re 196 MOTION to Quash *Subpoena to Liberty University, in part,* . filed by Baby Doe, Jane Doe, John Doe. (Attachments: # 1 Exhibit Ex.1 − Unredacted )(Eckstein, Maya)  (Additional attachment(s) added on 4/12/2023: # 2 Exhibit 1 − Redacted). Modified on 4/12/2023 to attached redacted exhibit 1 and to seal the unredacted version with personal identifiers (kld). |
| 04/13/2023 | 201 | NOTICE of Appearance by Kevin Spencer Elliker on behalf of All Plaintiffs (Elliker, Kevin) |
| 04/17/2023 | 202 | Reply re 198 Notice (Other) *Reply in Support of Plaintiffs' Notice of Supplemental Authority*. filed by Baby Doe, Jane Doe, John Doe. (Attachments: # 1 Exhibit Ex.1 Transcript)(Eckstein, Maya) |
| 04/17/2023 | 203 | MOTION for Protective Order by United States Secretary of Defense General Lloyd Austin, United States Secretary of State Anthony Blinken. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order)(Wyer, Kathryn) |
| 04/17/2023 | 204 | Brief / Memorandum in Support re 203 MOTION for Protective Order *(redacted for public filing)*. filed by United States Secretary of Defense General Lloyd Austin, United States Secretary of State Anthony Blinken. (Attachments: # 1 Exhibit B (redacted for public filing))(Wyer, Kathryn) |
| 04/17/2023 | 205 | MOTION to Seal by United States Secretary of Defense General Lloyd Austin, United States Secretary of State Anthony Blinken. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order)(Wyer, Kathryn) |

| 04/18/2023 | 206 | REPLY to Response to Motion re 196 MOTION to Quash *Subpoena to Liberty University, in part,* . filed by Caleb Mast. (Williams, Melvin) |
| 04/19/2023 | 207 | ORDER granting 205 Motion to Seal. Signed by Magistrate Judge Joel C. Hoppe on 4/19/23. (kld) (Entered: 04/20/2023) |
| 04/20/2023 | 208 | Sealed Document − Memorandum in Support of 203 Federal Defendants' Motion for Protective Order (Attachments: # 1 Exhibit A, # 2 Exhibit B)(kld) |
| 05/01/2023 | 209 | Brief / Memorandum in Opposition re 203 MOTION for Protective Order . filed by Joshua Mast, Stephanie Mast. (Moran, John) |
| 05/01/2023 | 210 | Brief / Memorandum in Opposition re 203 MOTION for Protective Order . filed by Richard Mast. (Attachments: # 1 Text of Proposed Order Denying Motion)(Yerushalmi, David) |
| 05/04/2023 | 211 | Response re 198 Notice (Other) *Plaintffs' Further Notice of Supplemental Authority* . filed by Baby Doe, Jane Doe, John Doe. (Attachments: # 1 Exhibit Ex.1 Order)(Eckstein, Maya) (kld). *(Attachment 1 replaced on 5/5/2023)* (kld). Modified on 5/5/2023 to replace ex 1 which was missing pages (kld). |
| 05/04/2023 | 212 | STIPULATION *and [Proposed] Order regarding Participation in Discovery* by Kimberley Motley (Davison, Thomas) |
| 05/08/2023 | 213 | REPLY to Response to Motion re 203 MOTION for Protective Order . filed by United States Secretary of Defense General Lloyd Austin, United States Secretary of State Anthony Blinken. (Wyer, Kathryn) |
| 05/10/2023 | 214 | MOTION to Seal Document 171 Brief / Memorandum in Opposition,,, by United States Secretary of Defense General Lloyd Austin, United States Secretary of State Anthony Blinken. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Declaration of Frank M. Branch, # 2 Exhibit A (public version), # 3 Text of Proposed Order)(Wyer, Kathryn) |
| 05/10/2023 | 215 | MOTION to Seal *Exhibit A (public version at ECF 214−2)* by United States Secretary of Defense General Lloyd Austin, United States Secretary of State Anthony Blinken. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order)(Wyer, Kathryn) |
| 05/11/2023 | 216 | ORAL ORDER granting 214 Motion to Seal Document 214 MOTION to Seal Document 171 Brief / Memorandum in Opposition. The Clerk is directed to seal ECF Nos. 171−6 and 171−8. No publicly available, redacted documents need be filed in place of these sealed documents. Entered by Magistrate Judge Joel C. Hoppe on 5/11/23. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(JCH) |
| 05/11/2023 | 217 | ORAL ORDER finding as moot 215 Motion to Seal. Entered by Magistrate Judge Joel C. Hoppe on 5/11/23. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(JCH) |
| 05/16/2023 | 218 | JOINT STIPULATION AND ORDER REGARDING PARTICIPATION IN DISCOVERY. Signed by Senior Judge Norman K. Moon on 5/16/2023. (skm) |
| 05/17/2023 | 219 | MOTION to Compel *Production of Documents* by Richard Mast. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Exhibit 1, # 2 Text of Proposed Order)(Yerushalmi, David) |
| 05/19/2023 | 220 | Joint MOTION to Amend/Correct 148 Order on Motion to Amend/Correct *Second Amended Pretrial Order* by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Exhibit Proposed Pretrial Order)(Eckstein, Maya) |
| 05/19/2023 | 221 | NOTICE by Richard Mast re 211 , 198 , 202 , 199 *of Supplemental Authority* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Yerushalmi, David) |
| 05/31/2023 | 222 | RESPONSE in Opposition re 219 MOTION to Compel *Production of Documents* . filed by Baby Doe, Jane Doe, John Doe. (Eckstein, Maya) |
| 06/05/2023 | 223 | ORDER granting 166 Motion for Protective Order: The Clerk is directed to enter the Discovery Protective Order signed this date, see ECF No. 166−1, on the public docket. Signed by Magistrate Judge Joel C. Hoppe on 6/5/2023. (skm) |

| 06/05/2023 | 224 | PROTECTIVE ORDER. Signed by Magistrate Judge Joel C. Hoppe on 6/5/2023. (skm) |
|---|---|---|
| 06/05/2023 | 225 | NOTICE by Richard Mast *of Supplemental Authority* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Yerushalmi, David) |
| 06/05/2023 | 226 | ORDER denying 174 Motion for Order Directing Clerk to Request Information Held by a Virginia Circuit Court. Signed by Magistrate Judge Joel C. Hoppe on 6/5/2023. (skm) |
| 06/06/2023 | 227 | Response re 225 Notice (Other) *Plaintiffs' Response to Defendant Richard Mast's Notice of Supplemental Authority* . filed by Baby Doe, Jane Doe, John Doe. (Eckstein, Maya) |
| 06/08/2023 | 228 | ORDER denying without prejudice in part and denying with prejudice in part 196 Motion to Quash Subpoena to Liberty University. Signed by Magistrate Judge Joel C. Hoppe on 6/8/2023. (skm) |
| 06/09/2023 | 229 | ORAL ORDER: The Clerk is directed to seal ECF No. 171 −20 pursuant to the Oral Order entered May 11, 2023. ECF No. 216. No publicly available redacted document need be filed in place of this sealed document. Entered by Magistrate Judge Joel C. Hoppe on 6/9/2023. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(skm) |
| 06/13/2023 | 230 | MOTION to Compel *Production of Documents by Joshua and Stephanie Mast* by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Exhibit Ex.1, # 2 Exhibit Ex.2, # 3 Exhibit Ex.3, # 4 Exhibit Ex.4)(Eckstein, Maya) |
| 06/14/2023 | 231 | Emergency MOTION for Order to Show Cause by Baby Doe, Jane Doe, John Doe. (Attachments: # 1 Exhibit Ex.1)(Eckstein, Maya) Modified on 6/22/2023 − Docket text was modified to remove referral to Magistrate Judge text. (ca) |
| 06/14/2023 | 232 | ORAL Order: Upon consideration of Plaintiffs' emergency motion to show cause (Dkt. 231), Defendants Joshua and Stephanie Mast shall file any response to the motion within fourteen (14) days; and Plaintiffs shall file any reply within seven (7) days thereafter. The parties are directed forthwith to contact Carmen Amos, Courtroom Deputy, at carmena@vawd.uscourts.gov, to schedule a hearing on such motion, which shall be held following conclusion of the briefing on Plaintiffs' motion. Entered by Senior Judge Norman K. Moon on 6/14/2023. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(slt) |
| 06/22/2023 | 233 | NOTICE of Video−Conference Hearing on Motion: 231 Emergency MOTION for Order to Show Cause : **(CR)**   (Click on this link for guidance for participation via Zoom and Click on this link for instructions on how to listen to public hearings). Motion Hearing set for July 21, 2023 at 2:00 PM via Zoom before Senior Judge Norman K. Moon. (ca) |
| 06/26/2023 | 234 | NOTICE of Hearing on Motions re 203 MOTION for Protective Order and 220 Joint MOTION to Amend/Correct 148 Order on Motion to Amend/Correct *Second Amended Pretrial Order*: **(FTR)** (No Interpreter requested)   Motion Hearing set for 7/5/2023 01:00 PM by telephone conference before Magistrate Judge Joel C. Hoppe. (skm) |
| 06/27/2023 | 235 | STIPULATION *and [Proposed] Order regarding Participation in Discovery* by Ahmad Osmani (Brooks, Brennan) |
| 06/27/2023 | 236 | Brief / Memorandum in Opposition re 230 MOTION to Compel *Production of Documents by Joshua and Stephanie Mast* . filed by Joshua Mast, Stephanie Mast. (Moran, John) |
| 06/27/2023 | 237 | MOTION to Stay *Discovery* by Joshua Mast, Stephanie Mast. Motions referred to Judge Joel C. Hoppe. (Moran, John) |
| 06/27/2023 | 238 | Brief / Memorandum in Support re 237 MOTION to Stay *Discovery* . filed by Joshua Mast, Stephanie Mast. (Moran, John) |
| 06/28/2023 | 239 | RESPONSE in Opposition re 231 Emergency MOTION for Order to Show Cause . filed by Joshua Mast, Stephanie Mast. (Attachments: # 1 Declaration in Support Declaration of Joshua Mast)(Moran, John) |

| 07/05/2023 | 240 | JOINT STIPULATION AND ORDER Regarding Participation in Discovery. Signed by Senior Judge Norman K. Moon on 7/3/2023. (skm) |
|---|---|---|
| 07/05/2023 | 241 | Minute Entry for proceedings held before Magistrate Judge Joel C. Hoppe: Motion Hearing held on 7/5/2023 re 203 MOTION for Protective Order filed by United States Secretary of Defense General Lloyd Austin, United States Secretary of State Anthony Blinken, 220 Joint MOTION to Amend/Correct 148 Order on Motion to Amend/Correct *Second Amended Pretrial Order* filed by John Doe, Baby Doe, Jane Doe. (Cisco Conference Operator: Karen Dotson) (kld) |
| 07/05/2023 | 242 | Log Notes for Motions Hearing in the Harrisonburg Division held before Judge Joel C. Hoppe on 7/5/23. In accordance with 28 USC 753(b), I certify that I monitored the digital recording of this proceeding and that it is a true and correct record, that it is sufficiently intelligible when played on the FTR (For the Record) Player, and that it can be transcribed without undue difficulty. Cisco Conference Operator: Karen Dotson (kld) |
| 07/05/2023 | 243 | THIRD AMENDED PRETRIAL ORDER granting 220 Motion to Amend deadlines in 148 Amended Pretrial Order. Signed by Magistrate Judge Joel C. Hoppe on 7/5/23. (kld) |
| 07/05/2023 | 244 | RESPONSE in Support re 231 Emergency MOTION for Order to Show Cause . filed by Baby Doe, Jane Doe, John Doe. (Eckstein, Maya) |
| 07/05/2023 | 245 | RESPONSE in Support re 230 MOTION to Compel *Production of Documents by Joshua and Stephanie Mast* . filed by Baby Doe, Jane Doe, John Doe. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2)(Eckstein, Maya) |
| 07/05/2023 | 246 | MOTION to Seal *Exhibits 1 and 2 to Reply in Support of Motion to Compel* by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order Proposed Order)(Eckstein, Maya) |
| 07/06/2023 | 247 | ORDER granting 246 Motion to Seal Exhibits 1 and 2 to Reply in Support of Motion to Compel. Signed by Magistrate Judge Joel C. Hoppe on 7/6/2023. (skm) |
| 07/06/2023 | 248 | Sealed Document − Exhibits 1 and 2 to Reply in Support of 230 Motion to Compel. (Attachments: # 1 Exhibit 2)(skm) |
| 07/07/2023 | 249 | Notice Rescheduling Hearing **(CR)**  previously set for October 2 − 6 & 10 − 13, 2023 at 9:30 AM before Judge Norman K. Moon in Charlottesville. **Jury Trial RESET for February 5 − 9 & 12 − 16, 2024 at 9:30 AM in Charlottesville before Senior Judge Norman K. Moon.  Counsel must contact the Clerk's Office no later than five (5) business days before the scheduled trial date for your technology needs.** (ca) |
| 07/11/2023 | 250 | Brief / Memorandum in Opposition re 238 Brief / Memorandum in Support, 237 MOTION to Stay *Discovery* . filed by Baby Doe, Jane Doe, John Doe. (Eckstein, Maya) |
| 07/11/2023 | 251 | RESPONSE in Support re 237 MOTION to Stay *Discovery* . filed by Richard Mast. (Yerushalmi, David) |
| 07/12/2023 | 252 | MEMORANDUM OPINION AND ORDER: The 203 MOTION for Protective Order filed by United States Secretary of Defense General Lloyd Austin, United States Secretary of State Anthony Blinken, is denied without prejudice. Federal Defendants are directed to respond or object to each RFP in Defendant Richard Mast's First Set of Requests for Production, ECF No. 208−1, within twenty−one (21) days from the date of this Order. Signed by Magistrate Judge Joel C. Hoppe on 7/12/2023. (skm) |
| 07/13/2023 | 253 | MOTION for *Michael L. Francisco* to Appear Pro Hac Vice. Filing fee $ 100, receipt number AVAWDC−4221980. by Joshua Mast, Stephanie Mast. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order)(Moran, John) |
| 07/17/2023 | 254 | ORAL ORDER granting 253 MOTION to Appear Pro Hac Vice: Upon consideration of Mr. Francisco's motion to appear pro hac vice, and finding the requirements to appear pro hac vice met and good cause shown, the Court GRANTS the motion. Mr. Francisco may appear as counsel for Joshua Mast and Stephanie Mast. Entered by Senior Judge Norman K. Moon on 7/17/2023. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(skm) Modified on 7/17/2023 to correct name of defendant (skm). |

| 07/18/2023 | 255 | First NOTICE of Appearance by Dan Backer on behalf of Pipe Hitter Foundation, Inc. (Backer, Dan) |
|---|---|---|
| 07/18/2023 | 256 | First MOTION to Quash *Subpoena or for Entry of a Protective Order* by Pipe Hitter Foundation, Inc.. Motions referred to Judge Joel C. Hoppe. (Backer, Dan) |
| 07/18/2023 | 257 | Brief / Memorandum in Support re 256 First MOTION to Quash *Subpoena or for Entry of a Protective Order* . filed by Pipe Hitter Foundation, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Text of Proposed Order)(Backer, Dan) |
| 07/18/2023 | 258 | MOTION to Continue *Show Cause Hearing Currently Scheduled for July 21, 2023* by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Eckstein, Maya) |
| 07/18/2023 | 259 | REPLY to Response to Motion re 237 MOTION to Stay *Discovery* . filed by Joshua Mast, Stephanie Mast. (Moran, John) |
| 07/19/2023 | 260 | ORAL ORDER regarding 257 Brief / Memorandum in Support of 256 First MOTION to Quash filed by Pipe Hitter Foundation, Inc: The Clerk is directed to seal ECF No. 257−4 pursuant to the Oral Orders entered on May 11, 2023, ECF No. 216, and June 9, 2023, ECF No. 229. No publicly available redacted document need be filed in place of this sealed document. Entered by Magistrate Judge Joel C. Hoppe on 7/19/2023. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(skm) |
| 07/19/2023 | 261 | RESPONSE in Opposition re 258 MOTION to Continue *Show Cause Hearing Currently Scheduled for July 21, 2023* . filed by Joshua Mast, Stephanie Mast. (Moran, John) |
| 07/20/2023 | 262 | Reply re 258 MOTION to Continue *Show Cause Hearing Currently Scheduled for July 21, 2023* . filed by Baby Doe, Jane Doe, John Doe. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Eckstein, Maya) |
| 07/20/2023 | 263 | ORAL ORDER: Upon consideration of Plaintiffs' motion to continue the show cause hearing presently scheduled for July 21, 2023, Dkt. 258 , and considering Defendants' opposition thereto and Plaintiffs' reply, Dkts. 261 , 262 , and particularly noting Plaintiffs' arguments concerning material outstanding discovery bearing on the issues presented in their underlying motion for a show cause order (Dkt. 231 ), the Court finds good cause shown to grant the continuance. The show cause hearing shall be continued until the earliest practicable date, but at least seven days after a deposition of the Pipe Hitter Foundation (PHF) or resolution of PHF's motion to quash, whichever is later. **The motion to continue is GRANTED and the Show Cause Hearing is CONTINUED.** Dkt. 258. It is so ORDERED. Entered by Senior Judge Norman K. Moon on July 20, 2023. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(ca) |
| 07/20/2023 | 264 | Notice of Cancellation of Motion Hearing set for July 21, 2023 at 2:00 PM via ZOOM. <span style="color:red">(Cancel Court Reporter)</span> (ca) |
| 07/25/2023 | 265 | MOTION for Leave to File *Response in Opposition to Defendant Mast's Response in Support of Motion to Stay Discovery, and SurReply in Opposition to Motion to Stay Discovery* by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Appendix SurReply − Redacted, # 2 Exhibit Ex.1−Under Seal, # 3 Exhibit Ex.2, # 4 Exhibit Ex.3)(Eckstein, Maya) |
| 07/25/2023 | 266 | MOTION to Seal *Response in Opposition to Response in Support of Motion to Stay and Exhibit 1* by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order Proposed Order)(Eckstein, Maya) |
| 07/28/2023 | 267 | Brief / Memorandum in Opposition re 256 First MOTION to Quash *Subpoena or for Entry of a Protective Order*, 257 Brief / Memorandum in Support, . filed by Baby Doe, Jane Doe, John Doe. (Attachments: # 1 Exhibit Ex.1, # 2 Exhibit Ex.2−FILED UNDER SEAL)(Eckstein, Maya) |
| 07/28/2023 | 268 | MOTION to Seal *Exhibit 2 to Memorandum in Opposition* by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of |

| | | Proposed Order Proposed Order)(Eckstein, Maya) |
|---|---|---|
| 07/29/2023 | 269 | MOTION for *Caitlin Parry Contestable* to Appear Pro Hac Vice. Filing fee $ 100, receipt number AVAWDC−4231660. by Pipe Hitter Foundation, Inc.. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order)(Backer, Dan) |
| 08/01/2023 | 270 | STIPULATION *to Dismiss Nominal Defendants* by United States Secretary of Defense General Lloyd Austin, United States Secretary of State Anthony Blinken (Wyer, Kathryn) |
| 08/01/2023 | 271 | RESPONSE to Motion re 256 First MOTION to Quash *Subpoena or for Entry of a Protective Order AND FURTHER SUGGESTION OF LACK OF SUBJECT−MATTER JURISDICTION.* filed by Ahmad Osmani. (Attachments: # 1 Exhibit A − Second Declaration of Ahmad Osmani with Ex. 1, # 2 Exhibit B − Declaration of B. Tyler Brooks)(Brooks, Brennan) |
| 08/02/2023 | 272 | MOTION for Leave to File *Supplemental Brief in Support of Mot. to Vacate* by Richard Mast. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Exhibit 1, # 2 Text of Proposed Order)(Yerushalmi, David) |
| 08/04/2023 | 273 | RESPONSE in Support re 256 First MOTION to Quash *Subpoena or for Entry of a Protective Order* . filed by Pipe Hitter Foundation, Inc.. (Backer, Dan) |
| 08/15/2023 | 274 | Reply re 271 Response to Motion, *Plaintiffs' Reply to Osmani's Response to PHF's Motion to Quash and Further Suggestion of Lack of Subject Matter Jurisdiction.* filed by Baby Doe, Jane Doe, John Doe. (Eckstein, Maya) |
| 08/15/2023 | 275 | ORAL ORDER granting 269 MOTION for Caitlin Parry Contestable to Appear Pro Hac Vice in this case. Entered by Magistrate Judge Joel C. Hoppe on 8/15/23. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(JCH) |
| 08/16/2023 | 276 | RESPONSE to Motion re 272 MOTION for Leave to File *Supplemental Brief in Support of Mot. to Vacate* . filed by Baby Doe, Jane Doe, John Doe. (Eckstein, Maya) |
| 08/16/2023 | 277 | NOTICE of Appearance by Caitlin Parry Contestable on behalf of Pipe Hitter Foundation, Inc. (Contestable, Caitlin) |
| 08/23/2023 | 278 | REPLY to Response to Motion re 272 MOTION for Leave to File *Supplemental Brief in Support of Mot. to Vacate* . filed by Richard Mast. (Yerushalmi, David) |
| 08/25/2023 | 279 | ORAL ORDER granting 265 Motion for Leave to File. Plaintiffs' surreply is deemed filed. Entered by Magistrate Judge Joel C. Hoppe on 8/25/23. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(JCH) |
| 08/25/2023 | 280 | ORDER granting 266 Motion to Seal. Signed by Magistrate Judge Joel C. Hoppe on 8/25/2023. (skm) |
| 08/25/2023 | 281 | Sealed Document − Plaintiffs' Response in Opposition to Defendant Richard Mast's 251 Response in Support of 237 Motion to Stay Discovery, and Sur−Reply in Opposition to Defendants Joshua Mast and Stephanie Mast's Motion to Stay Discovery. (Attachments: # 1 Sealed Exhibit 1)(skm) |
| 08/25/2023 | 282 | ORDER granting 268 Motion to Seal. Signed by Magistrate Judge Joel C. Hoppe on 8/25/2023. (skm) |
| 08/25/2023 | 283 | Sealed Document − Exhibit 2 to 267 Memorandum in Opposition re 256 First MOTION to Quash Subpoena or for Entry of a Protective Order, 257 Brief/Memorandum in Support. (skm) |
| 08/28/2023 | 284 | NOTICE by United States *of Lodging* (Wyer, Kathryn) |
| 08/31/2023 | 285 | NOTICE of Hearing on Motion 256 First MOTION to Quash *Subpoena or for Entry of a Protective Order,* 230 MOTION to Compel *Production of Documents by Joshua and Stephanie Mast,* 237 MOTION to Stay *Discovery* : **(FTR)** (No Interpreter requested) Motion Hearing set for 10/11/2023 11:00 AM by telephone conference before Magistrate Judge Joel C. Hoppe. (kld) |

| | | |
|---|---|---|
| 08/31/2023 | 286 | Joint MOTION to Amend/Correct 243 Order on Motion to Amend/Correct *Pretrial Order* by Richard Mast. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order)(Yerushalmi, David) |
| 09/11/2023 | 287 | ORAL ORDER granting 286 Motion to Amend/Correct. The case deadlines and trial date are hereby continued. The court will address the revised schedule deadlines and trial date at the hearing on October 11, 2023. Entered by Magistrate Judge Joel C. Hoppe on 9/11/23. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(JCH) |
| 09/12/2023 | 288 | **Notice of Cancellation of Jury Trial set for February 5 − 9 & 12 − 16, 2024 in Charlottesville.** (Cancel Court Reporter) (Trial to be rescheduled) (ca) |
| 09/15/2023 | 289 | Supplemental MOTION to Compel by Richard Mast. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Text of Proposed Order)(Yerushalmi, David) Main document and Exhibits 1 and 5 sealed per 294 Order on 9/19/2023 (skm) |
| 09/15/2023 | 290 | MOTION to Seal Document 289 Supplemental MOTION to Compel *and Ex. 1 [289−1] and Ex. 5 [289−5]* by Richard Mast. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order)(Yerushalmi, David) |
| 09/15/2023 | 291 | Supplemental MOTION to Compel *Redacted* by Richard Mast. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Exhibit 5 Redacted, # 2 Exhibit 14 Redacted)(Yerushalmi, David) |
| 09/18/2023 | 292 | ORDER Regarding Highly Sensitive Documents. Signed by Senior Judge Norman K. Moon on 9/18/2023. (skm) |
| 09/18/2023 | 293 | Highly Sensitive Document(s) filed and lodged in a secure location: Paper filing system not connected to the internet or any network re 292 Order. (skm) |
| 09/19/2023 | 294 | ORDER granting 290 Motion to Seal Document re 289 Supplemental MOTION to Compel *and Ex. 1 [289−1] and Ex. 5 [289−5]*. Signed by Magistrate Judge Joel C. Hoppe on 9/19/2023. (skm) |
| 09/19/2023 | 295 | NOTICE of Hearing on Motion 289 Supplemental MOTION to Compel : **(FTR)** Motion Hearing set for 10/11/2023 11:00 AM by telephone conference before Magistrate Judge Joel C. Hoppe. (kld) |
| 09/29/2023 | 296 | Brief / Memorandum in Opposition re 289 Supplemental MOTION to Compel . filed by Baby Doe, Jane Doe, John Doe. (Attachments: # 1 Exhibit Ex.A, # 2 Exhibit Ex.B, # 3 Exhibit Ex.C−filed under seal, # 4 Exhibit Ex.D, # 5 Exhibit Ex.E−filed under seal, # 6 Exhibit Ex.F, # 7 Exhibit Ex.G, # 8 Exhibit Ex.H−filed under seal)(Eckstein, Maya) (Additional attachment(s) added on 10/12/2023: # 9 compelte exhibit D) (kld). Modified on 10/12/2023 to add exhibit D which was inadvertently omitted. (kld). (Additional attachment(s) added on 11/7/2023: # 10 Exhibit A − Redacted) (kld). |
| 09/29/2023 | 297 | MOTION to Seal *Exhibits C, E, H to Plaintiffs' Opposition to R.Mast's Supplemental Motion to Compel* by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order Proposed Order)(Eckstein, Maya) |
| 10/04/2023 | 298 | ORDER granting 297 Motion to Seal Exhibits C, E, H to Plaintiffs' 296 Opposition to 289 Supplemental Motion to Compel by Baby Doe, Jane Doe, John Doe. Signed by Magistrate Judge Joel C. Hoppe on 10/4/2023. (skm) |
| 10/04/2023 | 299 | Sealed Documents − Exhibits C, E, H to Plaintiffs' 296 Opposition to 289 Supplemental Motion to Compel by Baby Doe, Jane Doe, John Doe. (Attachments: # 1 Exhibit E, # 2 Exhibit H)(skm) |
| 10/04/2023 | 300 | MOTION to Compel by Joshua Mast, Stephanie Mast. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Exhibit Ex. A − Second Set of Interrogatories, # 2 Exhibit Ex. B − Ps' Objections & Responses to J&S Mast's 2nd ROGs, # 3 Exhibit Ex. C − Second Set of Requests for Production, # 4 Exhibit Ex. D − Ps' Objections & Responses to J&S Mast's 2nd RFPs, # 5 Exhibit Ex. E − 20230508 Mast RFPs to Plaintiffs, # 6 Exhibit Ex. F − DOJ Email redacted, # 7 Exhibit Ex. G − Meet and |

| | | |
|---|---|---|
| | | Confer Letter − federal case discovery violations 9.21.23, # 8 Exhibit Ex. H − RE_ A.A. v. Mast − meet and confer _ discovery − follow up − additional Jenkins documents)(Francisco, Michael) |
| 10/06/2023 | 301 | REPLY to Response to Motion re 291 Supplemental MOTION to Compel *Redacted*, 289 Supplemental MOTION to Compel . filed by Richard Mast. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Yerushalmi, David) (Additional attachment(s) added on 11/13/2023: # 3 Ex 2 with clent's name redacted) (kld). |
| 10/10/2023 | 302 | MOTION to Compel *Production of Documents by John David Gibson* by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Exhibit Ex.1, # 2 Exhibit Ex.2, # 3 Exhibit Ex.3, # 4 Exhibit Ex.4, # 5 Exhibit Ex.5)(Eckstein, Maya) |
| 10/11/2023 | 303 | Minute Entry for proceedings held before Magistrate Judge Joel C. Hoppe: Motion Hearing held on 10/11/2023 re 256 First MOTION to Quash *Subpoena or for Entry of a Protective Order* filed by Pipe Hitter Foundation, Inc., 230 MOTION to Compel *Production of Documents by Joshua and Stephanie Mast* filed by John Doe, Baby Doe, Jane Doe, 237 MOTION to Stay *Discovery* filed by Stephanie Mast, Joshua Mast, 289 Supplemental MOTION to Compel filed by Richard Mast. (FTR Operator: Karen Dotson) (kld) |
| 10/11/2023 | 304 | Log Notes for Telephonic Motions Hearing held before Judge Joel C. Hoppe on 10/11/23. In accordance with 28 USC 753(b), I certify that I monitored the digital recording of this proceeding and that it is a true and correct record, that it is sufficiently intelligible when played on the FTR (For the Record) Player, and that it can be transcribed without undue difficulty. CISCO Conference Operator: Karen Dotson (kld) |
| 10/11/2023 | 305 | TRANSCRIPT REQUEST (Expedited−7 calendar days Service) by Baby Doe, Jane Doe, John Doe for Hearing held on **10/11/2023** reported by Court Reporter Karen Dotson before Judge Hoppe. *Transcript Due Deadline will be set when Financial Arrangements are made.* (Eckstein, Maya) |
| 10/11/2023 | 306 | AMENDED PRETRIAL ORDER granting 286 Joint Motion to Amend. Signed by Magistrate Judge Joel C. Hoppe on 10/11/2023. (skm) |
| 10/12/2023 | 307 | Amended MOTION to Compel *Production of Documents by John David Gibson* by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Exhibit Ex.1, # 2 Exhibit Ex.2, # 3 Exhibit Ex.3, # 4 Exhibit Ex.4, # 5 Exhibit Ex.5)(Eckstein, Maya) |
| 10/12/2023 | 308 | NOTICE of Hearing: **(CR)  Jury Trial RESET for September 9 − 13 & 16 − 20, 2024 at 9:30 AM in Charlottesville before Senior Judge Norman K. Moon. Counsel must contact the Clerk's Office no later than five (5) business days before the scheduled trial date for your technology needs.** (ca) |
| 10/12/2023 | 309 | **Financial arrangements made**  (Original) (Expedited−7 calendar days Service) re 305 Transcript Request,  **Transcript due by 10/19/2023.** (lmb) |
| 10/17/2023 | 310 | TRANSCRIPT of Proceedings: Telephonic motions hearing held on **10/11/2023** before Judge Joel C. Hoppe. Court Reporter/Transcriber Lisa Blair, Telephone number 434.409.4575. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vawd.uscourts.gov.** Transcript may be viewed at the court public terminal or purchased through Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER unless a Redacted Transcript has been filed. Redaction Request due 11/7/2023. Redacted Transcript Deadline set for 11/17/2023. Release of Transcript Restriction set for 1/16/2024. (lmb) |
| 10/18/2023 | 311 | Brief / Memorandum in Opposition re 300 MOTION to Compel . filed by Baby Doe, Jane Doe, John Doe. (Attachments: # 1 Exhibit Exhibit 1 − FILED UNDER SEAL)(Eckstein, Maya) (Additional attachment(s) added on 10/19/2023: # 2 SEALED−Exhibit 1) (slt). |

| | | |
|---|---|---|
| 10/18/2023 | 312 | MOTION to Seal by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Exhibit Exhibit A, # 2 Text of Proposed Order Proposed Order)(Eckstein, Maya) |
| 10/18/2023 | 313 | TRANSCRIPT REQUEST (3 Day Service) by Richard Mast for Hearing Dkt. 303 held on **10/11/2023** reported by Court Reporter Recordied / Karen Dotson before Judge Magistrate Judge Hoppe. *Transcript Due Deadline will be set when Financial Arrangements are made.* (Yerushalmi, David) |
| 10/18/2023 | 314 | **Financial arrangements made** (Copy) (3 Days Service) re 313 Transcript Request, **Transcript due by 10/21/2023.** (lmb) |
| 10/19/2023 | 315 | ORDER granting 312 Motion to Seal. Signed by Magistrate Judge Joel C. Hoppe on 10/19/2023. (slt) |
| 10/19/2023 | 316 | Transcript Copy Delivered re 313 Transcript Request, (lmb) |
| 10/25/2023 | 317 | Reply re 300 MOTION to Compel *PRODUCTION BY JOHN AND JANE DOE REGARDING THEIR INTERROGATORIES AND REQUESTS FOR PRODUCTION.* filed by Joshua Mast, Stephanie Mast. (Francisco, Michael) |
| 10/26/2023 | 318 | STRUCK ON 11/1/2023 pursuant to Oral Order at dkt. # 320 − − MOTION for Leave to File *Supplemental Brief in Support of Mot. to Compel* by Richard Mast. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Exhibit 1 (Under Seal), # 2 Exhibit 2 (Under Seal), # 3 Text of Proposed Order)(Yerushalmi, David) Modified on 11/1/2023 (jv). |
| 10/26/2023 | 319 | MOTION to Seal Document 318 MOTION for Leave to File *Supplemental Brief in Support of Mot. to Compel Exhibits 1 and 2* by Richard Mast. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order)(Yerushalmi, David) |
| 11/01/2023 | 320 | ORAL ORDER denying 318 Motion for Leave to File. The briefing is complete on Defendant Richard Mast's motion to compel, and the Court held a hearing on that motion. Defendant Richard Mast's proposed supplemental brief does not assist the court in rendering a decision on the motion. Accordingly, the motion is denied, and the Clerk is directed to strike the motion. Entered by Magistrate Judge Joel C. Hoppe on 11/1/23. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(JCH) |
| 11/01/2023 | 321 | ORAL ORDER finding as moot 319 Motion to Seal Document 319 MOTION to Seal Document 318 MOTION for Leave to File *Supplemental Brief in Support of Mot. to Compel Exhibits 1 and 2.* Entered by Magistrate Judge Joel C. Hoppe on 11/1/23. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(JCH) |
| 11/09/2023 | 322 | ORDER denying 237 Motion to Stay Discovery. Signed by Magistrate Judge Joel C. Hoppe on 11/9/2023. (skm) |
| 11/14/2023 | 323 | NOTICE of Hearing on Motion 300 MOTION to Compel : **(FTR)** Motion Hearing set for 11/21/2023 11:00 AM by telephone conference before Magistrate Judge Joel C. Hoppe. (kld) |
| 11/21/2023 | 324 | Minute Entry for proceedings held before Magistrate Judge Joel C. Hoppe: Motion Hearing held on 11/21/2023 re 300 MOTION to Compel filed by Stephanie Mast, Joshua Mast. (Cisco Conference Operator: Karen Dotson) (kld) |
| 11/21/2023 | 325 | Log Notes for Motion Hearing in the Harrisonburg Division held before Judge Joel C. Hoppe on 11/21/23. In accordance with 28 USC 753(b), I certify that I monitored the digital recording of this proceeding and that it is a true and correct record, that it is sufficiently intelligible when played on the FTR (For the Record) Player, and that it can be transcribed without undue difficulty. CISCO Conference Operator: Karen Dotson (kld) |
| 11/28/2023 | 326 | MEMORANDUM OPINION AND ORDER granting 230 Motion to Compel. Signed by Magistrate Judge Joel C. Hoppe on 11/28/2023. (skm) |
| 11/28/2023 | 327 | MOTION to Seal *Their Reply in Support of Their Motion to Compel and Their Deficiency Letter Attached to the Motion to Compel* by Joshua Mast, Stephanie Mast. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 [Proposed] |

| | | |
|---|---|---|
| | | Order)(Francisco, Michael) |
| 11/28/2023 | 328 | Reply re 317 Reply − *Corrected Reply in Support of Their Motion to Compel Production by John & Jane Doe Re Their Interrogatories & Requests for Production*. filed by Joshua Mast, Stephanie Mast. (Francisco, Michael) |
| 11/29/2023 | 329 | ORAL ORDER granting 327 Motion to Seal. Joshua and Stephanie Mast's Reply Brief, ECF No. 317, and Exhibit 7, ECF No. 300−7, shall be filed under seal. Entered by Magistrate Judge Joel C. Hoppe on 11/29/23. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(JCH) |
| 12/04/2023 | 330 | NOTICE by Richard Mast re 291 *Supplemental Authority* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2 (Under Seal))(Yerushalmi, David) |
| 12/04/2023 | 331 | MOTION to Seal Document 330 Notice (Other) *of Supplemental Authority* by Richard Mast. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order)(Yerushalmi, David) |
| 12/05/2023 | 332 | ORDER granting 307 Amended Motion to Compel; finding as moot 302 Motion to Compel. Signed by Magistrate Judge Joel C. Hoppe on 12/5/2023. (Order mailed to nonparty John David Gibson via US Mail)(skm) |
| 12/07/2023 | 333 | MEMORANDUM OPINION AND ORDER granting in part and denying in part 300 MOTION to Compel filed by Stephanie Mast and Joshua Mast. Signed by Magistrate Judge Joel C. Hoppe on 12/7/2023. (skm) |
| 12/11/2023 | 334 | Response re 330 Notice (Other) *Plaintiffs' Response to Richard Mast's Notice of Supplemental Authority* . filed by Baby Doe, Jane Doe, John Doe. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Eckstein, Maya) |
| 12/11/2023 | 335 | MOTION to Seal *Exhibit B of Plaintiffs' Response to Richard Mast's Notice of Supplemental Authority* by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order Exhibit A)(Eckstein, Maya) |
| 01/31/2024 | 336 | MOTION for Sanctions by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10)(Eckstein, Maya) |
| 01/31/2024 | 337 | MOTION to Seal *Exhibits 2, 7, 8, 9 to Plaintiffs' Motion for Sanctions (DKT No 336)* by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order)(Eckstein, Maya) |
| 02/09/2024 | 338 | ORDER granting 337 Motion to Seal Exhibits 2, 7, 8, 9 to Plaintiffs' Motion for Sanctions (DKT No 336). Signed by Magistrate Judge Joel C. Hoppe on 2/9/2024. (skm) |
| 02/09/2024 | 339 | Sealed Exhibits re 336 Motion for Sanctions by Baby Doe, Jane Doe, John Doe. (Attachments: # 1 Exhibit 7, # 2 Exhibit 8, # 3 Exhibit 9)(skm) |
| 02/14/2024 | 340 | RESPONSE in Opposition re 336 MOTION for Sanctions . filed by Joshua Mast, Stephanie Mast. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Francisco, Michael) |
| 02/21/2024 | 341 | Reply re 336 MOTION for Sanctions . filed by Baby Doe, Jane Doe, John Doe. (Attachments: # 1 Sealed Exhibit 1, # 2 Exhibit 2)(Eckstein, Maya) (Attachment 1 replaced on 5/6/2024) (dsa). Replaced Exhibit 1 with sealed document pursuant to 398 order Modified on 5/6/2024 (dsa). |
| 02/21/2024 | 342 | MOTION to Seal by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order)(Eckstein, Maya) |
| 02/22/2024 | 343 | ORDER granting 342 Motion to Seal Exhibit 1 to Reply Brief. Signed by Magistrate Judge Joel C. Hoppe on 2/22/2024. (skm) |
| 02/22/2024 | 344 | Sealed Exhibit 1 re 341 Reply Brief in Support of 336 Motion for Sanctions by Baby Doe, Jane Doe, John Doe. (skm) |
| 02/25/2024 | 345 | MOTION to Quash *Modify Subpoena and for Protective Order* by Richard Mast. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2 |

| | | (Under Seal), # <u>3</u> Exhibit 3, # <u>4</u> Exhibit 4, # <u>5</u> Exhibit 5, # <u>6</u> Exhibit 6, # <u>7</u> Text of Proposed Order)(Yerushalmi, David) |
|---|---|---|
| 02/25/2024 | <u>346</u> | MOTION to Seal *Ex. 2 to Mot. to Quash/Modify and Prot. Order* by Richard Mast. Motions referred to Judge Joel C. Hoppe. (Attachments: # <u>1</u> Text of Proposed Order)(Yerushalmi, David) |
| 02/25/2024 | <u>347</u> | MOTION for Protective Order , MOTION to Quash *Plaintiffs' Subpoena of Nonparty Liberty University* by Joshua Mast, Stephanie Mast. Motions referred to Judge Joel C. Hoppe. (Attachments: # <u>1</u> Memorandum in Support of Motion to Quash Plaintiffs' Subpoena of Nonparty Liberty University and for a Protective Order, # <u>2</u> Exhibit Exhibit 1 − Sealed cover sheet, # <u>3</u> Exhibit Exhibit 2 − Subpoena, # <u>4</u> Text of Proposed Order Proposed Order)(Francisco, Michael) |
| 02/25/2024 | <u>348</u> | MOTION to Seal Document <u>347</u> MOTION for Protective Order MOTION to Quash *Plaintiffs' Subpoena of Nonparty Liberty University* by Joshua Mast, Stephanie Mast. Motions referred to Judge Joel C. Hoppe. (Attachments: # <u>1</u> Text of Proposed Order Proposed Order)(Francisco, Michael) |
| 02/26/2024 | <u>349</u> | ORDER granting <u>346</u> Motion to Seal Exhibit 2. Signed by Magistrate Judge Joel C. Hoppe on 2/26/2024. (skm) |
| 02/26/2024 | <u>350</u> | Sealed Exhibit 2 re <u>345</u> Motion to Quash/Modify Subpoena and Motion for Protective Order by Richard Mast. (skm) |
| 02/27/2024 | <u>351</u> | ORDER granting <u>348</u> Motion to Seal Document <u>347</u> MOTION for Protective Order MOTION to Quash *Plaintiffs' Subpoena of Nonparty Liberty University* . Signed by Magistrate Judge Joel C. Hoppe on 2/27/2024. (dsa) |
| 02/27/2024 | <u>352</u> | Sealed Exhibit 1 re: <u>347</u> MOTION for Protective Order, MOTION to Quash Plaintiffs' Subpoena of Nonparty Liberty University by Stephanie Mast and Joshua Mast. (dsa) |
| 03/07/2024 | <u>353</u> | NOTICE by Richard Mast re <u>345</u> *of Supplemental Filing* (Attachments: # <u>1</u> Exhibit 7 Under Seal)(Yerushalmi, David) |
| 03/07/2024 | <u>354</u> | MOTION to Seal Document <u>353</u> Notice (Other) by Richard Mast. Motions referred to Judge Joel C. Hoppe. (Attachments: # <u>1</u> Text of Proposed Order)(Yerushalmi, David) |
| 03/07/2024 | <u>355</u> | MOTION to Withdraw as Attorney by Caleb Mast. Motions referred to Judge Joel C. Hoppe. (Attachments: # <u>1</u> Text of Proposed Order)(Williams, Melvin) |
| 03/07/2024 | <u>356</u> | MOTION to Compel by Joshua Mast, Stephanie Mast. Motions referred to Judge Joel C. Hoppe. (Attachments: # <u>1</u> Exhibit Exhibit A − Mast Third Interrogatories, # <u>2</u> Exhibit Exhibit B − Plaintiffs' Objections to Third Interrogatories, # <u>3</u> Exhibit Exhibit C − Sealed Exhibit, # <u>4</u> Text of Proposed Order Proposed Order Granting Motion to Compel)(Francisco, Michael) |
| 03/07/2024 | <u>357</u> | MOTION to Seal *Exhibit C* by Joshua Mast, Stephanie Mast. Motions referred to Judge Joel C. Hoppe. (Attachments: # <u>1</u> Text of Proposed Order Proposed Order Granting Motion to Seal Exhibit)(Francisco, Michael) |
| 03/11/2024 | <u>358</u> | Cross MOTION to Compel *Joshua, Stephanie and Richard Mast* by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Eckstein, Maya) |
| 03/11/2024 | <u>359</u> | Brief / Memorandum in Opposition re <u>345</u> MOTION to Quash */Modify Subpoena and for Protective Order*, <u>347</u> MOTION for Protective Order MOTION to Quash *Plaintiffs' Subpoena of Nonparty Liberty University Opposition to Motions to Quash and for Protective order, and* <u>358</u> *Cross Motion to Compel*. filed by Baby Doe, Jane Doe, John Doe. (Attachments: # <u>1</u> Exhibit 1, # <u>2</u> Exhibit 2, # <u>3</u> Exhibit 3−REDACTED−FILED UNDER SEAL, # <u>4</u> Exhibit 4, # <u>5</u> Exhibit 5−REDACTED−FILED UNDER SEAL, # <u>6</u> Exhibit 6, # <u>7</u> Exhibit 7, # <u>8</u> Exhibit 8, # <u>9</u> Exhibit 9 − FILED UNDER SEAL, # <u>10</u> Exhibit 10− FILED UNDER SEAL, # <u>11</u> Exhibit 11− FILED UNDER SEAL, # <u>12</u> Exhibit 12− FILED UNDER SEAL, # <u>13</u> Exhibit 13)(Eckstein, Maya) |
| 03/11/2024 | <u>360</u> | MOTION to Seal *Exhibits 3, 5, 9, 10, 11 and 12* by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # <u>1</u> Text of Proposed Order Proposed Order)(Eckstein, Maya) |

| 03/13/2024 | 361 | Amended Exhibit *Exhibit 5 to Dkt. 358* by Baby Doe, Jane Doe, John Doe. (Eckstein, Maya) |
|---|---|---|
| 03/13/2024 | 362 | ORDER granting 354 Motion to Seal Document re 353 Notice. Signed by Magistrate Judge Joel C. Hoppe on 3/13/2024. (skm) |
| 03/13/2024 | 363 | Sealed Exhibit 7 as to 353 Notice of Supplemental Filing re 345 Motion to Quash/Modify Subpoena and for Protective Order by Richard Mast. (skm) |
| 03/13/2024 | 364 | ORDER granting 355 Motion to Withdraw as Attorney. Attorney Melvin E Williams terminated. Signed by Magistrate Judge Joel C. Hoppe on 3/13/2024. (skm) |
| 03/13/2024 | 365 | ORDER granting 357 Motion to Seal Exhibit C. Signed by Magistrate Judge Joel C. Hoppe on 3/13/2024. (skm) |
| 03/13/2024 | 366 | Sealed Exhibit C re 356 Motion to Compel by Joshua Mast, Stephanie Mast. (skm) |
| 03/13/2024 | 367 | ORDER granting 360 Motion to Seal Exhibits 3, 5, 9, 10, 11 and 12. Signed by Magistrate Judge Joel C. Hoppe on 3/13/2024. (skm) |
| 03/13/2024 | 368 | Sealed Exhibits 3, 5, 5 (Amended), 9, 10, 11 and 12 re 359 Brief/Memorandum in Opposition re 345 Motion, 347 Motion and in Support of 358 Cross Motion to Compel by Baby Doe, Jane Doe, John Doe. (Attachments: # 1 Exhibit 5, # 2 Amended Exhibit 5, # 3 Exhibit 9, # 4 Exhibit 10, # 5 Exhibit 11, # 6 Exhibit 12)(skm) |
| 03/18/2024 | 369 | REPLY to Response to Motion re 345 MOTION to Quash *Modify Subpoena and for Protective Order*, 358 Cross MOTION to Compel *Joshua, Stephanie and Richard Mast* , Response . filed by Richard Mast. (Attachments: # 1 Exhibit 1)(Yerushalmi, David) |
| 03/21/2024 | 370 | Brief / Memorandum in Opposition re 356 MOTION to Compel . filed by Baby Doe, Jane Doe, John Doe. (Eckstein, Maya) |
| 03/21/2024 | 371 | MOTION to Seal *Plaintiffs' Opposition to Defendants Motion to Compel* by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order Proposed Order)(Eckstein, Maya) |
| 03/22/2024 | 372 | ORAL ORDER granting 371 Motion to Seal. Plaintiff's unredacted brief in opposition to motion to compel shall be filed under seal. Entered by Magistrate Judge Joel C. Hoppe on 3/22/24. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.* (The Clerk is directed to mail a copy of this Order to any applicable pro se party/parties via US Mail)(JCH) |
| 03/22/2024 | 373 | Sealed Document: Plaintiffs' Opposition to Defendants Joshua and Stephanie Mast's Motion, and Memorandum in Support, to Compel Production 356 by John and Jane Doe Regarding Their Interrogatories. (dsa) |
| 03/25/2024 | 374 | Reply re 347 MOTION for Protective Order MOTION to Quash *Plaintiffs' Subpoena of Nonparty Liberty University*, 358 Cross MOTION to Compel *Joshua, Stephanie and Richard Mast* . filed by Joshua Mast, Stephanie Mast. (Attachments: # 1 Exhibit 1)(Francisco, Michael) |
| 03/25/2024 | 375 | Reply re 358 Cross MOTION to Compel *Joshua, Stephanie and Richard Mast Plaintiffs' Reply Memorandum in Support of Cross Motion to Compel as to Richard Mast*. filed by Baby Doe, Jane Doe, John Doe. (Eckstein, Maya) |
| 03/26/2024 | 376 | MEMORANDUM OPINION AND ORDER denying as moot 219 Motion to Compel; denying with prejudice 289 Supplemental MOTION to Compel, 291 Supplemental MOTION to Compel *Redacted*; denying without prejudice as moot 331 MOTION to Seal Document 330 Notice *of Supplemental Authority*, 335 MOTION to Seal *Exhibit B of Plaintiffs' Response to Richard Mast's Notice of Supplemental Authority*. Signed by Magistrate Judge Joel C. Hoppe on 3/26/2024. (skm) |
| 03/28/2024 | 377 | Reply re 356 MOTION to Compel *Their Reply in Support of Their Motion to Compel and Their Deficiency Letter Attached to the Motion to Compel*. filed by Joshua Mast, Stephanie Mast. (Francisco, Michael) |
| 03/29/2024 | 378 | MEMORANDUM OPINION & ORDER granting 256 Motion to Quash. Signed by Magistrate Judge Joel C. Hoppe on 3/29/24. (kld) |

| | | |
|---|---|---|
| 03/29/2024 | 379 | ORAL ORDER: This matter is before the Court upon the Defendant Richard Mast's motion for leave to file a supplemental brief and attachment in support of the pending motions to vacate and modify the protective order. In view of the limited nature and length of the additional filing, the Court will permit the filing and grant the motion for leave to file, Dkt. 272 , reserving any determination of the relevance and persuasiveness of their contents for the Court's resolution of the underlying motions to vacate and modify. It is so ORDERED. Entered by Senior Judge Norman K. Moon on 03/29/2024. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(ck) |
| 04/01/2024 | 380 | Reply re 358 Cross MOTION to Compel *Joshua, Stephanie and Richard Mast PLAINTIFFS REPLY MEMORANDUM IN SUPPORT OF CROSS MOTION TO COMPEL AS TO JOSHUA AND STEPHANIE MAST.* filed by Baby Doe, Jane Doe, John Doe. (Eckstein, Maya) |
| 04/02/2024 | 381 | MOTION for Leave to File *Sur−Reply in Support of Motion for Sanctions* by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Eckstein, Maya) |
| 04/02/2024 | 382 | Reply re 381 MOTION for Leave to File *Sur−Reply in Support of Motion for Sanctions* . filed by Baby Doe, Jane Doe, John Doe. (Attachments: # 1 Exhibit Ex. 1)(Eckstein, Maya) |
| 04/09/2024 | 383 | NOTICE of Hearing on Motion 381 MOTION for Leave to File *Sur−Reply in Support of Motion for Sanctions*, 347 MOTION for Protective Order MOTION to Quash *Plaintiffs' Subpoena of Nonparty Liberty University*, 358 Cross MOTION to Compel *Joshua, Stephanie and Richard Mast*, 356 MOTION to Compel , 336 MOTION for Sanctions : **(FTR)**   Motion Hearing set for 5/2/2024 11:00 AM by telephone conference before Magistrate Judge Joel C. Hoppe. (kld) |
| 04/12/2024 | 384 | MOTION for Hearing *Unopposed Motion for Pre−Hearing Briefing Schedule* by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Exhibit Proposed Order)(Eckstein, Maya) |
| 04/12/2024 | 385 | ORDER granting 384 Motion for Pre−Hearing Briefing Schedule. Signed by Senior Judge Norman K. Moon on 4/12/2024. (skm) |
| 04/17/2024 | 386 | NOTICE of In−Person Hearing on Motion: 231 Emergency MOTION for Order to Show Cause. **(CR)   Motion / Show Cause Hearing set for May 29, 2024 at 1:00 PM in Charlottesville before Senior Judge Norman K. Moon.** (*Hearing set for 2 1/2 hours*) (ca) |
| 04/18/2024 | 387 | ORAL ORDER granting 381 Motion for Leave to File sur−reply. Entered by Magistrate Judge Joel C. Hoppe on 4/18/24. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.* (The Clerk is directed to mail a copy of this Order to any applicable pro se party/parties via US Mail)(JCH) |
| 04/30/2024 | 388 | MOTION for *Francis J. Aul* to Appear Pro Hac Vice. Filing fee $ 100, receipt number AVAWDC−4417880. by Joshua Mast, Stephanie Mast. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order)(Moran, John) |
| 04/30/2024 | 389 | MOTION to Quash *Subpoenas* by United States. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Memorandum in Support, # 2 Exhibit A (redacted), # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G − Department of State, Response, # 9 Exhibit H − Department of Defense, Response, # 10 Exhibit I − Oral ruling, Baby L (redacted), # 11 Exhibit J − Notice of Transfer, Baby L (redacted), # 12 Text of Proposed Order)(Wyer, Kathryn) (Additional attachment(s) added on 5/1/2024: # 13 Exhibit Sealed Unredacted Exhibit A, # 14 Exhibit Sealed Unredacted Exhibit I, # 15 Exhibit Sealed Undredacted Exhibit J) Modified on 5/1/2024 to add sealed exhibits as per order 391 . (dsa). |
| 04/30/2024 | 390 | MOTION to Seal Document by United States. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Exhibit A − Baby L Order of Nov. 30, 2023, # 2 Text of Proposed Order)(Wyer, Kathryn) |
| 05/01/2024 | 391 | NOTICE by Baby Doe, Jane Doe, John Doe *Notice of Withdrawal of Jeremy C. King, Esq. as counsel on behalf of Plaintiffs John, Jane, and Baby Doe.* (King, Jeremy) |

| 05/01/2024 | 392 | ORDER granting 390 Motion to Seal Document 390 MOTION to Seal Document . Signed by Magistrate Judge Joel C. Hoppe on 5/1/2024. (dsa) |
|---|---|---|
| 05/01/2024 | 393 | NOTICE of Change of Address by Michael Lee Francisco (Francisco, Michael) |
| 05/02/2024 | 394 | Minute Entry for proceedings held before Magistrate Judge Joel C. Hoppe: Telephonic Motion Hearing held on 5/2/2024 re 345 MOTION to Quash *Modify Subpoena and for Protective Order* filed by Richard Mast, 347 MOTION for Protective Order MOTION to Quash *Plaintiffs' Subpoena of Nonparty Liberty University* filed by Stephanie Mast, Joshua Mast, 358 Cross MOTION to Compel *Joshua, Stephanie and Richard Mast* filed by John Doe, Baby Doe, Jane Doe, 356 MOTION to Compel filed by Stephanie Mast, Joshua Mast, 336 MOTION for Sanctions filed by John Doe, Baby Doe, Jane Doe. (FTR Operator: Karen Dotson) (kld) |
| 05/02/2024 | 395 | FTR Log Notes for Motions Hearing in the Harrisonburg Division held before Judge Joel C. Hoppe on 5/2/24. In accordance with 28 USC 753(b), I certify that I monitored the digital recording of this proceeding and that it is a true and correct record, that it is sufficiently intelligible when played on the FTR (For the Record) Player, and that it can be transcribed without undue difficulty. CISCO Conference Operator: Karen Dotson (kld) |
| 05/03/2024 | 396 | ORAL ORDER granting 388 MOTION for Francis J. Aul to Appear Pro Hac Vice in this case. Entered by Magistrate Judge Joel C. Hoppe on 5/3/24. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.* (The Clerk is directed to mail a copy of this Order to any applicable pro se party/parties via US Mail)(JCH) |
| 05/03/2024 | 397 | MOTION to Seal *Exhibit 1A to ECF No. 341* by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order)(Eckstein, Maya) |
| 05/06/2024 | 398 | ORDER granting 397 Motion to Seal Exhibit 1A to ECF No. 341. Signed by Magistrate Judge Joel C. Hoppe on 5/6/2024. (dsa) Modified to correct Judge Modified on 5/6/2024 (dsa). |
| 05/08/2024 | 399 | Joint MOTION to Amend/Correct 306 Pretrial Order by Richard Mast. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order)(Yerushalmi, David) |
| 05/08/2024 | 400 | ORDER granting in part and denying in part 356 Motion to Compel. Signed by Magistrate Judge Joel C. Hoppe on 5/8/2024. (skm) |
| 05/10/2024 | 401 | MOTION for Extension of Time to File *BRIEFS PURSUANT TO NON−PARTY THE UNITED STATES MOTION TO QUASH SUBPOENAS* by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order Proposed Order)(Eckstein, Maya) |
| 05/10/2024 | 402 | ORDER granting 401 Motion for Extension of Time to File BRIEFS PURSUANT TO NON−PARTY THE UNITED STATES MOTION TO QUASH SUBPOENAS. Plaintiff's brief due May 21, 2024. United States' reply due May 31, 2024. Signed by Magistrate Judge Joel C. Hoppe on 5/10/2024. (dsa) |
| 05/15/2024 | 403 | PRETRIAL MEMORANDUM by Baby Doe, Jane Doe, John Doe (Attachments: # 1 Exhibit Ex.A. Filed Under Seal, # 2 Exhibit Ex.B Filed Under Seal, # 3 Exhibit Ex.C, # 4 Exhibit Ex.D, # 5 Exhibit Ex.E, # 6 Exhibit Ex.F Redacted, # 7 Exhibit Ex.G, # 8 Exhibit Ex.H, # 9 Exhibit Ex.I Filed Under Seal, # 10 Exhibit Ex.J Filed Under Seal, # 11 Exhibit Ex.K, # 12 Exhibit Ex.L Filed Under Seal, # 13 Exhibit Ex.M Redacted, # 14 Exhibit Ex.N Filed Under Seal, # 15 Exhibit Ex.O, # 16 Exhibit Ex.P, # 17 Exhibit Ex.Q, # 18 Exhibit Ex.R Filed Under Seal)(Eckstein, Maya) |
| 05/15/2024 | 404 | MOTION to Seal *Exhibits A, B, F, I, J, L, M, N, R to PreTrial Memorandum* by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order Order)(Eckstein, Maya) |
| 05/16/2024 | 405 | NOTICE of Hearing on Motion 399 Joint MOTION to Amend/Correct 306 Pretrial Order : **(FTR)**   Motion Hearing set for 5/28/2024 12:00 PM in by telephone conference before Magistrate Judge Joel C. Hoppe. (kld) |

| 05/16/2024 | 406 | ORDER granting 404 Motion to Seal Exhibits A, B, F, I, J, L, M, N, R to PreTrial Memorandum. Exhibits A, B, I, J, L, N, and R to Plaintiffs' Pre−hearing Brief is filed under seal. Signed by Magistrate Judge Joel C. Hoppe on 5/16/2024. (skm) |
| --- | --- | --- |
| 05/16/2024 | 407 | Sealed Exhibits A, B, I, J, L, N, and R re 403 Pre−Hearing Brief in Support of Motion to Show Cause by Baby Doe, Jane Doe, John Doe. (Attachments: # 1 Exhibit B, # 2 Exhibit I, # 3 Exhibit J, # 4 Exhibit L, # 5 Exhibit N, # 6 Exhibit R)(skm) |
| 05/21/2024 | 408 | RESPONSE in Opposition re 389 MOTION to Quash *Subpoenas* . filed by Baby Doe, Jane Doe, John Doe. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C, # 4 Exhibit Exhibit D, # 5 Exhibit Exhibit E, # 6 Exhibit Exhibit F, # 7 Exhibit Exhibit G, # 8 Exhibit Exhibit H, # 9 Exhibit Exhibit I, # 10 Exhibit Exhibit J−under seal, # 11 Exhibit Exhibit K−under seal, # 12 Exhibit Exhibit L−under seal, # 13 Exhibit Exhibit M, # 14 Exhibit Exhibit N−under seal, # 15 Exhibit Exhibit O−under seal, # 16 Exhibit Exhibit P−under seal)(Eckstein, Maya) |
| 05/21/2024 | 409 | MOTION to Seal *Exhibits J, K, L, N, O, P to Plaintiffs' Opposition to Non Party Motion to Quash Subpoena*sto by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order Proposed Order)(Eckstein, Maya) |
| 05/21/2024 | 410 | RESPONSE to Motion re 389 MOTION to Quash *Subpoenas* . filed by Joshua Mast, Stephanie Mast. (Moran, John) |
| 05/22/2024 | 411 | NOTICE of Hearing on Motion: 231 Emergency MOTION for Order to Show Cause : **(CR)  — Motion Hearing set for May 29, 2024 at 1:00 PM in Charlottesville before Senior Judge Norman K. Moon.** (ca) |
| 05/22/2024 | 412 | RESPONSE in Opposition re 399 Joint MOTION to Amend/Correct 306 Pretrial Order . filed by Baby Doe, Jane Doe, John Doe. (Attachments: # 1 Exhibit Ex.A, # 2 Exhibit Ex.B, # 3 Exhibit Ex.C)(Eckstein, Maya) |
| 05/22/2024 | 413 | ORDER granting 409 Motion to Seal Exhibits J, K, L, N, O, P to Plaintiffs' Opposition to Non Party Motion to Quash Subpoenas. Signed by Magistrate Judge Joel C. Hoppe on 5/22/2024. (skm) |
| 05/22/2024 | 414 | Sealed Exhibits J, K, L, N, O, P to Plaintiffs' 408 Opposition to Non Party 389 Motion to Quash Subpoenas. (Attachments: # 1 Exhibit K, # 2 Exhibit L, # 3 Exhibit N, # 4 Exhibit O, # 5 Exhibit P)(skm) |
| 05/22/2024 | 415 | PRETRIAL MEMORANDUM by Joshua Mast, Stephanie Mast (Attachments: # 1 Exhibit A, # 2 Exhibit B − under seal, # 3 Exhibit C − under seal, # 4 Exhibit D, # 5 Exhibit E − under seal)(Moran, John) (Additional attachment(s) added on 6/3/2024: # 6 Sealed Unredacted Pre−Hearing Brief) (dsa) *Modified on 6/3/2024 to add sealed exhibits and sealed brief. Sealed pursuant to 433 order.* . (dsa) |
| 05/22/2024 | 416 | MOTION to Seal Document 415 Pretrial Memorandum *and Exhibits* by Joshua Mast, Stephanie Mast. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order)(Moran, John) |
| 05/23/2024 | 417 | MOTION Motion to Determine the Sufficiency of Joshua Mast's Responses to Plaintiffs' Second Requests for Admission by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Exhibit Ex.A, # 2 Exhibit Ex.B, # 3 Exhibit Ex.C − sealed unredacted, # 4 Exhibit Ex.D)(Eckstein, Maya) (Additional attachment(s) added on 5/28/2024: # 5 Exhibit C − redacted) (kld). *Modified on 5/28/2024 to add redacted exhibit C and sealed unredacted version of exhibit C. (kld)* |
| 05/24/2024 | 418 | ORAL ORDER granting 399 Motion to Amend/Correct. The trial date is continued, and the hearing on the motion to amend the pretrial order scheduled for May 28, 2024, is cancelled. The Court will issue a new the trial date after consulting with the parties and a revised case schedule. Entered by Magistrate Judge Joel C. Hoppe on 5/24/24. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.* (The Clerk is directed to mail a copy of this Order to any applicable pro se party/parties via US Mail)(JCH) |
| 05/24/2024 | 419 | REPLY to Response to Motion re 399 Joint MOTION to Amend/Correct 306 Pretrial Order . filed by Richard Mast. (Yerushalmi, David) |

| 05/28/2024 | 420 | **Notice of Cancellation of Jury Trial set for September 9 − 13 & 16 − 20, 2024 in Charlottesville.** (Cancel Court Reporter) (Trial to be Rescheduled) (ca) |
|---|---|---|
| 05/28/2024 | 421 | Notice of Cancellation of telephonic Motion Hearing 8/28/24 at 12:00 pm (No Court Reporter Requested) (kld) |
| 05/29/2024 | 422 | Minute Entry for proceedings held before Senior Judge Norman K. Moon: Motion Hearing held on 5/29/2024 re 231 Emergency MOTION for Order to Show Cause filed by John Doe, Baby Doe, and Jane Doe. (Court Reporter: Sindie Bragg) (ca) |
| 05/29/2024 | 423 | TRANSCRIPT REQUEST (14 calendar days Service) by Baby Doe, Jane Doe, John Doe for Motions Hearing held on 05/29/2024 reported by Court Reporter Sindie Bragg before Judge Norman Moon. *Transcript Due Deadline will be set when Financial Arrangements are made.* (Eckstein, Maya) |
| 05/30/2024 | 424 | TRANSCRIPT REQUEST (Daily Service) by Richard Mast for Hearing held on 5/29/2024 reported by Court Reporter Sindie Bragg before Judge Norman Moon. *Transcript Due Deadline will be set when Financial Arrangements are made.* (Yerushalmi, David) |
| 05/30/2024 | 425 | NOTICE of Appearance *of Jonathan Mast* by Elliott Michael Harding on behalf of Jonathan Mast (Harding, Elliott) |
| 05/30/2024 | 426 | TRANSCRIPT REQUEST (Expedited−7 calendar days Service) *(Amended)* by Richard Mast for Hearing held on 5/29/2024 reported by Court Reporter Sindie Bragg before Judge Norman Moon. *Transcript Due Deadline will be set when Financial Arrangements are made.* (Yerushalmi, David) |
| 05/30/2024 | 427 | **Financial arrangements made** (Original) (Expedited−7 calendar days Service) re 426 Transcript Request, **Transcript due by 6/6/2024.** (clb) |
| 05/30/2024 | 428 | **Financial arrangements made** (Copy) (14 calendar days Service) re 423 Transcript Request, **Transcript due by 6/13/2024.** (clb) |
| 05/30/2024 | 429 | MOTION for Leave to File *Post−Hearing Brief* by Jonathan Mast. Motions referred to Judge Joel C. Hoppe. (Harding, Elliott) |
| 05/30/2024 | 430 | TRANSCRIPT REQUEST (14 calendar days Service) by Kimberley Motley for Motion Hearing held on 05/29/2024 reported by Court Reporter Sindie Bragg before Judge Norman Moon. *Transcript Due Deadline will be set when Financial Arrangements are made.* (Davison, Thomas) |
| 05/31/2024 | 431 | **Financial arrangements made** (Copy) (14 calendar days Service) re 430 Transcript Request, **Transcript due by 6/14/2024.** (clb) |
| 05/31/2024 | 432 | Reply re 389 MOTION to Quash *Subpoenas* . filed by United States. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Declaration of Col. Joseph M. Fairfield)(Wyer, Kathryn) |
| 06/03/2024 | 433 | ORDER granting 416 Motion to Seal Document 415 Pretrial Memorandum *and Exhibits*. Signed by Magistrate Judge Joel C. Hoppe on 6/3/2024. (dsa) |
| 06/04/2024 | 434 | ORAL ORDER: Upon consideration of counsel for Jonathan Mast's motion for leave to file a post−hearing memorandum (Dkt. 429 ), the Court concludes that the relief requested is warranted and the Motion shall be GRANTED. Counsel for Jonathan Mast shall have until June 7 to file a post−hearing memorandum. Plaintiffs may, but need not, file any reply to Jonathan Mast's memorandum within seven (7) days of its filing. If Plaintiffs do not wish to file a reply to the memorandum they shall file a notice so advising the Court. Entered by Senior Judge Norman K. Moon on 6/4/2024. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(skm) |
| 06/06/2024 | 435 | RESPONSE to Motion re 417 MOTION Motion to Determine the Sufficiency of Joshua Mast's Responses to Plaintiffs' Second Requests for Admission . filed by Joshua Mast, Stephanie Mast. (Attachments: # 1 Exhibit 1 − Amended Responses to RFAs)(Moran, John) |
| 06/07/2024 | 436 | TRANSCRIPT of Proceedings: Motions Hearing held on 5/29/2024 before Judge Norman Moon. Court Reporter/Transcriber Cynthia Bragg, Telephone number |

| | | |
|---|---|---|
| | | (276)451−6311. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vawd.uscourts.gov.** Transcript may be viewed at the court public terminal or purchased through Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER unless a Redacted Transcript has been filed. Redaction Request due 6/28/2024. Redacted Transcript Deadline set for 7/8/2024. Release of Transcript Restriction set for 9/5/2024. (clb) |
| 06/07/2024 | 437 | RESPONSE in Opposition re 231 Emergency MOTION for Order to Show Cause . filed by Jonathan Mast. (Attachments: # 1 Exhibit Fluvanna Co. Cir. Ct. Order)(Harding, Elliott) |
| 06/11/2024 | 438 | Response *to Jonathan Mast's Post−Hearing Brief in Opposition to Plaintiff's Motion to Show Cause and Sanctions* . filed by Baby Doe, Jane Doe, John Doe. (Eckstein, Maya) |
| 06/11/2024 | 439 | Supplemental Brief / Memorandum in Support re 176 MOTION to Vacate 26 Protective Order . filed by Richard Mast. (Attachments: # 1 Exhibit 1)(Yerushalmi, David) |
| 06/13/2024 | 440 | Reply re 417 MOTION Motion to Determine the Sufficiency of Joshua Mast's Responses to Plaintiffs' Second Requests for Admission . filed by Baby Doe, Jane Doe, John Doe. (Attachments: # 1 Exhibit Ex. A)(Eckstein, Maya) |
| 06/14/2024 | 441 | NOTICE of Hearing on Motion 389 MOTION to Quash *Subpoenas* : **(FTR)**   Motion Hearing set for 7/15/2024 11:00 AM by telephone conference before Magistrate Judge Joel C. Hoppe. (kld) |
| 07/08/2024 | 442 | MOTION to Vacate 26 Protective Order by Richard Mast. (Attachments: # 1 Exhibit 1 (Under Seal), # 2 Exhibit 2 (Under Seal), # 3 Exhibit 3 (Under Seal), # 4 Exhibit 4 (Under Seal), # 5 Exhibit 5 (Under Seal), # 6 Text of Proposed Order)(Yerushalmi, David) (Additional attachment(s) added on 7/9/2024: # 7 Sealed Exhibit 1, # 8 Sealed Exhibit 2, # 9 Sealed Exhibit 3, # 10 Sealed Exhibit 4, # 11 Sealed Exhibit 5) (skm). Sealed Exhibits added 7/9/2024 pursuant to 444 Oral Order(skm). |
| 07/08/2024 | 443 | MOTION to Seal by Richard Mast. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order)(Yerushalmi, David) |
| 07/09/2024 | 444 | ORAL ORDER granting 443 Motion to Seal. Exhibits 1 through 5 of Defendant Richard Mast's motion, ECF Nos. 442−1 through 442−5) shall be filed under seal until further order of the court. Entered by Magistrate Judge Joel C. Hoppe on 7/9/24. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.* (The Clerk is directed to mail a copy of this Order to any applicable pro se party/parties via US Mail)(JCH) |
| 07/10/2024 | 445 | MEMORANDUM OPINION AND ORDER granting in part and denying in part 336 Motion for Sanctions. Signed by Magistrate Judge Joel C. Hoppe on 7/10/2024. (skm) |
| 07/11/2024 | 446 | NOTICE of Appearance by Michael Randolph Shebelskie on behalf of Baby Doe, Jane Doe, John Doe (Shebelskie, Michael) |
| 07/15/2024 | 447 | FTR Log Notes for Motion Hearing held before Judge Joel C. Hoppe on 7/15/24. In accordance with 28 USC 753(b), I certify that I monitored the digital recording of this proceeding and that it is a true and correct record, that it is sufficiently intelligible when played on the FTR (For the Record) Player, and that it can be transcribed without undue difficulty. CISCO Conference Operator: Karen Dotson (kld) |
| 07/15/2024 | 448 | Minute Entry for proceedings held before Magistrate Judge Joel C. Hoppe: Telephonic Motion Hearing held on 7/15/2024 re 389 MOTION to Quash *Subpoenas* filed by United States. (CISCO Conference Operator: Karen Dotson) (kld) |
| 07/16/2024 | 449 | NOTICE by Baby Doe, Jane Doe, John Doe *Notice of Supplemental Authority* (Attachments: # 1 Exhibit VA COA Opinion)(Eckstein, Maya) |

| | | |
|---|---|---|
| 07/19/2024 | 450 | TRANSCRIPT REQUEST (Daily Service) by Joshua Mast, Stephanie Mast for Telephonic Motion Hearing held on **5/2/24** reported by Court Reporter Cynthia Bragg before Judge Joel C. Hoppe. *Transcript Due Deadline will be set when Financial Arrangements are made.* (Aul, Francis) Modified on 7/22/2024− Incorrect reporter listed on request; advised to file new request. (slt). |
| 07/22/2024 | 451 | TRANSCRIPT REQUEST (Daily Service) by Joshua Mast, Stephanie Mast for Telephonic Motion Hearing held on **May 2, 2024** reported by Court Reporter Karen Dotson before Judge Joel C. Hoppe. *Transcript Due Deadline will be set when Financial Arrangements are made.* (Aul, Francis) |
| 07/22/2024 | 452 | RESPONSE in Opposition re 442 MOTION to Vacate 26 Protective Order *Opposition to R.Mast's Motion for Leave to file Supplemental Brief to Provide Court with New Evidence and Argument to Support Motion to Vacate Protective Order and/or Motion to Modify Protective Order.* filed by Baby Doe, Jane Doe, John Doe. (Eckstein, Maya) |
| 07/22/2024 | 453 | **Financial arrangements made** (Original) (Daily Service) re 451 Transcript Request, **Transcript due by 7/23/2024.** (lmb) |
| 07/23/2024 | 454 | TRANSCRIPT of Proceedings: Telephonic Motions Hearing held on **5/2/2024** before Judge Joel Hoppe. Court Reporter/Transcriber Lisa Blair, Telephone number 434.409.4575. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vawd.uscourts.gov.** Transcript may be viewed at the court public terminal or purchased through Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER unless a Redacted Transcript has been filed. Redaction Request due 8/13/2024. Redacted Transcript Deadline set for 8/23/2024. Release of Transcript Restriction set for 10/21/2024. (lmb) |
| 07/24/2024 | 455 | MEMORANDUM OPINION AND ORDER: The Masts' Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction is GRANTED IN PART and DENIED IN PART; and their motion to dismiss pursuant to Rule 12(b)(6) is DENIED. Dkt. 85 . Osmani and Motley's Rule 12(b)(2) motions to dismiss for lack of personal jurisdiction are DENIED; and their motion to dismiss pursuant to Rule 12(b)(6) is DENIED. Dkts. 90 , 92 . Richard Mast's Rule 12(b)(6) motion to dismiss is DENIED. Dkt. 88 . Signed by Senior Judge Norman K. Moon on 7/24/2024. (skm) |
| 07/24/2024 | 456 | MOTION for Reconsideration re 445 Order on Motion for Sanctions by Joshua Mast, Stephanie Mast. (Moran, John) |
| 07/24/2024 | 457 | Brief / Memorandum in Support re 456 MOTION for Reconsideration re 445 Order on Motion for Sanctions . filed by Joshua Mast, Stephanie Mast. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K)(Moran, John) |
| 07/29/2024 | 458 | REPLY to Response to Motion re 442 MOTION to Vacate 26 Protective Order . filed by Richard Mast. (Yerushalmi, David) |
| 07/30/2024 | 459 | MOTION to Withdraw as Attorney *Damon Porter* by Baby Doe, Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order)(Connelly, Blair) |
| 07/30/2024 | 460 | NOTICE by Jane Doe, John Doe *Voluntary Dismissal of Defendant Ahmad Osmani* (Eckstein, Maya) |
| 07/31/2024 | 461 | MOTION for Attorney Fees by Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Eckstein, Maya) |
| 07/31/2024 | 462 | Brief / Memorandum in Support re 461 MOTION for Attorney Fees . filed by Jane Doe, John Doe. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Eckstein, Maya) |
| 08/06/2024 | 463 | Consent MOTION for Extension of Time to File Answer re 68 Amended Complaint by Kimberley Motley. Motions referred to Judge Joel C. Hoppe. (Davison, Thomas) |

| 08/07/2024 | 464 | ORAL ORDER granting 463 Motion for Extension of Time to Answer re 463 Consent MOTION for Extension of Time to File Answer re 68 Amended Complaint Kimberley Motley answer due 8/21/2024. Defendant Kimberley Motley shall file an answer to the amended complaint no later than August 21, 2024. Entered by Magistrate Judge Joel C. Hoppe on 8/7/24. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.* (The Clerk is directed to mail a copy of this Order to any applicable pro se party/parties via US Mail)(JCH) |
| 08/07/2024 | 465 | ORAL ORDER granting 459 Motion to Withdraw as Attorney. Attorney Damon R. Porter terminated. Entered by Magistrate Judge Joel C. Hoppe on 8/7/24. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.* (The Clerk is directed to mail a copy of this Order to any applicable pro se party/parties via US Mail)(JCH) |
| 08/07/2024 | 466 | Brief / Memorandum in Opposition re 456 MOTION for Reconsideration re 445 Order on Motion for Sanctions . filed by Jane Doe, John Doe. (Eckstein, Maya) |
| 08/07/2024 | 467 | ANSWER to 68 Amended Complaint with JURY DEMAND *Affirmative Defenses and*, COUNTERCLAIM against Jane Doe, John Doe by Stephanie Mast, Joshua Mast.(Moran, John) (Additional attachment(s) added on 8/13/2024: # 1 Sealed Unredacted Answer) (skm). Modified on 8/13/2024 to attach sealed answer pursuant to 471 Order. (skm). |
| 08/07/2024 | 468 | MOTION to Seal by Joshua Mast, Stephanie Mast. Motions referred to Judge Joel C. Hoppe. (Moran, John) |
| 08/07/2024 | 469 | COUNTERCLAIM against Jane Doe, John Doe, filed by Richard Mast.(Yerushalmi, David) Modified to restrict entry on 8/8/2024, per filing attorney document refiled correctly at docket 470 (skm). |
| 08/07/2024 | 470 | ANSWER to 68 Amended Complaint with JURY DEMAND , COUNTERCLAIM against Jane Doe, John Doe by Richard Mast.(Yerushalmi, David) |
| 08/13/2024 | 471 | ORDER granting 468 Motion to Seal. Signed by Magistrate Judge Joel C. Hoppe on 8/12/2024. (skm) |
| 08/14/2024 | 472 | REPLY to Response to Motion re 456 MOTION for Reconsideration re 445 Order on Motion for Sanctions . filed by Joshua Mast, Stephanie Mast. (Moran, John) |
| 08/16/2024 | 473 | MEMORANDUM OPINION AND ORDER denying 130 Motion to Amend/Correct 26 Protective Order; denying 176 Motion to Vacate 26 Protective Order; denying 442 Motion to Vacate 26 Protective Order; denying 141 Motion for Order to Show Cause; denying 142 Supplemental Motion for Order to Show Cause; granting 231 Motion for Order to Show Cause. In view of the Court's decision granting Dkt. 231, Plaintiffs shall file any motion for reasonable attorney's fees incurred in connection with the prosecution of that motion, no later than thirty (30) days from the issuance of this decision. Signed by Senior Judge Norman K. Moon on 8/16/2024. (skm) |
| 08/19/2024 | 474 | NOTICE by United States re 389 *Relating to United States' Motion to Quash* (Wyer, Kathryn) |
| 08/20/2024 | 475 | Consent MOTION for Extension of Time to File Answer re 68 Amended Complaint by Kimberley Motley. Motions referred to Judge Joel C. Hoppe. (Davison, Thomas) |
| 08/20/2024 | 476 | ORAL ORDER granting 475 Motion for Extension of Time to Answer re 475 Consent MOTION for Extension of Time to File Answer re 68 Amended Complaint Kimberley Motley answer due 9/11/2024. Defendant Kimberley Motley shall file an answer to the amended complaint no later than September 11, 2024. Entered by Magistrate Judge Joel C. Hoppe on 8/20/24. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.* (The Clerk is directed to mail a copy of this Order to any applicable pro se party/parties via US Mail)(JCH) |
| 08/20/2024 | 477 | Consent MOTION for Extension of Time to File Response/Reply as to 461 MOTION for Attorney Fees by Joshua Mast, Stephanie Mast. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order)(Moran, John) |
| 08/21/2024 | 478 | ORAL ORDER granting 477 Motion for Extension of Time to File Response/Reply. Defendants Joshua and Stephanie mast shall file any response to Plaintiff's motion for attorney's fees, ECF No. 461, no later than August 28, 2024. Entered by Magistrate |

| | | |
|---|---|---|
| | | Judge Joel C. Hoppe on 8/21/24. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.* (The Clerk is directed to mail a copy of this Order to any applicable pro se party/parties via US Mail)(JCH) |
| 08/21/2024 | 479 | Consent MOTION for Extension of Time to File *Motion for Extension and to Set a Briefing Schedule for Plaintiff's Motions to Dismiss Defendants' Counterclaims* by Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order Proposed Order)(Elliker, Kevin) |
| 08/21/2024 | 480 | ORDER granting 479 Consent MOTION for Extension of Time to File Motion for Extension and to Set a Briefing Schedule for Plaintiff's Motions to Dismiss Defendants' Counterclaims. Signed by Magistrate Judge Joel C. Hoppe on 8/21/2024. (skm) |
| 08/26/2024 | 481 | ORAL ORDER TRANSFERRING CASE. Case transferred to District Judge Robert S. Ballou for all further proceedings. Senior Judge Norman K. Moon no longer assigned to case. Entered by Senior Judge Norman K. Moon on August 26, 2024. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(ca) |
| 08/28/2024 | 482 | Consent MOTION for Extension of Time to File Response/Reply as to 461 MOTION for Attorney Fees by Joshua Mast, Stephanie Mast. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order)(Moran, John) |
| 08/29/2024 | 483 | ORAL ORDER granting 482 Motion for Extension of Time to File Response/Reply. Defendants Joshua and Stephanie Mast shall file any response to Plaintiffs' motion for attorney's fees, ECF No. 461, no later than September 3, 2024. Entered by Magistrate Judge Joel C. Hoppe on 8/29/24. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.* (The Clerk is directed to mail a copy of this Order to any applicable pro se party/parties via US Mail)(JCH) |
| 09/03/2024 | 484 | RESPONSE to Motion re 461 MOTION for Attorney Fees . filed by Joshua Mast, Stephanie Mast. (Moran, John) |
| 09/10/2024 | 485 | Reply re 461 MOTION for Attorney Fees *Reply in Support of Motion for Attorney's Fees.* filed by Jane Doe, John Doe. (Eckstein, Maya) |
| 09/11/2024 | 486 | MOTION to Dismiss for Lack of Jurisdiction *Defendants' Counterclaims*, MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *Defendants' Counterclaims* by Jane Doe, John Doe. (Elliker, Kevin) |
| 09/11/2024 | 487 | Brief / Memorandum in Support re 486 MOTION to Dismiss for Lack of Jurisdiction *Defendants' Counterclaims* MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *Defendants' Counterclaims* . filed by Baby Doe, John Doe. (Elliker, Kevin) |
| 09/11/2024 | 488 | ANSWER to 68 Amended Complaint , COUNTERCLAIM against Jane Doe, John Doe by Kimberley Motley.(Davison, Thomas) |
| 09/13/2024 | 489 | MOTION for Attorney Fees *Pursuant to the Court's Order of Contempt (ECF 473)* by Jane Doe, John Doe(citizen of Afghanistan and legal guardian of Baby Doe). Motions referred to Judge Joel C. Hoppe. (Eckstein, Maya) |
| 09/13/2024 | 490 | RESPONSE in Support re 489 MOTION for Attorney Fees *Pursuant to the Court's Order of Contempt (ECF 473)* . filed by Jane Doe, John Doe(citizen of Afghanistan and legal guardian of Baby Doe). (Attachments: # 1 Exhibit 1 Declaration of Maya M. Eckstein, # 2 Exhibit A to Eckstein Declaration − Billing Entries, # 3 Exhibit B to Eckstein Declaration − Attorney Bios)(Eckstein, Maya) |
| 09/16/2024 | 491 | NOTICE OF APPEAL as to 473 Order on Motion to Vacate,,, Order on Motion to Amend/Correct,,, Order on Motion for Order to Show Cause,,,,,,,,,, by Joshua Mast, Richard Mast, Stephanie Mast. Filing fee $ 605, receipt number AVAWDC−4512880. (Moran, John) |
| 09/17/2024 | 492 | Transmittal of Notice of Appeal to 4CCA re 491 Notice of Appeal. NOTE: The Docketing Statement and Transcript Order Form are available on the 4th Circuit Court of Appeals website at www.ca4.uscourts.gov. If CJA24 form(s) are applicable, you must submit a separate Auth−24 for each court reporter from whom you wish to order a transcript through the District Court's eVoucher system. (skm) |

| | | |
|---|---|---|
| 09/17/2024 | 493 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *Defendant Kimberley Motley's Counterclaims* by Jane Doe, John Doe. (Elliker, Kevin) |
| 09/17/2024 | 494 | Brief / Memorandum in Support re 493 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *Defendant Kimberley Motley's Counterclaims* . filed by Baby Doe, John Doe. (Elliker, Kevin) |
| 09/17/2024 | 495 | Consent MOTION for Extension of Time to File Response/Reply as to 493 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *Defendant Kimberley Motley's Counterclaims Motion for a Briefing Schedule* by Baby Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order)(Elliker, Kevin) |
| 09/18/2024 | 496 | ORDER granting 495 Consent Motion for Extension of Time to File Response/Reply. Defendant Motley's Response due by October 15, 2024. Plaintiff's Reply due by October 29, 2024. Signed by Magistrate Judge Joel C. Hoppe on September 18, 2024. (dsa) |
| 09/18/2024 | 497 | USCA Notice of Appellate Case Opening re 491 Notice of Appeal, filed by Stephanie Mast, Richard Mast, Joshua Mast. **USCA Case Number 24−1900**. Case Manager: Rachel Phillips. (dsa) |
| 09/30/2024 | 498 | MEMORANDUM OPINION AND ORDER granting 345 Motion for Protective Order; granting 347 Motion for Protective Order; denying 358 Cross Motion to Compel. Signed by Magistrate Judge Joel C. Hoppe on 9/30/2024. (skm) |
| 10/04/2024 | 499 | RESPONSE in Opposition re 489 MOTION for Attorney Fees *Pursuant to the Court's Order of Contempt (ECF 473)* . filed by Joshua Mast. (Moran, John) |
| 10/04/2024 | 500 | RESPONSE in Opposition re 489 MOTION for Attorney Fees *Pursuant to the Court's Order of Contempt (ECF 473)* . filed by Jonathan Mast. (Harding, Elliott) |
| 10/09/2024 | 501 | MOTION for Extension of Time to File Response/Reply *in Support of Plaintiffs' Motion for Attorney Fees* by Jane Doe, John Doe. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order)(Eckstein, Maya) |
| 10/09/2024 | 502 | ORAL ORDER granting 501 Motion for Extension of Time to File Response/Reply. Plaintiffs shall file any reply brief regarding their motion for attorney's fees, ECF No. 489, no later than October 18, 2024. Entered by Magistrate Judge Joel C. Hoppe on 10/9/24. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.* (The Clerk is directed to mail a copy of this Order to any applicable pro se party/parties via US Mail)(JCH) |
| 10/10/2024 | 503 | Consent MOTION for Extension of Time to File Response/Reply as to 486 MOTION to Dismiss for Lack of Jurisdiction *Defendants' Counterclaims* MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *Defendants' Counterclaims* by Richard Mast. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order)(Yerushalmi, David) |
| 10/11/2024 | 504 | ORAL ORDER granting 503 Motion for Extension of Time to File Response/Reply. Defendant−Counterclaim Plaintiff Richard Masts response to the motion to dismiss, ECF No. 486, shall be filed by October 21, 2024, and Plaintiffs−Counterclaim Defendants reply shall be filed by November 6, 2024. Entered by Magistrate Judge Joel C. Hoppe on 10/11/24. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.* (The Clerk is directed to mail a copy of this Order to any applicable pro se party/parties via US Mail)(JCH) |
| 10/11/2024 | 505 | Consent MOTION for Extension of Time to File Response/Reply as to 493 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *Defendant Kimberley Motley's Counterclaims,* 486 MOTION to Dismiss for Lack of Jurisdiction *Defendants' Counterclaims* MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *Defendants' Counterclaims* by Joshua Mast, Stephanie Mast, Kimberley Motley. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order)(Moran, John) |
| 10/15/2024 | 506 | ORAL ORDER granting 505 Motion for Extension of Time to File Response/Reply. Joshua and Stephanie Mast and Kimberley Motley shall file any opposition briefs to Plaintiffs motions to dismiss, ECF Nos. 486 and 493, no later than October 21, 2024. |

| | | |
|---|---|---|
| | | Plaintiffs may file reply briefs no later than November 6, 2024. Entered by Magistrate Judge Joel C. Hoppe on 10/15/24. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.* (The Clerk is directed to mail a copy of this Order to any applicable pro se party/parties via US Mail)(JCH) |
| 10/15/2024 | 507 | Consent MOTION for Extension of Time to File Response/Reply as to 486 MOTION to Dismiss for Lack of Jurisdiction *Defendants' Counterclaims* MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *Defendants' Counterclaims* by Richard Mast. Motions referred to Judge Joel C. Hoppe. (Attachments: # 1 Text of Proposed Order)(Yerushalmi, David) |
| 10/16/2024 | 508 | ORAL ORDER granting 507 Motion for Extension of Time to File Response/Reply. Defendant−Counterclaim Plaintiff Richard Mast shall file any response to the motion to dismiss, ECF No. 486, no later than October 31, 2024, and Plaintiffs−Counterclaim Defendants shall file any reply no later than November 18, 2024.. Entered by Magistrate Judge Joel C. Hoppe on 10/16/24. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.* (The Clerk is directed to mail a copy of this Order to any applicable pro se party/parties via US Mail)(JCH) |
| 10/17/2024 | 509 | NOTICE of Hearing on Motion 493 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *Defendant Kimberley Motley's Counterclaims*, 486 MOTION to Dismiss for Lack of Jurisdiction *Defendants' Counterclaims* MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *Defendants' Counterclaims* : **(CR)** Motion Hearing set for 12/12/2024 01:00 PM in Charlottesville before District Judge Robert S. Ballou. (kab) |
| 10/18/2024 | 510 | Reply re 489 MOTION for Attorney Fees *Pursuant to the Court's Order of Contempt (ECF 473)* . filed by Jane Doe, John Doe. (Eckstein, Maya) |
| 10/21/2024 | 511 | Brief / Memorandum in Opposition re 493 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *Defendant Kimberley Motley's Counterclaims* . filed by Kimberley Motley. (Davison, Thomas) |
| 10/21/2024 | 512 | RESPONSE in Opposition re 486 MOTION to Dismiss for Lack of Jurisdiction *Defendants' Counterclaims* MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *Defendants' Counterclaims* . filed by Joshua Mast, Stephanie Mast. (Moran, John) |
| 10/23/2024 | 513 | SCHEDULING ORDER ADDENDUM. Signed by Magistrate Judge Joel C. Hoppe on October 23, 2024. (dsa) |
| 10/31/2024 | 514 | RESPONSE to Motion re 486 MOTION to Dismiss for Lack of Jurisdiction *Defendants' Counterclaims* MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *Defendants' Counterclaims* . filed by Richard Mast. (Yerushalmi, David) |
| 11/04/2024 | 515 | STIPULATION of Dismissal *of R. Mast Counterclaims* by Richard Mast (Yerushalmi, David) |
| 11/06/2024 | 516 | Reply re 493 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *Defendant Kimberley Motley's Counterclaims*, 486 MOTION to Dismiss for Lack of Jurisdiction *Defendants' Counterclaims* MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *Defendants' Counterclaims* . filed by Jane Doe, John Doe. (Elliker, Kevin) |

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

BABY DOE, A CITIZEN OF AFGHANISTAN  :
CURRENTLY RESIDING IN NORTH  :
CAROLINA, BY AND THROUGH NEXT  :   CIVIL ACTION NO.  3:22-CV-49
FRIENDS, JOHN AND JANE DOE; AND JOHN  :
AND JANE DOE, CITIZENS OF AFGHANISTAN:
AND LEGAL GUARDIANS OF BABY DOE,  :
                                :

     Plaintiffs,                :
                                  :

v.                                  :
                                  :

JOSHUA MAST, STEPHANIE MAST, RICHARD :
MAST, KIMBERLEY MOTLEY, AND AHMAD  :
OSMANI,                          :
                                  :

     Defendants,             :
                                  :

and                                :
                                  :

UNITED STATES SECRETARY OF STATE  :
ANTONY BLINKEN AND UNITED STATES  :
SECRETARY OF DEFENSE GENERAL  :
LLOYD AUSTIN,                 :
                                  :

     Nominal Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**DOE PLAINTIFFS' MOTION FOR LEAVE
TO PROCEED UNDER PSEUDONYMS
AND FOR ENTRY OF A PROTECTIVE ORDER**

     Plaintiffs, by counsel, respectfully move for leave to proceed under pseudonyms in this

action. Plaintiffs further move for the entry of a Protective Order prohibiting Defendants,

counsel, or any other interested or involved parties from disclosing Plaintiffs' identities or the

locations of their habitual residence in Afghanistan. The grounds for this Motion are explained in

the accompanying Memorandum of Law in Support of Plaintiffs' Motion to Proceed Under

Pseudonyms. A proposed Order is attached as Exhibit C to the Memorandum of Law.

Dated:  September 2, 2022                 Respectfully submitted,

                                          /s/ *Maya Eckstein*
                                          _____
                                          Maya M. Eckstein (VSB No. 41413)
                                          Lewis F. Powell III (VSB No. 18266)
                                          HUNTON ANDREWS KURTH LLP
                                          951 E Byrd St
                                          Richmond, VA 23219
                                          Telephone: (804) 788-8200
                                          Fax: (804) 788-8218
                                          Email:  meckstein@HuntonAK.com
                                          Email:  lpowell@HuntonAK.com

                                          Sherli M. Furst (*pro hac vice forthcoming*)
                                          Jeremy C. King (*pro hac vice forthcoming*)
                                          HUNTON ANDREWS KURTH LLP
                                          200 Park Avenue
                                          New York, NY 10166
                                          Telephone: (212) 309-1000
                                          Fax: (212) 309-1100
                                          Email:  sfurst@HuntonAK.com
                                          Email:  jking@HuntonAK.com

                                          *Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 2nd day of September 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all CM/ECF participants and further certify that a copy was sent via US mail to the following:

Joshua and Stephanie Mast
15 Bunchberry Court
Hampstead, NC 28443-7247

Richard Mast
413 QUAIL HOLLOW DR
FOREST, VA 24551-1029

Kimberley Motley
2206 Bonnie Butler Way
Charlotte, NC 28270

Ahmad Osmani
8524 King William Street
Cordova, TN 38016

OFFICE OF THE U.S. ATTORNEY
255 W. Main Street
Charlottesville, VA 22902
Lloyd Austin
United States Secretary of Defense General

OFFICE OF THE U.S. ATTORNEY
255 W. Main Street
Charlottesville, VA 22902
Antony Blinken
United States Secretary of State

By:    */s/ Maya M. Eckstein*
Maya M. Eckstein (VSB # 41413)
Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
Telephone: (804) 788-8200
Facsimile: (804) 788-8218
meckstein@HuntonAK.com

*Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | | |
|---|---|---|
| BABY DOE, A CITIZEN OF AFGHANISTAN CURRENTLY RESIDING IN NORTH CAROLINA, BY AND THROUGH NEXT FRIENDS, JOHN AND JANE DOE;AND JOHN AND JANE DOE, CITIZENS OF AFGHANISTAN AND LEGAL GUARDIANS OF BABY DOE, | : : : : : : : | CIVIL ACTION NO.  3:22-CV-49 |
| Plaintiffs, | : : | |
| v. | : : | |
| JOSHUA MAST, STEPHANIE MAST, RICHARD MAST, KIMBERLEY MOTLEY, AND AHMAD OSMANI, | : : : | |
| Defendants, | : : | |
| and | : : | |
| UNITED STATES SECRETARY OF STATE ANTONY BLINKEN AND UNITED STATES SECRETARY OF DEFENSE GENERAL LLOYD AUSTIN, | : : : : | |
| Nominal Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**<u>PROTECTIVE ORDER</u>**

This matter is before the Court on Plaintiffs' Motion to Proceed by Pseudonym, in which

it requests the entry of a protective order governing disclosure of the Plaintiffs' identities and

identifying information. Dkt. 3. For the reasons set forth in Plaintiffs' brief in support of their

motion, Dkt. 4, as well as incorporated in this Court's order (Dkt. 16), granting Plaintiffs'

accompanying motion to seal, the Court **finds** that Plaintiffs have established grounds to proceed

1

**JA050**

by pseudonym and for entry of the following terms of a protective order. *See James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993); *see also United States v. Doe*, 962 F.3d 139, 147 (4th Cir. 2020). Because the Court **finds** that Plaintiffs have demonstrated that disclosure of Plaintiffs' identities and identifying information would pose a substantial risk to the physical safety of Plaintiffs and other innocent non-parties, in view of the age of minor Plaintiff Baby Doe, and concluding that any risk of prejudice or unfairness (if any should exist), is more than sufficiently mitigated by the measured steps requested by Plaintiffs' counsel below which are tailored to protect such safety interests, in order to ensure Plaintiffs' safety and the safety of other innocent non-parties, this Court **ORDERS** as follows:

1.     The Defendants and their counsel and representatives are prohibited from disclosing any information that directly or indirectly identifies Plaintiffs or their family members to any person, including but not limited to the Plaintiffs' names and the locations of their residences abroad and places of birth, unless that person first executes a non-disclosure agreement enforceable through the contempt sanction. This applies to any disclosure in the course of any investigation undertaken by the Defendants, their counsel, or their other agents or representatives.

2.     All papers filed with this Court or disseminated to any person who has not executed a non-disclosure agreement enforceable through the contempt sanction shall use the "John Doe", "Jane Doe", or "Baby Doe" pseudonyms to refer to the Plaintiffs.

3.     Any papers that identify any Plaintiff either directly or indirectly shall be filed under seal, with redacted copies placed in the public files.

4.      Defendants shall disclose to Plaintiffs' counsel any person to whom Defendants, their counsel or representatives, have disclosed Plaintiffs' identities, and shall provide Plaintiffs with copies of the executed non-disclosure agreements required by this Order.

5.      The parties shall be permitted to notice depositions and depose witnesses and conduct other discovery using the "John Doe", "Jane Doe", and "Baby Doe" pseudonyms. In deposing any witnesses who are unacquainted with the Plaintiffs, the Doe pseudonyms shall be used. In deposing any witnesses already acquainted with the Plaintiffs, actual names may be used, but the Doe pseudonyms must be used in any transcript of those depositions.

Accordingly, Plaintiffs' motion for leave to proceed under a pseudonym and for entry of the protective order will be and hereby is **GRANTED**. Dkt. 3.

It is so **ORDERED**.

The Clerk of Court shall send a certified copy of this Order to all counsel of record. Plaintiffs shall be responsible for providing a copy of this Order to Defendants forthwith, who have not yet entered an appearance in the case.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

3

**JA052**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**CHARLOTTESVILLE DIVISION**

------------------------------------------------------------ X
BABY DOE, A CITIZEN OF AFGHANISTAN   :   CIVIL ACTION NO.  3:22-cv-49
CURRENTLY RESIDING IN NORTH   :
CAROLINA, BY AND THROUGH NEXT   :
FRIENDS, JOHN AND JANE DOE; AND   :   **AMENDED COMPLAINT**
JOHN AND JANE DOE, CITIZENS OF   :
AFGHANISTAN AND LEGAL GUARDIANS   :
OF BABY DOE,   :   **JURY TRIAL DEMANDED**
  :
      Plaintiffs,   :
  :
v.   :
  :
JOSHUA MAST, STEPHANIE MAST,   :
RICHARD MAST, KIMBERLEY MOTLEY,   :
AND AHMAD OSMANI,   :
  :
      Defendants,   :
  :
and   :
  :
UNITED STATES SECRETARY OF STATE   :
ANTONY BLINKEN AND UNITED STATES   :
SECRETARY OF DEFENSE GENERAL   :
LLOYD AUSTIN,   :
  :
      Nominal Defendants.   :
  :
------------------------------------------------------------ X

      Plaintiffs Baby Doe and John and Jane Doe file this Complaint against Defendants Joshua

Mast, Stephanie Mast, Richard Mast, Kimberley Motley and Ahmad Osmani (collectively,

"Defendants") and allege as follows:

## **INTRODUCTION**

      1.    This action for conspiracy, tortious interference with parental rights, fraud,

intentional infliction of emotional distress, and false imprisonment arises from a U.S. Marine

Corp Judge Advocate's unlawful abduction of Baby Doe, an Afghan war orphan, from her

biological family and legal guardians, Plaintiffs John and Jane Doe. Plaintiffs seek a declaratory judgment and compensatory and punitive damages.

2.      Defendants collectively engaged in a fraudulent scheme over the course of nearly two years to accomplish the abduction of Baby Doe for the purpose of "adoption" by Defendants Joshua and Stephanie Mast.

3.      On September 6, 2019, Baby Doe's parents and five siblings were killed in a U.S. military operation in rural Afghanistan. She survived and U.S. forces transported her to a military hospital for emergency medical treatment. Baby Doe, then only two months old, was seriously injured in the battle.

4.      In November 2019, while Baby Doe was recovering from her injuries in a U.S. military hospital in Afghanistan, Defendants Joshua and Stephanie Mast, represented by Defendant Richard Mast (a member of the Virginia Bar), fraudulently obtained a custody order and an interlocutory order of adoption over Baby Doe from Virginia courts that they knew, or reasonably should have known, lacked personal and subject matter jurisdiction over Baby Doe, a citizen of Afghanistan who had biological family in Afghanistan and had no legal or physical connection to the United States (the "Fraudulent Custody and Adoption Orders").[1]

5.      Notwithstanding the Fraudulent Custody and Adoption Orders, the U.S. government in Afghanistan refused to release Baby Doe to Joshua and Stephanie Mast. Instead, the U.S. government honored its unambiguous federal and international legal obligations to release her to the government of Afghanistan so that she could be reunited with her next of kin in

---

[1] The Fraudulent Custody and Adoption Orders include a final order of adoption that the Masts later obtained.

Afghanistan.  Pursuant to Afghan law, Baby Doe's first cousin (John Doe) and his wife (Jane Doe) assumed permanent guardianship over her, loved her, and welcomed her as their first child.

6.      Undeterred, Joshua and Stephanie Mast engaged the services of Kimberley Motley to search for and communicate with John and Jane Doe.  Motley was aware that Joshua and Stephanie Mast had obtained the Fraudulent Custody and Adoption Orders for Baby Doe and was aware from the outset that Joshua and Stephanie Mast wanted to take physical custody of her in the United States and intended to adopt her as their own child.  In coordination with Joshua and Stephanie Mast, however, Motley never disclosed the Masts' true intentions to the Does.

7.      Instead, Motley told the Does only that an American family wanted to help Baby Doe with her continuing medical needs.  Joshua and Stephanie Mast's primary and undisclosed intention, however, was to induce John and Jane Doe to bring Baby Doe to the United States to enable them (one way or another) to acquire physical custody of Baby Doe based on the "authority" of the Fraudulent Custody and Adoption Orders.

8.      Despite communicating with John and Jane Doe for more than a year, first through Kimberley Motley, and eventually both directly and through Ahmad Osmani, Joshua and Stephanie Mast never revealed to them the Fraudulent Custody and Adoption Orders.  Instead, through their omissions and misrepresentations, Joshua and Stephanie Mast deceived John and Jane Doe into believing that the Masts' only interest was in helping Baby Doe access medical care that was not available in Afghanistan.  In reality, however, the Masts' chief objective was to consummate their illicit scheme to take Baby Doe from her lawful Afghan parents.

9.      In August 2021, as a result of this long-running and coordinated fraudulent scheme, John and Jane Doe brought Baby Doe to the United States for medical care, only to have Joshua and Stephanie Mast tear her away from the only parents she had known for most of her life.

**JA055**

10.     Defendants have caused irreversible harm to an innocent toddler and Plaintiffs John and Jane Doe.  As her true family and legal guardians, they raised Baby Doe for 18 months before the abduction and love her as their own child.  Though this lawsuit can never make them whole, Defendants must be held accountable for their unconscionable conduct.

## PARTIES

11.     Baby Doe is a three-year-old Afghan citizen whose biological parents died in 2019. She currently is being held in North Carolina by Joshua and Stephanie Mast.

12.     John and Jane Doe, citizens of Afghanistan, are a married couple and the legal guardians of Baby Doe under the laws of Afghanistan.  John Doe is the paternal first cousin[2] of Baby Doe.  John and Jane Doe currently reside in Texas.

13.     Joshua and Stephanie Mast are a married couple, and are United States citizens claiming domicile in Palmyra, Virginia, but currently residing in North Carolina, where Joshua Mast is stationed in the United States Marine Corps.  Joshua Mast is a Major in the Marine Corps, a Judge Advocate, and an attorney admitted to the bar of the Commonwealth of Virginia.

14.     Upon information and belief, Richard Mast is a United States citizen domiciled and residing in Forest, Virginia.  Richard Mast is Joshua Mast's brother and is also an attorney admitted to the bar of the Commonwealth of Virginia.  Richard Mast is affiliated with an entity named "Liberty Counsel."

15.     Upon information and belief, Kimberley Motley is a United States citizen domiciled and residing in North Carolina.  Upon information and belief, Motley is an attorney admitted to the bar of the state of Wisconsin and has periodically worked in Afghanistan. Upon

---

[2] John Doe and Baby Doe share a grandparent.

4

**JA056**

information and belief, Motley is the general counsel of Women for Afghan Women, which has a Community Center in Alexandria, Virginia.

16.    Upon information and belief, Ahmad Osmani is an Afghan national permanently residing in Tennessee.  Upon information and belief, Osmani is married to Natalie Osmani, a U.S. citizen.

17.    United States Secretary of State Antony Blinken and United States Secretary of Defense General Lloyd Austin are named as nominal defendants, in their official capacities, as parties who are necessary to this proceeding.  Plaintiffs are seeking no relief from them in this action.

## JURISDICTION & VENUE

18.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332, as the parties are completely diverse in citizenship, and the amount in controversy, exclusive of costs and interest, exceeds $75,000.

19.    This Court also has subject matter jurisdiction under 28 U.S.C. § 1331, and supplemental subject matter jurisdiction under 28 U.S.C. § 1367, because Plaintiffs' right to relief as to Count 1 and their request for declaratory relief necessarily depend on resolution of substantial questions of federal law.

20.    All Defendants are subject to personal jurisdiction in Virginia under Virginia Code §§ 8.01-328.1(A)(1) and (3), because the causes of action asserted in this Complaint arise from their having transacted business in Virginia and/or having caused tortious injury by an act or omission in Virginia. Defendants Motley and Osmani also are subject to personal jurisdiction in Virginia as alleged co-conspirators with Joshua and Stephanie Mast and Richard Mast. As co-conspirators, Motley and Osmani are liable for the Mast defendants' acts and omissions in Virginia, as set forth herein, in furtherance of the conspiracy to enable Joshua and Stephanie Mast

**JA057**

to abduct Baby Doe. In addition, at the request of Joshua and Stephanie Mast and in furtherance of the conspiracy, Osmani voluntarily appeared in Virginia to testify on the Masts' behalf in the proceeding filed by John and Jane Doe in the Circuit Court of Fluvanna County to vacate that court's Fraudulent Adoption Order.

21.     Venue lies in this Court pursuant to 28 U.S.C. § 1391, as a substantial part of Defendants' wrongful conduct occurred in this district.

## **FACTUAL ALLEGATIONS**

### I.    **BABY DOE'S ORPHANED PAST**

22.     Baby Doe's biological parents and five of her siblings were killed on September 6, 2019, in Afghanistan, in a joint United States and Afghan military operation in the course of which their home was destroyed.  Baby Doe sustained serious injuries, including a fractured skull and femur, and second-degree burns.  U.S. military forces discovered Baby Doe in the rubble and immediately transported her to a nearby U.S. military hospital for urgent surgical and medical care. She was then transferred to ███████████ on September 25, 2019, at which time her condition stabilized.

23.     The International Committee of the Red Cross ("ICRC") is the organization authorized to care for children who are orphaned during wartime and to assist with family reunifications under the Geneva Convention Relative to the Protection of Civilian Persons in Time of War of August 12, 1949 ("The Fourth Geneva Convention").  The U.S. military informed ICRC that Baby Doe was in its custody, and ICRC began searching for her family.

24.     The ICRC has worked for over one hundred years in conflict areas and humanitarian disasters to reunite separated family members through its "Restoring Family Links Program." ICRC and the national Red Cross and Red Crescent societies are universally recognized

**JA058**

as experts in family tracing and reunification. *See https://www.brookings.edu/wp-content/uploads/2016/06/0119_internal_displacement_complete.pdf, p, 332.*

25.    By October 25, 2019, ICRC made contact with Baby Doe's uncle, who requested ICRC's assistance in reuniting her with her family.

## II.    JOSHUA AND STEPHANIE MAST, WITH THE HELP OF THEIR ATTORNEY, RICHARD MAST, TOOK STEPS TO BLOCK BABY DOE'S REUNIFICATION WITH HER BIOLOGICAL FAMILY IN AFGHANISTAN AND TO ADOPT HER.

### A.    Through fraud and misrepresentation, Joshua and Stephanie Mast and Richard Mast obtained an Order of Custody and Interlocutory Order of Adoption over Baby Doe from Virginia courts.

26.    Through his position as a Captain Judge Advocate in the United States Marine Corps deployed in Afghanistan, Joshua Mast learned of Baby Doe while she was in the custody of the Department of Defense (the "DoD") and under the care of the Military Health System,.

27.    Upon information and belief, Joshua and Stephanie Mast and Richard Mast were aware that ICRC would be searching for Baby Doe's biological family in Afghanistan.

28.    In spite of this knowledge, the Masts began taking steps to remove Baby Doe to the United States.

29.    Joshua Mast is an attorney, barred in Virginia, who served at the Center for Law and Military Operations, and whose responsibilities in Afghanistan included collection and analysis of data on targeting, collateral damage estimation, and civilian casualty response in an active combat zone.  As an attorney and member of the United States' Armed Forces in Afghanistan, it was his professional responsibility to be aware of Afghanistan's status as a sovereign nation, and of the Security and Defense Cooperation Agreement Between the Islamic Republic of Afghanistan and the United States of America (the "Bilateral Agreement") that governed U.S. military operations in Afghanistan.

30.    As a U.S. military attorney, Joshua Mast knew, or should have known, that the Bilateral Agreement governed the U.S. military presence in Afghanistan, and that all U.S. military operations in Afghanistan were conducted under its auspices.  Moreover, he was aware the Bilateral Agreement specifically recognized Afghan sovereignty and limited the Afghan Government's jurisdiction *only* over active-duty U.S. Armed Forces and DoD civilian employees; the Bilateral Agreement did not limit Afghanistan's jurisdiction over Afghan nationals in Afghanistan.

31.    As a U.S. military attorney, Joshua Mast knew, or should have known, that all obligations of the United States and Afghanistan under the Bilateral Agreement were "without prejudice to Afghan sovereignty over its territory," and that U.S. Armed Forces personnel and DoD civilian employees were obligated to "respect the Constitution and laws of Afghanistan." Bilateral Agreement, Articles 3:1, 3:2.

32.    As a U.S. military attorney, Joshua Mast knew, or should have known, that U.S. military bases under the Bilateral Agreement are not U.S. territory.  Indeed, the Bilateral Agreement is explicit that "Afghanistan has full sovereignty over its airspace, territory, and waters."  Bilateral Agreement, Article 10:1.  Joshua Mast was also aware that even if Baby Doe's identity was unknown, her nationality would be determined under Afghan law.  Accordingly, he knew, or should have known, that Baby Doe, as a civilian in Afghanistan, was subject solely to the sovereign jurisdiction of Afghanistan for the entire time she was in the care of U.S. military hospitals.

33.    As a U.S. military attorney working in Afghanistan, Joshua Mast knew, or should have known, that under Article 12 of Afghanistan's law on citizenship, if a child is found in the territory of Afghanistan and "his/her parents' documents proving their citizenship are not

**JA060**

available," the child is considered a citizen of Afghanistan. *See* United Nations High Commission for Refugees, Law on Citizenship of the Islamic Emirate of Afghanistan (English Translation), Article 12 (June 24, 2000), available at http://www.refworld.org/pdfid/404c988d4.pdf; *see also* Athayi, Abdullah, *Report on Citizenship Law: Afghanistan*, Robert Schuman Centre for Advanced Studies, European University Institute (March 2017), at p. 9, available at https://cadmus.eui.eu/bitstream/handle/1814/45933/GLOBALCIT CR 2017 09. pdf.

34.    As a U.S. military attorney working in Afghanistan, Joshua Mast knew, or should have known, that regardless of where in Afghanistan Baby Doe was recovered, all territory within the internationally recognized borders of Afghanistan was subject to the jurisdiction of the laws of Afghanistan. Bilateral Agreement, Article 10:1.

35.    On information and belief, these basic, uncontroversial principles of national sovereignty were not only known to Joshua Mast but were core obligations of his practice while serving as an attorney in the U.S. Marines in Afghanistan.

36.    On information and belief, Joshua Mast also knew that the ICRC was actively searching for Baby Doe's family, and he knew that, as Baby Doe was recovered from a remote area of Afghanistan, this process would be labor- and time-intensive.

37.    Virginia-barred lawyers like Joshua Mast and Richard Mast are expected to "conform to the requirements of the law, both in the professional service to clients and in the lawyer's business and personal affairs." Virginia Rules of Professional Conduct, Preamble. Virginia-barred lawyers also are expected to "use the law's procedures only for legitimate purposes and not to harass or intimidate others." *Id*. Further, lawyers are expected to "provide competent representation to a client," which "requires the legal knowledge, skill, thoroughness and

preparation reasonably necessary for the representation." Virginia Rules of Professional Conduct, 1.1.

38.  A myriad of national and state laws governs international adoptions in the United States.  In the case of an orphaned child in Afghanistan sought to be adopted in Virginia, the laws of the United States and Virginia require that prospective adoptive parents follow the laws of the Government of Afghanistan.

39.  As Virginia attorneys, Joshua Mast and Richard Mast knew, or should have known, that they would need to comply with the applicable laws of Afghanistan, the United States, and Virginia.

40.  As such, U.S. law requires that, before a child in Afghanistan can be adopted by someone in the United States, legal guardianship or custody must be obtained over the child in Afghanistan.[3]

41.  Afghanistan's laws, however, expressly prohibit the guardianship or custody of Muslim Afghan children by non-Afghan non-Muslims.

42.  Joshua and Stephanie Mast are not Muslim and are not Afghan nationals.

---

[3] U.S. Department of State, Adoption of Children from Countries in which Islamic Shari'a Law is Observed (last updated October 30, 2018), available at https://travel.state.gov/content/travel/en/Intercountry-Adoption/Adoption-Process/how-to-adopt/adoption-of-children-from-countries-sharia-law.html; https://web.archive.org/web/20171203170646/https:/travel.state.gov/content/travel/en/Intercountry-Adoption/Intercountry-Adoption-Country-Inforrnation/Afghanistan.html. *See also* 8 C.F.R. § 204.3(d)(1)(iv) (international adoption cannot proceed without "[e]vidence of adoption abroad or that the prospective adoptive parents have ... custody of the orphan for emigration and adoption in accordance with the laws of the foreign-sending country"); Va. Code Ann. § 63.2-1200.1 (applying the law of the Commonwealth to recognize foreign adoptions which were "finalized pursuant to the laws of the country from which the child was adopted" pending admission to the United States and issuance of a visa by USCIS.  8 C.F.R. § 204.3(b) defines a "foreign-sending country" as the "country of the orphan's citizenship, or if he or she is not permanently residing in the country of citizenship, the country of the orphan's habitual residence."

43.     Despite lacking any legitimate legal basis for doing so, in October 2019 Joshua and Stephanie Mast initiated custody proceedings for Baby Doe in the Juvenile and Domestic Relations Court of Fluvanna, Virginia (the "Juvenile Court") and adoption proceedings in the Fluvanna Circuit Court (the "Circuit Court"), despite the fact that Baby Doe had never stepped foot on Virginia soil and remained in Afghanistan.  Richard Mast represented Joshua and Stephanie Mast in these proceedings.

44.     Joshua and Stephanie Mast initiated these proceedings in their county of residence, even though: (a) they had not obtained legal guardianship of Baby Doe in Afghanistan; (b) Baby Doe had lived her entire life in Afghanistan; (c) Afghanistan had sole and exclusive jurisdiction over Baby Doe; and (d) Baby Doe had no connection with the United States or Virginia.

45.     By failing to serve notice of the custody and adoption proceedings on the DoD, which was Baby Doe's "physical" and "legal" custodian at the time, the Masts violated Virginia law.[4]

46.     Joshua and Stephanie Mast, through Richard Mast as counsel, advised both the Juvenile Court and the Circuit Court that they expected the Government of Afghanistan to waive its jurisdiction over Baby Doe.  In fact, the Government of Afghanistan explicitly asserted its jurisdiction over the child and requested, and then secured, her release from the U.S. military facility.

---

[4] DoD had physical custody of Baby Doe at the time of the custody proceeding and the initiation of the adoption proceeding, requiring Joshua and Stephanie Mast and their lawyer, Richard Mast, to provide DoD notice of those proceedings.  Va. Code Ann. § 20-146.16 ("Before a child's custody determination is made under this act, notice and an opportunity to be heard in accordance with the standards of § 20-146.7 must be given to . . . *any person having physical custody of the child.*") (emphasis added); *see also* Va. Code Ann. § 63.2-1202(L) ("*A legal custodian of a child* being placed for adoption . . . shall be entitled to proper notice of any adoption proceeding and an opportunity to be heard." (emphasis added)).

47.     The Masts also falsely claimed to both the Juvenile Court and the Circuit Court that Baby Doe's birth country and nationality were unknown, that she was a "stateless minor," and that she, therefore, was subject to the Virginia courts' jurisdiction because no other court would have jurisdiction.  The Masts knew or should have known these claims were untrue.

48.     At the same time, they claimed to have asked the Government of Afghanistan to waive jurisdiction over Baby Doe, thereby acknowledging Afghanistan's jurisdiction in the first place.  In fact, Baby Doe was never stateless.  Under the laws of Afghanistan, any child found in the territory of Afghanistan whose parents' nationality is unknown is considered a citizen of Afghanistan.[5]  Baby Doe was found in Afghanistan, and, to the extent her deceased parents' nationality could not be proven, she was deemed under the laws of Afghanistan to be an Afghan citizen.  The Masts knew, or should have known, that Baby Doe's nationality was Afghan under Afghan law.

49.     On November 6, 2019, relying on the factual and legal misrepresentations made by the Masts, and without serving the requisite process on the DoD , the Juvenile Court mistakenly concluded that it had jurisdiction over the case under Virginia Code §§ 20-146.12(A)(2) and (4) and granted the Masts temporary custody of Baby Doe.[6]

50.     To reach this conclusion under subsection (A)(2), the Court was required to have found that a court of the home state of the child had declined jurisdiction.  As discussed above, the

---

[5] Law on Citizenship of the Islamic Emirate of Afghanistan, 24 June 2000, https://www.refworld.org/docid/404c988d4.html, accessed March 27, 2022 ("Article Twelve: If a child is found in the territory of the IEA [Afghanistan] and his/her parents' documents proving their citizenship are not available, the child would be considered citizen of the IEA.")

[6] This custody order was not permanent and would expire approximately one year from the day it was issued if the Juvenile Court did not renew it.

Government of Afghanistan had jurisdiction, and had explicitly asserted jurisdiction over Baby Doe for reunification with her real family.

51.     Also under subsection (A)(2), the Court was required to have found that both the child *and* a person acting as a parent had a significant connection to the Commonwealth of Virginia.  Yet, Baby Doe had no connection to Virginia and Joshua Mast was a stranger to her. He had no caretaking responsibilities, rights, or bonds of affection that would constitute a parent-child relationship.  Only misrepresentations by the Masts could have led the Court to conclude otherwise.

52.     Finally, under subsection (2), the Court was required to have found that substantial evidence was available in this Commonwealth concerning the child's care, protection, training, and personal relationships.  The Masts knew or should have known that such evidence would be in Afghanistan and made available to the ICRC and the Afghan government's Ministry of Labor and Social Affairs, not the Masts.

53.     Two days later, Stephanie Mast appeared before the Circuit Court, represented by her brother-in-law, Richard Mast. Relying on the same, and additional, factual and legal misrepresentations, the Circuit Court issued an Order directing the State Registrar of Virginia to issue a Certificate of Foreign Birth for Baby Doe on an expedited basis for the purpose of obtaining medical care. Stephanie Mast had never met Baby Doe, and had no firsthand knowledge of Baby Doe's parents' identities, her nationality, or even her medical needs.

54.     Another two days later, Sunday November 10, 2019, Stephanie Mast appeared before the Circuit Court, again represented by Richard Mast. The Circuit Court issued an Interlocutory Order of Adoption that same day, designating Joshua and Stephanie Mast as Baby Doe's father and mother.

55.     That same day, Stephanie Mast presented the Interlocutory Order of Adoption and an application for a Certificate of Foreign Birth to the State Registrar, who promptly issued it, designating Joshua and Stephanie Mast as Baby Doe's father and mother. Richard Mast arranged Stephanie Mast's meeting with the State Registrar.

**B.      Relying on their fraudulently obtained Virginia state court orders, the Masts sought to prevent the United States from releasing Baby Doe to her biological family.**

56.     On October 24, 2019, Baby Doe's maternal uncle submitted a request to the ICRC through its Restoring Family Links Program for assistance in returning Baby Doe to her extended family.

57.     On November 17, 2019, the Afghan Ministry of Labor and Social Affairs documented its official involvement in the search for Baby Doe's biological family.

58.     The ICRC worked to verify the family's relationship with Baby Doe and facilitated the family's contact with the Afghan government.  The ICRC's efforts to reunite Baby Doe with her biological family came to fruition when it located her paternal uncle, John Doe's father.  Under the laws of Afghanistan (like the laws in many other Muslim countries), legal guardianship of an orphan is transferred to the child's paternal uncle (in the absence of a paternal grandfather or a brother).

59.     In late December 2019 or early January 2020, the Afghan Deputy Minister of Social Affairs met with U.S. State Department's Assistant Chief of Mission in Kabul, Donna Welton, and informed her that the Afghan government had identified Baby Doe's family.

60.     On January 5, 2020, Ms. Welton wrote an email to the Deputy Minister stating: "We stand ready to transfer custody of the infant following an official request from the Afghan government.  This is a high priority for our government and we would kindly request that the

Ministry of Labor and Social Affairs expedite this official request so that the infant can be reunited with her family members as soon as possible" (emphasis added).

61.    In February 2020, Afghanistan's Acting Minister of Labor and Social Affairs informed the Director of Social Security within the Ministry of Labor and Social Affairs, Directorate of ████████, that Baby Doe was to be "reintegrated into her family."

62.    Upon learning of Baby Doe's impending release on February 26, 2020, to her biological family in Afghanistan, the Masts filed a pseudonymous Complaint and Petition for a Temporary Restraining Order (the "TRO Petition") in this Court, the United States District Court for the Western District of Virginia, naming as defendants the DoD, the U.S. Department of State (the "DoS"), the Assistant Chief of Mission of the United States Embassy-Kabul, and various unknown persons.  Richard Mast's signature block on the TRO Petition identifies his employer as "Liberty Counsel."

63.    In the TRO Petition, the Masts sought to enjoin the United States government from releasing Baby Doe from its custody to the Government of Afghanistan for reunification with her biological family, relying on their fraudulently obtained Juvenile Court custody order as a basis for this request.

64.    Within hours of docketing the TRO Petition, U.S. District Judge Norman K. Moon convened a hearing at which Richard Mast represented Joshua and Stephanie Mast, and the U.S. Department of Justice (the "DOJ") represented the DoD and the DoS.

65.    During the hearing, Richard Mast falsely represented to the Court that Joshua and Stephanie Mast were *not seeking to adopt* Baby Doe, but instead were interested only in bringing her to the United States for the purposes of medical treatment.  Having just represented Joshua and Stephanie Mast in the Fluvanna Circuit Court to obtain an interlocutory order of adoption, Richard

Mast knew that his representation to Judge Moon was false.  So, too, did Joshua and Stephanie Mast.  Neither Joshua Mast, Stephanie Mast, nor Richard Mast informed this Court or the United States government of the pending adoption proceedings.

66.    For their part, the DOJ attorneys described the Juvenile Court custody order as "unlawful," "deeply flawed and incorrect," and apprised Judge Moon that the Masts had failed to serve the DoD and the DoS with notice of the custody proceedings.

67.    The DOJ attorneys also advised Judge Moon that, while Baby Doe was in the physical custody of the U.S. government to receive emergency medical care, she remained subject to the jurisdiction of the Government of Afghanistan, which had "determined that it's not going to waive jurisdiction because it has located that relative."

68.    Furthermore, the DOJ attorneys noted that "if the United States had been involved in th[e custody] proceeding as it should have been since it had custody . . . we would have been able to correct some of the factual errors that were happening there."

69.    Unsurprisingly, Judge Moon denied the request for a TRO that same day, finding that Joshua and Stephanie Mast were unlikely to prevail on the underlying cause of action.  In so doing, Judge Moon observed that: (a) the Juvenile Court orders were "foundational to plaintiffs' asserted authority to care" for Baby Doe, but they "reflect an assumption" that the Government of Afghanistan would issue a waiver of jurisdiction, which it did not do; (b) as custodian of Baby Doe, the DoD "should have been formally served with and provided notice of the proceedings"; and (c) the Masts had failed to "proceed through proper channels," including obtaining the consent of the Afghan government and obtaining a visa for Baby Doe to enter the United States.

70.     The next day, February 27, 2020, the DOJ filed a notice with the federal court advising that Baby Doe had been released from U.S. custody for reunification with her "next of kin."

71.     At that time, Baby Doe was placed in the care of her paternal uncle, John Doe's father.

72.     Concerned that Baby Doe would require ongoing medical care, Baby Doe's paternal uncle transferred his guardianship of Baby Doe, pursuant to his authority under the laws of Afghanistan, to his son and daughter-in-law, John and Jane Doe.  Baby Doe's paternal uncle believed that John and Jane Doe were best suited to care for Baby Doe because they were a young, educated couple who lived in a larger, more cosmopolitan area, with better access to doctors and hospitals than the rural region of Afghanistan where he lived.

73.     Though they themselves were young newlyweds who had not yet had biological children, John and Jane Doe agreed to welcome Baby Doe into their family and raise her as their own child.

74.     John and Jane Doe provided everything for Baby Doe that a parent would provide, including food, milk, diapers, and arranging medical care.  Most importantly, they loved Baby Doe like they would love their own biological child.  After more than five months of living in a medical institution on a military base, Baby Doe was finally surrounded by the love of a family, with grandparents and young aunts and uncles who also adored her.  Plaintiffs John and Jane Doe continued to raise Baby Doe as their first child for eighteen months, until the very moment of her abduction on September 3, 2021.

III.    **DEFENDANTS LURED PLAINTIFFS TO THE UNITED STATES UNDER FALSE PRETENSES.**

A.      **Joshua and Stephanie Mast engaged Kimberley Motley to locate and contact John and Jane Doe in Afghanistan under the guise of offering medical care for**

17

USCA4 Appeal: 24-1900    Doc: 16    Filed: 11/12/2024    Pg: 73 of 347

**Baby Doe in the United States, failing to disclose to the Does the custody and adoption orders the Masts had fraudulently obtained.**

75.     Having failed to prevent Baby Doe's reunification with her biological family in Afghanistan, and having failed thus far to obtain physical custody of Baby Doe, Joshua and Stephanie Mast pursued a new strategy: convince Baby Doe's family to let her travel to the United States, where Joshua and Stephanie Mast could abduct her and raise her as their own child.

76.     In the fall of 2019, Joshua Mast and Stephanie Mast reached out to Kimberley Motley, a U.S. citizen and attorney who had worked in Afghanistan, to assist in their efforts to bring Baby Doe to the United States. Joshua Mast identified himself as a U.S. Marine stationed in Kabul who sought to remove Baby Doe from Afghanistan. He advised Motley that he and Stephanie Mast intended to adopt Baby Doe.

77.     Between October 25-27, 2019, Joshua Mast and Motley communicated numerous times through emails and phone calls to share information about a shared desire to remove Baby Doe from Afghanistan. In the course of their email exchange, Joshua Mast acknowledged that he needed approval from the Government of Afghanistan to obtain a visa for Baby Doe to travel to the United States.

78.     Motley, who previously learned of Baby Doe through another U.S. servicemember and was representing herself as a "guardian ad litem" for Baby Doe (despite there being no court order naming her as such, and despite that Afghan law does not provide for "guardians ad litem"), asked the Government of Afghanistan to secure citizenship documentation for Baby Doe as an Afghan citizen, including a passport and "tashkira" (an Afghan identification document).

79.     On February 27, 2020, the day the United States released Baby Doe to the Afghan Government and the ICRC for reunification with her family, Joshua Mast advised Motley that he needed help to "handle [Baby Doe's] situation privately" by locating her relatives, contacting

them, offering them medical care, and then bringing the child out of Afghanistan to the United States, where the Masts had already successfully petitioned a Virginia Court for legal custody over the child.

80.     That same day, Joshua Mast provided Motley with a copy of an official diplomatic communication from the Government of Afghanistan to an official with the U.S. Department of Defense, formally requesting the return of Baby Doe to their physical custody for reunification with her family in Afghanistan. By this time, Motley also had received a copy of the Masts' Juvenile Court order, which she knew was void because it was expressly conditioned on a waiver of jurisdiction from the Government of Afghanistan, and the diplomatic communication that Mast sent her showed that the Government of Afghanistan was affirmatively asserting jurisdiction over Baby Doe, not waiving it.

81.     In addition, in spite of her prior recognition that Baby Doe was an Afghan citizen, and her knowledge that the Government of Afghanistan had demanded her return for reunification with her family and that the United States had agreed, Motley agreed to work with the Masts as they implemented their plan.

82.     Joshua Mast provided Motley with information he received about the identities of the people to whom Baby Doe was transferred. Motley used this information to find a contact who could connect her with John and Jane Doe.

83.     On or about March 6, 2020, just days after Baby Doe was united with her family, Motley called John Doe for the first time, pursuant to her agreement with, and at the direction of, Joshua and Stephanie Mast.

**JA071**

84.     In their initial introductions to Motley in March 2020, John and Jane Doe described themselves to Motley as Baby Doe's "cousin," and "the wife of [John Doe] and the mother of [Baby Doe]," respectively.

85.     In a subsequent conversation that same day, Motley advised Jane Doe that she understood Baby Doe had serious medical issues and that Motley knew an American family who wanted to help her.  Pursuant to her agreement with Joshua and Stephanie Mast, Motley did not disclose the Masts' custody order and interlocutory adoption order for Baby Doe, and did not disclose the Masts' intention to adopt Baby Doe or that the Masts had initiated court proceedings to do so.

86.     Five days later, the Masts filed a brief relating to their rejected TRO Petition, but did not disclose to the Court that they were in contact with John and Jane Doe through Motley or that Baby Doe was with her biological family and legal guardians in Afghanistan.

87.     On March 22, 2020, Joshua Mast wired a $4,500 payment to Motley via PayPal and messaged her to confirm that she received the funds.

88.     Motley continued to communicate with and befriend John and Jane Doe on behalf of the Masts over the course of more than a year, making multiple offers to assist with Baby Doe's medical care and occasionally asking for photographs of Baby Doe.  Motley did so at the direction of Joshua and Stephanie Mast and received thousands of dollars to do so.

89.     Motley also continued to hide the identity of the person or people purportedly willing to help Baby Doe, or that Joshua and Stephanie Mast had obtained a custody order and an interlocutory adoption order for Baby Doe.

90.     On July 30, 2020, and in response to one of Motley's requests for photos, Jane Doe sent her photographs of Baby Doe in swim trunks in a small wading pool.

B.    **The Masts made additional misrepresentations to the Circuit Court to obtain a Final Order of Adoption of Baby Doe.**

91.    At the same time Motley was communicating with and befriending John and Jane Doe at the behest of Joshua and Stephanie Mast, the Masts continued pursuing a final order of adoption in the Circuit Court.

92.    The Masts did so despite knowing that: (a) Baby Doe was in the custody of individuals determined by the Government of Afghanistan and ICRC to be her biological family and legal guardians under the laws of Afghanistan; (b) Joshua and Stephanie Mast had not obtained an order of custody or guardianship over Baby Doe in Afghanistan; (c) the Afghan government had asserted jurisdiction over Baby Doe; (d) this Court, the United States District Court for the Western District of Virginia, had characterized the Juvenile Court custody order as falsely premised upon the existence of a waiver of jurisdiction by the Afghan government; and (e) the DoD (Baby Doe's former custodian and Joshua Mast's employer) and the DoS (the agency that oversees intercountry adoptions) regarded the state court orders as "unlawful." Upon information and belief, the Masts intentionally failed to advise the Circuit Court of any of these facts.

93.    On December 3, 2020, nine months after Baby Doe had been reunited with her family in Afghanistan, and as a direct result of the Masts' omissions and misrepresentations, the Circuit Court entered a final order of adoption for Joshua and Stephanie Mast, incorrectly finding that Baby Doe "remains up to this point in time an orphaned, undocumented, stateless minor," and therefore "has the legal identity granted by order of this Court as constituting her sole legal identity." At the time of the order, neither Joshua and Stephanie Mast, Richard Mast, nor anyone else had informed John Doe or Jane Doe of the pendency of those proceedings. Nor had anyone informed the United States – despite this Court's denial of Joshua and Stephanie Mast's request for a TRO, and despite Richard Mast's express representation to this Court (in the presence of

**JA073**

United States' counsel) that Joshua and Stephanie Mast did not intend to adopt Baby Doe – that Joshua and Stephanie Mast had in fact continued to pursue Baby Doe's adoption.

**C.    With the assistance of Osmani and Motley, Joshua Mast built a fraudulent relationship of trust with John and Jane Doe, offering to help obtain medical care in the United States for Baby Doe but never disclosing the Fraudulent Custody and Adoption Orders.**

94.    After Joshua Mast met Ahmad Osmani in 2021 through a WhatsApp Bible study group, Osmani offered to help Joshua and Stephanie Mast bring Baby Doe to the United States so that they may raise her as their daughter.

95.    On February 2, 2021, Stephanie Mast emailed Joshua Mast an altered photo of Baby Doe for use in obtaining an Afghan passport for Baby Doe. The photo was nearly identical to the photo of Baby Doe that Jane Doe sent to Kimberley Motley, *see supra* ¶ 90. However, the photo that Stephanie Mast emailed to Joshua Mast had been altered to add a shirt, remove the background content, and be reformatted as a passport photo. Joshua Mast forwarded Stephanie Mast's email and the altered photo to Ahmad Osmani to be conveyed to his contact in the Afghan passport office.

96.    In March 2021, Osmani assisted Joshua and Stephanie Mast in obtaining a fake Afghan passport for Baby Doe. Joshua and Stephanie Mast wired more than $1,000 to Osmani, who then wired those funds to a contact in Afghanistan to pay for the procurement of the fake Afghan passport with a fake Americanized name that featured the Mast's last name.

97.    Osmani knew that Baby Doe was living with her biological family in Afghanistan. In fact, during his first encounter with Osmani and Joshua Mast, John Doe told Osmani and Joshua Mast that John Doe is Baby Doe's cousin. Osmani even identified John Doe as the child's cousin in the contact information Osmani stored in his phone for John Doe.

98.    On July 10, 2021, Motley offered for the first time to introduce John and Jane Doe to the American family supposedly interested in providing medical care for Baby Doe. Motley then facilitated a telephone conversation between John and Jane Doe and Joshua Mast, during which Ahmad Osmani provided interpretation. Mast told John and Jane Doe that he was familiar with Baby Doe's medical needs and warned them that, if Baby Doe did not receive medical care in the United States, she could be blind, brain damaged, and/or permanently physically disabled. In the course of their conversations, Mast claimed to be a volunteer in the U.S. military hospital who was responsible for her care while she was hospitalized there.

99.    John Doe, who trained as a nurse in Afghanistan, was not aware of the medical issues that Mast described. But John and Jane Doe were concerned about the scarring on Baby Doe's face from the burns she sustained, Baby Doe's irregular gait due to the leg injury she sustained, and the severe allergic reactions of unknown origin that she seemed to periodically suffer.

100.    Mast insisted that Baby Doe would suffer serious, permanent harm if she were not brought to the United States for special treatment. In that initial conversation and in other subsequent conversations, Mast asked John and Jane Doe to send Baby Doe to the United States for medical treatment. They declined because they did not want to be separated from their daughter.

101.    By July 2021, Jane Doe was in the third trimester of pregnancy and concerned about traveling to the United States. As a result, John and Jane Doe asked Mast if he would be willing to facilitate their taking Baby Doe to India or Pakistan for medical care, where he could pay doctors or hospitals directly, without providing any money to John and Jane Doe. Mast declined, insisting that hospitals in India and Pakistan did not have the specialists required to help Baby Doe.

102.    Over time and over the course of other telephone conversations and written communications, Ahmad Osmani helped Joshua and Stephanie Mast foster a relationship of trust with John and Jane Doe. Osmani also had conversations with the Does on other occasions in which the Masts did not participate. Osmani routinely referred to John Doe as his "brother." John and Jane Doe trusted Osmani, an Afghan who spoke their native language, when he told them that the Masts were trustworthy people with no ulterior motives who just wanted to help Baby Doe receive medical care. Upon information and belief, Osmani maintained contact with John and Jane Doe and reported back to Joshua Mast at his direction about his conversations with the Does. Unbeknownst to John and Jane Doe, Osmani was not the impartial interpreter he made himself out to be. Rather, Osmani knew that the Masts intended to take Baby Doe from her biological family, and Osmani helped them do so.

103.    Joshua Mast also repeatedly referred to John Doe as his "brother" and insisted he only wanted to help Baby Doe obtain needed medical care.  Based on the repeated warnings of Joshua and Stephanie Mast about Baby Doe's medical needs, and based on the repeated assurances by Osmani that the Masts were honest people who just wanted to help Baby Doe, John and Jane Doe began to fear that she would suffer long-term consequences if they did not obtain specialist care for her.

104.    Neither Joshua Mast, Stephanie Mast, Motley, nor Osmani disclosed to John and Jane Doe at this time that the Masts had (unsuccessfully) filed a legal action in the United States to prevent Baby Doe's reunification with her biological family and legal guardians in Afghanistan, or that the Masts had obtained an order of adoption for Baby Doe in a Virginia court.  Instead, Joshua and Stephanie Mast misrepresented that they wanted to bring Baby Doe to the United States solely so that she could receive medical treatment and for the sake of doing something good.

**D.      As Afghanistan fell to the Taliban, John and Jane Doe believed that they might never have another chance to obtain necessary medical care for Baby Doe.**

105.     In August 2021, as U.S. troops withdrew and the Taliban began to retake Afghanistan, Joshua and Stephanie Mast again reached out to John and Jane Doe to convince them to bring Baby Doe to the United States for medical treatment.  Given the political situation in Afghanistan and the Taliban's advances, John and Jane Doe believed this could be their last and only chance to obtain medical care for Baby Doe.  As a result, they advised Joshua Mast that they were considering his proposal, but were concerned that they would not be able to return to Afghanistan.

106.     Joshua Mast and Ahmad Osmani assured them that they would need to be in the United States for Baby Doe's medical care for only two or three months and that they would then be able to re-enter Afghanistan without issue.  Again, Joshua Mast and Ahmad Osmani failed to inform John and Jane Doe about the adoption order he and his wife and brother had fraudulently obtained from a Virginia court or their previous attempts to prevent Baby Doe from being reunited with her biological family and legal guardians in Afghanistan.  Rather, Mast and Osmani continued to misrepresent that the Masts merely wanted to bring Baby Doe to the United States solely to provide her with medical care.

107.     In reliance on Joshua Mast's misrepresentations regarding the purpose and duration of their travel, as well as their ability to return to Afghanistan, ignorant of Mast's and his wife's true intentions, and in reliance on Osmani's reassurances, John and Jane Doe agreed to travel to the United States for the purpose of obtaining medical care for Baby Doe.

E.   **Joshua Mast and Richard Mast filed a fraudulent immigration application for John Doe and made false statements to USCIS, without John Doe's knowledge or consent.**

108.   Joshua Mast informed John and Jane Doe that he would prepare immigration paperwork for them and Baby Doe to permit them to enter the United States for the purpose and duration of Baby Doe's medical care.

109.   In fact, Mast did not file the appropriate immigration paperwork for John and Jane Doe and Baby Doe for the purpose of having them visit the United States for a short duration to obtain medical care for Baby Doe. Instead, on August 20, 2021 and unbeknownst to John and Jane Doe, Richard Mast emailed U.S. Citizenship and Immigration Services ("USCIS") a Form I-360 Petition for Plaintiff John Doe. Upon information and belief, the form was prepared at the direction of Joshua and Stephanie Mast by Natalie Osmani, Ahmad Osmani's wife. Ms. Osmani signed the petition as its preparer, but listed Defendant Joshua Mast as the person acting on behalf of the petitioner, and provided Mast's North Carolina home address as a mailing address.

110.   In addition, Ms. Osmani wrote by hand the following visa category: "Special Immigrant Afghanistan national escorting military dependent." Not only does no such visa category exist, but it was false to claim that John Doe would be escorting a U.S. "military dependent" when the United States had by this time represented to this Court that it did not recognize any custodial relationship between Joshua Mast, Stephanie Mast and Baby Doe.

111.   Upon information and belief, John and Jane Doe nonetheless were placed on a list of potential evacuees with pending Special Immigrant Visa Applications as a result of the petition.[7]

---

[7] On November 10, 2021, the USCIS mailed a Notice of Intent to deny the Petition to Joshua Mast at his North Carolina address, with a response deadline of December 10, 2021. Mast never advised John and Jane Doe of the Petition or the Notice of Intent to deny. John and Jane Doe learned these facts only as a result of filing requests for personal records with USCIS.

112.     In his August 20, 2021, email to the USCIS, Richard Mast falsely wrote: "[John and Jane Doe] are helping US DoD at great risk to themselves, and have cared for a minor DoD dependent child ([Baby Doe]) who has serious medical needs."

113.     Of course, by then Baby Doe was not a "minor DoD dependent child," because she had been returned to her family in the exercise of the Government of Afghanistan's jurisdiction. Instead, John and Jane Doe were by then Baby Doe's legal guardians, raising her as their own child; they were not "caring" for her on behalf of Joshua and Stephanie Mast, the DoD, or anyone else.  Nor were they doing so as a "service to the US Government."

114.     In another email to USCIS seeking the evacuation of Ahmad Osmani's siblings to the United States, Richard Mast wrote that Osmani's siblings were the "family of an Afghan pastor" who had been "very instrumental to helping a US Marine" represented by Liberty Counsel "adopt an Afghan child."  Upon information and belief, the reference to a "US Marine" is a reference to Joshua Mast, and the reference to "an Afghan child" is a reference to Baby Doe.

115.     John and Jane Doe were not aware of the misrepresentations being made by Richard Mast, on behalf of Joshua and Stephanie Mast, about them and Baby Doe.

116.     The Does traveled to Kabul on August 23, 2021, to spend the night there with Osmani's parents and siblings, at the direction of Joshua Mast and Osmani.  The next morning, the Does traveled to Hamid Karzai International Airport as part of the evacuation efforts under Operation Allies Refuge. Osmani's siblings accompanied them.

117.     Between August 24 and August 26, 2021, Joshua Mast and Osmani continued to communicate with John and Jane Doe over WhatsApp as they transited from Afghanistan to the United States through Qatar and Germany.

118.     Again, Joshua Mast and Osmani failed to inform John and Jane Doe about the adoption order that Joshua and Stephanie Mast had obtained from a Virginia court or their previous attempts to prevent Baby Doe from being reunited with her biological family and legal guardians in Afghanistan.  Rather, they continued to misrepresent that the Masts wanted to bring Baby Doe to the United States only to provide her with medical care.

**F.      Joshua Mast told John and Jane Doe he was their lawyer and facilitated their entry into the United States.**

119.     On August 26, 2021, as Plaintiffs were in transit to the United States, Joshua Mast sent a WhatsApp voice note to Jane Doe, instructing her to tell anyone who asks that he was their lawyer.  He also sent her a text stating:

> If anyone asks to talk about your documents, show them this text: I am Major Joshua Mast, USMC.  I am a Judge Advocate with MARSOC, and I am here at Ramstein to provide this group of 6 pax with their original documents and escort them through the process. MARSOC coordinated a JSOC operation to extract them to Kabul airport three days ago, and I am tracking them down for the above purpose.

120.     At approximately the same time, Mast left John Doe a voice message, assuring him he would get them to the United States, and stating:

> [I]f someone tries to talk about documents, we want to come and show them all the forms that we filed for you all to get to America instead of staying here in Germany.  So before you talk to them about it, say "we have a lawyer here to talk with you about that for us" and that's me.  Just show them the text and have them call me.

121.     When Plaintiffs landed at Ramstein Airforce Base in Germany, Joshua and Stephanie Mast met them.  During their brief stop in Germany, Joshua and Stephanie Mast visited Plaintiffs' room three times, repeatedly trying to convince John and Jane Doe to allow Baby Doe to travel separately with the Masts, insisting that it would be easier for the toddler to enter the

**JA080**

United States that way.  John and Jane Doe repeatedly refused, as they did not want to leave Baby

Doe in anyone else's care.  Osmani provided interpretation over the telephone.

122.    Before leaving Germany, John Doe informed Joshua and Stephanie Mast of a

promise John Doe had made to Jane Doe: that Baby Doe would never leave her side while they

were in the United States.  There can be no doubt that Joshua and Stephanie Mast were aware that

John and Jane Doe understood they would have control over Baby Doe's location and custody

while in the United States, and that they intended to continue to care for her as their daughter.

123.    During a conversation in Germany, Jane Doe told Stephanie Mast that she could

not live without Baby Doe and that, given all that Baby Doe had been through, Baby Doe meant

even more to Jane Doe than her own yet-to-be-born child.

124.    Again, the Masts and Osmani failed to fully inform John and Jane Doe about the

adoption order that the Masts obtained from a Virginia court or their previous attempts to prevent

Baby Doe from being reunited with her biological family and legal guardians in Afghanistan.

Rather, the Masts and Osmani continued to misrepresent that they only wanted to bring Baby Doe

to the United States to provide her with medical care.

**G.    Despite repeatedly representing to Virginia and federal courts that she was not
Afghan and had no nationality, Joshua and Stephanie Mast used the Afghan
passport they fraudulently obtained for Baby Doe, with Osmani's assistance,
to bring Baby Doe to the United States.**

125.    After several days of grueling travel, which were especially hard on Jane Doe, who

was eight months pregnant, the Does and the Osmani siblings arrived at Dulles International

Airport on August 29, 2021.  Joshua Mast met the families while they waited in line for inspection,

pulled them out of the line, and took them directly to an inspecting officer.  There, they presented

their identity documents.

126.    John Doe presented his Afghan passport to the inspecting officer, and Jane Doe presented her Afghan ID. They then explained to the inspecting officer that Baby Doe had not yet received an identification document, as it was customary in Afghanistan to procure one only when the child was old enough to attend school. At the time, Baby Doe was two years old.

127.    To their surprise — and despite his representations to multiple courts that Baby Doe was not Afghan and had no nationality — Joshua Mast then handed an Afghan passport for Baby Doe to the inspecting officer. John and Jane Doe had never before seen this passport and did not procure it themselves. When the officer returned the passport to John and Jane Doe, they were shocked to see that the photograph in the passport appeared to be the same photograph that Jane Doe sent to Motley via WhatsApp on July 30, 2020, of Baby Doe in swim trunks in a small wading pool, but it had obviously been altered.

<strong>Original Photo</strong>    <strong>Passport Photo</strong>



128.    The altered picture had a different background, a shirt covering Baby Doe's shoulders and chest, and eliminated some stray hairs so it was less obvious that her hair was wet.

129.    Upon information and belief, the alteration of the photograph for use in the passport was done by, or at the direction of, both Joshua and Stephanie Mast.

130.    Upon information and belief, the procurement of a fake Afghan passport for Baby Doe was orchestrated by Osmani. Osmani identified, communicated with, and, at the direction of

Joshua and Stephanie Mast, paid an Afghan government official to create a passport for a child that Joshua Mast, Stephanie Mast, and Osmani claimed to the Circuit Court and this Court was not Afghan. The fake Afghan passport also identified Baby Doe with a fake name: an American name and the Mast's last name.

131.    John and Jane Doe were stunned to see that the name on the passport was "█████ Mast."

132.    When John and Jane Doe asked Joshua Mast why the name on the passport was incorrect, he told them to keep quiet and that it was just to make it easier to get medical care for Baby Doe.

133.    After screening at the airport, Plaintiffs were paroled into the United States, which permits them to lawfully remain in the United States through August 28, 2023. They ultimately were transported to refugee housing at Fort Pickett, in Blackstone, Virginia, the location that Joshua Mast instructed them to request.

**H.    Joshua and Stephanie Mast abducted Baby Doe.**

134.    Five days later, on September 3, 2021, John and Jane Doe were instructed that they would be moving to another housing unit on the base. They were escorted to a van, in which a woman sat in the last row with an infant car seat next to her. Baby Doe was placed in the infant car seat.

135.    But the Does were not transported to another housing unit on the base. Instead, they were taken to a building where the woman in the car picked up Baby Doe and held her while instructing John and Jane Doe to walk to the front of the building. There, they met another unknown woman who later informed them she was a social worker from the DoS.

136.    Inside the building, they were met by the social worker, a Pashto interpreter, and the woman from the car, who continued to hold Baby Doe. The social worker then informed John

**JA083**

USCA4 Appeal: 24-1220      Doc: 16      Filed: 11/12/2024      Pg: 87 of 347

and Jane Doe that they were not Baby Doe's lawful guardians and that Joshua Mast had adopted the child.

137.     John and Jane Doe did not understand what "adoption" meant, as guardianship and kinship care in Afghanistan are not understood in the same way as adoption in the U.S. legal system.  John and Jane Doe did understand, though, that Baby Doe would not be permitted to return to their housing unit with them, but that Joshua Mast would be taking her with him.

138.     When Joshua Mast entered the room, Jane Doe, who was more than eight months pregnant, fell to the ground crying and begging for him not to take Baby Doe.  The woman holding Baby Doe removed her from the room, against John and Jane Doe's objections, and gave her to Stephanie Mast, who was waiting outside.

139.     John Doe pleaded with Joshua Mast to act like the "brother" that he had promised to be to them.  Joshua Mast refused, leaving John and Jane Doe in tears as he and Stephanie Mast abducted Baby Doe.  John and Jane Doe have not seen their daughter since that day.

**I.     John and Jane Doe suffer severe emotional distress as a result of the trauma of having Baby Doe taken from them.**

140.     Bewildered and in despair, John and Jane Doe returned to their housing unit on the base.  The next day, they contacted Joshua Mast and asked why he had taken their child.  Mast responded that he had been instructed to pick up Baby Doe or she would be sent to an orphanage. He did not say who instructed him or mention the adoption order he and his wife had fraudulently obtained more than a year earlier.

141.     In a conversation with Joshua Mast and Richard Mast approximately two weeks later, Joshua Mast and Richard Mast again failed to disclose the adoption order, but instead told the Does that they currently were not able to properly care for Baby Doe at Fort Pickett and were not financially stable enough to provide for her. But, they told John and Jane Doe, after the Does

leave the base, got jobs, and were financially stable, they would discuss Baby Doe's status with

the Does. At no point during this conversation did either Joshua Mast or Richard Mast refer to

Baby Doe as the child of Joshua and Stephanie Mast or discuss the adoption order.

142.    Over the next few weeks, John and Jane Doe attempted to maintain a connection

with Joshua Mast over WhatsApp, hoping that he might allow them to see Baby Doe.  They

repeatedly begged him to allow them to see Baby Doe or at least speak with her, but he repeatedly

refused. At the same time, just one month after having abducted Baby Doe, Joshua Mast took her

to visit strangers at Liberty University so that they could meet her.

143.    John and Jane Doe were afraid of Mast, as he appeared to have lied to numerous

government agencies about Baby Doe and gotten away with it. Mast abducted their child in broad

daylight but appeared to face no consequences.  They were afraid of angering him, believing that,

if he could steal their child and get away with it, he could harm them, too.

144.    Ahmad Osmani maintained frequent contact with the Does, who pleaded with him

to help them get their child back. But Osmani continued to manipulate the Does, telling them that

he wanted to help them when instead he was acting solely in furtherance of the Masts' scheme to

abduct Baby Doe. For example, in the days after the abduction, the Does repeatedly asked Osmani

for help in retaining a lawyer or contacting other public officials in the United States for help in

getting their child back. But Osmani warned the Does that they must not seek legal help, that

lawyers will defraud them, that this issue must be resolved directly with the Masts and that,

regardless, no court would return the child to them because the court would see that the Masts had

more money than them.  Upon information and belief, Osmani attempted to dissuade the Does

from seeking legal recourse at the direction of Joshua Mast, and reported his conversations back

to Joshua Mast.

145.    Even though he knew that the Masts now claimed to be Baby Doe's adoptive parents and that the Masts had no intention of returning the child to the Does, Osmani suggested that if the Does kept in contact with the Masts, the Masts might be willing to return the child after the Does left the military base.

146.    John Doe continuously sought help from various agencies at Fort Pickett to help retrieve Baby Doe. Eventually, on September 18, 2021, an interpreter on the base with whom John and Jane Doe shared their story explained the meaning of "adoption" to them. This was the first time John and Jane Doe understood that Joshua and Stephanie Mast had been lying to them all the time and had no intention of returning Baby Doe to them.

147.    As a direct result of the decline of Jane Doe's mental health and the traumatic experience of losing Baby Doe, John Doe was afraid to leave Jane Doe alone in their room. He often asked other women in their building to keep an eye on her if he needed to be out of the room. Despite being in the ninth month of her pregnancy, Jane Doe no longer wanted to eat or drink, and she could not sleep. Both she and her husband were devastated and depressed.

148.    Jane Doe delivered her baby on October 1, 2021. Unfortunately, despite the joy of bringing a new child into this world, Jane Doe's depression deepened as it became increasingly clear that Joshua and Stephanie Mast would never voluntarily return Baby Doe to them. By November 5, 2021, Jane Doe had become suicidal and was taken to the Stress Clinic on Fort Pickett for treatment.

149.    In November 2021, Jane Doe messaged Kimberley Motley to inform her that the Masts, whom Motley had introduced to the Does, had abducted Baby Doe, and pleaded with Motley to help her. Motley did not respond.

**JA086**

150.    As a direct result of Joshua and Stephanie Mast's intentional and forcible removal of Baby Doe, John and Jane Doe have been unable to exercise their parental rights as Baby Doe's biological family and legal guardians.

151.    As a result of Joshua and Stephanie Mast's intentional and outrageous conduct, namely the abduction of Baby Doe in their presence, John and Jane Doe have experienced extreme emotional distress.

**J.    John and Jane Doe petitioned to vacate the Adoption Order, and the United States confirmed that Baby Doe was not a "stateless minor" but under the jurisdiction of Afghanistan, and confirmed that the United States transferred physical custody of Baby Doe to Afghanistan in the Executive Branch's exclusive authority over foreign affairs.**

152.    In December 2021, John and Jane Doe initiated proceedings in the Fluvanna Circuit Court to vacate the Adoption Order. In March 2022, by order of the Circuit Court, John and Jane Doe filed a new petition under a new case caption.

153.    On August 22, 2022, the United States filed a 21-page Statement of Interest (the "SOI"), with supporting declarations, pursuant to 28 U.S.C. § 517 (attached as Exh. 1). Consistent with the positions taken by the United States before this Court in response to the Masts' TRO Petition, the SOI explicitly confirms the position of the United States that Baby Doe was not a "stateless minor" but was instead an Afghan citizen subject to the jurisdiction of Afghanistan; that the Government of Afghanistan never waived jurisdiction over her but, in fact, affirmatively asserted jurisdiction over Baby Doe; and that, in the exercise of its exclusive authority over foreign affairs, the United States transferred physical custody of Baby Doe to the Government of Afghanistan so that she could be reunified with her family, as identified by the Afghan government. The United States further took the position in the SOI that a state court cannot usurp or contradict the decisions made by the United States with regard to foreign affairs.

## CLAIMS FOR RELIEF

### COUNT I

**TORTIOUS INTERFERENCE WITH PARENTAL RIGHTS
(AGAINST ALL DEFENDANTS)**

154.    Plaintiffs repeat and re-allege all the allegations set forth in the foregoing Paragraphs as if fully set forth and restated here.

155.    As the biological family and legal guardians of Baby Doe, John and Jane Doe have parental rights to and in their relationship with Baby Doe.  The right of parents or guardians to develop and to maintain a relationship with their child is a fundamental right recognized by the United States Supreme Court and federal law.  Further, the U.S. government recognized that the Does' parental and custodial rights to Baby Doe fell under the jurisdiction of Afghanistan and are recognized under the laws of Afghanistan.

156.    This Court concurred with the DOJ that sole jurisdiction over the custody of Baby Doe was a matter for the courts and Government of Afghanistan, which had expressly asserted its jurisdiction over Baby Doe.

157.    Upon information and belief, each of the Defendants was aware that John and Jane Doe were the lawful guardians of Baby Doe as determined by the Government of Afghanistan. Each of the Defendants was aware John and Jane Doe had maintained physical custody of Baby Doe.

158.    Notwithstanding this knowledge, each of the Defendants intentionally and willfully used improper, unethical and fraudulent means to preclude John and Jane Doe from continuing their parental relationship with Baby Doe and interfered with their parental rights, permanently depriving them of those rights.

159.    Defendants' actions as set forth above have resulted in the violation of these rights, causing John and Jane Doe harm for which they seek compensation.

160.     Defendants are jointly and severally liable for the harm to Plaintiffs as articulated above.

## COUNT II

### FRAUD
### (AGAINST DEFENDANTS JOSHUA AND STEPHANIE MAST AND KIMBERLEY MOTLEY)

161.     Plaintiffs repeat and re-allege all the allegations set forth in the foregoing Paragraphs as if fully set forth and restated here.

162.     Joshua and Stephanie Mast and Kimberley Motley intentionally made misleading and false statements and/or material omissions to John and Jane Doe to perpetrate the abduction of Baby Doe.

163.     Joshua and Stephanie Mast engaged the services of Motley, who acted as their agent, to, *inter alia*, contact John and Jane Doe and lure them into facilitating Baby Doe's travel to the United States, purportedly for the sole purpose of obtaining medical treatment for her, through false and misleading statements and material omissions.

164.     Upon information and belief, Joshua and Stephanie Mast, through their agent Motley, procured the identities and location of John and Jane Doe, as well as photographs of Baby Doe procured from John and Jane Doe via WhatsApp.

165.     John and Jane Doe relied on Motley's misrepresentations, which she made at the direction of Joshua and Stephanie Mast, when they communicated with her, sent her photographs of Baby Doe, and agreed to travel to the United States for what the Does thought was the sole purpose of obtaining medical treatment for Baby Doe.

166.     One of the photographs that Joshua and Stephanie Mast obtained from John and Jane Doe through Motley, under false pretenses, was digitally altered to create the fraudulently obtained identification documents used to bring Baby Doe into the United States.

167.    It was as a direct result of John and Jane Doe's reliance on Joshua and Stephanie Mast's prevarications, made through Motley, that Joshua and Stephanie Mast were able to lure Plaintiffs to the United States and unlawfully obtain physical custody of Baby Doe.

168.    On July 10, 2021, as well as in subsequent conversations, Joshua and Stephanie Mast, with the assistance of Motley, intentionally misrepresented to John and Jane Doe that their sole intention was to procure medical assistance for Baby Doe, and that it was in the Does' best interest to send Baby Doe to the United States.  Joshua and Stephanie Mast also intentionally withheld from John and Jane Doe any information or notice of the court proceedings they had initiated for Baby Doe in Virginia.

169.    On August 26, 2021, and in furtherance of the Masts' unlawful scheme to take Baby Doe from John and Jane Doe, Joshua Mast represented to John and Jane Doe that he was their attorney.

170.    Shortly thereafter, while John and Jane Doe were in Germany awaiting their final flights to the United States, Joshua and Stephanie Mast came to their room three times and again made misrepresentations to them, reiterating that they wanted to take Baby Doe to the United States for the sole purpose of obtaining medical treatment for her.  Further, Joshua and Stephanie Mast falsely stated that Baby Doe should travel with them, separately from the Does, because they were simply trying to make it easier for Baby Doe to enter the United States.  Instead, their true intention was to unlawfully and permanently take physical custody of Baby Doe.

171.    On September 3, 2021, Joshua Mast arranged for John and Jane Doe and Baby Doe to be moved to another building at Fort Pickett and revealed to John and Jane Doe for the first time that he had adopted Baby Doe.  He then utilized this opportunity to remove Baby Doe from their custody.

172.     John and Jane Does' reasonable reliance on this pattern of deception allowed Joshua and Stephanie Mast, through their agent Motley, to obtain the photographs necessary to procure fraudulently obtained identification documents, travel permissions, and erroneously granted custodial and adoption decisions necessary to effect this abduction.

173.     As a result of repeated material misrepresentations by the Masts and Motley, John and Jane Doe and Baby Doe traveled to the United States and subjected themselves to the controlled environment of a military base that Joshua Mast manipulated to his advantage to abduct Baby Doe in broad daylight.

174.     In reliance on the representation that they were only traveling to the United States for two to three months to obtain medical care for Baby Doe, after which they would return with Baby Doe to Afghanistan, John and Jane Doe left their homeland, to which they cannot yet return, and may never be able to return, because of the circumstances surrounding their departure. Specifically, John and Jane Doe fear that the current Afghanistan government will be quick to assume they are U.S. military collaborators — consequently, they fear they or their family will be shunned or targeted by the government, or by others in their community.

175.     Had John and Jane Doe been aware that the purpose of the communications initiated by Joshua and Stephanie Mast and Motley was to facilitate the Masts' abduction of Baby Doe, they never would have communicated with Motley, shared photographs of Baby Doe, or traveled to the United States at the behest of Joshua and Stephanie Mast.

176.     Had John and Jane Doe been aware that Joshua and Stephanie Mast had fraudulently obtained orders of custody and adoption for Baby Doe, they never would have communicated with Motley, shared photographs of Baby Doe, or traveled to the United States at the behest of Joshua and Stephanie Mast.

177.    Had John and Jane Doe been aware that Joshua and Stephanie Mast had filed an action in a U.S. federal court to prevent Baby Doe's reunification with her biological family and legal guardians, they never would have communicated with Motley, shared photographs of Baby Doe, or traveled to the United States at the behest of Joshua and Stephanie Mast.

178.    John and Jane Doe have suffered and will continue to suffer what they regard as the worst tragedy they have experienced, having their child unjustly ripped from their lives.

179.    Accordingly, Joshua and Stephanie Mast and Motley are jointly and severally liable for the harm suffered by Plaintiffs as articulated above.

### COUNT III
### COMMON LAW CONSPIRACY
### (AGAINST ALL DEFENDANTS)

180.    Plaintiffs repeat and re-allege all the allegations set forth in the foregoing Paragraphs as if fully set forth and restated here.

181.    Each of the Defendants acted in concert, agreed, associated, mutually undertook and combined together to intentionally and purposely commit the wrongful and tortious acts against all of the Plaintiffs as set forth above.  The concerted and purposeful actions of each Defendant have denied John and Jane Doe their parental rights and wrongfully interfered with their ability to establish and assert those rights; and denied Baby Doe her right to know and be raised in the natural home of her biological family and legal guardians.

182.    Each of the conspirators is fully responsible for the acts of each other.  The total effect of the conspiracy not only is tortious, but, indeed, also is a criminal act tantamount to child abduction under §§ 18.2-47(a) and 18.2-49 of the Code of Virginia.  The actions of the conspirators violate federal statutes, laws and regulations of the Commonwealth of Virginia, and the laws of Afghanistan.

40

**JA092**

183.     Each Defendant acted in furtherance of this conspiracy to defraud John and Jane Doe and to abduct and unlawfully restrain Baby Doe.

184.     Joshua and Stephanie Mast, *inter alia*, fraudulently induced John and Jane Doe, through their agent Motley, to share photographs of Baby Doe, which they used to unlawfully obtain an Afghan passport for Baby Doe without the knowledge or consent of her biological family and legal guardians.  Joshua and Stephanie Mast fraudulently misrepresented their intentions, both directly and through their agent Motley and through Osmani, to John and Jane Doe when persuading them to bring Baby Doe to the United States for the sole purpose of obtaining medical treatment.  Joshua and Stephanie Mast abducted Baby Doe and have continued to deprive John and Jane Doe of any contact with her.  Joshua and Stephanie Mast procured fraudulently obtained documents to affect her abduction.

185.     Richard Mast, *inter alia*, at the direction of and on behalf of Joshua and Stephanie Mast, fraudulently misrepresented material facts, and made numerous omissions of fact, to multiple courts to unlawfully obtain custody and adoption orders that would facilitate the abduction by Joshua and Stephanie Mast of Baby Doe, as well material misrepresentations to this Court and USCIS in furtherance of the same.  He did so in violation of his ethical rules of professional responsibility as an attorney licensed in the Commonwealth of Virginia. Richard Mast and Joshua and Stephanie Mast knew these statements to be false and the omissions to be material.

186.     Joshua and Stephanie Mast, through their agent Motley, and Osmani knowingly made false representations to John and Jane Doe when persuading them to have Baby Doe travel to the United States to obtain medical treatment.

187.     As set forth above, the Defendants' overt acts and omissions in furtherance of their conspiracy have harmed and will continue to harm each Plaintiff.

188.     Accordingly, the Defendants are jointly and severally liable for the harm to Plaintiffs as articulated above.

## COUNT IV

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (AGAINST ALL DEFENDANTS)

189.     Plaintiffs repeat and re-allege all the allegations set forth in the foregoing Paragraphs as if fully set forth and restated here.

190.     Since 2019, the conduct of Joshua and Stephanie Mast has shown a consistent pattern of reckless disregard for the very real possibility of causing extreme emotional distress to John and Jane Doe.  As set forth above, the Masts conspired to separate Baby Doe unlawfully from the only family she had ever known for the vast majority of her short life.  It is implausible that someone would be unaware of the extreme trauma that would be inflicted on parents when their child is ripped from their arms by someone who had for months been claiming that all he wanted was to help them.

191.     As alleged above, the conduct of Joshua and Stephanie Mast was both deceitful and criminal, violating the laws of Afghanistan, Virginia, and the United States.  They were aware that Baby Doe had been reunited with her biological family and legal guardians, and chose to conceal this from Virginia state and federal courts.  They continued to mispresent to the Virginia courts that Baby Doe was a stateless, unaccompanied orphan.  Neither the government of Afghanistan nor the United States agreed with this determination.  Nonetheless, to carry out their scheme, Joshua and Stephanie Mast consistently violated laws meant to safeguard not only the wellbeing of vulnerable children, but the foreign policy interests of the United States.

192.    Richard Mast knowingly furthered this scheme through his fraudulent in-court misrepresentations, by procuring the custody and adoption orders for Joshua and Stephanie Mast, and by submitting a deceptive immigration application for John Doe.

193.    Joshua and Stephanie Mast, through their agent Motley, and Osmani knowingly facilitated the plan to abduct Baby Doe by misrepresenting their intentions to John and Jane Doe when persuading them to bring Baby Doe to the United States supposedly for the sole purpose of obtaining medical treatment.

194.    These actions would be considered extreme, outrageous, and intolerable by any reasonable person.

195.    As a direct result of the extreme, outrageous, and intolerable conduct of all Defendants, Plaintiffs have suffered extreme emotional distress.  The lives of all three Plaintiffs have been forever altered in fundamental ways that no individual should be expected to endure.

196.    Accordingly, Defendants are jointly and severally liable to Plaintiffs for all of their harm suffered at the hands of the Defendants, as set forth above.

## COUNT V

### FALSE IMPRISONMENT
### (AGAINST DEFENDANTS JOSHUA AND STEPHANIE MAST)

197.    Plaintiffs repeat and re-allege all the allegations set forth in the foregoing Paragraphs as if fully set forth and restated here.

198.    On September 3, 2021, Joshua Mast physically removed Baby Doe from the custody of her lawful guardians without their permission or consent, restricting her movement and confining her to the care of himself and Stephanie Mast.

199.    Since September 3, 2021, Joshua and Stephanie Mast have continued to keep Baby Doe captive, without the permission or consent of her lawful guardians.

200.     On September 3, 2021, Baby Doe began crying when the woman assisting Joshua Mast would not return her to Jane Doe, indicating Baby Doe's awareness of this restraint.  John and Jane Doe, in their capacity as Baby Doe's legal guardians, were and are aware of and vehemently opposed to this unlawful restraint.

201.     As a result of this unlawful restraint, Baby Doe, John Doe and Jane Doe have been injured by this family separation since September 3, 2021.

202.     Accordingly, Joshua and Stephanie Mast are jointly and severally liable to Plaintiffs for all of the harm they have endured, as set forth above.

## **RELIEF REQUESTED**

**WHEREFORE**, Plaintiffs pray for relief and judgment against Defendants including:

a.     Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, a declaration that:

(i)     under the Supremacy Clause of the United States Constitution, the decisions of the United States to recognize Baby Doe's legal status as an Afghan citizen, and to recognize the Government of Afghanistan's jurisdiction over her, are binding and cannot be overridden or contradicted by a state court;

(ii)     at the time that Joshua and Stephanie Mast obtained a custody order for her from the Juvenile Court, Baby Doe was not "stateless," but was an Afghan citizen;

(iii)     at the time that Joshua and Stephanie Mast obtained an adoption order for her from the Circuit Court, Baby Doe was not "stateless," but was an Afghan citizen;

(iv)     the Government of Afghanistan never waived jurisdiction over Baby Doe for the purpose of her custody or adoption by Joshua and Stephanie Mast in the United States;

(v)     Baby Doe had no connection, let alone a significant connection, to the Commonwealth of Virginia at the time that Joshua and Stephanie Mast obtained a custody order for her from the Juvenile Court;

(vi)     Baby Doe had no connection, let alone a significant connection, to the Commonwealth of Virginia at the time that Joshua and Stephanie Mast obtained an adoption order for her from the Circuit Court;

    (vii)   neither Baby Doe's biological parents, nor Jane and John Doe, had a significant connection with the Commonwealth of Virginia at the time that Joshua and Stephanie Mast obtained a custody order for her from the Juvenile Court;

    (viii)   at the time that Joshua and Stephanie Mast obtained the custody order for Baby Doe, she was in the physical custody of the United States military in Afghanistan and, therefore, was beyond the jurisdiction of the Juvenile Court or any court of this Commonwealth of Virginia;

    (ix)   at the time that Joshua and Stephanie Mast obtained an adoption order for her from the Circuit Court, Baby Doe was not living in their home but was in Afghanistan;

    (x)   under the Supremacy Clause of the United States Constitution, the decision of the United States to exercise its foreign affairs powers by allowing Baby Doe's transfer to the Government of Afghanistan for family reunification supersedes and nullifies any conflicting state court action;

    (xi)   under the Supremacy Clause of the United States Constitution, a state court lacks authority to override the Executive Branch's foreign policy decision to allow Baby Doe's transfer to the Government of Afghanistan for family reunification; and

    (xii)   the decision of the United States to transfer Baby Doe to the Government of Afghanistan for family reunification was an exercise of the Executive's foreign affairs power that is binding on state courts.

b.    John Doe seeks ten million dollars ($10,000,000) in compensatory damages, jointly and severally, against each of the named Defendants for the harm set forth in the causes of action stated above;

c.    Jane Doe seeks ten million dollars ($10,000,000) in compensatory damages, jointly and severally, against each of the named Defendants for the harm set forth in the causes of action stated above;

d.    Baby Doe seeks ten million dollars ($10,000,000) in compensatory damages, jointly and severally, against each of the named Defendants for the harm set forth in the causes of action stated above;

e.    John Doe, Jane Doe, and Baby Doe each seek five million dollars ($5,000,000) in punitive damages or the maximum allowed under Virginia law against each of the Defendants for their wrongful actions as set forth above;

f.    Pre- and post-judgment interest on all such sums, in the amount allowed by law;

g.    All costs of Court that Plaintiffs have incurred as a result of this matter; and

h.    Any further relief this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a jury trial on all triable issues within this Complaint.

JA098

Dated: October 28, 2022                    Respectfully submitted,


                                           /s/ *Maya Eckstein*
                                           Maya M. Eckstein (VSB No. 41413)
                                           Lewis F. Powell III (VSB No. 18266)
                                           HUNTON ANDREWS KURTH LLP
                                           951 E. Byrd St
                                           Richmond, VA 23219
                                           Telephone: (804) 788-8200
                                           Fax: (804) 788-8218
                                           Email: meckstein@HuntonAK.com
                                           Email: lpowell@HuntonAK.com


                                           Jeremy C. King (*admitted pro hac vice*)
                                           Sherli Furst (*admitted pro hac vice*)
                                           HUNTON ANDREWS KURTH LLP
                                           200 Park Avenue
                                           New York, NY 10166
                                           Telephone: (212) 309-1000
                                           Fax: (212) 309-1100
                                           Email: sfurst@HuntonAK.com
                                           Email: jking@HuntonAK.com


                                           Sehla Ashai (*admitted pro hac vice*)
                                           ELBIALLY LAW, PLLC
                                           704 East 15th Street
                                           Suite 204
                                           Plano, TX 75074
                                           Telephone: (312) 659-0154
                                           Email: ashai@elbiallylaw.com


                                           *Attorneys for Plaintiffs*

JA099

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of October 2022, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing

to all CM/ECF participants.

By: /s/ Maya M. Eckstein
Maya M. Eckstein (VSB # 41413)
Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
Telephone: (804) 788-8200
Facsimile: (804) 788-8218
meckstein@HuntonAK.com

Counsel for Plaintiffs

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

| 1 | UNITED STATES DISTRICT COURT |
| | FOR THE WESTERN DISTRICT OF VIRGINIA |
| 2 | CHARLOTTESVILLE DIVISION |

3  \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

4   BABY DOE, ET AL,            CIVIL CASE NO.:  3:22CV49
                                FEBRUARY 8, 2023, 2:00 P.M.
5                               MOTIONS HEARING BY VIDEOCONFERENCE
            Plaintiffs,         \*\*REDACTED\*\*
6  vs.

7  JOSHUA MAST, ET AL.,         Before:
                                HONORABLE NORMAN K. MOON
8                               UNITED STATES DISTRICT JUDGE
            Defendants.         WESTERN DISTRICT OF VIRGINIA
9
   \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
10
   APPEARANCES:
11

12 For the Plaintiffs:         MAYA MIRIAM ECKSTEIN, ESQUIRE
                               LEWIS FRANKLIN POWELL, III, ESQUIRE
13                             Hunton & Williams LLP
                               Riverfront Plaza, East Tower
14                             951 East Byrd Street
                               Richmond, VA 23219
15                             804-788-8788

16

17 For Defendants Joshua and Stephanie Mast:
                               JOHN SAVAGE MORAN, ESQUIRE
18                             McGuireWoods LLP
                               888 16th St. N.W., Suite 500
19                             Washington, DC 20006
                               202-525-0356
20

21

22 Court Reporter:  Lisa M. Blair, RPR, RMR, CRR, FOCR
                    255 West Main Street, Suite 304
23                  Charlottesville, Virginia  22902
                    434.296.9284
24
          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY;
25 TRANSCRIPT PRODUCED BY COMPUTER.

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1    man.  And it's going to require him to be away from work and

2    require a lot of travel.  He is not represented by an army of

3    lawyers like the plaintiffs are.  So putting off trial past

4    that and giving us a delay would be very helpful for him as a

5    matter of case management, and would be helpful at least for

6    him as a party.  I don't know how it affects the other

7    parties -- as well as for his *pro bono* representation.  So we

8    would offer that as a matter as you consider the equities for

9    the parties.  We offer that to Your Honor.

10            Thank you very much.

11            THE COURT:  All right, sir.  Thank you.

12            All right.  I believe that's all on these issues.

13   Okay.  I'll hear from -- I guess the DOJ does not need to say

14   anything on these issues; is that correct?

15            I think you're muted.

16            MS. WYER:  Sorry, Your Honor.

17            If Your Honor has any questions about the United

18   States' position, we're happy to answer them.  The statement of

19   interest expresses our position.

20            THE COURT:  All right.  I have no questions.  Thank

21   you.

22            All right.  We'll hear from the plaintiffs' counsel

23   regarding the show cause.

24            MS. ECKSTEIN:  Thank you, Your Honor.

25            With respect to the show cause motion, I'd like to

**JA102**

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1    start with a set of undisputed facts.  These are facts that

2    cannot be disputed.  The Court entered a protective order, ECF

3    Number 26.  It prohibits the defendants, quote, "from

4    disclosing any information that directly or indirectly

5    identifies plaintiffs or their family members to any person."

6    And Baby Doe is defined as a plaintiff in that order.

7            Number two:  The *CBS Mornings* show aired two

8    segments, January 24th and 25th, both of which featured

9    interviews with Joshua and Stephanie Mast.

10           Number three:  CBS broadcast various photographs of

11   Baby Doe that showed her face in its entirety.

12           Number 4:  In the January 24th segment, for example,

13   at three minutes and 41 seconds, you see a photograph of Baby

14   Doe; again, showing her face in its entirety.  In that

15   photograph, Baby Doe appears to be at a hospital in Afghanistan

16   with an American flag behind her.  At the same time that this

17   photograph of Baby Doe appears on the screen, the reporter

18   states, "this photo shared with the Masts is from a nurses

19   station."  Then, with that image of Baby Doe still on the

20   screen, the viewer hears Joshua Mast state, "I would say that's

21   one of my favorite photos of her." The video then cuts to

22   Joshua and Stephanie Mast seated next to each other.  And

23   Joshua Mast finishes his sentence on camera describing the

24   photograph stating behind her there is a combat trauma center

25   and a real military hospital.  So Joshua Mast appeared on

**JA103**

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1   camera and directly identified Baby Doe to the CBS reporter and

2   to the entire viewing audience of *CBS Mornings.*  In addition,

3   Stephanie Mast referred to a distinctive scar on Baby Doe's

4   leg, further identifying her.

5         Also undisputed is that *CBS Mornings* has millions of

6   viewers across its television and YouTube channels, and that

7   hundreds of thousands of people have viewed the two segments

8   just on CBS's YouTube channel alone.

9         These facts establish a violation of the protective

10  order.  We have a valid decree of which the Masts were aware

11  that was clearly in the Does favor that the Masts violated

12  through their conduct and have harmed the Does as a result,

13  meeting the test for contempt under the Fourth Circuit's

14  decision in *De Simone versus VSL Pharmaceutical.*  With respect

15  to that last factor, harm, the Does and their family members

16  are now vulnerable to persecution from the Taliban.  The

17  exposure is the harm, as well as the emotional distress that

18  they have suffered since the CBS segment ran feared for their

19  family members.  Death, extortion, imprisonment, violence,

20  those should not be required to find that a violation of the

21  protective order harmed the Does.

22         Now, the Masts raise several defenses to our motion.

23  First they argue that -- the Masts' brief argues that they

24  never provided any, quote unquote, identifying photos to CBS.

25  First, this is really beside the point.  Joshua Mast directly

**JA104**

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1   identified Baby Doe to CBS and its millions of viewers when he

2   identified her in that photo in the hospital.  But second,

3   let's drill down on that assertion.  The assertion is made in

4   the brief.  It is not made in Mr. Mast's declaration, nor does

5   the declaration say that the Masts did not provide any photos

6   at all to CBS, whether identifying or not, however they define

7   that term.  And maybe that is because -- why is this missing

8   from the declaration of Mr. Mast?  We know that the Masts were

9   in possession of many, if not all, of the photographs that were

10  displayed by CBS, including the photo of Stephanie Mast and

11  Baby Doe in Germany, again showing her full face, that was

12  taken by Joshua Mast.  That photo was taken by Joshua Mast.

13  That is shown at five minutes and 55 seconds in the January

14  24th segment.  There is also a photo of Joshua Mast holding

15  Baby Doe in the hospital.  That's at four minutes, six seconds

16  in the January 24th segment.

17          And let me go back for a second to that photo of

18  Stephanie Mast and Baby Doe in Germany.  That photo taken by

19  Joshua Mast was taken just moments after they had fled

20  Afghanistan, meaning that anyone who knew them in Afghanistan

21  and who sees these segments, that photograph, is going to

22  recognize her and know who was involved in this lawsuit.  So

23  these photos, as well as others, we know that the Masts had in

24  their possession.  Stephanie Mast testified in the circuit

25  court proceeding that they have hundreds of photos from her

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  time at the hospital.  So maybe that is why the Masts have not

2  denied that they provided photographs of Baby Doe to CBS, and

3  did not put in Mr. Mast's declaration that they did not provide

4  identifying photographs of Baby Doe to CBS, however that term

5  is defined.

6        Now, third, our motion argued that CBS could have

7  obtained the photographs only from the Masts or with their

8  explicit permission.  That's at page 2 of our motion.  Also

9  absent, not found in Mr. Mast's declaration -- or the brief,

10 for that matter -- is any denial that the Masts gave permission

11 to any third party to provide photos of Baby Doe to CBS.  And

12 also not present in either the declaration or the brief is any

13 denial that they confirmed to CBS that the photographs that CBS

14 supposedly obtained from third parties showed Baby Doe.  It

15 seems unlikely that CBS would display photographs of a little

16 girl without knowing if she was the little girl that was the

17 subject of the story, but the Masts don't deny whether they

18 gave confirmation.  So the argument that the Masts cannot be

19 held in contempt because they did not provide identifying

20 photos to CBS does not get them very far.  And it doesn't

21 address the fact that I mentioned at the beginning, that Joshua

22 Mast directly identified Baby Doe to CBS and its viewers when

23 he referred to that photo of her in the hospital as his

24 favorite photograph of her.

25        The next argument that the defendants raise to our

**JA106**

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  motion is that the defendants [sic] lack standing.  That's also

2  irrelevant.  I've addressed that already with respect to the

3  12(b)(1) arguments.  John and Jane Doe have standing to sue on

4  behalf of Baby Doe.  But even if they didn't, Joshua Mast

5  directly identified Baby Doe.  She's covered by the protective

6  order itself.  And by doing so, he identified Jane and John

7  Doe, who are known to their community in Afghanistan as Baby

8  Doe's family.

9          Next the Masts argument that the protective order is

10 invalid, so it can't be enforced.  That's based on the motion

11 they filed to amend the protective order.  As this Court knows,

12 you have not yet ruled on that motion.  The protective order

13 remains in effect and it has to be complied with.  You don't

14 get to decide not to comply with an order of the Court just

15 because you disagree with it, even if you have filed a motion

16 in that respect.

17         Now, with respect to that motion, the *James versus*

18 *Jacobson* factors for allowing pseudonyms in litigation, the

19 Court found back in September that they were met then, and they

20 continue to be met today.  The Does still fear for the safety

21 of themselves and their family, and even more now because of

22 the Masts' conduct with respect to CBS.

23         The only argument that the Masts -- that the Does --

24 excuse me.  The only argument that the Masts make really with

25 respect to the pseudonyms is that they shouldn't be used here

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  because the Does spoke to *AP* -- *Associated Press* -- and the *New*
2  *York Times*. And that's true; the Does did speak to the *AP* and
3  the *New York Times* on the condition of anonymity, and a
4  condition that both respected media organizations guaranteed
5  and complied with. The Does have received -- or their lawyers
6  have received multiple calls from multiple media entities about
7  this case. This story was going to be covered. They decided
8  to speak with two entities that they trusted in an effort to
9  have a say in what was reported, but they did so only on the
10 condition of anonymity. Neither their names nor their
11 photographs have appeared in either of the *AP* or *New York Times*
12 pieces. The plaintiffs did not violate the protective order in
13 doing so because it did not give identifying information to
14 either. What it comes down to is that the Masts are simply
15 unhappy with those media organizations reporting on a case, but
16 their unhappiness does not a protective violation make; their
17 directly identifying Baby Doe on national television does.

18         Now, the Masts also argue that the protective order
19 is invalid because it is a gag order that does not meet the
20 strict scrutiny test. It is not a gag order. The parties can
21 speak. And according to this Court -- set aside what the
22 circuit court has ruled -- according to this Court, the parties
23 can speak with the public or the press. The order, ECF Number
24 26, the protective order, only precludes the identification of
25 plaintiffs. And that's consistent with an order on pseudonyms.

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  As we said in our brief, what good would a pseudonym order be

2  if the parties were allowed to tell the world the parties'

3  identities?  And while it is true that gag orders are measured

4  under strict scrutiny, again, this is not a gag order.

5  Pseudonyms are measured under the five-factor test of *James*

6  *versus Jacobson.*  And even if strict scrutiny applied, I would

7  argue that it passes the test here.  We have a compelling

8  public interest of protecting parties and innocent nonparties

9  from potential harm in a court proceeding in the least

10 restrictive means possible.  Not ordering the parties not to

11 talk to the public or the press, but simply ordering the use of

12 pseudonyms, and that the parties not disclose the plaintiffs'

13 identities.

14         Now, in their opposition brief, the Masts also made a

15 new argument as to why the protective order is invalid; and

16 that is that the protective order is supposedly vague because

17 they do not understand what it means to indirectly identify

18 someone.  Nobody denies that there is nothing vague about a

19 prohibition of direct identification, which indisputably

20 occurred here.  And it's also difficult to understand that

21 directly identifying Baby Doe -- excuse me, it's not difficult

22 to understand that directly identifying Baby Doe would

23 indirectly identify John and Jane Doe.  There is nothing

24 ambiguous about the protective order.  And frankly, if the

25 Masts were concerned about an ambiguity, the proper thing to do

**JA109**

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1    would be to ask this Court for clarification, not to risk

2    violating it.  But yet, they did not do that.

3         The Masts also argue in defense that they have

4    nonetheless substantially complied with the protective order.

5    Substantial compliance requires that all reasonable steps be

6    taken to comply with the order.  That's in *U.S. versus Darwin*

7    *Construction* from the Fourth Circuit.  The Masts did not take

8    all reasonable steps to comply when they went on national

9    television and directly identified Baby Doe.

10        Accordingly, Your Honor, we ask that Joshua and

11   Stephanie Mast be held in contempt.  They should be required to

12   advise the Court and plaintiffs to whom else they identified

13   any plaintiff, advise the Court and plaintiffs whether they

14   obtained NDAs from those persons or entities, provide the NDAs

15   to the Court and plaintiffs, produce to the Court and

16   plaintiffs whatever materials they provided to CBS, and they

17   should be required to pay our attorneys' fees in addressing

18   this issue.

19        Unless the Court has any questions, thank you, Your

20   Honor.

21        THE COURT:  All right.  Thank you.

22        MR. BOYER:  This may be a little bit out of order,

23   but my understanding is Mr. Osmani is not the subject of any of

24   the show causes.  My co-counsel, Mr. Brooks, is available.

25   Would the Court be willing to consider excusing me from the

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1   remainder of the proceedings given that the issues involving

2   Mr. Brooks have been argued at this point?  If needed, I can

3   stay, but I thought I would request.

4            THE COURT:  All right.  And who are you representing?

5            MR. BOYER:  I'm co-counsel with Mr. Brooks for

6   Mr. Osmani.

7            THE COURT:  Okay.  You're excused as far as I'm

8   concerned.  Go ahead.

9            MR. BOYER:  Thank you, Your Honor.

10           THE COURT:  All right.  Counsel for the Masts?

11           MR. MORAN:  Thank you, Your Honor.

12           So as I said, I wanted to address some of the issues

13  on the dueling narratives of this case in this context, because

14  unlike the discussion that we just had on the motion to

15  dismiss, on plaintiffs' motion for an order to show cause, the

16  Court is not entitled to take their allegations as true.  The

17  Court is not -- or not required to or entitled to, but there is

18  no need to accept as true their version of events.  And

19  frankly, as the Court might expect, the Masts have a very

20  different view of how all of this played out, that they very

21  candidly and selflessly worked openly with this couple to bring

22  Baby Doe to the United States on the mutual understanding that

23  John Doe knew from the beginning, that the entire plan was that

24  she would come and live with the Masts and she would be their

25  adoptive child.  And of course, again, these issues are being

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  actively and hotly litigated in the circuit court proceeding,

2  but I think that's important context for the order of show

3  cause that we're considering right now.

4          This has been an incredibly challenging episode for

5  the Masts where they have -- their family has been attacked,

6  both threatened legally as whether or not it continued to

7  exist, and also maligned in the press.  And we've heard

8  plaintiffs' counsel acknowledge candidly -- as they have no

9  choice but to do -- that they are responsible for that

10  maligning in the press, that they have gone to reporters, that

11  they have criticized the Masts, that they've leveled their

12  accusations publicly against them by name; and that they

13  themselves have, under their theory, identified Baby Doe.

14  Anyone who walks into the Masts' home and meets their adoptive

15  daughter would meet her, identify her, understand what her name

16  is; and, by their view, would be irreparably threatening harm

17  to her and to John and Jane Doe.  And candidly, that is not how

18  my clients, or me, or I would submit anyone making a reasonable

19  effort to read the protective order, would understand it to

20  work.  As a result of the intense media scrutiny that

21  plaintiffs themselves goaded on and secured through a series of

22  damning stories that culminated in a public condemnation of

23  Joshua Mast by the Taliban, as a result of that, the Masts

24  concluded that they had no choice but to speak to the press

25  themselves and tell their side of the story.  But in doing so,

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1    they took great pains to ensure that they never named John or

2    Jane Doe, and that they did not name Baby Doe either,

3    recognizing that this Court had a protective order in place.

4            Again, plaintiffs have articulated what they now view

5    as a theory under which she was directly identified because

6    Joshua acknowledged, when shown a photograph of her, that that

7    was indeed her, and that they indirectly identified her again

8    by discussing and reviewing photos.  But with respect, that's

9    simply not a reasonable reading of the protective order, we

10   submit, and certainly not something that they intentionally set

11   about to do in violation --

12           THE COURT:  Well, just on the program he did identify

13   a photograph when he said it's my favorite photograph, or words

14   to that effect.  And why wouldn't that be in direct violation

15   of the protective order?

16           MR. MORAN:  Well, Your Honor, I guess my question

17   would be she was not named --

18           THE COURT:  I'd rather an answer than a question.

19           MR. MORAN:  What's that, Your Honor?

20           THE COURT:  I said, I'd prefer an answer to my

21   question than a question to my question.

22           MR. MORAN:  No.  No.  No.  I understand.  I

23   apologize, Your Honor.

24           My answer is that Baby Doe -- who under the

25   protective order she may be referred to as "Baby Doe" -- and

**JA113**

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  this litigation identifies Baby Doe as the adopted daughter of
2  Joshua and Stephanie Mast.  They did no more than confirm that
3  the child who lives in their house with them is, indeed, Baby
4  Doe without naming her.  They did not disclose her name.  My
5  understanding of what a pseudonym is, is that the Court
6  provides a false name that is to be used in place of the
7  party's actual name.  And at no point during the aired segment
8  or during the unaired portion segment did they say:  Here is
9  her name, here is who Baby Doe is.  The only -- the reason it's
10 obvious and easy to connect the dots is because plaintiffs
11 themselves are the ones who filed a lawsuit of Baby Doe versus
12 Joshua and Stephanie Mast that draws an unmistakable link
13 between Baby Doe and Joshua and Stephanie Mast.  And so by
14 their -- by their argument, any -- walking around with her in
15 public, taking her to school, taking her to the playground is
16 identifying her because there is public information about the
17 fact that they have a girl from Afghanistan who is their
18 adopted daughter.  Her name is Baby Doe.  But if you see her
19 and you're able to connect those dots, you've now indirectly
20 violated her in violation of the protective order.

21          THE COURT:  Okay.  Look, you say that they were
22 taking pains to not violate the protective order.  How could
23 they not be violating the protective order if on national
24 television they show a picture and identify her?  I don't
25 understand the pains to adhere to the protective order.

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1      MR. MORAN:  So Your Honor, they ensured that any

2  current photograph that would be recognizably identified as her

3  were not taken or aired, that they --

4      THE COURT:  Where did those pictures come from that

5  the child was out in the yard with other children?

6      MR. MORAN:  So I want to be careful because I don't

7  want to misstate -- I don't -- I could go back and verify that

8  for Your Honor.  And I guess where I'm going with this is what

9  I would propose is that if the Court deems it necessary to make

10 some of these factual judgments about -- and it would have to,

11 I believe, before entering an order of contempt -- both as to

12 our clients' at a minimum good faith effort to comply with the

13 protective order, but I would also submit that there is still a

14 pending factual question about the actual harm that's alleged

15 by the plaintiffs, that the Court would hold an in-person

16 hearing.  We'd be happy to come to Lynchburg, if that's

17 preferable to Charlottesville.

18     THE COURT:  I mean, you know, we set this for a

19 hearing today on the show cause.  That's generally when I hear

20 evidence on this sort of thing, if there would be evidence.

21     MR. MORAN:  Well, I'm happy to see if my --

22     THE COURT:  You filed an affidavit on behalf of your

23 client, but I don't think he specifically denies that he did

24 anything.

25     MR. MORAN:  With the Court's indulgence, I would

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  bring Mr. Mast on.  I'd have to send him the link for this

2  outside the public docket.  I would bring him in.  He can

3  testify to you himself.

4         But I think before we get to that, I think there are

5  at least two reasons why the Court doesn't need to get to the

6  factual questions at this stage.  One, as we said, these

7  plaintiffs do not have standing to assert claims on behalf of

8  Baby Doe.  They do not allege -- other than just now in an

9  attempt to rehabilitate their claim -- their motion to show

10 cause was not based on the notion that John and Jane Doe had

11 been identified.  It was that Baby Doe had been identified.

12 And as we've stated, they don't have standing to bring claims

13 on behalf of Baby Doe or to allege actual harm on behalf of

14 Baby Doe.  And I would add that their theory of secondary harm

15 to themselves is entirely predicated on the notion that they

16 are going to succeed in their effort to set aside the adoption

17 order, that they're going to take her back to Afghanistan and

18 raise her there, and they will then some time at that point

19 suffer harm at that stage.

20        And the second is:  If the Court construes -- and

21 again, we did not at the time have more than the protective

22 order itself, which said direct or indirect identification --

23 if the Court construes that to mean that the Masts are

24 prohibited, without getting a signed NDA providing notice to

25 plaintiffs' counsel, if they are prohibited from acknowledging

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1    their daughter to any human -- because there is nothing in the

2    protective order that says this applies differently to a CBS

3    reporter than it does to a family friend at the grocery store.

4    So under their theory, if Stephanie Mast took Baby Doe with her

5    to the grocery store and somebody said, oh, is that your

6    daughter?  She'd have to pull out an NDA and say, excuse me,

7    could you sign this, please, and then let me send an email to

8    plaintiffs' counsel to let them know that I'm about to identify

9    my adoptive daughter.  And frankly, we submit that that's not a

10   reasonable interpretation of the protective order.  But again,

11   even if it were, it would be an unconstitutional gag order.

12   And it would not be enforceable by contempt because it is a

13   restriction on speech that is not just --

14          THE COURT:  Well, if they are trying so hard to

15   adhere to the protective order and they thought it was -- they

16   didn't have to, they were just doing it out of the goodness of

17   their heart, I mean, why couldn't they come to the Court and

18   ask the Court to lift it, because in the previous litigation

19   the Court sealed permanently the photos of Baby Doe.

20          MR. MORAN:  Well, Your Honor, we did ask the Court to

21   lift it entirely, and that was already pending in front of the

22   Court.  And I'm not suggesting that the Masts engaged in

23   self-help.  What I'm saying is, as their attorney, this is my

24   alternative argument that they took efforts to comply with the

25   protective order.  They believed that they were complying with

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1   the protective order.  At the same time, we believe --

2          THE COURT:  Well, how were they complying?  I mean,

3   if -- apparently CBS had these pictures of the children playing

4   in the yard, and didn't they have to give permission to CBS to

5   show any pictures of the child?

6          MR. MORAN:  So as laid out in the declaration, they

7   did not allow them to take any photographs that would include

8   her face, and they put her in a long-sleeved dress that would

9   cover what plaintiffs themselves describe --

10         THE COURT:  What about the photograph of her face

11  that he identified as being his favorite photo?

12         MR. MORAN:  That photograph had been obtained from a

13  third party, and it was shown to Mr. Mast by CBS.  And yes, he

14  said, that is my favorite photo.  And I suppose --

15         THE COURT:  Okay.

16         MR. MORAN:  I suppose there is an argument -- I'm not

17  claiming to not understand the argument that could be construed

18  to be --

19         THE COURT:  You say it was subpoenaed from a third

20  party?

21         MR. MORAN:  No, obtained.  Just obtained.

22         THE COURT:  Who was the third party?

23         MR. MORAN:  I don't know that, sitting here today.

24         THE COURT:  You all don't know much.  I mean,

25  everything seems -- I've never been in a case where there's

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  alleged so much misunderstanding and no one knows anything

2  about things that ought to be pretty important in the case.

3         MR. MORAN:  Well, Your Honor, again, I'd be happy --

4  I just don't -- sitting here today, I don't know the answer to

5  who provided that particular photo to CBS News.

6         THE COURT:  Well, if it's -- well, look, you know, if

7  your defense is your client didn't do it, it looks like it

8  would be pretty easy to ask him:  Well, who did you give the

9  photo to?

10        MR. MORAN:  Sure.  There are many -- there are many

11 members of the United States military who have photographs of

12 Baby Doe, including that photograph.  And we know from the

13 segment itself that CBS News, separately from their interview

14 of our clients, interviewed members of U.S. Special Forces who

15 were involved in rescuing her from the battlefield in

16 Afghanistan.  And I believe -- this part I can't say I'm 100

17 percent sure -- but I believe that those United States military

18 members whom CBS News contacted had access to these same

19 photographs.  So I can't say for sure that that's where CBS

20 News got them, but I think it's very likely that CBS obtained

21 those from other members of the U.S. military; and then in

22 preparing for an interview with the Masts, decided they would

23 show that photo and ask them about it.

24        And, you know, again, the Masts did not seek out the

25 public limelight.  They were content for a year to litigate

**JA119**

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  this without speaking to the press.  And it was --

2          THE COURT:  Well, you know, I saw -- I saw a tape or

3  something of the CBS interview, and he was asked, why did

4  you -- why are you coming forward now?  And certainly from

5  CBS's standpoint it sounded as if Mr. Mast was the initiator of

6  the public discussion about the child.

7          MR. MORAN:  With respect, Your Honor, absolutely not.

8  The record is indisputable that the public -- the public

9  scrutiny of this case, the public interest in Baby Doe and the

10 story of how she came to the United States was --

11         THE COURT:  Well, okay.  But do you dispute that the

12 question was asked something to the effect:  Why do you come

13 forward now?  And he said -- gave the answer because the Does

14 had slandered his family or words to that effect?

15         MR. MORAN:  No, absolutely, I don't dispute that.

16         THE COURT:  Okay.  Well, it was no accident.

17         MR. MORAN:  No.  No.  No.  I'm sorry, Your Honor.  I

18 didn't mean to suggest it was an accident.

19         My point was that they were content to -- we had a

20 state court proceeding for almost a year that had been pending

21 under pseudonyms and under -- or not under pseudonyms, rather

22 under seal in the state court proceeding.  And then in late

23 summer into the fall and the end of 2022 we had two sets of

24 things happen:  One, the plaintiffs filed this case, which for

25 the first time publicly named Joshua and Stephanie Mast and

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  made all of their allegations which had been litigated under

2  seal privately in the circuit court, they chose to make those

3  public by filing this case and by not using -- they sought to

4  use pseudonyms for themselves to obtain a one-sided protective

5  order *ex parte*, and then to publicly name and shame the Masts;

6  at the same time, they spoke to reporters.  They claim that

7  there was a relentless -- you know, relentless pressure.  There

8  had been zero reporting on this before they decided to give

9  interviews, their lawyers decided to give interviews.  Their

10 lawyers are quoted directly in the cases themselves.  And it

11 was only in the wake of that, as the Masts continued to receive

12 continued inquiries from the media, and the Taliban put out a

13 statement publicly condemning Joshua Mast based on in reaction

14 to those stories, that they concluded it was untenable, unfair,

15 and unworkable for their family to continue --

16          THE COURT:  So why did -- look, before -- why did

17 they move to lift the order?

18          MR. MORAN:  Why did we move to lift the order?

19 Because we believed --

20          THE COURT:  Okay.  But you did it after the -- after

21 you had already appeared on TV, right?

22          MR. MORAN:  No, Your Honor.

23          THE COURT:  Well, okay.  You filed the order.  Do you

24 take the position that your client, by filing an order, that he

25 could go ahead and do what he wants to do?

**JA121**

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1    MR. MORAN:  No, Your Honor.

2    THE COURT:  Okay.

3    MR. MORAN:  As I said, this is not an argument from

4  self-help.  This is an argument that, as an alternative -- our

5  principle argument and the way that the Masts conducted

6  themselves -- and I've confirmed that Mr. Mast would be happy,

7  if the Court would like him to dial into this version, that the

8  Court can ask him himself.  Mr. Mast believed -- and perhaps --

9  in view of the Court's apparent interpretation -- perhaps

10  erroneously, but he believed that the critical issue under the

11  protective order was whether or not he identified the names of

12  John Doe, Jane Doe, and Baby Doe, and perhaps by extension, you

13  know, gave sufficiently concrete details that would lead

14  somebody else to be able to determine their identity, which is

15  at least one import of the term indirectly.

16    The argument that's being made here today by the

17  plaintiffs is that by acknowledging that the baby -- that the

18  child who lives in their house, their adoptive daughter, by

19  acknowledging that she is their adoptive daughter, that they

20  indirectly identified her.  And again, if the Court has that

21  view today, then so be it.  That was not the view -- that was

22  not the understanding under which the Masts proceeded.  It was

23  not the basis on which they took what they believed were good

24  faith steps to comply with the Court's order while also doing

25  this interview.  And again, this is me as their attorney

**JA122**

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  zealously advocating for my client. I firmly believe that if

2  the Court construes the order to say that they cannot -- if

3  they are presented with a photograph of their own daughter and

4  someone says, is this your daughter, that they are prohibited

5  by law, by order of the Court from saying, oh, yes, that's my

6  daughter, I love that photo of her, if that's the meaning of

7  the Court's order, then it is unconstitutional, and it would be

8  unconstitutional to order contempt against the Masts on that

9  basis. And if the Court disagrees, then we'll proceed as we

10 need to, but that is me arguing as their advocate. That is not

11 the theory on which they undertook to do the interview. They

12 believed that they were complying, and they took what they

13 believed to be reasonable steps to comply with their

14 understanding of the order.

15         THE COURT: All right. Get him on the phone.

16         MR. MORAN: Okay. I will work on it.

17         MS. ECKSTEIN: Your Honor, I can wait, if you want to

18 hear from Mr. Mast first.

19         THE COURT: Okay. You may respond while they're

20 trying to reach him.

21         MS. ECKSTEIN: I have a few brief points, Your Honor.

22         Mr. Moran made the argument that the plaintiffs have

23 goaded on the press and pursued the press. I just want the

24 record to be clear here. The press -- numerous media entities

25 reached out to the Does and their lawyers. This story was

**JA123**

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  going to be told no matter what.  The Does did not pursue

2  them -- the press at all.

3          Mr. Moran made the argument that the Masts thought

4  that so long as they didn't provide the plaintiffs' names, they

5  were not violating the order, the protective order.  I give him

6  points for creativity.  The protective order says that the

7  plaintiffs, which include Baby Doe, cannot be directly or

8  indirectly identified.  The court order didn't say directly or

9  indirectly identified by name.  It said directly or indirectly

10 identified.  That has happened here.

11         Mr. Moran argued that the Does haven't proven harm

12 because they haven't gone back to Afghanistan and been

13 persecuted yet.  Let's remember the protective order also

14 protects innocent nonparties, their family members.  Their

15 family members are in Afghanistan now and now fear for their

16 lives.

17         Mr. Moran argued that the protective order is vague

18 and ambiguous if it prevents Stephanie Mast from walking a

19 child to school and being asked -- and answering affirmatively

20 when asked if that is her daughter.  There is a huge difference

21 between doing that and going on national television and

22 identifying Baby Doe directly.  No one is saying that Stephanie

23 Mast can't do that.

24         And you asked about the timing of the motion to lift

25 the protective order.  I want to make sure the record is clear

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023, REDACTED

1  here.  The Masts spoke or interviewed by CBS on January 3rd.

2  The motion to lift the protective order was filed on January

3  5th, two days later.  So they spoke with CBS, were interviewed

4  by CBS before they filed the motion.

5          I did have a point to make about the evidence before

6  you, but if we're getting Mr. Mast on the phone, I would like

7  to reserve that for later.

8          THE COURT:  All right.  Do you have Mr. Mast?

9          MR. MORAN:  Your Honor, I don't believe yet.  I

10  believe we'd see him pop in.

11          If I may just address that one last point, Your

12  Honor, about the timing.  I do believe I may have misspoken.  I

13  didn't mean to.

14          THE COURT:  That's all right.

15          MR. MORAN:  The interview took place on January 3rd.

16  Our motion was filed on the morning of January 5th.  The reason

17  I answered as I did was twofold:  One, I -- we had begun -- we

18  had prepared our motion and begun the process to meet and

19  confer with opposing counsel and intended to lift the --

20  intended to seek to lift the protective order prior to -- prior

21  to that point; and secondly, that I personally filed the motion

22  before I was aware of the interview.

23          So I apologize.  That was the reason for my

24  misstatement.  I just wanted to clarify.

25          THE COURT:  Carmen --

Mast - Direct

 1          THE CLERK:  He's coming in the waiting room right

 2   now.

 3          THE COURT:  I'll ask the clerk to swear in Mr. Mast.

 4          JOSHUA MAST, CALLED BY THE DEFENDANTS, SWORN

 5                      DIRECT EXAMINATION

 6          THE COURT:  Mr. Moran, do you care to question him?

 7          MR. MORAN:  Yeah, I'd be happy to.  I'd be happy to,

 8   Your Honor.

 9    BY MR. MORAN:

10   Q    So Joshua, why don't you just tell the Court how the

11   interview with CBS News came about.

12   A    Yes, sir.  So the interview with CBS News -- we had

13   declined to do any interviews at all for a year because the

14   state court judge didn't want us to make it public, and so we

15   declined multiple interviews from *New York Times* and the *AP*.

16   And then one of the rangers who was basically called a murderer

17   by the *New York Times* wanted to set the record straight about

18   the Al-Qaeda terrorists they were targeting that night, sir.

19   And so they asked me -- they told me they had talked to CBS,

20   and that this reporter was fair, and that they would like me to

21   basically help them set the record straight.  And so we agreed

22   to do that mostly because the *New York Times* article basically

23   called them murderers.

24          MS. ECKSTEIN:  Your Honor, I'd like to object on

25   hearsay grounds.

Mast - Direct

1              MR. MORAN:  It goes to the state of mind of Mr. Mast,

2    not to the truth of the matter asserted.

3              THE COURT:  All right.  I didn't understand the

4    objection.

5              MS. ECKSTEIN:  The objection was hearsay, Your Honor.

6    He's testifying --

7              THE COURT:  Oh, okay.

8              All right.  Overrule the objection.  It doesn't go to

9    the truth.  Go ahead.

10    BY MR. MORAN:

11   Q    You mentioned the state court protective order.

12        Were you aware that the federal court had entered a

13   protective order?

14   A    So yes, sir, I was aware that the federal court had done

15   an initial protective order for the case.  And so we tried to

16   stick with the -- like the intent of that protective order.

17   That's why we didn't talk about them at all.  We didn't name

18   them.  We didn't talk about where they're from in Afghanistan,

19   that type of thing.  We steered clear from that, and we were

20   really not trying to respond to their kind of salacious

21   allegations.  We were trying to tell the real story.  So that

22   was our intent with talking to them is because, you know, we're

23   ████  parents.  We've made that really clear from the

24   beginning.  I've told it to everybody for two years --

25   Q    I'll just advise you to use "Baby Doe" for purposes of

Mast - Direct

1  this --

2  A    Oh.

3  Q    -- of this proceeding.

4  A    I apologize, Your Honor.  Eighteen months with your

5  daughter will make that slip your mind.

6       So that was our intent with talking to CBS after they had

7  done like three months' worth of research and came to us with a

8  lot of information.  And so because of that personal request by

9  one of the rangers to participate, we decided to do that.  And

10 I'm thankful we did.

11 Q    And what steps, if any, did you take regarding Baby Doe's

12 identity and whether you could disclose it to CBS?

13 A    Sure.  So after ██████ got -- after the child got out of

14 Afghanistan with the Special Forces team, Your Honor, we -- we

15 basically let some of the doctors and nurses who had raised her

16 like from the bomb blast, from the suicide blast, we had let

17 them know of that.  So they provided a whole bunch of video and

18 photos from her time, you know, recovering from the suicide

19 blast.  So we -- we basically -- they came to us with a lot of

20 questions and had a lot of those images already from I'm

21 assuming the rangers, but they wouldn't tell me who exactly

22 they got those from.  So it was either the doctors and nurses

23 or some of the rangers who had access to those photos, and they

24 were actually some of the folks who provided them to us

25 originally.

**JA128**

Mast - Direct

1    So they asked us stuff like:  Do we have the rights to

2  these?  And we had said no.  And then the specific one -- I'm

3  not sure where they got the one in Germany specifically, but

4  they didn't ask us to comment on that.  My wife was kind of

5  describing the moment for that one.  The only one that I was

6  aware of was her baby photo from when she was like sitting

7  outside of the combat trauma center.  So that was the only one

8  that they specifically asked me about.  And then everything

9  else we did we were real careful not to show any of our kids'

10 faces or reveal their identities, because, you know, we're

11 trying to I guess respond to this, you know -- I don't know, I

12 don't want to be flippant, but some of these more salacious

13 allegations.

14         THE COURT:  What were the salacious allegations

15 toward you?

16         THE WITNESS:  Oh, well, that we didn't tell the

17 plaintiffs that we were legally responsible in the U.S., I

18 mean, because the other court already found that we did tell

19 them that.  So, I mean, we were just --

20         MS. ECKSTEIN:  And Your Honor --

21         (Overlapping speakers.)

22         MS. ECKSTEIN:  Objection.

23         MR. MORAN:  Objection, Your Honor.  Opposing counsel

24 can put on their own witnesses, if they'd like.

25         THE COURT:  Right.  Overruled.

**JA129**

Mast - Examination by the Court

1        MS. ECKSTEIN:  Objection to what the circuit court

2   said.

3        THE COURT:  Well, that --

4        MR. MORAN:  This is factual testimony.

5        THE COURT:  Right.  Okay.

6        MR. MORAN:  They can rebut it, if they want to.

7        THE WITNESS:  I was present for that, Your Honor.  So

8   the Court already found that we were more credible than the

9   plaintiffs in every issue that --

10        THE COURT:  All right.  Aren't you a lawyer?

11        THE WITNESS:  No, I'm just telling you what his

12   ruling was, sir.

13        THE COURT:  Well, okay.  No one asked you about his

14   ruling.

15        THE WITNESS:  Okay.  So I guess we were trying to

16   combat what we already combated for a year in court and the

17   public opinion that didn't have access to those court records.

18        THE COURT:  Okay.  Anything else you want to ask him,

19   Mr. Moran?

20        MR. MORAN:  No, Your Honor.

21        THE COURT:  Did CBS ask you for permission to show

22   photographs of the baby?

23        THE WITNESS:  Yeah.  We told them that we did not

24   authorize anything that showed her face.

25        THE COURT:  And they did it despite your denial?

**JA130**

Mast - Examination by the Court

1          THE WITNESS:  They didn't get those from us.  So they
2     did those anyway.
3          THE COURT:  CBS didn't need to get permission of you
4     to show anyone's picture?
5          THE WITNESS:  Well, I mean, they -- we only provided
6     them those photos and only authorized the ones that didn't show
7     her face.  Stuff they already had, I didn't provide to them.
8     So I did not believe that I was required to prevent them from
9     doing that, if they had those already.
10          THE COURT:  Well, did they ask you for permission to
11     show photographs of your child -- of the child?
12          THE WITNESS:  No, they did not.
13          THE COURT:  Okay.
14          THE WITNESS:  We declined to do that.  We only
15     allowed them to take the photos that --
16          THE COURT:  Well, why did you decline if you weren't
17     asked?
18          THE WITNESS:  Because I was required to do that by
19     the protective order.  I could not identify her to other
20     people.  So my understanding was I couldn't do that.  If they
21     had that independently, they're free to do whatever they want
22     in the country.
23          THE COURT:  Okay.  Any other questions, Mr. Moran?
24          MR. MORAN:  No, Your Honor.
25          THE COURT:  All right.  Counsel for the Does, any

**JA131**

Mast - Cross

1    questions?

2              MS. ECKSTEIN:  Just a few, Your Honor.

3                        CROSS-EXAMINATION

4     BY MS. ECKSTEIN:

5    Q    Mr. Mast, if I understand your testimony correctly, you

6    declined to respond to CBS's questions about photographs of

7    Baby Doe that they received from third parties; is that

8    correct?

9    A    Sure.  I have no problem with them seeing photos of her,

10   because honestly, baby photos seemed pretty innocuous to me.

11   So I felt like I was required to decline permission for

12   anything that would identify her, what she looks like now.  So

13   I declined to provide those.  So if they had other ones

14   independently, I didn't think that had anything to do with me.

15        So do I have a problem with her being seen?  I mean, the

16   Taliban already put my name on their website.  So what's the

17   difference at this point?  We're trying to protect her.

18   Q    So do I understand correctly that you see a distinction in

19   the protective order between showing pictures of Baby Doe when

20   she was an infant versus today; is that what you're telling

21   this Court?

22   A    No.  I'm telling him that there is a difference between me

23   authorizing them and encouraging them to show pictures of her

24   currently, or providing things that identify her and them

25   getting that from independent sources.  So my understanding is

**JA132**

Mast - Cross

1  they can get it from independent sources and show it if they

2  want to.  It's a free media.

3  Q    Did CBS ask you to confirm Baby Doe's identity in any of

4  the photographs that CBS allegedly obtained from third parties?

5  A    No.  They already knew who she was because there's a whole

6  bunch of us that know who she is.

7              THE COURT:  Well, the answer:  Did CBS ask you to

8  confirm?

9              THE WITNESS:  No.  I mean, they knew who the child --

10             THE COURT:  Okay.  We know they knew, but did they

11  ask you to confirm?  That was the question.

12             THE WITNESS:  I don't think so, like, because it was

13  assumed in everything that we were doing with speaking to them.

14  Like, they came to us with a pretty good grasp of the story.

15  So we were just articulating our perspective.

16             THE COURT:  Okay.  Did you give CBS any photos of

17  Baby Doe?

18             THE WITNESS:  So I went over some of the photos that

19  we had with them, and I did not authorize them to use any of

20  the photos that showed her identity.

21             THE COURT:  So you gave no photos to CBS?

22             THE WITNESS:  So no, I mean, I -- I showed the

23  reporter some photos, Your Honor.  We were --

24             THE COURT:  Did you give -- the answer is -- the

25  question is:  Did you give CBS any photos?

**JA133**

Mast - Cross

 1          THE WITNESS:  So yes, Your Honor.  I mean, we gave

 2   them all the ones --

 3          THE COURT:  All right.  The ones that showed her body

 4   and so forth from -- some showed a part of her face and other

 5   parts?

 6          THE WITNESS:  No.

 7          THE COURT:  She's in the backyard with a long dress.

 8          THE WITNESS:  So the one from -- so the photo from

 9   the rear, sir?  So we gave them photos that did not show her

10   identity.  So we absolutely did that.  I don't want to -- we

11   selected photos that did not reveal her identity and provided

12   them to CBS because of the protective order.

13          THE COURT:  You don't think anybody that watched CBS

14   would -- seeing those photographs -- would be able to pick her

15   out?

16          THE WITNESS:  With my family, I think anybody who

17   sees my family and knows who I am would be able to pick her out

18   because I have four boys and one girl.

19          THE COURT:  Well, but it takes somebody that knows

20   you, I mean -- right?

21          THE WITNESS:  Well, Your Honor, I mean, this has been

22   open for two years.  So yes, there's a lot of people.

23          THE COURT:  Okay.  But you didn't think it was

24   necessary to get the protective order changed until after you

25   had given the interview?

Mast - Cross

1          THE WITNESS:  No.  I believe we had been planning to

2    appeal it anyway because it's inhibiting some of our

3    investigative stuff.  But no, we were trying to comply with the

4    protective order.

5          THE COURT:  Okay.  All right.  I'm sorry, Counsel.  I

6    interrupted you.  Any other questions?

7          MS. ECKSTEIN:  Just a few, Your Honor.  Thank you.

8     BY MS. ECKSTEIN:

9    Q    Mr. Mast, you testified that you did give CBS some photos.

10   How many photos did you give to CBS?

11   A    I'm not sure.  They showed I think all of the ones that we

12   had given to them.

13   Q    So CBS showed, in its two segments, all the photographs

14   that were provided by you and your wife; is that correct?

15   A    I believe so.  They might have left out one or two that

16   I'm not recalling off the top of my head, but I believe that

17   they showed the ones that we had picked that wouldn't show her

18   face.

19   Q    Now, you also testified that you showed CBS -- didn't

20   give, but you showed CBS -- other photos.

21        Did those photographs show Baby Doe's face?

22   A    As a baby, I believe.

23   Q    So the answer is yes?

24   A    Yes.  It was photos that were in the -- some of the

25   rangers and other doctors that had sent to us.

**JA135**

USCA4 Appeal: 24-1900    Doc: 16      Filed: 11/12/2024    Pg: 139 of 347
Case 3:22-cv-00049-NKM-JCH    Document 170    Filed 02/22/23    Page 108 of 111    Pageid#: 1714

108

Mast - Cross

1   Q    And I believe you testified that CBS asked you and
2   Stephanie Mast if you had rights to some photographs, and you
3   said no; is that correct?
4   A    Yes.
5   Q    So CBS asked you about the photographs that they were
6   planning to show; is that right --
7   A    No.
8   Q    -- including showing her face?
9   A    They asked if I had the rights to I believe the one of her
10  in the hospital, but none of those I had taken.  So I did not
11  have the rights.
12  Q    And you claim that third parties gave permission to CBS,
13  or provided CBS with photographs of Baby Doe that showed her
14  full face.
15       Did any of those third parties ask you or Stephanie Mast
16  whether that was okay for them to share the photographs with
17  CBS?
18  A    No, ma'am.  So the other people participated under
19  anonymity with CBS so that they wouldn't even tell us who had
20  given them.  I assume it was some of the rangers.
21  Q    And you knew that the rangers and others -- the doctors --
22  had photographs of Baby Doe, including her full face.
23       And yet you did not let them know that they should not
24  share those with CBS; is that correct?
25  A    Sure.  I don't have anything to do with that.  So I

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023

1    wouldn't even tell them to do that if I could.

2    Q    Now, the photograph of Stephanie Mast with Baby Doe at

3    Ransteim Air Force base, you took that, correct?

4    A    Yes, I did.

5    Q    And it's your testimony that that photograph, neither you

6    nor Stephanie Mast provided it to CBS?

7    A    Correct.  We specifically did not.

8    Q    With how many people have you shared that photograph,

9    Mr. Mast?

10   A    I would estimate dozens to a hundred.

11             MS. ECKSTEIN:  Thank you, Your Honor.

12             THE COURT:  All right.  Thank you.

13             Mr. Moran, any other questions?

14             MR. MORAN:  No, no redirect unless the Court has

15   anything further.

16             THE COURT:  I have no questions.

17             Okay.  Anything else to be said about this?

18             Does anyone else have any other issue the Court has

19   not addressed?

20             MR. YERUSHALMI:  Yes, Your Honor.  David

21   Mr. Yerushalmi again.

22             Depending upon how the Court rules on the motion and

23   depending upon how the Court rules on the motion to lift the

24   protective order -- neither of which my client joined in -- I

25   have a question just from the reading of the protective order.

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023

1  On its face it seems to suggest that attorneys, including

2  myself, are required to sign an NDA.  Before I violate a

3  protective order and be the subject of an order to show cause,

4  I would like clarity.

5          In addition, the protective order --

6          THE COURT:  File a motion asking your question; and

7  if it's necessary, I'll respond to it.

8          MR. YERUSHALMI:  Okay.  Thank you.

9          THE COURT:  Because Judge Hoppe has before him

10  whether to lift the stay -- I mean, lift the order, not the

11  stay order, but the protective order.

12          All right.  Anything else?

13          Okay.  I'll take these matters under advisement.

14  Thank you.  We'll recess now.

15  (Proceedings adjourned, 5:02 p.m.)

16

17

18

19

20

21

22

23

24

25

Doe, et al. v. Mast, et al., 3:22cv49, 2/8/2023

1              C E R T I F I C A T E

2        I, Lisa M. Blair, RMR/CRR, Official Court Reporter for

3   the United States District Court for the Western District of

4   Virginia, appointed pursuant to the provisions of Title 28,

5   United States Code, Section 753, do hereby certify that the

6   foregoing is a correct transcript of the proceedings reported

7   by me using the stenotype reporting method in conjunction

8   with computer-aided transcription, and that same is a

9   true and correct transcript to the best of my ability and

10  understanding.

11       I further certify that the transcript fees and format

12  comply with those prescribed by the Court and the Judicial

13  Conference of the United States.

14       /s/ Lisa M. Blair              Date: February 21, 2023

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 1

# VIRGINIA:

*In the Court of Appeals of Virginia on* **Thursday** *the* **16th** *day of* **February, 2023**.



J█████ M███ and
S█████ M██,

Petitioners,

against          Record No. 1855-22-2
                 Circuit Court No. CL22000186-00

A█████ A███ and
F████ A██,

Respondents.

Upon a Petition for Review Under Code § 8.01-675.5(A)

On January 9, 2023, respondents, by counsel, moved to amend the caption in this appeal to replace the names of each party with initials of the party's first and last name. Petitioners, by counsel, timely opposed the motion.

Upon "showing of special circumstances when a party's need for anonymity outweighs the public's interest in knowing the party's identity and outweighs the prejudice to the opposing party, a court may exercise its discretion to allow a party to proceed anonymously." *Am. Online, Inc. v. Anon. Publicly Traded Co.*, 261 Va. 350, 364 (2001). Among other factors, a court evaluating a request to proceed anonymously should consider whether "the justification asserted by the requesting party is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of sensitive and highly personal nature" and "identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent non-parties." *Id.* at 363 (quoting *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993)). Additionally, the evaluation should consider "the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously." *Id.* (quoting *James*, 6 F.3d at 238).

Respondents allege that their safety and the safety of their families in their home country "could be threatened if their presence in the United States and the subject matter of this lawsuit become public." In response, petitioners contend that the relevant factors weigh against respondents. They assert that

**JA141**

respondents' interactions with the media demonstrate that they have not treated the underlying litigation's subject matter as "sensitive and highly personal" and undermine their claim that identification would put them in danger.  Petitioners also contend that they would be "highly prejudic[ed]" by allowing the proceedings to go forward anonymously, because petitioners' names have been used in media and social media while respondents "continue to enjoy the cloak of pseudonymity."

The underlying litigation concerns respondents' attempt to undo a final order of adoption of a child who they assert belongs with their family.  Respondents assert that they and their family members face danger if respondents' presence in the United States and participation in the underlying litigation becomes known in respondents' home country.

Upon consideration of the motion and petitioners' opposition thereto, we find that it is appropriate to allow the parties to proceed under their initials, especially given that respondents assert that the danger flowing from identification affects not only themselves but also family members who are not parties to the underlying litigation.  *Am. Online, Inc.*, 261 Va. at 363, 364.  Therefore, respondents' motion is granted, and the style of this case hereby is amended to substitute the parties' initials for their names.  Accordingly, the case must hereinafter be styled as J.M. and S.M. v. A.A. and F.A.

A Copy,

Teste:

A. John Vollino, Clerk

By:

Deputy Clerk

-2-

**JA142**

# EXHIBIT 2

# *VIRGINIA:*

*In the Court of Appeals of Virginia on* **Thursday** *the* **16th** *day of* **February, 2023**.

J.M. and
  S.M.,                                                                                                   Petitioners,

 against              Record No. 1855-22-2
                  Circuit Court No. CL22000186-00

A.A. and
  F.A.,                                                                                                  Respondents.

Upon a Petition for Review Under Code § 8.01-675.5(A)

On December 2, 2022, petitioners, by counsel, moved to seal temporarily the petition for appeal, the appendix, and any "briefs yet to be filed" with this Court, while the circuit court completes its determination of what portions of its record should be unsealed following an order from the Supreme Court of Virginia. Petitioners, by counsel, timely responded that they do not oppose the motion.

Generally, the "open-courts doctrine" applies to "judicial records in criminal and civil cases." *Daily Press, LLC v. Commonwealth*, __ Va. __, __ (Oct. 20, 2022). Such records "typically include 'pleadings and any exhibits or motions filed by the parties and all orders entered by the trial court in the judicial proceedings leading to the judgment under review.'" *Id.* (quoting *Shenandoah Publ'g House, Inc. v. Fanning*, 235 Va. 253, 257 (1988)). A party moving to seal judicial records must establish "an interest so compelling that it cannot be protected reasonably by some measure other than a protective order," and an order sealing judicial records must "be drafted in the manner least restrictive of the public's interest." *Fanning*, 235 Va. at 259.

Here, the underlying litigation concerns respondents' effort to vacate a final order of adoption of a minor child who they assert belongs with their family. Petitioners assert that sealing is necessary to allow the circuit court to complete its determination of what portions of its record should be unsealed following an order from the Supreme Court of Virginia. In a separate but related motion, respondents assert that they, and

**JA144**

their family still in their home country, are at risk of harm if their identities and presence in the United States become known.

As pertinent to this motion, we find that the documents identified in the motion contain the parties' full names and other identifying information and the parties face a risk of harm if their identities become public. Additionally, we find that the documents in the appendix and joint appendix previously were sealed by the circuit court, and that the petition, response, and briefs quote from those documents. We find that allowing the circuit court to finish determining what documents should be unsealed in its record is a compelling interest. We also find that the need to protect the parties' identities is a compelling interest, and no measure other than a protective order reasonably can protect these interests. *Fanning*, 235 Va. at 259. Accordingly, we grant the motion to seal. The petition for appeal, respondents' response to the petition, appendix, supplemental appendix, and briefs previously filed with this Court in this appeal are hereby sealed.

A Copy,

Teste:

A. John Vollino, Clerk

By:

Deputy Clerk

-2-
**JA145**

# EXHIBIT 1

# VIRGINIA:

*In the Supreme Court of Virginia held at the Supreme Court Building in the City of Richmond on Tuesday the 17th day of January, 2023.*

A.A. and F.A.,                                                                                      Petitioners,

  against       Record No. 220674
                Circuit Court No. CL22000186-00

Joshua Mast, et al.,                                                                              Respondents.

Upon a Motion To Proceed With Pseudonyms<br>Justices Kelsey, Chafin, and Russell

This matter comes before the Court on the Petitioners' Motion To Proceed With Pseudonyms, filed on January 10, 2023. Exercising our "inherent authority to control our Court records," *In re Bennett*, 301 Va. 68, 68 (2022), we have the "discretion" in special circumstances "to allow a party to proceed anonymously," *Am. Online, Inc. v. Anonymous Publicly Traded Co.*, 261 Va. 350, 364 (2001). When we exercise that discretion, however, it is always with the caveat "that circumstances may change as litigation progresses, thereby requiring reconsideration of initial rulings." *Id.*

Based upon the Petitioners' factual proffers in this case, the Court provisionally grants the Motion To Proceed With Pseudonyms to the extent it seeks to replace the full names of the Petitioners with pseudonyms ("A.A." and "F.A.") in all orders, docket entries, and pleadings or other documents previously filed in this Court. We direct the Clerk of Court to make these substitutions in all previously filed documents.[1] Until further order of the Court, the use of pseudonyms for the Petitioners shall be required for all future filings, docket entries, or other documents submitted to this Court by the Petitioners, Respondents, or other intervening parties. If the Respondents have any objections to this provisional decision, they shall file their objections with supporting authorities within 20 days of the date of this Order. The Court will thereafter reconsider this issue.

---

[1] The Respondents did not join in the Petitioners' motion and did not file a separate motion seeking to replace their full names with pseudonyms. Nor has any argument specific to the Respondents been advanced in this Court regarding the need to do so. We thus will not address this issue at this time.

**JA147**

USCA4 Appeal: 24-1900 Doc: 46 Filed: 11/12/2024 Pg: 151 of 347

The Petitioners' motion also seeks an order requiring that the child who is the subject of this litigation not be named in any orders, docket entries, pleadings, or other documents previously filed or later filed in this Court. The motion, however, does not address specifically the factual or legal basis for this request. Nor does the motion explain how the name given to the child by the Respondents would or could reveal the identity of the Petitioners. As an interim measure, however, the Court directs the Clerk of Court to redact the child's name in all documents previously filed in this Court. The Court further directs the parties to file simultaneous briefs on this issue within 20 days of the date of this Order. The Court will thereafter rule on the Petitioners' request that the child be identified by a pseudonym or other anonymous word or phrase.

The provisional rulings in this Order are subject to reconsideration in the event of changed circumstances or later adjudications in the trial court.

It is so ORDERED.

A Copy,

Teste:

Clerk

2

**JA148**

# EXHIBIT 2

# *VIRGINIA:*

In the Court of Appeals of Virginia on **Thursday** *the* **16th** *day of* **February, 2023**.

 J▮▮▮▮ M▮▮ and
S▮▮▮▮▮ M▮▮,                                                                   Petitioners,

against          Record No. 1855-22-2
                 Circuit Court No. CL22000186-00

A▮▮▮▮▮ A▮▮ and
F▮▮▮▮ A▮▮,                                                                    Respondents.

Upon a Petition for Review Under Code § 8.01-675.5(A)

On January 9, 2023, respondents, by counsel, moved to amend the caption in this appeal to replace the names of each party with initials of the party's first and last name. Petitioners, by counsel, timely opposed the motion.

Upon "showing of special circumstances when a party's need for anonymity outweighs the public's interest in knowing the party's identity and outweighs the prejudice to the opposing party, a court may exercise its discretion to allow a party to proceed anonymously." *Am. Online, Inc. v. Anon. Publicly Traded Co.*, 261 Va. 350, 364 (2001). Among other factors, a court evaluating a request to proceed anonymously should consider whether "the justification asserted by the requesting party is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of sensitive and highly personal nature" and "identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent non-parties." *Id.* at 363 (quoting *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993)). Additionally, the evaluation should consider "the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously." *Id.* (quoting *James*, 6 F.3d at 238).

Respondents allege that their safety and the safety of their families in their home country "could be threatened if their presence in the United States and the subject matter of this lawsuit become public." In response, petitioners contend that the relevant factors weigh against respondents. They assert that

**JA150**

respondents' interactions with the media demonstrate that they have not treated the underlying litigation's subject matter as "sensitive and highly personal" and undermine their claim that identification would put them in danger. Petitioners also contend that they would be "highly prejudic[ed]" by allowing the proceedings to go forward anonymously, because petitioners' names have been used in media and social media while respondents "continue to enjoy the cloak of pseudonymity."

The underlying litigation concerns respondents' attempt to undo a final order of adoption of a child who they assert belongs with their family. Respondents assert that they and their family members face danger if respondents' presence in the United States and participation in the underlying litigation becomes known in respondents' home country.

Upon consideration of the motion and petitioners' opposition thereto, we find that it is appropriate to allow the parties to proceed under their initials, especially given that respondents assert that the danger flowing from identification affects not only themselves but also family members who are not parties to the underlying litigation. *Am. Online, Inc.*, 261 Va. at 363, 364. Therefore, respondents' motion is granted, and the style of this case hereby is amended to substitute the parties' initials for their names. Accordingly, the case must hereinafter be styled as J.M. and S.M. v. A.A. and F.A.

A Copy,

Teste:

A. John Vollino, Clerk

By:

Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

| | |
|---|---|
| BABY DOE, *et al.*, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) Case No. 3:22-cv-00049-NKM-JCH |
| | ) |
| JOSHUA MAST, *et al.*, | ) |
| | ) |
| *Defendants*, | ) |
| | ) |
| and | ) |
| | ) |
| UNITED STATES SECRETARY OF | ) |
| STATE ANTONY BLINKEN, *et al.*, | ) |
| | ) |
| *Nominal Defendants.* | ) |
| | ) |

## STIPULATION TO DISMISS NOMINAL DEFENDANTS

Pursuant to Fed. R. Civ. P. 41(a), Plaintiffs Baby Doe, John Doe and Jane Doe; Defendants

Joshua Mast, Stephanie Mast, Richard Mast, Kimberley Motley, Ahmad Osmani; and Nominal

Defendants Secretary Antony Blinken and General Lloyd Austin, by counsel, hereby stipulate to the

dismissal of Nominal Defendants from this case. The dismissal of Nominal Defendants is without

prejudice to the United States' authority to attend to its interests in this case pursuant to 28 U.S.C.

§ 517 and without prejudice to any future assertion in this case of a claim seeking relief from any

federal party, including Nominal Defendants. Nominal Defendants, as well as any other federal party

who might be named in such a claim, reserve the right to assert any and all applicable defenses to any

such claim.

Dated: August 1, 2023                    Respectfully submitted,

                                          /s/ *Maya Eckstein*

1

**JA152**

Maya M. Eckstein (VSB No. 41413)
Lewis F. Powell III (VSB No. 18266)
Kevin S. Elliker (VSB No. 87498)
HUNTON ANDREWS KURTH LLP
951 E Byrd St
Richmond, VA 23219
Telephone: (804) 788-8200
Fax: (804) 788-8218
Email: meckstein@HuntonAK.com
Email: lpowell@HuntonAK.com
Email: kelliker@HuntonAK.com

Jeremy C. King (*admitted pro hac vice*)
HUNTON ANDREWS KURTH LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 309-1000
Fax: (212) 309-1100
Email:  jking@HuntonAK.com

Sehla Ashai (*admitted pro hac vice*)
ELBIALLY LAW, PLLC
704 East 15th Street
Suite 204
Plano, TX 75074
Telephone: (312) 659-0154
Email: ashai@elbiallylaw.com

Blair Connelly (*admitted pro hac vice*)
Zachary L. Rowen (admitted pro hac vice)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, New York 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email: Blair.Connelly@lw.com
Email: Zachary.Rowen@lw.com

Ehson Kashfipour (*admitted pro hac vice*)
Damon R. Porter (*admitted pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, N.W. Suite 1000
Washington, D.C. 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
Email: Ehson.Kashfipour@lw.com

2

JA153

Email: Damon.Porter@lw.com
*Counsel for Plaintiffs*

/s/ *John S. Moran*
John S. Moran (VSB No. 84236)
McGuireWoods LLP
888 16th St. N.W. Suite 500
Black Lives Matter Plaza
Washington, DC 20006
Phone: (202) 828 2817
Fax: (202) 828-3327
jmoran@mcguirewoods.com
*Counsel for Defendants Joshua Mast and Stephanie Mast*

/s/ *Michael R. Hoernlein*
Thomas W. Davison
(VSB No. 94387)
Samantha Van Winter
(VSB No. 97268)
ALSTON & BIRD LLP
950 F Street, N.W.
Washington, DC  20004-1404
Tel.:  (202) 756-3300
Fax:  (202) 654-3333
tom.davison@alston.com
samantha.vanwinter@alston.com

Michael R. Hoernlein
(pro hac vice)
ALSTON & BIRD LLP
101 South Tryon Street, Suite 4000
Charlotte, NC 28280-4000
Tel.: (704) 444-1000
Fax: (704) 444-1111
michael.hoernlein@alston.com

Sidney Webb
(pro hac vice)
ALSTON & BIRD LLP
2200 Ross Avenue, Suite 2300
Dallas, TX 75201
Tel.: (214) 922-3400
Fax: (214) 922-3899
sidney.webb@alston.com
*Counsel for Defendant Kimberley Motley*

3

/s/ *B. Tyler Brooks*
Rick Boyer (VSB No. 80154)
INTEGRITY LAW FIRM, PLLC
P.O. Box 10953
Lynchburg, VA 24506
Ph. 434-401-2093
F: 434-239-3651
Email: rickboyerlaw@gmail.com

B. Tyler Brooks (admitted pro hac vice)
LAW OFFICE OF
B. TYLER BROOKS, PLLC
P.O. Box 10767
Greensboro, NC 27404
Telephone: (336) 707-8855
Fax: (336) 900-6535
btb@btylerbrookslawyer.com
*Counsel for Defendant Ahmad Osmani*

/s/ *David Yerusahlmi*
David Yerushalmi, Esq.
American Freedom Law Center
2020 Pennsylvania Avenue NW, Suite 189
Washington, D.C. 20006
(*Admitted pro hac vice)

E. Scott Lloyd
Lloyd Law Group, PLLC
Va. Bar # 76989
20 E. 8th Street, Suite 3
Front Royal, VA 22630
Office (540) 823-1110
Cell: (540) 631-4108
Fax: (540) 583-4279
scott@lloydlg.com
*Counsel for Defendant Richard Mast*

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

/s/ *Kathryn L. Wyer*
KATHRYN L. WYER
Federal Programs Branch

4

**JA155**

U.S. Department of Justice, Civil Division
1100 L Street, N.W., Room 12014
Washington, DC  20005
Tel. (202) 616-8475
kathryn.wyer@usdoj.gov
*Counsel for Nominal Defendants*

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF VIRGINIA
 2                       Charlottesville Division

 3

 4    - - - - - - - - - - - - - - - - - -
                                         )
 5    BABY DOE, et al,                    )
                                         )
 6                 Plaintiffs,            )    CIVIL ACTION NO.
                                         )    3:22cv49
 7    v.                                  )
                                         )
 8    JOSHUA MAST, et al,                 )
                                         )
 9                 Defendants.            )
      - - - - - - - - - - - - - - - - - -

10

11                   TRANSCRIPT OF PROCEEDINGS

12                     (MOTIONS HEARING)

13                  Charlottesville, Virginia

14                       May 29, 2024

15

16    BEFORE:  THE HONORABLE NORMAN K. MOON,
               Senior United States District Judge
17

18
      APPEARANCES:
19
      COUNSEL FOR THE PLAINTIFFS:
20
                 HUNTON & WILLIAMS LLP
21               By:  Maya Miriam Eckstein
                     Lewis Franklin Powell, III
22               Riverfront Plaza, East Tower
                 951 East Byrd Street
23               Richmond, VA  23219

24

25
```

USCA4 Appeal: 24-1900    Doc: 16    Filed: 11/12/2024    Pg: 161 of 347
Case 3:22-cv-00049-RSB-JCH    Document 436    Filed 06/07/24    Page 2 of 68
Pageid#: 6063

2

```
┌─────────────────────────────────────────────────────────────────────┐
│         ──Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024──
│
│  1    Appearances Cont:
│
│  2            HUNTON ANDREWS KURTH LLP
│               By:  Kevin Spencer Elliker
│  3            Riverfront Plaza, East Tower
│               951 E. Byrd Street
│  4            Richmond, VA  23219
│
│  5            LATHAM & WATKINS LLP
│               By:  Ehson Kashfipour
│  6            555 Eleventh Street, NW, Suite 1000
│               Washington, DC  20004
│
│  7
│
│  8    COUNSEL FOR THE DEFENDANTS:
│
│  9            MCGUIRE WOODS LLP
│               By:  John Savage Moran
│ 10            888 16th Street, N.W., Suite 500
│               Washington, DC  20006
│ 11
│               FIRST & FOURTEENTH PLLC
│ 12            By:  Michael Lee Francisco
│               800 Connecticut Ave, NW, Suite 300
│ 13            Washington, DC  20006
│
│ 14
│       ALSO PRESENT - COUNSEL FOR JONATHAN MAST:
│ 15
│               HARDING COUNSEL, PLLC
│ 16            By:  Elliott M. Harding
│               2805 Meadow Vista Dr.
│ 17            Charlottesville, VA  22901
│
│ 18
│
│ 19
│
│ 20
│
│ 21
│
│ 22
│
│ 23
│
│ 24
│
│ 25
│
└─────────────────────────────────────────────────────────────────────┘
```

USCA4 Appeal: 24-1900    Doc: 16    Filed: 11/12/2024    Pg: 162 of 347
Case 3:22-cv-00049-RSB-JCH    Document 436    Filed 06/07/24    Page 3 of 68
Pageid#: 6064

3

—————Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024—————

```
 1                (Proceedings commenced at 12:57 p.m.)

 2                THE COURT:  Good afternoon.  Call the case, please.

 3                THE CLERK:  This is the matter of Baby Doe, et al v.

 4     Joshua Mast, et al, civil action number 3:22cv49.

 5                THE COURT:  Is the plaintiff ready?

 6                MS. ECKSTEIN:  We are, Your Honor.

 7                THE COURT:  Is the defendant ready?

 8                MR. MORAN:  Yes, your Honor.

 9                THE COURT:  All right.  We're here today on

10     plaintiffs' motion on why defendant Joshua Mast and also

11     Jonathan Mast should not be held in contempt for violating

12     the court's protective order requiring use of pseudonyms for

13     plaintiffs and the otherwise limited disclosure of their

14     identifying information.

15                The court has considered the parties' prehearing

16     filings and thanks the parties for those submissions.  I

17     would get into argument.  I would like to hear, first, if

18     there is any evidence, but I'm interested in what evidence

19     and basis is there to support the continued imposition of the

20     protective order in the case today as opposed to when it was

21     first entered, and what real risks remain present to

22     plaintiffs, as well as to innocent third parties, were

23     plaintiffs' identifying information to be disclosed, and how

24     does a protective order mitigate those risks?

25                Second, have plaintiffs or any innocent third
```

 1   parties been harmed or subjected to increased risk of harm on

 2   account of the asserted violation of the protective order by

 3   the defendants allegedly trying to circumvent the protective

 4   order?

 5           Third, the manner of disclosure of Baby Doe's

 6   likeness appears to be a central underlying violation of the

 7   protective order.  As she has gotten older, wouldn't any risk

 8   of harm of identifying her diminish because it would be less

 9   likely anyone would be able to identify the plaintiffs'

10   families based on her likeness today as opposed to when she

11   was first found in Afghanistan.

12           Finally, fourth, what legitimate reason could the

13   defendants, and Joshua Mast especially, have in identifying

14   plaintiffs specifically by name that would outweigh any

15   accompanying risk of harm to their families in Afghanistan?

16           With that in mind, plaintiffs may proceed.  Do you

17   anticipate you calling any witnesses?

18           MS. ECKSTEIN:  We do not anticipate calling any

19   witnesses.

20           THE COURT:  Does the defendant plan on calling any

21   witnesses?

22           MR. MORAN:  Your Honor, Joshua Mast and Jonathan

23   Mast are here.  We won't call them unless the Court expresses

24   an interest in hearing from them.

25           THE COURT:  Okay.  Well, we'll proceed on

5

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1   plaintiffs' motion.

2          MS. ECKSTEIN:  If I could have a moment, Your Honor,

3   just to hook up a PowerPoint.

4          THE COURT:  Okay.  I understand some counsel may be

5   listening in on Zoom.  This is a court proceeding, and under

6   the rules of the court in the Western District of Virginia

7   and elsewhere, I think, recording and broadcasting court

8   proceedings is not permitted, so no attorney or any other

9   person may record or broadcast these proceedings.

10         MS. ECKSTEIN:  Thank you, your Honor.  So we're here

11  on our second motion to show cause regarding Joshua Mast and

12  also seek to hold his brother, Jonathan Mast, in contempt as

13  an aider and abettor.

14         As you noted, the parties have filed prehearing

15  briefs.  In ours we set forth on evidentiary basis for the

16  motion, and we believe that based on the evidence submitted

17  in those briefs, you have enough evidence before you now to

18  hold both Joshua and Jonathan in contempt.

19         It's my understanding from Mr. Moran that he doesn't

20  object to the admission of any of the items that we

21  identified in our prehearing brief into evidence, so I have

22  those here for you.

23         Does it make sense to submit them to the Court?

24  It's exhibits A through R to our prehearing brief.  There is

25  also Joshua Mast's declaration, which was actually submitted

Cynthia L. Bragg, Official Court Reporter

**JA161**

USCA4 Appeal: 24-1900    Doc: 16    Filed: 11/12/2024    Pg: 165 of 347
Case 3:22-cv-00049-RSB-JCH    Document 436    Filed 06/07/24    Page 6 of 68
Pageid#: 6067

6

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1   to the Court at docket 239-1.  There is Ms. Disarro's

2   declaration from the Pipe Hitter Foundation, that was ECF

3   number 257-2.  Then we also have on thumb drives a copy of

4   the One America News Network interview that Jonathan Mast did

5   in which some identifying photographs were presented.

6           THE COURT:  That doesn't require us to take all

7   those notebooks, does it?

8           MS. ECKSTEIN:  Only one of each, or as many as you

9   want, I should say.

10          THE COURT:  Well, I mean, we don't want a lot of --

11  you know, we don't keep a lot of records like that, if we can

12  avoid it.  But everything that's necessary that, you know,

13  there is an exhibit of, anything that you're going to rely

14  upon ought to be -- any document needs to be filed, I think.

15          MS. ECKSTEIN:  Yes.  So we have one copy for you,

16  one copy for the law clerk, one copy for the deputy, and we

17  also have a copy for Mr. Moran.  Does that make sense?

18          THE COURT:  Yes.

19          MS. ECKSTEIN:  My apologies, Judge.  So you should

20  have in front of you a binder that has Exhibits A through R

21  to our prehearing brief.  You should also have Joshua Mast's

22  declaration, you should have Dena Disarro's declaration, and

23  you should have a thumb drive.

24          THE COURT:  I do.

25          MS. ECKSTEIN:  Great.

USCA4 Appeal: 24-1900    Doc: 16    Filed: 11/12/2024    Pg: 166 of 347
Case 3:22-cv-00049-RSB-JCH    Document 436    Filed 06/07/24    Page 7 of 68
Pageid#: 6068

7

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1          MR. MORAN:  Your Honor, if I may briefly again, on

2    the representation of counsel that these are the same

3    exhibits submitted in support of the motion, we don't object

4    to their consideration for purposes of the motion.

5          For example, we're not raising a hearsay objection.

6    If they were to later be admitted for another purpose, we

7    would reserve the right to raise that objection.

8          THE COURT:  All right.  Thank you.

9          MS. ECKSTEIN:  So, Your Honor, in his prehearing

10   brief Joshua Mast made four arguments in opposition to our

11   requests that he and his brother Jonathan be held in

12   contempt.

13         The first is that the protective order is not valid,

14   as you suggested earlier that we need to address.  Number

15   two, that Joshua Mast did not knowingly violate the

16   protective order.  Number three, that he took all reasonable

17   steps to comply with the protective order.  And number four,

18   that the Does, the plaintiffs, have not suffered any harm as

19   a result of this violation of the protective order.  I'd like

20   to address each of those arguments in turn.

21         With respect to your questions about the protective

22   order, my colleague, Kevin Elliker, is prepared to address

23   the issue of the protective order, whether it's still valid,

24   whether it's still necessary, which I think is a little bit

25   of a different question than whether it's valid.

—————Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024—————

1          The protective order was certainly valid at the time
2     that you entered it, and it was valid at the time that the
3     violations occurred.  Whether it continues to be necessary I
4     think is a different question, and, as I mentioned, my
5     college, Mr. Elliker, is prepared to address it.
6          We can move straight into the evidence now and then
7     have him address that or the other way around, whatever you
8     prefer.
9          THE COURT:  Just go on into the evidence.
10          MS. ECKSTEIN:  Okay.  Great.  With respect to
11     Mr. Mast's assertion that he did not violate the protective
12     order, his argument in the prehearing brief at least rests
13     solely on his ascertain that Jonathan Mast should be believed
14     when he says he wasn't representing Joshua Mast in working
15     with the Pipe Hitter Foundation.
16          The evidence, though, Your Honor, shows otherwise,
17     and there are 14 key facts.  There are 14 of them, and they
18     won't take that much time, but I'll run through these.
19          The first key fact, Your Honor, is that Joshua Mast,
20     he initiated the discussions with the Pipe Hitter Foundation,
21     and we know that from his own declaration, Joshua Mast's
22     declaration, in which he states that he inquired with the
23     Pipe Hitter Foundation about a grant to address the
24     significant expenses resulting from this lawsuit as well as
25     others.

—————Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024—————

1          Fact number two:  Joshua Mast provided the Pipe

2    Hitter Foundation with background information on this lawsuit

3    and a link to a Google photo album that included hundreds of

4    identifying photographs of Baby Doe.  And when I say

5    identifying photographs, I'm referring to photographs that

6    show her face, that make it clear this is who this child is.

7          And, again, we know that from -- well, first of all,

8    Exhibit R to our prehearing brief, that's an email from

9    Joshua Mast to the Pipe Hitter Foundation.  It includes that

10   background information, and it includes the link to the

11   Google photo album.  The Google photo album itself is Exhibit

12   L to be our brief.

13         Fact number three:  Joshua Mast told the Pipe Hitter

14   Foundation that he could not work with it in a public-facing

15   capacity because of the Court's protective order.  Again, we

16   know that from his own declaration where he states, "When I

17   inquired with the Pipe Hitter Foundation about a grant, I

18   explained to it that due to the Court's gag order," and

19   that's how they refer to it is a gag order rather than a

20   protective order.

21         "Due to the Court's gag order and its restrictions

22   on identifying Baby Doe in this suit, we were essentially

23   unable to defend ourselves or have others do so on our

24   account."  So Joshua Mast recognized he couldn't have

25   somebody do this on his account to act as a proxy for him.

Cynthia L. Bragg, Official Court Reporter

**JA165**

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1          In addition, we have the statements from
2   Ms. Disarro's declaration.  Ms. Disarro is the executive
3   director of a Pipe Hitter Foundation, and she submitted a 115
4   paragraph declaration that detailed the communications step
5   by step with her and Joshua Mast and with her and Jonathan
6   Mast.  She states, "I was told about a gag order by Joshua
7   Mast during a telephone call that occurred in March of 2023."
8          She also testified in her declaration that Joshua
9   Mast told her that neither he nor his wife would be permitted
10  to speak publicly about the case or Baby Doe, and it would
11  prevent them from serving in a public-facing capacity.
12         Fact number four:  Joshua Mast suggested instead
13  that Jonathan Mast, his brother, act in that public-facing
14  capacity.  And we know that first by Ms. Disarro's
15  declaration where she explicitly says he believed, meaning
16  Joshua Mast, believed his brother, Jonathan Mast, could serve
17  in a public-facing capacity to talk about the Mast case, and
18  we know that he did, in fact, do that.  His interview on the
19  One America News Network is one such example.
20         Fact number five:  Joshua Mast put Jonathan Mast in
21  touch with the Pipe Hitter Foundation in April of 2023, and
22  we know that in large part because of Jonathan Mast and his
23  testimony at his deposition.  He was specifically asked,
24  "Joshua said you were going to be contacted by somebody from
25  the Pipe Hitter Foundation, right?"  "Yes."

USCA4 Appeal: 24-1900    Doc: 46    Filed: 11/12/2024    Pg: 170 of 347
Case 3:22-cv-00049-RSB-JCH    Document 436    Filed 06/07/24    Page 11 of 68
Pageid#: 6072

11

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    Fact number six:  Jonathan Mast himself was familiar

2    with the court's protective order even before he began

3    communicating with the Pipe Hitter Foundation.  And how do we

4    know that?  Again, we know that because of Jonathan Mast's

5    own testimony when he testified -- when he was asked, "So

6    when is the first time you heard Joshua talk about a

7    protective order?"  At first he said, "I don't know."  Then

8    he's asked, "Was it before or after this call you had from

9    him," meaning Joshua Mast, "that he was going to hear from

10   the Pipe Hitter Foundation."  And Jonathan Mast answers, "The

11   first time that I heard about it was" -- "Was it before the

12   call?"  "Probably before, yes."

13       In addition, he also testified that he has seen the

14   protective order, and -- this is Jonathan Mast -- and he

15   understood the purpose of Judge Moon's protective order was

16   to protect the identity of John Doe, Jane Doe, and Baby Doe.

17       Fact number seven:  Jonathan Mast himself sent the

18   Pipe Hitter Foundation a link to that same Google photo album

19   with hundreds of identifying photographs as well as

20   additional photographs that he sent via an email, including

21   additional photographs of Baby Doe that identified her.

22       Again, we know this from Jonathan Mast's deposition

23   where he confirmed that he sent a link for the Google photo

24   album to the Pipe Hitter Foundation, and he testified that he

25   understood that the Pipe Hitter Foundation was going to use

Cynthia L. Bragg, Official Court Reporter

**JA167**

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    those photos in support of a fundraising campaign.

2          Exhibit L to our prehearing brief and that's been

3    submitted to the Court is a printout of the Google photo

4    album with the hundreds of photographs that identify Baby

5    Doe.  Exhibit J is the email from Jonathan Mast to the Pipe

6    Hitter Foundation that attaches or provides additional

7    identifying photographs of Baby Doe.

8          Fact number eight:  Joshua Mast knew that Jonathan

9    Mast was working with the Pipe Hitter Foundation, and we know

10   that for a couple of reasons.

11         One, Joshua Mast himself in his declaration admits

12   that he learned, he says as late as February or early March

13   of 2023, that my brother, Jonathan Mast, had coordinated with

14   them, so he already had coordinated with the Pipe Hitter

15   Foundation to raise money for our expenses.

16         Now, I think his timing is a little bit off here

17   because the evidence shows that Ms. Disarro's first text with

18   Jonathan Mast appears to be in April of 2023, but regardless,

19   Joshua Mast admits that he was aware early in the process

20   that his brother had partnered with the Pipe Hitter

21   Foundation, and Jonathan Mast in the his deposition confirmed

22   this.

23         He was asked, "During this time frame, April and May

24   of 2023, Joshua knew you were in touch with Pipe Hitter

25   Foundation, correct?"  "Yes, I had told him I had decided to

Cynthia L. Bragg, Official Court Reporter

**JA168**

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1   touch base with them and partner with them."

2        Fact number nine:  Even though Joshua Mast had put

3   the Pipe Hitter Foundation in contact with his brother,

4   Jonathan Mast, nonetheless, the Pipe Hitter Foundation

5   continued to communicate with Joshua Mast about the

6   fundraising campaign, including by sending Joshua Mast a copy

7   of the grant agreement for his signature.

8        Ms. Disarro in her declaration states that she

9   continued operating with the understanding that she could

10  speak with Joshua about the public awareness and legal

11  defense grant fundraising campaign privately, but that

12  Jonathan Mast would need to serve in the public-facing

13  capacity.  She further states that Joshua Mast was provided

14  with our standard legal defense agreement.

15       Fact number ten:  Joshua Mast told the Pipe Hitter

16  Foundation that he could not sign the grant agreement, but

17  that Jonathan Mast could do so instead.  And Ms. Disarro

18  explains that Joshua Mast told her he couldn't signed it

19  because of the Court's protective order, the so-called gag

20  order.  And he told Ms. Disarro to speak with Jonathan

21  instead about signing that agreement.

22       Fact number 11:  Jonathan Mast then signed the Pipe

23  Hitter Foundation grant agreement on Joshua Mast's behalf.

24  Exhibit K to our prehearing brief and that's now been

25  submitted to the Court is a copy of that grant agreement, and

Cynthia L. Bragg, Official Court Reporter

**JA169**

USCA4 Appeal: 24-1900    Doc: 46    Filed: 11/12/2024    Pg: 173 of 247
Case 3:22-cv-00049-RSB-JCH    Document 436    Filed 06/07/24    Page 14 of 68
Pageid#: 6075

14

————Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024————

1    it has Jonathan Mast's signature on it.  The grant agreement

2    states that the Pipe Hitter Foundation "is implementing a

3    fundraising campaign in support of Joshua Mast and his

4    family," and then defines Joshua Mast and his family as

5    grantees.

6           Then it states that the purpose of the funds raised

7    are to provide grantees' financial support for legal defense

8    and specifically refers to the legal fees of Joshua Mast.

9    And Jonathan Mast confirmed, he acknowledged that the purpose

10   of the grant agreement was to enable the Pipe Hitter

11   Foundation to provide financial assistance to his brother

12   Joshua.

13          Fact number 12:  As a result of the grant agreement,

14   the Pipe Hitter Foundation transferred $5,000 to Jonathan

15   Mast.  He then transferred $4,000 of those dollars to Joshua

16   Mast and kept $1,000 for himself because he had already given

17   his brother Joshua a $1,000 loan.  So in effect the entire

18   $5,000 from the Pipe Hitter Foundation went to Joshua Mast.

19          Fact number 13:  In May and June of 2023, the Pipe

20   Hitter Foundation published information about this litigation

21   along with identifying photographs of Baby Doe, at least

22   three of which appear to have come from the Google photo

23   album, the link that was provided by both Joshua and Jonathan

24   Mast to the Pipe Hitter Foundation, and the Pipe Hitter

25   Foundation published this information on its website and

Cynthia L. Bragg, Official Court Reporter

**JA170**

USCA4 Appeal: 24-1900    Doc: 46-3    Filed: 11/12/2024    Pg: 174 of 347
Case 3:22-cv-00049-RSB-JCH    Document 436    Filed 06/07/24    Page 15 of 68
Pageid#: 6076

15

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    related social media accounts with hundreds of thousands of

2    followers.

3         Exhibit A to our prehearing brief and submitted to

4    the Court today are the screen shots from the Pipe Hitter

5    Foundation website.  And as I mentioned, Exhibit L is the

6    Google photo album.

7         If you look at Exhibit A, I can tie the specific

8    photographs to the Google photo album, as well as Exhibit J,

9    which is the email that Jonathan Mast sent to the Pipe Hitter

10   Foundation with additional photographs.

11        For example, on Exhibit A on page 1, there is a

12   photo of Joshua Mast holding Baby Doe, and she's wearing a

13   purple shirt.  You will find that on Exhibit L, the Google

14   photo album, page 1, and you will also find it in Exhibit J

15   at the page that's Bates labeled PHF-39.

16        On page 2 of Exhibit A there is a photo of Stephanie

17   Mast with Baby Doe.  You can find that in Exhibit L, the

18   Google photo album, on page 9.  You can also find that at

19   Exhibit J, the email from Jonathan Mast, at the page Bates

20   labeled PHF-39.

21        Back to Exhibit A, on page 3 there is another

22   photograph of Baby Doe with a white blanket.  You can find

23   that in the Google photo album, Exhibit L, at page 3.

24        Then on page 8 of Exhibit A you will see a photo of

25   Baby Doe in which she's older.  It seems to be a more recent

USCA4 Appeal: 24-1900    Doc. 46    Filed: 11/12/2024    Pg: 175 of 247
Case 3:22-cv-00049-RSB-JCH    Document 436    Filed 06/07/24    Page 16 of 68
Pageid#: 6077

16

—————Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024—————

1   photograph.  She's standing on some exercise equipment.  That

2   appeared on Eddie Gallagher's Instagram account.  Eddie

3   Gallagher is the founder of the Pipe Hitter Foundation.  And

4   you will find that in Exhibit J, the email from Jonathan Mast

5   to the Pipe Hitter Foundation, at the page that's Bates

6   labeled PHF-45.

7           The last fact, fact number 14:  On June 6 of 2023

8   Jonathan Mast solicited donations for the Pipe Hitter

9   Foundation legal defense fund for Joshua Mast for this

10  litigation through an interview on the One America News

11  Network, which itself published identifying photographs of

12  Baby Doe that Jonathan Mast provided to it.

13          The thumb drive that I've submitted to the Court has

14  a recording of that interview, and there are a number of

15  photos there, four photos, that appear of Baby Doe.  At

16  minute 1:01 there is Baby Doe.  She's in a red onesie.  You

17  can find that in Exhibit L, the Google photo album, on page

18  3.

19          At 1:08 and 3:25 of the interview you'll see the

20  same photo of Joshua Mast holding Baby Doe who is wearing a

21  purple shirt.  You'll find than in Exhibit L, the Google

22  photo album, at page 1, and Exhibit J, Jonathan Mast's email,

23  at PHF-39.  Then at 2:43 of the interview you'll see the

24  photo of Baby Doe with the white blanket, and that, again, is

25  on Exhibit L, the Google photo album, at page 3.

Cynthia L. Bragg, Official Court Reporter

**JA172**

USCA4 Appeal: 24-1900    Doc: 46    Filed: 11/12/2024    Pg: 176 of 347
Case 3:22-cv-00049-RSB-JCH    Document 436    Filed 06/07/24    Page 17 of 68
Pageid#: 6078

17

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1          Jonathan Mast testified at his deposition that he
2   gave the One America News Network those photographs, and he
3   even gave them a link to the Google photo album.
4          So, Your Honor, based on these facts, we believe you
5   have sufficient facts in front of you to establish that a
6   violation of the protective order, several violations of the
7   protective order occurred.
8          We have separately for you -- this is a
9   demonstrative.  It's a timeline of the events that tries to
10  consolidate all of this.  It doesn't repeat what you've seen,
11  but it basically puts it in a timeline format.
12         These facts that I've gone through now here are
13  undisputed, and they establish Joshua Mast's violations of
14  the protective order as well as those of Jonathan Mast as an
15  aider and abettor.  They meet the requirements for a finding
16  of civil contempt.
17         I would add there is likely more evidence that we
18  don't have.  We know that Joshua Mast communicated with Dena
19  Disarro of the Pipe Hitter Foundation using the Signal
20  messaging application, and we know that he set his Signal
21  messages application, the messages with Ms. Disarro, to auto
22  delete.  This is during the middle of this case, of this
23  litigation, that he sets his communications about this
24  litigation to auto delete.
25         So as a result there are likely additional

Cynthia L. Bragg, Official Court Reporter

USCA4 Appeal: 24-1900    Doc: 46    Filed: 11/12/2024    Pg: 177 of 347
Case 3:22-cv-00049-RSB-JCH    Document 436    Filed 06/07/24    Page 18 of 68
Pageid#: 6079

18

---Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024---

1    communications between Joshua Mast and Ms. Disarro that we

2    simply don't have.  Ms. Disarro states as much in her

3    declaration.  Nonetheless, the facts that we have already

4    addressed we believe are sufficient for a finding of

5    contempt.

6           I want to briefly touch on the issue of harm.

7    Mr. Elliker will address the questions that you raised, but I

8    want to address it in a different context.

9           THE COURT:  Okay.

10          MS. ECKSTEIN:  Number one, with respect to harm,

11   Joshua Mast argues that the Does have not suffered any harm

12   apparently because they can't point to anyone in Afghanistan

13   who identified them through the Pipe Hitter Foundation's

14   postings.

15          This is the same argument that was made when we were

16   here on our first show cause motion regarding the CBS

17   interviews that were broadcast, and as we noted then, actual

18   harm is not a requirement.  That's from the Desimone case,

19   Roe v. General Motors, and additional cases cited in our

20   brief.

21          Frankly, it would be nonsensical to require actual

22   harm here that would confound the very purpose of the Court's

23   protective order.  The protective order is intended to

24   protect the plaintiffs and innocence nonparties in

25   Afghanistan.

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1           It should not take an innocent nonparty in

2    Afghanistan actually being harmed to have a protective order

3    violation.  That should not excuse Joshua Mast and Jonathan

4    Mast's conduct here.

5           Not only that, we raised -- we identified several

6    other harms that have resulted from these violations of the

7    protective order that the Joshua Mast prehearing brief does

8    not address at all.  It completely ignores them.

9           Those are the harms by the increased risk to

10   innocent nonparties in Afghanistan, the harm by the delay in

11   court proceedings and expenditure of resources.  As you know,

12   this is our second motion to show cause.  We've expended

13   considerable sums on this motion as well as the last one.

14          We took the deposition of Jonathan Mast for this

15   one.  We subpoenaed documents from Jonathan Mast and the Pipe

16   Hitter Foundation with respect to this show cause motion.  We

17   had motion practice with the Pipe Hitter Foundation.  We

18   would much prefer to be focusing our attention on the heart

19   of this case rather than on these side issues.

20          In addition, there is harm to the judicial system

21   itself requiring this court to spend unnecessary resources

22   dealing with these issues.  So harm is present even if there

23   is not actual harm to the plaintiffs themselves.

24          Now, a defense, of course, to civil contempt when

25   all four elements of contempt are found is if the alleged

—————Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024—————

1    contemptor took all reasonable steps.  Joshua Mast continues
2    to invoke what I refer to as the head in the sand defense.
3    He says, I didn't ask or direct Jonathan Mast to talk to
4    anybody, including the Pipe Hitter Foundation, on my behalf.
5    I didn't do that.
6           Courts have rejected this defense of willful
7    ignorance, and we've cited several such cases on pages 25 and
8    26 of our prehearing brief.  We think this Court should
9    reject it here as well.
10          Let's remember that willfulness is not a requirement
11   of a finding of civil contempt.  We know that from the
12   Supreme Court's decision in McComb v. Jacksonville in which
13   the Court was very clear stating, "Since the purpose of civil
14   contempt is remedial, it matters not with what intent the
15   defendant did the prohibited act."  The Court went on, "An
16   act does not cease to be in violation of a decree merely
17   because it may have been done innocently."
18          Now, we don't think this was done innocently here.
19   Even if intent was required -- it's not, but even if it was,
20   as we believe exists here, the evidence establishes that
21   Joshua Mast knew exactly what he was doing when he asked
22   Jonathan Mast to speak with the Pipe Hitter Foundation.
23          Joshua Mast asked Jonathan Mast to speak to the Pipe
24   Hitter Foundation on his behalf.  After Joshua Mast asked
25   Jonathan Mast to interface with the Pipe Hitter Foundation,

Cynthia L. Bragg, Official Court Reporter

**JA176**

—————Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024—————

1    Jonathan signed the grant agreement on Joshua's behalf.  And
2    when the Pipe Hitter Foundation sent funds to Jonathan Mast
3    pursuant to the grant agreement, he gave that money,
4    forwarded that money to Joshua Mast.
5           Not only that, let's not forget that Joshua Mast
6    himself sent the Pipe Hitter Foundation a link to the Google
7    photo album that contains hundreds of photographs with Baby
8    Doe's face clearly showing, clearly identifying her.  And he
9    continued to interact with the Pipe Hitter Foundation long
10   after he supposedly ceded that responsibility to Jonathan
11   Mast and after he knew that Jonathan Mast had partnered with
12   the Pipe Hitter Foundation.
13          So what could Joshua Mast have done differently?
14   There is a lot that he could have done differently.  We
15   identified in our prehearing brief a number of reasonable
16   steps he could have taken.  He did not respond to this, by
17   the way.
18          Well, I should say that he did say in the prehearing
19   brief that he acted in good faith, but what's required by the
20   case law is not just some general notion of good faith.  It's
21   a demonstration by the contemptor of having made in good
22   faith all reasonable efforts to comply, and that's where we
23   think he certainly has failed.  He did not make reasonable
24   efforts to comply.
25          What could he have done?  He could have given the

USCA4 Appeal: 24-1900   Doc: 46   Filed: 11/12/2024   Pg: 181 of 347
Case 3:22-cv-00049-RSB-JCH   Document 436   Filed 06/07/24   Page 22 of 68
Pageid#: 6083

22

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1   Pipe Hitter Foundation a copy of the protective order.  He

2   talked about the protective order with the Pipe Hitter

3   Foundation.  Just send them a copy.  He didn't do that.

4        He could have not sent the Pipe Hitter Foundation a

5   link to the Google photo album with the identifying

6   photographs of Baby Doe, providing only nonidentifying

7   photographs.  He could have directed his brother Jonathan not

8   to do that as well.

9        He could have directed the Pipe Hitter Foundation

10  itself, do not use any identifying photographs of Baby Doe.

11  And after the Pipe Hitter Foundation published her

12  identifying photographs, he could have directed it to remove

13  them, but he didn't.  Joshua Mast does not dispute he did

14  none of these things.

15       So, Your Honor, we believe the Court has broad

16  discretion here to fashion an appropriate remedy for civil

17  contempt.  I don't think we're asking for a lot.  We're

18  asking for a finding of contempt and an award of attorneys'

19  fees.  An award of fees is appropriate even without a finding

20  of willful disobedience, although I think it certainly exists

21  here.  We ask that the Court find Joshua and Jonathan Mast in

22  contempt.

23       In closing, Your Honor, it should be clear to the

24  Court that Joshua Mast is an individual who does not like to

25  follow court orders and rules.  In the Baby Doe litigation

Cynthia L. Bragg, Official Court Reporter

**JA178**

1    previously before this Court, you ruled that the custody

2    order he had obtained was substantially likely to be invalid

3    because the federal government's foreign policy decision, yet

4    after that order, he continued to pursue Baby Doe's adoption.

5    And his counsel, his other brother Richard Mast, didn't even

6    mention to you the interim adoption order he had in hand when

7    you directly asked about adoption.

8            Again, Joshua Mast moved to stay discovery in this

9    case pending a ruling on his motion to dismiss.  Judge Hoppe

10   denied that motion back in October of 2023, but Joshua Mast

11   nonetheless still did not produce any documents in response

12   to our first request for production, which had been pending

13   since December of 2022, until he was ordered to do so in

14   response to the motion to compel that we filed, and Judge

15   Hoppe ordered that production.  That was on November 28,

16   2023.

17           But even then he still did not comply with that

18   order which required us to file a motion for sanctions.

19   Judge Hoppe heard that motion on May 2nd.  Since then,

20   unfortunately, we've had to file yet another motion regarding

21   his failure to properly respond to requests for admission.

22   That motion is before Judge Hoppe.  Then, of course, we have

23   the protective order violations themselves, the first one

24   with CBS, and now this one with the Pipe Hitter Foundation.

25           Now, maybe because of the experience that he had

USCA4 Appeal: 24-1900    Doc: 46    Filed: 11/12/2024    Pg: 183 of 347
Case 3:22-cv-00049-RSB-JCH    Document 436    Filed 06/07/24    Page 24 of 68
Pageid#: 6085

24

1    with respect to the CBS motion to show cause, this time

2    Joshua Mast essentially went into the shadows in search of

3    plausible deniability.  He decided to use his brother

4    Jonathan as a proxy.

5           Each of these decisions by Joshua Mast has required

6    plaintiffs and the Court to spend a considerable amount of

7    time addressing everything except the heart of the case.

8           This motion practice easily could have been avoided

9    had Joshua Mast merely taken a few reasonable steps, but he

10   didn't, so we're here once again taking up the Court's time

11   on something other than the substance of the case itself.

12          Contempt sanctions are designed to coerce a

13   reluctant party to obey a Court's directive.  Respectfully,

14   Your Honor, we need to put an end to this conduct.  We ask

15   that the Court find Joshua Mast and Jonathan Mast in contempt

16   and award plaintiffs their attorneys' fees.

17          Should I turn it over to Mr. Elliker to address --

18          THE COURT:  Yes, please.

19          MR. ELLIKER:  Good morning, Your Honor.  My name is

20   Kevin Elliker.  I'm here on behalf of the plaintiffs.

21          As Ms. Eckstein explained, Your Honor, there is, I

22   think, an important distinction between the questions that

23   Your Honor asked about that you have particular concerns

24   about that I want to make sure I address and the element that

25   has to be satisfied in plaintiffs' view to make a finding of

USCA4 Appeal: 24-1900    Doc: 46    Filed: 11/12/2024    Pg: 184 of 347
Case 3:22-cv-00049-RSB-JCH    Document 436    Filed 06/07/24    Page 25 of 68
Pageid#: 6086

25

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    civil contempt.

2         That distinction is, on the one hand, whether there

3    was a valid order at the time of the conduct at issue.

4    That's what -- I'll address that issue first.  The second

5    issue that the Court's questions went to are more about the

6    ongoing need for the protective order going forward.

7         I first want to start by explaining why I think

8    there really should be little debate that the Court's

9    protective order is valid and certainly was valid when

10   entered and was valid at the time of the conduct at issue

11   here.

12        The use of pseudonyms in litigation in the Fourth

13   Circuit is guided by the Fourth Circuit's 1993 decision in

14   James v. Jacobson.  In that case, the Court cited several

15   factors where the Court advised district courts to consider,

16   among them whether the request for pseudonymity is based on

17   avoiding mere annoyance or inconvenience versus preserving

18   privacy in a matter that's a sensitive or highly personal

19   nature.

20        The second factor is whether identification poses a

21   risk of retaliatory physical or mental harm, or even

22   critically to innocent non-parties.  The third factor is the

23   ages of the persons who privacy interests are sought to be

24   protected.  Fourth, whether the action is against the

25   government or private party.  Fifth, whether the risk of

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    unfairness to the opposing party from allowing the action
2    against it, what is the risk of unfairness to the opposing
3    party of allowing that?

4          James is still the law of the Fourth Circuit.  It
5    was cited not three months ago in a published decision, Doe
6    v. Sidar, which is 93 F.4th 241.  It's a February 2024
7    decision citing those five factors and going through and
8    reversing a district court's determination to remove
9    anonymity protections as an abuse of discretion.  Just a few
10   months before that another decision from the Fourth Circuit,
11   Doe v. Doe, 85 F.4th 206.  That's from October of 2023.

12         In that decision the court acknowledges that there
13   is a First Amendment right of public access and openness in
14   judicial proceedings, and yet these factors can be
15   considered, and the Court in its discretion can allow parties
16   to proceed under pseudonyms.

17         I think that the additional components of the
18   protective order here are necessary carryons to allowing the
19   plaintiffs to proceed via pseudonym.  It is cold comfort to
20   allow their names to remain pseudonymous on the caption if
21   there is not additional protections that have to go into
22   protecting that information during the course of discovery
23   and litigation.

24         Most importantly, Your Honor, as you know, you
25   relied on the James case and cited it and made factual

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    findings in the protective order showing that the plaintiffs

2    had established grounds to proceed by pseudonym and for the

3    entry of the protective order, and those are laid out in some

4    detail in the protective order.

5         On all of this, Your Honor, the Masts do not argue

6    that a party can never proceed by pseudonym.  They do not

7    argue that restrictions like the ones in the protective order

8    can never be put in place.  They don't argue that the Court

9    relied on the wrong law or that it's bad law or that it

10   relied on the wrong factors.

11        They don't make any of those arguments because they

12   can't.  Really what their argument is is they disagree with

13   the Court's decision to exercise its discretion in the way

14   that it did and enter the protective order.  That is not an

15   argument as to the legal validity of the order.

16        They've obviously filed a motion to have that

17   protective order modified.  In fact, the very first argument

18   in their prehearing brief, argument one, is that the Court

19   should lift the protective order, which I know does not go

20   towards the question of whether it was a valid order when it

21   was violated.

22        We contest the arguments that they make, and I'll

23   address those in a moment, but I think it just bears emphasis

24   that the point, for purposes of finding contempt, is not

25   whether they think the order should be in place today.  It's

USCA4 Appeal: 24-1900    Doc: 46    Filed: 11/12/2024    Pg: 187 of 347
Case 3:22-cv-00049-RSB-JCH    Document 436    Filed 06/07/24    Page 28 of 68
Pageid#: 6089

28

———Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024———

1    whether the order was valid when it was violated last year.

2          Now, the primary argument that they do make as to

3    validity arises under the First Amendment.  They repeatedly

4    refer to the Court's protective order as a gag order.  They

5    cite exactly zero cases, Your Honor, where the granting of

6    pseudonymity protections have been deemed an unconstitutional

7    gag order.

8          The case they rely on in principle is the

9    *Murphy-Brown* case, which our firm knows a fair amount about

10   that case, Your Honor, because we're the party that won --

11   we're the lawyers who won that case for *Murphy-Brown* at the

12   Fourth Circuit on mandamus having that particular order

13   thrown out as a gag order.

14         The circumstances of that case could not be more

15   different.  That was a mid-trial order from the trial judge

16   ordering that the parties could not disclose information that

17   could be prejudicial to the proceedings during the course of

18   trial.  It was a blanket prohibition against all parties.  It

19   was a true gag order.  That was what Judge Wilkinson in the

20   *Murphy-Brown* decision walked through and explained the First

21   Amendment implications for that.

22         The Fourth Circuit in its many, many decisions

23   citing James v. Jacobson doesn't cite any gag order cases.

24   So I think what that indicates is that the First Amendment

25   construct for a gag order like *Murphy-Brown* stands apart from

USCA4 Appeal: 24-1900    Doc: 46-3    Filed: 11/12/2024    Pg: 189 of 347
Case 3:22-cv-00049-RSB-JCH    Document 436    Filed 06/07/24    Page 29 of 68
Pageid#: 6090

29

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    the question of whether a party can proceed via pseudonym.

2         Now, most importantly, Your Honor, their selective

3    quotation of the protective order where they say it's a gag

4    order makes it seem like the Court said you can't talk about

5    anything having to do with the case, right?  That you can't

6    come out and raise money; you can't give an interview to news

7    networks.  That's not what the protective order says.

8         What the protective order says is that they're

9    prohibited from disclosing identifying information.  There is

10   an important word, "unless."  It doesn't prohibit the

11   disclosure of identifying information.  It prohibits that

12   disclosure unless the person who receives the information

13   also executes a nondisclosure agreement that's subject to the

14   contempt power of this court.  So it's not a true gag order,

15   as they say.

16        Again, I think, Your Honor, that their argument

17   betrays that they really actually don't argue that it's

18   unconstitutional because they disagree with it only as to the

19   plaintiffs.  They actually don't raise an issue as to

20   maintaining the confidentiality as to the child.

21        So they don't seriously contest that there are

22   interests identified by the Court here that would support the

23   entry of a protective order.  It means that their argument is

24   not based on legal principles, legal validity.  It's about

25   the factual underpinning, and they simply disagree.

USCA4 Appeal: 24-1900    Doc: 46    Filed: 11/12/2024    Pg: 189 of 347
Case 3:22-cv-00049-RSB-JCH    Document 436    Filed 06/07/24    Page 30 of 68
Pageid#: 6091

30

————Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024————

1          Now, on that particular point, Your Honor -- so I'll
2    stop there and say that I think everything I have just said
3    is sufficient to show the first element that has to be proven
4    to find Joshua and Jonathan Mast in civil contempt.  There
5    was a valid order.  It was valid when it was entered, and it
6    was valid in 2023.
7          Even if -- not if.  We know that they disagree with
8    the entry of the order.  We know that they filed a motion
9    with the court to modify the order.  We know that they want
10   it lifted.  We understand all of that stuff.
11         None of that, though, gives license to go ahead and
12   act as though it isn't in place or to engage in a form of
13   self-help to essentially tee up -- I'm not suggesting that
14   this was a long plan, but to wait until this boomerangs back,
15   and now we're going to take down a protective order on a
16   First Amendment argument or to say that the facts as they
17   stand now show that it shouldn't exist; therefore, we'll
18   retroactively forgive a violation in the past.  I think none
19   of that passes muster.
20         In terms of the protective order as it stands today,
21   Your Honor, I think that what I can say is the Masts have
22   made much of discreet pieces of information that they say in
23   small ways show that someone or some people or some
24   individuals might have the ability to identify the plaintiffs
25   in this litigation.

USCA4 Appeal: 24-1900    Doc: 46-8    Filed: 11/12/2024    Pg: 190 of 347
Case 3:22-cv-00049-RSB-JCH    Document 436    Filed 06/07/24    Page 31 of 68
Pageid#: 6092

31

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    I don't think that that is sufficient to show that
2    the protective order should not be in place because there is
3    a difference between individuals being able to put together
4    pieces of information on their own through their own
5    ingenuity, whether it's media outlets or investigators or
6    whoever it may be, to on their own go and try to find the
7    pieces of information.  It's another thing to open up the
8    court's docket to allow that information to be spilled out
9    into the public where it's inevitable that anyone could grab
10   that information and take it with them.
11   I also think it's important that innocent parties
12   still remain in Afghanistan.  Of course, as has been written
13   about I think in the papers, Your Honor, the plaintiffs have
14   been granted asylum.  That reenforces, I think, the view that
15   they have a well-founded fear of what would happen to them if
16   they went back to Afghanistan.
17   It stands to reason, Your Honor, that if they are
18   then publicly identified in the court's docket making it easy
19   to identify their family members back in Afghanistan, that
20   risk propounds onto them, onto the family members there.
21   Certainly, I think among all protective order cases this one
22   stands apart in terms of the kind of harm we're talking about
23   here with innocent folks who are back in Afghanistan.
24   Ms. Eckstein discussed the harms.  I think Your
25   Honor asked about the disclosure of the child's likeness

Cynthia L. Bragg, Official Court Reporter

USCA4 Appeal: 24-1900    Doc. 46    Filed: 11/12/2024    Pg: 191 of 347
Case 3:22-cv-00049-RSB-JCH    Document 436    Filed 06/07/24    Page 32 of 68
Pageid#: 6093

32

1   given her aging and whether she looks today like she did when
2   folks who may be able to identify her and associate her with
3   a particular family or relatives.
4        I would say that I think it would be difficult to --
5   first of all, I would say the plaintiffs don't object
6   themselves to maintaining confidentiality as to the child.
7   Whether they would say that we only want that as to her name,
8   and we would be fine with having photographs put out there
9   with her, I think it's unclear how we would decide whether
10  someone's likeness starts to make them look like someone from
11  a family somewhere else in the world.
12       Certainly, I know just the other day I was showing
13  Mr. Powell a photograph of my daughter, and he said, "Gosh,
14  that looks just like your wife."  So I think to lift the
15  protective order as to the likeness of the child based on the
16  supposition that she doesn't look now like she did then
17  overlooks that she could still be identified by folks back in
18  Afghanistan and create that risk to innocent parties.
19       Your Honor, I think that addresses the questions
20  that the Court identified.  Thank you.  I appreciate your
21  time.
22            THE COURT:  Okay.  Mr. Moran.
23            MS. ECKSTEIN:  Real quick, two housekeeping things.
24            THE COURT:  Yes.
25            MS. ECKSTEIN:  I just wanted to make sure the Court

USCA4 Appeal: 24-1900    Doc: 46    Filed: 11/12/2024    Pg: 192 of 347
Case 3:22-cv-00049-RSB-JCH    Document 436    Filed 06/07/24    Page 33 of 68
Pageid#: 6094

33

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    was aware that Jonathan Mast is here with his counsel.

2                THE COURT:  Okay.

3                MS. ECKSTEIN:  I wanted to make sure the Court was

4    aware.  Then, separately, I do have the PowerPoints in

5    binders if you would like a copy, if I could submit them to

6    the Court.

7                THE COURT:  All right.

8                MR. MORAN:  Thank you, Your Honor.  John Moran for

9    defendants Joshua and Stephanie Mast.

10               As Ms. Eckstein said, Mr. Jonathan Mast and his

11   counsel are here.  We do not represent him.  If the Court

12   wishes to hear from them, we certainly have no objection.

13               With the Court's indulgence, I'd like to address

14   three things.  First, the actual sanctions motion that's here

15   before us today; number two, the question that the Court has

16   raised about the ongoing need for the protective order; then

17   third, to briefly address some of the related points that

18   Mr. Elliker raised about the protective order.

19               First, we think the most -- we've set forth our

20   arguments in the briefing, including the prehearing brief.

21   We think the simplest way for the Court to resolve this case

22   is to hold the plaintiffs have not met their burden of

23   showing by clear and convincing evidence either that there

24   was a knowing violation of the protective order or that the

25   movants have suffered harm as a result.  That is their burden

USCA4 Appeal: 24-1900   Doc: 46   Filed: 11/12/2024   Pg: 193 of 347
Case 3:22-cv-00049-RSB-JCH   Document 436   Filed 06/07/24   Page 34 of 68
Pageid#: 6095

34

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1   under Ashcraft and Fourth Circuit precedent.

2        In particular, on the showing of harm, that goes

3   very closely to the questions that the Court has raised about

4   the ongoing need for the protective order.  Now, I agree with

5   Mr. Elliker that there are two separate questions of whether

6   there is a need for the protective order on an ongoing basis

7   and whether the protective order was valid when it was issued

8   and at the time of the conduct that's the issue of this

9   hearing.

10        We've set forth our arguments as to why we don't

11   think the order is valid, but, again, our argument here is

12   not self-help, as Mr. Elliker insinuated.  The point here was

13   not that Joshua Mast believed that he was free to ignore the

14   protective order because he didn't like it or because he had

15   challenged it.  In fact, clearly the record shows that he

16   changed his conduct in order to ensure that he was complying

17   with the protective order, at least as he understood it, and

18   we know --

19        THE COURT:  Well, he changed it to reach the same

20   result.  I mean, he changed just that someone else did what

21   he was trying to achieve.

22        MR. MORAN:  Well, again, Your Honor, we think the

23   record is clear that what he was trying to achieve was to

24   receive financial help to support him in defending this

25   litigation.

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    THE COURT:  I know, but he was trying not to -- for

2    him not to violate the protective order, rather he was having

3    someone else do it for him.

4        MR. MORAN:  Well, again, Your Honor, the record

5    shows he knew that his family, his brother included, were

6    supportive of him and his family, and they wanted them to get

7    this help as well.

8        THE COURT:  Well, the question is was it aiding and

9    abetting by Jonathan of Joshua and vice versa.

10       MR. MORAN:  Understood, Your Honor.  We believe that

11   both their testimony and the declaration on which the

12   plaintiffs rely are clear that Joshua initially spoke to the

13   Pipe Hitters Foundation.  Again, I'm --

14       THE COURT:  I don't know if you do any criminal law,

15   but have you ever been in a conspiracy case in a criminal

16   case?

17       MR. MORAN:  Yes, your Honor, I'm very familiar with

18   it.

19       THE COURT:  I mean, if you were to raise this kind

20   of motion at the close of the government's evidence and say

21   there was not evidence of a conspiracy, I think you'd be

22   laughed out of court.

23       MR. MORAN:  Well, again, Your Honor, I think the

24   question would be what is the common goal of the conspiracy?

25   What plaintiffs want to insinuate is that the goal of the

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    conspiracy was to circumvent the protective order by getting
2    pictures of our client's child out into public view.  I would
3    respectfully submit that if that was the goal, then this was
4    a very round about way to do it.

5         THE COURT:  Well, I can't imagine people with a law
6    degree thinking they can do something like this.  I mean, it
7    is clumsy and it's just to me -- I just can't believe that
8    somebody would think this was okay.

9         MR. MORAN:  I understand that, Your Honor.  Again,
10   we've laid out why we believe that Joshua Mast acted in good
11   faith and, again, if you'd like to hear from him, we would
12   call him.

13        I suppose I can move on to the second piece of that
14   which is that plaintiffs also have the burden of establishing
15   that they were harmed by the disclosure.

16        THE COURT:  Right.

17        MR. MORAN:  Still to this day, even after the Court
18   raised those questions and a year after we filed our motion
19   to lift the protective order on the grounds that we didn't
20   think it had a factual basis, they still have not come
21   forward with any evidence to show that there is actual harm
22   or a heightened risk of harm to them or to their family from
23   these disclosures.

24        If that were all the matter, then we believe that
25   would be enough to defeat the motion, but the facts of this

Cynthia L. Bragg, Official Court Reporter

USCA4 Appeal: 24-1900    Doc: 46-3    Filed: 11/12/2024    Pg: 196 of 347
Case 3:22-cv-00049-RSB-JCH    Document 436    Filed 06/07/24    Page 37 of 68
Pageid#: 6098

37

—————Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024—————

1  case are sort of extraordinary in that resolve, which is that

2  we know, and there is no dispute, that plaintiffs, through

3  their counsel, have given on-the-record statements to

4  reporters.  The Associated Press is here in the courtroom.

5  They've run stories than included on-the-record statements

6  from plaintiffs and their counsel.  We know that members of

7  the media have traveled to Afghanistan and spoken with

8  members of their family about the underlying facts of this

9  case and reported on them publicly.

10        So it's difficult for us to accept the

11  representation of the plaintiffs, which is unsupported by any

12  evidence, to merely accept their representation that our

13  client by allowing photographs of their daughter to be posted

14  online, which is something every parent has to make decisions

15  about and deal with, but that by allowing that to happen,

16  that they are putting plaintiffs and their family at danger

17  and risk of identification when there are American reporters

18  and other reporters running around Afghanistan interviewing

19  their family members about the underlying facts of this case.

20        So, again, we think that goes both to the question

21  of whether the protective order should continue forward on an

22  ongoing basis, but it also goes to the question of whether or

23  not they've met their burden of proving by clear and

24  convincing evidence that they were harmed by the conduct that

25  is the subject of the sanctions motion.

USCA4 Appeal: 24-1900    Doc: 46    Filed: 11/12/2024    Pg: 197 of 347
Case 3:22-cv-00049-RSB-JCH    Document 436    Filed 06/07/24    Page 38 of 68
Pageid#: 6099

38

——Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024——

1      THE COURT:  Well, isn't the main -- I mean, they're
2   not prohibited from discussing the case.  They just are told
3   they cannot identify --

4      MR. MORAN:  Well, Your Honor, the plaintiffs are
5   under no restrictions.  If they --

6      THE COURT:  Okay.  But what is the harm to the
7   defendants in not being able to identify the plaintiffs?

8      MR. MORAN:  So, Your Honor, I think I need to
9   separate that into plaintiffs Jane Doe and John Doe, who are
10  the adult plaintiffs, and then Baby Doe who is our client's
11  child whom they've purported to represent and named as a
12  plaintiff in this case and make subject of the protective
13  order.

14      That child lives with our clients.  She has for over
15  two and a half years.  They have her meet family and friends.
16  People can -- anyone who knows them and knows that they're
17  associated with this lawsuit because their names are included
18  on the docket can see her today and say, Oh, that must be the
19  child that's associated with this lawsuit.  So there is a
20  need, I think, to separate the identification of, again, John
21  and Jane Doe, the adult plaintiffs in this case on the one
22  hand, and Baby Doe, the minor child, on the other hand.

23      Our clients' position is that the federal rules
24  already provide for the use of initials in the case of a
25  minor child, that that would be more than adequate

———— Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024 ————

1    pseudonymity for purposes of this case, but if the Court said

2    that Baby Doe were a preferable moniker for the child in the

3    conduct of litigation, then we would understand that.

4            The question about identifying -- so that issue is

5    separated from the harm to plaintiffs because the mere fact

6    that somebody identifies the minor child, knows that she

7    lives with our clients, that she's their daughter, that

8    doesn't give rise directly to any risk in Afghanistan for

9    members of their family.

10           As to their identities, again, there is no

11   insinuation here that their discussions with the Pipe Hitter

12   Foundation included identifying information about who John

13   Doe and Jane Doe really are, what their names are, their

14   address, their identity, any of that information.  Our

15   clients have been fastidious about avoiding --

16           THE COURT:  But you're complaining about the

17   protective order not allowing you to name the plaintiffs.

18   You're not prohibited from discussing the case as long as you

19   don't name them.  That's what I was asking.  Why is that such

20   a terrible burden on the defendants?

21           MR. MORAN:  Understood, Your Honor.  The principal

22   burden of that is in fact development for the case.  For

23   example, when we are endeavoring to contact potential

24   witnesses, either in the United States or in Afghanistan, we

25   are limited by the fact of not being able to say, you know,

Cynthia L. Bragg, Official Court Reporter

**JA195**

USCA4 Appeal: 24-1900    Doc: 46    Filed: 11/12/2024    Pg: 199 of 347
Case 3:22-cv-00049-RSB-JCH    Document 436    Filed 06/07/24    Page 40 of 68
Pageid#: 6101

40

—————Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024—————

1    here is the person that we're talking about, unless -- again,
2    Mr. Elliker raised this.  We have two choices.  We either try
3    to talk around it and find a way to figure out if somebody
4    knows anything without telling them who we're even asking
5    about, or we could go to plaintiffs' counsel and say --

6         THE COURT:  Is that a genuine problem or a
7    theoretical problem?

8         MR. MORAN:  No, Your Honor, it has been a genuine
9    problem.  I mean, our clients have had difficulty contacting
10   potential witnesses based on their understanding that they
11   are unable to tell those potential witnesses who it is that
12   they're interested in asking about.

13        Again, I think what Mr. Elliker did is important to
14   come back to.  So he said that the case law under James is
15   very lenient, or perhaps, you know, more lenient on the use
16   of pseudonyms on the docket sheet and in the public filings
17   and the litigation so that if somebody looks up the docket,
18   it says John Doe and Jane Doe and Baby Doe.

19        If that were all we were talking about, we would
20   still have the objections that we raised, but I don't think
21   we would be as concerned about the scope of the protective
22   order.

23        The problem, and what they say, is that these other
24   restrictions are essentially necessary corollaries.  That,
25   well, gee, what good is it to have pseudonyms if you don't

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    have an order that prohibits the parties from naming the

2    person that's subject to the pseudonyms.  I understand the

3    logic of that, but that's not what James and the related

4    cases say.

5           It precisely is a gag order.  That's the piece of

6    the order that we -- that's the reason that we've used that

7    terminology.  It's one thing to say that they will be listed

8    as John Doe and Jane Doe and Baby Doe on the docket sheet and

9    in the public filings.  It's another thing to say that Joshua

10   and Stephanie Mast are prohibited from identifying them to

11   any third party.

12          I think as this episode illustrates, it's

13   particularly challenging when it relates to their minor child

14   and how they navigate.  You know, the last time we were here

15   on the first motion, I believe, if I recall correctly, both

16   plaintiffs and the Court suggested, well, of course we don't

17   think that they would violate the protective order by taking

18   their daughter to the grocery store and having somebody see

19   her and identify her with them.

20          But under the logic of their rule, which is that by

21   any means necessary we need to make sure that nobody can

22   trace a line between a flesh and blood person and the

23   pseudonyms on the docket, there is no logical reason why that

24   and other similar day-to-day activities wouldn't constitute a

25   violation of the protective order as written.

USCA4 Appeal: 24-1900    Doc. 46    Filed: 11/12/2024    Pg: 201 of 347
Case 3:22-cv-00049-RSB-JCH    Document 436    Filed 06/07/24    Page 42 of 68
Pageid#: 6103

42

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1      So, again, our clients have done their best to do
2  what they understand to be their obligations under the
3  protective order, but it's been very challenging under the
4  circumstances.

5      Again, we think for purposes of the motion that's
6  before the Court today, the key questions are, have the
7  plaintiffs proved by clear and convincing evidence that there
8  was a knowingly violation, and have they proved by clear and
9  convincing evidence that their clients were harmed?

10     On that last prong in particular, I think it's hard
11 to show clear and convincing evidence when there simply is no
12 evidence.  There is the representation of the counsel.  First
13 of all, they acknowledge that there is no actual harm as a
14 result of the disclosure, but they cite cases saying that
15 actual harm is not required.

16     Then they cited three things that they think meets
17 that test.  First, the increased risk to non-parties.  Again,
18 all we have is their say so.  They've not at any point
19 initially when they obtained the ex parte protective order
20 through last year when we filed a motion to lift the
21 protective order or even here today after the Court raised
22 its questions, they have not provided any evidence to
23 substantiate the risk to third parties.

24     THE COURT:  Just practically speaking, isn't anyone
25 who came to the United States from Afghanistan during this

Cynthia L. Bragg, Official Court Reporter

USCA4 Appeal: 24-1900    Doc: 46    Filed: 11/12/2024    Pg: 202 of 347
Case 3:22-cv-00049-RSB-JCH    Document 436    Filed 06/07/24    Page 43 of 68
Pageid#: 6104

43

1    period of time who stays here any period of time and goes

2    back under some risk, additional risk?  I don't mean just

3    might have an accident, but isn't there a real risk?

4        MR. MORAN:  Well, Your Honor, that could be.  I'd be

5    reticent to say that the Court can take judicial notice of

6    that risk.  I think, you know, if plaintiffs wanted to

7    rely --

8        THE COURT:  Well, maybe the Court can't take

9    judicial notice that it's an actual risk, but certainly

10   what's published in the news and anyone that reads the

11   newspapers and things think it's very dangerous.

12        You saw people fleeing from Afghanistan.  It wasn't

13   all because they wanted to come on a sightseeing trip to the

14   United States.  They were actually -- you could draw the

15   conclusion that these people were frightened to death because

16   of their association with the United States.

17        MR. MORAN:  Your Honor, I understand that as a

18   matter of human intuition based on current events, but what I

19   would point out is that if that were the case, then I would

20   not expect for plaintiffs to have their counsel making

21   on-the-record statements to the press about this litigation.

22        I would not expect for them to have members of the

23   media traveling around Afghanistan speaking with family

24   members and potential witnesses and then, you know, not

25   seeking to prevent those efforts as well or explaining why

————Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024————

1   those developments, which are the result of their own actions

2   of communicating with the media, talking about the case,

3   trying to generate public interest, getting the media

4   involved to investigate their allegations on the one hand is

5   safe and doesn't create any risk of harm to them or their

6   family even if they return, but on the other hand, our client

7   sharing a link to a Google drive that happens to have some

8   younger photos of their daughter, that's, you know, a crisis

9   that calls out for remedy because it puts their family at

10  risk.

11          THE COURT:  Well, there may be two separate things,

12  but you do not agree that there is any risk when a person

13  comes to the United States, such as they did, brings the

14  child, and went back without the child?

15          MR. MORAN:  Again, Your Honor, I don't contest that

16  it could be a risk, but I think in order to justify a

17  restriction on our client's ability to speak out about the

18  case, which has a presumptive First Amendment right

19  protection, that they would need to come forward with actual

20  evidence to substantiate that.  Maybe that would be in the

21  form of expert testimony, maybe it would be in the form of a

22  declaration from --

23          THE COURT:  All right.  I understand your position.

24          MR. MORAN:  With that, Your Honor, again, we've set

25  forth our position in the briefing.  We've offered to put on

Cynthia L. Bragg, Official Court Reporter

**JA200**

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1  Joshua Mast and/or -- you know, again, Jonathan Mast is here.

2  He's not our client to represent.

3           Unless the Court has anything --

4           THE COURT:  Okay.  I was just -- you said that your

5  client was having trouble finding witnesses.  Can you tell us

6  any idea of how many witnesses there were?  Have you tried

7  to --

8           MR. MORAN:  I could confer briefly with my client.

9  I'm aware of one particular incident where it's created an

10 issue, but I could confer briefly if the Court --

11          THE COURT:  Okay.  Well, I mean, you could have

12 asked the magistrate judge in this case to allow you to

13 change that aspect of the order, couldn't you?  I mean, did

14 you do that?

15          MR. MORAN:  Well, we filed a motion to amend the

16 protective order about a year ago, and it has not been

17 resolved, Your Honor.  But we did not specifically go to

18 Judge Hoppe and say, We have one particular witness.  Can you

19 give us relief from the protective order.  I mean, perhaps we

20 would in the future if that would be the way to go.

21          THE COURT:  Okay.  Thank you.  Did Jonathan's

22 counsel wish to address the Court?

23          MR HARDING:  Good afternoon, Your Honor.  I'll be

24 brief.  My name is Elliott Harding.  I'm here on behalf of

25 Jonathan Mast.

Cynthia L. Bragg, Official Court Reporter

**JA201**

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1          I recognize that neither party, nor does the Court,

2    have a prehearing brief from us on this issue, so I'm not

3    going to try to argue outside of some general things that I

4    think have already been addressed.

5          We're not here to argue on behalf of Joshua Mast,

6    but we believe that any liability to Jonathan, to my client,

7    would naturally have to flow from Joshua being held to be in

8    contempt, so they do somehow collapse into each other.

9          Ultimately, we don't believe that Joshua Mast is

10   Jonathan's -- they're brothers, but as the axiom is, you're

11   not your brother's keeper.  I think that Joshua Mast is not

12   responsible for Jonathan Mast being an interested person in

13   seeing litigation advanced in a noble and well-funded way,

14   and that's what we have here.

15         The standard would be actual notice that my client

16   could somehow fall within the scope of this Court's

17   protective order.  Now, he did testify that he had read the

18   order through his own due diligence of finding such order,

19   and he shouldn't be punished because as a layman he actually

20   took affirmative steps to try to be compliant with something

21   so that he didn't get his brother in trouble.

22         I say that because there is no evidence that this

23   Court or that the plaintiffs' counsel sent an order to my

24   client after the protective order was issued as some type of

25   a preemptive warning after it was issued to say everybody in

Cynthia L. Bragg, Official Court Reporter

**JA202**

  1    Joshua Mast's immediate family better take note that they

  2    can't talk or show pictures of their niece in this case.

  3            There is no evidence that Jonathan sent this Google

  4    link to my client after having had a Signal conversation with

  5    Pipe Hitter.  This is an active Google link that I believe

  6    the family just shares generally, and it preexisted any type

  7    of conversation with Pipe Hitter.

  8            So that's one thing is what is the impetus of these

  9    pictures even existing or being in my client's possession,

 10    and that's just based on family.  It's not based on the idea

 11    of going out and courting media.

 12            There is no evidence that Joshua Mast had any

 13    knowledge as to any network that Pipe Hitter could

 14    potentially bring into the ambit of media coverage.  So there

 15    is no evidence that Jonathan, I mean, that Joshua knew that

 16    my client would have any conversations with One America News

 17    Network or any network.  It could have been any network.

 18    Joshua had no communication --

 19            THE COURT:  Wasn't there evidence that Joshua told

 20    Pipe Hitter that he couldn't do it, but his brother might be

 21    a good -- would be a good source to talk to?

 22            MR. HARDING:  That is literally the only link.

 23            THE COURT:  I mean, does there have to be another

 24    link?

 25            MR. HARDING:  It could have been the neighbor.  It

USCA4 Appeal: 24-1900    Doc: 46    Filed: 11/12/2024    Pg: 207 of 247
Case 3:22-cv-00049-RSB-JCH    Document 436    Filed 06/07/24    Pageid#: 6109    Page 48 of 68

48

—————Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024—————

1    could have been a church member.  Just because there are

2    other people out there in the world that have a vested

3    interest in Joshua's case, does not make them agents.  He

4    knows what he can and cannot do, and he acted accordingly,

5    Joshua did.  He did not --

6            THE COURT:  Well, it was pretty clear in the

7    protective order that Joshua couldn't act himself or through

8    agents and representatives.

9            MR. HARDING:  Correct, but in the conversation with

10   Pipe Hitter -- again, just going off what the plaintiffs have

11   referenced.  I don't have his whole transcript.  I wasn't a

12   party to that deposition.

13           I don't believe that there is any reference to the

14   idea that, oh, you can go talk to my brother, and he'll

15   provide pictures, or he'll breach pseudonymity, but I can't

16   do that.  All he said was, effectively, I'm not allowed to

17   talk about it.  There are other people out there that might

18   talk about it.  That was the end of any direction.  That is

19   literally that there is someone else in the world that might

20   be interested.

21           I think that's notable because he didn't send my

22   client their contact information for Pipe Hitter and say go

23   call this woman, she wants to talk to you.  That's not what

24   happened.  He didn't affirmatively --

25           THE COURT:  Joshua told her to call his brother,

—————Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024—————

1    right?

2           MR. HARDING:  He said that he might be someone that

3    she could talk to, but there is a big difference -- we're

4    talking about agency relationship, and that's really what is

5    at issue here.

6           There is a big difference between telling someone

7    that there is a third party in the world that might be vested

8    in seeing our case go well and might talk to you versus him

9    affirmatively telling my client and directing him to go do it

10   and say, I can't to it, but can you go do it for me?  I know

11   that sounds like a distinction without a difference, but --

12          THE COURT:  I mean, it sounds like something you

13   would hear in moot court in junior high school, frankly.  I

14   mean, it doesn't sound like a serious legal argument.

15          MR. HARDING:  Well, what I think is a serious legal

16   argument is the First Amendment and due process components to

17   my client being held in contempt.  He was not represented --

18          THE COURT:  Well, I think that's your issue too, but

19   that's not what you're arguing.

20          MR. HARDING:  Well, I was just going to the factual

21   aspect.  The Court has rightfully noted the one caveat in the

22   entire 14 points that the plaintiffs point to is that my

23   client's name came up in one conversation with Pipe Hitter

24   saying he might be somebody you could talk to.

25          They mentioned Signal conversations being deleted or

————Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024————

```
 1    something like that.  What we don't know is whether or not --
 2    no one directed my client what to do with those photos, yet
 3    there is evidence in Joshua Mast's brief and in the
 4    depositions referencing that he asked them to blur out the
 5    photos, and the only photos that he thought were being
 6    referenced were things that were already in the public
 7    domain.
 8         So at the end of the day, it's really not any -- if
 9    a neighbor across the street were to be interested in this
10    case and take a picture of the Mast children playing in their
11    front yard, knowing the plight that they feel like they're
12    going through, and be sympathetic and say, These are people
13    I've known my whole life.  Here is their family.  No blurring
14    the photos, just goes out there and does it, puts pictures of
15    this young person up online, does a Go Fund Me and raises,
16    $10-, $20-, $30,000 and puts their name all over it, no one
17    would say that that person would fall within the purview of
18    this court's protective order.
19         All we have here, the only way we get there is the
20    idea that when he spoke to Pipe Hitter -- not knowing what
21    Pipe Hitter would necessarily end up doing, mind you -- he
22    said, I can't talk to you.  You might want to talk to my
23    brother.  That's it.  He didn't say, My brother will go on
24    the news and show you the exact pictures you're asking for or
25    anything like that.  He didn't tell my client to do that.  If
```

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    anything, I think he would have told him not to do that.

2         The reason I say that is because in my client's

3    deposition when he talks about if he had any conversations

4    with Joshua or his wife about Pipe Hitter, he said he didn't

5    because he was trying to a keep a distance.  Not because he

6    was trying to keep plausible deniability, but because he

7    doesn't believe he falls within the purview of this Court's

8    protective order, and I think he's right.

9         He wasn't on actual notice.  He was not listed by

10   name.  The plaintiffs could have asked for that.  Talking

11   about maintaining a protective order, they could ask to

12   expand a protective order.  I don't think that would be

13   appropriate, but they're not asking for that today.

14        They could have asked to include all the brothers or

15   the parents or the cousins.  Anyone in the family can't post

16   pictures anywhere of their own family member or to talk about

17   what is an issue of public importance, international

18   important, and very personal importance to my client.  He

19   wasn't served with anything about the protective order.  He

20   didn't have counsel at the protective order hearing.

21        Mind you, I think it's notable that Pipe Hitter

22   isn't here today.  The plaintiffs intentionally reference in

23   their brief that they dropped them as a party because after

24   review they considered them an innocent pawn in the matter.

25   Yet they had legal counsel, they were informed about a

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    protective order.  My client didn't and wasn't as far as

2    being legally notified.

3            When a lawyer is told that there is a protective

4    order involved, you would think there is some due diligence

5    necessary before they start putting up pictures and calling

6    people to speak.  Yet if they're an innocent pawn in that

7    matter, I don't see how my client isn't as well.  They're the

8    impetus of any network connections, any media --

9            THE COURT:  They didn't desist after they knew about

10   the protective order.

11           MR. HARDING:  They knew about the protective order

12   before they even contacted my client.

13           THE COURT:  Right, but when they knew the actual

14   terms of the order, they didn't desist.

15           MR. HARDING:  Right, but they didn't take any

16   affirmative -- the plaintiffs noted all the --

17           THE COURT:  You may be right, they may be guilty.

18   But like you say, they're not here.  That's not a defense to

19   somebody else, that somebody else is equally guilty.

20           MR. HARDING:  Well, I think it just goes to the

21   weight of the plaintiffs' argument because it's not that the

22   Court has dropped them in the matter, it's that they

23   effectively concede that they're an innocent party.

24           I'm just saying to the weight of the argument that

25   my client is somehow a guilty party, I'm arguing that he's

1   just as innocent, if not more so, because he was not legally

2   represented at the time.  He was not the one that's handling

3   PR and putting people on networks.  In fact, he told them to

4   blur certain things in order to take good faith efforts to

5   make sure there was no backlash.

6           I say all of this because we've got some serious

7   concerns about his speech being limited and him not being on

8   any actual notice, which is the standard for an agent or an

9   aider and abettor in this type of situation.

10          He could read it all day as a layman, but that's not

11  the type of notice we're talking about from a due process

12  standard.  He was not actively represented.  He was dealing

13  with -- everybody else in this conversation was actively

14  represented, including Pipe Hitter.

15          He's acting under a good faith assumption that his

16  own layman reading of the order he's allowed to act.  He's

17  not named in it.  It doesn't mention him by reference, such

18  as immediate family.  He takes affirmative steps to blur any

19  photos.  The photos that were provided had already been in

20  the public domain.  And he was talking to a represented

21  entity that assists in these types of matters thinking

22  that --

23          Now, granted, there is no evidence as to whether or

24  not he knew that they did or did not have the protective

25  order, and to the Court's point, once Pipe Hitter got the

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    actual physical protective order, they took affirmative steps

2    to remove these things from online presence.

3         But, again, if that makes them an innocent actor, I

4    think my client is just as innocent because of his steps to

5    blur these things out, avoid any type of contact with his

6    brother, and, honestly, he might have said things that his

7    brother didn't like or wouldn't have wanted him to say in the

8    first place.

9         There is no definition of the scope of the agency

10   that they're trying to proffer to this court.  There is no

11   conversation saying go on to Pipe Hitter and do this, I'm not

12   allowed to do it.  That's not what we have.  What we have is

13   you might get contacted by these people.

14        Jonathan could have easily said no.  Jonathan could

15   have gone out and done this previously.  He could have done

16   it on his own accord, which he effectively did.  He could

17   have gone to secondary or third parties that did the same

18   thing Pipe Hitter does.  He could have done his own Go Fund

19   Me account and raised it on his own without having to use a

20   charitable intermediary for press purposes.

21        I don't think -- I think the plaintiffs would still

22   be making the same argument, though.  That's what I'm trying

23   to say.  I don't think the evidentiary hook that they're

24   trying to have this Court rely on exists.  We have Pipe

25   Hitter learning my client's name, and my client being

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    forewarned that he might hear from this entity.  That's the

2    extent.

3         Now, the idea that money exchanged hands is

4    irrelevant.  My client could have pocketed it all, and he

5    would have had a breach of contract or a fraud claim between

6    him and Pipe Hitter, but he could have personally went $5,000

7    prior to talking to Pipe Hitter and just used this as a way

8    to get his money back.  They're not saying he's aiding and

9    abetting in breach of the protective order because he's

10   loaning many to his brother.  The money is not what's at

11   issue here.

12        My client is the one who signed the document knowing

13   that it was just between him and Pipe Hitter.  He didn't go

14   out and have his brother review the terms before he signed

15   it.  There is just so much more evidence.  They're saying

16   there are things that Joshua --

17        THE COURT:  Didn't they send the agreement to his

18   brother, and the brother sent it back and said, Well, I can't

19   sign it, you sign it?

20        MR. HARDING:  He had already said he can't be a part

21   of it, meaning -- his name was referenced in it, but he

22   didn't say these terms, you know, edit this, amend this, make

23   sure you do that.  We don't have that.

24        I think it matters significantly, again harping on

25   two primary issues, First Amendment, just because he's his

USCA4 Appeal: 24-1900    Doc. 46    Filed: 11/12/2024    Pg: 215 of 247
Case 3:22-cv-00049-RSB-JCH    Document 436    Filed 06/07/24    Page 56 of 68
Pageid#: 6117

56

———Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024———

1  brother doesn't mean he has to keep his mouth closed.  If
2  that's what the plaintiffs wanted, they should have asked for
3  that.  I don't know how that would have stood up with this
4  Court's review, but I'm just saying that they should have
5  asked for it, and maybe they can ask for it tomorrow.  But he
6  wasn't a part of it.

7       Then it goes to due process.  To hold him in
8  contempt for something that he had no legitimate actual
9  notice of -- granted, he did read it himself, but that's not
10 a court directive, that's not legally represented, and it's
11 not like a cease and desist or a forewarning type of letter
12 from opposing counsel to put you on notice and say go hire
13 counsel so they --

14      THE COURT:  So all he did was aid and abet his
15 brother in getting around the protective order; is that
16 correct?

17      MR. HARDING:  That's what they're arguing, but
18 that's not his position.  He wasn't trying to --

19      THE COURT:  I know it's not his position, but what
20 are the facts other than that?

21      MR. HARDING:  He wants to aid with his brother
22 having strong litigation, but violating the protective order
23 is not what he sought to do.  That's why we have blurred
24 images.  That's why we have pseudonymity being maintained.  I
25 think the blurred images is a huge recognition that my client

Cynthia L. Bragg, Official Court Reporter

JA212

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

 1   is not looking to aid and abet Joshua doing anything other

 2   than litigating the case generally and having a good outcome.

 3            THE COURT:  Okay.

 4            MR. HARDING:  We also don't have evidence that he

 5   spoke to Joshua's attorneys about this going beforehand.

 6   There is nothing to say they told him he could do it.  There

 7   is just a huge lack here.  We do --

 8            THE COURT:  Well, what about the fact that telephone

 9   records were erased after a few days?

10            MR. HARDING:  The Signal app, I think it's wrong to

11   view an app that has automatic deletion as some type of

12   spoilage argument that weighs against an evidentiary finding.

13   I find that to be disingenuous.

14            THE COURT:  Would that not be a spoliation problem

15   in any other case?

16            MR. HARDING:  Not -- I mean, my client is not the

17   one who had that issue, so I can't speak to it.  I just find

18   it to be --

19            THE COURT:  Well, I mean, you're rendering an

20   opinion.

21            MR. HARDING:  If the Court is just asking for an

22   opinion about the use of Signal, there are plenty of

23   innocuous reasons that people want to have their messages on

24   automatic deletion.

25            THE COURT:  I know, but when you're in litigation

Cynthia L. Bragg, Official Court Reporter

———Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024———

1  and you deliberately are using something that erases your

2  communications, isn't that a problem?

3          MR. HARDING:  Well, we don't --

4          THE COURT:  Okay.

5          MR. HARDING:  As someone who actively uses that

6  application, along with others that automatically delete, and

7  the Court is digressing into just pure opinion on the matter.

8  We don't have evidence of how many other conversations he was

9  having that were also being deleted.  All of his

10  conversations were likely being deleted within five days, or

11  however long he set the timer to.

12          We also don't know if he's the one that set the

13  automatic delete, right?  It could have been the other party.

14  That's how those apps work.  That's why I think it's wrong to

15  read too much into that because there is so much dynamics

16  into that type of thing.

17          I think it's a stretch to say that Joshua Mast was

18  somehow facilitating my client to aid and abet him purely

19  because some messages went away.

20          THE COURT:  Okay.  Well, I got into this because you

21  said there was no evidence of them talking, and that was, you

22  know, some reason where there may not be that evidence.  But

23  I understand your position.

24          MR. HARDING:  Ultimately, we just think it would be

25  an unfounded and arguably unconstitutional sanction for my

USCA4 Appeal: 24-1900    Doc: 46    Filed: 11/12/2024    Pg: 219 of 347
Case 3:22-cv-00049-RSB-JCH    Document 436    Filed 06/07/24    Page 59 of 68
Pageid#: 6120

59

—————Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024—————

1    client to be brought within the scope of this.  We don't

2    believe Joshua Mast is his brother's keeper in this matter.

3           With that, we would ask for, obviously, my client

4    not to be held in violation of an order that he was not named

5    in or served with.  Thank you.

6           THE COURT:  Okay.  Thank you.  Go ahead.

7           MS. ECKSTEIN:  Thank you, your Honor.  Mr. Elliker

8    is going to address specifically the protective order issues,

9    but I want to address items stated by both Mr. Moran and

10   Mr. Harding.

11          With respect to Mr. Moran, he's again emphasizing

12   this lack of actual harm.  The case law is very clear.

13   Actual harm is not required, and he does not address the

14   other harms that we raised in our brief, including harm to

15   the Court itself, harm with respect to the expenditure of

16   time, resources, money, by the parties and the Court in terms

17   of time, of course.

18          We've heard this before, this argument that it

19   should be okay for his clients to post photographs of Baby

20   Doe.  I get it.  We're not saying otherwise.  What they can't

21   do is tie that to this litigation.  If they hadn't given

22   photographs that identified Baby Doe to the Pipe Hitter

23   Foundation but given ones of her from her back, for example,

24   or from some other way so that she can't be identified, we

25   would not be here today.  As well as with respect to the One

1    America News Network.  If they hadn't provided those

2    photographs to the Pipe Hitter Foundation or the One America

3    News Network, we would not be here today.

4          The protective order, as you know, I've heard from

5    Mr. Harding that his brother didn't think the protective

6    order applied to him, that Jonathan Mast didn't think that.

7    It does refer to representatives and agents.  Of course, they

8    are also prohibited, and in this case Jonathan Mast was

9    acting as Joshua Mast's representative.

10          Also, he did testify, Jonathan Mast did testify that

11   he was aware of the protective order, and he was aware of

12   protective order before he even got into contact with the

13   Pipe Hitter Foundation.  That's in his deposition.  It's

14   cited in the PowerPoint that I provided to the Court, so the

15   citations are there.

16          Mr. Harding said there was just one conversation --

17   yeah, just this one conversation about Joshua saying, Well,

18   Jonathan can do those, can talk to the Pipe Hitter Foundation

19   as opposed to me.

20          There are several instances in Ms. Disarro's

21   declaration in which she specifically references a couple of

22   different conversations in which Joshua Mast told her, I

23   can't be in a public-facing capacity, but my brother can.  I

24   can't sign the grant agreement, but my brother can.  And

25   those are paragraphs 62, 63, 69, and 75 of her declaration.

—————Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024—————

1          I may have misunderstood Mr. Harding.  I heard him

2    say that he wasn't present at a deposition.  The only

3    deposition we've taken thus far of Jonathan Mast, he was

4    there.  I may have misunderstood what he said, but I just

5    wanted to make that clear.

6          Mr. Harding also made some comments about, well, the

7    Pipe Hitter Foundation knew about the protective order before

8    Jonathan Mast.  I want to be clear about a couple of things.

9          As I said, Jonathan Mast testified that he knew

10   about the protective order even before he contacted the Pipe

11   Hitter Foundation.  Ms. Disarro said she did not -- that the

12   Pipe Hitter Foundation did not have a copy of the protective

13   order until we reached out to them with a cease and desist

14   letter.  The cease and desist letter that we sent to the Pipe

15   Hitter Foundation, we sent one to Jonathan Mast, I believe on

16   the same day.

17         Also, Mr. Harding said that Jonathan Mast acted in

18   good faith in some way.  He even told the Pipe Hitter

19   Foundation to blur out some photographs.  I'd like to point

20   Your Honor to Exhibit I of our prehearing brief.  That's also

21   been submitted to the Court in the binder.  Exhibit I, this

22   is a text from Jonathan Mast to Dena Cruden.  Dena Cruden, by

23   the way, is the same person as Dena Disarro.  She got

24   married, so it's Dena Cruden-Disarro.

25         It's dated Wednesday, June 14th.  We sent the cease

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    and desist letter to Jonathan Mast the day before, and he

2    specifically says in this text message to Ms. Cruden, this is

3    after the Pipe Hitter Foundation has already posted the

4    identifying photographs in connection with this litigation,

5    and he says, "I got a cease and desist letter from the

6    opposition's law firm specifying that he had not blurred that

7    out," meaning that Eddie Gallagher had not blurred out some

8    of Baby Doe's face, "and that they might claim that I am

9    breaking the protective order."

10        "Seeing as how that photo" -- the specific photo

11   he's referring to is the one, I believe, where it's Baby Doe

12   standing on the exercise equipment.  Jonathan says, "Seeing

13   as how that photo came from me and wasn't one of the ones

14   that aired on CBS, thus already in the public domain, I think

15   it would behoove us to take a precaution to blur it out like

16   the one on Pipe Hitter's Instagram account.  I hope that

17   makes sense."

18        All he asked to be blurred out where photographs

19   that he thought were already in the public domain, even

20   though he also knew that we had filed a motion to show cause

21   as to the photographs that were displayed on the CBS

22   broadcast.  So this wasn't innocent.  He knew exactly what he

23   was doing as well.

24        Again, with respect to the protective order, in his

25   deposition he testified that he saw it, he read it, he

Cynthia L. Bragg, Official Court Reporter

**JA218**

USCA4 Appeal: 24-1900    Doc: 46    Filed: 11/12/2024    Pg: 222 of 347
Case 3:22-cv-00049-RSB-JCH    Document 436    Filed 06/07/24    Page 63 of 68
Pageid#: 6124

63

1   understood it.

2            Then finally to your questions, just real briefly,

3   about the Signal messaging app.  My understanding is that

4   those settings can be changed for every single message

5   stream.  So Joshua Mast could have changed those settings,

6   but he didn't in the middle of this litigation when he is

7   texting about this litigation.

8            Not only that, but Ms. Disarro avers in her

9   declaration, she says in her declaration that she can see on

10  her app that it is Joshua Mast who has the auto delete

11  settings on, auto delete within one week.  So it's not

12  someone else that had the auto delete settings on, it is

13  Joshua Mast who had those auto delete settings on.  So there

14  is likely a trove of correspondence back and forth that we

15  have not seen and we don't have access to anymore.

16           I'll turn it over to my colleague at this point

17  unless you have any questions.

18           THE COURT:  No questions.  Go ahead.  Well, just a

19  minute.  Speak to the point they raised that your clients

20  were making these public statements and revelations before

21  they were or at the same time.

22           MS. ECKSTEIN:  So my clients did speak with certain

23  news outlets, specifically the Associated Press and the New

24  York Times, but only on the condition, which the reporters

25  honored, that they not be identified.  Our clients were not

1    identified in any of the news articles that were published.

2         I heard something about how we should have somehow
3    controlled the media, prevented them from going to
4    Afghanistan.  I'm sure the Associated Press would laugh at
5    that, frankly.  We can't control them.  John Doe and Jane Doe
6    can't control what the press does.

7         They on their own, the Associated Press, decided to
8    go to Afghanistan and did its own investigation, and it got
9    that information on its own, not from our clients.

10        THE COURT:  Well, the information that got out there
11   once they started their interviews with people, did that put
12   the information out into the public so that this protective
13   order was no longer effective?

14        MS. ECKSTEIN:  So our clients did not know about
15   what the Associated Press was doing until it was reported.
16   So they had no idea.

17        To the extent -- we don't know what it is the
18   Associated Press told whomever they spoke with in
19   Afghanistan.  We don't know -- we don't know if they used
20   names.  We don't know what they did.

21        So that fear still exists.  I think, as you started,
22   the idea of them going back, our clients going back to
23   Afghanistan without the little girl, is deathly worrying to
24   them.

25        THE COURT:  Well, they couldn't go back now once

USCA4 Appeal: 24-1900    Doc: 46    Filed: 11/12/2024    Pg: 224 of 347
Case 3:22-cv-00049-RSB-JCH    Document 436    Filed 06/07/24    Page 65 of 68
Pageid#: 6126

65

———Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024———

1   they've asked for asylum.  I mean, that's out of the

2   question.

3           MS. ECKSTEIN:  Absolutely.  Remember, one of the

4   reasons they asked for asylum is because of this fear,

5   because they can't go back without her.  Then there is the

6   risk to the innocent civilians who remain in Afghanistan, the

7   family members and the like.

8           You know, I don't know what the Taliban knows.  They

9   don't know what the Taliban knows.  All we know is that the

10  Associated Press did some investigation and reported on that

11  investigation.  We do not know what they said to whom, what

12  they revealed to whom, any of that information.

13          THE COURT:  Okay.  Thank you.

14          MS. ECKSTEIN:  Thank you.

15          THE COURT:  All right.

16          MR. ELLIKER:  Thank you, your Honor.  I'll be very

17  brief I think, just on a few of the legal questions or the

18  arguments that my friend Mr. Moran raised.

19          First is in terms of the mechanics of the protective

20  order, some discussion about how this affects the plaintiffs'

21  ability to conduct discovery.  I take Mr. Moran at his word,

22  the representation that it has had some effect, at least as

23  to one particular witness, although, you know, I don't know

24  that it necessarily is a blanket restriction on the ability

25  to conduct discovery, but that's not an argument that has

USCA4 Appeal: 24-1900    Doc. 46    Filed: 11/12/2024    Pg: 225 of 347
Case 3:22-cv-00049-RSB-JCH    Document 436    Filed 06/07/24    Page 66 of 68
Pageid#: 6127

66

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

 1    been raised by the Masts insofar as the issues put before the

 2    Court on the motion to modify the protective order or their

 3    response, their prehearing response.

 4            They want the protective order lifted, right?  The

 5    relief they request in their motion filed last January is to

 6    deny the plaintiffs leave to proceed under pseudonyms, remove

 7    restrictions on the use of their real names, maintain privacy

 8    for the baby, and then allow filings from the circuit court

 9    having -- there's, you know, a connection to the way that

10    sealing works in the circuit court to this one.

11            So the issue is, I suppose, an interesting one as to

12    the mechanics of it, and maybe there is a way that that could

13    be a discussion as to a more, you know, a slight tailoring

14    for a particular issue in discovery, but that's not the issue

15    that's been put before the Court through the motion that the

16    plaintiffs -- sorry, that the Masts have filed.

17            I'll also note, Your Honor, that the language that's

18    in the protective order about how to handle the use of the

19    pseudonyms and the protection of the identity of the

20    plaintiffs during the course of discovery is verbatim from

21    James v. Jacobson.  So it's not as though that was invented

22    out of whole cloth and plucked out.

23            Again, I think we're all on the same page that the

24    idea of the protective order going forward is a distinct

25    issue as to the contempt issue, but insofar as the Court is

Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024

1    considering how to handle the protective order going forward,

2    I think that if there is some kind of discovery-related

3    issue, maybe that's something that could be addressed in

4    particular, but it's certainly not something that's been teed

5    up by the plaintiffs -- excuse me, by the Masts' motion on

6    this.

7          I think as your discussion with Ms. Eckstein just

8    pointed out, particularly as it relates to the asylum, the

9    risk of harm I think is indisputable, right?  I mean, that is

10   certainly I think something the Court could recognize is a

11   finding of the United States government with respect to the

12   granting of asylum.

13         I don't think we have to talk about judicial notice.

14   I think we can talk about common sense with regard to the

15   connection of that risk of harm as to innocent parties would

16   remain in Afghanistan.  I don't think that we need to have to

17   have additional proof of specific risk of harm to particular

18   people who remain in Afghanistan.

19         Sorry, Your Honor.  Ms. Eckstein stole some of my

20   points.  Unless Your Honor has any additional questions, I

21   think that's all.

22         THE COURT:  All right.  Thank you.

23         Thank you-all.  I appreciate your presentations and

24   briefing.  I'll rule promptly on this, I promise you.

25         I would say in the meantime I caution the defendants

———Doe, et al v. Mast, et al (3:22cv49) - Motion Hearing 5/29/2024———

1  and Jonathan Mast to abide by the terms of the protective

2  order until such time as the Court rules on the defendants'

3  motion to vacate or modify the protective order.

4          All right.  Thank you-all.  We'll recess court.

5          (The proceedings concluded at 2:39 p.m.)

6

7                          CERTIFICATION

8

9      I certify that the foregoing is a correct transcript

10  from the record of proceedings in the above-entitled matter.

11

12

13          _____/s/_____

14                      Cynthia L. Bragg

15                      June 6, 2024

16

17

18

19

20

21

22

23

24

25

Cynthia L. Bragg, Official Court Reporter

JA224

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**CHARLOTTESVILLE DIVISION**

| | |
|---|---|
| JOHN AND JANE DOE, | : |
| | : |
| *Plaintiffs & Counterclaim-Defendants,* | : |
| | : |
| v. | : |
| | : CIVIL ACTION NO. 3:22-cv-49 |
| JOSHUA & STEPHANIE MAST, | : |
| | : |
| *Defendants & Counterclaim-Plaintiffs,* | : **ANSWER TO AMENDED** |
| | : **COMPLAINT; AFFIRMATIVE &** |
| | : **OTHER DEFENSES; &** |
| RICHARD MAST & KIMBERLEY MOTLEY, | : **COUNTERCLAIM COMPLAINT** |
| | : |
| *Defendants.* | : |
| | : **JURY DEMANDED** |

### (1) ANSWER TO AMENDED COMPLAINT

Defendants Joshua & Stephanie Mast respond to Plaintiffs' Amended Complaint as

follows:

### INTRODUCTION

**1.      This action for conspiracy, tortious interference with parental rights, fraud,
intentional infliction of emotional distress, and false imprisonment arises from a U.S. Marine
Corp Judge Advocate's unlawful abduction of Baby Doe, an Afghan war orphan, from her
biological family and legal guardians, Plaintiffs John and Jane Doe. Plaintiffs seek a
declaratory judgment and compensatory and punitive damages.**

**ANSWER:** Joshua and Stephanie Mast (hereinafter, "the Masts") state that Paragraph 1 asserts

legal conclusions to which no response is required. To the extent Paragraph 1 contains factual

allegations to which is required, the Masts deny the allegations contained within Paragraph 1.

**2.      Defendants collectively engaged in a fraudulent scheme over the course of
nearly two years to accomplish the abduction of Baby Doe for the purpose of "adoption" by
Defendants Joshua and Stephanie Mast.**

**ANSWER:**  The Masts deny the allegations contained within Paragraph 2.

3.      On September 6, 2019, Baby Doe's parents and five siblings were killed in a U.S. military operation in rural Afghanistan. She survived and U.S. forces transported her to a military hospital for emergency medical treatment. Baby Doe, then only two months old, was seriously injured in the battle.

**ANSWER:** The Masts admit that the Child's parents were killed in a U.S. military operation after they chose to fight the 75th Ranger Regiment to their deaths and that the Child miraculously survived an attempt by the Afghan partner force to murder her during the mission that was thwarted by U.S. Army Rangers. This allowed the child to be transported to a U.S. military hospital where she could recover from her serious injuries, and were she remained for approximately five months. The Mast's extended the offer to pay for DNA confirmation of any alleged biological relationship approximately three years ago, and expressly deny that any of the five different Afghan identities asserted for "Baby Doe" correspond to her true identity or origin. The Masts deny all other allegations contained within Paragraph 3.

4.      In November 2019, while Baby Doe was recovering from her injuries in a U.S. military hospital in Afghanistan, Defendants Joshua and Stephanie Mast, represented by Defendant Richard Mast (a member of the Virginia Bar), fraudulently obtained a custody order and an interlocutory order of adoption over Baby Doe from Virginia courts that they knew, or reasonably should have known, lacked personal and subject matter jurisdiction over Baby Doe, a citizen of Afghanistan who had biological family in Afghanistan and had no legal or physical connection to the United States (the "Fraudulent Custody and Adoption Orders").

**ANSWER:** The Masts admit that they obtained a custody order and interlocutory adoption order in late 2019 so the Child could be transported from a hospital in Afghanistan that was constantly under rocket fire and could be treated at the University of Virginia's medical center to be transported to a U.S. military hospital where should recover from her serious injuries. The Masts deny all other allegations contained within Paragraph 4.

**JA226**

5.    Notwithstanding the Fraudulent Custody and Adoption Orders, the U.S. government in Afghanistan refused to release Baby Doe to Joshua and Stephanie Mast. Instead, the U.S. government honored its unambiguous federal and international legal obligations to release her to the government of Afghanistan so that she could be reunited with her next of kin in Afghanistan. Pursuant to Afghan law, Baby Doe's first cousin (John Doe) and his wife (Jane Doe) assumed permanent guardianship over her, loved her, and welcomed her as their first child.

**ANSWER:** The Masts deny the characterization of the custody and adoption orders as fraudulent, the legal characterizations of United States obligations and Afghan law, and the characterization of the relationship between the Child and John and Jane Doe. The Masts admit that the Child was transferred out of United States custody in Afghanistan. The Masts otherwise deny the allegations contained within Paragraph 5.

6.    Undeterred, Joshua and Stephanie Mast engaged the services of Kimberley Motley to search for and communicate with John and Jane Doe. Motley was aware that Joshua and Stephanie Mast had obtained the Fraudulent Custody and Adoption Orders for Baby Doe and was aware from the outset that Joshua and Stephanie Mast wanted to take physical custody of her in the United States and intended to adopt her as their own child. In coordination with Joshua and Stephanie Mast, however, Motley never disclosed the Masts' true intentions to the Does.

**ANSWER:** The Masts lack knowledge or information sufficient to form a belief about the truth of the allegations regarding Defendant Kimberley Motley's awareness or knowledge and on that basis denies them. Plaintiff Jane Doe has admitted that Motley disclosed to her from the beginning that an American family wanted to provide a home for the child. The Masts otherwise deny the allegations contained within Paragraph 6.

7.    Instead, Motley told the Does only that an American family wanted to help Baby Doe with her continuing medical needs. Joshua and Stephanie Mast's primary and undisclosed intention, however, was to induce John and Jane Doe to bring Baby Doe to the United States to enable them (one way or another) to acquire physical custody of Baby Doe based on the "authority" of the Fraudulent Custody and Adoption Orders.

**ANSWER:** The Masts lack knowledge or information sufficient to form a belief about the truth of the allegations regarding Defendant Kimberley Motley's statements and on that basis denies them. The Masts deny that their intentions were undisclosed. Joshua Mast told John Doe, through

**JA227**

an interpreter, that his intention was for the Child to live with the Masts in the United States, and

John and Jane Doe agreed that it was in the child's best interest to live with the Masts. The Masts

otherwise deny the allegations contained within Paragraph 7.

**8.    Despite communicating with John and Jane Doe for more than a year, first through Kimberley Motley, and eventually both directly and through Ahmad Osmani, Joshua and Stephanie Mast never revealed to them the Fraudulent Custody and Adoption Orders. Instead, through their omissions and misrepresentations, Joshua and Stephanie Mast deceived John and Jane Doe into believing that the Masts' only interest was in helping Baby Doe access medical care that was not available in Afghanistan. In reality, however, the Masts' chief objective was to consummate their illicit scheme to take Baby Doe from her lawful Afghan parents.**

<u>**ANSWER:**</u>  The Masts deny the allegations contained within Paragraph 8.

**9.    In August 2021, as a result of this long-running and coordinated fraudulent scheme, John and Jane Doe brought Baby Doe to the United States for medical care, only to have Joshua and Stephanie Mast tear her away from the only parents she had known for most of her life.**

<u>**ANSWER:**</u>  The Masts deny the allegations contained within Paragraph 9.

**10.    Defendants have caused irreversible harm to an innocent toddler and Plaintiffs John and Jane Doe. As her true family and legal guardians, they raised Baby Doe for 18 months before the abduction and love her as their own child. Though this lawsuit can never make them whole, Defendants must be held accountable for their unconscionable conduct.**

<u>**ANSWER:**</u>  The Masts deny the allegations contained within Paragraph 10.

<u>**PARTIES**</u>

**11.    Baby Doe is a three-year-old Afghan citizen whose biological parents died in 2019. She currently is being held in North Carolina by Joshua and Stephanie Mast.**

<u>**ANSWER:**</u>  The Masts admit that the Child is a five-year-old girl whose biological parents died

in 2019 and that she lives with her adopted family in North Carolina. The Masts otherwise deny

the allegations contained within Paragraph 11.

4

**12.    John and Jane Doe, citizens of Afghanistan, are a married couple and the legal guardians of Baby Doe under the laws of Afghanistan. John Doe is the paternal first cousin of Baby Doe. John and Jane Doe currently reside in Texas.**

<u>**ANSWER:**</u>  The Masts deny the allegations contained within Paragraph 12.

**13.    Joshua and Stephanie Mast are a married couple, and are United States citizens claiming domicile in Palmyra, Virginia, but currently residing in North Carolina, where Joshua Mast is stationed in the United States Marine Corps. Joshua Mast is a Major in the Marine Corps, a Judge Advocate, and an attorney admitted to the bar of the Commonwealth of Virginia.**

<u>**ANSWER:**</u>  The Mast's deny that they claim domicile in Palmyra, Virginia. The Mast's currently

reside and are domiciled in Hampstead, North Carolina. They have not resided in Palmyra since

July of 2020. The Mast's admit that Joshua Mast is a Major in the United States Marine Corps.

Major Mast is currently serving as the Executive Officer of a Raider Support Battalion and not as

a Judge Advocate. Major Mast is admitted to the bar of the Commonwealth of Virginia.

**14.    Upon information and belief, Richard Mast is a United States citizen domiciled and residing in Forest, Virginia. Richard Mast is Joshua Mast's brother and is also an attorney admitted to the bar of the Commonwealth of Virginia. Richard Mast is affiliated with an entity named "Liberty Counsel."**

<u>**ANSWER:**</u>  The Masts admit the allegations in Paragraph 14.

**15.    Upon information and belief, Kimberley Motley is a United States citizen domiciled and residing in North Carolina. Upon information and belief, Motley is an attorney admitted to the bar of the state of Wisconsin and has periodically worked in Afghanistan. Upon information and belief, Motley is the general counsel of Women for Afghan Women, which has a Community Center in Alexandria, Virginia.**

<u>**ANSWER:**</u>  The Masts admit that Kimberley Motley is a United States citizen. The Mast's lack

knowledge or information sufficient to form a belief about the truth of the remaining allegations

in Paragraph 15 and on that basis deny them.

16.    Upon information and belief, **Ahmad Osmani is an Afghan national permanently residing in Tennessee. Upon information and belief, Osmani is married to Natalie Osmani, a U.S. citizen.**

<u>**ANSWER**</u>:  The Masts acknowledge Ahmad Osmani is an Afghan national married to a U.S. citizen. The Mast's lack information sufficient to form a belief about the truth of the remaining allegations in Paragraph 16 and on that basis deny them.

17.    **United States Secretary of State Antony Blinken and United States Secretary of Defense General Lloyd Austin are named as nominal defendants, in their official capacities, as parties who are necessary to this proceeding. Plaintiffs are seeking no relief from them in this action.**

<u>**ANSWER**</u>:  The Masts admit the allegations in Paragraph 17.

## JURISDICTION & VENUE

18.    **This Court has subject matter jurisdiction under 28 U.S.C. § 1332, as the parties are completely diverse in citizenship, and the amount in controversy, exclusive of costs and interest, exceeds $75,000.**

<u>**ANSWER**</u>:  The Masts deny the allegations in Paragraph 18.

19.    **This Court also has subject matter jurisdiction under 28 U.S.C. § 1331, and supplemental subject matter jurisdiction under 28 U.S.C. § 1367, because Plaintiffs' right to relief as to Count 1 and their request for declaratory relief necessarily depend on resolution of substantial questions of federal law.**

<u>**ANSWER**</u>:  The Masts deny the allegations in Paragraph 18.

20.    **All Defendants are subject to personal jurisdiction in Virginia under Virginia Code §§ 8.01-328.1(A)(1) and (3), because the causes of action asserted in this Complaint arise from their having transacted business in Virginia and/or having caused tortious injury by an act or omission in Virginia. Defendants Motley and Osmani also are subject to personal jurisdiction in Virginia as alleged co-conspirators with Joshua and Stephanie Mast and Richard Mast. As co-conspirators, Motley and Osmani are liable for the Mast defendants' acts and omissions in Virginia, as set forth herein, in furtherance of the conspiracy to enable Joshua and Stephanie Mast to abduct Baby Doe. In addition, at the request of Joshua and Stephanie Mast and in furtherance of the conspiracy, Osmani voluntarily appeared in Virginia to testify on the Masts' behalf in the proceeding filed by John and Jane Doe in the Circuit Court of Fluvanna County to vacate that court's Fraudulent Adoption Order.**

<u>**ANSWER**</u>:  The Masts deny the allegations in Paragraph 20.

21.     Venue lies in this Court pursuant to 28 U.S.C. § 1391, as a substantial part of Defendants' wrongful conduct occurred in this district.

**ANSWER:**  Paragraph 21 asserts legal conclusions to which no response is required. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 21.

## FACTUAL ALLEGATIONS

### I.     BABY DOE'S ORPHANED PAST

22.     Baby Doe's biological parents and five of her siblings were killed on September 6, 2019, in Afghanistan, in a joint United States and Afghan military operation in the course of which their home was destroyed. Baby Doe sustained serious injuries, including a fractured skull and femur, and second-degree burns. U.S. military forces discovered Baby Doe in the rubble and immediately transported her to a nearby U.S. military hospital for urgent surgical and medical care. She was then transferred to [REDACTED] on September 25, 2019, at which time her condition stabilized.

**ANSWER:**  The Masts admit that the Child's biological parents died fighting in close combat with U.S. Army Rangers because they refused to surrender and fought U.S. forces to the death. The child has no known siblings, and the Mast's extended an offer to pay for a DNA comparison approximately three years ago. The Masts also admit that the Child sustained serious injuries, which were treated only by a U.S. military hospital and the Masts. The Masts also admit she was transferred between U.S. military hospitals on September 25, 2019. The Masts otherwise deny the allegations in Paragraph 22.

23.     The International Committee of the Red Cross ("ICRC") is the organization authorized to care for children who are orphaned during wartime and to assist with family reunifications under the Geneva Convention Relative to the Protection of Civilian Persons in Time of War of August 12, 1949 ("The Fourth Geneva Convention"). The U.S. military informed ICRC that Baby Doe was in its custody, and ICRC began searching for her family.

**ANSWER:**  The Masts lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 23 and on that basis deny them. Furthermore, the ICRC did not vet John Doe, Jane Doe, or plaintiff John Doe's father for biological or familial relationship to the

child. Plaintiff's were aware of this fact and did not provide responsive discovery in the Virginia Circuit Court until this federal proceeding.

24.     **The ICRC has worked for over one hundred years in conflict areas and humanitarian disasters to reunite separated family members through its "Restoring Family Links Program." ICRC and the national Red Cross and Red Crescent societies are universally recognized as experts in family tracing and reunification.** *See https://www.brookings.edu/wp-content/uploads/2016/06/0119_internal_displacement_complete.pdf, p, 332.*

**ANSWER:** The Masts lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 24 and on that basis deny them. Furthermore, the ICRC did not vet John Doe, Jane Doe, or plaintiff John Doe's father for biological or familial relationship to the child. Plaintiff's were aware of this fact and did not provide responsive discovery in the Virginia Circuit Court until this federal proceeding.

25.     **By October 25, 2019, ICRC made contact with Baby Doe's uncle, who requested ICRC's assistance in reuniting her with her family.**

**ANSWER:** The Masts deny that the individual referred to in Paragraph 25 as the Child's uncle is, in fact her uncle. The Masts otherwise lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 25 and on that basis deny them.

26.     **Through his position as a Captain Judge Advocate in the United States Marine Corps deployed in Afghanistan, Joshua Mast learned of Baby Doe while she was in the custody of the Department of Defense (the "DoD") and under the care of the Military Health System,.**

**ANSWER:** The Masts admit the allegations in Paragraph 26.

27.     **Upon information and belief, Joshua and Stephanie Mast and Richard Mast were aware that ICRC would be searching for Baby Doe's biological family in Afghanistan.**

**ANSWER:** The Masts admit the allegations in Paragraph 27.

28.     **In spite of this knowledge, the Masts began taking steps to remove Baby Doe to the United States.**

**ANSWER:** The Masts deny the allegations in Paragraph 28.

**JA232**

29.     Joshua Mast is an attorney, barred in Virginia, who served at the Center for Law and Military Operations, and whose responsibilities in Afghanistan included collection and analysis of data on targeting, collateral damage estimation, and civilian casualty response in an active combat zone. As an attorney and member of the United States' Armed Forces in Afghanistan, it was his professional responsibility to be aware of Afghanistan's status as a sovereign nation, and of the Security and Defense Cooperation Agreement Between the Islamic Republic of Afghanistan and the United States of America (the "Bilateral Agreement") that governed U.S. military operations in Afghanistan.

**ANSWER:** The Masts admit that Joshua Mast is an attorney barred in Virginia who served at the Center for Law and Military Operations. The U.S. was unilaterally negotiating with the Taliban regarding control over the territory of Afghanistan during the alleged period, the Deputy SJA, USFOR-A was involved in these negotiations, and regularly briefed the Office of the SJA on the status of negotiations with that terrorist organization which resulted in the collapse of the U.S. backed government and resulting catastrophe. The Masts otherwise deny the allegations in Paragraph 29.

30.     As a U.S. military attorney, Joshua Mast knew, or should have known, that the Bilateral Agreement governed the U.S. military presence in Afghanistan, and that all U.S. military operations in Afghanistan were conducted under its auspices. Moreover, he was aware the Bilateral Agreement specifically recognized Afghan sovereignty and limited the Afghan Government's jurisdiction only over active-duty U.S. Armed Forces and DoD civilian employees; the Bilateral Agreement did not limit Afghanistan's jurisdiction over Afghan nationals in Afghanistan.

**ANSWER:** The Masts deny the allegations in Paragraph 30. Furthermore., the U.S. abrogated the Bilateral "Security" Agreement, gave Afghanistan to a terrorist organization, and left many former Afghan government officials to their deaths. Finally, the child's status as an authorized Department of Defense dependent allowed her to depart Afghanistan on a military aircraft with her military identification card in accordance with the BSA – which is exactly how the child ultimately escaped the Taliban takeover of Afghanistan.

31.     As a U.S. military attorney, Joshua Mast knew, or should have known, that all obligations of the United States and Afghanistan under the Bilateral Agreement were

"without prejudice to Afghan sovereignty over its territory," and that U.S. Armed Forces personnel and DoD civilian employees were obligated to "respect the Constitution and laws of Afghanistan." Bilateral Agreement, Articles 3:1, 3:2.

**ANSWER:** The Masts admit that Joshua Mast was aware of the Bilateral Agreement but do not accept the legal characterization of that agreement. Furthermore, the agreement does not create third party rights or obligations under international law, is non-justiciable by the terms of the agreement, and is irrelevant to any claim or defense in this proceeding. The Masts otherwise deny the allegations in Paragraph 31.

32. **As a U.S. military attorney, Joshua Mast knew, or should have known, that U.S. military bases under the Bilateral Agreement are not U.S. territory. Indeed, the Bilateral Agreement is explicit that "Afghanistan has full sovereignty over its airspace, territory, and waters." Bilateral Agreement, Article 10:1. Joshua Mast was also aware that even if Baby Doe's identity was unknown, her nationality would be determined under Afghan law. Accordingly, he knew, or should have known, that Baby Doe, as a civilian in Afghanistan, was subject solely to the sovereign jurisdiction of Afghanistan for the entire time she was in the care of U.S. military hospitals.**

**ANSWER:** The Mast's incorporate by reference the responses to Paragraphs 29, 30, and 31 and otherwise deny the allegations in Paragraph 32.

33. **As a U.S. military attorney working in Afghanistan, Joshua Mast knew, or should have known, that under Article 12 of Afghanistan's law on citizenship, if a child is found in the territory of Afghanistan and "his/her parents' documents proving their citizenship are not available," the child is considered a citizen of Afghanistan. See United Nations High Commission for Refugees, Law on Citizenship of the Islamic Emirate of Afghanistan (English Translation), Article 12 (June 24, 2000), available at http://www.refworld.org/pdfid/404c988d4.pdf; see also Athayi, Abdullah, Report on Citizenship Law: Afghanistan, Robert Schuman Centre for Advanced Studies, European University Institute (March 2017), at p. 9, available at https://cadmus.eui.eu/bitstream/handle/1814/45933/GLOBALCIT_CR_2017_09. pdf.**

**ANSWER:** The Masts deny the allegations in Paragraph 33.

34. **As a U.S. military attorney working in Afghanistan, Joshua Mast knew, or should have known, that regardless of where in Afghanistan Baby Doe was recovered, all territory within the internationally recognized borders of Afghanistan was subject to the jurisdiction of the laws of Afghanistan. Bilateral Agreement, Article 10:1.**

**ANSWER:** The Masts deny the allegations in Paragraph 34.

35.     On information and belief, these basic, uncontroversial principles of national sovereignty were not only known to Joshua Mast but were core obligations of his practice while serving as an attorney in the U.S. Marines in Afghanistan.

**ANSWER:**  The Masts admit Joshua Mast understands national sovereignty, including the three requirements for sovereignty under international law (defined territory, permanent population, control/effective government). It is a historical fact that these factors did not exist concurrently in Afghanistan during any relevant period. In addition, it is a historical fact that the U.S backed former Afghan government never realized sovereignty over the territory of Afghanistan, and, during the alleged period, the United States unilaterally negotiated with the Taliban over control of Afghanistan without the participation of the then existing Afghan government. The Masts otherwise deny the allegations in Paragraph 35.

36.     On information and belief, Joshua Mast also knew that the ICRC was actively searching for Baby Doe's family, and he knew that, as Baby Doe was recovered from a remote area of Afghanistan, this process would be labor- and time-intensive.

**ANSWER:**  The Mast's incorporate by reference the responses to Paragraphs 23, 24, and 25. Furthermore, Joshua Mast was aware that permission from the Taliban to access the area in question would be required ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████. The Masts otherwise deny the allegations in Paragraph 36.

37.     Virginia-barred lawyers like Joshua Mast and Richard Mast are expected to "conform to the requirements of the law, both in the professional service to clients and in the lawyer's business and personal affairs." Virginia Rules of Professional Conduct, Preamble. Virginia-barred lawyers also are expected to "use the law's procedures only for legitimate purposes and not to harass or intimidate others." Id. Further, lawyers are expected to "provide competent representation to a client," which "requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." Virginia Rules of Professional Conduct, 1.1.

**ANSWER:** Paragraph 37 asserts legal conclusions to which no response is required. The referenced rules speak for themselves. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 37.

**38.    A myriad of national and state laws governs international adoptions in the United States. In the case of an orphaned child in Afghanistan sought to be adopted in Virginia, the laws of the United States and Virginia require that prospective adoptive parents follow the laws of the Government of Afghanistan.**

**ANSWER:** Paragraph 38 asserts legal conclusions to which no response is required. The referenced rules speak for themselves. Furthermore, the laws of the Afghanistan defer to the state in which a lawsuit is instituted if a civil controversy arises and has a choice of law provision that imposes the law of the father's home state. In addition, Virginia Courts are not required to apply or enforce the child custody laws of a foreign state if they violate fundamental principles of human rights. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 38.

**39.    As Virginia attorneys, Joshua Mast and Richard Mast knew, or should have known, that they would need to comply with the applicable laws of Afghanistan, the United States, and Virginia.**

**ANSWER:** The Masts admit Joshua Mast understands his obligations as a Virginia attorney. Furthermore, the Mast's advocated to the relevant authorities and abided by the requests and guidance provided during all relevant periods. But for the U.S. Embassy's bad faith and unlawful conduct in regards to the child and the Mast's, the child would not have been exposed to the danger, deprivation, abuse, and neglect she endured. The Masts otherwise deny the allegations in Paragraph 39.

**JA236**

40.     As such, U.S. law requires that, before a child in Afghanistan can be adopted by someone in the United States, legal guardianship or custody must be obtained over the child in Afghanistan.

**ANSWER:**  Paragraph 40 asserts legal conclusions to which no response is required. The referenced rules speak for themselves. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 40.

41.     Afghanistan's laws, however, expressly prohibit the guardianship or custody of Muslim Afghan children by non-Afghan non-Muslims.

**ANSWER:**  Paragraph 41 asserts legal conclusions to which no response is required. The referenced rules speak for themselves. In addition, laws that discriminate on the bases of national origin and religion are unenforceable under the Constitution of the United States and the Commonwealth of Virginia. Such laws are repugnant to a free people. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 41.

42.     Joshua and Stephanie Mast are not Muslim and are not Afghan nationals.

**ANSWER:**  The Masts admit the allegations in Paragraph 42.

43.     Despite lacking any legitimate legal basis for doing so, in October 2019 Joshua and Stephanie Mast initiated custody proceedings for Baby Doe in the Juvenile and Domestic Relations Court of Fluvanna, Virginia (the "Juvenile Court") and adoption proceedings in the Fluvanna Circuit Court (the "Circuit Court"), despite the fact that Baby Doe had never stepped foot on Virginia soil and remained in Afghanistan. Richard Mast represented Joshua and Stephanie Mast in these proceedings.

**ANSWER:**  The Masts admit that they initiated the referenced proceedings and that they were represented by Richard Mast. The Masts otherwise deny the allegations in Paragraph 43.

44.     Joshua and Stephanie Mast initiated these proceedings in their county of residence, even though: (a) they had not obtained legal guardianship of Baby Doe in Afghanistan; (b) Baby Doe had lived her entire life in Afghanistan; (c) Afghanistan had sole and exclusive jurisdiction over Baby Doe; and (d) Baby Doe had no connection with the United States or Virginia.

**ANSWER:**  The Masts admit that the Child was an orphan in Afghanistan when they learned of her plight. The Masts otherwise deny the allegations in Paragraph 44.

**45.     By failing to serve notice of the custody and adoption proceedings on the DoD, which was Baby Doe's "physical" and "legal" custodian at the time, the Masts violated Virginia law.**

**ANSWER:** The Masts deny the allegations in Paragraph 45.

**46.     Joshua and Stephanie Mast, through Richard Mast as counsel, advised both the Juvenile Court and the Circuit Court that they expected the Government of Afghanistan to waive its jurisdiction over Baby Doe. In fact, the Government of Afghanistan explicitly asserted its jurisdiction over the child and requested, and then secured, her release from the U.S. military facility.**

**ANSWER:** The Masts admit they relayed to the Circuit Court their understanding of what the

then existing Afghan Government planned to do at each step of obtaining the custody and adoption

of their daughter. In addition, the Embassy generated the document referenced in paragraph 46

and improperly pressured Afghans through back channels to sign them and drop scientific vetting

standards, such as DNA testing. The Afghan official who signed the document in question could

not read  English and denied the statements of fact contained in the document. Unfortunately, the

corruption in this case was initiated by the Embassy, and does not reflect an appropriate objective

standard of care American's typically apply to children in dangerous situations. Consequently, the

child was handed over to non-relative, terrorist affiliated persons in a war zone despite all evidence

available. They otherwise deny the allegations in Paragraph 46.

**47.     The Masts also falsely claimed to both the Juvenile Court and the Circuit Court that Baby Doe's birth country and nationality were unknown, that she was a "stateless minor," and that she, therefore, was subject to the Virginia courts' jurisdiction because no other court would have jurisdiction. The Masts knew or should have known these claims were untrue.**

**ANSWER:** The Masts deny the allegations in Paragraph 47.

**48.     At the same time, they claimed to have asked the Government of Afghanistan to waive jurisdiction over Baby Doe, thereby acknowledging Afghanistan's jurisdiction in the first place. In fact, Baby Doe was never stateless. Under the laws of Afghanistan, any child found in the territory of Afghanistan whose parents' nationality is unknown is considered a citizen of Afghanistan. Baby Doe was found in Afghanistan, and, to the extent**

**JA238**

her deceased parents' nationality could not be proven, she was deemed under the laws of Afghanistan to be an Afghan citizen. The Masts knew, or should have known, that Baby Doe's nationality was Afghan under Afghan law.

**ANSWER:**  The Mast's deny the allegations in Paragraph 48.

49.    On November 6, 2019, relying on the factual and legal misrepresentations made by the Masts, and without serving the requisite process on the DoD , the Juvenile Court mistakenly concluded that it had jurisdiction over the case under Virginia Code §§ 20-146.12(A)(2) and (4) and granted the Masts temporary custody of Baby Doe.

**ANSWER:**  Paragraph 49 asserts legal conclusions to which no response is required. The

referenced rules speak for themselves. Inasmuch as a response is required, the Masts deny the

allegations in Paragraph 49.

50.    To reach this conclusion under subsection (A)(2), the Court was required to have found that a court of the home state of the child had declined jurisdiction. As discussed above, the Government of Afghanistan had jurisdiction, and had explicitly asserted jurisdiction over Baby Doe for reunification with her real family.

**ANSWER:**  Paragraph 50 asserts legal conclusions to which no response is required. The

referenced rules speak for themselves. Inasmuch as a response is required, the Masts deny the

allegations in Paragraph 50.

51.    Also under subsection (A)(2), the Court was required to have found that both the child *and* a person acting as a parent had a significant connection to the Commonwealth of Virginia. Yet, Baby Doe had no connection to Virginia and Joshua Mast was a stranger to her. He had no caretaking responsibilities, rights, or bonds of affection that would constitute a parent-child relationship. Only misrepresentations by the Masts could have led the Court to conclude otherwise.

**ANSWER:**  Paragraph 51 asserts legal conclusions to which no response is required. The

referenced rules speak for themselves. Inasmuch as a response is required, the Masts deny the

allegations in Paragraph 51.

52.    Finally, under subsection (2), the Court was required to have found that substantial evidence was available in this Commonwealth concerning the child's care, protection, training, and personal relationships. The Masts knew or should have known that such evidence would be in Afghanistan and made available to the ICRC and the Afghan government's Ministry of Labor and Social Affairs, not the Masts.

**ANSWER:** Paragraph 52 asserts legal conclusions to which no response is required. The referenced rules speak for themselves. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 52.

53. **Two days later, Stephanie Mast appeared before the Circuit Court, represented by her brother-in-law, Richard Mast. Relying on the same, and additional, factual and legal misrepresentations, the Circuit Court issued an Order directing the State Registrar of Virginia to issue a Certificate of Foreign Birth for Baby Doe on an expedited basis for the purpose of obtaining medical care. Stephanie Mast had never met Baby Doe, and had no firsthand knowledge of Baby Doe's parents' identities, her nationality, or even her medical needs.**

**ANSWER:** The Masts admit that Stephanie Mast appeared before the Circuit Court to provide it with the Masts' understanding of the Child's plight and of the relevant facts in Afghanistan. The Masts otherwise deny the allegations in Paragraph 53.

54. **Another two days later, Sunday November 10, 2019, Stephanie Mast appeared before the Circuit Court, again represented by Richard Mast. The Circuit Court issued an Interlocutory Order of Adoption that same day, designating Joshua and Stephanie Mast as Baby Doe's father and mother.**

**ANSWER:** The Masts admit the allegations in Paragraph 54. Furthermore, this petition was requested by the Virginia Attorney General's Office to resolve a dispute over the issuance of the child's birth certificate required to submit a Humanitarian Parole Visa. The birth certificate was immediately provided to Headquarters, Marine Corps, and the child was approved as Major Mast's dependent with full knowledge she was a patient at the Craig Joint Theatre Hospital at Bagram Air Field.

55. **That same day, Stephanie Mast presented the Interlocutory Order of Adoption and an application for a Certificate of Foreign Birth to the State Registrar, who promptly issued it, designating Joshua and Stephanie Mast as Baby Doe's father and mother. Richard Mast arranged Stephanie Mast's meeting with the State Registrar.**

**ANSWER:** The Masts incorporate the response to paragraph 54, and admit the allegations in Paragraph 55.

**B.    Relying on their fraudulently obtained Virginia state court orders, the Masts sought to prevent the United States from releasing Baby Doe to her biological family.**

56.    **On October 24, 2019, Baby Doe's maternal uncle submitted a request to the ICRC through its Restoring Family Links Program for assistance in returning Baby Doe to her extended family.**

<u>ANSWER</u>:  The Masts deny that the individual referred to in Paragraph 56 as Baby Doe's maternal

uncle is, in fact, her maternal uncle. The Masts otherwise lack knowledge or information sufficient

to form a belief about the truth of the allegations in Paragraph 56 and on that basis deny them.

57.    **On November 17, 2019, the Afghan Ministry of Labor and Social Affairs documented its official involvement in the search for Baby Doe's biological family.**

<u>ANSWER</u>:  The Masts lack knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 57 and on that basis deny them.

58.    **The ICRC worked to verify the family's relationship with Baby Doe and facilitated the family's contact with the Afghan government. The ICRC's efforts to reunite Baby Doe with her biological family came to fruition when it located her paternal uncle, John Doe's father. Under the laws of Afghanistan (like the laws in many other Muslim countries), legal guardianship of an orphan is transferred to the child's paternal uncle (in the absence of a paternal grandfather or a brother).**

<u>ANSWER</u>:  The Masts lack knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 58 and on that basis deny them.

59.    **In late December 2019 or early January 2020, the Afghan Deputy Minister of Social Affairs met with U.S. State Department's Assistant Chief of Mission in Kabul, Donna Welton, and informed her that the Afghan government had identified Baby Doe's family.**

<u>ANSWER</u>:  The Masts deny that the Afghan Government identified the Child's family. The Masts

otherwise lack knowledge or information sufficient to form a belief about the truth of the

allegations in Paragraph 59 and on that basis deny them.

60.    **On January 5, 2020, Ms. Welton wrote an email to the Deputy Minister stating: "We stand ready to transfer custody of the infant following an official request from the Afghan government. This is a high priority for our government and we would kindly request that the Ministry of Labor and Social Affairs expedite this official request so that the infant can be reunited with her family members as soon as possible" (emphasis added).**

**JA241**

**ANSWER:** The Masts lack knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 60 and on that basis deny them.

     **61.** **In February 2020, Afghanistan's Acting Minister of Labor and Social Affairs informed the Director of Social Security within the Ministry of Labor and Social Affairs, Directorate of [REDACTED], that Baby Doe was to be "reintegrated into her family."**

**ANSWER:** The Masts incorporate the response to paragraph 46 and otherwise state that they lack

knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph

61 and on that basis deny them.

     **62.** **Upon learning of Baby Doe's impending release on February 26, 2020, to her biological family in Afghanistan, the Masts filed a pseudonymous Complaint and Petition for a Temporary Restraining Order (the "TRO Petition") in this Court, the United States District Court for the Western District of Virginia, naming as defendants the DoD, the U.S. Department of State (the "DoS"), the Assistant Chief of Mission of the United States Embassy-Kabul, and various unknown persons. Richard Mast's signature block on the TRO Petition identifies his employer as "Liberty Counsel."**

**ANSWER:** The Masts admit they filed suit to prevent an objectively dangerous transfer of the

child without DNA testing and terrorist vetting to what has proven to a non-relative, terrorist

affiliated person. The Virginia Circuit Court has previously held the Does have failed to

demonstrate a biological relationship, and John Doe's father's Taliban flag displayed on his

WhatsApp profile was admitted into evidence. John and Jane Doe are not biologically related to

the child, and were unknown to the U.S. government, ICRC, and MOLSA during all relevant

periods. The Masts otherwise deny the allegations in Paragraph 62.

     **63.** **In the TRO Petition, the Masts sought to enjoin the United States government from releasing Baby Doe from its custody to the Government of Afghanistan for reunification with her biological family, relying on their fraudulently obtained Juvenile Court custody order as a basis for this request.**

**ANSWER:** The Masts admit they sought to enjoin the U.S. government from releasing the Child

without DNA testing and terrorist vetting given the extraordinary circumstances of her recovery

██████████████████████████████████████████████████████████. The

Masts otherwise deny the allegations in Paragraph 63.

**64.     Within hours of docketing the TRO Petition, U.S. District Judge Norman K. Moon convened a hearing at which Richard Mast represented Joshua and Stephanie Mast, and the U.S. Department of Justice (the "DOJ") represented the DoD and the DoS.**

**ANSWER:**  The Masts admit the allegations in Paragraph 64.

**65.     During the hearing, Richard Mast falsely represented to the Court that Joshua and Stephanie Mast were *not seeking to adopt* Baby Doe, but instead were interested only in bringing her to the United States for the purposes of medical treatment. Having just represented Joshua and Stephanie Mast in the Fluvanna Circuit Court to obtain an interlocutory order of adoption, Richard Mast knew that his representation to Judge Moon was false. So, too, did Joshua and Stephanie Mast. Neither Joshua Mast, Stephanie Mast, nor Richard Mast informed this Court or the United States government of the pending adoption proceedings.**

**ANSWER:**  The Masts deny the allegations in Paragraph 65.

**66.     For their part, the DOJ attorneys described the Juvenile Court custody order as "unlawful," "deeply flawed and incorrect," and apprised Judge Moon that the Masts had failed to serve the DoD and the DoS with notice of the custody proceedings.**

**ANSWER:**  The Masts admit the allegations in Paragraph 66.

**67.     The DOJ attorneys also advised Judge Moon that, while Baby Doe was in the physical custody of the U.S. government to receive emergency medical care, she remained subject to the jurisdiction of the Government of Afghanistan, which had "determined that it's not going to waive jurisdiction because it has located that relative."**

**ANSWER:**  The Masts incorporate the responses to Paragraph 46 and 66, and admit the positions

that the DOJ attorney conveyed to the Court. Furthermore, the same attorney represented that the

United States could not and did not determine if John Doe's father was a "proper person" to turn

the child over to, or an actual biological relative. The Masts otherwise deny the allegations in

Paragraph 67.

19

**JA243**

68.    Furthermore, the DOJ attorneys noted that "if the United States had been involved in th[e custody] proceeding as it should have been since it had custody . . . we would have been able to correct some of the factual errors that were happening there."

**ANSWER:**  The Masts admit the position that the DOJ attorney conveyed to the Court and otherwise deny the allegations in Paragraph 68.

69.    Unsurprisingly, Judge Moon denied the request for a TRO that same day, finding that Joshua and Stephanie Mast were unlikely to prevail on the underlying cause of action. In so doing, Judge Moon observed that: (a) the Juvenile Court orders were "foundational to plaintiffs' asserted authority to care" for Baby Doe, but they "reflect an assumption" that the Government of Afghanistan would issue a waiver of jurisdiction, which it did not do; (b) as custodian of Baby Doe, the DoD "should have been formally served with and provided notice of the proceedings"; and (c) the Masts had failed to "proceed through proper channels," including obtaining the consent of the Afghan government and obtaining a visa for Baby Doe to enter the United States.

**ANSWER:**  The Masts admit Judge Moon denied the request for a TRO. To the extent that the allegations in Paragraph 69 quote that order, that order speaks for itself and no response is required. Inasmuch as a response is required, the Mast deny the allegations in Paragraph 69.

70.    The next day, February 27, 2020, the DOJ filed a notice with the federal court advising that Baby Doe had been released from U.S. custody for reunification with her "next of kin."

**ANSWER:**  The Masts admit the DOJ filed a notice. To the extent that the allegations in Paragraph 70 quote that notice, the notice speaks for itself and no response is required. Inasmuch as a response is required, the Mast deny the allegations in Paragraph 70.

71.    At that time, Baby Doe was placed in the care of her paternal uncle, John Doe's father.

**ANSWER:**  The Masts aver that John Doe's father is not the Child's paternal uncle and otherwise deny the allegations in Paragraph 71.

72.    Concerned that Baby Doe would require ongoing medical care, Baby Doe's paternal uncle transferred his guardianship of Baby Doe, pursuant to his authority under the laws of Afghanistan, to his son and daughter-in-law, John and Jane Doe. Baby Doe's paternal uncle believed that John and Jane Doe were best suited to care for Baby Doe because they were a young, educated couple who lived in a larger, more cosmopolitan area, with better access to doctors and hospitals than the rural region of Afghanistan where he lived.

**ANSWER:** The Masts deny the allegations in Paragraph 72.

73.     Though they themselves were young newlyweds who had not yet had biological children, John and Jane Doe agreed to welcome Baby Doe into their family and raise her as their own child.

**ANSWER:** The Masts deny the allegations in Paragraph 73.

74.     John and Jane Doe provided everything for Baby Doe that a parent would provide, including food, milk, diapers, and arranging medical care. Most importantly, they loved Baby Doe like they would love their own biological child. After more than five months of living in a medical institution on a military base, Baby Doe was finally surrounded by the love of a family, with grandparents and young aunts and uncles who also adored her. Plaintiffs John and Jane Doe continued to raise Baby Doe as their first child for eighteen months, until the very moment of her abduction on September 3, 2021.

**ANSWER:** The Masts deny the allegations in Paragraph 74.

III.    **DEFENDANTS LURED PLAINTIFFS TO THE UNITED STATES UNDER FALSE PRETENSES.**

A.      Joshua and Stephanie Mast engaged Kimberley Motley to locate and contact John and Jane Doe in Afghanistan under the guise of offering medical care for Baby Doe in the United States, failing to disclose to the Does the custody and adoption orders the Masts had fraudulently obtained.

75.     Having failed to prevent Baby Doe's reunification with her biological family in Afghanistan, and having failed thus far to obtain physical custody of Baby Doe, Joshua and Stephanie Mast pursued a new strategy: convince Baby Doe's family to let her travel to the United States, where Joshua and Stephanie Mast could abduct her and raise her as their own child.

**ANSWER:** The Masts deny the allegations in Paragraph 75.

76.     In the fall of 2019, Joshua Mast and Stephanie Mast reached out to Kimberley Motley, a U.S. citizen and attorney who had worked in Afghanistan, to assist in their efforts to bring Baby Doe to the United States. Joshua Mast identified himself as a U.S. Marine stationed in Kabul who sought to remove Baby Doe from Afghanistan. He advised Motley that he and Stephanie Mast intended to adopt Baby Doe.

**ANSWER:** The Masts admit that they communicated with Kimberley Motley in the fall of 2019 a Marine stationed in Afghanistan after she had reached out to USFOR-A to serve as a guardian ad litem for the child. The Masts otherwise deny the allegations in Paragraph 76.

77.    Between October 25-27, 2019, Joshua Mast and Motley communicated numerous times through emails and phone calls to share information about a shared desire to remove Baby Doe from Afghanistan. In the course of their email exchange, Joshua Mast acknowledged that he needed approval from the Government of Afghanistan to obtain a visa for Baby Doe to travel to the United States.

**ANSWER:**  The Masts deny the allegations in Paragraph 77.

78.    Motley, who previously learned of Baby Doe through another U.S. servicemember and was representing herself as a "guardian ad litem" for Baby Doe (despite there being no court order naming her as such, and despite that Afghan law does not provide for "guardians ad litem"), asked the Government of Afghanistan to secure citizenship documentation for Baby Doe as an Afghan citizen, including a passport and "tashkira" (an Afghan identification document).

**ANSWER:**  The Masts admit that the former Afghan Government refused a U.S. backed request

to provide identity documents for the child so she could seek a visa to the United States. In addition,

Mrs. Motley is a well-known humanitarian lawyer that has represented underprivileged women

and children in Afghanistan at great personal risk on numerous occasions. In addition, Mrs. Motley

successfully assisted hundreds of at risk refugees flee the Taliban during the evacuation, including

John Doe and Jane Doe. The Masts otherwise lack knowledge or information sufficient to form a

belief about the truth of the allegations in Paragraph 78 and on that basis deny them.

79.    On February 27, 2020, the day the United States released Baby Doe to the Afghan Government and the ICRC for reunification with her family, Joshua Mast advised Motley that he needed help to "handle [Baby Doe's] situation privately" by locating her relatives, contacting them, offering them medical care, and then bringing the child out of Afghanistan to the United States, where the Masts had already successfully petitioned a Virginia Court for legal custody over the child.

**ANSWER:**  The Masts deny the allegations in Paragraph 79.

80.    That same day, Joshua Mast provided Motley with a copy of an official diplomatic communication from the Government of Afghanistan to an official with the U.S. Department of Defense, formally requesting the return of Baby Doe to their physical custody for reunification with her family in Afghanistan. By this time, Motley also had received a copy of the Masts' Juvenile Court order, which she knew was void because it was expressly conditioned on a waiver of jurisdiction from the Government of Afghanistan, and the

**JA246**

diplomatic communication that Mast sent her showed that the Government of Afghanistan was affirmatively asserting jurisdiction over Baby Doe, not waiving it.

**ANSWER:** The Masts lack knowledge or information sufficient to form a belief about the truth of the allegations related to Motley in Paragraph 80 and on that basis deny them. The Masts otherwise deny the allegations in Paragraph 80.

81.    In addition, in spite of her prior recognition that Baby Doe was an Afghan citizen, and her knowledge that the Government of Afghanistan had demanded her return for reunification with her family and that the United States had agreed, Motley agreed to work with the Masts as they implemented their plan.

**ANSWER:** The Masts lack knowledge or information sufficient to form a belief about the truth of the allegations related to Motley in Paragraph 81 and on that basis deny them. The Masts otherwise deny the allegations in Paragraph 81.

82.    Joshua Mast provided Motley with information he received about the identities of the people to whom Baby Doe was transferred. Motley used this information to find a contact who could connect her with John and Jane Doe.

**ANSWER:** The Masts lack knowledge or information sufficient to form a belief about the truth of the allegations related to Motley in Paragraph 82 and on that basis deny them. At the time, the Mast's were informed that the child was being turned over to an unvetted claimant that wished to remain anonymous, did not want to be DNA tested, and was likely ███████. The Masts were unaware of the identities of John Doe's father until December, 2021. The Mast's were unaware of John Doe and Jane Doe's name, identity or contact information until July 2021. The Masts otherwise deny the allegations in Paragraph 82.

83.    On or about March 6, 2020, just days after Baby Doe was united with her family, Motley called John Doe for the first time, pursuant to her agreement with, and at the direction of, Joshua and Stephanie Mast.

**ANSWER:** Mrs. Motley expressly declined to represent the Masts and did not act on their behalf. The Masts otherwise lack knowledge or information sufficient to form a belief about the truth of

the allegations related to Motley in Paragraph 83 and on that basis deny them. The Masts deny the

remaining allegations in Paragraph 83.

**84.    In their initial introductions to Motley in March 2020, John and Jane Doe described themselves to Motley as Baby Doe's "cousin," and "the wife of [John Doe] and the mother of [Baby Doe]," respectively.**

<u>ANSWER:</u>  The Masts lack knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 84 and on that basis deny them.

**85.    In a subsequent conversation that same day, Motley advised Jane Doe that she understood Baby Doe had serious medical issues and that Motley knew an American family who wanted to help her. Pursuant to her agreement with Joshua and Stephanie Mast, Motley did not disclose the Masts' custody order and interlocutory adoption order for Baby Doe, and did not disclose the Masts' intention to adopt Baby Doe or that the Masts had initiated court proceedings to do so.**

<u>ANSWER:</u>  The Masts lack knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 85 and on that basis deny them.

**86.    Five days later, the Masts filed a brief relating to their rejected TRO Petition, but did not disclose to the Court that they were in contact with John and Jane Doe through Motley or that Baby Doe was with her biological family and legal guardians in Afghanistan.**

<u>ANSWER:</u>  The Masts admit that they filed a brief but otherwise deny the allegations in Paragraph

86.

**87.    On March 22, 2020, Joshua Mast wired a $4,500 payment to Motley via PayPal and messaged her to confirm that she received the funds.**

<u>ANSWER:</u>  The Masts admit that they transmitted $4,500 to Mrs. Motley to support her work to

advocate for the best interests of the Child through her established charitable fund.

**88.    Motley continued to communicate with and befriend John and Jane Doe on behalf of the Masts over the course of more than a year, making multiple offers to assist with Baby Doe's medical care and occasionally asking for photographs of Baby Doe. Motley did so at the direction of Joshua and Stephanie Mast and received thousands of dollars to do so.**

<u>ANSWER:</u>  The Masts lack knowledge or information sufficient to form a belief about the truth

of the allegations related to Motley in Paragraph 88 and on that basis deny them. The Masts admit

that videos were requested to provide to the Child's pediatrician at the University of Virginia to diagnose the symptoms Jane Doe had described of her "shaking" at night and during the day, and her eyes "twitching." Contemporaneously, Joshua Mast also reached out to Kandahar Air Field to coordinate accepting the child to the hospital at that location to ensure she had appropriate medical care. The Masts otherwise deny the allegations in Paragraph 88.

**89.    Motley also continued to hide the identity of the person or people purportedly willing to help Baby Doe, or that Joshua and Stephanie Mast had obtained a custody order and an interlocutory adoption order for Baby Doe.**

**ANSWER:** The Masts lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 89 and on that basis deny them.

**90.    On July 30, 2020, and in response to one of Motley's requests for photos, Jane Doe sent her photographs of Baby Doe in swim trunks in a small wading pool.**

**ANSWER:** The Masts are aware of the photograph referred to in Paragraph 90 but otherwise lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 90 and on that basis deny them.

**B.    The Masts made additional misrepresentations to the Circuit Court to obtain a Final Order of Adoption of Baby Doe.**

**91.    At the same time Motley was communicating with and befriending John and Jane Doe at the behest of Joshua and Stephanie Mast, the Masts continued pursuing a final order of adoption in the Circuit Court.**

**ANSWER:** The Masts admit that they continued to purse a final adoption order in the Circuit Court to create a legal path to the United States before the Taliban took over Afghanistan. The Masts otherwise deny the allegations in Paragraph 91.

**92.    The Masts did so despite knowing that: (a) Baby Doe was in the custody of individuals determined by the Government of Afghanistan and ICRC to be her biological family and legal guardians under the laws of Afghanistan; (b) Joshua and Stephanie Mast had not obtained an order of custody or guardianship over Baby Doe in Afghanistan; (c) the Afghan government had asserted jurisdiction over Baby Doe; (d) this Court, the United States District Court for the Western District of Virginia, had characterized the Juvenile Court custody order as falsely premised upon the existence of a waiver of jurisdiction by the**

Afghan government; and (e) the DoD (Baby Doe's former custodian and Joshua Mast's employer) and the DoS (the agency that oversees intercountry adoptions) regarded the state court orders as "unlawful." Upon information and belief, the Masts intentionally failed to advise the Circuit Court of any of these facts.

**ANSWER:** The Masts deny the allegations in Paragraph 92.

93. On December 3, 2020, nine months after Baby Doe had been reunited with her family in Afghanistan, and as a direct result of the Masts' omissions and misrepresentations, the Circuit Court entered a final order of adoption for Joshua and Stephanie Mast, incorrectly finding that Baby Doe "remains up to this point in time an orphaned, undocumented, stateless minor," and therefore "has the legal identity granted by order of this Court as constituting her sole legal identity." At the time of the order, neither Joshua and Stephanie Mast, Richard Mast, nor anyone else had informed John Doe or Jane Doe of the pendency of those proceedings. Nor had anyone informed the United States – despite this Court's denial of Joshua and Stephanie Mast's request for a TRO, and despite Richard Mast's express representation to this Court (in the presence of United States' counsel) that Joshua and Stephanie Mast did not intend to adopt Baby Doe – that Joshua and Stephanie Mast had in fact continued to pursue Baby Doe's adoption.

**ANSWER:** The Masts admit the Fluvanna County Circuit Court entered a final adoption order, which placed the Child with the Masts—a place where she remains today. To the extent that the allegations in Paragraph 93 quote that order, that order speaks for itself and no response is required. Inasmuch as a response is required, the Mast deny the allegations in Paragraph 93.

**C.** **With the assistance of Osmani and Motley, Joshua Mast built a fraudulent relationship of trust with John and Jane Doe, offering to help obtain medical care in the United States for Baby Doe but never disclosing the Fraudulent Custody and Adoption Orders.**

94. After Joshua Mast met Ahmad Osmani in 2021 through a WhatsApp Bible study group, Osmani offered to help Joshua and Stephanie Mast bring Baby Doe to the United States so that they may raise her as their daughter.

**ANSWER:** The Masts were introduced to Mr. Osmani through a friend of their family as a person who could interpret both Pashto and Dari. Mr. Osmani acted in the capacity of an interpreter and translator during the course of his interactions with the Masts. The Masts otherwise deny the allegations in Paragraph 94.

95.   **On February 2, 2021, Stephanie Mast emailed Joshua Mast an altered photo of Baby Doe for use in obtaining an Afghan passport for Baby Doe. The photo was nearly identical to the photo of Baby Doe that Jane Doe sent to Kimberley Motley, see supra ¶ 90. However, the photo that Stephanie Mast emailed to Joshua Mast had been altered to add a shirt, remove the background content, and be reformatted as a passport photo. Joshua Mast forwarded Stephanie Mast's email and the altered photo to Ahmad Osmani to be conveyed to his contact in the Afghan passport office.**

**ANSWER:** The Masts admit the allegations in Paragraph 95. The Passport Office required a more modest photo of the child, and a digital shirt was added to the image, which was otherwise unaltered. Furthermore, John Doe and Jane Doe utilized the passport to identify the child with full knowledge of the Mast's claims while in the United States in 2021.

96.   **In March 2021, Osmani assisted Joshua and Stephanie Mast in obtaining a fake Afghan passport for Baby Doe. Joshua and Stephanie Mast wired more than $1,000 to Osmani, who then wired those funds to a contact in Afghanistan to pay for the procurement of the fake Afghan passport with a fake Americanized name that featured the Mast's last name.**

**ANSWER:** The Masts admit that a passport was issued by the former Government of Afghanistan within its territorial boundaries based on the child's U.S. documents and admitted medical needs. Furthermore, John Doe and Jane Doe utilized the child's U.S identity, including the child's military ID to themselves be evacuated from Afghanistan. In addition, the Doe's used the child's Afghan passport to identify the child with full knowledge of the Mast's claims while in the United States in 2021. Finally, the child has no legal identity beyond that provided by the United States. The Masts otherwise deny the allegations in Paragraph 96.

97.   **Osmani knew that Baby Doe was living with her biological family in Afghanistan. In fact, during his first encounter with Osmani and Joshua Mast, John Doe told Osmani and Joshua Mast that John Doe is Baby Doe's cousin. Osmani even identified John Doe as the child's cousin in the contact information Osmani stored in his phone for John Doe.**

**ANSWER:** The Masts admit that the word "cousin" appeared in Mr. Osmani's contacts, but it was included in scare quotes. The Masts otherwise lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 97 and on that basis deny them.

98.    On July 10, 2021, Motley offered for the first time to introduce John and Jane Doe to the American family supposedly interested in providing medical care for Baby Doe. Motley then facilitated a telephone conversation between John and Jane Doe and Joshua Mast, during which Ahmad Osmani provided interpretation. Mast told John and Jane Doe that he was familiar with Baby Doe's medical needs and warned them that, if Baby Doe did not receive medical care in the United States, she could be blind, brain damaged, and/or permanently physically disabled. In the course of their conversations, Mast claimed to be a volunteer in the U.S. military hospital who was responsible for her care while she was hospitalized there.

**ANSWER:**  The Masts admit that Joshua Mast spoke to John Doe for the first time on July 10, 2021. Furthermore, Joshua Mast explained to John Doe that his job was to ensure that only bad people were targeted by U.S. forces in Afghanistan, that Joshua Mast had volunteered to assist the doctors and nurses who had cared for the Child achieve her long-term best interests, that Joshua Mast and Stephanie Mast had volunteered to seek and had received legal responsibility for the child under U.S. law; that this was done because the Mast's believed the Child was a foreign child and had significant medical concerns; that the Child had all the documents necessary to fly internationally and leave Afghanistan; that the Child's pediatrician at the University of Virginia had clinical concerns based on the symptoms Jane Doe had reported and the Child's medical history of a skull fracture, fractured femur, and second degree burns on her face and neck. Furthermore, Joshua Mast explained that the Child's U.S. identity required the Mast's to treat the child equally as there other children, and that the U.S. identity entitled her to healthcare through Joshua Mast's employment, as well as college benefits. In addition, Joshua Mast repeatedly emphasized that Afghanistan was imminently collapsing to the Taliban, and that it was urgent to fly the Child out of Kabul before international flights were stopped. John Doe represented that he was a nurse and was aware of the child's clinical outcome if she did not receive the care she needed. He first asked if Joshua Mast could get him and his brother in law a visa to the United States, and when he was told that was not possible, represented to Joshua Mast that he thought the Child should come to the U.S. to live with the Masts, but that his father was responsible for the Child

and he would have to ask permission. Consistent with factual findings of the Virginia Circuit Court, the strongest words for legal responsibility over a child in Pashto were used to reference the Mast's legal relationship to the Child. On July 10, 2021, the Does fully understood that the Mast's believed the Child was foreign, that the Masts had accepted responsibility for the Child under U.S. law, and that the Masts were asking for the Child to be sent to the U.S. to live with them before the Taliban takeover on August 15, 2021. The Masts otherwise deny the allegations in Paragraph 98.

**99.    John Doe, who trained as a nurse in Afghanistan, was not aware of the medical issues that Mast described. But John and Jane Doe were concerned about the scarring on Baby Doe's face from the burns she sustained, Baby Doe's irregular gait due to the leg injury she sustained, and the severe allergic reactions of unknown origin that she seemed to periodically suffer.**

<u>ANSWER</u>:  The Masts lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 99 and on that basis deny them.

**100.    Mast insisted that Baby Doe would suffer serious, permanent harm if she were not brought to the United States for special treatment. In that initial conversation and in other subsequent conversations, Mast asked John and Jane Doe to send Baby Doe to the United States for medical treatment. They declined because they did not want to be separated from their daughter.**

<u>ANSWER</u>:  The Masts incorporate their response to Paragraph 98 and otherwise deny the allegation in Paragraph 100.

**101.    By July 2021, Jane Doe was in the third trimester of pregnancy and concerned about traveling to the United States. As a result, John and Jane Doe asked Mast if he would be willing to facilitate their taking Baby Doe to India or Pakistan for medical care, where he could pay doctors or hospitals directly, without providing any money to John and Jane Doe. Mast declined, insisting that hospitals in India and Pakistan did not have the specialists required to help Baby Doe.**

<u>ANSWER</u>:  The Masts deny the allegations in Paragraph 101.

**102.    Over time and over the course of other telephone conversations and written communications, Ahmad Osmani helped Joshua and Stephanie Mast foster a relationship of trust with John and Jane Doe. Osmani also had conversations with the Does on other occasions in which the Masts did not participate. Osmani routinely referred to John Doe as**

his "brother." John and Jane Doe trusted Osmani, an Afghan who spoke their native language, when he told them that the Masts were trustworthy people with no ulterior motives who just wanted to help Baby Doe receive medical care. Upon information and belief, Osmani maintained contact with John and Jane Doe and reported back to Joshua Mast at his direction about his conversations with the Does. Unbeknownst to John and Jane Doe, Osmani was not the impartial interpreter he made himself out to be. Rather, Osmani knew that the Masts intended to take Baby Doe from her biological family, and Osmani helped them do so.

**ANSWER:**  The Masts lack knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 102 and on that basis deny them.

103.    Joshua Mast also repeatedly referred to John Doe as his "brother" and insisted he only wanted to help Baby Doe obtain needed medical care. Based on the repeated warnings of Joshua and Stephanie Mast about Baby Doe's medical needs, and based on the repeated assurances by Osmani that the Masts were honest people who just wanted to help Baby Doe, John and Jane Doe began to fear that she would suffer long-term consequences if they did not obtain specialist care for her.

**ANSWER:**  The Masts lack knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 103 related to John and Jane Doe and on that basis deny them. The

Masts otherwise admit the allegations in Paragraph 103.

104.    Neither Joshua Mast, Stephanie Mast, Motley, nor Osmani disclosed to John and Jane Doe at this time that the Masts had (unsuccessfully) filed a legal action in the United States to prevent Baby Doe's reunification with her biological family and legal guardians in Afghanistan, or that the Masts had obtained an order of adoption for Baby Doe in a Virginia court. Instead, Joshua and Stephanie Mast misrepresented that they wanted to bring Baby Doe to the United States solely so that she could receive medical treatment and for the sake of doing something good.

**ANSWER:**  The Masts deny the allegations in Paragraph 104.

D.    As Afghanistan fell to the Taliban, John and Jane Doe believed that they might never have another chance to obtain necessary medical care for Baby Doe.

105.    In August 2021, as U.S. troops withdrew and the Taliban began to retake Afghanistan, Joshua and Stephanie Mast again reached out to John and Jane Doe to convince them to bring Baby Doe to the United States for medical treatment. Given the political situation in Afghanistan and the Taliban's advances, John and Jane Doe believed this could be their last and only chance to obtain medical care for Baby Doe. As a result, they advised

Joshua Mast that they were considering his proposal, but were concerned that they would not be able to return to Afghanistan.

**ANSWER:** The Masts admit that Joshua Mast told John Doe that Afghanistan was collapsing in July and August 2021. Immediately after John Doe informed the Masts that the Taliban had forbidden the Child from going to American, the historical evacuation commenced. Prior to this event, there was no foreseeable way for John Doe or Jane Doe to leave Afghanistan, and the entire conversation surrounded sending the Child to live with the Masts before the Taliban took over Afghanistan. The Masts deny that John Doe ever mentioned returning to Afghanistan or medical care for the Child as his motivation for leaving Afghanistan. Rather, John Doe represented that there was "no hope in Afghanistan" and inquired how he could be employed, how much money he could make, and what life was like in America. The Masts otherwise deny the allegations in Paragraph 105.

106.     Joshua Mast and Ahmad Osmani assured them that they would need to be in the United States for Baby Doe's medical care for only two or three months and that they would then be able to re-enter Afghanistan without issue. Again, Joshua Mast and Ahmad Osmani failed to inform John and Jane Doe about the adoption order he and his wife and brother had fraudulently obtained from a Virginia court or their previous attempts to prevent Baby Doe from being reunited with her biological family and legal guardians in Afghanistan. Rather, Mast and Osmani continued to misrepresent that the Masts merely wanted to bring Baby Doe to the United States solely to provide her with medical care.

**ANSWER:** The Masts deny the allegations in Paragraph 106.

107.     In reliance on Joshua Mast's misrepresentations regarding the purpose and duration of their travel, as well as their ability to return to Afghanistan, ignorant of Mast's and his wife's true intentions, and in reliance on Osmani's reassurances, John and Jane Doe agreed to travel to the United States for the purpose of obtaining medical care for Baby Doe.

**ANSWER:** The Masts deny the allegations in Paragraph 107.

**E.    Joshua Mast and Richard Mast filed a fraudulent immigration application for John Doe and made false statements to USCIS, without John Doe's knowledge or consent.**

**108.    Joshua Mast informed John and Jane Doe that he would prepare immigration paperwork for them and Baby Doe to permit them to enter the United States for the purpose and duration of Baby Doe's medical care.**

<u>ANSWER:</u>  The Masts deny the allegations in Paragraph 108.

**109.    In fact, Mast did not file the appropriate immigration paperwork for John and Jane Doe and Baby Doe for the purpose of having them visit the United States for a short duration to obtain medical care for Baby Doe. Instead, on August 20, 2021 and unbeknownst to John and Jane Doe, Richard Mast emailed U.S. Citizenship and Immigration Services ("USCIS") a Form I¬360 Petition for Plaintiff John Doe. Upon information and belief, the form was prepared at the direction of Joshua and Stephanie Mast by Natalie Osmani, Ahmad Osmani's wife. Ms. Osmani signed the petition as its preparer, but listed Defendant Joshua Mast as the person acting on behalf of the petitioner, and provided Mast's North Carolina home address as a mailing address.**

<u>ANSWER:</u>  The Masts deny the allegations in Paragraph 109.

**110.    In addition, Ms. Osmani wrote by hand the following visa category: "Special Immigrant Afghanistan national escorting military dependent." Not only does no such visa category exist, but it was false to claim that John Doe would be escorting a U.S. "military dependent" when the United States had by this time represented to this Court that it did not recognize any custodial relationship between Joshua Mast, Stephanie Mast and Baby Doe.**

<u>ANSWER:</u>  The Masts admit that they obtained a military ID card for the Child, which John Doe

used to be evacuated from Afghanistan by U.S. Special Forces from behind Taliban lines. The

Masts otherwise deny the allegations in Paragraph 110.

**111.    Upon information and belief, John and Jane Doe nonetheless were placed on a list of potential evacuees with pending Special Immigrant Visa Applications as a result of the petition.**

<u>ANSWER:</u>  The Masts lack knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 111 and on that basis deny them.

**112.    In his August 20, 2021, email to the USCIS, Richard Mast falsely wrote: "[John and Jane Doe] are helping US DoD at great risk to themselves, and have cared for a minor DoD dependent child ([Baby Doe]) who has serious medical needs."**

<u>ANSWER:</u>  The Masts admit that Richard Mast wrote the quoted email but deny that it was false.

113.    Of course, by then Baby Doe was not a "minor DoD dependent child," because she had been returned to her family in the exercise of the Government of Afghanistan's jurisdiction. Instead, John and Jane Doe were by then Baby Doe's legal guardians, raising her as their own child; they were not "caring" for her on behalf of Joshua and Stephanie Mast, the DoD, or anyone else. Nor were they doing so as a "service to the US Government."

**ANSWER:** The Masts deny the allegations in Paragraph 113.

114.    In another email to USCIS seeking the evacuation of Ahmad Osmani's siblings to the United States, Richard Mast wrote that Osmani's siblings were the "family of an Afghan pastor" who had been "very instrumental to helping a US Marine" represented by Liberty Counsel "adopt an Afghan child." Upon information and belief, the reference to a "US Marine" is a reference to Joshua Mast, and the reference to "an Afghan child" is a reference to Baby Doe.

**ANSWER:** The Masts lack personal knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 114 and on that basis deny them.

115.    John and Jane Doe were not aware of the misrepresentations being made by Richard Mast, on behalf of Joshua and Stephanie Mast, about them and Baby Doe.

**ANSWER:** The Masts deny the allegations in Paragraph 115.

116.    The Does traveled to Kabul on August 23, 2021, to spend the night there with Osmani's parents and siblings, at the direction of Joshua Mast and Osmani. The next morning, the Does traveled to Hamid Karzai International Airport as part of the evacuation efforts under Operation Allies Refuge. Osmani's siblings accompanied them.

**ANSWER:** The Masts deny that the Does were not fully informed and acting on their own volition to flee Afghanistan. In addition, John Doe was comminating with the Special Operations Task Force he was aware had been tasked with evacuating the Child to America and had informed John Doe they would "take the child" when he arrived in Kabul. Only through Joshua Mast's affirmative efforts were the Does able to evacuate with the Child after Joshua Mast personally ensured the operators were aware that the Does were at risk of being murdered by the Taliban if they were not evacuated. The Masts otherwise lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 116 and on that basis deny them.

117.    Between August 24 and August 26, 2021, Joshua Mast and Osmani continued to communicate with John and Jane Doe over WhatsApp as they transited from Afghanistan to the United States through Qatar and Germany.

**ANSWER:**  The Masts admit that Joshua Mast communicated with John and Jane Doe while they were transited from Afghanistan to Qatar and Germany, and that John and Jane Doe were only able to enter the United States due to the Masts' efforts.

118.    Again, Joshua Mast and Osmani failed to inform John and Jane Doe about the adoption order that Joshua and Stephanie Mast had obtained from a Virginia court or their previous attempts to prevent Baby Doe from being reunited with her biological family and legal guardians in Afghanistan. Rather, they continued to misrepresent that the Masts wanted to bring Baby Doe to the United States only to provide her with medical care.

**ANSWER:**  The Masts deny the allegations in Paragraph 118.

F.    Joshua Mast told John and Jane Doe he was their lawyer and facilitated their entry into the United States.

119.    On August 26, 2021, as Plaintiffs were in transit to the United States, Joshua Mast sent a WhatsApp voice note to Jane Doe, instructing her to tell anyone who asks that he was their lawyer. He also sent her a text stating:

> If anyone asks to talk about your documents, show them this text: I am Major Joshua Mast, USMC. I am a Judge Advocate with MARSOC, and I am here at Ramstein to provide this group of 6 pax with their original documents and escort them through the process. MARSOC coordinated a JSOC operation to extract them to Kabul airport three days ago, and I am tracking them down for the above purpose.

**ANSWER:**  The Masts deny the allegations in Paragraph 119.

120.    At approximately the same time, Mast left John Doe a voice message, assuring him he would get them to the United States, and stating:

> [I]f someone tries to talk about documents, we want to come and show them all the forms that we filed for you all to get to America instead of staying here in Germany. So before you talk to them about it, say "we have a lawyer here to talk with you about that for us" and that's me. Just show them the text and have them call me.

**ANSWER:**  The Masts admit Joshua Mast repeatedly told immigration and military authorities that the Does had disobeyed the Taliban by bringing the child to U.S. forces against the Taliban's orders and that Jane Doe should be expedited through the process so she could deliver her child in a safe location. The Masts further admit that Joshua Mast conveyed these efforts to John Doe.

121.    When Plaintiffs landed at Ramstein Airforce Base in Germany, Joshua and Stephanie Mast met them. During their brief stop in Germany, Joshua and Stephanie Mast visited Plaintiffs' room three times, repeatedly trying to convince John and Jane Doe to allow Baby Doe to travel separately with the Masts, insisting that it would be easier for the toddler to enter the United States that way. John and Jane Doe repeatedly refused, as they did not want to leave Baby Doe in anyone else's care. Osmani provided interpretation over the telephone.

**ANSWER:**  The Masts admit that Joshua Mast communicated with John and Jane Doe while they were transited from Afghanistan to Qatar and Germany and that John and Jane Doe were only able to enter the United States due to the Masts' efforts. The Masts otherwise deny the allegations in Paragraph 121.

122.    Before leaving Germany, John Doe informed Joshua and Stephanie Mast of a promise John Doe had made to Jane Doe: that Baby Doe would never leave her side while they were in the United States. There can be no doubt that Joshua and Stephanie Mast were aware that John and Jane Doe understood they would have control over Baby Doe's location and custody while in the United States, and that they intended to continue to care for her as their daughter.

**ANSWER:**  The Masts admit that John Doe first revealed the collateral promise he made to Jane Doe after the Does were safely out of Afghanistan. Neither John Doe nor Jane Doe made any reference to any sort of parental or legal claim to custody or control of the Child at that time or at

35

**JA259**

any other time; rather, John Doe represented to Joshua Mast both before and after this conversation that his wife was attached to the Child but would be fine with the Child's living with the Masts once her own child was born. The Masts otherwise deny the allegations in Paragraph 122.

**123.    During a conversation in Germany, Jane Doe told Stephanie Mast that she could not live without Baby Doe and that, given all that Baby Doe had been through, Baby Doe meant even more to Jane Doe than her own yet-to-be-born child.**

**ANSWER:** The Masts admit that Jane Doe and Stephanie Mast spoke about Jane Doe's feelings toward the Child. Jane Doe stated she did not love her own unborn child, and that she loved the Child more than she loved John Doe. These statements were unsettling and disturbing to Stephanie Mast. The Masts otherwise deny the allegations in Paragraph 123.

**124.    Again, the Masts and Osmani failed to fully inform John and Jane Doe about the adoption order that the Masts obtained from a Virginia court or their previous attempts to prevent Baby Doe from being reunited with her biological family and legal guardians in Afghanistan. Rather, the Masts and Osmani continued to misrepresent that they only wanted to bring Baby Doe to the United States to provide her with medical care.**

**ANSWER:** The Masts deny the allegations in Paragraph 124.

**G.    Despite repeatedly representing to Virginia and federal courts that she was not Afghan and had no nationality, Joshua and Stephanie Mast used the Afghan passport they fraudulently obtained for Baby Doe, with Osmani's assistance, to bring Baby Doe to the United States.**

**125.    After several days of grueling travel, which were especially hard on Jane Doe, who was eight months pregnant, the Does and the Osmani siblings arrived at Dulles International Airport on August 29, 2021. Joshua Mast met the families while they waited in line for inspection, pulled them out of the line, and took them directly to an inspecting officer. There, they presented their identity documents.**

**ANSWER:** The Masts admit that the Does and the Osmanis arrived at Dulles Airport on August 29, 2021, and that Joshua Mast was there. The Masts otherwise deny the allegations in Paragraph 125.

**126.    John Doe presented his Afghan passport to the inspecting officer, and Jane Doe presented her Afghan ID. They then explained to the inspecting officer that Baby Doe had not yet received an identification document, as it was customary in Afghanistan to**

**JA260**

procure one only when the child was old enough to attend school. At the time, Baby Doe was two years old.

**ANSWER:** The Masts deny the allegations in Paragraph 126.

127. **To their surprise — and despite his representations to multiple courts that Baby Doe was not Afghan and had no nationality — Joshua Mast then handed an Afghan passport for Baby Doe to the inspecting officer. John and Jane Doe had never before seen this passport and did not procure it themselves. When the officer returned the passport to John and Jane Doe, they were shocked to see that the photograph in the passport appeared to be the same photograph that Jane Doe sent to Motley via WhatsApp on July 30, 2020, of Baby Doe in swim trunks in a small wading pool, but it had obviously been altered.**

Original Photo                    Passport Photo

[REDACTED]                        [REDACTED]

**ANSWER:** The Masts admit that Joshua Mast presented the Afghan passport to government officials, along with other documents. The Child was paroled into the United States using her military ID. Joshua Mast provided the passport, along with copies of all of the Child's original documents he had promised (on video) to bring when he attempted to fly to Kabul. John and Jane Doe subsequently used the Child's only identity documents for their intended purpose—to verify the Child's identity. John Doe and Jane Doe had previously been informed on July 10, 2021 that the Child had all the necessary documents to fly internationally from Kabul and leave Afghanistan. The Masts otherwise deny the allegations in paragraph 127.

128. **The altered picture had a different background, a shirt covering Baby Doe's shoulders and chest, and eliminated some stray hairs so it was less obvious that her hair was wet.**

**ANSWER:** The Masts incorporate the answer to paragraph 95 of the complaint and otherwise deny the allegations in Paragraph 128.

129. **Upon information and belief, the alteration of the photograph for use in the passport was done by, or at the direction of, both Joshua and Stephanie Mast.**

**ANSWER:** The Masts admit they procured a passport to help the Child and John and Jane Doe escape Afghanistan. The Masts otherwise deny the allegations in Paragraph 129.

**130.** Upon information and belief, the procurement of a fake Afghan passport for Baby Doe was orchestrated by Osmani. Osmani identified, communicated with, and, at the direction of Joshua and Stephanie Mast, paid an Afghan government official to create a passport for a child that Joshua Mast, Stephanie Mast, and Osmani claimed to the Circuit Court and this Court was not Afghan. The fake Afghan passport also identified Baby Doe with a fake name: an American name and the Mast's last name.

**ANSWER:** The Masts admit they procured a passport to help the Child and John and Jane Doe escape Afghanistan. The Masts otherwise deny the allegations in Paragraph 130.

**131.** John and Jane Doe were stunned to see that the name on the passport was "[REDACTED] Mast."

**ANSWER:** The Masts deny the allegations in paragraph 131 on the basis that the Does had previously also used the Child's U.S. identity as a dependent of Joshua Mast to leave Afghanistan.

**132.** When John and Jane Doe asked Joshua Mast why the name on the passport was incorrect, he told them to keep quiet and that it was just to make it easier to get medical care for Baby Doe.

**ANSWER:** The Masts deny the allegations in Paragraph 132.

**133.** After screening at the airport, Plaintiffs were paroled into the United States, which permits them to lawfully remain in the United States through August 28, 2023. They ultimately were transported to refugee housing at Fort Pickett, in Blackstone, Virginia, the location that Joshua Mast instructed them to request.

**ANSWER:** The Masts admit that John and Jane Doe were paroled in the United States and ultimately were sent to Fort Pickett, Virginia. This was after Jane Doe called Joshua Mast and told him they were being deported to Mexico via a bus. Joshua Mast spoke to the American personnel, again explained that the Does had disobeyed the Taliban and could not be deported, and requested they be sent to Fort Pickett, as it was the closest location to Joshua Mast's duty station. The Masts otherwise deny the allegations in Paragraph 133.

**JA262**

H.    **Joshua and Stephanie Mast abducted Baby Doe.**

134.    **Five days later, on September 3, 2021, John and Jane Doe were instructed that they would be moving to another housing unit on the base. They were escorted to a van, in which a woman sat in the last row with an infant car seat next to her. Baby Doe was placed in the infant car seat.**

**ANSWER:** The Masts lack knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 134 and on that basis deny them.

135.    **But the Does were not transported to another housing unit on the base. Instead, they were taken to a building where the woman in the car picked up Baby Doe and held her while instructing John and Jane Doe to walk to the front of the building. There, they met another unknown woman who later informed them she was a social worker from the DoS.**

**ANSWER:** The Masts lack knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 135 and on that basis deny them.

136.    **Inside the building, they were met by the social worker, a Pashto interpreter, and the woman from the car, who continued to hold Baby Doe. The social worker then informed John and Jane Doe that they were not Baby Doe's lawful guardians and that Joshua Mast had adopted the child.**

**ANSWER:** The Masts lack knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 136 and on that basis deny them.

137.    **John and Jane Doe did not understand what "adoption" meant, as guardianship and kinship care in Afghanistan are not understood in the same way as adoption in the U.S. legal system. John and Jane Doe did understand, though, that Baby Doe would not be permitted to return to their housing unit with them, but that Joshua Mast would be taking her with him.**

**ANSWER:** The Masts lack knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 137 and on that basis deny them.

138.    **When Joshua Mast entered the room, Jane Doe, who was more than eight months pregnant, fell to the ground crying and begging for him not to take Baby Doe. The**

woman holding Baby Doe removed her from the room, against John and Jane Doe's objections, and gave her to Stephanie Mast, who was waiting outside.

**ANSWER:** The Masts admit that Joshua Mast came to the room at the Does' request out of concern for John Doe's representation that Jane Doe was attached to the Child but would be fine when her own child was born. Prior to this occasions, the Masts expressly advised John Doe and Jane Doe that they, the Masts, were legally responsible for the Child and would not be allowed to abandon her under U.S. law. John Doe appeared to be vacillating between what he had represented to the Masts, and what he had apparently represented to his wife to induce her to come to the United States. It was unclear at whom Jane Doe's anger was directed, and she did not address Joshua Mast directly during this brief interaction. Joshua Mast was directed to leave the room by the American personnel in authority prior to the Child's or the Does' leaving the room. The Masts otherwise deny the allegations in Paragraph 138.

**139.** **John Doe pleaded with Joshua Mast to act like the "brother" that he had promised to be to them. Joshua Mast refused, leaving John and Jane Doe in tears as he and Stephanie Mast abducted Baby Doe. John and Jane Doe have not seen their daughter since that day.**

**ANSWER:** The Masts admit that John Doe and Jane Doe asserted that Jane Doe was emotionally attached to the Child. The Does never referred to the Child as their daughter, or asserted any sort of legal claim to the child in Afghanistan, Germany, or Fort Pickett. The Masts otherwise deny the allegations in Paragraph 139.

**I.** **John and Jane Doe suffer severe emotional distress as a result of the trauma of having Baby Doe taken from them.**

**140.** **Bewildered and in despair, John and Jane Doe returned to their housing unit on the base. The next day, they contacted Joshua Mast and asked why he had taken their child. Mast responded that he had been instructed to pick up Baby Doe or she would be sent to an orphanage. He did not say who instructed him or mention the adoption order he and his wife had fraudulently obtained more than a year earlier.**

**ANSWER:** The Masts deny the allegations in Paragraph 140.

40

**JA264**

**141.** In a conversation with Joshua Mast and Richard Mast approximately two weeks later, Joshua Mast and Richard Mast again failed to disclose the adoption order, but instead told the Does that they currently were not able to properly care for Baby Doe at Fort Pickett and were not financially stable enough to provide for her. But, they told John and Jane Doe, after the Does leave the base, got jobs, and were financially stable, they would discuss Baby Doe's status with the Does. At no point during this conversation did either Joshua Mast or Richard Mast refer to Baby Doe as the child of Joshua and Stephanie Mast or discuss the adoption order.

**ANSWER:** The Masts deny the allegations in Paragraph 141.

**142.** Over the next few weeks, John and Jane Doe attempted to maintain a connection with Joshua Mast over WhatsApp, hoping that he might allow them to see Baby Doe. They repeatedly begged him to allow them to see Baby Doe or at least speak with her, but he repeatedly refused. At the same time, just one month after having abducted Baby Doe, Joshua Mast took her to visit strangers at Liberty University so that they could meet her.

**ANSWER:** The Masts admit that they had previously invited the Does to be as involved in the Child's life as they wanted, but later changed their position. After that initial invitation, the Does did not reach out for over a year. In the last text conversation Jane Doe had with the Masts, she was invited to schedule a time to facetime the Child. The Does subsequently requested to live near the Masts and asked for and received hundreds of dollars' worth of fresh food and supplies, including a gift basket for their newly born child. The Masts otherwise deny the allegations in Paragraph 142.

**143.** John and Jane Doe were afraid of Mast, as he appeared to have lied to numerous government agencies about Baby Doe and gotten away with it. Mast abducted their child in broad daylight but appeared to face no consequences. They were afraid of angering him, believing that, if he could steal their child and get away with it, he could harm them, too.

**ANSWER:** The Masts lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 143 related to John and Jane Doe and on that basis deny them. The Masts otherwise deny the allegations in Paragraph 143.

**144.** Ahmad Osmani maintained frequent contact with the Does, who pleaded with him to help them get their child back. But Osmani continued to manipulate the Does, telling

them that he wanted to help them when instead he was acting solely in furtherance of the Masts' scheme to abduct Baby Doe. For example, in the days after the abduction, the Does repeatedly asked Osmani for help in retaining a lawyer or contacting other public officials in the United States for help in getting their child back. But Osmani warned the Does that they must not seek legal help, that lawyers will defraud them, that this issue must be resolved directly with the Masts and that, regardless, no court would return the child to them because the court would see that the Masts had more money than them. Upon information and belief, Osmani attempted to dissuade the Does from seeking legal recourse at the direction of Joshua Mast, and reported his conversations back to Joshua Mast.

**ANSWER:** The Masts lack knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 144 and on that basis deny them.

145.    Even though he knew that the Masts now claimed to be Baby Doe's adoptive parents and that the Masts had no intention of returning the child to the Does, Osmani suggested that if the Does kept in contact with the Masts, the Masts might be willing to return the child after the Does left the military base.

**ANSWER:** The Masts lack knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 145 and on that basis deny them.

146.    John Doe continuously sought help from various agencies at Fort Pickett to help retrieve Baby Doe. Eventually, on September 18, 2021, an interpreter on the base with whom John and Jane Doe shared their story explained the meaning of "adoption" to them. This was the first time John and Jane Doe understood that Joshua and Stephanie Mast had been lying to them all the time and had no intention of returning Baby Doe to them.

**ANSWER:** The Masts lack knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 146 and on that basis deny them.

147.    As a direct result of the decline of Jane Doe's mental health and the traumatic experience of losing Baby Doe, John Doe was afraid to leave Jane Doe alone in their room. He often asked other women in their building to keep an eye on her if he needed to be out of the room. Despite being in the ninth month of her pregnancy, Jane Doe no longer wanted to eat or drink, and she could not sleep. Both she and her husband were devastated and depressed.

**ANSWER:** The Masts lack knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 147 and on that basis deny them.

148.    Jane Doe delivered her baby on October 1, 2021. Unfortunately, despite the joy of bringing a new child into this world, Jane Doe's depression deepened as it became increasingly clear that Joshua and Stephanie Mast would never voluntarily return Baby Doe

to them. By November 5, 2021, Jane Doe had become suicidal and was taken to the Stress Clinic on Fort Pickett for treatment.

**ANSWER:** The Masts lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 148 and on that basis deny them.

149. In November 2021, Jane Doe messaged Kimberley Motley to inform her that the Masts, whom Motley had introduced to the Does, had abducted Baby Doe, and pleaded with Motley to help her. Motley did not respond.

**ANSWER:** The Masts lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 149 and on that basis deny them.

150. As a direct result of Joshua and Stephanie Mast's intentional and forcible removal of Baby Doe, John and Jane Doe have been unable to exercise their parental rights as Baby Doe's biological family and legal guardians.

**ANSWER:** The Masts deny that Jane Doe and John Doe are biologically related to the Child, or that they are legal guardians of the child under any theory of Afghan law. Paragraph 150 otherwise asserts legal conclusions to which no response is required. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 150.

151. As a result of Joshua and Stephanie Mast's intentional and outrageous conduct, namely the abduction of Baby Doe in their presence, John and Jane Doe have experienced extreme emotional distress.

**ANSWER:** Paragraph 151 asserts legal conclusions to which no response is required. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 151.

**J.     John and Jane Doe petitioned to vacate the Adoption Order, and the United States confirmed that Baby Doe was not a "stateless minor" but under the jurisdiction of Afghanistan, and confirmed that the United States transferred physical custody of Baby Doe to Afghanistan in the Executive Branch's exclusive authority over foreign affairs.**

**152.    In December 2021, John and Jane Doe initiated proceedings in the Fluvanna Circuit Court to vacate the Adoption Order. In March 2022, by order of the Circuit Court, John and Jane Doe filed a new petition under a new case caption.**

**ANSWER:** The Masts admit the allegations in Paragraph 152 and note that those proceedings are

ongoing.

**153.    On August 22, 2022, the United States filed a 21-page Statement of Interest (the "SOI"), with supporting declarations, pursuant to 28 U.S.C. § 517 (attached as Exh. 1). Consistent with the positions taken by the United States before this Court in response to the Masts' TRO Petition, the SOI explicitly confirms the position of the United States that Baby Doe was not a "stateless minor" but was instead an Afghan citizen subject to the jurisdiction of Afghanistan; that the Government of Afghanistan never waived jurisdiction over her but, in fact, affirmatively asserted jurisdiction over Baby Doe; and that, in the exercise of its exclusive authority over foreign affairs, the United States transferred physical custody of Baby Doe to the Government of Afghanistan so that she could be reunified with her family, as identified by the Afghan government. The United States further took the position in the SOI that a state court cannot usurp or contradict the decisions made by the United States with regard to foreign affairs.**

**ANSWER:** The Masts admit the United States DOJ filed a Statement of Interest. To the extent

that the allegations in Paragraph 153 quote that document, the document speaks for itself and no

response is required. Inasmuch as a response is required, the Mast deny the allegations in

Paragraph 153.

## CLAIMS FOR RELIEF

## COUNT I

### TORTIOUS INTERFERENCE WITH PARENTAL RIGHTS
### (AGAINST ALL DEFENDANTS)

**154.    Plaintiffs repeat and re-allege all the allegations set forth in the foregoing Paragraphs as if fully set forth and restated here.**

**ANSWER:** The Masts incorporate their responses to the allegations contained in the preceding paragraphs as if fully set forth herein.

**155.    As the biological family and legal guardians of Baby Doe, John and Jane Doe have parental rights to and in their relationship with Baby Doe. The right of parents or guardians to develop and to maintain a relationship with their child is a fundamental right recognized by the United States Supreme Court and federal law. Further, the U.S. government recognized that the Does' parental and custodial rights to Baby Doe fell under the jurisdiction of Afghanistan and are recognized under the laws of Afghanistan.**

**ANSWER:** Paragraph 155 asserts a legal conclusion, so no response is required. The Masts further note that the Court dismissed this claim. *See* ECF No. 455 at 96–97. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 155.

**156.    This Court concurred with the DOJ that sole jurisdiction over the custody of Baby Doe was a matter for the courts and Government of Afghanistan, which had expressly asserted its jurisdiction over Baby Doe.**

**ANSWER:** Paragraph 156 asserts a legal conclusion, so no response is required. The Masts further note that the Court dismissed this claim. *See* ECF No. 455 at 96–97. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 156.

**157.    Upon information and belief, each of the Defendants was aware that John and Jane Doe were the lawful guardians of Baby Doe as determined by the Government of Afghanistan. Each of the Defendants was aware John and Jane Doe had maintained physical custody of Baby Doe.**

**ANSWER:** The Masts deny the allegations in Paragraph 157. The Masts further note that the Court dismissed this claim. *See* ECF No. 455 at 96–97.

45

**JA269**

158.   Notwithstanding this knowledge, each of the Defendants intentionally and willfully used improper, unethical and fraudulent means to preclude John and Jane Doe from continuing their parental relationship with Baby Doe and interfered with their parental rights, permanently depriving them of those rights.

**ANSWER:**   Paragraph 158 asserts a legal conclusion, so no response is required. The Masts further note that the Court dismissed this claim. *See* ECF No. 455 at 96–97. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 158.

159.   Defendants' actions as set forth above have resulted in the violation of these rights, causing John and Jane Doe harm for which they seek compensation.

**ANSWER:**   Paragraph 159 asserts a legal conclusion, so no response is required. The Masts further note that the Court dismissed this claim. *See* ECF No. 455 at 96–97. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 159.

160.   Defendants are jointly and severally liable for the harm to Plaintiffs as articulated above.

**ANSWER:**   Paragraph 160 asserts a legal conclusion, so no response is required. The Masts further note that the Court dismissed this claim. *See* ECF No. 455 at 96–97. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 160.

## COUNT II

### FRAUD
### (AGAINST DEFENDANTS JOSHUA AND STEPHANIE MAST AND KIMBERLEY MOTLEY)

161.   Plaintiffs repeat and re-allege all the allegations set forth in the foregoing Paragraphs as if fully set forth and restated here.

**ANSWER:**   The Masts incorporate their responses to the allegations contained in the preceding paragraphs as if fully set forth herein.

162.   Joshua and Stephanie Mast and Kimberley Motley intentionally made misleading and false statements and/or material omissions to John and Jane Doe to perpetrate the abduction of Baby Doe.

**ANSWER:**   The Masts deny the allegations in Paragraph 162.

163.    Joshua and Stephanie Mast engaged the services of Motley, who acted as their agent, to, inter alia, contact John and Jane Doe and lure them into facilitating Baby Doe's travel to the United States, purportedly for the sole purpose of obtaining medical treatment for her, through false and misleading statements and material omissions.

**ANSWER:**  The Masts deny the allegations in Paragraph 163.

164.    Upon information and belief, Joshua and Stephanie Mast, through their agent Motley, procured the identities and location of John and Jane Doe, as well as photographs of Baby Doe procured from John and Jane Doe via WhatsApp.

**ANSWER:**  The Masts deny the allegations in Paragraph 164.

165.    John and Jane Doe relied on Motley's misrepresentations, which she made at the direction of Joshua and Stephanie Mast, when they communicated with her, sent her photographs of Baby Doe, and agreed to travel to the United States for what the Does thought was the sole purpose of obtaining medical treatment for Baby Doe.

**ANSWER:**  The Masts deny the allegations in Paragraph 165.

166.    One of the photographs that Joshua and Stephanie Mast obtained from John and Jane Doe through Motley, under false pretenses, was digitally altered to create the fraudulently obtained identification documents used to bring Baby Doe into the United States.

**ANSWER:**  The Masts deny the allegations in Paragraph 166.

167.    It was as a direct result of John and Jane Doe's reliance on Joshua and Stephanie Mast's prevarications, made through Motley, that Joshua and Stephanie Mast were able to lure Plaintiffs to the United States and unlawfully obtain physical custody of Baby Doe.

**ANSWER:**  Paragraph 167 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 167.

168.    On July 10, 2021, as well as in subsequent conversations, Joshua and Stephanie Mast, with the assistance of Motley, intentionally misrepresented to John and Jane Doe that their sole intention was to procure medical assistance for Baby Doe, and that it was in the Does' best interest to send Baby Doe to the United States. Joshua and Stephanie Mast also intentionally withheld from John and Jane Doe any information or notice of the court proceedings they had initiated for Baby Doe in Virginia.

**ANSWER:**  The Masts deny the allegations in Paragraph 168.

169.    On August 26, 2021, and in furtherance of the Masts' unlawful scheme to take Baby Doe from John and Jane Doe, Joshua Mast represented to John and Jane Doe that he was their attorney.

<u>ANSWER</u>:  The Masts deny the allegations in Paragraph 169.

170.    Shortly thereafter, while John and Jane Doe were in Germany awaiting their final flights to the United States, Joshua and Stephanie Mast came to their room three times and again made misrepresentations to them, reiterating that they wanted to take Baby Doe to the United States for the sole purpose of obtaining medical treatment for her. Further, Joshua and Stephanie Mast falsely stated that Baby Doe should travel with them, separately from the Does, because they were simply trying to make it easier for Baby Doe to enter the United States. Instead, their true intention was to unlawfully and permanently take physical custody of Baby Doe.

<u>ANSWER</u>:  The Masts deny the allegations in Paragraph 170.

171.    On September 3, 2021, Joshua Mast arranged for John and Jane Doe and Baby Doe to be moved to another building at Fort Pickett and revealed to John and Jane Doe for the first time that he had adopted Baby Doe. He then utilized this opportunity to remove Baby Doe from their custody.

<u>ANSWER</u>:  The Masts deny the allegations in Paragraph 171.

172.    John and Jane Does' reasonable reliance on this pattern of deception allowed Joshua and Stephanie Mast, through their agent Motley, to obtain the photographs necessary to procure fraudulently obtained identification documents, travel permissions, and erroneously granted custodial and adoption decisions necessary to effect this abduction.

<u>ANSWER</u>:  Paragraph 172 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 172.

173.    As a result of repeated material misrepresentations by the Masts and Motley, John and Jane Doe and Baby Doe traveled to the United States and subjected themselves to the controlled environment of a military base that Joshua Mast manipulated to his advantage to abduct Baby Doe in broad daylight.

<u>ANSWER</u>:  Paragraph 173 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 173.

174.    In reliance on the representation that they were only traveling to the United States for two to three months to obtain medical care for Baby Doe, after which they would return with Baby Doe to Afghanistan, John and Jane Doe left their homeland, to which they cannot yet return, and may never be able to return, because of the circumstances surrounding their departure. Specifically, John and Jane Doe fear that the current

Afghanistan government will be quick to assume they are U.S. military collaborators — consequently, they fear they or their family will be shunned or targeted by the government, or by others in their community.

**ANSWER:** Paragraph 174 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 174.

175. **Had John and Jane Doe been aware that the purpose of the communications initiated by Joshua and Stephanie Mast and Motley was to facilitate the Masts' abduction of Baby Doe, they never would have communicated with Motley, shared photographs of Baby Doe, or traveled to the United States at the behest of Joshua and Stephanie Mast.**

**ANSWER:** The Masts deny the allegations in Paragraph 175.

176. **Had John and Jane Doe been aware that Joshua and Stephanie Mast had fraudulently obtained orders of custody and adoption for Baby Doe, they never would have communicated with Motley, shared photographs of Baby Doe, or traveled to the United States at the behest of Joshua and Stephanie Mast.**

**ANSWER:** The Masts deny the allegations in Paragraph 176.

177. **Had John and Jane Doe been aware that Joshua and Stephanie Mast had filed an action in a U.S. federal court to prevent Baby Doe's reunification with her biological family and legal guardians, they never would have communicated with Motley, shared photographs of Baby Doe, or traveled to the United States at the behest of Joshua and Stephanie Mast.**

**ANSWER:** The Masts deny the allegations in Paragraph 177.

178. **John and Jane Doe have suffered and will continue to suffer what they regard as the worst tragedy they have experienced, having their child unjustly ripped from their lives.**

**ANSWER:** The Masts deny the allegations in Paragraph 178.

179. **Accordingly, Joshua and Stephanie Mast and Motley are jointly and severally liable for the harm suffered by Plaintiffs as articulated above.**

**ANSWER:** Paragraph 179 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 179.

<u>COUNT III</u>

**COMMON LAW CONSPIRACY
(AGAINST ALL DEFENDANTS)**

**180.    Plaintiffs repeat and re-allege all the allegations set forth in the foregoing Paragraphs as if fully set forth and restated here.**

<u>ANSWER</u>:  The Masts incorporate their responses to the allegations contained in the preceding paragraphs as if fully set forth herein.

**181.    Each of the Defendants acted in concert, agreed, associated, mutually undertook and combined together to intentionally and purposely commit the wrongful and tortious acts against all of the Plaintiffs as set forth above. The concerted and purposeful actions of each Defendant have denied John and Jane Doe their parental rights and wrongfully interfered with their ability to establish and assert those rights; and denied Baby Doe her right to know and be raised in the natural home of her biological family and legal guardians.**

<u>ANSWER</u>:  Paragraph 181 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 181.

**182.    Each of the conspirators is fully responsible for the acts of each other. The total effect of the conspiracy not only is tortious, but, indeed, also is a criminal act tantamount to child abduction under §§ 18.2-47(a) and 18.2-49 of the Code of Virginia. The actions of the conspirators violate federal statutes, laws and regulations of the Commonwealth of Virginia, and the laws of Afghanistan.**

<u>ANSWER</u>:  Paragraph 182 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 182.

**183.    Each Defendant acted in furtherance of this conspiracy to defraud John and Jane Doe and to abduct and unlawfully restrain Baby Doe.**

<u>ANSWER</u>:  Paragraph 183 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 183.

**184.    Joshua and Stephanie Mast, inter alia, fraudulently induced John and Jane Doe, through their agent Motley, to share photographs of Baby Doe, which they used to unlawfully obtain an Afghan passport for Baby Doe without the knowledge or consent of her biological family and legal guardians. Joshua and Stephanie Mast fraudulently misrepresented their intentions, both directly and through their agent Motley and through Osmani, to John and Jane Doe when persuading them to bring Baby Doe to the United States**

for the sole purpose of obtaining medical treatment. Joshua and Stephanie Mast abducted Baby Doe and have continued to deprive John and Jane Doe of any contact with her. Joshua and Stephanie Mast procured fraudulently obtained documents to affect her abduction.

**ANSWER:** The Masts deny the allegations in Paragraph 184.

185.    Richard Mast, inter alia, at the direction of and on behalf of Joshua and Stephanie Mast, fraudulently misrepresented material facts, and made numerous omissions of fact, to multiple courts to unlawfully obtain custody and adoption orders that would facilitate the abduction by Joshua and Stephanie Mast of Baby Doe, as well material misrepresentations to this Court and USCIS in furtherance of the same. He did so in violation of his ethical rules of professional responsibility as an attorney licensed in the Commonwealth of Virginia. Richard Mast and Joshua and Stephanie Mast knew these statements to be false and the omissions to be material.

**ANSWER:** The Masts deny the allegations in Paragraph 185.

186.    Joshua and Stephanie Mast, through their agent Motley, and Osmani knowingly made false representations to John and Jane Doe when persuading them to have Baby Doe travel to the United States to obtain medical treatment.

**ANSWER:** The Masts deny the allegations in Paragraph 186.

187.    As set forth above, the Defendants' overt acts and omissions in furtherance of their conspiracy have harmed and will continue to harm each Plaintiff.

**ANSWER:** Paragraph 187 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 187.

188.    Accordingly, the Defendants are jointly and severally liable for the harm to Plaintiffs as articulated above.

**ANSWER:** Paragraph 188 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 188.

## COUNT IV

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (AGAINST ALL DEFENDANTS)

189.    Plaintiffs repeat and re-allege all the allegations set forth in the foregoing Paragraphs as if fully set forth and restated here.

**ANSWER:** The Masts incorporate their responses to the allegations contained in the preceding paragraphs as if fully set forth herein.

**JA275**

190.    Since 2019, the conduct of Joshua and Stephanie Mast has shown a consistent pattern of reckless disregard for the very real possibility of causing extreme emotional distress to John and Jane Doe. As set forth above, the Masts conspired to separate Baby Doe unlawfully from the only family she had ever known for the vast majority of her short life. It is implausible that someone would be unaware of the extreme trauma that would be inflicted on parents when their child is ripped from their arms by someone who had for months been claiming that all he wanted was to help them.

**ANSWER:**  The Masts deny the allegations in Paragraph 190.

191.    As alleged above, the conduct of Joshua and Stephanie Mast was both deceitful and criminal, violating the laws of Afghanistan, Virginia, and the United States. They were aware that Baby Doe had been reunited with her biological family and legal guardians, and chose to conceal this from Virginia state and federal courts. They continued to mispresent to the Virginia courts that Baby Doe was a stateless, unaccompanied orphan. Neither the government of Afghanistan nor the United States agreed with this determination. Nonetheless, to carry out their scheme, Joshua and Stephanie Mast consistently violated laws meant to safeguard not only the wellbeing of vulnerable children, but the foreign policy interests of the United States.

**ANSWER:**  The Masts deny the allegations in Paragraph 191.

192.    Richard Mast knowingly furthered this scheme through his fraudulent in-court misrepresentations, by procuring the custody and adoption orders for Joshua and Stephanie Mast, and by submitting a deceptive immigration application for John Doe.

**ANSWER:**  The Masts deny the allegations in Paragraph 192.

193.    Joshua and Stephanie Mast, through their agent Motley, and Osmani knowingly facilitated the plan to abduct Baby Doe by misrepresenting their intentions to John and Jane Doe when persuading them to bring Baby Doe to the United States supposedly for the sole purpose of obtaining medical treatment.

**ANSWER:**  The Masts deny the allegations in Paragraph 193.

194.    These actions would be considered extreme, outrageous, and intolerable by any reasonable person.

**ANSWER:**  Paragraph 194 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 194.

195.    As a direct result of the extreme, outrageous, and intolerable conduct of all Defendants, Plaintiffs have suffered extreme emotional distress. The lives of all three

**JA276**

Plaintiffs have been forever altered in fundamental ways that no individual should be expected to endure.

**ANSWER:** The Masts deny the allegations in Paragraph 195.

196. **Accordingly, Defendants are jointly and severally liable to Plaintiffs for all of their harm suffered at the hands of the Defendants, as set forth above.**

**ANSWER:** Paragraph 196 asserts a legal conclusion, so no response is required. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 196.

## COUNT V

### FALSE IMPRISONMENT
### (AGAINST DEFENDANTS JOSHUA AND STEPHANIE MAST)

197. **Plaintiffs repeat and re-allege all the allegations set forth in the foregoing Paragraphs as if fully set forth and restated here.**

**ANSWER:** The Masts incorporate their responses to the allegations contained in the preceding paragraphs as if fully set forth herein.

198. **On September 3, 2021, Joshua Mast physically removed Baby Doe from the custody of her lawful guardians without their permission or consent, restricting her movement and confining her to the care of himself and Stephanie Mast.**

**ANSWER:** The Masts deny the allegations in Paragraph 198. The Masts further note that the Court dismissed this claim. *See* ECF No. 455 at 96–97.

199. **Since September 3, 2021, Joshua and Stephanie Mast have continued to keep Baby Doe captive, without the permission or consent of her lawful guardians.**

**ANSWER:** The Masts deny the allegations in Paragraph 199. The Masts further note that the Court dismissed this claim. *See* ECF No. 455 at 96–97.

200. **On September 3, 2021, Baby Doe began crying when the woman assisting Joshua Mast would not return her to Jane Doe, indicating Baby Doe's awareness of this restraint. John and Jane Doe, in their capacity as Baby Doe's legal guardians, were and are aware of and vehemently opposed to this unlawful restraint.**

**ANSWER:** The Masts deny the allegations in Paragraph 200. The Masts further note that the Court dismissed this claim. *See* ECF No. 455 at 96–97.

**201.    As a result of this unlawful restraint, Baby Doe, John Doe and Jane Doe have been injured by this family separation since September 3, 2021.**

**ANSWER:**  Paragraph 201 asserts a legal conclusion, so no response is required. The Masts further note that the Court dismissed this claim. *See* ECF No. 455 at 96–97. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 201.

**202.    Accordingly, Joshua and Stephanie Mast are jointly and severally liable to Plaintiffs for all of the harm they have endured, as set forth above.**

**ANSWER:**  Paragraph 202 asserts a legal conclusion, so no response is required. The Masts further note that the Court dismissed this claim. *See* ECF No. 455 at 96–97. Inasmuch as a response is required, the Masts deny the allegations in Paragraph 202.

## RELIEF REQUESTED

The Masts deny that John and Jane Doe are entitled to any relief and, on that basis, denies any and all allegations that follow the heading "Prayer for Relief" in the Amended Complaint.

## (2) AFFIRMATIVE AND OTHER DEFENSES

Without assuming any burden of proof that they would not otherwise bear, Defendants Joshua & Stephanie Mast assert the following affirmative and other defenses to the allegations and claims in the Amended Complaint. The Masts deny wrongdoing or liability of any kind. No defense constitutes an admission that the Masts are liable to John and Jane Doe, that John and Jane Doe has been or will be injured or damaged, or that John and Jane Doe are entitled to relief from the Masts. The Masts reserve the right to add or amend its affirmative and other defenses as facts develop through discovery.

## First Defense

The district court lacks subject matter jurisdiction over Plaintiffs' claims.

### Second Defense

Plaintiffs' claims are barred in whole or in part under doctrines of res judicata and collateral estoppel in other litigations.

### Third Defense

Plaintiffs' claims for equitable relief are barred by the doctrine of unclean hands.

\*       \*       \*

Additional facts that may support additional defenses may come to light through discovery or further investigation. Joshua and Stephanie Mast reserve the right to assert new affirmative or other defenses in the future.

### (3) COUNTERCLAIM COMPLAINT

### INTRODUCTION

1.      Joshua and Stephanie Mast are the adoptive parents of the Child, an orphan of war and victim of terrorism, who was rescued under tragic circumstances from a battlefield in Afghanistan. The Masts have gone to great lengths at great personal expense and sacrifice to ensure that the Child has a safe and loving home and receives the medical care she requires. John and Jane Doe have engaged in a prolonged campaign to smear the Masts reputation and to attack their family including through the press. As part of that campaign, they have knowingly made false statements about the Masts and about their own relationship with the Child. Those knowingly false statements have tarnished the Masts' reputation, have inflicted substantial emotional distress, and have otherwise tortiously interfered with the lives of the Masts and their family.

2.      The Masts continue to maintain that this Court lacks subject matter jurisdiction over Plaintiffs' claims and that this matter must therefore be dismissed in its entirety. But in light of the Court's ruling on jurisdiction, and so long as this Court continues to exercise subject-matter

jurisdiction over this case, the Masts assert counterclaims for defamation, intentional infliction of emotional distress, and civil conspiracy.

## PARTIES

3.      Joshua Mast is the adoptive father of the Child, residing in North Carolina.

4.      Stephanie Mast is the adoptive mother of the Child, residing in North Carolina.

5.      John Doe is a national of Afghanistan, residing in Texas, who has asserted claims against the Masts related to the Child and who is prosecuting a civil proceeding in Virginia Circuit Court to challenge the validity of the Masts' adoption of the Child.

6.      Jane Doe is a national of Afghanistan, residing in Texas, who has asserted claims against the Masts related to the Child and who is prosecuting a civil proceeding in Virginia Circuit Court to challenge the validity of the Masts' adoption of the Child.

## JURISDICTION AND VENUE

7.      As the Masts have previously argued, this Court does not have subject-matter jurisdiction over this dispute.

8.      But in light of the Court's ruling on jurisdiction, and so long as this Court continues to exercise subject-matter jurisdiction over this case, the Masts assert that this Court would also have jurisdiction over their counterclaims under 28 U.S.C. §§ 1332 and 1367.

9.      This Court has personal jurisdiction over John and Jane Doe because they initiated this action and submitted to the personal jurisdiction of this Court.

10.     Assuming that venue for Plaintiffs' claims is proper in this district under 28 U.S.C. § 1391(b), then venue is likewise proper for the Masts' counterclaims.

## RELEVANT FACTS

**A.    The Child's Recovery in Afghanistan**

11.    The Child was recovered off the battlefield at approximately 6–8 weeks old during a U.S. Special Forces mission ███████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████████.

12.    During the engagement, the Child's biological parents fought to the death in close combat against U.S. Special Forces, and her biological mother was wounded in a suicide blast detonation.

13.    An eye-witness Army Ranger on the ground the night of September 5-6, 2019 testified in Virginia Circuit Court that the Child's presumed father fought to the death, while holding the infant child in front of him like a human shield, aiming an AK-47 at the Rangers.

14.    The fighter's gun jammed; he disappeared back into the compound with the child; and reappeared without the child and with a grenade to throw at the Rangers. Four Rangers were wounded. One was not. The Ranger killed the fighter with grenades of his own at a distance of a few feet.

15.    The same eyewitness ranger testified that he then saw the Child's presumed mother run from the South Compound of Interest, with a person-borne improvised explosives device (IED) and while carrying the baby. The Ranger saw the woman blow herself and the baby up 15 feet in front of him, outside the compound, with the baby falling to the ground. The mother died. The baby suffered serious injuries. The Ranger tenderly picked the baby up and gave her to U.S. female soldiers who were on the mission to search women and children. One of them held her during the fight.

**JA281**

16.     The explosion severely injured the Child, fracturing her femur, deforming her skull, and leaving several burns, scars, and other signs of trauma on her face and body

17.     An eyewitness Ranger testified that at the North Compound of Interest approximately 100 meters from the location where the Child was blown up by her mother, stored explosives detonated, causing a wall collapse that buried multiple Rangers at the North Compound. He sprinted to the rescue with his dog.

18.     The Ranger returned to the South Compound to find that an Afghan Government soldier wanted to shoot the injured The Child in the head on the spot, and "throw her in the f***ing river" because the Afghan government soldier didn't want a foreign terrorist's child to grow up in his country. The Rangers prevented this and brought the Child to the hospital.

19.     Intelligence recovered by U.S. forces from the September 5-6 2019 raid included a picture of Child's likely father recovered from a terrorist's captured device. The picture was included in a declassified mission summary obtained by Associated Press and hosted at https://www.documentcloud.org/documents/23815515-declassified-mission-summary-1.

20.     This terrorist was a ████████████████ fighter foreign to Afghanistan, not a "peaceful farmer." A detainee captured by US forces identified this man with the machine gun as living in the compound outside of which the Child's mother detonated herself and the Child, and beside which the Child was recovered. This man bears a strong physical resemblance to the Child.

21.     The Masts compared the Child's features to this fighter's photos early on. The similarities noted include: ████████████████████████████████████ ████████████████████████████████. The similarities have grown as the Child has grown.

58

**JA282**

22.     Another photo recovered from a terrorist's electronic device the night of the September 5-6 raid depicted another ████████████████ terrorist fighter in front of a black Al Qaeda flag. This man was reportedly the nephew of the older fighter. The picture was also listed in a document obtained and hosted by the AP.

23.     This picture (Image X) is not just any terrorist, but is a picture of the current second-in-command of the Turkistan Islamic Party, its "deputy emir," Abdusalam Al-Turkistani (a.k.a. various spelling variations), in front of a black Al Qaeda flag background.

24.     Abdusalam Al-Turkistani is very much alive today, giving a recent interview published in February 2023, around the time the AP went on its Taliban-guided tour of the village from which the Child was recovered, pictures of which AP published in an August 4, 2023 article. ████████████████████████████████████████.

**B.     The Child's Recovery in Afghanistan**

25.     At the time the Child was rescued by U.S. forces and taken to receive treatment for her injuries in the Military Hospital system, Major Joshua Mast (then Captain) was deployed in Afghanistan where he served as a Marine Corps Judge Advocate.

26.     Joshua Mast grew concerned that the Child, a foreign female infant in Afghanistan being treated in a Military Hospital under consistent rocket attack, would not have access to the medical care required to treat her injuries.

27.     It was apparent to Joshua Mast and other military lawyers working the case (who helped compile what became the "Declassified Mission Summary") that The Child had no living relatives, due to the nature of the terrorist group from which she was recovered ████████ ███████████████████████████████████████████████████████████, the sophistication of the unit

**JA283**

involved, the strength of the intelligence assessing her likely area of origin, and the devastating scale of the destruction of the AQ training camp.

28.     Joshua Mast—with the full knowledge of his command, as US DoD documents show—fought for the child's rights to safety, medical treatment, and to not be turned over to non-relatives in an objectively dangerous manner. Joshua Mast—along with others within DoD—demanded at a minimum a DNA test for any claimants and vetting for terrorist ties. The DoD was well aware the risk that unrelated Taliban proxies would step forth as "uncles" to try to claim the child. The command was fully informed Joshua Mast was seeking custody and birth documents to facilitate her safety, treatment and continuing care.

29.     Joshua Mast, while deployed and still in Afghanistan, reached out to a national nonprofit legal organization noted for its First Amendment-related defense of religious freedom, the sanctity of human life, and the family, because of that organization's expertise and reputation for protecting innocent human life, including preborn and newborn infants.

30.     His brother, Richard Mast, was an attorney at this nonprofit. Joshua explained the situation, and Richard Mast agreed to try to help him ensure a safe outcome for the infant child through advocacy and representation.

31.     Still in Afghanistan, Joshua Mast (through Richard's representation in Joshua's county of residence in Virginia) initiated custody proceedings in the Juvenile and Domestic Relations Court of Fluvanna, Virginia (the "J&DR Court") largely to establish a legal identity that would allow her to  receive appropriate medical care in the United States via a humanitarian parole visa.

32.    After receiving the facts as understood by the Masts at the time (and borne out by multiple lawsuits later), and satisfied that it had jurisdiction, the J&DR Court granted custody of the Child to Joshua and Stephanie Mast, but the Child still needed a legal identity as she had none.

33.    Richard Mast filed again on their behalf, in Fluvanna County Circuit Court, a Petition to Amend a Certificate of Birth, which Judge Richard E. Moore signed on November 8, 2019. It was presented to the Virginia Department of Health that same day.

34.    The Virginia Department of Health declined to issue a Certificate of Birth on the basis of that Order, prompting further discussions between Richard Mast, the court, and the Virginia Office of the Attorney General.

35.    Richard Mast consulted extensively with an assigned Assistant Attorney General who represents and advises the Virginia Department of Health. This Assistant AG circulated the request to her superiors for input, including the facts as understood at the time, and the legal reasoning.

36.    The Virginia Office of the Attorney General, recognizing that the purpose of the request was to provide a legal identity and care for the Child, consulted with the Virginia Circuit Court judge regarding his authority to issue the order. The Virginia AG's Office never suggested that serving formal notice to the United States was necessary.

37.    The Virginia Department of Health, through the Office of the Attorney General, opined that Richard Mast should file a Petition for Adoption on behalf of the Masts, and that the Circuit Court could issue an "Interlocutory Order of Adoption," after which VDH could issue a Birth Certificate.

38.    On November 9, 2019, the Assistant AG informed Richard Mast: "Good morning. I've been communicating with my Deputy this morning and am waiting to hear back with a final

**JA285**

response. I'm guessing she is likely going to run this up the chain further. Her first response was similar to mine – **we need an adoption order**." Richard Mast responded with an offer to send further thoughts and analysis to the Virginia Office of the Attorney General, which he did.

39.     Later that day, the Assistant AG responded to Richard Mast while she was on the road: "I just stopped for a break and forwarded your email to my chain of command and texted my Deputy to alert her to it." She advised that she had spoken to the Circuit Court judge: "I just talked with him. He actually asked about his authority to enter an adoption order. I told him I would pursue it with my office [Office of the Attorney General], which I'm trying to do now" from her out-of-office location.

40.     Finally, the Assistant AG responded with a green light: "Talked with the judge. He will issue an interlocutory order. I advised [the Virginia Registrar] that **she can issue the certificate on the interlocutory order**. I think you're going to have to coordinate logistics with the judge because he's [out of state]. He's going to try to call you. Feel free to call me and I can give you more details but I think we found a way to get this done."

41.     The Assistant Attorney General continued, that the Circuit Court judge "knows what he wants the order to say and he and I went over it together… Please make sure the order states that the Mast's are the adoptive parents and should be listed as the parents on the birth certificate. The order...should also contain the dates and places of birth of Capt. and Mrs. Mast. It should also state that Baby [Doe's] place of birth and her natural parents are unknown."

42.     On November 10, 2019, Richard Mast responded that the "Petition and interlocutory order are done and sent to [C]aptain Mast for review; then will go to [a Virginia] adoption attorney" for final review, and that "Judge Moore has been advised."

43.     Richard Mast sought input from the Virginia adoption attorney, who reviewed the draft pleadings. She did not suggest serving formal notice to the United States was necessary.

44.     Pursuant to these consultations, Richard Mast filed the Petition for Adoption, and the Circuit Court judge signed an Interlocutory Order of Adoption so the Masts would be able to bring The Child to the United States. VDH issued the Birth Certificate. The Virginia Assistant Attorney General informed the Circuit Court on November 10, 2019: "the Registrar has issued the certificate of foreign birth for [the Child]. Thanks for your patience with me and my Office. Hope you can enjoy the rest of your weekend."

45.     Joshua Mast presented these developments to his chain of command in Afghanistan, providing actual notice to DoD. The Child was approved by DoD as the DoD Dependent of Joshua Mast, her U.S. guardian. The DoD drafted a written request to Afghan government officials to send The Child to her U.S. Guardian in America for treatment.

46.     Captain Mast's commander in Afghanistan made preparations to move the Child to Germany and then to the U.S., on the basis of Baby Doe's only legal identity, and status as Captain Mast's DoD Dependent.

**C.      The United States Relinquishes Custody of the Child**

47.     Joshua Mast believed at the time and continues to believe, with the hindsight of approximately two years of litigation and the testimony of eyewitnesses and Afghan law experts, that the Child was a stateless minor rather than an Afghan citizen based on, among other things, the fact that many fighters killed in the assault on the training camp were ███████████ ███████████, and that children born to foreigners do not receive birthright citizenship in Afghanistan.

**JA287**

48.     Joshua Mast raised these concerns with appropriate authorities, including in the Department of Defense (DoD) and the U.S. Congress, many of whom supported his efforts.

49.     The Commandant of the Marine Corps approved the Child as a DoD dependent with full knowledge of her location and status as a patient in a U.S military hospital at Bagram Air Base.

50.     At least one official from the State Department—the Assistant Chief of Mission (ACM) at the Embassy in Afghanistan—took the contrary view that the Child should be handed over to the custody of the then-extant Afghan Government.

51.     In a meeting on October 23, 2019 at which the ACM was supposed to receive a classified briefing on U.S. intelligence about the Child's likely origin ███████████████████ ████████████, the ACM invited representatives of the Afghan Government ultimately and arranged for the Child to be placed in Afghan custody.

52.     The ACM also secured an order that restricted military personnel from advocating against transferring the Child to Afghan custody.

53.     Joshua Mast remained concerned for the dangerous situation facing the Child after the superficial review of the Embassy.

54.     It was clear to Joshua Mast that the Child would not receive adequate medical care in Afghanistan, was not an Afghan national (but a stateless child), and was likely being turned over to non-relative, terrorist affiliated persons.

55.     Joshua Mast and his wife, Stephanie, filed for a Temporary Restraining Order (TRO) in this Court on February 26, 2020 seeking to prevent a transfer of custody without a DNA test and vetting for terrorist affiliations, which had been the position of DoD during the preceding months leading up to the filing of the TRO.

56.     Counsel for the United States represented to this Court that the U.S. Government was unaware of Captain Mast's actions, but that was not true. At that time, the U.S. Government had in its possession an extensive memorandum signed two weeks' prior by Deputy Assistant Secretary of Defense Eric J Mauerer, which establishes (1) DoD's knowledge of both the J&DR Court Order and the Circuit Court Order, and (2) DoD's understanding, which was consistent with the understanding of the Masts at that time, that the request was not for purposes of adoption, but for humanitarian treatment and care for the child.

57.     After the Court questioned the Government's lawyers, who failed to apprise this Court of the high level DoD recognition of the Child as Joshua Mast's dependent, and after querying Richard Mast with a compound question (the answer to which has been wildly misconstrued by DOJ lawyers, Plaintiffs' counsel and the press), the Court denied that request, and the transfer of custody went forward.

58.     Upon information and belief, after the Child left DoD custody, she was placed with John Doe's father, who purports to be the older half brother of the child's purported biological father. John Doe's father has not testified in the past two years of litigation, but the Does assert this man left her with the Does.

**D.      The Masts Relocate the Child & Get Her Out of Afghanistan**

59.     After receiving reports that the Child was experiencing medical complications, the Masts continued to be concerned that the Child would not receive the medical care she needed in Afghanistan and that it was not a safe place for her.

60.     The Masts proceeded with finalizing their adoption of the Child in the United States.

**JA289**

61.     As the Taliban campaign swept over Afghanistan in the late summer of 2021, Joshua Mast established contact with John Doe and requested he bring the Child to Kabul to fly to the United States before the country collapsed.

62.     Joshua Mast communicated with John Doe through an interpreter, Ahmad Osmani.

63.     Based on John Doe's representations, Joshua Mast and Ahmad Osmani understood that John Doe's father was the actual person with decision-making authority over the Child. At no point did John Doe represent that he personally had legal responsibility for the Child.

64.     Osmani repeatedly asked on Joshua Mast's behalf whether John Doe's father had made a decision yet to send the Child to Joshua Mast.

65.     Osmani asked in one recorded message about how the Child was doing physically, and where she lived.

66.     John Doe left a recorded voice message in response for Joshua, which was interpreted by Osmani. Using the Child's American name, which Joshua had secured for her, John Doe stated that the little girl did not live with him, his father, or "[his] family," but with "another family" and "that family has become like her mother and father."

67.     Joshua Mast was candid with John Doe from the beginning and throughout their discussions, that Joshua and Stephanie Mast had adopted the Child, that they had created a legal identity for her in the United States, and that they intended for her to live with them in the United States using the strongest words for legal responsibility over a child in Pashto.

68.     When the Afghan Government collapsed on August 15, 2021, and the evacuation began, Joshua Mast again contacted John Doe about bringing the Child to U.S. forces, extremely concerned that they may not get another chance—a belief that John Doe shared.

69.     Through the efforts of Joshua Mast and other U.S. military personnel, and based on the legal identity of the Child under the Adoption Order, John and Jane Doe were able to flee Afghanistan, notwithstanding the chaos of the U.S. withdrawal, by bringing the Child to U.S. Forces.

70.     Joshua Mast made sure that the U.S. military did not evacuate only the Child but also that they brought John Doe and Jane Doe along so they would not be killed by the Taliban for disobeying their orders.

71.     But for the personal efforts of Joshua Mast and the child's U.S. identity, John Doe and Jane Doe would not have been able to flee Afghanistan in the aftermath of the U.S. withdrawal.

72.     Specifically, Joshua Mast was told by his commanding officer that the assets recovering the child "don't give a [expletive] about Afghans, and would likely stick a gun in their face and take [the Child]." Furthermore, Joshua Mast was told that he would have to "choose between [the Child] and [John and Jane Doe]" as it came down to execution of the mission to recover the Child from behind Taliban lines. Joshua Mast refused to abandon the Does to be murdered by the Taliban, and instead delayed the mission for over 24 hours until he personally confirmed the unit would evacuate the Does as well.

73.     During a stop in Germany on the trip from Afghanistan to the United States, concerns arose that John Doe and Jane Doe would be diverted to another country and would not be permitted to travel to the United States with the Child and the Masts.

74.     During that same trip, upon information and belief, Jane Doe confronted John Doe, expressing displeasure that he had consciously agreed to allow the Masts to take custody of the Child as a means to secure safe passage to the United States. This encounter illustrates that both

67

**JA291**

John Doe and Jane Doe were aware that Joshua and Stephanie Mast had adopted the Child and would have custody of her in the United States.

75.     Jane Doe also pejoratively referred to John Doe as a "Modegal" because "[John Doe] wants to go to America, and [the child] is the price."

76.     In Germany, John Doe revealed for the first time that he had made a collateral promise to Jane Doe to induce her to abandon her threat to remain in Afghanistan and instead accompany him to the America. Specifically, John Doe told Jane Doe that the Child would never leave her, Jane Doe's, side if Jane Doe would come to America. Neither John Doe nor Jane Doe made any reference to any sort of parental or legal claim to custody or control of the Child at that time or at any other time; rather, John Doe represented to Joshua Mast both before and after this conversation that his wife was attached to the Child but would be fine with the Child's living with the Masts once her own child was born. This promise demonstrates the Does were aware the Mast's intended the child to live with them in America.

77.     In Germany, Joshua Mast again intervened to ensure that John Doe and Jane Doe would be able to travel to the United States with Baby Doe and the Masts.

78.     But for Joshua Mast's intervention, John Doe and Jane Doe would not have been permitted to travel to the United States. This episode illustrates that the Masts were not attempting to "kidnap" Baby Doe or otherwise trick John Doe and Jane Doe—and that John Doe and Jane Doe were well aware of that fact.

79.     Upon the Does entry to the United States, Joshua Mast learned derogatory information about John Doe, the details of which are known to John Doe and Jane Doe, but which are subject to a protective order sought and obtained by the United States Government. That

information, along with subsequent developments, changed the Masts' view of the Does. While the Masts were still willing to provide them what help they could, they became more wary.

80.     John and Jane Doe were paroled in the United States and ultimately were sent to Fort Pickett, Virginia. This was after Jane Doe called Joshua Mast and told them they were being deported to Mexico via a bus. Joshua Mast spoke to the American personnel, again explained that the Does had disobeyed the Taliban and could not be deported, and requested they be sent to Fort Pickett, as it was the closest location to Joshua Mast's duty station.

81.     On September 3, 2021, the Masts went to Fort Pickett and took custody of Baby Doe pursuant to the final order of adoption from the Virginia Circuit Court.

**E.     Litigation Between the Does and the Masts**

82.     In November 2021, John and Jane Doe filed a petition seeking to set aside the Adoption Order in the Fluvanna County Circuit Court before Judge Richard Moore, who had presided over the original adoption proceeding. John Doe alleged that he was the "first cousin of the child" and that Baby Doe's unspecified "Afghan family" had initiated "proceedings" to gain custody of her. Neither John Doe nor Jane Doe alleged any parental or custodial rights over the Child under Afghan law or otherwise.

83.     Virginia law provides that "[a]fter the expiration of six months from the date of entry of any final order of adoption from which no appeal has been taken to the Court of Appeals, the validity thereof shall not be subject to attack in any proceedings, collateral or direct, for any reason, including but not limited to fraud, duress, failure to give any required notice, failure of any procedural requirement, or lack of jurisdiction over any person, and such order shall be final for all purposes." Va. Code § 63.2-1216. Virginia courts have recognized a narrow exception, allowing a parent with an "actual relationship of parental responsibility," not just a "mere

**JA293**

biological relationship," to contest an adoption if he proves extrinsic fraud by clear and convincing evidence that prevented filing within the six-month period. *See McCallum v. Salazar*, 49 Va. App. 51, 57 (2006) (quoting *F.E. v. G.F.M.*, 35 Va. App. 648, 663 (2001)).

84.    In March 2022, the Does repleaded the petition, alleging for the first time that they were "in effect, the child's adoptive parents as legal and permanent guardians of the minor child under Afghan law," "verbally delegated" from Doe's father. The Circuit Court has since held that the Does have not established any biological or legal parental relationship with Baby Doe, though it nevertheless allowed the case to proceed.

85.    That Virginia Circuit Court proceeding is ongoing and the current subject of an interlocutory appeal concerning the applicability of Code § 63.2-1216.

86.    The Does first filed this lawsuit on September 2, 2022, naming as defendants not only Joshua & Stephanie Mast but also Richard Mast, their lawyer in the state-court proceedings; Ahmad Osmani, Joshua Mast's interpreter; and Kimberley Motley, the renowned humanitarian lawyer who helped find and provide for the Child in Afghanistan.

87.    In the Circuit Court litigation, and as shown in discovery from that litigation, John Doe has made multiple false or inconsistent claims. And as explained below, upon information and belief, the Does have repeated those false claims, directly and through agents and intermediaries, the news media in a successful effort to plant defamatory news stories about Joshua and Stephanie Mast.

88.    John Doe has lied about his relationship with the Child. Indeed, his claims of relationship to the Child have varied wildly among the many court filings, testimony and evidence. In 2021, John Doe received a voice message recording from Afghan interpreter Osmani asking "Are you doing well? Is your wife doing well? How is your kid? Have you heard about how

[Child's American Name] is doing? Is [Child's American Name] at <u>your house</u>, or is she at [<u>your</u> <u>father's] House</u>? How is [Child's American Name]  doing? How is [your father] and everyone else in your family doing?"

89.    John Doe responded: "*And* [Child's American Name - *everything else is Pashto] no she is with someone else, there is another family she lives with them, she is not with me or [my father]. I bring her over sometimes, but she doesn't stay with me,* <u>*with my family*</u>*. For her* <u>*that family has become like her mother and father.*</u>"

90.    Notwithstanding these clear contemporaneous statements that the Child was not living with him or with his family—including Jane Doe—John Doe has repeatedly alleged he and Jane Doe acted as the Child's parents consistently over an extended period and cared for her in their home.

91.    John Doe testified under oath in 2022 that his father never asked permission of the Taliban to send the Child to America. Yet, he told US Conference of Catholic Bishops (USCCB) volunteers in 2021 (who took down a written report filed in the WDVA federal suit) that his family "**had asked permission from the Taliban to take the child to the US**" and that he "**chose to disobey the Taliban's order**" and take her anyways.

92.    This USCCB report mentions the derogatory information about John Doe, the false "eldest surviving uncle" claim of John Doe's father, and John Doe's false "Marine stomped on my foot and threw me back" claim. John Doe dropped this last allegation from the Amended Complaint, but repeated it in Paragraph 121 of the original complaint.

93.    John Doe wrongly withheld this document based on an unsupported assertion of attorney-client privilege, and it was therefore hidden from the Masts and the Virginia Circuit Court for over a year. The Circuit Court later sanctioned John Doe for withholding the memo.

94.     John Doe has repeatedly testified under oath and claimed in writing that his father is the oldest "half-brother" with two younger "half-brothers"; that his grandmother remarried, giving birth from the second marriage to the "half-brother" father of the Child, a "peaceful farmer." But this purported father's *Taskerah* (Afghan national identity document) shows that this individual is five years *older* than John Doe's father. The documentary evidence establishes that John Doe's family-origin narrative is false.

95.     The purported "peaceful farmer" is not a "younger" "half-brother" of John Doe's father, as John Doe and Jane Doe have repeatedly claimed to the courts and beyond. Moreover, John Doe and counsel have translated the purported father's name as "[NAME] Uncle," a homonym for the words "Sir" or "Commander" in Pashto. It would therefore be accurate to translate that name as "[NAME] Commander" or "[NAME] Sir," but that would not support John Doe's false "relative" narrative.

96.     John Doe has claimed that the Red Cross identified a family member in 2019. Yet this is demonstrably false as well. This reported "uncle" is an unrelated third-party. When ordered to respond to discovery in this case by identifying relevant family members, the Does did not identify this individual.

97.     This name of this individual, ████████████ is the name of the same claimant on two different official claims documents, each with a different name for the child. The Does do not contest that ████████ is unrelated to the child.

98.     The unrelated ████████ who completed the ICRC "Request For Family Reunification" dated October 10, 2019, claimed that the child of John Doe's deceased "uncle" is named ███ and that "all other surviving siblings are living with" this ████████████ The

WhatsApp profile at the number listed in the ICRC Request by ███████ displays a Taliban profile.

99.    The unrelated ███████ who completed the "OCT-2019" "Individual Case Report of Child Rights Violations" form claims the child of John Doe's deceased "uncle" is named ███ This ███████ provided a different WhatsApp phone number, which shows a profile image depicting a baby wearing a headband with the word "martyr" on it. This ███████ claimed that "in reality, no one knew about the child's existence. He explained that during the bombing incident, the child's three sisters, two brothers, mother, and father were killed. Initially, they thought the child had also died, but they later received a report from the Red Cross ███████ ████████████████████████████████████████████████████████████████████"

100.    Yet the child was not given to either ███████ but to John Doe's father, who appears nowhere in ICRC documents, except for a "Handover Certificate."

101.    At the outset of litigation, John Doe, though counsel requested and received from ICRC all documents relating to the child. The ICRC's initial privacy waiver draft permitting the release of documents was sent by ICRC to counsel drafted in the name of ███████ Moreover, the ICRC cover letter attached to this document lists the child by three different names. Counsel redrafted and returned the "waiver" to Red Cross, not with the signature of ███████ but signed by John Doe's father.

102.    There are a total of at least four different "Afghan names" for the child used in various documents by various individuals, with two different names for the supposed same child used by ███████ who has been disclaimed by John Doe as a relative. And the Does themselves have claimed at times to have used a fifth name for the child—though in

communications with the Masts, they used the American name the Masts had used in the adoption proceeding.

103.    John Doe has claimed no one in his family supports the Taliban. This is also demonstrably false.

104.    John Doe's father displayed support for the Taliban on his own WhatsApp profile, until it was brought to the attention of the Doe and their counsel in the Virginia Circuit Court litigation. Then, it promptly was removed from WhatsApp not to be seen again.

105.    John Doe's father obtained the child without a DNA test or terror ties vetting by the Americans, despite Afghan government officials requesting a DNA test.

106.    John Doe stated his father was "responsible" to the Taliban for the child. John Doe stated his father asked "permission" from the Taliban to send the child to America. John Doe stated he had many Taliban fighter contacts in his phone.

107.    These false allegations are not just isolated statements. They are part of a broader false narrative, crafted by John Doe and Jane Doe and refined during the course of this litigation and the antecedent related litigation in the Virginia Circuit Court, to paint Joshua and Stephanie Mast as "kidnappers."

108.    In support of this false "kidnapping" narrative, the Does have made numerous false statements about their alleged relationship to the Child and numerous false statements about the Masts' candor to them during the evacuation from Afghanistan. In truth, the Masts were candid with the Does from the beginning that they were seeking to bring the Child to the United States to live with them pursuant to a U.S. legal order. The Does, however, have lied by denying that these intentions were ever disclosed to them. And they have crafted these lies in furtherance of their

broader effort to obtain custody of the Child by painting Joshua and Stephanie Mast as "kidnappers."

### B. False Media Publications

109. The Does' false "kidnapping" narrative, and their supporting lies, have not been limited to the docket and the courtroom.

110. On numerous occasions, both directly and through agents or intermediaries, the Does have repeated these false allegations to members of the media and other third parties. They have done so with full knowledge of their falsity and with the specific intent of procuring negative news stories about the Masts that, they hope, will influence the litigation in their favor.

111. To further stack the deck, the Does have sought and obtained gag orders from this Court and from the Virginia Circuit Court that limit the Masts' ability to defend themselves in the court of public opinion.

112. On October 20, 2022, the Associated Press published an article entitled *Afghan couple accuse US Marine of abducting their baby*. *See* https://apnews.com/article/afghan-baby-us-marine-custody-battle-b157557538b84b288a0a8415735e24ab.

113. In reality, the Child is not their baby, and the Masts did not abduct her. But the article falsely conveys its defamatory message based on the information that the Does provided.

114. Jane Doe is quoted directly in the article, having spoken on the record to the Associated Press to relay the Does' false "kidnapping" narrative. Two attorneys for the Does, Sehla Ashai and Maya Eckstein, also spoke on the record to the Associated Press on the Does' behalf. According to the article, the attorneys "say the baby's parents were actually farmers, unaffiliated with any terrorist group," and "described the event as a tragedy that left two innocent

civilians and five of their children dead." That account is demonstrably false, and yet it bolsters the Does' "kidnapping" narrative, as it is intended to do.

115.    The publication and republication of the Does' false "kidnapping" narrative and their supporting allegations did not stop with that first October 2022 article. The Associated Press, along with other news outlets, have continued to publish articles fueled by the Does' false "kidnapping" narrative. And the Does and their agents and intermediaries have continued to fuel the fire.

116.    On December 31, 2022, the Associate Press published a defamatory article, based on the Does' false "kidnapping" narrative, entitled *Afghan war orphan remans with Marine accused of abduction. See* https://apnews.com/article/afghanistan-politics-united-states-government-virginia-children-97a4e2f4c38925d50e5511a3232974f0.

117.    As recounted in that article, the Does' false "kidnapping" narrative prompted a public statement by the Taliban denouncing Joshua Mast. *See* https://www.documentcloud.org/documents/23558568-mofa-statement. The statement denouncing Joshua Mast says that it is based on "information from reliable sources"—*i.e.*, from the Does and their agents and intermediaries.

118.    The Does' false narrative continues to be repeated and republished, including in Associated Press articles from March 31, 2023, *see* https://apnews.com/article/afghanistan-baby-marine-adoption-joshua-mast-295673fb358cf30abd243995cd846c99; August 4, 2023, https://apnews.com/article/afghanistan-raid-marine-orphan-custody-1e73bba608994a53fca37b904dfd9a81; September 15, 2023, https://apnews.com/article/afghan-war-orphan-marine-baby-abduct-adoption-8a0411f16067d73ad0d86b706f5ae46d; and July 16, 2024, https://apnews.com/article/afghan-baby-adoption-marine-joshua-mast-2496683d5dbab37aa091e42edc24ad16.

119.     Numerous other media outlets have picked up on the story as well, further republishing the Does' false "kidnapping" narrative and the false statements that they have made in support of that narrative.

120.     The Does know the truth, and they know that their "kidnapping" narrative is false. But they have intentionally spread it to support their litigation efforts. And in the process, they have caused significant damage to Joshua and Stephanie Mast, to their reputations, and to their lives.

## COUNT I – Defamation

121.     The Does have numerous false factual allegations about Joshua and Stephanie Mast, including the false "kidnapping" narrative and the numerous subsidiary false statements that make up that narrative.

122.     These false statements are defamatory *per se* because they impute to the Masts a crime of mortal turpitude. They are also defamatory in fact by wrongly painting the Masts has nefarious wrongdoers who deceived the Does to steal their child, rather than loving and caring adoptive parents who helped to rescue a young girl in desperate need of help from a dire situation in a collapsing country.

123.     The defamatory statements are unambiguously about Joshua and Stephanie Mast, and they were made to third parties, including but not limited to reporters at the Associated Press.

124.     The Does' defamatory statements to the press and other third parties are not legally privileged.

125.     The Masts are not public figures and therefore need not establish that the Does' statements were made with actual malice, but in any event, the Does did act with actual malice. They knew then, and know now, that their "kidnapping" narrative is false and that their supporting

lies about their relationship to the Child and their interactions with the Masts are false. They have published and republished those statements nevertheless, motivated at least in part by a desire to increase their chances of prevailing in this litigation and the related state-court litigation.

126.    In any event, the Does acted with sufficient intent to be liable for defamation.

127.    The Does' defamatory statements about the Masts have caused substantial damages including financial loss, a loss of standing in the community, and emotional distress.

## COUNT II – Intentional Infliction of Emotional Distress

128.    The Does' conduct, and in particular their public pressing of the false "kidnapping" narrative, has inflicted extreme emotional distress upon Joshua and Stephanie Mast.

129.    The Does, who know that their "kidnapping" narrative is false and who were are from the beginning that the Masts intended to take custody of the Child, have acted with reckless disregard for the emotional distress that their conduct would inflict on the Masts.

130.    To falsely press a public narrative that the Masts "kidnapped" their child, when the Does knew that the Masts had been forthcoming about their intentions and when the child was not *their* child to begin with, is extreme, outrageous, and intolerable. So is continuing to press that false narrative after your prior conduct leads the Taliban to denounce Joshua Mast in a public statement.

131.    The Does' conduct is the direct and proximate cause of significant emotional distress that the Masts have suffered.

132.    That emotional distress has been severe, interfering with the Masts' ability to enjoy their ordinary lives.

## COUNT III – Civil Conspiracy

133.    The Does acted together and in combination with others to commit the tortious acts set forth herein.

134.    The Does' common objective was to spread the false "kidnapping" narrative against the Masts, motivated at least in part by a desire to influence the outcome of this litigation and the related state-court proceeding.

135.    The Does both had an unlawful purpose and employed unlawful means, including by intentionally defaming the Masts and by recklessly inflicting severe emotional distress upon them.

136.    The Masts have suffered damages as a direct and proximate result of the Does' unlawful scheme, including financial loss, a loss of standing in the community, and emotional distress.

## PRAYER FOR RELIEF

Wherefore, Joshua and Stephanie Mast ask the Court to enter judgment in their favor and against John Doe and Jane Doe and to order the following relief:

a.    An award of damages;

b.    An injunction prohibiting John Doe and Jane Doe from making further false and defamatory statements about Joshua Mast and/or Stephanie Mast;

c.    An award of reasonable expenses, including attorneys' fees and costs; and

d.    Any and all other relief that the Court deems just and proper.

Dated: August 7, 2024

/s/ John S. Moran

John S. Moran
MCGUIREWOODS LLP
888 16th St. N.W., Suite 500
Black Lives Matter Plaza
Washington, DC 20006
T: (202) 828-2817
F: (202) 828-3327
jmoran@mcguirewoods.com

*Counsel for Defendants Joshua and Stephanie Mast*

CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
August 16, 2024
LAURA A. AUSTIN, CLERK
BY   s/ S. MELVIN
       DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

|  |  |
|---|---|
| JOHN DOE, et al., | Case No. 3:22-cv-00049 |
| *Plaintiffs*, |  |
| v. | <u>MEMORANDUM OPINION</u> <u>& ORDER</u> |
| JOSHUA MAST, *et al*., |  |
| *Defendants*. | Judge Norman K. Moon |

Before the Court are a series of motions concerning whether Plaintiffs should be afforded the ability to continue litigating this case using pseudonyms. The Court entered a Protective Order at the outset of this litigation allowing Plaintiffs to use pseudonyms following evidence that their families still living in Afghanistan under Taliban rule would face a serious risk of threat, injury, or death, should Plaintiffs' identities become known. Defendants ask the Court to vacate the Protective Order—arguing that the order is unfair largely because it shields Plaintiffs from public scrutiny, while permitting Defendants to be publicly named. For the reasons set forth below, the Court will deny the motions to vacate the Protective Order. Dkt. 26.

The Court also considers several motions by Plaintiffs seeking to enforce the Protective Order against Defendants Joshua and Stephanie Mast, and asking the Court to find them in civil contempt. The first alleged breach of the Protective Order stems from a television interview the Masts gave, in which they publicly identified Baby Doe from a photograph. The Court finds the disclosure inadvertent at best, and not rising to clear and convincing evidence of a knowing violation of the Protective Order.

1

The second alleged breach of the Protective Order stems from Joshua and Jonathan Mast's communications with a non-profit to seek funding for the Masts' legal defense in this action. Plaintiffs claim that Joshua Mast knowingly violated the Protective Order by sending photos of Baby Doe to the non-profit, and then seeking to maintain a fictitious distance with the entity by positioning his brother, Jonathan Mast, as the group's point of contact with the family. The non-profit posted identifying photos of Baby Doe on its website and social media accounts during the fundraising campaign. The Court finds Joshua and Jonathan Mast committed knowing violations of the Protective Order in this regard, and will find them in civil contempt.

## **Background**

Contemporaneously with the filing of their complaint, Baby Doe, John Doe, and Jane Doe filed a motion for leave to proceed as Plaintiffs in the litigation using pseudonyms. Dkts. 3, 4. Plaintiffs sought a protective order that would prohibit "Defendants and their counsel and representatives from disclosing any information that directly or indirectly identifies Plaintiffs or their family members … including but not limited to Plaintiffs' names and the locations of their residences abroad and places of birth." Dkt. 4-3 at 1. The primary basis for those protections, Plaintiffs asserted, was that disclosure of their identities or the locations of their homes in Afghanistan would jeopardize their safety and their families' safety. Dkt. 4 at 2.

Plaintiffs submitted evidence substantiating the reasons they feared for their safety. Significantly, John Doe filed a sealed declaration in which he explained that he and Jane Doe only disclosed their true whereabouts in the United States to a few trusted family members. Dkt. 15 ("John Doe Decl.") ¶ 8. They have told everyone else that they are in Qatar or elsewhere in "the Middle East." *Id.* John Doe explained that he is "extremely worried" that if his location in the United States were to become known in Afghanistan, the Taliban would (wrongly) believe he

2

**JA306**

had been helping the U.S. government—especially considering that John and Jane Doe had come to the United States during the evacuation of Afghans who worked with the U.S. military. Dkt. 4 at 4; John Doe Decl. ¶ 7. In fact, John Doe had "never worked for the U.S. government." *Id.* ¶ 7. Still, John Doe is afraid that as a result of a mistaken belief that he did, he and Jane Doe would be "in danger of physical harm or death if [they] returned to Afghanistan." *Id.* John Doe also testified that he knows that the Taliban have hurt or killed many who worked with the U.S. government, often targeting their families to pressure them to return to Afghanistan. *Id.* ¶ 8.[1] As a result, John Doe wrote of his fear that the Taliban would "harm or kill [their] families in Afghanistan," either "to punish [them]," or "because they believe that [their] families are spies for the U.S. government." *Id.* John Doe further attested that he was concerned that if his relatives or people in Afghanistan learned that Baby Doe was taken by a non-Muslim family, they would be very upset at John Doe and Jane Doe. He believes they could mistakenly think that John and Jane Doe gave her up for a chance to come to the United States, and it is illegal in Afghanistan for non-Muslims like the Masts to adopt Muslim children. *Id.* ¶¶ 9–10. Finally, John Doe also explained how if their names were disclosed, he and Jane Doe would never be able to return to Afghanistan because they would be in too much danger; and that even if just the locations of their residences became known, their identities could be discovered. *Id.* ¶¶ 12–13.

The Court granted Plaintiffs' motion to proceed using pseudonyms and issued their requested Protective Order. Dkt. 26. In the Protective Order, the Court found Plaintiffs had satisfied the requisite standard for allowing litigants to proceed using a pseudonym set forth in

---

[1] *See also* Dkt. 4 at 4–5 (citing articles documenting how Afghans who provided assistance to the U.S. government or even non-governmental organizations have faced retaliatory killings and violence after the withdrawal of U.S. forces).

*James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993). Dkt. 26 at 1–2.[2] Moreover, the Court explained that:

> Plaintiffs have demonstrated that disclosure of Plaintiffs' identities and identifying information would pose a substantial risk to the physical safety of Plaintiffs and other innocent non-parties, in view of the age of minor Plaintiff Baby Doe, and concluding that any risk of prejudice or unfairness (if any should exist) is more than sufficiently mitigated by the measured steps requested by Plaintiffs' counsel below which are tailored to protect such safety interests, in order to ensure Plaintiffs' safety and the safety of other innocent non-parties.

Dkt. 26 at 2.

The Protective Order contained certain provisions to guard against dissemination of Plaintiffs' identifying information, including (1) a prohibition on "Defendants and their counsel and representatives" from disclosing information "that directly or indirectly identifies Plaintiffs or their family members to any person," without first securing a signed non-disclosure agreement, enforceable through a contempt sanction; (2) court papers would use the pseudonyms John Doe, Jane Doe, and Baby Doe; (3) papers that "identify any Plaintiff directly or indirectly shall be filed under seal," with redacted copies filed on the public docket; (4) Defendants shall disclose to Plaintiffs' counsel any person with whom they have shared Plaintiffs' identities and provide executed copies of the non-disclosure agreement for each such individual; and (5) certain provisions were made for use of pseudonyms during depositions. Dkt. 26 at 2–3.

---

[2] The Court also cited its prior decision granting Plaintiffs' motion to seal John Doe's Declaration as well as other exhibits, in support of its ruling on the Protective Order. *See* Dkt. 26 at 1. In that sealing order, the Court explained how Plaintiffs' "valid concern for their safety and the safety of others," was a "significant interest" "outweigh[ing] the common law presumption in favor of the right of public access to judicial records." Dkt. 14 at 2.

4

## Motions to Amend, Modify or Vacate the Protective Order

Defendants Joshua and Stephanie Mast, and Richard Mast, have filed motions to amend, modify, or vacate the Protective Order entered permitting Plaintiffs leave to proceed under pseudonyms. Dkts. 130, 176, 442. For the reasons set forth below, their motions are denied.

Defendants Joshua and Stephanie Mast have filed a motion to modify the Court's protective order, in which they ask the Court to reject Plaintiff John and Jane Doe's ability to proceed using a pseudonym, as well as removing any restrictions on the use of their real names. Dkt. 130 at 3.[3] They raise two principal arguments in support of their request. First, the Masts assert that John and Jane Doe have themselves spoken to the press, "to tell *their* side of the story," "undermin[ing] their claimed fear of publicity and illustrat[ing] the fundamental unfairness of allowing Plaintiffs' asymmetrical anonymity." *Id.* at 8. Specifically, the Masts point to two articles in the Associated Press ("AP")[4] and the New York Times Magazine,[5] respectively, as examples when John and Jane Doe and their attorneys "provided their version of the facts while naming the Masts." *Id.* at 5–6. After the AP story was released in 2022, the Taliban issued a statement on the internet (later taken down) stating: "According to information from reliable sources, a Marine officer Joshua Mast, [sic] has forcibly taken the only remaining child of a family martyred in their bombardment in Afghanistan from her relatives in Virginia and registered her as his own family member." *Id.* at 6.

---

[3] The Masts did not object to Baby Doe remaining under a pseudonym.

[4] Juliet Linderman, et al., *Afghan couple accuse US Marine of abducting their baby*, Associated Press (Oct. 20, 2022), https://apnews.com/article/afghan-baby-us-marine-custody-battle-b157557538b84b288a0a8415735e24ab (last visited Aug. 8, 2024).

[5] Rozina, Ali, *How Did This Man Think He Had the Right to Adopt This Baby?*, The New York Times Magazine (Nov. 20, 2022), https://www.nytimes.com/2022/11/10/magazine/afghanistan-orphan-baby-l.html (last visited Aug. 8, 2024).

Second, the Masts contend that anonymity for John and Jane Doe is not warranted because John Doe's name was, for a time, publicly available in certain docket entries in the pending state-court adoption and custody proceedings involving these same parties. *Id.* at 2, 6. Thus, the Masts claim that John Doe and Jane Doe have not satisfied the *James* factors[6] for a party to proceed using a pseudonym. *Id.* at 8–11.

The Masts also argue that, regardless whether Plaintiffs are allowed to proceed using pseudonyms, the Court "must lift any restrictions on discussion of Plaintiffs" or the subject matter of this case, which they characterize as a "gag order" that violates the First Amendment. *Id.* at 12–13. They argue that requiring Defendants to (1) secure a non-disclosure agreement before sharing Plaintiffs' identities, and (2) share such disclosures with Plaintiffs, effectively constitutes a "gag order" that must survive strict scrutiny to pass constitutional muster. *Id.*

In addition, Richard Mast, a codefendant and brother of Joshua Mast, has also filed several of his own motions to vacate the Protective Order. Dkts. 176, 442. Therein, he largely repeats arguments raised in Joshua and Stephanie Mast's motion. For instance, in his initial motion, Richard characterizes the Protective Order as a "unilateral gag order," which he argues is unconstitutional on grounds that it fails to satisfy the stringent "strict scrutiny" standard applicable to true gag orders. Dkt. 176 at 8–17. Richard trots out a parade of horribles and "absurd consequence[s]" that he claims would follow from leaving the Protective Order in place—largely on behalf of Joshua and Stephanie Mast. *Id.* at ii. For example, he asserts that the Protective Order's requirement for a non-disclosure agreement would preclude Joshua and Stephanie Mast from registering Baby Doe in school without getting non-disclosure agreements signed by teachers and administrators. *Id.* Richard Mast also contends that his own wife and

---

[6] These factors derive from *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993).

other family members would have to sign a non-disclosure agreement under the terms of the

Protective Order. He also claims the Protective Order is unconstitutionally vague. *Id.* at 17–18.

While Richard Mast levies invectives against the Protective Order ("biased … asymmetrical …

[and] extreme," *id.* at 1), the merits of his claims largely can be distilled into whether its terms

constitute a true "gag order," or whether the *James* factors have been satisfied.

Recently, Richard Mast filed another motion to vacate or modify the Protective Order.

Dkt. 442. He raises a bevy of arguments therein, some of which the Court has already resolved.[7]

His primary new argument, however, is that the Protective Order has "effectively prohibit[ed]

Defendants' defense." *Id.* at 9. For example, Richard argues that he "knows of specific

individuals in Afghanistan who have, or can obtain, relevant information" supportive of

Defendants' defenses, but they "will not sign non-disclosure agreements for a federal court; nor

will they allow themselves to be exposed to the Taliban as witnesses for the Masts." *Id.* at 9–10;

*id.* at 10 ("no Afghani will sign a U.S. non-disclosure agreement"). Thus, he argues that the

Protective Order infringes not only his discovery rights but also due process rights. *Id.* at 10–11.

1. Governing Legal Standard

Rule 10(a) of the Federal Rules of Civil Procedure states that a civil complaint "must

name all the parties." Fed. R. Civ. P. 10(a). That rule reflects the "general presumption of

openness of judicial proceedings" grounded in the common law and First Amendment. *Doe v.

Doe*, 85 F.4th 206, 210 (4th Cir. 2023). Allowing a litigant to proceed in federal court under a

---

[7] For instance, Richard Mast requested that the Court resolve outstanding motions to dismiss for lack of subject matter jurisdiction before considering the motions to vacate or amend the Protective Order, or resolving the parties' Rule 12(b)(6) motions. *See* Dkt. 442 at 6–9. And Richard elaborated further on his subject matter jurisdiction challenges. *See id.* Since the filing of Richard's motion, the Court has held that the Court has subject matter jurisdiction, rejecting his and his codefendants' arguments. *See* Dkt. 455 ("MTD Mem. Op.") at 26–61. The Court need not rehash its rulings on the topic.

7

pseudonym runs counter to public's right of access to judicial proceedings, while providing a

litigant's identity furthers the openness of judicial proceedings. *Id.* at 210–11.

Yet certain circumstances can warrant permitting a litigant to sue under a pseudonym. In

some cases, "privacy or confidentiality concerns are sometimes sufficiently critical that parties or

witnesses should be allowed this rare dispensation." *James*, 6 F.3d at 238. "Extraordinary

circumstances" must support the request, that "balanc[e] the party's stated interest in anonymity

against the public's interest in openness and any prejudice that would pose to the opposing

party." *Doe v. Pub. Citizen*, 749 F.3d 246, 274 (4th Cir. 2014). Whether to allow a litigant to

proceed under a pseudonym is committed to the trial court's discretion. *Doe*, 85 F.4th at 211;

*James*, 6 F.3d at 238.

In *James*, the Fourth Circuit identified five (non-exhaustive) factors that district courts

should consider when deciding whether to allow a litigant to proceed using a pseudonym:

> (1) Whether the justification asserted by the requesting party is merely to avoid the
> annoyance and criticism that may attend any litigation or is to preserve privacy
> in a matter of sensitive and highly personal nature;

> (2) Whether identification poses a risk of retaliatory physical or mental harm to the
> requesting party or even more critically, to innocent nonparties;

> (3) The ages of the persons whose privacy interests are sought to be protected;

> (4) Whether the action is against a governmental or private party; and

> (5) Relatedly, the risk of unfairness to the opposing party from allowing an action
> against it to proceed anonymously.

*Doe*, 85 F.4th at 211 (quoting *James*, 6 F.3d at 238) (cleaned up).

Defendants dispute that the *James* factors supply the legal framework that governs the

propriety of the Protective Order. Defendants instead characterize the Court's order as a "gag

order," which they assert is presumptively unconstitutional and must satisfy strict scrutiny. *See, e.g.*, Dkt. 176 at 7–8; *id.* at 8–16; Dkt. 130 at 12–13.

Defendants' arguments are unpersuasive. The Court did not issue a "gag order." The Court allowed Plaintiffs leave to proceed using pseudonyms: John Doe, Jane Doe, and Baby Doe. This stands in stark contrast with the actual "gag orders" issued in the gag-order cases that Defendants have cited. *In re Murphy-Brown, LLC*, 907 F.3d 788, 796 (4th Cir. 2018) (district court imposed order that "the parties, their lawyers, and all potential witnesses were not allowed to 'give or authorize *any* extrajudicial statement … relating to the trial, the parties or issues in this case' if such statement could reasonable reach 'public communications media' and could 'interfere with a fair trial or prejudice any plaintiff, the defendant, or the administration of justice'") (emphasis added); *Am. Sci. & Eng'g, Inc. v. Autoclear, LLC*, 606 F. Supp. 2d 617, 626 (E.D. Va. 2008) (ruling that "publishing false information about the Court's rulings is egregious and vexatious misconduct justifying the imposition of sanctions").

Time and again, the Fourth Circuit has explained that the decision to allow a party to proceed in litigation using a pseudonym is governed by its framework in *James v. Jacobson*. *E.g.*, *Doe v. Sidar*, 93 F.4th 241, 247 (4th Cir. 2024); *Doe v. Doe*, 85 F.4th 206, 211 (4th Cir. 2023) ("In *James*, we set out five nonexhaustive factors for district courts to consider when deciding motions to proceed by pseudonym."); *Pub. Citizen*, 749 F.3d at 273 ("In *Jacobson*, we identified the following nonexclusive factors for district courts to consider when determining whether a party should be permitted to litigate pseudonymously …"); *James*, 6 F.3d at 238. To be sure, a court's decision to allow a litigant to use a pseudonym involves some intrusion on the public's right of access to the courts and judicial proceedings, implicating First Amendment and common law interests. *Pub. Citizen*, 749 F.3d at 261, 264. But, as the Fourth Circuit has

explained, those interests are accounted for in the *James* factors. *Doe v. Doe*, 85 F.4th at 210–11;

*Doe v. Sidar*, 93 F.4th at 247.

The Court also is not persuaded by Defendants' argument that the Court imposed an

unconstitutional "gag order" by prohibiting Defendants from disclosing Plaintiffs' identities and

identifying information concerning their residences in Afghanistan, unless Defendants first

secure a signed non-disclosure agreement for every such disclosure. *See, e.g.*, Dkt. 130 at 12–13;

Dkt. 176 at 12–17. It could be said that inherent in any order permitting a party to proceed under

a pseudonym is an implicit command that the parties bound by the order not publicly disclose the

pseudonymous litigant's real name. Such an order is a limited intrusion on the public's "interest

in knowing the names of the litigants," after all. *See Public Citizen*, 749 F.3d at 273. And an

order permitting a party to use a pseudonym would be of scant (if any) utility if the opposing

litigant could publicly name them. Still, it would appear the better practice—which Plaintiffs

followed here—to explicitly seek a protective order prohibiting Defendants' disclosure of their

identities in addition to asking for leave to proceed under a pseudonym. *See, e.g.*, *Doe v. Va.*

*Polytechnic. Inst. & State Univ.*, No. 7:21-cv-378, 2022 WL 972629, at *4 (W.D. Va. Mar. 30,

2022) (granting the plaintiff's motion to proceed under a pseudonym and motion for a protective

order prohibiting the defendants from disclosing his identity). That way, the Court would be

most explicit in articulating the litigants' rights and obligations. In many respects, a protective

order is a corollary to a pseudonym order. Yet that does not mean that the order allowing the

pseudonym and prohibiting disclosure of the litigant's real identity becomes a "gag order"

subject to strict scrutiny. Defendants have cited no precedent that would support applying the

"strict scrutiny" standard under these circumstances. To the contrary, all authority supports the

application of the *James* factors in considering such requests. *See id.* at * 2–4 (applying *James*

factors); *Doe v. Alger*, 317 F.R.D. 37, 39–42 (W.D. Va. 2016) (applying *James* factors in

decision to allow a pseudonym and entry of "a protective order prohibiting the use of [plaintiff's]

real name … during this case"). The Court will therefore consider Plaintiffs' requests using the

established *James* framework.

    2.  <u>Application of the *James* Factors</u>

        a.  *Risk of Harm to Plaintiffs and Their Families in Afghanistan*

The *James* factor of paramount significance in this case is "whether identification poses a

risk of retaliatory physical or mental harm to the requesting party or *even more critically, to*

*innocent nonparties*." *See James*, 6 F.3d at 238 (emphasis added).

When the Court initially granted Plaintiffs' motion to proceed under pseudonyms,

Plaintiffs presented a compelling case, based upon record evidence, that disclosure of their

names would put them, Baby Doe, and innocent non-party family members in Afghanistan at

great risk of physical harm. Dkt. 26 at 2. John Doe testified in a sealed affidavit that he and Jane

Doe have told only a few trusted family members that they are in the United States. John Doe

Decl. ¶ 6. They fear that if their identifies become known, the Taliban will wrongly believe John

Doe was helping the U.S. government, though he was not. *Id.* ¶ 7. John Doe testified that he

knew that the Taliban "have hurt or killed many people who worked with the U.S. government

and have targeted their families to find them or pressure them to return." *Id.* ¶ 8. As a result, John

Doe testified that he feared the Taliban would harm or kill their families in Afghanistan. *Id.* This

and other evidence readily showed the grave safety risks that John and Jane Doe and their

families in Afghanistan would face if their identities became public. *See* Dkt. 4 at 4–5 (citing

reports of Taliban targeting Afghans in "retaliatory killings or violence" if they were believed to

have provided assistance to United States or non-governmental organizations). In addition, John

Doe testified that others in Afghanistan may erroneously believe he and Jane Doe voluntarily gave Baby Doe to the Masts for the "chance to come to the U.S."—a belief that would yet further risk visiting harm upon the Does' families in Afghanistan, as it is illegal in Afghanistan for non-Muslims to adopt Muslim children. John Doe Decl. ¶¶ 8–10; Am. Compl. ¶ 41.

Notably, besides characterizing the threat of harm as "speculation," Dkt. 149 at 6, the Masts do not directly challenge Plaintiffs' evidence or present contrary evidence that John and Jane Doe and their families would not face such a risk of physical harm or even death. Dkt. 130 at 9–10; Dkt. 149 at 6–7. This is significant. No party has presented any substantial evidence to challenge Plaintiffs' evidence that if their names become known, the Taliban could well believe (incorrectly) that John Doe had been working for the United States, and carry out violence against the Does' families remaining in Afghanistan as they have to those who provided assistance to the United States before the Taliban came to power. This evidence is just as relevant and compelling as it was when Plaintiffs first presented it.

To be sure, in some respects, the threat of physical harm imminently facing *John and Jane Doe directly* has decreased since they were granted asylum in the United States. Dkt. 415 at 8. But the threat to their families, as "innocent nonparties," has become only more real and acute. And the evidence before the Court demonstrates a continuing, clear, and substantiated risk of physical harm to Plaintiffs' families in Afghanistan, should their identities become public. As Plaintiffs' counsel articulated and have supported with evidence, there already have been several instances in which certain known members of Plaintiffs' families in Afghanistan appear to have been directly targeted by shadowy figures alluding to Plaintiffs and/or Baby Doe. *See* Dkt. 415-3 ("John Doe USCIS Decl.") ¶¶ 55–75; *see also* Dkt. 436 ("May 2024 Hr'g") at 31 (arguing that

"innocent parties still remain in Afghanistan"). The Court finds that the threat to Plaintiffs'

families in Afghanistan, if Plaintiffs' identities become known, is anything but speculative.

The Masts have several counterarguments—but no supporting evidence—for why this

risk-of-harm factor should not weigh in favor of John and Jane Doe's continued pseudonymity.

First, they argue that Plaintiffs' "willingness to speak to the news media entirely undermines

their prior representation to this Court that they fear the consequences of media coverage about

the case." Dkt. 130 at 9–10; Dkt. 149 at 1, 6 (similar). There is no dispute that Plaintiffs John and

Jane Doe spoke to two media outlets (the AP and the New York Times) about this case. Dkt. 137

at 6 (noting Plaintiffs' "decision to speak with select members of the press … only with express

guarantees from those journalists to identify them only with pseudonyms"); Dkt. 167 ("MTD

Hr'g") at 80. Plaintiffs explained that they did so after their lawyers received requests for

comment from news outlets, and they believed the "story was going to be covered," and they

wanted to do so with "two entities that they trusted." MTD Hr'g at 80. Yet critically, Plaintiffs

did so only giving their names to the media outlets on condition of anonymity; the organizations

honored that commitment to their anonymity; and as a result, the outlets did not include their

names or photographs, or other identifying information that would undermine the anonymity

Plaintiffs requested, and the Court countenanced in the Protective Order. *See supra* at 5 nn.4–5.[8]

Nothing in the limited outreach by Plaintiffs to these two media outlets, under the identity-

protecting terms described, undermines the Court's assessment of the risk of physical harm that

---

[8] To the extent that the Masts have argued that the allowing Plaintiffs to proceed using pseudonyms in view of their press outreach is "highly prejudicial" to the Masts and the other named defendants because it "inflame[s] the public against the Masts [and] invites harm upon them," Dkt. 130 at 10; Dkt. 149 at 6–7, the Court will consider such arguments in considering the fifth *James* factor: "the risk of unfairness to the opposing party from allowing an action against [them] to proceed anonymously." *See James*, 6 F.3d at 238.

13

JA317

would be occasioned by disclosure of Plaintiffs' identities, particularly to innocent third

parties—namely, Plaintiffs' families living in Afghanistan.

The Masts also argued that Plaintiffs' request to use pseudonyms is undermined by the

fact that, for a time, the Virginia custody and adoption proceedings publicly identified John and

Jane Doe by their real names on the public case docket. Dkt. 130 at 2, 6. However, the Virginia

Court of Appeals later unequivocally accepted John and Jane Doe's assertions "that the danger

flowing from identification affects not only themselves but also family members who are not

parties to the underlying litigation." Dkt. 168 at 2 (citing Dkt. 168-1 at 2). That court then

allowed the parties to proceed in the state-court litigation using their first and last initials. The

Masts' argument in this regard is therefore unfounded. To the contrary, the subsequent ruling of

the Virginia Court of Appeals provides yet further support for finding a continued risk of

physical harm to Plaintiffs' families if Plaintiffs' identities become known.

Finally, the Masts argue in a recent filing that certain newly discovered evidence

undermines Plaintiffs' assertion that the Protective Order is necessary to protect their identities

and their family members in Afghanistan. Dkt. 415 at 14–15. In the Masts' view, "the facts

establish that anyone in Afghanistan can readily discern who the Does and the child in this case

are." *Id.* at 15. The Masts' argument fails. For one, the evidence the Masts marshal falls far short

of showing that "anyone in Afghanistan can readily discern" who Plaintiffs and their families

are. Second, there is a vast gulf between the relief that the Masts seek—i.e., that the two adult

Plaintiffs' names are included in the case caption and docket for anyone to see, versus evidence

that certain interested persons with ample resources and inclination may be able to connect the

dots. Substantial safety considerations remain for Plaintiffs' families still living in Afghanistan.

As a result, the Court must require a far greater evidentiary basis that the Protective Order is no

longer fulfilling its intended function before the Court will jettison the Protective Order and

spotlight Plaintiffs' identities.

Accordingly, the Court finds that the "risk of physical or mental harm" *James* factor

weighs significantly in favor of retaining Plaintiffs' pseudonymity.

b. *Age of the Person Seeking Anonymity*

Another *James* factor considers "the ages of the persons whose privacy interests are

sought to be protected." *See James*, 6 F.3d at 238. This factor bears little on the disputed issues

before the Court. Plaintiffs John and Jane Doe do not argue that *their* ages counsel in favor of

anonymity. *See* Dkt. 137 at 11–12; Dkt. 149 at 7–8. And as to Baby Doe, no Defendant argues

that she should not be afforded protection of a pseudonym, given that she is a minor. Dkt. 130

at 3; Dkt. 137 at 11; Dkt. 176 at 1.

The only dispute on this factor is that the Masts argue that Baby Doe should not be

referred to as "Baby Doe," as they believe this particular pseudonym "false[ly] and unfairly

implies that the Mats' adoptive daughter is not related to them but is instead related to

Plaintiffs." Dkt. 130 at 10. Rather, the Masts contend that she should be referred to by "the

initials of Baby Doe's legal name … because she is the Masts' adopted daughter." Dkt. 149 at 7.

The Court will not change Baby Doe's pseudonym. Innumerable docket entries and briefs in this

action so refer to her. And the Masts' argument about unfair implications of the pseudonym

"Baby Doe" is unfounded—the Court has been clear that "[t]his federal case does not involve

adoption or custody," which are matters being addressed in the Virginia courts. Dkt. 455 ("MTD

Mem. Op.") at 4. The Court will not wade into those waters to resolve a dispute over which

pseudonym is preferable. Put simply, nothing should be read into the Court's use of the

pseudonym, "Baby Doe," except that the Court found that the child's true identity should not be
made public under the *James* factors.

c.    *Whether the Case Involves a Sensitive and Highly Personal Matter*

The Masts next argued that the subject matter of this case is not of a "sensitive and highly
personal" matter, largely on the basis that Plaintiffs and their attorneys have "discuss[ed] it with
the media" as have their attorneys. Dkt. 130 at 9; Dkt. 149 at 4; *see James*, 6 F.3d at 238.

The Court disagrees. This case involves an alleged scheme by the Masts and their co-
defendants to dupe Plaintiffs into bringing their young daughter Baby Doe to the United States to
receive specialized medical care, only to have the Masts abduct Baby Doe once they arrived in
the United States. The fact that Plaintiffs and their attorneys engaged in limited outreach to the
press on a few occasions, and on condition that their anonymity was preserved, does not detract
from the sensitive and highly personal nature of this case. Moreover, the record does not support
any suggestion that Plaintiffs sought anonymity "merely to avoid the annoyance and criticism
that may attend any litigation." *See James*, 6 F.3d at 238. Rather, the record shows that Plaintiffs
have acted on a more-than-good-faith fear that publication of their names or other identifying
information will result in substantial risk of physical harm to their family still in Afghanistan.
The Court finds that this factor also weighs in favor of retaining Plaintiffs' pseudonymity.

d.    *Whether the Case Is Against a Governmental or Private Party*

Next, the Court considers the fourth *James* factor, "[w]hether the action is against a
governmental or private party." *See James*, 6 F.3d at 238. Plaintiffs initially filed this action
against both private individual defendants (the Masts, et al.) as well as two federal cabinet
officials as "nominal defendants" in their official capacities. Dkt. 68 ("Am. Compl.") at 1
(Caption). Subsequently, however, Plaintiffs filed a stipulation of dismissal against the two

federal officials, leaving only private parties as defendants. Dkt. 270. To be sure, when a litigant

only sues a governmental party, courts have generally been more likely to allow a plaintiff leave

to proceed under a pseudonym. *Alger*, 317 F.R.D. at 41. The rationale underlying that factor is

that a case against a government "do[es] no harm to its reputation." *Id.* Conversely, when a

litigant only sues a private party, this factor is more likely to weigh against allowing anonymity

or pseudonymity. *See Doe*, 85 F.4th at 215. That is because a suit against private parties "may

damage their good names and result in economic harm." *Alger*, 317 F.R.D. at 41.

    Notwithstanding the initial inclusion of the two federal officials as defendants, the Court

finds that this factor does weigh somewhat against retaining John and Jane Doe's pseudonymity,

as Plaintiffs brought the case against several private individuals and they remain the only

defendants in this action. To be sure, the Masts argue stridently that "[t]his is … not a case where

the plaintiffs have sought bilateral pseudonymity to protect *both sides* in a private dispute," but

rather, charge that Plaintiffs "are using their pseudonymity to shield themselves while publicly

attacking the Masts." Dkt. 130 at 10. This argument sounds in both the fourth *James* factor

(identity of the opposing party), and the fifth James factor (the "risk of unfairness to the

opposing party from allowing an action against it to proceed anonymously"). Yet the Fourth

Circuit has explained that it would be improper for a court to adopt a "flat rule" that "the fairness

factor always counsels against letting a plaintiff in a civil action use a pseudonym at trial unless

the defendant is also using one." *See Sidar*, 93 F.4th at 248. This admonition similarly counsels

against attributing overbearing weight solely to this one factor—the identity of the opposing

party—especially when, as here, the Court finds that other factors, namely the risk of retaliatory

and physical harm, weigh heavily in favor of granting protection. Thus, the Court finds that the

fourth *James* factor weighs somewhat against retaining pseudonymity, yet the Court finds that

17

the weight of this factor on the Court's cumulative assessment of the *James* factors is leavened

considerably by the presence of the other *James* factors.

        e.   *Risk of Unfairness to Party Opposing the Pseudonym*

      Lastly, the Court considers the "risk of unfairness to the opposing party from allowing an

action against it to proceed anonymously." *See James*, 6 F.3d at 238. The parties' arguments on

this factor mirror in some respects their arguments on the prior factor—that the case is brought

against private parties rather than a government.

      The Masts' argument in this regard largely focuses on the perceived unfairness of

Plaintiffs' seeking anonymity while they have been publicly named as Defendants in the action.

Dkt. 130 at 10–11. They argue that it is "highly prejudicial" for the Court to allow Plaintiffs "to

enjoy the cloak of pseudonymity," while they "have shared their false and defamatory

accusations against the Masts with the media and indeed the world." *Id.* at 10–11. The Masts

argue that "Plaintiffs' speaking to the media has resulted in" negative publicity about them;

various posts by others on social media claiming, among other things, Joshua Mast committed a

"war crime"; and certain outlets publicizing photos of the Masts' biological children and

disclosure of the town where they live. *Id.* at 11; Dkt. 149 at 8 (arguing that allowing Plaintiffs to

proceed under pseudonyms "is exceptionally unfair to the Masts because the Plaintiffs have used

pseudonymity to draw public attention to the private family matters of the Masts").

      Again, the Fourth Circuit has admonished courts that the fairness factor does not "always

counsel[ ] against letting a plaintiff in a civil action use a pseudonym at trial unless the defendant

is also using one." *See Sidar*, 93 F.4th at 248. That is not to say the issue is irrelevant—just that

the Court's consideration of the fairness factor must be grounded in the specifics of the case, and

not any general aversion to one-sided anonymity requests. In this case, any potential unfairness

to the Masts is greatly mitigated by one fact—they have always known Plaintiffs' identities.

Thus, the Masts cannot persuasively argue in seeking to modify the Protective Order that

Plaintiffs' use of pseudonyms has hindered the Masts' ability to mount a defense—as it might in

a case in which the defendants do not know the plaintiffs' identities. *See Student A v. Liberty

Univ., Inc.*, 602 F. Supp. 901, 920 (W.D. Va. 2022) (finding that the "unfairness factor" was

"significantly mitigated by named Plaintiffs' willingness to provide names and other discovery to

certain Defense counsel and limited persons at Liberty so that they could prepare its defense");

*Doe v. Rector & Visitors of George Mason Univ.*, 179 F. Supp. 3d 583, 594 (E.D. Va. 2016)

(finding this factor did not weigh against allowing plaintiff to use a pseudonym when there was

"no indication" defendants "faced any hardship in mounting an effective defense as a result").

Richard Mast has raised a related argument challenging other provisions in the Protective

Order, namely the requirement that persons to whom Defendants or their representatives disclose

Plaintiffs' true identities must sign a non-disclosure agreement. Dkt. 442 at 9–11. He claims

unfairness arising from the Protective Order that, in his view, not only undermines his discovery

rights but also due process rights.[9] *See id.* The Court finds, at this time, the argument both

speculative and underdeveloped. While Richard Mast says he "knows of specific individuals"

who could be helpful to his case but from whom he cannot get information on account of the

Protective Order, *see id.* at 9–10, he offers no specific facts, much less evidence, to substantiate

the assertion. It is further entirely unclear why, for instance, these individuals' concerns to not

"allow themselves to be exposed to the Taliban as witnesses for the Masts," counsel *against* the

provisions of *this* Protective Order (to protect the identities of Plaintiffs), rather than seeking

---

[9] Counsel for Joshua and Stephanie Mast made a similar point at oral argument in May, calling it a "genuine problem," but similarly did not back it up with any evidence or specifics at that time, or in the months that have followed. *See* May 2024 Hr'g at 40.

19

from the Magistrate Judge *a discovery protective* order that would include measures to protect

other potential witnesses' safety. *See* Fed. R. Civ. P. 26(c)(1). The Court also notes that Richard

Mast has been engaging in discovery and has opposed other parties' motions for discovery

protective orders.[10] Without further development, the Court finds at this time that this argument

does not support any unfairness to Defendants under this *James* factor.[11]

The Masts attempt to claim "*Plaintiffs' speaking to the media* has resulted in pictures of

the Masts' other children being widely disseminated and in disclosing the town in which the

Masts' live." Dkt. 130 at 11 (emphasis added). As objectionable as that other outlet's publication

of photos of the Masts' biological children may be, there is no basis to believe that *Plaintiffs'*

*statements* to the media prompted this disclosure, as the Masts argue. Nor does the Court find

persuasive the Masts' attempt to lay directly at Plaintiffs' feet all the vitriol the Masts have

received from corners of social media for their alleged conduct that underlies Plaintiffs' claims in

this case. *See* Dkt. 130 at 10–11. There is no evidence to support that Plaintiffs, for example,

were egging on those who subjected the Masts to online abuse.

The Masts have also highlighted a statement issued by the Taliban condemning the Masts

as demonstrating the perceived unfairness that the Court "should shield [Plaintiffs] (and only

[Plaintiffs]) from public scrutiny or criticism." *Id.* at 1–2. The Court need not discount that the

---

[10] *See* Dkt. 452 at 2 n.2 (explaining that Richard has "served 139 requests for production, 7 interrogatories, 7 requests for admission, and at least one third-party subpoena"); Dkts. 171, 210.

[11] Richard Mast attempts to distinguish *James* on the basis that the case "involved matters and witnesses in the U.S., not Afghanistan controlled by the Taliban," and that, "in *James*, there was no threat of murder or mayhem if a witness for the defense were to be asked to a sign a non-disclosure agreement." Dkt. 442 at 11. If anything, the location of the witnesses would appear to point in precisely the opposite direction: rendering even more important the need for the provisions of the Protective Order, and, were Defendants to substantiate the need, protections for non-party witnesses in a separate discovery protective order. Fed. R. Civ. P. 26(c)(1).

20

Masts would have legitimate concerns about the issuance of such a statement. Yet that does not

negate or undermine the safety risks Plaintiffs demonstrated that their families who are living in

Afghanistan would face, should Plaintiffs' identities come to light. *See* Dkt. 137 at 10.

At bottom, the Masts' objections are largely based on the perceived unfairness that *they*

(the Masts) have not been afforded anonymity, rather than the risk of unfairness to them (the

Masts) from allowing *Plaintiffs* to litigate the case under pseudonyms. *See James*, 6 F.3d at 238.

The Court finds that, though the Masts have undoubtedly faced the harsh glare of the media

spotlight following initiation of this litigation and the ongoing Virginia proceedings, the Masts

have not demonstrated that the "risk of unfairness" *James* factor tilts in favor of jettisoning

Plaintiffs' anonymity. Indeed, the Virginia Court of Appeals reached a similar conclusion when

it determined that the litigants could file in that court using only their initials. *See* Dkt. 168 at 2;

Dkt. 168-1. In so ruling, that court rejected the Masts' identical argument that "they would be

'highly prejudic[ed]' by allowing the proceedings to go forward anonymously, because [the

Masts'] names have been used in media and social media while [Plaintiffs] continue to enjoy the

cloak of pseudonymity." *See* Dkt. 168-1 at 2. Ultimately, the Virginia Court of Appeals found

paramount the risk of "danger flowing from [Plaintiffs'] identification," which would affect

"family members who are not parties to the underlying litigation." *Id.*

3.   Conclusion

Having considered the *James* factors, the Court finds that the "risk of harm" factor—

particularly the risk of physical injury or even death facing Plaintiffs' relatives currently living in

Afghanistan should Plaintiffs' identities become known—is of paramount significance. The

Court also finds Plaintiffs did not initiate this lawsuit pseudonymously merely to avoid

annoyance and criticism that attends any litigation, but rather based on a well-founded concern

21

of risk of physical harm—another *James* factor that weighs in Plaintiffs' favor. That the case is

against private parties weighs, to a degree, in the Masts' favor. But the Masts have not

demonstrated any unfairness from allowing *Plaintiffs* continued leave to proceed under

pseudonyms, much less unfairness to such a degree as would counterbalance the threat of

physical harm facing Plaintiffs' families in Afghanistan. On balance, then, the Court finds that

the *James* factors weigh decisively in favor of retaining the Protective Order; that Plaintiffs have

demonstrated that "exceptional circumstances" warrant the Court's affording them the "rare"

ability to litigate using pseudonyms, *see Pub. Citizen*, 749 F.3d at 273 (citing *James*, 6 F.3d at

238); and that, as a result, Plaintiffs may continue to proceed in this litigation using their

respective pseudonyms.[12]

---

[12] Even if strict scrutiny applicable to true "gag orders" governed the validity of the
Protective Order—and it does not—the Court would conclude that Plaintiffs have established
that such standard is met. Here, there is a "compelling" public interest in preserving Plaintiffs'
safety and the safety of their families, who are innocent nonparties. *See Kolbe v. Hogan*, 849
F.3d 114, 139 (4th Cir. 2017) (en banc) (a state's "interest in the protection of its citizenry and
the public safety is not only substantial, but compelling"), *rev'd on other grounds*, *N.Y. State
Rifle & Pistol Ass'n*, 597 U.S. 1 (2022); *cf. Int'l Refugee Assistance Project v. Trump*, No. 17-cv-
361, 2017 WL 818255, at *2 (D. Md. Mar. 1, 2017) (holding that privacy concerning litigants'
faith and immigration status supported anonymity because, "if disclosed, [it] could jeopardize
their safety in foreign countries").

Moreover, the Court finds that the limited measures imposed in the Protective Order—
use of pseudonyms, prohibiting identification of Plaintiffs' identities and where they were from,
absent securing a non-disclosure agreement, etc.—are not only "narrowly tailored to serve their
intended purpose," but constitute "the least restrictive means" to ensure Plaintiffs' safety and that
of their families still living in Afghanistan. *See In re Murphy-Brown*, 907 F.3d at 799 (citations
omitted). Defendants suggest that leaving the Protective Order in place would spawn a parade of
horribles, including that it would preclude them from enrolling Baby Doe in kindergarten absent
the teacher signing a non-disclosure agreement. Dkt. 176 at ii, 17; Dkt. 149 at 9–10. Defendants'
artificially expansive interpretation of the Protective Order is unmoored from its text. It limits
Defendants' identification of Plaintiffs as such—*Plaintiffs in this case*—as well as identification
of Plaintiffs' family members. *See* Dkt. 26 at 2–3; Dkt. 188 at 3–4. Simply put, the common-
sense provisions in the Protective Order cannot reasonably be read to require that anyone
interacting with Baby Doe (e.g., her teacher) must execute a non-disclosure agreement first,
when she has not been identified in connection with this litigation. Giving the Protective Order
its natural meaning, Defendants have not identified any less restrictive means than those set forth

Accordingly, the Court will **DENY** Defendants' motions to amend, modify or vacate the Protective Order. Dkts. 130, 176, 442.

### Motions to Hold the Masts in Civil Contempt for CBS Interview

Plaintiffs first filed a motion to show cause why Defendants Joshua and Stephanie Mast should not be held in civil contempt for violating the Court's Protective Order. Dkt. 141. In the motion, Plaintiffs charge that they were "stunned to see a CBS television segment" that included "photographs and video imagery of Baby Doe that CBS could have obtained only from the Masts or with their explicit permission." *Id.* at 2. They also took exception to other photographs shown in the news segment, as well as instances during the interview in which Joshua and Stephanie Mast identify Baby Doe from a photograph and describe the physical injuries she sustained in some of the events underlying this lawsuit. *Id.* Plaintiffs assert that by this conduct, the Masts have "imperiled" their safety as well as that of Plaintiffs' families. *Id.* Thus, Plaintiffs contend that the Masts committed a knowing violation of the Protective Order that warrants a civil contempt sanction. *Id.*

The next day, Plaintiffs filed a supplemental motion for an order to show cause based on a "second installment" of the CBS program. Dkt. 142. Plaintiffs claimed that the second program provided "additional evidence of the Masts' contumacious conduct," depicting photos and videos "that could have been obtained only from the Masts," and during which "Joshua Mast is shown passing unknown materials to the CBS reporter." *Id.* at 2.

---

in the Protective Order that would safeguard such compelling safety interests. *See* Dkt. 130 at 12–13. Thus, Defendants' arguments that the Protective Order fails to satisfy the strict scrutiny standard are without merit, both because that is not the governing legal framework, and because the Protective Order does satisfy that test. Nor for these reasons can the Protective Order be considered unconstitutionally vague.

In the Fourth Circuit, courts employ a burden-shifting framework to determine whether a party should be found in civil contempt. *Consumer Fin. Prot. Bureau v. Klopp*, 957 F.3d 454, 462 (4th Cir. 2020). At the first step, a party moving for civil contempt must prove four elements by clear and convincing evidence:

(1) The existence of a valid decree of which the alleged contemnor had actual or constructive knowledge;

(2) That the decree was in the movant's favor;

(3) That the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations; and

(4) That the movant suffered harm as a result.

*De Simone v. VSL Pharms, Inc.*, 36 F.4th 518, 529 (4th Cir. 2022) (quoting *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir. 2000) (cleaned up in *De Simone*)). If the movant establishes these elements, the burden then shifts to the alleged contemnor "to demonstrate that she made in good faith all reasonable efforts to comply with the decree." *De Simone*, 36 F.4th at 529 (cleaned up). If the alleged contemnor fails to show good faith in making all reasonable efforts to comply with the order, they may be held in contempt. *Klopp*, 957 F.3d at 461–62. Civil contempt orders and the appropriateness of consequences crafted for violating court orders fall within the district court's discretion. *Id.* at 461.

During the hearing on Plaintiffs' motion to show cause, as well as on other motions, the Court heard testimony from Joshua Mast concerning the circumstances underlying his and Stephanie's involvement in the CBS interview. *See* MTD Hr'g at 98–111. Having heard the testimony and argument thereon, and considered other evidence submitted on this subject, the Court **finds**, with respect to the CBS interview, that Plaintiffs **have not shown** by clear and convincing evidence that either Joshua Mast or Stephanie Mast violated the terms of the

24

**JA328**

Protective Order and had knowledge at the time of such violations. *See De Simone*, 36 F.4th at 529. Moreover, even if Plaintiffs had shown this element—and they have not—the Court would conclude that the Masts had established that in good faith they made all reasonable efforts to comply with the Protective Order with respect to the CBS interview. *See id.*

The Court finds significant that (1) the Masts themselves never disclosed Plaintiffs' names, nor themselves provided identifying information where Baby Doe was found,[13] (2) Joshua Mast's testimony is unrefuted that third parties had provided CBS with the other photographs of Baby Doe,[14] (3) Joshua Mast testified that when CBS asked for permission to show photographs of Baby Doe, he "told them that we did not authorize anything that showed her face,"[15] and finally (4) Joshua Mast also testified, without contradiction, that he only "gave" photographs of Baby Doe to CBS that did not show her face.[16]

Of course, in the interview, Joshua Mast did identify Baby Doe from a photograph that the reporter says was "provided" to them. Yet the tenor of his response to the reporter ("I would say that's one of my favorite photos of her …"), reflect little more than an accidental slip, rather than a knowing violation of the Protective Order. The Court also views Stephanie Mast's

---

[13] MTD Hr'g at 99 (Joshua Mast, testifying that "we tried to stick with the … intent of that protective order. That's why we didn't talk about them [Plaintiffs] at all. We didn't name them. We didn't talk about where they're from in Afghanistan, that type of thing.").

[14] MTD Hr'g at 102–03 (Joshua Mast, testifying that CBS "didn't get those from us," referring to the photographs of Baby Doe showing her face); *id.* at 104–05 (testifying that he believed the protective order reflected a difference between "providing things that identify [Baby Doe] and [CBS] getting that from independent sources").

[15] MTD Hr'g at 102 (Joshua Mast testimony).

[16] MTD Hr'g at 106. To be sure, Joshua Mast did testify that he did "show" the CBS reporter photographs of Baby Doe as a baby that did show her face, but he did not "give" the photographs to the reporter. *Id.* at 107. To the extent this act evidences a violation of the Protective Order, the Court does not consider the violation such as would undermine the Court's conclusion that Joshua and Stephanie Mast acted in good faith in making all reasonable efforts to comply with the Protective Order vis-à-vis the CBS interview.

25

response concerning Baby Doe's injury in a similar light. Because the Court finds—with respect to the Masts' challenged conduct during the CBS interview—that Plaintiffs have failed to establish that Joshua and Stephanie Mast knowingly violated a term of the Protective Order. Alternatively, the Court finds that even if Plaintiffs had made a prima facie showing of all four elements of civil contempt,[17] the Masts established that they had taken in good faith all reasonable steps to comply with the Protective Order.

Accordingly, the Court **DENIES** Plaintiffs' Motion to Show Cause and Supplemental Motion to Show Cause why Joshua and Stephanie Mast Should Not Be Held In Civil Contempt, with respect to the CBS interview. Dkts. 141, 142.

### Motion to Hold Joshua Mast and Jonathan Mast in Civil Contempt for Communications with the "Pipe Hitter Foundation"

Plaintiffs have also filed a motion to hold Joshua Mast and one of his brothers, Jonathan Mast, in civil contempt, for violating the Protective Order when they were enlisting an organization called the "Pipe Hitter Foundation" or "PHF" to implement a fundraising campaign for Joshua and Stephanie Masts' legal defense in this case. Dkts. 231, 403.[18] In the course of that fundraising campaign, the organization posted numerous identifying photos of Baby Doe on its website and social media accounts. Noting arguments made in the briefs that outstanding

---

[17] Because the Court held there was no knowing violation of the Protective Order, the Court need not address the other elements of civil contempt with respect to this motion.

[18] Plaintiffs initially sought a civil contempt sanction against Stephanie Mast as well, but they later withdrew the request "because discovery revealed no evidence that she was actively involved in Joshua Mast's scheme" with respect to the Pipe Hitter Foundation. Dkt. 403 at 2 n.1. In addition, Plaintiffs represented that "[d]iscovery further suggested that PHF was an innocent pawn," and that once Plaintiffs' counsel informed it of the Protective Order, "PHF acted promptly to pull down the social media posts" at issue in Plaintiffs' motion. *Id.* As a result, Plaintiffs also withdrew their request "that PHF be held in contempt as aiding and abetting Joshua Mast's violation of the Protective Order." *Id.*

discovery would be material to the issue, the Court granted a continuance so that the parties

could conduct such discovery. Dkt. 263. Subsequently, the parties filed and the Court has

considered prehearing memoranda and evidence, Dkts. 403, 415, the Court heard argument on

the motion to hold Joshua and Jonathan Mast in civil contempt, Dkt. 436 ("May 2024 Hr'g"),

and the Court received and considered post-hearing submissions, including the first filing from

Jonathan Mast, Dkt. 437, 438. Upon consideration of the submissions and evidence, the Court

makes the following findings of fact.

The Pipe Hitter Foundation is a 501(c)(3) non-profit organization that, among other

things, provides financial support, legal defense grants, and otherwise advocates for service

members, first responders and their families.[19] In early 2023, Joshua Mast initiated discussions

with PHF in order to raise money for his legal defense in this case.[20] On January 7, 2023, Joshua

emailed PHF background information on this case, and, significantly, also sent his contact within

the organization a Google photo album that included hundreds of identifying photographs of

Baby Doe.[21] When he sent the photographs to PHF, Joshua Mast did not inform the organization

about the Protective Order, much less secure a non-disclosure agreement.[22] From January to

March 2023, identifying photographs of Baby Doe were circulated amongst staff and the board

of the PHF, when it was considering and later approved a legal defense grant for the Masts.[23]

---

[19] Dkt. 257-2 ("Disarro Decl.") ¶¶ 7–9.

[20] Dkt. 239-1 ("Joshua Mast Decl.") ¶ 6. Joshua Mast made the initial outreach through
Brian Ferguson, an attorney with whom PHF had previously partnered. Disarro Decl. at 2 ¶¶ 20–
24.

[21] Dkt. 407-6 ("Pls' Ex. R") at ECF 2–3 (email); Dkt. 407-4 ("Pls' Ex. L") (Google
folder, including photographs).

[22] *See id.*; *see also* Disarro Decl. ¶¶ 23–24, 28, 54–55.

[23] Disarro Decl. ¶¶ 25–32, 36–37, 54.

27

The executive director of PHF only learned about the Protective Order in March 2023, when Joshua Mast told her about it.[24] While Joshua Mast told PHF's Executive Director that the Protective Order (which he called a "gag order") prevented *him* from speaking publicly about the case, Joshua Mast suggested that his brother, Jonathan Mast, could instead act on their behalf in that public-facing capacity.[25] Joshua then called Jonathan to let him know he could expect to hear from PHF's executive director.[26]

This evidence severely undermines the credibility of Joshua Mast's statements, made under oath, that "[his] understanding is the [PHF] subsequently reached out to [his] family members," and that in February or March 2023, "Stephanie and [Joshua] learned that [his] brother, Jonathan Mast, had coordinated with the [PHF] to raise money for [their] expenses."[27] Those statements would suggest that Joshua Mast was totally ignorant of the connection between his brother and PHF, that those two nonparties independently began working together without his knowledge. But Joshua's testimony omits material context that is supported by persuasive and consistent evidence before the Court: that he (Joshua) had prearranged with both PHF and Jonathan to have Jonathan serve as point of contact and spokesperson for the Masts' legal defense campaign. Considering this evidence, the Court finds that Joshua Mast knowingly

---

[24] Disarro Decl. ¶¶ 54–55. To the extent Joshua Mast testified that he "*from the outset* explained to [PHF] that due to the Court's gag order and its restrictions on identifying our daughter in this suit, we were essentially unable to defend ourselves …", Joshua Mast Decl. ¶ 6 (emphasis added), the Court finds more credible, persuasive, and supported by evidence the more detailed account by Ms. Disarro that she only learned of the Protective Order in March 2023. *See* Disarro Decl. ¶¶ 54–56; *id.* ¶¶ 19–55 (background).

[25] Disarro Decl. ¶¶ 55–57, 60–64.

[26] *See* Dkt. 403-6 ("Jonathan Mast Dep.") at 49–50, 56, 76–77.

[27] Joshua Mast Decl. ¶¶ 8–10.

designated Jonathan Mast to serve as his and Stephanie Mast's "representative," within the meaning of the Protective Order. *See* Dkt. 26 at 2 (¶ 1).

For his part, Jonathan Mast testified that he was familiar with the Protective Order before he heard from PHF, and that he understood that its purpose was to protect the identities of John Doe, Jane Doe, and Baby Doe.[28] Nonetheless, on May 10, 2023, Jonathan Mast sent PHF emails containing about twenty identifying photos of Baby Doe.[29]

At this time, Joshua Mast was aware that his brother Jonathan was working with PHF.[30] Still, PHF continued to communicate with Joshua Mast about the fundraising campaign.[31] After PHF sent Joshua Mast the legal defense grant agreement, Joshua said that he could not sign it due to the "gag order."[32] Instead, Joshua Mast told his contact at PHF to speak to Jonathan about the grant agreement; Jonathan was the one who ultimately signed this agreement on May 10, 2023.[33] The grant agreement provided that PHF would be "implementing a fundraising campaign in support of Joshua Mast and his family."[34] Following the fundraising campaign, PHF transferred $5,000 to Jonathan Mast on May 19, 2023, the entirety of which went to Joshua Mast.[35]

---

[28] Jonathan Mast Dep. at 54–55; *id.* at 32–33.

[29] Dkt. 407-3 ("Pls' Ex. J") (email from Jonathan Mast to Ms. Disarro); *see also* Jonathan Mast Dep. at 86 (testifying that, "I sent some photos from this [Google photo album] to Pipe Hitter Foundation").

[30] *See, e.g.*, Joshua Mast Decl. ¶ 10; Jonathan Mast Dep. at 145.

[31] Disarro Decl. ¶¶ 69–73.

[32] Disarro Decl. ¶ 74.

[33] Disarro Decl. ¶¶ 74–75, 81; Dkt. 403-11 ("Pls' Ex. K") (executed grant agreement).

[34] Pls' Ex. K at ECF 3.

[35] Disarro Decl. ¶ 109; Jonathan Mast Dep. at 69–70.

In the course of its fundraising campaign from May to June 2023, PHF published on its website and social media accounts information about this case, including numerous photos of Baby Doe that showed her face.[36] Joshua Mast and Jonathan Mast had sent several of these identifying photos of Baby Doe to PHF, which later published them on its fundraising pages.[37] As part of that fundraising campaign, Jonathan Mast also appeared on One America News Network to describe his family's side of the events involving Baby Doe.[38] In the interview, Jonathan Mast mentioned the ongoing state court litigation as well as this federal action, and he also solicited donations for the Masts' legal defense through the PHF website.[39] Moreover, during that interview, several identifying photos of Baby Doe were shown—photos which Jonathan Mast had sent to the media outlet as well.[40]

Accordingly, the Court finds, by clear and convincing evidence, that both Joshua and Jonathan Mast, by their conduct, violated the terms of the Protective Order and that they had knowledge (and at least constructive knowledge) of such violations. *See Ashcraft*, 218 F.3d at 301. The Protective Order prohibited "Defendants and their … representatives" "from disclosing any information that directly or indirectly identifies Plaintiffs or their family members to any person … unless that person first executes a non-disclosure agreement." Dkt. 26 at 2.

---

[36] Disarro Decl. ¶ 25; Dkt. 407 ("Pls' Ex. A") (screenshots of PHF website donation page for Masts).

[37] These included an unredacted photo of Joshua Mast holding Baby Doe, and an unredacted photo of Stephanie Mast sitting next to Baby Doe. *Compare* Pls' Ex. A at ECF 2–4 (PHF donation page) *with* Pls' Ex. J at ECF 3–4 (photos sent by Jonathan Mast to PHF), and Pls' Ex. L at ECF 2, 10 (Google photo album). *See also* Disarro Decl. ¶¶ 25–27 (explaining that several photos of Baby Doe that were included in the Google photo album were ultimately used by PHF).

[38] Dkt. 403 at 13–14 (and accompanying record citations); Jonathan Mast Dep. at 139.

[39] *See id.*

[40] Jonathan Mast Dep. at 139–40.

30

**JA334**

Joshua and Jonathan Mast both shared identifying photographs of Baby Doe with PHF and

Jonathan sent them to One America News Network, which the organizations published on their

websites and social media accounts.[41] Of course, neither executed a non-disclosure agreement,

nor did Joshua or Jonathan ask them to do so.

Defendants argue that Joshua Mast did not knowingly violate the Protective Order,

claiming that Jonathan Mast had "acted on his own accord and was not directed or asked to

provide photos of Baby Doe." Dkt. 415 at 18; Dkt. 437 at 11–12. The Court finds that argument

carries little weight. For one, Joshua and Jonathan Mast each provided identifying photos of

Baby Doe to PHF, ignoring the Protective Order's express requirements. Further, the evidentiary

record demonstrates that Joshua Mast not only orchestrated Jonathan serving as his and

Stephanie's public-facing point of contact with PHF, but also that Joshua and PHF continued to

communicate afterward.[42] And, further still, the Court finds uncredible Defendants' story that

Joshua and Jonathan's actions vis-à-vis PHF were independent. For instance, Defendants wrote

in their initial opposition brief that "Joshua and Stephanie Mast had no knowledge that Jonathan

Mast was speaking with the [PHF] … until after Jonathan had already done so." Dkt. 239 at 3.

But that wasn't entirely true: Joshua knew that they were in touch.[43] And, in any event, the

statement falls apart in the face of credible evidence showing continued communication between

---

[41] *See* Pls' Exs. A, J, L, R; Jonathan Mast Dep. at 86, 139–40; Disarro Decl. ¶¶ 25–27.

[42] In fact, because Joshua Mast communicated with PHF by an electronic messaging application Signal that automatically deleted his messages, the full record of his communications is necessarily lacking. *See* Disarro Decl. ¶ 38 ("I began communicating with Joshua Mast at his request using an application called Signal …."). In any event, the record evidence still shows continued communication between Joshua Mast and PHF.

[43] Jonathan Mast Dep. at 147 (testifying that Joshua was aware in April and May 2023 that he (Jonathan) was in contact with PHF).

31

Joshua and Jonathan concerning the fundraising campaign.[44] Joshua Mast's sworn declaration was, at best, misleading, in that it indicated that PHF and Jonathan had independently sought to work together—omitting the key fact that the evidence ultimately demonstrated that Joshua had arranged with both parties ahead of time that Jonathan would serve as the public-facing point of contact for the fundraising campaign.

While Defendants argue that "all the evidence suggests Jonathan Mast was acting on his own initiative and Joshua had no knowledge Jonathan was communicating with [PHF] or what Jonathan would ultimately say or do," Dkt 437 at 12, the Court finds that the record evidence points in precisely the opposite direction. That is, the brothers were working together to achieve the same goal of boosting the Masts' legal defense fund.

Defendants also raise challenges to other elements of civil contempt,[45] including "the existence of a valid decree," and that "the movant suffered harm as a result," as well as other arguments seeking to avoid a contempt sanction. None are persuasive.

First, Defendants dispute the element of "the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge." *Ashcraft*, 218 F.3d at 301. In Defendants' view, the Protective Order is not a "valid decree" because it violated the Masts' First Amendment rights—repeating their now-rejected argument that the Protective Order is an unconstitutional "gag order" that failed to satisfy strict scrutiny under the Fourth Circuit's decision in *In re Murphy Brown*, 907 F.3d 788 (4th Cir. 2018); *see* Dkt. 415 at 16–17; Dkt. 437

---

[44] Jonathan Mast Dep. at 148 ("I talked with them [PHF] first and then informed Joshua of that.").

[45] There is and can be no real dispute that the second element of civil contempt has been satisfied—"that the decree was in the movant's [i.e., Plaintiffs'] favor," as the Court granted Plaintiffs' motion for a protective order and for leave to proceed using pseudonyms. *See* Dkt. 26; *Ashcraft*, 218 F.3d at 301.

at 16–17. This argument fails. As explained above, the Protective Order was not a "gag order," and the *James* factors established the governing standard for the Protective Order's issuance. *See supra* at 7–22. The Court has already concluded that the Protective Order satisfied, and continues to satisfy, the *James* factors. *See id.* Further, the Court has determined that even if strict scrutiny applies (and it doesn't), that the Protective Order satisfies that stringent standard. *See supra* at 22 n.12. And the Protective Order was not "reversed," which can render a decree invalid. *See Ashcraft*, 218 F.3d at 302–03. The Court therefore finds that Plaintiffs have demonstrated by clear and convincing evidence that the Protective Order was, and remains, a "valid decree." For substantially the same reasons, Jonathan Mast's mirror arguments that the Protective Order was unconstitutional and violated his First Amendment rights are rejected. *See* Dkt. 437 at 16–17.

    Second, Jonathan Mast argues that there is not a valid decree because the Court lacks subject matter jurisdiction. *See* Dkt. 437 at 2–8. The Court has already addressed challenges to the Court's subject matter jurisdiction at length, and concluded that the Court has subject matter jurisdiction namely on account of diversity of citizenship. *See* MTD Mem. Op. at 26–61.[46] Jonathan Mast argues that one of the original individual defendants, Ahmad Osmani, should be treated as an alien for purposes of the subject matter jurisdiction analysis, and that having aliens as both plaintiffs and defendants defeats diversity jurisdiction. *See* Dkt. 437 at 2–3. The record is clear, however, that Osmani is a United States citizen, as he has represented in the Virginia state court proceedings, *see* Dkt. 267 at 8–9 nn. 3–4, Dkt. 283 at 2465–66 (representation by counsel), and therefore the Court is not confronted with the circumstance Jonathan hypothesizes. Further, Jonathan devotes several pages to his brief addressing the jurisdictional implications of

---

[46] To be sure, Jonathan Mast did not have the benefit of the Court's ruling on Defendants' motions to dismiss when he filed this submission contesting Plaintiffs' motion to hold him in civil contempt.

Plaintiffs' inclusion of federal "nominal defendants," apparently without recognizing that they have since been dismissed from the case. Dkt. 270. In any event, as "nominal defendants," they are disregarded for purposes of diversity jurisdiction. *See Hartford Fire Ins. Co. v. Harleysville Mut. Ins. Co.*, 736 F.3d 255, 260 (4th Cir. 2013); *Payne v. Bank of Am., N.A.*, No. 3:09-cv-80, 2010 WL 546770, at *4 (W.D. Va. Feb. 11, 2020); *cf. Doe v. Mast*, No. 3:22-cv-49, 2023 WL 4492466, at *4 (W.D. Va. July 12, 2023) (recognizing that "no claims have been asserted against" them, meaning that they are "nominal" parties in the action).[47]

Third, Defendants argue that Plaintiffs have failed to show by clear and convincing evidence that the "movant suffered harm as a result" of their violations of the Protective Order. *See* Dkt. 415 at 19–20. Defendants appear to have confused the requirement that the movant "suffered harm" with a requirement of "actual harm" or something akin to "tangible" harm. *See* Dkt. 239 at 9. But that is not the law. In similar circumstances, the Fourth Circuit has held that "monetary loss" is not required to constitute "harm," and that "informational harms" can suffice to satisfy the element. *See Klopp*, 957 F.3d at 465–66; *cf. Rainbow Sch., Inc. v. Rainbow Early Educ. Holding, LLC*, 887 F.3d 610, 619 (4th Cir. 2018) (holding that trademark confusion and dilution can constitute "harm" to support a contempt order). These and other cases show that Defendants' myopic emphasis on "actual harm" in the context of this case specifically, would make little sense in practice.

Put simply, it beggars belief that the Court would have to wait for *physical harm* to *actually* befall Plaintiffs' families in Afghanistan to impose a contempt sanction for a litigant's failure to abide by the terms of the Protective Order. For the reasons set forth above, the Court

---

[47] In view of the Court's opinion addressing subject matter jurisdiction, the Court need not address Jonathan Mast's challenges to federal question jurisdiction. *See* Dkt. 437 at 5–8.

has found that the risk of physical harm to Plaintiffs' families is anything but hypothetical or speculative, but rather it is concrete, supported by ample evidence. *See supra* at 11–15. By disclosing information identifying Baby Doe, accessible on the internet everywhere including to those in Afghanistan, Joshua and Jonathan put the safety of Plaintiffs' family members in Afghanistan in jeopardy. They have thus rendered it more likely that Plaintiffs' families will be recognized, and subject to reprisals based on, for example, a mistaken belief that John Doe had worked for the U.S. government. Therefore the Court finds by clear and convincing evidence that Plaintiffs have "suffered harm from the violation" of the Protective Order. *See Ashcraft*, 218 F.3d at 301.

Fourth, Joshua and Jonathan Mast argue that, even if Plaintiffs have established the elements of civil contempt, the Court cannot hold them in contempt because they "took all reasonable steps to comply with the Protective Order." Dkt. 415 at 20–21; Dkt. 437 at 12. The Court finds that Joshua and Jonathan have not met their burden to demonstrate that they "made in good faith all reasonable efforts to comply" with the Protective Order. *See De Simone*, 36 F.4th at 529. Indeed, the weight of persuasive evidence is decidedly to the contrary. Joshua Mast's argument in this regard is that he and Stephanie Mast "did not ask or direct Jonathan Mast to speak to anyone—including [PHF]—on their behalf." Dkt. 415 at 21. And he argues that the Masts did not "provide Jonathan with any of the photos that were provided to PHF." *Id.*; *see also* Dkt. 437 at 12–13.

These arguments overlook a clear point—Joshua and Jonathan Mast each provided dozens of individual identifying photos of Baby Doe to PHF, either directly emailing them or by sending PHF a link to a Google photo album containing hundreds of such photos. At the time they sent the photos, neither Joshua or Jonathan informed PHF of the Protective Order; sought to

35

**JA339**

get PHF to execute a non-disclosure agreement, as the Protective Order provided; or in any way suggested the photos should be treated with any measure of confidentiality at all—instead, the transmission of Baby Doe's identifying photos to PHF was for use in a public fundraising campaign for the Masts' legal defense. Ironically, the Masts' intended use of Baby Doe's photos on an internet and social media fundraising campaign, as well as on a news broadcast, significantly undermined the Masts' claimed efforts to secure *Baby Doe* a measure of privacy and confidentiality in this litigation, through use of a pseudonym and other measures.[48] Moreover, the Court finds that the weight of the evidence is that Joshua Mast did not even mention the so-called "gag order" to PHF for months after he sent them these photos.[49]

Whatever added insulation in legal liability Joshua and Jonathan Mast thought they were accomplishing by structuring their relationship with PHF in the manner they did, the evidence establishes that Jonathan Mast was serving as Joshua's representative throughout, and regularly apprised him about developments in the fundraising campaign. Nor is the Court persuaded by Jonathan's argument he should be considered to have taken all reasonable efforts to comply, because he requested that PHF remove identifying photos of Baby Doe once "it came to [his] attention that the production of photographs may prove subject to the Court Order." Dkt. 437 at 18. At most, that would support that he gave "some effort" to complying, which is not the relevant inquiry. The Court finds, collectively as well as individually, that Joshua and Jonathan Mast have not met their burden to show that they undertook in good faith all reasonable efforts to comply with the Protective Order.

---

[48] *See* Dkt. 130 at 14 (agreeing to anonymity for Baby Doe, and stating that "Baby Doe should continue to be protected through the use of her initials").

[49] *See, e.g.*, Disarro Decl. ¶¶ 23–24, 54–55.

For these reasons, the Court **finds** that **Plaintiffs have established, by clear and convincing evidence, all elements of civil contempt**: the Protective Order was a valid decree of which Joshua and Jonathan Mast had both actual and constructive knowledge; the Protective Order was a decree in Plaintiffs' favor; Joshua and Jonathan each, by their conduct, violated the terms of the decree and had at least constructive knowledge of such violations; and Plaintiffs suffered harm as a result. The Court further **finds** that Joshua and Jonathan Mast have not established that they took in good faith all reasonable steps to comply with the Protective Order, and as such, are not entitled to the defense from civil contempt. Accordingly, the Court **finds** Joshua and Jonathan Mast in **civil contempt**.

Plaintiffs have sought from Joshua and Jonathan Mast "the payment of Plaintiffs' attorney's fees related to the prosecution of this motion," as the appropriate sanction for the contumacious conduct. Dkt. 403 at 27. The Court **finds** the payment of reasonable attorney's fees Plaintiffs incurred in connection with the prosecution of this motion to show cause, to be reasonable and appropriate as a remedy for the contempt. *See In re Gen. Motors Corp.*, 61 F.3d 256, 258 (4th Cir. 1995) (explaining that remedies for civil contempt "include ordering the contemnor to reimburse the complainant for losses sustained and for reasonable attorney's fees"); *see also id.* ("remedies and sanctions [for civil contempt] must be remedial and compensatory and, unlike criminal contempt, nonpunitive"). The Court further **finds** that the award of reasonable attorney's fees is a nonpunitive remedy that uses the least possible power necessary to ensure Joshua and Jonathan Mast's compliance with the Protective Order. *See Spallone v. United States*, 493 U.S. 265, 275 (1990). The Court will therefore direct Plaintiffs to

file a motion for reasonable attorney's fees incurred in connection with the prosecution of this

specific motion to show cause, within thirty days of the issuance of this decision.[50]

<u>**Conclusion**</u>

For the aforementioned reasons, the Court has determined, and hereby issues the

following **ORDERS**, that:

(1) Defendants' Motions to Amend, Modify, or Vacate the Protective Order will be and hereby are **DENIED**. Dkts. 130, 176, 442.

(2) Plaintiffs' Motion to Show Cause and Supplemental Motion to Show Cause Why Joshua and Stephanie Mast Should Not Be Found in Contempt, with respect to the CBS interview, will be and hereby are **DENIED**. Dkts. 141, 142.

(3) Plaintiffs' Motion to Show Cause Why Joshua and Jonathan Mast Should Not Be Found in Contempt, will be and hereby is **GRANTED**, to the extent set forth above. Dkt. 231.

(4) In view of the Court's decision granting Dkt. 231, Plaintiffs **shall file** any motion for reasonable attorney's fees incurred in connection with the prosecution of that motion, no later than **thirty (30) days** from the issuance of this decision.

It is so **ORDERED**.

The Clerk of Court is directed to send this Memorandum Opinion & Order to the parties.

Entered this 16th day of August, 2024.

_____
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

---

[50] Defendants will be entitled to respond in the usual course to the motion, should they, for example, wish to contest the amount or scope of such requested fees.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION**

---------------------------------------------------------------------

JOHN AND JANE DOE,                          :

    *Plaintiffs & Counterclaim-Defendants*,   :

                                       :

v.                                           :

JOSHUA & STEPHANIE MAST,                     :

    *Defendants & Counterclaim-Plaintiffs*,   :      CIVIL ACTION NO. 3:22-cv-49

RICHARD MAST,                                :

    *Defendant & Counterclaim-Plaintiff*,     :

& KIMBERLEY MOTLEY,                          :

    *Defendant*.                               :

                                       :

---------------------------------------------------------------------

## **NOTICE OF APPEAL**

Notice is hereby given that Defendants Joshua Mast, Stephanie Mast, and Richard Mast appeal to the U.S. Court of Appeals for the Fourth Circuit from the Memorandum Opinion & Order, Dkt. No. 473, issued by Judge Norman K. Moon on August 16, 2024.

Dated: September 16, 2024                    Respectfully submitted,

/s/ David Yerushalmi                          /s/ John S. Moran
David Yerushalmi, Esq.*                       John S. Moran
AMERICAN FREEDOM LAW CENTER                   MCGUIREWOODS LLP
2020 Pennsylvania Ave NW                      888 16th St. N.W., Suite 500
Suite 189                                     Black Lives Matter Plaza
Washington, DC 20006                          Washington, DC 20006
                                              T: (202) 828-2817
* Admitted *pro hac vice*                     F: (202) 828-3327
                                              jmoran@mcguirewoods.com
*Counsel for Defendant*
*Richard Mast*                                *Counsel for Defendants*
                                              *Joshua & Stephanie Mast*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 12, 2024, the foregoing was filed with the

Clerk of the United States Court of Appeals for the Fourth Circuit using the

appellate CM/ECF system, which will also serve counsel of record.


*/s/ John S. Moran*
John S. Moran