No. 24-1900

# In the
# United States Court of Appeals
# For the Fourth Circuit

JOHN DOE AND JANE DOE,
*Plaintiffs-Appellees,*

v.

JOSHUA MAST, STEPHANIE MAST, AND RICHARD MAST,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the Western District of Virginia
Case No. 3:22-cv-49

## RESPONSE BRIEF OF APPELLEES

Maya M. Eckstein
Lewis F. Powell III
Kevin S. Elliker
HUNTON ANDREWS KURTH LLP
951 E. Byrd Street
Richmond, VA 23219
(804) 788-8200
kelliker@HuntonAK.com

January 2, 2025          *Counsel for Appellees*

[*Additional counsel listed on signature page*]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. _____    Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____

(name of party/amicus)

_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?      YES      NO


2.      Does party/amicus have any parent corporations?                                  YES      NO
        If yes, identify all parent corporations, including all generations of parent corporations:




3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                            YES      NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?                          YES    NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)      YES    NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                          YES    NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?          YES    NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____        Date: _____

Counsel for: _____

- 2 -

## TABLE OF CONTENTS

**Page**

Table of Authorities.................................................................iii

Introduction.......................................................................... 1

Counterstatement of Jurisdiction ........................................... 4

Counterstatement of the Issues............................................. 5

Counterstatement of the Case .............................................. 6

I.    Factual Background ....................................................... 6

      A.    Baby Doe is orphaned then reunited with her family............ 6

      B.    The Masts lure the Does to the United States so they
            can deploy their improper adoption order. ........................... 9

      C.    The Does travel to the United States. ................................ 12

      D.    The Masts abduct Baby Doe. ........................................... 13

      E.    The Does seek the return of their daughter through
            Virginia court proceedings. ............................................. 14

II.   Procedural History ....................................................... 16

      A.    The Does sue the Masts and their co-conspirators using
            pseudonyms. ................................................................ 16

      B.    The Masts seek to undo the Protective Order and engage
            in repeated violations along the way. ................................ 19

      C.    The district court finds Joshua and Jonathan Mast in
            contempt for their violations of the Protective Order. ..........23

Summary of Argument......................................................... 28

Argument............................................................................. 33

I.    Strict scrutiny does not apply to the Protective Order. ............... 34

      A.    Under *James*, district courts have discretion to grant
            party pseudonymity in appropriate cases. ............................ 34

      B.    The Protective Order satisfies the *James* standard............. 37

i

C.   The Protective Order's non-disclosure requirement is a necessary corollary to pseudonymity. ................................... 41

D.   The Protective Order is not a "gag order." ........................... 45

E.   Valid protective orders are assessed under the "good cause" standard, not strict scrutiny. ................................... 47

II.   Even if strict scrutiny applies, the Protective Order satisfies that standard. ................................................................ 51

A.   Protecting the physical safety of the Does and their non-party family members is a compelling interest. ................... 51

B.   The Protective Order is narrowly tailored to protecting the compelling interest of safety. ......................................... 54

III.   The Protective Order is not unconstitutionally vague. ................ 57

Conclusion ......................................................................................... 61

Statement Regarding Oral Argument .................................................. 62

Certificate of Compliance ................................................................... 62

Certificate of Service ......................................................................... 63

# TABLE OF AUTHORITIES

**Page**

## Cases

*A.A. v. J.M.*, 903 S.E.2d 513 (Va. Ct. App. 2024).....................15

*ACLU v. Holder*, 673 F.3d 245 (4th Cir. 2011) ........................49

*Adoptive Couple v. Baby Girl*, 570 U.S. 637 (2013) ................35

*Anderson v. Cryovac, Inc.*, 805 F.2d 1 (1st Cir. 1986) ...........49

*Burson v. Freeman*, 504 U.S. 191 (1992) ...............................55

*Covil Corp. ex rel. Protopatas v. U.S. Fid. & Guar. Co.*, 544 F. Supp. 3d 588 (M.D.N.C. 2021) .........................................45

*Doe v. Doe*, 85 F.4th 206 (4th Cir. 2023) .................................36

*Doe v. Mast*, No. 3:22-cv-49, 2023 WL 8481049 (W.D. Va. Dec. 7, 2023) .........................................................................60

*Doe v. Mast*, No 3:22-cv-49, 2024 WL 3524070 (July 24, 2024 W.D. Va. 2024)...........................................................6

*Doe v. Pub. Citizen*, 749 F.3d 246 (4th Cir. 2014).................36

*Doe v. Reed*, 561 U.S. 186 (2010)...........................................35

*Doe v. Sidar*, 93 F.4th 241 (4th Cir. 2024)...............35, 36, 37

*Doe v. Stegall*, 653 F.2d 180 (5th Cir. Unit A Aug. 1981) ...............35, 36

*Doe v. Vill. of Deerfield*, 819 F.3d 372 (7th Cir. 2016)...........42

*Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058 (9th Cir. 2000) .......................................................43

*Fusaro v. Howard*, 19 F.4th 357 (4th Cir. 2021) ...................58

*Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307 (4th Cir. 2017) .............................................................................40

*In re Murphy-Brown, LLC*, 907 F.3d 788 (4th Cir. 2018)25, 45, 46, 47, 60

*James v. Jacobson*, 6 F.3d 233 (4th Cir. 1993) ..... 2, 17, 28, 36, 37, 43, 44

iii

*Kelly v. City of New York*, No. 01 Civ. 8906, 2003 WL 548400 (S.D.N.Y. Feb. 24, 2003) .................................................. 46

*M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160 (4th Cir. 1992) (en banc) ................................. 50

*Martin v. Franklin Cap. Corp.*, 546 U.S. 132 (2005) ........................... 37

*Minn. Voters All. v. Mansky*, 585 U.S. 1 (2018) ..................................... 57

*Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972) .................... 57

*Recht v. Morrisey*, 32 F.4th 398 (4th Cir. 2022).................................... 58

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ........................................ 51

*Reno v. ACLU*, 521 U.S. 844 (1997) ......................................................... 51

*Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678 (11th Cir. 2001) .................................................................................. 43

*Roe v. Wade*, 410 U.S. 113 (1973)............................................................ 35

*Russe v. Harman*, No. 1:21-cv-270, 2021 WL 5043358 (W.D.N.C. Oct. 29, 2021) .................................................. 47

*Schleifer v. City of Charlottesville*, 159 F.3d 843 (4th Cir. 1998) ......................................................................................... 58

*Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984) ....... 30, 47, 48, 49, 50

*Springs v. Ally Fin. Inc.*, 684 F. App'x 336 (4th Cir. 2017) .................... 50

*United States ex rel. Davis v. Prince*, 754 F. Supp. 3d 561 (E.D. Va. 2010)........................................................................... 42

*United States v. Doe*, 962 F.3d 139 (4th Cir. 2020) .................... 17, 51, 52

*United States v. Harris*, 890 F.3d 480 (4th Cir. 2018)........................... 52

*Williams-Yulee v. Fla. Bar*, 575 U.S. 433 (2015) .................................... 55

**Statutes and Rules**

28 U.S.C. § 1292(a)(1)............................................................................... 4

28 U.S.C. § 1332 ....................................................................................... 4

28 U.S.C. § 1651 ....................................................................................... 4

28 U.S.C. § 2107 ................................................................ 4

Fed. R. Civ. P. 10(a) ......................................................... 34

Fed. R. Civ. P. 26(c) ................................................... 43, 48

Fed. R. Civ. P. 5.2(e) ...................................................... 48

**Other Authorities**

*Gagging order*, Merriam-Webster.com Dictionary, *available
      at* https://bit.ly/3DihRhT .......................................... 46

# INTRODUCTION

Afghan citizens John and Jane Doe brought this lawsuit to right the civil wrongs committed by Appellants Joshua Mast, his wife Stephanie, his brother Richard, and others who joined the Masts in their scheme to take the Does' child, Baby Doe, from them more than three years ago. At the outset of this litigation in September 2022, the district court recognized the grave danger posed to the Does, and their innocent family members remaining in Afghanistan, if they were publicly identified. So in the exercise of its discretion, the court permitted the Does to proceed by pseudonym and entered a corollary Protective Order to limit the disclosure of their identities. Despite the clarity of the Protective Order, the Masts violated it, and, in August 2024, the district court found Joshua and his younger brother Jonathan (a non-party who aided and abetted Joshua's misconduct) in contempt.

In this interlocutory appeal, the Masts challenge the constitutionality of the Protective Order by appealing the district court's Contempt Order. For the reasons given in the Does' motion to dismiss, however, the Court lacks jurisdiction. But even if the Court has jurisdiction over the appeal, the Masts' arguments are meritless.

Under this Court's precedent in *James v. Jacobson*, 6 F.3d 233 (4th Cir. 1993), a trial court may permit a party to litigate under a pseudonym when privacy considerations outweigh the right of public access and the risk of unfairness to the opposing party. Applying *James*, the district court found—and the Masts do not challenge—that public disclosure of the Does' identities would present a grave safety risk to them and their families in Afghanistan. Concomitant with that finding, the district court concluded that their identities could not be disclosed to anyone who had not executed a non-disclosure agreement, enforceable through the customary remedy of contempt.

That non-disclosure protection does not call for strict scrutiny under the First Amendment. Trial courts may regulate the disclosure of a pseudonymous plaintiff's identity when case-specific considerations demonstrate good cause. And that makes perfect sense. Courts routinely limit the dissemination of litigation-related information using protective orders. The Masts' unfounded assertion that such orders are "gag orders" subject to strict scrutiny would undermine the routine judicial oversight permitted by the law.

2

Yet even if strict scrutiny did apply, the Protective Order surely satisfies it. It should be beyond dispute that protecting the safety of the Does and their innocent family members is a compelling government interest. The Protective Order's non-disclosure provision is narrowly tailored to that end. The Does' legitimate safety concerns are not less urgent because their innocent family members are foreign non-citizens; nor are those concerns undermined by their agreement to sit for a few media interviews on the condition of anonymity. The Masts are not prohibited from sitting for their own interviews or publicizing their crusade, so long as they do not reveal the Does' identities in the process. But they did, and the district court held them to account.

Finally, the Protective Order is not unconstitutionally vague. Joshua Mast's own testimony below reflects his understanding of its commonsense provisions. The Masts' equivocation over a particular word and their feigned handwringing about the branches of the Does' family trees do not show a lack of guidance or notice.

If the Court does not dismiss the appeal for lack of jurisdiction, it should reject the Masts' arguments and affirm the district court's decision.

## COUNTERSTATEMENT OF JURISDICTION

The district court's jurisdiction in the case below arises from 28 U.S.C. § 1332. As explained in Appellees' motion to dismiss, this Court lacks appellate jurisdiction for at least four reasons.

*First*, the Masts' appeal is untimely under 28 U.S.C. § 2107. While they purport to appeal the district court's August 2024 Contempt Order, their true target is the September 2022 Protective Order. The deadline to appeal the Protective Order lapsed more than two years ago.

*Second*, the Contempt Order is not appealable under 28 U.S.C. § 1292(a)(1) as an order "refusing to dissolve or modify [an] injunction[]." The Protective Order is no injunction. It is a procedural order that governs the conduct of litigation, and it is unrelated to the merits.

*Third*, the Contempt Order is not appealable under the collateral order doctrine, which applies categorically to matters that cannot wait for a post-judgment appeal. Any perceived harm from the Contempt Order may be addressed through the standard post-judgment route.

*Fourth*, mandamus under 28 U.S.C. § 1651 is not appropriate when an order may be reviewed on appeal. The Masts cannot bridge that gap by erroneously construing the Protective Order as a "gag order."

4

## COUNTERSTATEMENT OF THE ISSUES

If the Court concludes that it has jurisdiction over this appeal, the Does submit the issues are as follows:

1. Under this Court's longstanding decision in *James*, a district court may permit a party to proceed in civil litigation using a pseudonym based on a case-by-case consideration of judicially recognized factors. Must an order permitting pseudonymity satisfy strict scrutiny under the First Amendment if it prohibits the disclosure of the pseudonymous party's identity to the public?

2. In its Contempt Order, the district court reaffirmed the factual finding in the Protective Order that the public disclosure of the identities of John, Jane, or Baby Doe would cause grave safety risks to the Does and their innocent non-party family members in Afghanistan. The court likewise concluded that the limited measure of prohibiting the disclosure of the Does' identities absent securing an enforceable non-disclosure agreement was both narrowly tailored and the least restrictive means to ensure the safety of the Does and their families. Assuming strict scrutiny applies, does the Protective Order satisfy that standard?

3.   Is the Protective Order's prohibition against the disclosure of "information that directly or indirectly identifies Plaintiffs or their family members to any person, including but not limited to the Plaintiffs' names and the locations of their residences abroad and places of birth," absent the execution of a non-disclosure agreement, impermissibly vague?

## COUNTERSTATEMENT OF THE CASE

### I.   Factual Background

This case arises from "a remarkable story of resilience and duplicity," involving a yearslong, "dogged[]" effort by John and Jane Doe to uncover and unravel an elaborate conspiracy to "abduct Baby Doe" through acts of "fraud." *Doe v. Mast*, No 3:22-cv-49, 2024 WL 3524070, at *1–2 (July 24, 2024 W.D. Va. 2024).

### A.   Baby Doe is orphaned then reunited with her family.

The arc of that story began with tragedy in September 2019, when an Afghan infant—Baby Doe—was orphaned and injured in a joint U.S.-Afghan military operation in Afghanistan.  JA58.  U.S. forces took her to a nearby U.S. military hospital for medical care, where she stabilized and recovered.  *Id.*  Joint humanitarian efforts by the U.S. government, the Afghan government, and the International Committee of the Red Cross identified Baby Doe's next of kin so that she could be reunified with her

6

family.  JA59.  In February 2020, Baby Doe was placed with her uncle, who granted guardianship to his son and daughter-in-law, John and Jane Doe.  JA69.  John and Jane welcomed Baby Doe into their family and began to raise her as their own.  *Id.*

Unbeknownst to the Does, an American family thousands of miles away had been plotting to claim Baby Doe as their own.  In October 2019, U.S. Marine Corps lawyer Joshua Mast learned about the orphaned Baby Doe while she was being cared for at the military hospital, and he knew that U.S., Afghan, and Red Cross officials were attempting to reunite her with her Afghan family.  JA59.  Even so, Joshua and his wife Stephanie, represented by Joshua's brother Richard (who, like Joshua, is a Virginia-barred lawyer), initiated custody proceedings in Fluvanna County, Virginia.  Based on the misrepresentation that Baby Doe was a "stateless minor" over whom the Government of Afghanistan would waive jurisdiction, they obtained custody and interlocutory adoption orders from the Fluvanna County courts in November 2019.  JA63–65.  Using those documents, they then obtained a Certificate of Foreign Birth from the Virginia Department of Health that listed Joshua and Stephanie Mast as Baby Doe's mother and father.  JA66.

In February 2020, when the Masts learned that Baby Doe was about to be reunified with her family, they tried to stop the U.S. government from delivering the child back to her family. JA67. The Masts filed a pseudonymous complaint and petition for a temporary restraining order in the U.S. District Court for the Western District of Virginia to enjoin the Afghan family reunification. *Id.*[1] Within hours of docketing the complaint, the district court convened a hearing, during which Richard Mast represented Joshua and Stephanie. *Id.* During the hearing, Richard falsely represented that Joshua and Stephanie were not seeking to adopt Baby Doe but sought only to bring her to the United States for medical treatment. *Id.* The U.S. government opposed the motion and advised the district court that the Masts' custody order was "unlawful" and "deeply flawed and incorrect" because, under the Supremacy Clause, it violated the exclusive right of the Executive Branch to make decisions on foreign policy, and because the Masts had never served the federal government with notice of those proceedings. *Id.* Moreover, the child was under the jurisdiction of the Government of Afghanistan. *Id.* The district court denied the Masts' request for a

---

[1] *See Baby L. v. Esper*, No. 3:20-cv-9 (W.D. Va. filed Feb. 25, 2020).

temporary restraining order. *Id.* Baby Doe was released the next day from U.S. custody for reunification with her Afghan family. JA69. For the next 18 months, John and Jane cared for and raised Baby Doe. *Id.*

### B. The Masts lure the Does to the United States so they can deploy their improper adoption order.

Having failed to prevent Baby Doe's reunification with her family, Joshua and Stephanie Mast pursued a new strategy: convince Baby Doe's family to let her travel to the United States alone. JA70.

They first enlisted the help of Defendant Kimberley Motley, a U.S. citizen and attorney who had worked in Afghanistan. *Id.* After Baby Doe was released to her Afghan family, Joshua told Motley that he needed help to "handle [Baby Doe's] situation privately" by locating her relatives, contacting them, offering them medical care, and then bringing the child out of Afghanistan to the United States. JA70–71. Joshua provided Motley information about the people to whom Baby Doe was transferred, which Motley used to identify John and Jane Doe. *Id.*

Motley called the Does, told them that she knew Baby Doe had serious medical issues, and offered that she knew an American family who wanted to help. JA72. She continued to communicate with the Does for months, offering to assist with Baby Doe's medical care and asking

9

for photographs of the child. *Id.* Motley never mentioned to the Does that the Masts had obtained a custody order and interlocutory adoption order for Baby Doe. JA72. The Masts paid Motley at least $4,500 for her assistance. *Id.*

Meanwhile, the Masts continued pursuing a final order of adoption in Fluvanna County—notwithstanding that none of the Does had been notified or had ever set foot in the United States, and contrary to their representations to the district court during their unsuccessful effort to halt reunification. In December 2020, nine months after Baby Doe was reunited with the Does, the Fluvanna Circuit Court accepted the Masts' misrepresentation of the child's status as a "stateless minor" and entered a final order of adoption for Joshua and Stephanie. JA73. As before, no one informed John Doe, Jane Doe, or the U.S. government of these proceedings. *Id.*

A few months later, the Masts enlisted the help of Ahmad Osmani, whom they met through a Bible study group. JA74. The Masts provided Osmani with a photograph of Baby Doe that Motley obtained from the Does but which had been altered; Osmani used it to procure a fake Afghan passport with a fake Americanized name for the child that

featured the Masts' last name.  JA74.  The Masts sent Osmani more than $1,000 to bribe an Afghan official to create the passport.  *Id.*

In July 2021, in a phone call facilitated by Motley and interpreted by Osmani, John and Jane Doe spoke with Joshua Mast for the first time. JA75.  Joshua lied to them and said he had been a volunteer in the U.S. military hospital who had been responsible for Baby Doe's care.  *Id.*  He also told the couple that he was familiar with Baby Doe's medical needs and warned them that, if she did not receive medical care in the United States, she could go blind, experience brain damage, or become permanently physically disabled.  *Id.*[2]  Joshua asked John and Jane to send Baby Doe to the United States by herself, but John and Jane refused to be separated from their daughter.  *Id.*  And Jane was by then in the third trimester of pregnancy and concerned with traveling to the United States.  *Id.*  They suggested Joshua could facilitate their travel to India or Pakistan for medical care, but Joshua declined, insisting that those countries lacked the specialists Baby Doe purportedly needed.  *Id.*

---

[2] John Doe, who trained as a nurse in Afghanistan, was not aware of the medical issues that Mast described to them.  JA75.  In fact, documentation from October 2019 shows U.S. officials considered Baby Doe healthy, healing, and in need of normal infant care.

**C.     The Does travel to the United States.**

In August 2021, as U.S. troops withdrew and the Taliban began to retake Afghanistan, Joshua Mast again contacted John and Jane Doe to convince them to bring Baby Doe to the U.S. for medical treatment. JA77. Given the unfolding crisis in Afghanistan, the Does believed this could be their last and only chance to obtain medical care the Masts claimed Baby Doe needed. *Id.* But the Does were concerned about their ability to return home someday if they left Afghanistan. *Id.* Joshua and Osmani assured them that Baby Doe's care would take only two or three months, after which the family could return to Afghanistan. *Id.* As before, none of the co-conspirators told the Does about the adoption order or the Masts' intent to take Baby Doe. *Id.* The Does agreed to travel to the United States to obtain medical care for Baby Doe. *Id.*

The Does left Afghanistan on a U.S. military transport in late August 2021. JA80–81. They first landed at Ramstein Airforce Base in Germany, where Joshua and Stephanie were waiting. JA80. Joshua and Stephanie repeatedly asked the Does to allow Baby Doe to travel with them to the United States, insisting it would be easier for the toddler to

12

enter the country that way.  JA80–81.  The Does repeatedly refused, as they did not want to leave their child in anyone else's care.  JA81.

The Does arrived at Dulles International Airport on August 29, 2021.  JA81.  Joshua met them there and accompanied them to an inspecting officer.  JA81–82.  There, Joshua presented the falsified Afghan passport for Baby Doe showing the altered photograph and the Masts' chosen Americanized name for the child.  JA82–83.  John and Jane were shocked to see this document, but Joshua sought to reassure them that the passport was designed to make it easier to get the child medical care once in the United States.  JA83.

**D.    The Masts abduct Baby Doe.**

The Does were paroled into the United States and transported to refugee housing at Fort Pickett in Blackstone, Virginia.  JA83.[3]  A few days later, on September 3, 2021, John and Jane were told that they were being moved to a different housing unit on the base.  JA83.  Military police brought John, Jane, and Baby Doe by car to a new building, where a woman picked up Baby Doe and instructed John and Jane to walk inside.  *Id.*

---

[3] Fort Pickett is now known as Fort Barfoot.

Once inside, a social worker and a Pashto interpreter met them. JA83. The social worker told the Does that they were not Baby Doe's lawful guardians and that Joshua Mast had adopted the child. JA84. Joshua entered the room. *Id.* Confused but hearing that Baby Doe was being taken from them, the eight-months-pregnant Jane Doe fell to the ground, crying and begging Joshua not to take Baby Doe. *Id.* Baby Doe was carried out of the room and given to the Masts, who drove off with her. *Id.* John and Jane Doe have not seen their daughter since. *Id.*

## E.    The Does seek the return of their daughter through Virginia court proceedings.

In December 2021, the Does initiated proceedings in Fluvanna County Circuit Court to vacate the Masts' wrongfully obtained adoption order. JA87. The United States government supported the Does' position, explaining that Baby Doe was never a stateless minor, the Government of Afghanistan never waived jurisdiction over her, and that, in the exercise of its exclusive authority over foreign affairs, the U.S. government transferred custody of Baby Doe to the Government of Afghanistan so that she could be reunited with the family they had identified. *Id.* At every step from then until today, the Masts have fought

14

tooth and nail to prevent the Does from recovering their kidnapped daughter.

After many months of proceedings, in May 2023, the Circuit Court found "evidence of some extrinsic fraud" by the Masts and determined that the Does "were de facto parents of the child and were entitled to some process that they did not receive." *A.A. v. J.M.*, 903 S.E.2d 513, 521 (Va. Ct. App. 2024) (quotation marks omitted. The Circuit Court therefore vacated the final order of adoption but kept in place the custody order and interlocutory adoption order. *Id.* On appeal, the Court of Appeals of Virginia held on July 16, 2024, that the Masts' custody, interlocutory adoption, and final adoption orders were all void ab initio because the Fluvanna County courts had lacked the power to render them. *Id.* On November 1, 2024, the Supreme Court of Virginia granted review of the Court of Appeals' decision. At this time, briefing in that matter is ongoing, and an argument date has not been set. *See J.M. v. A.A.*, No. 24-0707 (Va.).

## II.    Procedural History

### A.    The Does sue the Masts and their co-conspirators using pseudonyms.

While the Does continue to pursue the return of their daughter through Virginia courts, they commenced this federal lawsuit to seek justice for the civil wrongs done to them by Joshua Mast, Stephanie Mast, Richard Mast, Kimberley Motley, and Ahmad Osmani. John and Jane Doe sued those five defendants on September 2, 2022. JA13. Their claims included tortious interference with parental rights, fraud, conspiracy, intentional infliction of emotional distress, and false imprisonment. ECF 1 ¶¶ 131–79.[4]

When they filed their complaint, the Does sought leave to proceed under pseudonyms and for the entry of a protective order that would restrict the public disclosure of their identities. JA47. The Does justified

---

[4] John and Jane sued in their own names and on behalf of Baby Doe. They later filed an Amended Complaint that added as nominal defendants the U.S. Secretary of State and the U.S. Secretary of Defense, JA53, who were dismissed by stipulation in August 2023, JA152. Citing the domestic relations exception, the district court later dismissed without prejudice the Does' claims for tortious interference with parental rights and false imprisonment, as well as the claims asserted on behalf of Baby Doe. *Doe v. Mast*, 2024 WL 3524070, at *45. The Does voluntarily dismissed Osmani in July 2024. JA42 (ECF 460).

16

this request by explaining they feared for their safety and for that of their families who remained in Afghanistan if their presence in the United States or the circumstances of Baby Doe's abduction were revealed to their Afghan communities or the Taliban.

The Does' fears were supported by a sworn declaration from John Doe. JA344–45 (filed under seal). John Doe articulated the concern that Afghans who are even perceived as having worked with the U.S. military have been persecuted in Afghanistan. The Does feared that the Taliban might so associate them based on the circumstances that brought them to the United States. Moreover, the Does feared that others in Afghanistan could mistakenly believe that they intentionally gave or sold Baby Doe to an American family in exchange for safe passage to the United States—something that also would place the Does and, especially, their families in Afghanistan in danger. *See id.*

The district court granted the motion, concluding that the Does had "established grounds to proceed by pseudonym and for the entry of the following terms of a protective order." JA50–51 (citing *James*, 6 F.3d at 238 and *United States v. Doe*, 962 F.3d 139, 147 (4th Cir. 2020)). In particular, the court found "that disclosure of Plaintiffs' identities and

identifying information would pose a substantial risk to the physical safety of Plaintiffs and other innocent non-parties." JA51. Given that risk, plus "the age of minor Plaintiff Baby Doe" and the fact "that any risk of prejudice or unfairness (if any should exist) is more than sufficiently mitigated by the measured steps" outlined by the Protective Order, the Court imposed the following conditions:

1. Defendants, their counsel, and their representatives were "prohibited from disclosing any information that directly or indirectly identifies Plaintiffs or their family members to any person, including but not limited to the Plaintiffs' names and the locations of their residences abroad and places of birth, unless that person first executes a non-disclosure agreement enforceable through the contempt sanction."

2. All filings in the case, as well as any papers "disseminated to any person who has not executed a non-disclosure agreement enforceable through the contempt sanction" must refer to John, Jane, and Baby Doe by their pseudonyms.

3. "Any papers that identify any Plaintiff either directly or indirectly shall be filed under seal, with redacted copies placed in the public files."

4. Defendants must "disclose to Plaintiffs' counsel any person to whom Defendants, their counsel or representatives, have disclosed Plaintiffs' identities, and shall provide Plaintiffs with copies of the executed non-disclosure agreements required by this [Protective] Order."

5. In depositions, the Does must be referred to by their pseudonyms.

JA51–52.  The district court entered the Protective Order on September 13, 2022.  JA52.

## B.  The Masts seek to undo the Protective Order and engage in repeated violations along the way.

On January 5, 2023,  Joshua and Stephanie Mast moved to remove the Does' pseudonymity protection.  *See* JA20 (ECF 130).  The Masts did not bring forward any new, credible evidence that undermined the Does' safety concerns.  Instead, they complained that a few media interviews of the Does—which were given on the condition of anonymity—somehow showed that anonymity was unnecessary.  Richard Mast filed his own motion seeking to vacate the Protective Order two months later.  *See* JA24 (ECF 176).  The Does opposed the requests.

While their modification request was pending, however, the Masts took matters into their own hands and violated the Protective Order. First, in January 2023, Joshua and Stephanie Mast appeared on the nationally televised program *CBS Mornings* on two successive days and were interviewed about the "custody battle" playing out in Virginia court. JA103.  These segments broadcast identifying photographs of Baby Doe, including ones showing the child in late 2019 and August 2021—stages

19

of her life where she would be recognizable to those who knew her or her family in Afghanistan. JA103, 105.

Right after seeing the CBS segments, the Does filed a show-cause motion to hold Joshua and Stephanie in contempt for violating the Protective Order. JA21 (ECF 141, 142). The district court held a hearing on February 8, 2023, during which Joshua testified regarding his involvement in the CBS interview. *See* JA98–111. He claimed that CBS did not seek his permission to show photographs of Baby Doe and that he and Stephanie had "told them that we did not authorize anything that showed her face" because they were "required to do that by the protective order." JA130–31. He admitted that they showed photos of the child to the reporter, but said they gave CBS only photos that did not show the child's face. JA134. According to Joshua, CBS must have obtained the identifying photos from some other source. JA1363–37. The court took the matter under advisement. JA138.

In June 2023, the Does discovered another violation of the Protective Order by way of an interview given by Joshua's younger brother, Jonathan Mast, on the One America News Network (OANN), during which he promoted a fundraising campaign by an organization

called the Pipe Hitter Foundation (PHF). JA172. The OANN appearance, as well as multiple social media posts by the PHF, featured identifying photographs of Baby Doe. JA164–70.

Through third-party discovery, the Does uncovered Joshua's scheme to publicize his side of the case with Baby Doe's photographs but to conceal his involvement. JA164–70. Several months earlier, Joshua had initiated discussions with the PHF about raising money for the Masts' legal expenses. JA164. To that end, he provided the PHF a link to a Google photo album that contained hundreds of identifying photographs of Baby Doe. JA165. But, after his interactions with CBS, Joshua was explicit that he could not interface directly with the PHF due to the Protective Order. JA165. So he enlisted the help of his younger brother Jonathan to be his surrogate and a public face for fundraising. JA166.

In April 2023, Joshua connected Jonathan with the PHF. JA166. Jonathan knew about the Protective Order, yet he also shared with the PHF a link to the Google photo album with identifying photographs of Baby Doe. JA166–167. Joshua continued to maintain contact with the PHF, but when they sent him a grant agreement, he suggested his

brother should sign it instead. JA169. So Jonathan signed the agreement, which made clear the organization would be "implementing a fundraising campaign in support of Joshua Mast and his family." JA170.

In May and June 2023, the PHF published information and identifying photographs of Baby Doe as part of its fundraising campaign. *Id.* The photos were posted to the organization's website as well as several social media accounts with hundreds of thousands of followers. JA171. Then, on June 6, Jonathan gave the OANN interview, which featured identifying photographs of Baby Doe provided by Jonathan. JA172. The PHF transferred $5,000 to Jonathan as part of the grant agreement, and Jonathan sent the money to Joshua. JA170.

After seeing the OANN interview, the Does immediately filed a second show-cause motion for another violation of the Protective Order. JA27 (ECF 231). During the subsequent show-cause hearing, counsel for Joshua Mast again contended that Joshua could not be found in contempt because the Protective Order was invalid. JA190. Counsel for Jonathan Mast argued that one brother could not be liable for the action of another. JA202.

## C.   The district court finds Joshua and Jonathan Mast in contempt for their violations of the Protective Order.

In a 38-page order issued August 16, 2024, the district court resolved the Masts' motions attacking the Protective Order and denied in part and granted in part the Does' show-cause motions. JA305 (the "Contempt Order").

First, the district court rejected the Masts' requests to amend, modify, or vacate the Protective Order. JA309. The court identified the Fourth Circuit's *James* decision as the governing precedent for entering a pseudonym order and concluded that the Protective Order (still) satisfied that framework. JA313. In particular, the court noted that no party had "presented any substantial evidence to challenge Plaintiffs' evidence that if their names become known, the Taliban could well believe (incorrectly) that John Doe had been working for the United States, and carry out violence against the Does' families remaining in Afghanistan as they have to those who provided assistance to the United States before the Taliban came to power." JA316. The Masts' counterarguments regarding safety concerns lacked any "supporting evidence." JA317. The court likewise rejected their remaining arguments, finding that the Does "did not initiate this lawsuit

23

pseudonymously merely to avoid annoyance and criticism that attends any litigation, but rather based on a well-founded concern of risk of physical harm." JA325–326. "On balance," the court concluded, "the *James* factors weigh decisively in favor of retaining the Protective Order," which would remain in place. JA326.

The district court also rejected the Masts' characterization of the Protective Order as a "gag order" subject to strict scrutiny under the First Amendment. JA312–314. Although "[i]t could be said that inherent in any order permitting a party to proceed under a pseudonym is an implicit command that the parties bound by the order not publicly disclose the pseudonymous litigant's real name," the court explained, "that does not mean that the order allowing the pseudonym and prohibiting disclosure of the litigant's real identity becomes a 'gag order' subject to strict scrutiny." JA314. Indeed, "an order permitting a party to use a pseudonym would be of scant (if any) utility if the opposing litigant could publicly name them." *Id*. Moreover, the Masts "cited no precedent that would support applying the 'strict scrutiny' standard under these circumstances," leaving the court to look to the uniform authority applying "the *James* factors in considering such requests." *Id*.

24

Notwithstanding that uniform precedent, however, the district court observed in a lengthy footnote that the Protective Order would satisfy strict scrutiny. JA326 n.12. The Does' concerns for the physical safety of themselves and their family was "a 'compelling' public interest." *Id.* And "the limited measures imposed in the Protective Order—use of pseudonyms, prohibiting identification of Plaintiffs' identities and where they were from, absent securing a non-disclosure agreement, etc.—[were] not only 'narrowly tailored to serve their intended purpose,'" but also "'the least restrictive means' to ensure Plaintiffs' safety and that of their families still living in Afghanistan.'" *Id.* (quoting *In re Murphy-Brown, LLC*, 907 F.3d 788, 799 (4th Cir. 2018)). The Masts' "artificially expansive interpretation of the Protective Order [was] unmoored from its text," and did not show that the Protective Order failed strict scrutiny or was unconstitutionally vague. *Id.*

Having sustained the validity of the Protective Order, the district court turned to the circumstances giving rise to the show-cause motions. As to the CBS interview, the court concluded that the evidence was insufficient to show "that either Joshua or Stephanie Mast violated the terms of the Protective Order and had knowledge at the time of such

violations." JA328–329. In reaching that conclusion, the court deemed it "significant" that neither Joshua nor Stephanie provided the Does' names or identified where Baby Doe had been found; that Joshua gave unrefuted testimony "that third parties had provided CBS with the other photographs of Baby Doe"; that Joshua also testified he refused authorization to CBS to show the child's face; and that Joshua provided uncontradicted testimony "that he only 'gave' photographs of Baby Doe to CBS that did not show her face." JA329.

The district court reached a different conclusion when it came to the PHF campaign. Based on the evidence submitted by the parties, the court found that Joshua Mast sent "hundreds of identifying photographs of Baby Doe" to the organization without informing them of the Protective Order, and those photographs were subsequently "circulated amongst staff and the board of the PHF." JA331. Then, when Joshua told the organization about the Protective Order, he claimed it limited only *his* ability to speak publicly. JA332. The "persuasive and consistent evidence before the Court" made clear that Joshua "prearranged with both PHF and Jonathan to have Jonathan serve as a point of contact and spokesperson for the Masts' legal defense campaign," which meant

26

Jonathan was designated as a "representative" within the ambit of the Protective Order. JA332–33. Joshua remained aware of Jonathan's actions, including his younger brother's agreement on his behalf to sign the grant agreement with the PHF, which resulted in a transfer of $5,000 to Joshua. JA333. Based on these findings, the district court found that Joshua and Jonathan engaged in several knowing violations of the Protective Order vis-à-vis their sharing of identifying photos of Baby Doe with the PHF and OANN. JA334–335.

Having found violations of the Protective Order, the district court turned to the matter of civil contempt. The court found each element satisfied, including the validity of the Protective Order, the fact that it was entered in the Does' favor, that the violations created a nonspeculative risk of physical harm, and that Joshua and Jonathan failed "to show that they undertook in good faith all reasonable efforts to comply with the Protective Order." JA336–340. The court therefore found Joshua and Jonathan in contempt and invited the Does to submit a motion to recover their reasonable attorney's fees for remedying the violations. JA341–342.[5]

---

[5] The Does' fee petition remains pending below. JA44 (ECF 489).

On September 16, 2024, Joshua Mast, Stephanie Mast, and Richard Mast noticed an appeal of the Contempt Order. JA343. Jonathan Mast did not appeal.

## SUMMARY OF ARGUMENT

If the Court concludes appellate jurisdiction is proper, it should reject the Masts' contention that the Protective Order's non-disclosure protection violates the First Amendment.

I. The Masts are wrong that the district court should have reviewed the Protective Order under strict scrutiny. That standard does not apply to non-disclosure protections that accompany pseudonymity orders.

A. This Court's decision in *James v. Jacobson*, 6 F.3d 233 (4th Cir. 1993), guides a trial court's discretionary decision to permit a party to sue using a pseudonym. The case-specific factors in *James* highlight the need to weigh a party's privacy or confidentiality concerns against the need for public access and potential prejudice to other parties. Although pseudonymity is a rare exception, it is more than appropriate when a litigant faces threats of violence.

B. The district court dutifully considered and applied *James* in both the Protective Order and the Contempt Order. The court made detailed

factual findings supporting the Does' well-founded fear that publicity created a grave risk of danger to themselves and their innocent family members remaining in Afghanistan.  That non-speculative risk of harm proved the Does had good reason to seek pseudonymity, and it far outweighed any general interest in public access in this case.  Nor is there any genuine risk of unfairness to the Masts, particularly given that they have always known the Does' identities.  On appeal, the Masts do not challenge any of these factual findings or the court's legal conclusion that pseudonymity is proper under *James*.  They have thus waived any challenge to those findings and conclusions.

C.  Given the propriety of pseudonymity under *James*, the district court was authorized to impose corollary restrictions on the disclosure of the Does' identities.  Indeed, omitting that kind of restriction would render the Protective Order toothless.  The Masts' repeated invocation of strict scrutiny finds no support in the law, as they cannot point to any judicial decision imposing strict scrutiny on a non-disclosure request relating to a pseudonymous litigant's identity.  Instead, the court below properly concluded that all authority supported the application of the *James* factors to such a request.

D.  The Masts' repeated rejoinder of labeling the Protective Order a "gag order" does not make it one.  Gag orders are fundamentally different from the kind of limited non-disclosure obligations imposed by protective orders.  The Protective Order does not broadly prohibit statements about the litigation.  It identifies a particular piece of sensitive information—the Does' identities—that requires safeguards under the circumstances.  And even then, the Protective Order outlines an appropriate way for the Masts to share that information with third parties.

E.  Even if the Protective Order's non-disclosure provision must be evaluated under a standard separate from *James*, strict scrutiny is not the appropriate test.  The Supreme Court has recognized that trial courts retain broad discretion to impose orders designed to protect the privacy and confidentiality concerns of litigants.  In *Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984), the Court rejected the notion that such protective orders are prior restraints subject to strict scrutiny.  Instead, the First Amendment test for protective orders is simply "good cause" under Federal Rule of Civil Procedure 26(c).  The Protective Order easily meets that test here.

30

II.  If the Court concludes that the Protective Order's non-disclosure provision is a content-based restriction that must satisfy strict scrutiny, it should still reject the Masts' arguments.  As the district court explained in the Contempt Order's alternative holding, the Protective Order satisfies that test.

A. The Protective Order and its non-disclosure provision meet a compelling state interest:  mitigating the substantial risk to the physical safety of the Does and their innocent family members in Afghanistan. This Court has recognized the compelling nature of protecting family members, and—given the district court's unchallenged factual findings— the Masts cannot dispute it here.   There is no exception for family members located abroad, and nothing in the procedural history of the Does' quest to be reunited with Baby Doe undermined their safety concerns.

B.  The Protective Order is also narrowly tailored to protect that safety interest.  It prohibits only the dissemination of information that discloses the identities of the Does or their family members.  It does not purport to regulate any party's ability to speak about the litigation or the parties' claims.  There are no alternative or narrower constructions that

would achieve the same confidentiality protections, and the Masts' attempts to prove otherwise lead them to misconstrue the record below.

III.  The Protective Order is not unconstitutionally vague.  Both the plain meanings of its terms and common sense give clear notice that the Masts may not disclose information that betrays the identities of the Does unless the person to whom they make the disclosure first signs a non-disclosure agreement.  Joshua Mast's own testimony shows he understood as much before any show-cause motions were filed.  The Masts' gripes that they might unwittingly stumble into a conversation in which they disclose identifying information is neither realistic nor rational.  They understand the scope of the Protective Order.

## ARGUMENT

Appellants Joshua, Stephanie, and Richard Mast do not challenge the district court's conclusion that Appellees John and Jane Doe should be identified in the proceedings below by their pseudonyms. Nor do they challenge the court's factual findings that, absent pseudonymity, the Does and their families in Afghanistan face a continued risk of physical harm. That should be the end of this appeal—if the Court does not first dismiss the case for lack of appellate jurisdiction.

The Masts nevertheless insist that the district court erred by declining to evaluate the Protective Order's non-disclosure provision under strict scrutiny. But, as the court below explained, strict scrutiny does not apply to such provisions—this Court's *James* framework does. The court followed that framework in granting the Protective Order, and this Court should not find that conclusion was an abuse of discretion. And even if non-disclosure of a pseudonymous plaintiff's identity must be evaluated separately from the threshold *James* decision, such a protective order requires only a showing of "good cause." The Protective Order meets that test, too.

33

And the district court did not disregard strict scrutiny. In an alternative holding, the court explained why the Protective Order served the compelling government interest of protecting the safety of the Does and their families and concluded that the non-disclosure provision was narrowly tailored to that end. Thus, even if strict scrutiny does apply, the Protective Order satisfies the test.

Finally, the Protective Order does not suffer from unconstitutional vagueness. Its terms and scope are clear, as shown by Joshua Mast's contemporaneous understanding at the time of the first violation. The Masts disagree with the scope of the Protective Order, but that does not mean they do not understand it.

For these reasons, if the Court reaches the merits of the Masts' interlocutory appeal, it should reject their arguments and affirm the Contempt Order.

# I.    Strict scrutiny does not apply to the Protective Order.

## A.    Under *James*, district courts have discretion to grant party pseudonymity in appropriate cases.

While parties generally must proceed using their own names, Fed. R. Civ. P. 10(a), courts may "allow a litigant to proceed anonymously" in appropriate circumstances. *Doe v. Sidar*, 93 F.4th 241, 247 (4th Cir.

2024). Indeed, pseudonymous litigants appear throughout the United States Reports. *See, e.g., Adoptive Couple v. Baby Girl*, 570 U.S. 637 (2013); *Doe v. Reed*, 561 U.S. 186 (2010); *Roe v. Wade*, 410 U.S. 113 (1973). Anonymity does not offend the First Amendment right of public access, because it "does not obstruct the public's view of the issues joined or the court's performance in resolving them." *Doe v. Stegall*, 653 F.2d 180, 185 (5th Cir. Unit A Aug. 1981).

In the Fourth Circuit, courts consider "five nonexhaustive factors" when weighing "motions to proceed by pseudonym":

> (1) "[W]hether the justification asserted by the requesting party is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of sensitive and highly personal nature";
>
> (2) "whether identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent nonparties";
>
> (3) "the ages of the persons whose privacy interests are sought to be protected";
>
> (4) "whether the action is against a governmental or private party"; and,
>
> (5) "relatedly, the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously."

*Doe v. Doe*, 85 F.4th 206, 211 (4th Cir. 2023) (quoting *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993)). These *James* factors focus on whether "compelling concerns relating to personal privacy or confidentiality may warrant some degree of anonymity in judicial proceedings." *Doe v. Pub. Citizen*, 749 F.3d 246, 273 (4th Cir. 2014).

Although "few cases warrant anonymity, and few litigants request it," that does not mean a trial court may "deny such requests 'on the basis of general disapproval of party anonymity at trial' or act based on any 'general rule.'" *Sidar*, 93 F.4th at 247 (quoting *James*, 6 F.3d at 239, 249). Instead, courts must render a decision on anonymity based on "the circumstances of particular cases." *James*, 6 F.3d at 238. The situations warranting anonymity thus vary, though some circumstances recur more than others. *See Sidar*, 93 F.4th at 248 (noting that "fictitious names are often allowed when necessary to protect the privacy of children, rape victims, and other particularly vulnerable parties or witnesses") (brackets and quotation marks omitted). As relevant here, "threats of violence" have supported anonymity orders. *Stegall*, 653 F.2d at 186.

As with most issues "involving management of the trial process," the decision to grant anonymity to a party is "committed in the first

instance to trial court discretion." *James*, 6 F.3d at 238. That discretion must reflect judgment "guided by sound legal principles." *Sidar*, 93 F.4th at 247 (quoting *Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 139 (2005)).

### B.    The Protective Order satisfies the *James* standard.

The district court considered the circumstances of this case, construed them against the *James* factors, and appropriately concluded that the Does should be permitted to proceed by pseudonym. *See* JA51. In the Protective Order itself, the court expressly found that "disclosure of Plaintiffs' identities and identifying information would pose a substantial risk to the physical safety of Plaintiffs and other innocent non-parties." *Id.* The court also observed "the age of minor Plaintiff Baby Doe" justified pseudonymity. *Id.* The Masts do not argue otherwise.

If there were any doubt that the district court properly exercised its discretion under *James*, the Contempt Order removed it. Before ruling on the Masts' contumacious conduct, the court reaffirmed the Protective Order with a full analysis of the *James* factors. JA315–322. The court reiterated "the grave safety risks that John and Jane Doe and their families in Afghanistan would face if their identities became public," which it found were "continuing, clear, and substantiated" and "anything

but speculative." JA315–316, JA319. The "risk of physical or mental harm" consideration "weigh[ed] significantly in favor of retaining Plaintiffs' pseudonymity." JA319. That risk was enhanced by "the sensitive and highly personal nature of the case." JA320. And the court rejected "any suggestion that Plaintiffs sought anonymity 'merely to avoid the annoyance and criticism that may attend any litigation.'" *Id.* (quoting *James*, 6 F.3d at 238). Again, the Masts do not challenge these holdings.[6]

Moreover, in both the Protective Order and the Contempt Order, the district court balanced the Does' need for anonymity against the Masts' own interests. In the Protective Order, the court concluded "that any risk of prejudice or unfairness (if any should exist), is more than sufficiently mitigated by the measured steps" identified in the Protective

---

[6] The district court found that the second *James* factor—"the ages of the persons whose privacy interests are sought to be protected," 6 F.3d at 238—did not factor into its analysis given that there was no argument that John and Jane Doe's ages were relevant or that Baby Doe's identity should not remain anonymous. JA319. The fourth factor—"whether the action is against a governmental or private party," 6 F.3d at 238— "weigh[ed] somewhat against retaining pseudonymity," because the only remaining defendants are private parties. JA321. Even so, "the weight of this factor on the [c]ourt's cumulative assessment of the *James* factors [was] leavened considerably by the presence of the other *James* factors." JA322.

Order, "which are tailored to protect such safety interests." JA51. And in the Contempt Order, the court explained that "any potential unfairness to the Masts is greatly mitigated by one fact—they have always known Plaintiffs' identities." JA323. They therefore could not contend that the pseudonymity order had "hindered [their] ability to mount a defense." *Id.* To be sure, the Masts made vague references to roadblocks in having third parties sign non-disclosure agreements, but the district court found "the argument both speculative and underdeveloped." *Id.* None of the defendants offered "specific facts, much less evidence, to substantiate the assertion." *Id.*; *see* JA323 n.9 (noting counsel for Joshua and Stephanie Mast likewise failed to point to "any evidence or specifics" at the show-cause hearing "or in the months that have followed" that the Protective Order has hindered discovery efforts).

Ultimately, the court found "that the *James* factors weigh decisively in favor of retaining the Protective Order" and the Does had "demonstrated that 'exceptional circumstances' warrant the [c]ourt's affording them the 'rare' ability to litigate using pseudonyms." JA326 (quoting *Pub. Citizen*, 749 F.3d at 273). The court emphasized the "paramount significance" of "the risk of physical injury or even death

39

facing Plaintiffs' relatives currently living in Afghanistan should Plaintiffs' identities become known." JA325. Because that "well-founded concern" motivated the Does' request for pseudonymity, and the Masts failed to show "*any* unfairness" to permitting pseudonymity—"much less unfairness to such a degree as would counterbalance the threat of physical harm"—the court reaffirmed the Protective Order. JA236 (emphasis added).

The Masts do not challenge *any* of the district court's factual findings in either the Protective Order or the Contempt Order. Nor do they appeal the legal conclusion that the Does should be permitted to proceed anonymously. They have therefore waived any challenge to the district court's factual findings and its decision to permit John and Jane Doe to litigate pseudonymously. *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief or by failing to develop its argument—even if its brief takes a passing shot at the issue.") (internal quotation marks and brackets omitted). As a result, there is no basis for this Court to "vacate the Protective Order" as the Masts request. Appellants' Br. 42.

## C.    The Protective Order's non-disclosure requirement is a necessary corollary to pseudonymity.

The Masts' primary focus in this appeal is on the legal standard used to assess "challenged portions of the Protective Order." Appellants' Br. 21.[7] The "challenged portions" do not include the court's permission for the Does to litigate using pseudonyms or the requirement that all identifying references in the proceedings to the Does use those pseudonyms or be filed under seal. JA51–52. Instead, they challenge only the provision that prohibits them "from disclosing any information that directly or indirectly identifies Plaintiffs or their family members to any person . . . unless that person first executes a non-disclosure agreement enforceable through the contempt citation." JA51. This

---

[7] In nearly every instance (more than 50 times), the Masts refer to the Protective Order as "the *ex parte* protective order." But the original *ex parte* nature of the Protective Order is irrelevant and misleading. The Masts have always known the true identities of John and Jane Doe, which are likewise shielded from the public in the state-court litigation that predates the federal litigation by a year. Moreover, the Masts appeared within days of the entry of the Protective Order and took every opportunity to challenge its validity. The district court fully considered— and rejected—their arguments in the Contempt Order. Finally, the Does *had* to file their motion at the outset of the case lest the original complaint bearing their names be filed on the public docket.

41

portion of the Protective Order, they contend, should have been reviewed under strict scrutiny rather than this Court's *James* standard.

Yet the Masts cite exactly *zero* cases in which a court—any court, anywhere—applied strict scrutiny to a party-anonymity order. And it is little wonder why. As the district court explained, "an order permitting a party to use a pseudonym would be scant (if any) utility if the opposing litigant could publicly name them." JA314; *cf. United States ex rel. Davis v. Prince*, 754 F. Supp. 3d 561, 568 (E.D. Va. 2010) (observing the propriety of "prohibit[ing] extrajudicial statements revealing the substance" of materials covered by "a valid protective order" because "[o]mitting such a restriction renders a protective order toothless"). In this vein, "a protective order is a corollary to a pseudonym order." JA314.

Indeed, many courts have found that pseudonymity and protective orders go hand-in-hand. The Seventh Circuit has observed that trial courts may use "protective orders and plac[e] documents under seal" to "prevent[] a party's name from reaching the public domain." *Doe v. Vill. of Deerfield*, 819 F.3d 372, 376 (7th Cir. 2016). The Eleventh Circuit has noted with approval that a plaintiff requesting pseudonymity can mitigate any potential prejudice to defendants by offering to "disclose her

42

name" in exchange for the promise "that they do not disclose it to the general public"—and a trial court "can enter an appropriate protective order" to that effect. *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 687 (11th Cir. 2001). And the Ninth Circuit has explained that a trial court can "preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case" by "issu[ing] protective orders limiting disclosure of the party's name." *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000) (citing Fed. R. Civ. P. 26(c)). The original anonymity order issued in *James* included such a provision.[8]

Because the district court properly granted the Does' request for pseudonymity under *James*, the Protective Order's corollary non-disclosure provision was permissible. The Masts resist that obvious conclusion by claiming that "not every case with a request for pseudonymity has such extreme facts that would garner significant

---

[8] *James*, 6 F.3d at 235 (describing the order to "preserv[e] the plaintiffs' anonymities" as forbidding "disclosure by defendants and their counsel or representatives of any information that directly or indirectly identified plaintiffs or their children to any person unless that person first executed a non-disclosure agreement enforceable by the contempt sanction"). Notably, this language is nearly identical to the challenged provision in the Protective Order. *See* JA51.

national and international attention." Appellants' Br. 27. That may be so, but *James* accounts for the case-specific circumstances "that should be taken into account in ruling on anonymity requests." 6 F.3d at 242.

Moreover, the Masts mischaracterize the district court's holding in the Contempt Order that "no pseudonym order could stand on its own without a corresponding out-of-court speech restriction." Appellants' Br. 27. Instead, the court observed "the better practice—*which Plaintiffs followed here*—[is] to explicitly seek a protective order prohibiting Defendants' disclosure of their identities *in addition to asking for leave to proceed under a pseudonym*." JA314 (emphasis added). The forms of relief are best understood as corollaries not because one automatically begets the other but because the need for each is analyzed under the same standard for anonymous litigation. *See id.* (explaining "all authority supports the application of the *James* factors in considering such requests").

In sum, the district court applied the correct legal standard for considering the need for pseudonymity, and it did not abuse its discretion in granting the Protective Order.

44

### D. The Protective Order is not a "gag order."

Against this commonsense headwind, the Masts insist that the Protective Order operates as a "gag order" because (they say) it "restricts [them] from speaking about issues related to the case." Appellants' Br. 22. On that logic, they assert, strict scrutiny applies. *See id.* (citing *Murphy-Brown*, 907 F.3d at 797).

But the district court "did not issue a 'gag order.'" JA313. A judicial order protecting specific information implicates "the common law tradition of public access to judicial proceedings," but it does not raise the same concerns as a true gag order. *Covil Corp. ex rel. Protopatas v. U.S. Fid. & Guar. Co.*, 544 F. Supp. 3d 588, 603 (M.D.N.C. 2021). As the court explained, the "decision to allow a litigant to use a pseudonym involves some intrusion into the public's right of access to the courts and judicial proceedings, implicating First Amendment and common law interests." JA313. But "those interests are accounted for in the *James* factors." JA313–314 (citations omitted).

Looking past the label assigned by the Masts to actual the text of the Protective Order proves the point. The district court did not prohibit the Masts from "giv[ing] or authoriz[ing] any extrajudicial statement or

interview . . . relating to the trial, the parties or issues in this case"[9] or from "talk[ing] about the case or anything related to it in public."[10] Instead, the Protective Order prohibits the disclosure of the identities of "Plaintiffs or their family members," including their "names and the locations of their residences abroad and places of birth." JA51.[11] And even then, the Protective Order does not issue a blanket prohibition, because such information may be shared with third parties who sign a non-disclosure agreement. *See id.*

The Masts insist that the district court's decision "rests on a false dichotomy" that the Protective Order "must be either a pseudonym order or a gag order." Appellants' Br. 22. But the contrast drawn by the district court was between the body of caselaw permitting anonymity orders—*James* and its progeny—and the absence of any "precedent that would

---

[9] *Murphy-Brown*, 907 F.3d at 792–93 (alteration in original).

[10] *Gagging order*, Merriam-Webster.com Dictionary, *available at* https://bit.ly/3DihRhT (cited at Appellants' Br. 22).

[11] *See also Kelly v. City of New York*, No. 01 Civ. 8906, 2003 WL 548400, at *7 (S.D.N.Y. Feb. 24, 2003) (noting a judicial non-disclosure order was "not a 'gag order'" because the parties were "free to speak with the press about this case generally, and about any documents that are already in the hands of the press or the public," but neither side could "disclose the identities of any non-party employees whose names have not already been disclosed").

support applying the 'strict scrutiny' standard under these circumstances." JA314. Even still, the Masts do not point this Court to any case construing the kind of anonymity protections permitted here as a content-based "gag order" subject to strict scrutiny.[12]

## E. Valid protective orders are assessed under the "good cause" standard, not strict scrutiny.

Finally, even if the Protective Order's non-disclosure provision must be justified separately from the granting of pseudonymity under *James*, strict scrutiny remains an inappropriate test. "Although litigants do not surrender their First Amendment rights at the courthouse door, those rights may be subordinated to other interests that arise in this setting." *Seattle Times*, 467 U.S. at 32 n.18 (citation omitted). Thus, a

---

[12] Appellants cite *Russe v. Harman*, No. 1:21-cv-270, 2021 WL 5043358 (W.D.N.C. Oct. 29, 2021), as an example of the kind of analysis they say the district court should have done here. Appellants' Br. 3, 32. But the case is inapposite, as the plaintiff there expressly sought to completely seal her lawsuit, requested "a protective Gag Order for all participants and Attorneys in this matter," and asked "to proceed under anonymity." *Russe*, 2021 WL 5043358, at *1. There is no comparison between that case and this one, where the Does simply seek to remain anonymous. Likewise, recognizing the corollarial relationship between a pseudonym order and a non-disclosure order would not "gut[]" the Court's decision in *Murphy-Brown*." Appellants' Br. 28. *Murphy-Brown* was a true "gag order" case that had nothing to do with anonymity. 907 F.3d at 792.

court order restricting the dissemination of litigation-related information "implicates the First Amendment rights of the restricted party to a far lesser extent than would restraints on dissemination of information in a different context." *Id.* at 34.

Trial courts may impose litigation-related restraints using protective orders. Under Rule 5.2(e), district courts may require the redaction or sealing of certain confidential information. Fed. R. Civ. P. 5.2(e). Likewise, under Rule 26(c), the court may issue an order "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c). Trial courts have "substantial latitude to fashion protective orders" when supported by "good cause." *Seattle Times*, 467 U.S. at 36.

In *Seattle Times*, the Supreme Court rejected the application of First Amendment strict scrutiny to an order entered to protect the dissemination of information obtained in discovery. *See id.* at 31.[13] Such a protective order, the Court reasoned, "is not the kind of classic prior restraint that requires exacting First Amendment scrutiny." *Id.* at 33.

---

[13] The case dealt with Rule 26(c) of Washington State's civil rules, which the Supreme Court noted was "virtually identical" to the federal Rule 26(c). *Seattle Times*, 467 U.S. at 29 n.14.

To the contrary, imposing strict scrutiny on protective orders "would impose an unwarranted restriction on the duty and discretion of a trial court to oversee the discovery process." *Id.* at 31. And just as a court has "a substantial interest in preventing [the] abuse of its processes," *id.* at 35–36, there is a similar need to "ensur[e] that potential litigants have unimpeded access to the courts," *id.* at 36 n.22. If courts withhold protective orders, "individuals may well forgo the pursuit of their just claims," resulting in a system that makes "the utilization of its remedies so onerous that the people will be reluctant or unwilling to use it, resulting in frustration of a right as valuable as that of speech itself." *Id.*

Strict scrutiny therefore does not apply to such protective orders. Instead, so long as the protective order is supported by "good cause" and measured to prevent abuse of the judicial system, "it does not offend the First Amendment." *Id.* at 37; *see ACLU v. Holder*, 673 F.3d 245, 254 (4th Cir. 2011) (citing *Seattle Times* for the proposition that the "'good cause' standard under the Federal Rules of Civil Procedure does not require heightened First Amendment scrutiny"); *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 7 (1st Cir. 1986) (explaining, after *Seattle Times*, the correct test

49

under the First Amendment for protective orders is "the good cause inquiry found in Rule 26(c)").

The Masts do not cite *Seattle Times*, and the case sabotages their contention that any order that "prohibits the Masts from disclosing information" is a content-based restriction subject to strict scrutiny. Appellants' Br. 23 (quotation marks and ellipses omitted). Instead, First Amendment challenges to valid protective orders are reviewed under the "good cause" standard. *Seattle Times*, 467 U.S. at 37. And, just like pseudonymity orders, the decision to enter a protective order "is committed to the discretion of the trial court and will not be disturbed on appeal unless the court has abused its discretion." *M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 163 (4th Cir. 1992) (en banc).

For the same reasons the Protective Order satisfies the *James* framework, it meets the "good cause" standard required for First Amendment review. The district court's analysis reflects more than mere "[b]road allegations of harm, unsubstantiated by specific examples or articulated reasoning." *Springs v. Ally Fin. Inc.*, 684 F. App'x 336, 338 (4th Cir. 2017) (describing decisions that do not satisfy "good cause"). The

50

detailed factual findings and substantiated legal conclusions on the need for protection, *supra* Part I.B, more than meet the benchmark for issuing a protective order.

## II. Even if strict scrutiny applies, the Protective Order satisfies that standard.

If the Court concludes that strict scrutiny applies to the Protective Order's non-disclosure provision, it should still reject the Masts' arguments. Their arguments under strict scrutiny fail because the Protective Order is "narrowly tailored to serve [a] compelling [government] interest[]," *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015), and there are no "less restrictive alternatives [that] would be at least as effective in achieving" that "legitimate purpose," *Reno v. ACLU*, 521 U.S. 844, 874 (1997). Indeed, in an alternative holding, the district court concluded just that in its Contempt Order. JA326 n.12.

### A. Protecting the physical safety of the Does and their non-party family members is a compelling interest.

The Protective Order and its nondisclosure provision serve a compelling government interest: mitigating the "substantial risk to the physical safety of Plaintiffs and other innocent non-parties" if the Does' identities were disclosed. JA51. These are compelling state interests. JA326 n.22; *see, e.g.*, *United States v. Doe*, 962 F.3d at 147 n.9 (noting

that "protecting family members is certainly a compelling interest"); *United States v. Harris*, 890 F.3d 480, 492 (4th Cir. 2018) (recognizing "an interest in protecting the physical and psychological well-being of individuals related to the litigation, including family members and particularly minors").

The Masts raise three issues with the district court's compelling-interest finding. First, they contend that the safety of the Does' family members doesn't qualify as "compelling" because they are "a small group of non-citizens living abroad." Appellants' Br. 34. But the judicial concern with public safety does not fluctuate based on the number or location of potential victims. When this Court has noted the "compelling interest" of "protecting family members," *United States v. Doe*, 962 F.3d at 147 n.9, it has not cabined the concern based on how many or where those family members live. *See Harris*, 890 F.3d at 492.

Second, the Masts say that the district court "declined to explain in its brief footnote which factual findings demonstrate a compelling government interest." Appellants' Br. 35. This blinks reality. The "brief footnote" repeatedly identifies the "compelling" interest of "preserving Plaintiffs' safety and the safety of their families." JA236 n.12; *see id.*

52

(noting the need "to ensure Plaintiffs' safety and that of their families still living in Afghanistan"); *id.* (noting the need to "safeguard such compelling safety interests"). And the court's factual findings verifying that compelling need are legion.[14] This was no "mere notion of a safety concern." Appellants' Br. 35. As the district court emphasized, "the threat to Plaintiffs' families in Afghanistan, if Plaintiffs' identities become known, is anything but speculative." JA317.

Third, the Masts repeat their complaint that the Does' public safety concerns are "greatly undermined by the fact that" they have given a small number of media interviews and because they were briefly named publicly in other court proceedings. Appellants' Br. 35. The district court

---

[14] *See* JA315 (describing "the grave safety risks that John and Jane Doe and their families in Afghanistan would face if their identities became public"); JA316 (noting as "significant" the Does' unchallenged "evidence that if their names became known, the Taliban could well believe (incorrectly) that John Doe had been working for the United States, and carry out violence against the Does' families remaining in Afghanistan as they have to those who provided assistance to the United States before the Taliban came to power"); *id.* (noting "the threat to [the Does'] families, as 'innocent nonparties,' has become only more real and acute" and that evidence "demonstrates a continuing, clear, and substantiated risk of physical harm to Plaintiffs' families in Afghanistan, should their identities become public"); JA318 (finding "a continued risk of physical harm to Plaintiffs' families if Plaintiffs' identities become known").

rejected these arguments, too. Although the Does spoke to two media outlets in the early days of their federal case, they did so "on condition of anonymity," which was honored by those outlets. JA317. Moreover, after the Does' names were listed on the public docket of the state-court proceedings very briefly, "the Virginia Court of Appeals later unequivocally accepted" the Does' submission that their identification "affects not only themselves but also family members who are not parties to the underlying litigation," and permitted the Does to proceed using their initials. JA318; *see* JA141–151 (orders permitting anonymity and sealing identifying information in state-court proceedings). Nothing about the interviews given on condition of anonymity or the state-court sealing procedures undermines the Does' legitimate safety concerns.

**B. The Protective Order is narrowly tailored to protecting the compelling interest of safety.**

The Protective Order is narrowly tailored to mitigating the safety risks to Plaintiffs and other innocent non-parties because limiting the disclosure of the Does' identities is the least restrictive means to advance that compelling interest. The scope of the Protective Order is narrow. It prohibits the disclosure of information that identifies the Does or their family members, "including but not limited to the Plaintiffs' names and

54

locations of their residences abroad and places of birth." JA51. It does

not purport to regulate any party's ability to speak about the litigation,

the Does' claims, or the Masts' defenses.

Even so, the Masts insist the Protective Order fails the narrow-

tailoring requirement because it prohibits the disclosure of the Does'

identities to "any person" whether "directly or indirectly." Appellants'

Br. 36. They say that a narrower application might have focused on

"communications that have a reasonable likelihood of reaching the

Taliban." *Id.*[15] Alternatively, disclosure could be permitted "for

communications that are necessary for the Masts to prepare their

defense." *Id.* at 36–37. But the First Amendment requires a restriction

"be narrowly tailored, not that it be 'perfectly tailored.'" *Williams-Yulee*

*v. Fla. Bar*, 575 U.S. 433, 454 (2015) (quoting *Burson v. Freeman*, 504

U.S. 191, 209 (1992)). Given the magnitude of the potential harm from

the public identification of the Does, the Protective Order is not unduly

---

[15] The Masts do not explain how one would know the "reasonable likelihood" that a communication might reach the Taliban except to identify "communications with media outlets as opposed to communications with private individuals." Appellants' Br. 36. Lost in this assertion is any recognition that the Masts' violations arose from communications with media outlets—not private individuals.

restrictive in prohibiting "Defendants' identification of Plaintiffs as such—*Plaintiffs in this case*."  JA326 n.12.  Moreover, the permitted disclosure to individuals who have executed a non-disclosure agreement limits the sweep of the restriction vis-à-vis the Masts' defense.  Indeed, the district court observed that "the Masts cannot persuasively argue in seeking to modify the Protective Order that Plaintiffs' use of pseudonyms has hindered the Masts' ability to mount a defense."  JA323.

Beyond pedantic abstractions of "any person" and "direct" versus "indirect" identification, the Masts fail to show any meaningful failure in tailoring.  The best they do is to suggest that it was unfair to apply the Protective Order to Joshua Mast's brother Jonathan, "who is not a party," for "sharing photos of the child with a non-profit group that was considering providing the Masts a legal defense grant, even though no pictures of the Does were shared nor any identifying information about them given."  Appellants' Br. 37.  This argument badly misconstrues the record.  Jonathan was found in contempt because he had actual knowledge of the Protective Order, acted as his brother's representative with the PHF, and disclosed identifying information to (and via) the PHF and OANN.  JA332–335.  And the photographs at issue were both

56

distributed in the context of this litigation and deemed "identifying" under the Protective Order.  *See* JA334 n.37 (describing some of the identifying photos).

Finally, the Masts complain that the district court "erroneously shifted the burden" to them on the issue of narrow tailoring.  Appellants' Br. 37.  Not so.  The Does carried their burden on that issue.  The district court merely observed that, with that burden having been met, the Masts failed to respond with any "less restrictive means than those set forth in the Protective Order that would safeguard such compelling safety interests."  JA326 n.12.

## III.  The Protective Order is not unconstitutionally vague.

Finally, the Masts argue that the Protective Order is unconstitutionally vague.  It is not.

An unconstitutionally vague rule fails to give a person of ordinary intelligence fair notice that his or her conduct is forbidden.  *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972).  Restraints on speech must include "some sensible basis for distinguishing what may come in from what must stay out."  *Minn. Voters All. v. Mansky*, 585 U.S. 1, 17 (2018).  "That some smidgen of ambiguity remains is no reason to find a

[law] unconstitutionally vague." *Recht v. Morrisey*, 32 F.4th 398, 415 (4th Cir. 2022). So long as the rule "(1) establishes minimal guidelines to govern [enforcement], and (2) gives reasonable notice of the proscribed conduct," it will not be voided for vagueness. *Schleifer v. City of Charlottesville*, 159 F.3d 843, 853 (4th Cir. 1998) (internal quotation marks omitted). "That inquiry is aided by both dictionary definitions and old-fashioned common sense." *Fusaro v. Howard*, 19 F.4th 357, 371 (4th Cir. 2021) (internal quotation marks omitted).

The Protective Order satisfies these standards. Simply put, the Masts may not disclose information that betrays the Does' identities unless the person to whom they make the disclosure first signs a non-disclosure agreement. JA51. No amount of feigned confusion over "direct" versus "indirect" identification or the geographic boundaries of a "place of birth," Appellants' Br. 39 & n.7, undermines the common sense understanding of the Protective Order's restrictions.[16]

Undeterred, the Masts once again misstate the nature of Jonathan's and Joshua's violations of the Protective Order to support

---

[16] Appellants' handwringing over whether "place of birth" might be so broad as to cover the "continent" or "country" is nonsensical given that the caption of the case identifies the Does as citizens of Afghanistan.

their argument.  Before the Contempt Order, they say, "it would be anyone's guess as to whether sharing a photo of an individual without providing their name, residence or place of birth would count as 'indirectly' identifying them."  Appellants' Br. 40.  But Jonathan and Joshua did not simply share an anonymous photo.  They provided identifying photos of Baby Doe to a third party for the express purpose of raising money *for this litigation* with the knowledge and expectation that those photographs would be shared and publicized—and they were.

Moreover, the suggestion that the Masts had no idea of the sensitivity surrounding photographs of the child is undercut by Joshua Mast's own testimony at the first show-cause hearing.  Joshua told the Court that he and his wife had only "authorized" *CBS Mornings* to air photos of Baby Doe "that didn't show her face."  JA131.  When asked why he declined to allow them to show more, Joshua responded, "[b]ecause I was required to do that by the protective order.  I could not identify her to other people."  *Id.*; *see* JA134 (testifying that "we selected photos that did not reveal her identity and provided them to CBS because of the protective order").  To that end, Joshua's defense at the first show-cause hearing was not that he did not understand the scope of the Protective

59

Order, but that he had not provided the photos that showed Baby Doe's face.  JA329 & nn.14–16.

The Masts also founder in their attempt to label the Protective Order unduly vague based on the uncertainty of the Does' family trees. True enough, no one can expect "to know the identities of all individuals related to the Does."  Appellants' Br. 41.  The Masts fail to mention, however, that more than a year ago the Does identified "each biological parent and each paternal or maternal sibling, grandparent, aunt, or uncle of John Doe, Jane Doe, or Baby Doe in Afghanistan" and described those relationships.  *Doe v. Mast*, 3:22-cv-49, 2023 WL 8481049, at *3 (W.D. Va. Dec. 7, 2023) (granting the Masts' motion to compel a response to the interrogatory, as modified).  In any event, the Masts' concern over unknown family members does not render the Protective Order "vague." If the Masts do not know someone is a family member of the Does, it is hard to see how they might step on the "landmine" of identifying that person as a family member of the Does to someone else.

The Masts need not "guess at [the] contours" of the Protective Order or wonder about "who it covers."  Appellants' Br. 41 (quoting *Murphy-Brown*, 907 F.3d at 800–01)  The Protective Order protects the identities

of "Plaintiffs" and "their family members," and it covers "[t]he Defendants and their counsel and representatives." JA51. There is nothing vague about that.

## CONCLUSION

If the Court does not dismiss this appeal for lack of jurisdiction, it should affirm the district court's Contempt Order.

January 2, 2025                            Respectfully submitted,

                                           */s/ Kevin S. Elliker*

                                           Maya M. Eckstein
                                           Lewis F. Powell III
                                           Kevin S. Elliker
                                           HUNTON ANDREWS KURTH LLP
                                           951 E. Byrd Street
                                           Richmond, VA 23219
                                           (804) 788-8200
                                           meckstein@HuntonAK.com
                                           lpowell@HuntonAK.com
                                           kelliker@HuntonAK.com

                                           Brittany M.J. Record
                                           Ehson Kashfipour
                                           LATHAM & WATKINS LLP
                                           555 Eleventh Street, NW, Suite 1000
                                           Washington, DC 20004-1304
                                           (202) 637-2200
                                           brittany.record@lw.com
                                           ehson.kashfipour@lw.com

                                           Blair Connelly
                                           Zachary Rowen

LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10029
(212) 906-1200
blair.connelly@lw.com
zachary.rowen@lw.com

*Counsel for Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

Given the importance of the jurisdictional issues and the grave safety concerns underlying the Protective Order, John and Jane Doe submit that oral argument would be appropriate on both their motion to dismiss and the merits of the appeal.

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the word limitation of Fed. R. App. P. 32(a)(7)(B) because the portion of the brief subject to that rule is 12,262 words and therefore does not exceed the 13,000-word limit.

I further certify that the brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point Century Schoolbook typeface using Microsoft Word.

*/s/ Kevin S. Elliker*
Kevin S. Elliker

## CERTIFICATE OF SERVICE

I certify that the foregoing has been filed on this 2nd day of January, 2025, using the Court's CM/ECF system, which will serve notice on all counsel of record.

_/s/ Kevin S. Elliker_
Kevin S. Elliker