No. 24-1900

In the

# United States Court of Appeals

## For the Fourth Circuit

———————————

BABY DOE, JOHN DOE, & JANE DOE,

*Plaintiffs-Appellees,*

V.

JOSHUA MAST, STEPHANIE MAST, & RICHARD MAST,

*Defendants-Appellants.*

———————————

On Appeal from the United States District Court
for the Western District of Virginia
Honorable Norman K. Moon
Case No. 3:22-cv-00049

———————————

**REPLY BRIEF OF APPELLANTS**

———————————

John S. Moran                  David Eliezer Yerushalmi
MCGUIREWOODS LLP               AMERICAN FREEDOM LAW CENTER
Suite 500                      Suite 189
888 16th Street, NW            2020 Pennsylvania Avenue, NW
Washington, D.C. 20006         Washington, D.C. 20006
T: 202-525-0356                T: 646-262-0500

January 23, 2025

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................1

ARGUMENT .....................................................................................3

I.    Granting pseudonymity under the *James* standard does not give
      district courts *carte blanche* to gag litigants ...............................3

II.   The *ex parte* Protective Order imposes a content-based speech
      restriction and is therefore subject to strict scrutiny ...............10

III.  The *ex parte* Protective Order does not meet strict scrutiny.................16

IV.   The *ex parte* Protective Order's speech restrictions are
      unconstitutionally vague under the first and fifth amendments.............21

CONCLUSION ...............................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adarand Constructors, Inc. v. Mineta,*
  534 U.S. 103 (2001)..................................................................16

*Alexander v. S.C. State Conf. of the NAACP,*
  602 U.S. 1 (2024)....................................................................18

*Alexander v. United States,*
  509 U.S. 544 (1993).................................................................11

*City of Richmond v. J.A. Croson Co.,*
  488 U.S. 469 (1989).................................................................17

*Concrete Pipe & Prods. of California, Inc. v. Constr. Laborers
  Pension Tr. for S. California,*
  508 U.S. 602 (1993) ...............................................................18

*Covil Corp. by & through Protopapas v. United States Fid. & Guar.
  Co.,*
  544 F. Supp. 3d 588 (M.D.N.C. 2021) ...............................................14

*Doe v. Vill. of Deerfield,*
  819 F.3d 372 (7th Cir. 2016) ...................................................6, 7

*Does I thru XXIII v. Advanced Textile Corp.,*
  214 F.3d 1058 (9th Cir. 2000) .....................................................8

*James v. Jacobson,*
  6 F.3d 233 (4th Cir. 1993) .................................................1, 3, 4, 18

*Kelly v. City of New York,*
  No. 01 Civ. 8906, 2003 WL 548400 (S.D.N.Y. Feb. 24, 2003)..................14, 15

*In re Murphy-Brown, LLC,*
  907 F.3d 788 (4th Cir. 2018) ....................................................4, 5

*NAACP v. Bureau of the Census,*
  945 F.3d 183 (4th Cir. 2019) ......................................................16

*Ramirez v. Collier*,
142 S. Ct. 1264 (2022)............................................................................20

*Reed v. Town of Gilbert, Ariz.*,
576 U.S. 155 (2015)................................................................................11

*Roe v. Aware Woman Ctr. for Choice, Inc.*,
253 F.3d 678 (11th Cir. 2001) .............................................................7, 8

*In re Russell*,
726 F.2d 1007 (4th Cir. 1984) ................................................................6

*In re State-Rec. Co., Inc.*,
917 F.2d 124 (4th Cir. 1990) ..................................................................6

*United States v. Young*,
No. 23-6830, 2024 WL 3508154 (4th Cir. July 23, 2024) ..................16

*U.S. ex rel. Davis v. Prince*,
753 F. Supp. 2d 561 (E.D. Va. 2010) .....................................................5

**Statutes**

42 U.S.C. § 2000cc-1 .............................................................................20

**Other Authorities**

Eugene Volokh, *The Law of Pseudonymous Litigation*, 73 HASTINGS
L.J. (2022)...........................................................................................8, 11

**INTRODUCTION**

Plaintiffs John and Jane Doe would have the Court simply close its eyes and affirm. Their arguments ignore the particulars of this Court's precedents, which distinguish between pseudonymity and restrictions on extrajudicial statements. And they ignore the particulars of the district court's order, which indisputably restricts the Masts' ability to discuss information they obtained wholly independently from this litigation. The Court should see through the superficial characterizations and reverse.

*First*, contrary to the Does suggestion, there is no precedent in the Fourth Circuit or elsewhere for the proposition that restrictions on extrajudicial identification are a "necessary corollary," Opp. 41, when a court allows pseudonymity based on the standard articulated in *James v. Jacobson*, 6 F.3d 233 (4th Cir. 1993), and exempt from First Amendment scrutiny. This Court did not even address the First Amendment in *James*, and its subsequent cases have made clear that the First Amendment applies to restrictions on a party's extrajudicial statements. Nor does any other case the Does cite establish such a proposition. And in any event, the speech restrictions at issue in *James* were substantially narrower than what is at issue here.

*Second*, the Does dispute that the district court imposed a "gag order," but those arguments fall flat as well. Whatever label one attaches, the *ex parte* Protective

Order expressly bars the Masts from making extrajudicial disclosures of information, which—it is undisputed—they knew long before this lawsuit was ever filed. Such restrictions are subject to strict scrutiny under the First Amendment regardless of whether one wishes to characterize them as a "gag order."

**Third**, the Does' attempt to satisfy strict scrutiny, *see* Opp. 51–57, is doubly misguided. To start, it sets forth an analysis that the district court never conducted below and which this Court should not be expected to conduct in the first instance. At a minimum, this Court should vacate the *ex parte* Protective Order while allowing the Does an opportunity to seek a new order under the strict scrutiny standard. But in any event, those arguments fail because the Does have not put forth sufficient evidence to establish a compelling interest (which is their burden), and because the *ex parte* Protective Order is not remotely narrowly tailored to serve that compelling interest, even assuming it were established.

**Finally**, the *ex parte* Protective Order's speech restrictions are unconstitutionally vague under the First and Fifth Amendments. The Does argue that the order covers any "information that betrays the Does' identities," Opp. 58, but that is no clearer than the order itself.

There are no doubt cases where federal courts have good reason to permit pseudonymity. And in a smaller subset of those cases, there may even be justification for a court to restrict the parties from discussing matters outside of court. But those

2

circumstances are exceedingly rare, and under clearly established precedent, they are governed by the First Amendment and its strict-scrutiny standard. This Court should reaffirm that critical principle here, reverse the district court below, and remand with instructions to vacate the speech restrictions in the *ex parte* Protective Order—at least unless and until the Does make a showing that each such restriction would satisfy strict scrutiny.

## ARGUMENT

### I.  Granting pseudonymity under the *James* standard does not give district courts *carte blanche* to gag litigants.

This Court in *James* held that "[t]he decision whether to permit parties to proceed anonymously at trial is one of many involving management of the trial process . . . committed in the first instance to trial court discretion," and provided "some guidelines . . . in the form of factors that should be considered by courts considering anonymity requests." 6 F.3d at 238. But contrary to the district court's ruling below and the Does' argument on appeal, this Court did *not* hold that anonymity orders are immune from First Amendment scrutiny or that restrictions on parties' out-of-court statements are a "necessary corollary" to pseudonymity. Opp. 41. Indeed, the narrow issue before the Court concerned "party or witness anonymity *at trial*," *id.* at 239 (emphasis added), not extra-judicial statements, and the Court in *James* did not discuss the First Amendment at all.

3

*James* thus cannot stand for the proposition that, when a district court grants leave to litigate pseudonymously, it may also limit the parties' extra-judicial statements free from First Amendment scrutiny. The Does attempt to salvage this reading of *James* by arguing that the challenged speech restrictions in the *ex parte* Protective Order are "nearly identical" to restrictions included in the "original anonymity order issued in *James*." Opp. 43 & n.8. But they fail to acknowledge the *James* Court's own description of what was at stake. The Court expressly relied on representations from the plaintiffs that "they disavowed any request to be protected at trial against the risk of their *indirect* identification." 6 F.3d at 241. The defendants were free to discuss at trial "their profession, where they come from, what they do, what they stand for[, . . .] and all of the other portions of cross-examination." *Id*. This context alone refutes the Does' contention that the speech restrictions in the *ex parte* Protective Order—which expressly include restrictions on "indirect" identification, JA51—represent a "necessary corollary," Opp. 41, to pseudonymity under *James*.

When this Court *has* addressed a district court's restrictions on extra-judicial statements about opposing parties, it has made clear that the First Amendment and strict scrutiny apply. *See In re Murphy-Brown, LLC*, 907 F.3d 788, 797 (4th Cir. 2018). Like the speech restrictions in the *ex parte* Protective Order at issue here, the challenged order in *Murphy-Brown* restricted the ability of "the parties, their

4

lawyers, and all potential witnesses . . . to 'give or authorize . . . extrajudicial statement[s]'" about the case. *Id.* at 796. The stated purpose of that order was to limit potentially prejudicial publicity, *see id.*, rather than to protect anonymity. But relevant consideration was that it imposed a "content based" "prior restraint[]" on speech outside the courtroom and was thus "presumptively unconstitutional," subject to review under "strict scrutiny." *Id.* at 797. The same rationale applies here, notwithstanding the difference in stated justifications for the two orders.[1]

None of the cases the Does cite, *see* Opp. 42–43, supports their contention that restricting a party's extrajudicial statements is a "necessary corollary" to pseudonymity exempt from First Amendment scrutiny.

*U.S. ex rel. Davis v. Prince*, 753 F. Supp. 2d 561 (E.D. Va. 2010), concerned the enforcement of a protective order that limited the disclosure of discovery materials *obtained through litigation*. To be clear, that is a wholly distinct context from this one in which it is undisputed, *see* Opp. 39, that the Masts knew the Does' identities long before this lawsuit was filed. But in any event, the court held that it was appropriate to *deny* a gag order, which would be a "restraint[] on expression and raise First Amendment concerns." *Id.* at 568 (citing *United States v. Brown*, 218 F.3d 415, 424 (5th Cir. 2000)). The court further suggested, in *dicta*, that "[i]n the Fourth

---

[1] At most, the difference in stated justifications would be relevant to the compelling-interest and narrow tailoring prongs of the strict scrutiny analysis, not to assessing in the first instance whether strict scrutiny applies.

Circuit, district courts may restrict extrajudicial statements by parties and counsel *only* if those comments present a 'reasonable likelihood' of prejudicing a fair trial." *Id.* (quoting *In re Russell*, 726 F.2d 1007, 1010 (4th Cir. 1984)) (emphasis added).[2] Again, the district court did not rely on such a rationale here. And finally, the cherrypicked language the Does cite, *see* Opp. 42, comes from the court's general statements about what a more narrowly tailored protective order might cover. *See* 753 F. Supp. 3d at 568. As noted, the restrictions a court might place on a party as a precondition to *obtaining* information through discovery is wholly distinct from a court's effort to restrict a party's extrajudicial statements about knowledge that predates the lawsuit.

*Doe v. Vill. of Deerfield*, 819 F.3d 372 (7th Cir. 2016), held that an order denying pseudonymity was immediately appealable but affirmed the district court's denial because the plaintiff "failed to show exceptional circumstances justifying anonymity." *Id.* at 374. Far from suggesting that restrictions on a party's extrajudicial statements represent a "necessary corollary" to pseudonymity, the Court of Appeals emphasized that "anonymous litigation runs contrary to the rights

---

[2] This Court has since made clear that *In re Russell* was narrowly cabined to ruling that prohibited "potential witnesses in a criminal case from discussing their proposed trial testimony with members of the news media." *In re State-Rec. Co., Inc.*, 917 F.2d 124, 128 (4th Cir. 1990). For broader restrictions on extrajudicial statements, this Court has made clear that a "more rigorous First Amendment standard," *id.* at 127, must apply.

of the public to have open judicial proceedings and to know who is using court facilities and procedures funded by public taxes." *Id.* at 377. Because the court rejected the anonymity request, it simply had no occasion to opine on whether further speech restrictions were appropriate, and if so, under what legal standard they would be scrutinized.

*Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678 (11th Cir. 2001), held that a plaintiff could proceed anonymously in litigation over an abortion procedure. The Eleventh Circuit did not hold that the district court could restrict the defendants from making extrajudicial statements about the plaintiff, nor did it suggest that such restrictions would be immune from First Amendment scrutiny. Rather, the passage the Does cite comes from a brief discussion at the end of the opinion about the alleged difficulty the defendants had in developing their case when they *did not know* the identity of the plaintiff. In that context, the Court of Appeals suggested it would be reasonable for the district court to enter a protective order that allowed the defendants to learn the plaintiff's identity through discovery "on condition that they do not disclose it to the general public." 253 F.3d at 687. Again, however, a district court's regulation of the use of discovery material is a far cry

from an order that limits a party's ability to make extrajudicial statements the party could just as easily have made before the lawsuit was filed.[3]

Finally, *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058 (9th Cir. 2000), similarly involved a case about anonymous plaintiffs whose identifies had not even been "disclosed to defendants" prior to filing the lawsuit. *Id.* at 1062. The Ninth Circuit did not hold that the district court could restrict the defendants from making extrajudicial statements about the plaintiffs, nor did it suggest that such restrictions would be immune from First Amendment scrutiny. Instead, the Ninth Circuit, like the Eleventh Circuit in *Roe*, suggested that the district court could enter a protective order that would allow the defendants to compel disclosure of the plaintiffs' identities through the discovery process on the condition that use of the information be limited to the litigation. *See id.* at 1069.

The district court here did not justify the speech restrictions in the *ex parte* Protective Order as an exercise of the court's authority to manage discovery. Nor could it have. At the time this federal lawsuit was filed, the Masts were fully aware of the Does' identities and did not need the machinery of discovery to obtain that

---

[3] *See, e.g.*, Eugene Volokh, *The Law of Pseudonymous Litigation*, 73 HASTINGS L.J. 1353, 1376 (2022) (distinguishing between the accepted proposition that, "[w]hen a party learns information through discovery—essentially invoking the coercive power of the court—a court may impose a protective order limiting the publication of this information," and "injunctions against parties revealing information that they already knew before filing the case" which "are generally unconstitutional prior restraints on speech").

information. The "necessary corollary" is that the district court had no authority to restrict the Masts' use of that information outside the context of the litigation—at least not without satisfying strict scrutiny.

This Court also should not lose sight of the broader context in which this federal lawsuit arose. The Masts first established contact with the Does in the summer of 2021 and helped them to flee from Afghanistan following the withdrawal of U.S. forces. *See* JA242–44. In 2021, many months before this federal lawsuit was ever filed, the Does filed suit in Virginia state court challenging the Masts' adoption and arguing that they were the lawful custodians for Mast's adoptive daughter. *See generally* JA247–256 at ¶¶ 82–108. They then filed this federal lawsuit in 2022 while their collateral attack on the Masts' adoption was still pending in Virginia Circuit Court and obtained the *ex parte* Protective Order. At the same time, however, the Does were giving media interviews to the Associated Press to feed stories that broadcast their allegations of "kidnapping" against the Masts. *See* JA256–259 at ¶¶ 109–120. The plain effect of this timing—and quite likely the intent—was to give the Does an asymmetrical advantage in a media battle of their own making in an effort to influence the proceedings below and the state court proceedings.

This Court's precedents make clear that restrictions on public access and parties' extrajudicial statements must be exceedingly rare, but when they are permitted, it is to protect the integrity of the judicial process. Sometimes, that even

includes protecting the judicial process from the undue influence of the media. But it would turn those precedents on their head for this Court to endorse how the Does have exploited the judicial process here. If the Court were to accept their proposed rule that restrictions on extrajudicial identification is a "necessary corollary" of every anonymity order, that holding would dramatically limit First Amendment protected speech and would create a substantial incentive for parties in high-profile suits to conduct media interviews without the opposing party's knowledge and then seek *ex parte* pseudonymity orders like the one Plaintiffs obtained here while asking the media to wait to publish any interviews until after receiving the *ex parte* order.

## II.     The *ex parte* Protective Order imposes a content-based speech restriction and is therefore subject to strict scrutiny.

After arguing that speech restrictions are a "necessary corollary" of pseudonymity, the Does then circularly argue that the speech restrictions at issue here are not a "gag order" because they are merely corollaries to pseudonymity. *See* Opp. 47 n.12 (purporting to distinguish *Murphy-Brown* and other cases about gag orders because "the Does simply seek to remain anonymous"). That argument fails as a matter of law because, as just explained, speech restrictions are not a "necessary corollary" of pseudonymity. But the argument further fails because it ignores the nature of the speech restrictions that the district court has imposed.

As Professor Eugene Volokh has explained, "injunctions against parties revealing information that they already knew before filing the case . . . are generally

unconstitutional prior restraints on speech . . . [and] violate the First Amendment."
Eugene Volokh, *The Law of Pseudonymous Litigation*, 73 HASTINGS L.J. 1353, 1376
(2022). That is precisely and plainly what the speech restrictions at issue here do—
as both the district court and the Does have acknowledged. *See* Opp. 39 (quoting
JA323) (acknowledging that the Masts "'have always known Plaintiffs'
identities'").[4] In clear terms, the *ex parte* Protective Order "prohibit[s]" the Masts
"from disclosing . . . [this] information." JA51. The order thus operates a prior
restraint because it "actually forbid[s] speech activities," *Alexander v. United States*,
509 U.S. 544, 550 (1993), and represents a content-based restriction because it is a
"regulation of speech" that "applies to particular speech because of the topic," *Reed
v. Town of Gilbert, Ariz.*, 576 U.S. 155, 162–63 (2015)—namely, speech conveying
"information that directly or indirectly identifies Plaintiffs," JA51.

The authority the Does cite for their claim that the speech restrictions are not
a "gag order" is the district court's own opinion. *See* Opp. 45 (citing JA313). But the
district court's own say-so does not establish that the order is exempt from First

---

[4] The Does and the district court's understanding of the importance of this fact is
exactly backwards. They suggest that the Masts' familiarity with the Does' identity
mitigates the unfairness and leaves room for the Masts effectively to mount a
defense. *See id*. To the contrary, it substantially broadens the scope of the speech
restrictions in the *ex parte* Protective Order and effectively means that the Masts are
prohibited from speaking about the Does even in contexts that are wholly unrelated
to this federal lawsuit or the district court's supervisory authority over its own
proceedings.

Amendment scrutiny. And the assertion is belied by the applications of the speech restrictions that the Does argued for and which the district court accepted.

In the same order appealed from, the district court held that Joshua Mast violated the *ex parte* Protective Order by allowing his brother to send family photographs, which included his adoptive daughter, to a non-profit organization interested in raising money for the Masts' legal fees. *See* JA331–33.[5] That episode has nothing to do with John Doe or Jane Doe; they were not included in any of the photographs; and the sharing of those photographs in no way threatened to associate their real names with their pseudonyms. The Does do not even attempt to explain how this sort of speech restriction represents a "necessary corollary" of a court's allowing a party to proceed pseudonymously. They thus also fail to explain how the *ex parte* Protective Order does not operate as a gag order when it restricts the Masts' ability to share family photos (not obtained through discovery or otherwise connected to this litigation) with third parties.

The Does also purport to distinguish *Murphy-Brown* by arguing that the order does not "prohibit the Masts from 'giv[ing] or authorizing any extrajudicial

_____

[5] As explained in the Masts' response to Plaintiffs' separately filed motion to dismiss, the Masts acknowledge that the contempt portion of the order is not appealable at this time. And they have not purported to appeal it. But the district court's application of the *ex parte* Protective Order's speech restrictions still provides relevant context for understanding the scope of the order. And it undermines Plaintiffs' contention that the restrictions are modestly drawn simply to effectuate anonymity.

statement or interview . . . relating to the trial, the parties or issues in this case' or from 'talk[ing] about the case or anything related to it in public.'" Opp. 45–46 (quoting *Murphy-Brown*, 907 F.3d at 792–93; *Gagging order*, Merriam-Webster.com Dictionary, *available at* [https://bit.ly/3DihRhT](https://bit.ly/3DihRhT)). And yet, when the Masts did give an interview—following the publication of news stories based on the Does' own media interviews, *see generally* Opening Br. 16–17—the Does sought to have them held in contempt. *See* Emergency Mot. for Order to Show Cause, ECF No. 141.

The Does would simply have the Court ignore all of this context, and their own interpretation of the *ex parte* Protective Order, to affirm what they now on appeal characterize as a modest restriction solely in furtherance of pseudonymity. If the Court ultimately were to decide that the speech restrictions in the *ex parte* Protective Order are valid because they are narrowly constrained to statements related to this federal litigation, then the Court should make that narrowing construction clear. But the Masts respectfully doubt that the Does truly view the order that narrowly. To illustrate, suppose that the Masts were to give an on-the-record interview to the same journalists with whom the Does spoke and identified the Does by name—not with any reference to this federal lawsuit, but either with reference to the previously-filed state-court litigation or simply be reference to the Afghan family who has publicly accused them of "kidnapping." Or suppose that,

13

even short of identifying the Does by name, the Masts described their familial, social, and political ties in Afghanistan or the location from which the Does fled. Restricting such statements cannot be justified simply by reference to anonymity in this federal lawsuit because both the Masts' knowledge and their basis for disclosing arose wholly separate from this lawsuit. And yet, the Masts have no doubt that the Does would promptly file yet another contempt motion accusing them of violating the *ex parte* Protective Order.

Once again, neither of the cases the Does cite, *see* Opp. 45–46 & n.11, actually supports their position:

*Covil Corp. by & through Protopapas v. United States Fid. & Guar. Co.*, 544 F. Supp. 3d 588 (M.D.N.C. 2021), is a case about the disclosure of settlement agreements in discovery in which the district court noted that "[s]ealing orders differ from gag orders," which "'impinge upon freedom of speech and press under the First Amendment, and must pass muster under well-established constitutional case law'"—*i.e.*, strict scrutiny. *Id.* at 603 (quoting *In re Sealing & Non-Disclosure*, 562 F. Supp. 2d 876, 880 (S.D. Tex. May 30, 2008)). This is not a case about access to a sealed court filing.

*Kelly v. City of New York*, No. 01 Civ. 8906, 2003 WL 548400 (S.D.N.Y. Feb. 24, 2003), involved a unique situation that is wholly different from this case. There, the defendant produced in discovery private information about non-parties

"purportedly . . . in reliance on an oral representation by Plaintiffs' counsel that such information would be kept confidential." *Id.* at *1. Plaintiffs' counsel then revealed "some of the produced documents to the press," which the defendant alleged to be a violation of the parties' discovery agreement. *Id.* The court then ordered that the documents should be kept confidential until the matter was resolved, and the press organization intervened to challenge the protective order. *See id.* at *2. The court then granted the motion to intervene, *id.* at *3; and ruled that the materials could be disclosed but only with certain privacy redactions, *see id.* at *4–7. This case, which involved the court's management of discovery and limitations on the use of materials obtained through discovery is, again, inapposite here.

It is undisputed that the information the Masts are prohibited from disclosing under the *ex parte* Protective Order was obtained independently from this proceeding and indeed known to them before the case was filed. District courts may have broad leeway to regulate the discovery process and even to ensure, in appropriately narrow circumstances, that what happens in court stays in court. But when a court purports to restrict a party from publicly discussing or disclosing information that the party knows or learns independently, that restriction necessarily takes on a different character and must be subjected to strict scrutiny.

### III.   The *ex parte* Protective Order does not meet strict scrutiny.

The Does argue that, even if strict scrutiny does apply, they have met it. *See* Opp. 51–57. The Court should reject that contention for two reasons.

***First***, the district court did not conduct a real strict-scrutiny analysis, *see* Opening Br. 32–38, and it is not this Court's role to do so in the first instance. This is a "court of review, not first review." *United States v. Young*, No. 23-6830, 2024 WL 3508154, at *1 n.* (4th Cir. July 23, 2024) (quoting *NAACP v. Bureau of the Census*, 945 F.3d 183, 193 (4th Cir. 2019)); *cf. Adarand Constructors, Inc. v. Mineta*, 534 U.S. 103, 108–09 (2001) (expressing reluctance to "apply strict scrutiny in the first instance . . . without benefit of any lower court review"). It would be entirely sufficient and appropriate for this Court to hold that the speech restrictions in the *ex parte* Protective Order are subject to strict scrutiny, to reverse the district court on that basis, and to leave open the opportunity on remand for the Does to seek a new protective order under the appropriate standard if they can.

***Second***, Plaintiffs' alternative strict-scrutiny arguments fail on the merits.

With respect to a compelling government interest, the Masts do not dispute that protecting the safety of a party or a non-party may in appropriate circumstances rise to the level of a compelling governmental interest. *Accord* Opening Br. 33–36. Rather, the point is that the district court improperly accepted the Does' one-sided assertions on an *ex parte* basis and then failed to subject them to any meaningful

16

evidentiary scrutiny once the Masts raised objections. To qualify as a "compelling governmental interest" for purposes of strict scrutiny, it is not enough that an interest is serious or noble. There must also be "a strong basis *in evidence* for [the] conclusion that remedial action [is] necessary." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 500 (1989) (quotation omitted; emphasis added). The district court failed to ensure that there was a strong evidentiary basis for the findings it had originally made on an *ex parte* basis on the papers.

At the hearing below, the Does did not put on any evidence beyond the original *ex parte* record to support their contention that their identification would pose a concrete risk of imminent harm. And it is beyond question that the original *ex parte* record was stale: the district court had since rejected the Does' standing to bring claims on behalf of the Child, whom they included in the *ex parte* Protective Order; the United States had since granted the Does asylum, and they had represented that they had no intention to return to Afghanistan; and the Does had since acknowledged that they had identified themselves to the Associated Press, which at a minimum created questions about the sincerity of their stated concerns. It may be possible that, notwithstanding all of these intervening changes and after subjecting their assertions to evidentiary testing, the Does could still show a compelling interest to support some form of speech restriction. The Masts doubt it. But their assertions first need to be subjected to strict scrutiny.

17

The Supreme Court has called it a matter of "hornbook law" that a district court's factual findings are necessarily tied up in application of the appropriate standard of proof. *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 33 n.11 (2024) (citing *Concrete Pipe & Prods. of California, Inc. v. Constr. Laborers Pension Tr. for S. California*, 508 U.S. 602, 622 (1993)). It is therefore wholly insufficient for the Does—or for the district court in its decision below—to say that strict scrutiny can be satisfied based on factual determinations made in applying the *James* standard to the *ex parte* record the Does submitted at the outset of the case. At a minimum, the *ex parte* Protective Order needs to be vacated with the opportunity for the Does to seek a new order under the appropriate standard.

To be clear, the record on which the district court originally granted the *ex parte* Protective Order on September 13, 2022, and the record at the time the court rejected the Masts' motions to lift or modify the Protective order on August 16, 2024, were materially different. Nearly two years had passed in the interim. When the Does sought the *ex parte* Protective Order, they asserted "fear . . . that they will be hurt or killed if they return to Afghanistan." Pl. Br. in Support of Mot. for Protective Order at p. 3, ECF. No. 4. By August 2024, however, they had been granted asylum and expressed their intention never to return to Afghanistan. When the Does sought the *ex parte* Protective Order, the district court allowed them to include the Child—whom they had purported to name as Plaintiff "Baby Doe"—within the scope of the

order. By August 2024, however, the district court had held that John Doe and Jane Doe lacked standing to bring claims on behalf of the Child. *See* MTD Op. at 57–59, ECF No. 455. When the Does sought the *ex parte* Protective Order, they never disclosed to the district court that they had identified themselves to the media for the purpose of generating publicity about the case and their dispute with the Masts. By August 2024, however, it was clear that they had, and that this publicity had greatly undermined their claimed concerns about their family in Afghanistan. The Masts raised these changes and proffered additional evidence in seeking to lift or modify the *ex parte* Protective Order that had not been before the district court originally. *See generally* Mot. to Modify Protective Order, ECF No. 130; Mot. to Vacate Protective Order, ECF No. 176. At a minimum, the district court should have conducted a fresh evidentiary review based on this new record under the proper strict scrutiny standard before concluding that the Does had established a compelling governmental interest in restricting the Masts' extrajudicial statements.[6]

The Does also fail to show that the *ex parte* Protective Order is "narrowly tailored to mitigating the safety risks to Plaintiffs and other innocent non-parties." Opp. 54. The Does concede that they bear the burden on narrow tailoring, *id.* at 57,

---

[6] As explained in the Masts' opposition to the Does' motion to dismiss the appeal, ECF Doc. 20, these material differences in the record also confirm that the district court's August 2024 Order is distinct from its September 2022 and independently appealable. *See id.* at 9–10.

but then fault the Masts for not defining what "'less restrictive means . . . would safeguard such compelling interests,'" *id.* (quoting JA326 n.12). But that is not how strict scrutiny works. Under strict scrutiny, the challenging party is *not* required to establish some less restrictive alternative. *See Ramirez v. Collier*, 142 S. Ct. 1264, 1268 (2022). The burden remains on the government—or here, the Does as proponents of the speech restriction—to consider and "rebut obvious alternatives." *Id.* The Does "suggestion that [the Masts] must identify other less restrictive means that would accomplish the government's interests gets [the strict-scrutiny] burden shifting backward." *Id.*[7]

Once again, it may be possible that the Does could show, and the district court could find, that certain narrowly tailored restrictions on the Masts' extrajudicial statements are necessary to further a compelling governmental interest and represent the least restrictive means of accomplishing that interest. The Masts find that doubtful. But the existing record and the district court's analysis performed to date do not meet the exacting standard of strict scrutiny. And if any such speech

---

[7] *Ramirez* involved the application of strict scrutiny under the Religious Land Use and Institutionalized Persons Act (RLUIPA), but the strict-scrutiny standard is the same. *See* 42 U.S.C. § 2000cc-1 (prohibiting the government from imposing certain burdens on religious exercise "unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest").

restrictions are to be put in place, they must first run that constitutional gauntlet, and they simply have not.

## IV.    The *ex parte* Protective Order's speech restrictions are unconstitutionally vague under the First and Fifth Amendments.

Finally, the Does' vagueness arguments only confirm that the speech restrictions in the *ex parte* Protective Order is improper and fails to provide a reasonable person notice of what is and is not covered and what speech is prohibited.

***First***, they purport to show that the order is clear simply by restating its scope as covering any "information that betrays the Does' identities." Opp. 58. But that is no clearer than the order itself and its reference to "direct" and "indirect" identification. Recall that the district court has purported to hold Joshua Mast in contempt for allowing his brother to share family photos that do not include John Doe, Jane Doe, or any member of their extended family in Afghanistan. Indeed, the only person shown in those photos about whom the Does complain is the Masts' adoptive daughter whose association with the Masts is plain to see for anyone who knows them from school, from church, from the neighborhood, or from his service on active duty in the U.S. Marine Corps. To the extent someone might be able to "indirectly" connect the Child to the Masts and through the Masts back to this litigation, that is only because *the Does* have filed this suit without affording the Masts the same anonymity to which they helped themselves and have waged a years-long media campaign to attempt to drag the Masts' reputation through the mud.

The Does suggest that the photo-sharing implicates the *ex parte* Protective Order only because the third party was considering raising money to help the Masts pay legal fees associated with this litigation. *See* Opp. 59. But the third-party's fundraising plans were not limited to this litigation, and in any event, it strains credulity—and undermines the very premise of the order—for the Does to suggest that the same conduct would be perfectly fine if the fundraising were intended solely for the state-court litigation or for other non-litigation purposes.[8] If "indirectly" identifying the Does in contexts not directly connected to this federal litigation is permissible, then it is hard to see how the speech restrictions in the *ex parte* Protective Order serve a compelling interest.

Lastly, the Does try to salvage the scope of the *ex parte* Protective Order by pointing to subsequent developments, such as Joshua Mast's statement that he limited his interview with CBS to avoid violating the order or the Does' providing a list of foreign relatives in discovery (after being compelled to make the disclosure). *See* Opp. 59–60. But these after-the-fact anecdotes just reinforce the point: the speech restrictions in the *ex parte* Protective Order are impermissibly vague, and the

---

[8] To the extent that this Court agrees with the Does about the scope of the district court's order, it should make clear that the Masts are permitted publicly to share photographs of their adoptive daughter for purposes not specifically connected to this litigation. That would be a welcome reprieve, albeit in insufficient remedy for the overbroad *ex parte* Protective Order.

Masts have been forced to feel their way in the dark—all under the threat of later being held in contempt for failure to walk the right path.

Neither the First nor Fifth Amendment permits such uncertainty or the chilling effect on the Masts' constitutionally protected speech that it necessarily engenders.

## CONCLUSION

The Masts do not challenge the Protective Order to spite the Does or to see them come to any harm. Rather, they simply seek the ability to investigate and litigate their claims that the Does are unrelated to the Child and have no parental rights and to defend their reputations on equal footing. The Does have used the *ex parte* Protective Order to quash the Masts' fundraising efforts, to gain asymmetrical leverage in the public sphere, and to prevent meaningful investigation into their claims that they had legal and physical custody over the Child. That is not a compelling governmental interest, nor is it anything the federal courts should seek to condone. The Masts therefore respectfully submit that the Court should reverse the district court and remand with instructions to vacate the restrictions on extrajudicial statements in the *ex parte* Protective Order.

Dated: January 23, 2025

Respectfully submitted,

*/s/ John S. Moran*
John S. Moran
MCGUIREWOODS LLP
Suite 500
888 16th Street, NW
Washington, D.C. 20006
T: 202-525-0356

*Counsel for Defendant-Appellants*
*Joshua Mast and Stephanie Mast*

David Eliezer Yerushalmi
AMERICAN FREEDOM LAW
CENTER
Suite 189
2020 Pennsylvania Avenue, NW
T: 646-262-0500

*Counsel for Defendant-Appellant*
*Richard Mast*

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

No. __24-1900__     **Caption:** __Baby Doe, et al. v. Mast, et al.__

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

---

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

---

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2) & 40(d)(3).

---

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6). Sans-serif type, such as Arial, may not be used except in captions and headings.

---

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✓] this brief or other document contains _____5,855_____ [*state number of*] words

[ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✓] this brief or other document has been prepared in a proportionally spaced typeface using
Microsoft Word _____ [*identify word processing program*] in
Times New Roman, Size 14 _____ [*identify font, size, and type style*];

**or**

[ ] this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font, size, and type style*].

**NOTE: The Court's preferred typefaces are Times New Roman, Century Schoolbook, and Georgia. The Court discourages the use of Garamond.**

(s) John S. Moran _____

Party Name Joshua Mast, Stephanie Mast, & Richard Mast     Date: 1/23/2025 _____

## CERTIFICATE OF SERVICE

I hereby certify that on January 23, 2025, the foregoing was filed with the Clerk of the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system, which will also serve counsel of record.

*/s/ John S. Moran*
John S. Moran