PRESENT:  Powell, Kelsey, McCullough, Chafin, Russell, and Mann, JJ., and Millette, S.J.

JOSHUA MAST AND STEPHANIE MAST

|  | Record No. 240707 | OPINION BY |
|---|---|---|
| v. | Court of Appeals Nos. 1855-22-2, 0876-23-2, 0940-23-2, and 0953-23-2 | JUSTICE D. ARTHUR KELSEY FEBRUARY 12, 2026 |

A.A. AND F.A.

FROM THE COURT OF APPEALS OF VIRGINIA

In 2020, a Virginia circuit court issued a final order approving the adoption by Joshua

and Stephanie Mast of a severely wounded orphan discovered by the U.S. military on a

battlefield in Afghanistan in 2019.  Two years later, A.A. and F.A. filed a petition to vacate the

final adoption order claiming that Afghan law vested custody of the child with them.  In

response, the Masts relied upon Code § 63.2-1216, which states in pertinent part that "[a]fter the

expiration of six months from the date of entry of any final order of adoption . . . , the validity

thereof shall not be subject to attack in any proceedings, collateral or direct, for any reason."

Asserting different rationales, the circuit court and the Court of Appeals found that Code

§ 63.2-1216 did not apply to this case.  *See A.A. v. J.M.*, 81 Va. App. 213, 220 (2024).  Because

it does apply, we reverse and enter final judgment dismissing the A.s' petition to vacate the 2020

final adoption order.[1]

---

[1] Before this Court is the consolidated appeal of the Masts and the A.s from a Court of
Appeals ruling on two interlocutory orders — Record Nos. 1855-22-2, 0876-23-2, 0940-23-2,
and 0953-23-2.  The Masts filed their initial interlocutory appeal in December 2022 from the
Order Denying Pleas in Bar.  In February 2023, the Court of Appeals dismissed the Masts'
petition, holding that it did not have jurisdiction over interlocutory appeals, CAV R. at 5378, and
the Masts appealed to this Court.  Meanwhile, the matter proceeded in the circuit court,
culminating in the Order Granting Summary Judgment.  In May 2023, the parties each appealed
this summary judgment order.  In June 2023, this Court vacated the Court of Appeals order that
had dismissed the first interlocutory appeal, remanded the case, and ordered the Court of Appeals
to consolidate all the appeals in this case.  *Id.* at 5390.  All citations in this opinion to the record
of the Court of Appeals refer to Record No. 1855-22-2.

I.

A.

In this appeal, the Masts challenge each of the rationales offered by the circuit court and the Court of Appeals in support of their decisions to declare the 2020 final adoption order void ab initio. The A.s defend these rationales and argue that even if we find them unpersuasive, other reasons independently support the judgment in their favor. *See generally Rickman v. Commonwealth*, 294 Va. 531, 542 (2017) (recognizing the appellate power to affirm on different legal grounds).

As we survey the factual record, two markers establish its boundaries. First, given that the consolidated appellate record exceeds tens of thousands of pages, we recite only the legally material facts that are relevant to the decisions of the lower courts and the arguments independently advanced by the parties.[2] Second, when "parties present evidence on the plea ore tenus," we give the circuit court's "factual findings" the same "weight of a jury finding" on disputed evidence. *Hawthorne v. VanMarter*, 279 Va. 566, 577 (2010).

Two circuit court judges presided over the A.s' petition-to-vacate proceeding. The first judge also entered the final adoption order in 2020. On November 18, 2022, in this collateral proceeding filed by the A.s challenging the final adoption order, the first judge issued a 38-page, singled-spaced "Order" titled "Findings and Rulings." R. at 2528 (altering capitalization).

---

[2] Our recitation of the factual record includes facts previously sealed by the circuit court and provisionally sealed by this Court. "To the extent that we mention facts found only in the sealed record," however, "we unseal only those specific facts, finding them relevant to our decision in this case. The remainder of the previously sealed record remains sealed." *Minh Duy Du v. Commonwealth*, 292 Va. 555, 560 n.3 (2016). Following the issuance of this opinion, the Court will address any pending or contemplated motions seeking further appellate review of the circuit court's sealing and nondisclosure orders. *See Daily Press, LLC v. Commonwealth*, 301 Va. 384, 414-15 & n.23 (2022) (addressing the open-courts doctrine, its limited exceptions, and the treatment of such disputes "as ancillary proceedings that can persist beyond and even arise after the entry of final judgment in the underlying case").

Presiding over at least 12 hearings, the judge heard from 10 witnesses who testified ore tenus and 2 by deposition. Over 100 exhibits were introduced into evidence. The judge's Findings and Rulings addressed the conflicting evidence offered for and against the validity of the 2020 final adoption order. "Since the Court speaks through its orders," the judge stated, "a more detailed and comprehensive ruling (with rationale) than what the Court was able to give from the bench [was] not only appropriate and merited, but necessary." *Id.*[3]

In his subsequent "Order Denying Pleas in Bar" entered on November 30, 2022, the judge expressly "incorporat[ed] the Court's comments, findings, and rulings from the bench November 11, 2022, and the supplemental written Findings and Rulings of this Court dated November 18, 2022." *Id.* at 2603. After informing the parties that he would be retiring soon from the bench, the judge acknowledged that his Findings and Rulings order may be "revisited and modified" by later judges who preside over the case after his retirement. *Id.* at 2528.[4]

---

[3] The A.s mischaracterize the Findings and Rulings order as a mere "non-binding letter" to counsel as opposed to a judicial order. *See* Appellee Br. at 16-17 & n. 12; *see also* CAV R. at 5963, 5973; Oral Argument Audio at 22:00 to 22:10, 30:44 to 30:50, 36:45 to 36:53; CAV Oral Argument Audio at 7:18 to 7:25. The heading on the first page of the order, however, includes the full style of the case, the case number assigned by the Clerk of Court, a heading titled "FINDINGS AND RULINGS" in full capitalization, "This Order" as the first two words in the first sentence, and the judge's signature and date of entry on the last page. *See* R. at 2528-65.

[4] The A.s interpret the circuit court's "revisited and modified" qualifier as a basis for concluding that the order's findings and rulings are nonbinding and have no precedential value. Just the opposite inference is warranted. The power to revise or modify prior orders within a court's jurisdiction is a truism that applies to all interlocutory orders. *See Robbins v. Robbins*, 48 Va. App. 466, 474 (2006). The power to consider, after all, "carries with it the power to reconsider as a necessary adjunct." *Commonwealth v. McBride*, 302 Va. 443, 449-50 (2023). Interlocutory orders bind the parties during the circuit court proceedings unless and until they are later vacated or modified by the circuit court.

Maybe so, the A.s respond, but the judge in a footnote stated that he wanted to be "confident" of his understanding of the evidence, and thus, he invited the parties to file proposed "corrections or revisions of the recited facts or evidence if based on references to the transcript of testimony or exhibits." R. at 2535 n.9. The A.s did so, but not until March 27, 2023, which was after the second judge took over the case. *See id.* at 3331. The second judge never

3

Another judge took over the case after his colleague's retirement. The parties did not request, nor did the new judge conduct, any plenary ore tenus hearings with witnesses. Instead, the second judge heard argument from counsel, received a few additional exhibits,[5] and entered a six-page, double-spaced "Order Granting Summary Judgment." *Id*. at 3694-99. The Order Granting Summary Judgment stated that "the reasons" for its ultimate decision included "the Court's written rulings and opinions." *Id.* at 3694. Only two were pertinent: the first judge's written Findings and Rulings order and his later Order Denying Pleas in Bar. Read together, these three orders comprise the only written judicial determinations specifically addressing the facts in this hotly disputed case.

One additional clarification of the evidentiary record should be made. The A.s rely heavily upon a timeline of events prepared by the second judge. They claim the timeline implicitly created "new written factual findings" that supersede the first judge's factual findings. *See* Appellee Br. at 18; *see also* CAV R. at 5691, 5963, 5973, 6275-76; Oral Argument Audio at 22:00 to 22:10, 36:05 to 36:17. We disagree. The text of the timeline cites almost exclusively to pleadings, including the A.s' Bill of Particulars, and to filings by a non-party,[6] none of which were admitted into evidence. *See* R. at 16120. The second judge did not treat the timeline as a

---

acknowledged, much less adopted, the A.s' proffered "requested corrections to the court's findings and rulings," *id.* (altering capitalization).

[5] During one of the hearings, the second judge permitted the Masts to call A.A. to the stand for the sole purpose of admitting three exhibits through him. *See id.* at 13756-73.

[6] The Declaration of Donna Welton dated August 22, 2022, *see id*. at 961-65, was not admitted into evidence and thus plays no role in our appellate review. *But see post* at 53-54. In the trial court, the Welton declarations were a subject of much debate. *See, e.g.*, R. at 5399-5400 (the circuit court refusing to admit the May 5, 2022 Declaration of Donna Welton and taking it under advisement); *id.* at 6256 (the circuit court refusing to admit the June 8, 2022 Declaration of Donna Welton). Ultimately, the only Welton declaration that was admitted as evidence was the November 8, 2022 declaration. *See id.* at 3114.

4

statement of factual findings. Instead, he said that he put together the "general timeline" to give him "some understanding" about the case. *Id.* at 13973; *see also id.* at 16120. At no point did the second judge suggest that he created the general timeline to revise or modify the factual findings of the first judge who had presided over the multiple evidentiary hearings.

We know this with certitude because the A.s submitted a proposed draft order to the second judge that expressly incorporated the general timeline and made specific "findings" that would "supersede the earlier, preliminary findings" made by the first judge. *See id.* at 3556-62, 3556 n.1, 3557 n.2. The Masts objected to the proposed order because the general timeline included factual inaccuracies. The order proposed by the A.s, the Masts added, was an "attempt to whitewash and supersede all of [the first judge's] findings, which he made after thirteen days of hearings," and it went "far beyond this Court's verbal order, and propose[d] numerous facts which are hotly disputed." *Id.* at 3581. The Masts proposed an alternative order, *id.* at 3573-82, and provided a corrected timeline "should the Court wish to incorporate" a timeline of some sort in the order, *id.* 3650, 3657-58. In reply, the A.s urged the second judge to adopt their proposed order to "make clear that its findings in this order are the operative findings in this proceeding." *Id.* at 3595-96. In response to this dispute, the second judge adopted verbatim the Masts' proposed order, rejected the A.s' proposed order, and refused to incorporate any timelines in his order. *See id.* at 3694-99. The written order's purposeful exclusion of the general timeline confirms that it carries little, if any, weight on appeal.

B.

Having framed the evidentiary record before us, we begin with the circuit court's observation in its Findings and Rulings that this case involves "really only two possible overarching narratives." *Id.* at 2560. "One is that the Masts, with no obligation, stepped up and stepped in early on when literally no one else did or would, to help a child in severe need who

5

had no one, to save her life and procure her safety, to spend their time and money to try to help this child." *Id.* But there was a competing "narrative," the circuit court recognized, "championed" by the A.s. *Id.* They claimed that "the Masts, with bad motives from the beginning, decided to steal a child" away from her extended family and her homeland in a brazen act of "child trafficking." *Id.* at 2560 & n.29. The circuit court rejected the "interpretation and narrative" advanced by the A.s. *Id.* at 2560.

The circuit court's factual findings begin with the discovery by U.S. Special Forces of a badly injured infant on a battlefield in Afghanistan in September 2019. The female infant had "sustained several fractures, including broken ribs, a broken femur, and a skull fracture" as well as "serious burns and other injuries." *Id.* at 2531. She was found in an "Al Qaeda foreign fighter facility" and "was orphaned in a lawful combat operation against Al Qaeda terrorists." *Id.* at 15104-05. It "has never been disputed," the circuit court found, that the "parents" of the infant died in the firefight and that it "appeared from the evidence to possibly have been from self-inflicted wounds by a 'suicide bomber.'" *Id.* at 2530; *see also id.* at 15107.

Witnesses "testified that the Afghan partner forces assisting the U.S. [f]orces did not want to save or care for the child at all, but desired to just kill the child there." *Id.* at 2531; *see also id.* at 7172-75, 7286-88, 7290-91. Reflecting on this evidence, the circuit court stated, "most likely . . . [this was] because of who they believed the child's parents to be, viz., not Afghan." *Id.* at 2531. Further crediting this testimony, the circuit court found "that not only is this circumstantial evidence that the child was and is not Afghan, but more important, it contributes to the reasonable basis for the Masts' belief [of the same]." *Id.*

Given the infant's injuries, "[t]here was grave concern that without proper medical care she may die or be severely disabled, and serious doubt that such needed medical care and treatment could be provided in Afghanistan." *Id.* As a result, the child was first taken to an

American military field hospital in Kandahar and later transported for medical care at Bagram Airfield in Afghanistan, which was then controlled by American forces.

Stationed in Afghanistan, Major (then Captain) Joshua Mast was serving at the time as a Judge Advocate General in the U.S. Marine Corps. In September 2019, he and his wife learned of the child's condition and decided that the child would benefit from getting medical care in the United States. "This was the impetus for the legal proceedings," the circuit court found. *Id.* The evidence supporting the circuit court's finding included a contemporaneous memorandum from the U.S. Commander of Task Force Medical-Afghanistan, which stated:

> Currently, [the infant] is living in a military hospital on Bagram Air Field in a combat zone. This Air Field receives indirect fire in the form of rockets and mortar rounds on a routine basis. In addition, the [Hospital Commander] has indicated that there is a serious risk of infection and disease in a military hospital due to the war wounds and diseased patients being treated there. This living situation is still far safer tha[n] any alternative available to [the infant], as both the U.S. Military and Afghan government have agreed it is safer for her in the military hospital, and illustrates the danger [the infant] faces if she remains in Afghanistan.
>
> Due to [the infant's] ongoing medical needs and the lack of any Afghan facilities that can adequately house her through the winter, care for her, and treat her medical needs, access to the United States for follow on care is appropriate given the circumstances.

*Id.* at 15104 (paragraph numbers omitted).

Motivated by these circumstances, the Masts filed in a Virginia juvenile and domestic relations district court a petition for custody of the child "on an emergency basis on the ground that [the child] was a stateless, orphaned minor with severe medical needs." *Id.* at 2532. In November 2019, the district court granted the petition "making specific findings in its order, including the child being stateless with no other home jurisdiction." *Id.*

7

The Masts thereafter filed a petition for adoption in the circuit court. The petition stressed the "emergency nature of the situation," "the need for prompt medical attention," the Masts' belief that "the child was stateless and not a citizen of Afghanistan or any other known nation, with no known living relatives," and the fact that "the authorities in Afghanistan [had] at that point declined to take the child or assume responsibility for her care." *Id.* Believing that the "only reasonable, logical, and compassionate course of action at [the] time" was to do so, the circuit court exercised jurisdiction over the case. *Id.* "[D]elaying legal action further," the circuit court concluded, "could jeopardize the child's life or recovery, and could result in loss of life or permanent or long-lasting residual effects." *Id.*

Having "questions" about the proper procedural posture of the case, the circuit court "conferr[ed] with the Virginia Attorney General's Office" about the scope of the district and circuit courts' jurisdiction "given the novel nature of this emergency situation." *Id.* at 2532 & n.2. A representative of the Attorney General's office in 2019 "advised the Court that under the emergency circumstances (involving urgent medical treatment and no known home state)," the circuit court had "jurisdiction to go forward with the birth certificate proceeding" after the entry of the custody order by the district court. *Id.* at 2532 n.2.

The child, only a few months old at this time, was still at Bagram Airfield awaiting transport to the United States. Anticipating that the child would soon be arriving in the United States, the circuit court entered an interlocutory adoption order after finding that it was in the child's "best interest" and that the Masts were "suitable and proper persons for the custody and care of the child." *Id.* at 2533. The circuit court thereafter appointed a guardian ad litem to represent the child's interests and directed the Department of Social Services to conduct an independent evaluation of the proposed adoption.

8

After the entry of the interlocutory adoption order, the Masts learned that the child was going to be transferred from the U.S. medical facility to the International Committee of the Red Cross ("ICRC") and later delivered to an unknown person at an unknown location. "Capt. Mast credibly testified in the current proceedings," the circuit court found, "that he had no such specific identification information at that time." *Id.* at 2534. The day before the expected transfer, the Masts filed a motion for a temporary restraining order ("TRO") in the U.S. District Court for the Western District of Virginia seeking a temporary stay on the transfer of the infant until evidentiary hearings could be conducted. *See id.* at 1040-62 (Verified Complaint and Petition for TRO, *Baby L. v. Esper*, No. 3:20-cv-00009 (W.D. Va. Feb. 26, 2020)). The presiding federal judge denied the TRO motion on the same day it was filed. The next day the child was transferred to the ICRC and later delivered to a man thought to be the child's uncle. The Masts thereafter voluntarily dismissed the civil action as moot pursuant to Federal Rule of Civil Procedure 41(a).

At a later hearing before the circuit court, the Masts presented a document that included a brief reference to the "denial" of a "temporary restraining order" issued by the federal district court. *Id.* at 2534. The circuit court recalled that the Masts' counsel mentioned "in at least one hearing a 'TRO' and relayed difficulties with arranging for the child to leave Afghanistan." *Id.* at 2558. The circuit court, however, "did not notice or did not focus on the TRO when it was mentioned." *Id.*

The circuit court also received testimony from the "general in charge of the Bagram military hospital" and a nurse who cared for the infant. *Id.* at 2534. They "testified to the danger and risk if the child was left in Afghanistan with such injuries and the long-term care needed, and the risks in being left as a disabled (and believed foreign) orphan in a war zone in Afghanistan"

9

and "that it was not in the child's best interest to be left in Afghanistan under those circumstances." *Id.*

At some point prior to the entry of the final adoption order, the Masts learned that the "then-government of Afghanistan," *id.* at 2541, had turned the infant over to her "purported uncle," *id.* at 2552. Though the circuit court at the time knew none of these details, the court later concluded (after hearing the evidence during the petition-to-vacate hearings) that "[t]his was not a decision the United States initiated" but merely one "consented to or acquiesced in" by U.S. officials. *Id.* at 2564; *see also id.* at 2541. The "main or principal determinant" in this decision, the circuit court found, was the ICRC, not the United States. *Id.* at 2564.

"[G]iven the danger and unstable situation" in Afghanistan at that time and the "delay in bringing the child" to the United States as planned, the circuit court decided it would be prudent to enter a final adoption order. *Id.* at 2535. Doing so, the circuit court found, was in the child's best interests because it would "get [her] out of harm's way and allow [her] to be brought safely to the United States to begin receiving the medical care that she had desperately needed." *Id.* Both the Department of Social Services and the guardian ad litem representing the child recommended that the circuit court enter the final adoption order. *Id.* The circuit court did so in December 2020.

### C.

In March 2022, the A.s filed a petition to vacate the 2020 final adoption order and to declare it void ab initio.[7] They asserted two arguments in their petition: (i) the Masts obtained the adoption orders by committing fraud on the court, and (ii) the A.s are "in effect, the child's

---

[7] In December 2021, the A.s initially filed a petition to vacate in the original adoption proceedings. They refiled the same petition as a collateral action in March 2022. In neither of these petitions did the A.s seek to declare void ab initio the custody order issued by the juvenile and domestic relations district court.

10

adoptive parents as legal and permanent guardians of the minor child under Afghan law." *Id*. at 1. The Masts denied both allegations and argued that even if they were true, Code § 63.2-1216 expressly states that six months after the entry of a final adoption order its "validity" cannot be attacked "for any reason" in any "collateral or direct" proceeding.

The circuit court treated the Masts' defense as raising plea-in-bar issues and heard 11 days of contested evidence offered by the parties. On the issue of the parties' credibility, the circuit court found that "overall, the Court had more confidence in the Masts and found them more believable, particularly with regard to the child, and the Court resolved any credibility conflicts in their favor." R. at 2560. In contrast, the circuit court stated, the A.s "admitted in their testimony that on at least three different occasions one or the other of them misrepresented certain facts and lied (to either the Masts or the authorities) for their own purposes." *Id.* at 2560-61; *see, e.g.*, *id.* at 5273-74, 5296-97, 5663-64, 5714-17, 5728-31.

On the question whether the infant was and still is a stateless minor or an Afghan citizen, the circuit court stated that "circumstantial evidence" suggested "that the child was and is not Afghan" and that this evidence "contributes to the reasonable basis for the Masts' belief." *Id.* at 2531. "Not only does this Court find a basis for the Masts believing that the child likely was from somewhere other than Afghanistan, it finds that the Masts did in fact believe [this]." *Id.* at 2555. The circuit court acknowledged that the Masts may be "later proved wrong or incorrect" but that "has not occurred yet." *Id.* at 2556. Supportive of this finding was the deposition testimony of Brigadier General Norman West, who was the Commander of the 455th Expeditionary Medical Group at the Craig Joint Theatre Hospital at the time the child received medical treatment there. *See id.* at 15120-36, 15104-05.

On the question whether the A.s had proved that they have a familial relationship with the child, the circuit court stated: "The Court, after having heard all of the evidence, does not have

confidence that the [A.s] are who they say they are regarding their asserted familial relationship to the child, so the Court is not convinced or persuaded on this point." *Id.* at 2538.  Emphasizing this point, the circuit court said that it was "not persuaded that Petitioners are who they say they are as to the family relation" and "not convinced that they are really relatives of the child." *Id.* at 2541.  "The Court finds, on the evidence presented[,] that it is at least as likely that [the A.s] are not biologically related, and [it] has not been proved by a preponderance that they are." *Id.* at 2541 n.19.  "To reiterate, the Court finds that [the A.s] have not proved to the Court's satisfaction that they are in fact kin to the child . . . ." *Id.* at 2564.

The circuit court also stated that it had questions about "the true identity of the child. There was no Afghan birth certificate presented, the [A.s] had never met the child, and there were no photographs of the child from before the explosion [that killed her parents]." *Id.* at 2539.  The circuit court added that it "cannot ignore" that the Masts have "asked for DNA evidence from the very beginning, and [the A.s] [have] resisted this from the very beginning." *Id.* at 2540 n.16.

On the question whether Afghan law deemed the A.s to be guardians of the child, the circuit court was also unconvinced.  None of the ICRC and Afghan Ministry of Labor and Social Affairs memoranda mention any placement of the infant with A.A. or F.A.  "They are not parents, and it has not been proved that they had legal custody," the circuit court ruled.  *Id.* at 2565.  "In fact, by [the A.s'] own evidence," the child's purported uncle ("H.I."), who is A.A.'s father, "was the actual guardian or custodian and he allowed the child to be cared for by the [A.s] (he 'gave the waleyah to A.A.')." *Id.* at 2539.[8]  "[T]he Court has no confidence that Afghan law

---

[8] "Waleyah" is sometimes spelled "walaya" or "welyah" in the record. *See, e.g.*, R. at 5144, 5779.

even gave [H.I.] the authority to give the child to A.A." *Id.* at 2539 n.15. Further explaining the

point, the circuit court added that the A.s

> were at most guardians or custodians when they and the child were
> in Afghanistan. They are not natural parents or adoptive parents.
> (Even an aunt or uncle would be a closer family relation, and as
> noted, above, the Court has no confidence that they are even blood
> relatives.) That Afghanistan does not (and did not) have anything
> other than guardianship does not equate them to parents, natural or
> adoptive. The child was not placed with them by court order, but
> rather by a purported uncle who has never appeared and is not a
> party, who only by asserted Afghan tradition is the guardian.
> Again, to be similar to or "close to" something does not mean it is
> the same thing.

*Id.* at 2552.[9]

On the question whether authorized representatives of the United States officially

adjudicated the A.s to be "next of kin," the circuit court stated that it was "not persuaded and

does not see it that way." *Id.* at 2563-64. "The fact that physical custody short of legal custody

---

[9] The circuit court also found fault with the factual predicates for the A.s' reliance on
Afghan customary law:

> While [the A.s] have relied on Afghan law to show their custody or
> guardianship, their experts [said] that the closest older relative in
> the father's line would be the wali. But it came out in [the A.s']
> evidence that [A.A.'s] father shares a mother with the supposed
> father of the child ([B.]), but not the father, so [H.I.], who A.A. is
> claiming through, would not really be the wali under Afghan law,
> as it was explained, and he would not have the authority to give
> [A.A.] the authority. It appeared that [the A.s'] counsel may have
> been surprised by this testimony since they had made a point to
> emphasize the automatic operation of Afghan law. But that was
> never explained or followed up on by [the A.s'] counsel. In fact
> there was no evidence about [B.'s] father's line, or whether his
> father was alive. According to the experts' testimony, in the
> absence of survivors in the father's male line, the child's mother's
> line would assume the waleyah (and produce the wali). There was
> no evidence of that at all. So the Court has no confidence that
> Afghan law even gave [H.I.] the authority to give the child to
> [A.A.].

R. at 2539 n.15.

13

may have been given to someone *believed* to be next of kin, with the approval or acquiescence of the United States (DOD)," the circuit court added, "does not equate that to parenthood or legal custody and does not establish that they are in fact related. That has to be proved in court." *Id.* at 2564 (emphasis added). As noted earlier, the circuit court found that "[t]his was not a decision the United States initiated, but rather consented to or acquiesced in. . . . There were numerous factors cited above causing this Court not to be convinced that [the A.s] are actually relatives." *Id.*

On the fraud issue, the circuit court stated that the A.s did not prove by "clear and convincing evidence" that the Masts had misrepresented "that the child was a stateless minor."[10] *Id.* at 2555. They had "ample reason for believing this," the circuit court found, in light of the testimony of the U.S. Special Forces operators who described the child's parents as non-Afghan, "foreign fighters" associated with Al Qaeda. *Id.* at 2555-56. The circuit court also found that the Masts "credibly testified that they had significant doubts when they were later told the petitioners were claiming to be relatives or kin." *Id.* at 2556.[11] The circuit court also pointed to other

---

[10] The circuit court stated it was willing to hear "additional evidence" on the fraud issue if that became necessary later in the proceeding, *id.* at 2538 n.12, and anticipated possible "continued proceedings" on this issue, *id.* at 2559, 2565. No additional evidence, however, was ever submitted to the circuit court in support of the A.s' fraud allegations.

[11] The A.s also accuse the Masts of fraudulently obtaining an Afghan passport by using a "digitally altered" photo of the child. *Id.* at 8; *see also id.* at 2317-18; Appellee Br. at 49. The Court of Appeals placed considerable emphasis on this allegation. *See A.A.*, 81 Va. App. at 225-26 & n.12. The circuit court, however, summarily rejected this claim because the Masts merely altered a picture of the nude child (given to them by the A.s) to cover her naked body with clothes because the photo "was not acceptable to the authorities because the child was not adequately clothed." R. at 2558.

In addition, the A.s alleged that the Masts fraudulently failed to fully inform the circuit court of the federal litigation that ended in a denial of the Masts' TRO motion and their later voluntary dismissal of the case. The circuit court stated that it knew of the existence of the federal litigation and would have "preferred" that the Masts had provided more details about it. *Id.* at 2559. The circuit court nevertheless stated it knew of no "explicit legal duty" upon the Masts to provide those details. *Id.* at 2558-59.

14

evidence in the sealed record in this case supporting its ruling that the Masts made no fraudulent statements. *See id.* at 2556-58.

The circuit court observed that "in the context of the fraud allegations" the A.s have "painted the Masts in a negative light throughout, including their motivations and intentions." *Id.* at 2559. Rejecting these allegations, the circuit court stated

> that from the beginning [the Masts] were concerned about the child foremost, and they acted for her welfare or what they believed to be her welfare when no one else was. The Court finds from the evidence it has heard so far that [the Masts'] main concern, from the beginning, was the life, health, safety, and welfare of the child. Their failing to inform the Court appears to have been a misguided effort to hasten the child's transport to the U.S. where she could receive necessary medical care and be a part of their family.

*Id.* at 2559-60.

Finally, the A.s' counsel in the circuit court "asserted that [the Masts] may not benefit from their criminal acts." *Id.* at 2546 n.24.[12] Similar allegations have been made by the A.s' counsel during the appellate process.[13] Most of these accusations arise out of the physical

---

We see no need to address the TRO issue further. Under Federal Rule of Civil Procedure 41(a)(1), a voluntary dismissal without prejudice deprives all earlier rulings in the case (including those granting or denying TROs and preliminary injunctions) of any stare decisis effect or other precedential weight. *See* Fed. R. Civ. P. 41(a)(1); *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 396 (1990) ("'Dismissal without prejudice' is a dismissal that does not 'operate as an adjudication upon the merits,' Rule 41(a)(1), and thus does not have a res judicata effect."), *superseded by rule on other grounds*, Fed. R. Civ. P. 11; 8 James Wm. Moore et al., Moore's Federal Practice § 41.33[6][b], at 41-79 to 41-80 (3d ed. 2023) ("The dismissal thus leaves matters as if no action were ever filed, and neither res judicata nor collateral estoppel result from a dismissal by notice."); 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2367, at 649-61 (2020) ("[A] voluntary dismissal without prejudice under Rule 41(a) leaves the situation as if the action never had been filed.").

[12] *See, e.g.*, R. at 5086 ("What happened to [the child] was human trafficking . . . ."); *id.* at 8874 ("[W]hat we are alleging is that Mr. Mast has engaged in human trafficking. He has effectively kidnapped this child from her family.").

[13] *See, e.g.*, CAV R. at 5714 ("This court should not reward flagrant kidnapping" (altering capitalization)); *id.* at 6260 (arguing that the words "child snatching" and "kidnapping"

15

transfer of the child from the A.s to the Masts after their arrival in the United States. The circuit

court specifically addressed this issue:

> [The Masts] have not been convicted of any crime, nor charged
> with any, as far as this Court knows. This is a civil proceeding and
> the Court does not find they engaged in criminal behavior —
> however unwise their conduct may have been — even by a
> preponderance. In relation to the incident at the airport, [the
> Masts] did have a final adoption order, and the Court finds they
> believed it was valid, and certainly they would be able to keep the
> [A.s] from preventing them from taking custody of the child, and
> knowledge of the order in this Court's view preempts any criminal
> intent unless they knew such was not valid, and the Court finds
> they clearly believed it was valid.

*Id.* at 2546 n.24.

### D.

After making its factual findings, the circuit court turned its attention to Code § 63.2-

1216 — which it understood to be "[t]he ultimate issue and disposition in this case." *Id.* at 2543.

Surveying the statutory text and the Virginia cases interpreting it, the circuit court observed that

the "unmistakable language" of the statute forbids attacks on final adoption orders based on

allegations of "1) fraud, 2) lack of proper notice, 3) other procedural deficiencies, and 4) lack of

jurisdiction, all of which were raised and relied on by [the A.s] in this case. And the list is not

exhaustive, as the statute precedes those terms with 'including but not limited to.'" *Id.*

The circuit court then addressed the A.s' two-tiered argument: They asserted that the

final adoption order was void ab initio and that Code § 63.2-1216 only applies to valid — not

void ab initio — final orders. The underlying premise of that argument, the circuit court

responded, "stands the statute on its head." *Id.* at 2551. "The very purpose, function, and impact

---

accurately "reflect the relevant body of law" in this case); Appellee Br. at 12 ("The [Masts]
lure[d] the [A.s] to Virginia and kidnap[ped] their child" (altering capitalization)).

16

of this statute . . . is to say that all of that does not matter, and the orders are valid and final anyway. That is the only logical and rational interpretation and construction." *Id.*

Quoting from a recent decision of the Court of Appeals, the circuit court recognized that the "purpose of the statute is clear. The General Assembly made the policy choice to favor finality, recognizing that repeatedly subjecting a child to multiple changes in or even mere challenges to who his legal parents are has the potential to cause significant harm to the child." *Id.* at 2544 (quoting *Nelson v. Middlesex Dep't of Soc. Servs.*, 69 Va. App. 496, 509 (2018) (alterations omitted)). Given the clarity of the statutory text, the circuit court explained:

> The whole point and purpose of [Code] § 63.2-1216 is not to allow such attacks or challenges as this. [The Masts] have asserted all along that this case really should never have gotten this far. Perhaps they are right, based on the statute. . . . The Court was inclined to impose the bar early on, but wanted the [A.s] to have the chance to argue and present their side of the case. But from the beginning, the Court viewed [Code] § 63.2-1216 to be a steep climb for the [A.s].

*Id.* at 2545. With the benefit of time and months of hearings, however, the circuit court declared what it had reasoned from the beginning:

> To reiterate, the statute says that no final adoption may be "attacked" after six months for any reason, by anyone. It does not say, "unless there has been fraud, duress, lack of notice, other procedural defects or lack of jurisdiction", but rather, even if there was such. The intent of the General Assembly is unmistakable. Those are all reasons that the adoption order might be able to be attacked after 21 days, but not after six months.

*Id.* at 2546.[14]

---

[14] The circuit court acknowledged that the final adoption order did not satisfy all the "procedural requirements" imposed by the adoption statutes. R. at 2562. The A.s argued, for example, that "since the child was not placed by an entity listed in [Code] § 63.2-1200," this was a "fatal defect" requiring vacatur of the final adoption order. *Id.* at 2563. "[B]ut [Code] § 63.2-1213 says this is not so," the circuit court replied. *Id.*

17

The "only chink in the armor" of Code § 63.2-1216, the circuit court concluded, was "the constitutional rights of a parent who has a fundamental liberty interest" in maintaining the parent-child bond. *Id.* at 2552. That posed quite a challenge for the A.s. They "are not natural parents," the circuit court held, and "[t]hey are not parents at all. Neither of them is an actual biological parent, and they are not adoptive parents (or even grandparents)." *Id.* at 2547. Nor did they prove that "they are legal custodians." *Id.* at 2604. Their status, the circuit court observed, "is not the equivalent of a parent, certainly not a natural, biological parent." *Id.* at 2547.

"[T]he question comes down to this," the circuit court reasoned, "under the facts of this case, not being parents, do the [A.s] nevertheless have a fundamental liberty interest in their relationship with the child due to being 'in the role of' parents." *Id.* "[T]here is no case explicitly indicating such," the circuit court conceded. *Id.* at 2547-48. But the court nonetheless held that even though the A.s had no "court-ordered custody or guardianship" rights to the child, *id.* at 2536-37, 2564, they nonetheless played the role as "*physical* custodians and caretakers of this child" and "parent figures" for a period of time, *id.* at 2547-48-34 (emphasis added).

This physical role was enough, the circuit court held, to recognize that the A.s had "a fundamental liberty interest in their relationship with this child, despite not being natural parents, adoptive parents, legal custodians, or even biological kin." *Id.* at 2548. Acknowledging that the A.s could not assert this interest while they were foreign nationals living in Afghanistan and that the six-month period of statutory repose had expired before they entered the United States, the circuit court nonetheless "ruled that the statute was unconstitutional as applied in this case, despite there being no case that explicitly says this." *Id.* at 2550.

18

E.

The circuit court also addressed and rejected the assertion that the final adoption order violated the Supremacy Clause of the U.S. Constitution. Even though the United States had unsuccessfully sought to intervene in the case, the circuit court nonetheless permitted an attorney from the Department of Justice to attend the evidentiary hearings to monitor testimony and exhibits that may involve "classified or sensitive" national security matters. *Id.* at 2563. The DOJ attorney advised the circuit court that she would "not [be] weighing in on the merits of the case," but that later changed when the representative began "championing" various positions on the "merits" of the case. *Id.*

The DOJ attorney argued that the federal government, in its foreign relations role, accepted the view that the A.s were the child's "next of kin" and that a state court had no power to conclude otherwise. *Id.* at 2563-64. The circuit court disagreed on factual grounds. The next-of-kin assertion, the circuit court held, "has to be proved in court." *Id.* at 2564. "The fact that physical custody short of legal custody may have been given to someone believed to be next of kin," the circuit court explained, "with the approval or acquiescence of the United States (DOD), does not equate that to parenthood or legal custody and does not establish that they are in fact related." *Id.* "This was not a decision the United States initiated," the circuit court found, "but rather consented to or acquiesced in." *Id.* The issue is further complicated, the circuit court observed, by the fact that the "Afghan government the Court is being asked to defer to in vacating this order no longer exists, and the successor government is not recognized by the U.S." *Id.*

F.

In the end, based upon its ruling that the A.s had a "fundamental liberty interest" as "caretakers and physical custodians" of the child, the circuit court denied the Masts' plea in bar

19

asserting the statutory bar of Code § 63.2-1216 and granted leave for the parties to seek an interlocutory appeal pursuant to Code § 8.01-675.5(A). *Id.* at 2604. Given the circuit court's factual findings and its view of Code § 63.2-1216's statutory bar, it believed an appellate determination of this issue "could be dispositive of the entire case."[15] *Id.* at 2565; *see also id.* at 2605.

After the retirement of the circuit court judge who had presided over the evidentiary hearings, a colleague took over the case. The second judge heard argument on various motions and issued an Order Granting Summary Judgment in May 2023. The order stated that it was based upon, among other things, "the reasons stated on the record in this hearing and in previous hearings and in the Court's written rulings and opinions." *Id.* at 3694. As noted earlier, there were only two prior "written rulings and opinions," *id.*, relied upon as "reasons" for the circuit court's summary judgment: the Findings and Rulings order (entered November 18, 2022) and the Order Denying Pleas in Bar (entered November 30, 2022).

The Order Granting Summary Judgment repeated the circuit court's earlier conclusion that Code § 63.2-1216 barred collateral attacks based upon "statutory objection[s]" to the adoption proceeding. *Id.* at 3697 (stating that there is "no way" around that conclusion). The Order Granting Summary Judgment also addressed, albeit in a less than clear manner, the A.s' allegations of extrinsic fraud:

> There are some things that the Court should have been made aware of from [the Masts] in this process that the Court was never made aware of. There is an argument to be made. There is evidence of some extrinsic fraud as it relates to this process and what was happening in Afghanistan at the same time the Court was issuing its final order. And so the Court finds that there is a due process basis to avoid [Code] § 63.2-1216. The Court also finds that there

---

[15] The circuit court summarily rejected the A.s' argument that the court lacked subject matter jurisdiction over the adoption proceeding. This case, the circuit court stated, "raises an issue of procedural defect and trial error, but not jurisdiction." *Id.* at 2554.

> is evidence of extrinsic fraud, not extrinsic fraud in a tortious conduct way. The Court is not sure that the evidence will show that there was an intentional hiding of anything by [the Masts]. But the fact of the matter is the Court did not have all of the information known to the [Masts] at the time the order was entered.

*Id.* at 3698. The circuit court did not explain how Code § 63.2-1216 (which specifically precludes challenges alleging fraud) is sidelined by a finding of some non-tortious genre of fraud that did not involve "intentional hiding" of information, *id.*[16]

In its conclusion, the Order Granting Summary Judgment repeated the earlier finding that the A.s were "de facto parents" entitled to the same constitutional rights as de jure parents. *Id.* at 3697. The circuit court acknowledged that it could not "point to any actual determination of law that was made in Afghanistan or elsewhere, because none was made. No court in Afghanistan made any final ruling or anything else." *Id.* Because the A.s' constitutional interests as "de facto parents" were not considered in the adoption proceeding, the circuit court held that "the [final adoption] order issued by this court on December 3, 2020, is void." *Id.* at 3697-98.

G.

On appeal to the Court of Appeals,[17] the Masts challenged the circuit court's de facto parent theory used to declare Code § 63.2-1216 unconstitutional as applied to the A.s. In

---

[16] The Order Granting Summary Judgment addressed the citizenship of the child in an equally puzzling manner:

> There is some thought that the child might have been something else. And there is some thought that the child might have been yet something else. And there is another thought that the child might have been something else, too. But in the end, it was determined that the child was an Afghan child.

*Id.* at 3695.

[17] *See supra* note 1.

21

response, the A.s defended that holding and asserted alternative legal theories in support of the circuit court's rulings in their favor:

- The circuit court did not have subject matter jurisdiction to enter the Masts' final adoption order.

- Code § 63.2-1216's bar of untimely fraud claims does not apply to fraud claims that render an order void ab initio.

- The final adoption order violated the Supremacy Clause of Article VI of the U.S. Constitution.

The Court of Appeals rejected the A.s' argument that the circuit court lacked subject matter jurisdiction over the adoption case. Given "the broad grant of jurisdiction of Code § 17.1-513," the Court of Appeals held, "the circuit court had subject-matter jurisdiction over the adoption proceeding." *A.A.*, 81 Va. App. at 233. The Court of Appeals, however, deemed the A.s' position to be "nominally fashioned under the doctrine of subject-matter jurisdiction" but better understood "as an argument that the circuit court lacked the power to render." *Id.* at 234.

The Court of Appeals then applied the power-to-render doctrine as an alternative ground supporting the circuit court's vacatur order.[18] The Court of Appeals did not rule on the A.s' fraud and de facto parent claims. Addressing the A.s' claim that the final adoption order violated the Supremacy Clause, however, the Court of Appeals stated: "To the extent that our interpretation of Code § 63.2-1216 is lacking, federal preemption principles counsel the same result. . . . But we need not decide this case on such grounds, given the power to render rationale

---

[18] The Court of Appeals also ruled on the validity of the custody order issued by the juvenile and domestic relations district court. *See A.A.*, 81 Va. App. at 230-36. The A.s' petition to vacate filed in the circuit court, however, did not challenge the district court custody order. *See* R. at 10 (limiting the request for relief to the December 3, 2020 final adoption order); *see also* Appellants' Br. at 7, 38 (arguing that the custody order was not properly before the Court of Appeals). In their Appellee Brief before us, the A.s concede that "the custody and interlocutory adoption orders were subsumed into the final adoption order and have no independent continuing force." Appellee Br. at 16 n.11. Given our ruling reinstating the final adoption order, we need not address the issue further.

22

contained herein." *A.A.*, 81 Va. App. at 239 n.24.

## II.

On appeal to us, the Masts argue that the syntactic clarity of Code § 63.2-1216 bars the various challenges advanced in the A.s' collateral attack[19] on the final adoption order and that their constitutional claims are unavailing.  For the following reasons, we agree.

## A.

We hold to the historical maxim that "[t]he power to open or vacate judgments is essentially judicial."  1 Henry Campbell Black, A Treatise on the Law of Judgments § 298, at 455 (2d ed. 1902).  English judges exercised this power in the common-law courts by reaching back into prior terms of court, *see generally* 1 A.C. Freeman, A Treatise on the Law of Judgments § 96, at 133-34 (4th ed. 1892), and chancellors in equity accomplished the same result by enjoining litigants from enforcing void common-law judgments, *see* Black, *supra*, § 357, at 563; 1 W.F. Bailey, The Law of Jurisdictions § 142, at 117-18 (1899); 4 John Norton Pomeroy, A Treatise on Equity Jurisprudence § 1360, at 3248-49 (4th ed. 1919).  Early American courts did the same.  *See generally* 2 Restatement (Second) of Judgments § 78 cmt. c, at 230 (1982).

---

[19] The expression "collateral attack" has different meanings in different historical contexts, *see generally* 2 Restatement (Second) of Judgments § 80 reporter's note, cmt. a, at 247-48 (1982), and modern contexts, *see, e.g.*, *Wall v. Kholi*, 562 U.S. 545, 552 (2011).  Without attempting to mark off the exact metes and bounds of the concept, we use the term "collateral attack" in this opinion to describe any challenge to the validity of a court order (whether interlocutory or final) in any judicial proceeding *other than* the proceeding (from commencement to final resolution, if any, on appeal) in which the challenged order was entered.  However precisely we define the concepts, it is certain that "the distinction between a direct and a collateral attack is thus clearly drawn: 'Any proceeding provided by law for the purpose of avoiding or correcting a judgment is a direct attack, which will be successful upon *showing error*; while an attempt to do the same thing in any other proceeding is a collateral attack which will be successful only upon *showing a want of power*.'"  *Eagle, Star & British Dominions Ins. Co. v. Heller*, 149 Va. 82, 104 (1927) (emphasis added) (quoting John M. Van Fleet, The Law of Collateral Attack on Judicial Proceedings § 3 (1892)).

But the voiding power was not then and is not now boundless. The judicial power to retrospectively vacate an order as void has always been subject to *statutory limits* "either in respect to the grounds upon which it may be put in operation, the time within which it may be invoked, the manner of calling it into play, or the practice upon an occasion for its exercise. And such [statutory] regulations may either enlarge or abridge its common law scope, or otherwise transform it." Black, *supra*, § 297, at 453; *see also* Pomeroy, *supra*, § 1364, at 3258 (observing that voiding powers can be "modified or abrogated by statute").

This first premise takes us to the centerpiece of this case, Code § 63.2-1216. It applies to "any" final order of adoption, and thus it applies to the final order of adoption in this case. The statute then addresses the kind of "validity" attacks that are prohibited after the expiration of six months. The statute answers that question by again using the capacious "any" adjective. The statutory bar applies to attacks "in any proceedings, collateral or direct, for any reason." Code § 63.2-1216. If that were not clear enough, the statute continues by textually reinforcing the definition of "any reason" as "including but not limited to" attacks alleging "fraud, duress, failure to give any required notice, failure of any procedural requirement, or lack of jurisdiction over any person." *Id.*

The legislative evolution of Code § 63.2-1216 reinforces the any-means-any theme of the statutory text. In 1942, the General Assembly enacted the first version of what is now Code § 63.2-1216. *See* 1942 Acts ch. 205, at 258-59. It included a two-year statute of repose on attacks "collateral or direct" on final orders of adoption "by reason of any irregularity in proceedings." *Id.* In 1954, the legislature reduced the statutory repose period to six months and excised the undefined "irregularity" scope of the statutory bar. *See* 1954 Acts ch. 489, at 586.

In 1995, based upon a report of a joint subcommittee, the General Assembly unanimously amended the statute, codified then as Code § 63.1-237. *See* 1995 Acts ch. 772, at 1444; *Report*

24

*of the Joint Subcommittee Studying the Commonwealth's Adoption Laws*, House Doc. No. 65, at 14 (1995). The 1995 amendment "strengthen[ed] [the] existing Code section" by adding the expansive, adverbial phrase "for any reason, including but not limited to fraud, duress, failure to give any required notice, failure of any procedural requirement, or lack of jurisdiction over any person." *Report of the Joint Subcommittee Studying the Commonwealth's Adoption Laws*, House Doc. No. 65, at 14; *see also* 1995 Acts ch. 772, at 1444. Although the statute was later reenacted and renumbered as Code § 63.2-1216, the statutory text enacted in 1995 has remained unaltered. *See* 2000 Acts ch. 830, at 1768 (renumbered and reenacted as Code § 63.1-219.23); 2002 Acts ch. 747, at 1186 (renumbered and reenacted as Code § 63.2-1216).

For these reasons, we cannot accept the A.s' assertion that the final adoption order in this case is just a piece of "paper" — not an "'order' at all" — because "as a legal nullity," it can "be challenged at any time." Appellee Br. at 2, 34. From the A.s' perspective, the statutory bar to challenging the validity of "any" final adoption order excludes all orders that can be successfully challenged as void ab initio. Under this circular logic, the statutory bar applies only when it is unnecessary to apply it — an odd type of performative contradiction that turns back on itself. There is no need for a statute to place a time limit on an ineffectual collateral attack on a mere voidable judgment.

B.

Guided by these principles, we first address the holding of the Court of Appeals that the judicially created "power to render" doctrine negates the statutory operation of Code § 63.2-1216. *See A.A.*, 81 Va. App. at 234-41.[20] When properly applied, this doctrine authorizes a

---

[20] The Court of Appeals ruled on this issue because the A.s "nominally fashioned" their argument as a limited attack on the circuit court's "subject matter jurisdiction" to enter the final adoption order. *A.A.*, 81 Va. App. at 234. The Court of Appeals summarily rejected the A.s' argument that the circuit court lacked subject matter jurisdiction. *Id*. at 233. We likewise find

25

court to vacate a final order even in cases where the prior circuit court adjudicated the case within its subject matter jurisdiction.

The power-to-render doctrine applied in this case, the Court of Appeals held, because the final adoption order, which treated the case as an agency adoption proceeding, did not comply with a procedural requirement that the child be "properly committed or entrusted to [the agency's] care." *A.A.*, 81 Va. App. at 236 (citing Code § 63.2-1230). The Court of Appeals acknowledged that the Department of Social Services (the applicable "agency") and the guardian ad litem appointed by the circuit court "[b]oth recommended" that the child be adopted by the Masts. *Id.*; *see also* R. at 2535. But because the child was not "present in the United States and neither the [DSS] nor the guardian ad litem ever met the child prior to issuance of the [adoption] orders," the Court of Appeals held that these "procedural errors" rendered the final adoption order void ab initio under the power-to-render doctrine. *A.A.*, 81 Va. App. at 236.[21]

Though rarely applied, the power-to-render doctrine has found its way into an eclectic array of settings, each marked by indistinct conceptual boundaries. Its ad hoc unpredictability validates Justice Holmes's observation that "repetition of inadequate catch words" can "delay further analysis for fifty years." Oliver Wendell Holmes, *Law in Science and Science in Law*, 12 Harv. L. Rev. 443, 455 (1899). A good example is the oft-repeated statement that a collateral

---

no merit in this argument. *See Bonanno v. Quinn*, 299 Va. 722, 735 (2021) (holding that "circuit courts have subject-matter jurisdiction to adjudicate adoptions" and the "power to adjudicate adoption petitions under Code §§ 17.1-513 and 63.2-1201").

[21] This absentee situation did not go unnoticed by the circuit court. Because the Masts were Virginia "residents" and had been granted legal custody over the child by a Virginia court, the circuit court reasoned that "the child was necessarily deemed to be a resident or domiciliary" of Virginia, and it was unnecessary for the child to be "physically" present in Virginia at the time of the interlocutory adoption order. R. at 2533. Under this view, the same situation existed at the time of the final adoption order, which the circuit court entered "to get the child out of harm's way and allow the child to be brought safely to the United States to begin receiving the medical care that she had desperately needed." *Id.* at 2535.

challenge to a void ab initio order can be asserted "by all persons, anywhere, at any time, or in any manner." *Bonanno v. Quinn*, 299 Va. 722, 736 (2021) (citation omitted).

For over a century, legal scholars have called out as "misleading" the view that an "absolutely void" judgment "may be impeached whenever and wherever confronted, either in a direct or collateral proceeding." Bailey, *supra*, § 165a, at 136. It is an overstatement because "much depends on the character of the proceeding and the manner in which the question is presented." *Id.*; *accord* Freeman, *supra*, § 116, at 176. We agree.

The anytime-anywhere "rhetorical flourish," we recently held, "does not accurately state the law." *Bonanno*, 299 Va. at 736. Virginia cases "do not support the broad statement there that voidness may be raised by 'all persons, anywhere, at any time, or in any manner.'" *Id.* at 738. "There are limitations on where, when, and how such challenges may be brought in court, and by whom," and thus, "we strongly discourage litigants from invoking that language in future proceedings." *Id.* Only a court can declare a judicial order void ab initio, *Bonanno* held, and a litigant's request for such relief must be raised in a "proceeding where the voidness of the order is properly at issue." *Id.* at 736-37.

This last principle — *properly at issue* — undermines the reasoning of the Court of Appeals in this case *even if* the circuit court's "procedural errors," *A.A.*, 81 Va. App. at 236, justified the void ab initio remedy. The alleged voidness of the final adoption order was never "properly at issue," *Bonanno*, 299 Va. at 736-37, in the circuit court. Mistakenly thinking that it was, the Court of Appeals relied on several of our cases that approve of motions to vacate filed long after the challenged final order. In not one of those cases, however, was there a statute that expressly placed a time limit on filing such motions. The only time limit we set aside in those power-to-render cases was our own 21-day deadline in Rule 1:1 — a judicially promulgated rule

27

of court establishing a deadline for challenges to final judgments — pursuant to a judicially created exception to the deadline. *See, e.g.*, *Collins v. Shepherd*, 274 Va. 390, 402-03 (2007).

This case presents a very different scenario. Code § 63.2-1216 is a legislatively created statute of repose, not a judicially created procedural deadline. Statutes of repose "reflect a legislative decision to extinguish all causes of action after passage of an arbitrary period of time," *Roller v. Basic Constr. Co.*, 238 Va. 321, 329 (1989). "The purpose and effect of a statute of repose . . . is to override customary tolling rules arising from the equitable powers of courts." *California Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 582 U.S. 497, 508 (2017). In this respect, a statute of repose involves a "policy determination," *Friends of Clark Mountain Found., Inc. v. Board of Supervisors*, 242 Va. 16, 20 (1991), legislating a "redefinition of the substantive rights and obligations of the parties," *Hess v. Snyder Hunt Corp.*, 240 Va. 49, 52 (1990) (citation omitted).

For these reasons, the power-to-render doctrine (when applicable) sets aside Rule 1:1's deadline — but not Code § 63.2-1216's deadline. The statute supersedes any contrary judicial doctrines and cannot be subordinated to caselaw exceptions to Rule 1:1. In the clearest of terms, Code § 63.2-1216 establishes a six-month repose for collateral challenges filed "in any proceedings" seeking to "attack" the "validity" of a final adoption order "for any reason" including the "failure of any procedural requirement." Citing "procedural errors" committed by the circuit court in this case, *A.A.*, 81 Va. App. at 236, the Court of Appeals invoked the power-to-render doctrine to attack the validity of the final adoption order. The unmistakable meaning of Code § 63.2-1216, however, has taken this argument off the table.

The only way to put it back on the table is to subordinate the precise language of a statute enacted by the legislature to an imprecise legal doctrine applied by the judiciary. Both the text and the tone of the A.s' arguments ask us to do just that. We respectfully decline the invitation.

28

Our interpretative task considers only "what the statute says" and not what we or the litigants "think it should have said." *Verizon Va. LLC v. State Corp. Comm'n*, 302 Va. 467, 477 (2023) (citation omitted). We cannot engage assertions that "a statute is 'unwise, improper, or inequitable' because the legislature, not the judiciary, is the sole 'author of public policy.'" *Tvardek v. Powhatan Vill. Homeowners Ass'n*, 291 Va. 269, 279-80 (2016) (citations omitted). Emotive narratives, whether factually supported or not, do not authorize courts "to rewrite [a] statute under 'the subtle "guise of judicial interpretation."'" *Commonwealth v. Hall*, 297 Va. 143, 148 (2019) (citation omitted).

In short, Code § 63.2-1216 evinces a legislative "policy choice to favor finality, recognizing that repeatedly subjecting a child to multiple changes in or even mere challenges to who his legal parents are has the potential to cause significant harm to the child." *Nelson*, 69 Va. App. at 509. Because the textual clarity of the statute is strong and the invocation of the power-to-render doctrine is weak, the validity of the final adoption order cannot be set aside on this basis. The Court of Appeals erred in concluding otherwise.

### C.

We next address the A.s' claim that the Masts "perpetrated an extraordinary fraud on the Virginia courts to take an Afghan baby (now a young child), Baby Doe, from her family" and that failing to remedy this fraud would constitute "state-sanctioned kidnapping." Appellee Br. at 1, 38. The Masts vigorously contest this accusation on multiple factual and legal grounds.[22] We will address only one of them.

---

[22] The statutory bar precludes the necessity for us to address the Masts' arguments that (i) the A.s failed to shoulder the burden of proof to establish extrinsic fraud by "clear and convincing evidence," *Gulfstream Bldg. Assocs., Inc. v. Britt*, 239 Va. 178, 183 (1990); *see* R. at 2555-58, and (ii) the A.s' allegations, even if true, involve intrinsic, not extrinsic fraud, *see generally Rowe v. Big Sandy Coal Corp.*, 197 Va. 136, 143 (1955); *O'Neill v. Cole*, 194 Va. 50, 56 (1952); *Justice v. Georgia Indus. Realty Co.*, 109 Va. 366, 369-70 (1909).

Code § 63.2-1216's six-month deadline applies to fraud claims. Extrinsic fraud *is* fraud. And, thus, the statute bars the A.s' untimely assertion of an extrinsic fraud claim. The A.s appear to suggest that claims of extrinsic fraud by their very nature should not be subject to any time limitation. But that has never been the case. In *Rowe v. Big Sandy Coal Corporation*, we addressed a litigant seeking an "annulment" of a prior judicial decree, arguing that it was "utterly void and of no effect" because it was allegedly procured by a "fraud upon the court." 197 Va. 136, 137-41 (1955). Whether fraud had been proven or not, we held, the equitable doctrine of "laches" barred this claim. *Id.* at 143; *see also O'Neill v. Cole*, 194 Va. 50, 59-61 (1952). This principle has been traditionally applied to voidness. *See generally* Black, *supra*, § 387, at 615; Pomeroy, *supra*, § 1442, at 3417-23. Code § 63.2-1216 replaced the indeterminate nature of laches with a determinate statutory deadline for voidness claims asserting fraud. *See generally* Pomeroy, *supra*, § 1364, at 3258 (stating that an equitable vacatur doctrine applies to a claim "except where it has been modified or abrogated by statute").

We thus reject the A.s' argument that Code § 63.2-1216 does not apply because the final adoption order should be declared void ab initio due to extrinsic fraud. This inverted argument seeks to set aside the final adoption order by first setting aside the unqualified text of Code § 63.2-1216. This non sequitur assumes what it should be proving. In short, Code § 63.2-1216 imposes a statutory deadline for making a void ab initio challenge to a final adoption order based upon an allegation of fraud. The circuit court did not err in rejecting the argument to the contrary, and the Court of Appeals did not err in declining to address it at all.

### D.

Our interpretation of Code § 63.2-1216 does not render it wholly invulnerable to judicial review. Relying on this foundational truth, the A.s raise two theories of constitutional law that

they claim render Code § 63.2-1216 unconstitutional as applied to them.[23]  They first argue that the circuit court correctly held that they were "de facto" parents of the child and that no American court could constitutionally sever that relationship.  Second, they claim that the Supremacy Clause of Article VI of the U.S. Constitution subordinates Code § 63.2-1216 to the federal government's alleged interest in dissolving the final adoption order.  We find no legal merit in either assertion.

1.

Given its application of the power-to-render doctrine, the Court of Appeals chose not to address the circuit court's "de facto parents" thesis.  *A.A.*, 81 Va. App. at 228, 240.  The A.s raise the "de facto parents" issue again with us as an alternative basis for affirmance.  *See* Appellee Br. at 43-46.  To succeed on this theory, the A.s need to prevail on each of the following three assertions.  First, the preponderance of the evidence would have to factually establish that the A.s' relationship with the child justifies their claimed status as de facto parents.  Second, the A.s would have to demonstrate that de facto parents (however defined) have the same constitutional rights under American (not Afghan) law as biological or adoptive parents.  And, finally, they would have to establish that they — Afghans living in Afghanistan at the time the final adoption order was entered — can assert a claim attacking the entry of that order in an American court.

a.

On the first point, the circuit court made multiple factual findings concerning the A.s' relationship with the child while in Afghanistan.  The Findings and Rulings order set forth a

---

[23] "The nature of an as-applied challenge assumes the possibility of different circumstances in which the statute could be constitutional."  *McKeithen v. City of Richmond*, 302 Va. 422, 438-39 (2023).

31

series of factual findings on this issue.  The repetitive and emphatic nature of the findings underscores the circuit court's view of the evidence:

- The A.s "are not natural parents, adoptive parents, grandparents, or anyone with court-ordered custody or guardianship, and have not proved they are even biological relatives."  R. at 2536-37.

- The A.s "are not natural parents or adoptive parents, or the equivalent thereof." *Id.* at 2562.  "They are not parents at all." *Id.* at 2547.

- The A.s "are not the natural or biological parents of the child or adoptive parents." *Id.* at 2537.

- There was no "court-ordered custody to the [A.s]," and "they are not parents (natural or adoptive) and do not have legal custody, and did not have a parent's right of consent." *Id.* at 2562.

- "There is no evidence [the A.s] were ever given legal custody," and their witness on this issue "said that custody could only be granted by court order." *Id.*; *see also id.* at 2541-42.

- The circuit court was "not convinced or persuaded" that the "[A.s] are who they say they are regarding their asserted familial relationship to the child." *Id.* at 2538.

- "To reiterate, the Court finds that [the A.s] have not proved to the Court's satisfaction that they are in fact kin to the child . . . ." *Id.* at 2564.

- "The Court did not ever have confidence that his child is the child of [B.], [A.A.'s] purported uncle, and there was no basis in the case to find this beyond the [A.s'] testimony." *Id.* at 2562.

- "[The Masts] asked for DNA evidence from the very beginning, and [the A.s] resisted this from the very beginning.  The Court cannot ignore this." *Id.* at 2540 n.16.

- "[T]he Court has no confidence that Afghan law even gave [the child's uncle] the authority to give the child to [A.A.]." *Id.* at 2539 n.15.

- In sum, the A.s "are not and never were parents." *Id.* at 2547.

The circuit court also pointed out that the A.s "have asserted from the beginning [of this litigation] that there is no adoption in Afghanistan." *Id.* And their claimed status as physical caretakers or guardians, the circuit court observed, is not "the same as an adoptive parent." *Id.*

Despite these factual findings, the circuit court viewed the A.s as "parent figures" for the 18 months prior to the child leaving Afghanistan and coming to the United States and thus had a "fundamental liberty interest" protected by the U.S. Constitution. *Id.* at 2548. "Admittedly no case the Court is aware of explicitly holds this," the circuit court acknowledged, particularly given the fact that the [A.s] were not "natural parents, adoptive parents, legal custodians, or even biological kin." *Id.*

The circuit court recognized that "non-U.S. citizens who do not reside in the U.S. do not have constitutional rights under our law." *Id.* The A.s, the circuit court observed, "are not U.S. citizens and they were not residing in the U.S. when the events occurred." *Id.* at 2552. "Nevertheless," the circuit court held, "I find that Va. Code § 63.2-1216 would be unconstitutional as applied to the facts of this case." *Id.* With the statute of repose set aside, the circuit court denied the initial plea in bar so that the case could proceed to its "ultimate outcome." *Id.* at 2553.

Later the circuit court, with the second judge presiding, entered the Order Granting Summary Judgment. Adopting the findings of the first judge who presided over the evidentiary hearings,[24] the second judge deemed the A.s to be "de facto parents" whose constitutional rights were violated by the entry of the final adoption order. *Id.* at 3697. Like his predecessor, the second judge conceded that "[t]he Court cannot point to any actual determination of law that was made in Afghanistan or elsewhere, because none was made." *Id.* "No court in Afghanistan

---

[24] *See supra* Section I.A.

33

made any final ruling or anything else." *Id.* Even so, because the A.s' constitutional rights as "de facto parents" had been violated, the circuit court held, the final adoption order entered three years earlier "is void." *Id.* at 3697-98.

b.

Whatever the strength or weakness of the A.s' disputed factual allegations, we reject their de facto parent thesis as a matter of law.[25] No Virginia state or federal court has endorsed this constitutional theory. Nor has any American court applied it extraterritorially to foreign citizens living in a foreign country at the time of the alleged violation of their claimed rights under the U.S. Constitution. For several reasons, we will not be the first to do so.

The U.S. Supreme Court in *Troxel v. Granville* addressed the question whether the Fourteenth Amendment's Due Process Clause protected the liberty interest of "parents in the care, custody, and control of their children." 530 U.S. 57, 65 (2000) (plurality opinion). There was no majority opinion in *Troxel*. Among the six opinions issued, a plurality of four Justices opined that the "substantive component" of the Fourteenth Amendment forbids a state court from ordering a biological parent (in that case, a mother) against her will to make her children available for visitation by nonparents (in that case, the child's grandparents). *Id.* at 65, 68. The state statute authorizing such visitation orders was unconstitutional, these Justices opined, because a "fit custodial parent" has a constitutionally protected "interest" in decisions affecting the "care, custody, and control" of her children. *Id.* at 65, 67. Concurring in the judgment only, Justice Souter agreed with the result but questioned the need "for turning any fresh furrows in the

---

[25] Rule 3:20 governs summary judgments in Virginia courts. Its "key phrase — 'entitled to [summary] judgment' — requires the moving party to demonstrate that no 'material' facts are 'genuinely in dispute.'" *AlBritton v. Commonwealth*, 299 Va. 392, 403 (2021). Given our legal ruling on the de facto parent issue, we need not address the procedural propriety of entering summary judgment in this case.

34

'treacherous field' of substantive due process." *Id.* at 76 (Souter, J., concurring).  Justice Thomas also concurred in the judgment only.  On various dissimilar grounds, Justices Stevens, Scalia, and Kennedy dissented.

Since *Troxel*, more than 6,000 judicial opinions have cited it in an effort to discern its precedential parameters.  One issue sometimes raised is whether nonparents (grandparents, close relatives, etc.) have the same constitutional rights as biological parents and legally adoptive parents.  That issue did not arise in *Troxel*.  None of the six opinions in *Troxel* recognized nonparents as having constitutionally protected parental rights over a child.  The only person in *Troxel* recognized by the four-Justice plurality as having constitutional "fit parent" rights, *id.* at 70, was the child's biological mother.

We will not survey the extensive list of post-*Troxel* citations in other jurisdictions.  In every one of our opinions applying *Troxel*, we have applied its constitutional protections only to actual parents.  *See L.F. v. Breit*, 285 Va. 163, 182-83 (2013); *Copeland v. Todd*, 282 Va. 183, 198-201 (2011).  The same is true of the opinions issued by the Court of Appeals.[26]  Two of those Court of Appeals opinions are particularly pertinent.

In *Nelson*, the Court of Appeals addressed whether grandparents of a child could attack the validity of a final adoption order in a petition to vacate filed after the expiration of Code § 63.2-1216's six-month deadline.  69 Va. App. at 508-09.  The grandparents argued that their

---

[26] *See, e.g.*, *Williams v. Panter*, 83 Va. App. 520, 540-42 (2025); *Caphe v. Skeens*, 80 Va. App. 556, 567-68 (2024); *Moore v. Joe*, 76 Va. App. 509, 517-20 (2023); *Bedell v. Price*, 70 Va. App. 497, 507-08 (2019); *Nelson*, 69 Va. App. at 512-13, 512 n.11; *Hawkins v. Grese*, 68 Va. App. 462, 471-74 (2018); *Geouge v. Traylor*, 68 Va. App. 343, 368-70 (2017); *Rhodes v. Lang*, 66 Va. App. 702, 708-10 (2016); *Thach v. Arlington Cnty. Dep't of Hum. Servs.*, 63 Va. App. 157, 172-74 (2014); *Todd v. Copeland*, 55 Va. App. 773, 789-90 (2010), *aff'd in part, rev'd in part*, 282 Va. 183 (2011); *Damon v. York*, 54 Va. App. 544, 551-52 (2009); *Stadter v. Siperko*, 52 Va. App. 81, 88-91 (2008); *Surles v. Mayer*, 48 Va. App. 146, 166-69 (2006); *Griffin v. Griffin*, 41 Va. App. 77, 82-86 (2003).

close familial relationship with the child had the same constitutional status as a parent-child relationship protected by the *Troxel* plurality. The Court of Appeals disagreed. The *Troxel* principle, *Nelson* held, was applicable to "the *parent*-child relationship," not the grandparent-child relationship. *Id.* at 512 (emphasis in original).

Another decision by the Court of Appeals has persuasive weight on this issue. In *Stadter v. Siperko*, a woman gave birth to a child via artificial insemination during a romantic relationship with someone other than the biological father. 52 Va. App. 81, 86 (2008). After the couple separated, the nonparent sought court-ordered visitation rights claiming she was a "de facto parent" of the child. *Id.* at 87. The separated partner claimed that she previously had "shared parenting responsibilities" with the mother and "provided substantial financial support." *Id.* at 86. This "de facto parent" status, the separating partner argued, entitled her to constitutional rights under *Troxel*. *Id.* at 90-91.

Deeming the argument as an invitation to exercise "judicial fiat," the Court of Appeals refused to adopt the novel "doctrine of de facto or psychological parent in the Commonwealth." *Id.* at 91. "[N]o appellate court in Virginia has ever so applied the de facto parent doctrine," the Court of Appeals held, "despite numerous opportunities under analogous circumstances to do so. We likewise decline to do so now." *Id.* (citation omitted); *see also Griffin v. Griffin*, 41 Va. App. 77, 81, 86 (2003) (finding that a "non-parent seeking to play the role of a de facto father" does not have the protected constitutional status of an actual parent).

The concurring opinion in *Stadter* further emphasized this point. The claimant had "no legal claim under United States law or Virginia law to parental rights. She did not give birth to the child, she did not adopt the child, and no previous court order gave her any parental rights." *Stadter*, 52 Va. App. at 96 (Beales, J., concurring) (citation omitted). Agreeing with the majority, the concurring judge stated that Virginia courts have no power "to create by judicial

36

fiat a new category of parent, a de facto parent, who would have the same rights as an actual, fit parent." *Id.* at 98.

On this issue, we agree with the Court of Appeals. Only a venturesome expansion of *Troxel* could justify the judicial recognition of the de facto parent theory. If *Troxel* had held as much, of course, we would be "duty bound" to apply it. *See Jones v. Commonwealth*, 293 Va. 29, 56 (2017). "However, our 'duty to follow binding precedent is fixed upon case-specific holdings, not general expressions in an opinion that exceed the scope of a specific holding.'" *Id.* (citation omitted). "This limiting principle exists because 'words [in judicial] opinions are to be read in the light of the facts of the case under discussion.'" *Id.* (alteration in original) (citation omitted).[27]

For these reasons, the circuit court erred in holding that the A.s were "de facto parents" entitled under *Troxel* to the Fourteenth Amendment's due-process protections afforded to actual

---

[27] The A.s also claim that the *Troxel* plurality held that "guardians" have constitutional rights over children to the same degree as biological and adoptive parents. *See* Appellee Br. at 43-44; CAV Oral Argument Audio at 4:59 to 5:04 ("*Troxel v. Granville*, for example, is very clear that parenthood can extend to guardians with a parental relationship."). There was no such holding. The mention of "guardians" in *Troxel*'s four-Justice opinion quotes *Pierce v. Society of Sisters*, 268 U.S. 510, 534-35 (1925), which in turn relies upon *Meyer v. Nebraska*, 262 U.S. 390, 401-02 (1923). The mention of "guardians" in *Pierce* referred to legal guardians in the context of a state statute that criminalized parents and guardians for sending children to private rather than public schools. Even more attenuated, *Meyer* refers to "official guardians" imagined in Plato's Republic where wives "are to be common, and their children are to be common, and no parent is to know his own child, nor any child his parent." *Id.* at 401-02.

We find this line of cases to have little, if any, precedential weight on the question whether a self-identifying "guardian," not legally appointed by any court, has the same constitutional rights over a child as a biological or adoptive parent. Given the paucity of the A.s' argument on this point, *see* Appellee Br. at 43-44 (a single paragraph); *Coward v. Wellmont Health Sys.*, 295 Va. 351, 367 (2018) ("Lack of an adequate argument on brief in support of an assignment of error constitutes a waiver of that issue." (citation omitted)), the absence of persuasive precedent, and the circuit court's findings of fact, we reject the A.s' assertion that *Troxel* supports their constitutional claim in this case.

parents. R. at 3697. The de facto parent theory, therefore, cannot serve as a right-result-different-reason basis for affirming the Court of Appeal's vacatur of the final adoption order.[28]

### 2.

In their final collateral attack on the final adoption order, the A.s assert that it violates the Supremacy Clause of the U.S. Constitution. They see this ground as one of several "other reasons why the courts below found the adoption order void and challengeable under Section 1216." Appellee Br. at 3. We read the record differently. The circuit court addressed the federal preemption theory and concluded only that it "is to be considered, but is not dispositive." R. at 2564. And the Court of Appeals expressly stated it "need not decide this case on such grounds, given the power to render rationale contained herein." *A.A.*, 81 Va. App. at 239 n.24. The federal preemption claim, therefore, is before us on a right-result-different-reason basis — which means that it can succeed only if there are no disputed facts and the law supports the alternative reason. *See Rickman*, 294 Va. at 542; *Morgan v. Board of Supervisors*, 302 Va. 46, 62 n.6 (2023).

### a.

We first consider the role of the United States in this case. As the circuit court emphasized, "[t]he United States is not a party to this case." R. at 2549. Its two motions to intervene were denied by the circuit court. With the permission of the circuit court, the United States appeared as an amicus curiae. It filed briefs supporting the A.s' federal preemption argument in the lower courts and in our Court. Prior to oral argument before us, however, the

---

[28] Given our rejection of the de facto parent theory, we need not address the question whether a *Troxel* claim can be asserted in an American court by foreign nationals living in a foreign country at the time that their alleged *Troxel* rights were purportedly violated. *See generally Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 433 (2020) (stating that "it is long settled as a matter of American constitutional law that foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution").

U.S. Department of Justice stated that "the United States has now had an opportunity to reevaluate its position in this case."  Mot. by U.S. Dep't of Just. to Withdraw Amicus Br. at 1 (Mar. 5, 2025).  As a result of this reevaluation, "[t]he United States has determined, in light of current U.S. foreign-policy interests and intervening foreign-policy developments, including developments in Afghanistan, to respectfully withdraw its amicus curiae brief filed in [this] case."  *Id.*  Given the withdrawal by the United States of its prior support for the A.s' federal preemption argument, we focus our analysis solely on the A.s' position as they articulate it.

b.

A successful federal preemption claim must have "'its roots' in the Supremacy Clause," *Maretta v. Hillman*, 283 Va. 34, 40 (2012) (citation omitted), which provides in pertinent part that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land."  U.S. Const. art. VI, cl. 2.

This case does not involve a state court's interference with any "Treaties made," *id.*, with an existing foreign government.  There was no treaty between the United States and the Government of the Islamic Republic of Afghanistan.  Nor could there be today.  The Government of the Islamic Republic of Afghanistan no longer exists.  It was overthrown by the Taliban and replaced by the Islamic Emirate of Afghanistan after American forces evacuated in August 2021.  The same could be said of any bilateral agreements between the United States and the now-nonexistent Islamic Republic of Afghanistan.

The circuit court expressed concern over this issue, observing that the "Afghan government the Court is being asked to defer to in vacating this order no longer exists, and the successor government is not recognized by the U.S."  *See* R. at 2564.  The concern was justified. The United States does not officially recognize the Islamic Emirate of Afghanistan as a

39

sovereign state.[29] and deems the Taliban to be a "Specially Designated Global Terrorist[]" entity.[30] These anomalous circumstances — described diplomatically by the U.S. Department of Justice as "current U.S. foreign-policy interests and intervening foreign-policy developments, including developments in Afghanistan".[31] — cut deeply into the taproot of the A.s' argument.

The A.s' core claim is that the final adoption order offends the President's constitutional "responsibility for foreign affairs" and puts the Commonwealth of Virginia at risk of "establish[ing] its own foreign policy." Appellee Br. at 41-42 (alteration in original) (citations omitted).[32] The unique facts and circumstances of this case, however, support a more measured view of the impact of the final adoption order on the President's Article II powers over the foreign policy of the United States.

The U.S. Embassy in Kabul agreed to "facilitate" the transfer of the child to the former Afghan Ministry of Labor and Social Affairs. R. at 2413. No evidence suggests that the U.S.

---

[29] *See* R. at 15294 (the U.S. Department of State's "Agreement for Bringing Peace to Afghanistan between the Islamic Emirate of Afghanistan which is not recognized by the United States as a state and is known as the Taliban and the United States of America" dated February 29, 2020).

[30] *See Executive Order 13224*, U.S. Dep't of State, https://www.state.gov/executive-order-13224 (last visited Jan. 8, 2026) (summarizing the background behind U.S. designations of terrorists for financial purposes); Exec. Order No. 13,224, 3 C.F.R. 78 (2002) (blocking designated individuals from receiving funds to aid terrorist activities); Exec. Order No. 13,268, 3 C.F.R. 240 (2003) (designating the Taliban as an entity to be blocked).

[31] Mot. by U.S. Dep't of Just. to Withdraw Amicus Br. at 1 (Mar. 5, 2025).

[32] Under settled principles, "conflicting state family law" can be preempted "when Congress validly legislates pursuant to its Article I powers" on the subject. *Haaland v. Brackeen*, 599 U.S. 255, 277 (2023) (rejecting a state challenge to the Indian Child Welfare Act). The A.s, however, do not identify any "Laws of the United States," U.S. Const. art. VI, cl. 2, that address the fact specific issues surrounding the entry of the final adoption order. In a footnote of their brief, *see* Appellee Br. at 42 n.28, the A.s briefly mention the Authorization for Use of Military Force, Pub. L. No. 107-40, § 2, 115 Stat. 224, 224 (2001), which authorized President Bush "to use all necessary and appropriate force" against those responsible for the 2001 attack on the Twin Towers of New York City. Nothing in this Joint Resolution expressly or implicitly seeks to displace final adoption orders entered by state courts under the sui generis circumstances of this case.

Embassy conducted its own independent investigation to determine the child's true identity or her extended family relationships.[33]  "This was not a decision the United States initiated," the circuit court stated, but rather one the United States merely "consented to or acquiesced in."  *See id.* at 2564, 2541.  The A.s assert that the U.S. officials involved in the decision believed they had to defer to that decision because of the Bilateral Security Agreement between the United States and Afghanistan.  *See* Appellee Br. at 42.  Fully titled "Security and Defense Cooperation Agreement Between the Islamic Republic of Afghanistan and the United States of America," this bilateral agreement stated in part that U.S. forces would "respect the Constitution and laws of Afghanistan."[34]  Relying on that agreement, U.S. officials turned the child over to the Islamic Republic of Afghanistan on February 27, 2020, R. at 2398.

The circumstances changed almost immediately thereafter.  Two days later, on February 29, 2020, the United States entered into a "comprehensive peace agreement" with the Taliban insurgency, which, at that time, was in hostile control of various sectors of Afghanistan.  *See id.* at 15294.  The peace agreement's title, "Agreement for Bringing Peace to Afghanistan between the Islamic Emirate of Afghanistan which is not recognized by the United States as a state and is

---

[33] The Court of Appeals and the A.s rely upon the circuit court's later statement that "in the end, it was determined that the child was an Afghan child." *A.A.*, 81 Va. App. at 232 (alterations omitted); *see* R. at 3695.  That is true, but only in context.  "[I]n the end," R. at 3695, the determination was made by the then-existing Government of Afghanistan, *id.* at 2398, not the U.S. Embassy in Kabul.  The circuit court was skeptical that it was factually true.  *See supra* at 11-12.  *Compare* R. at 8308-09 (the Afghan Minister of Labor and Social Affairs testifying that his agency does not "make a determination as to whether or not the child was Afghan" because "[t]hat is the court's job"), *with id.* at 9688-89 (A.A. acknowledging in testimony that "there's no court order" for him or his father related to guardianship of the child).  The circuit court stated that it could not "point to any actual determination of law that was made in Afghanistan or elsewhere, because none was made.  No court in Afghanistan made any final ruling or anything else."  R. at 3697.

[34] *See* Security and Defense Cooperation Agreement Between the United States of America and the Islamic Republic of Afghanistan, Afg.-U.S., Sep. 30, 2014, T.I.A.S. No. 15-101.  The bilateral agreement was signed on September 30, 2014, and became effective on January 1, 2015. *See id.*

41

known as the Taliban and the United States of America," and its various later provisions repeatedly stated that notwithstanding the withdrawal of its military forces, the United States did not officially recognize the Taliban's "Islamic Emirate of Afghanistan" as a sovereign state. *See id.* at 15294-97.

The next year, in 2021, the Taliban violently toppled the Islamic Republic of Afghanistan, gained control of the entire country, and declared it to be governed by the Islamic Emirate of Afghanistan — effectively extinguishing the 2015 bilateral agreement with the Islamic Republic of Afghanistan. These developments undermine the A.s' federal preemption argument. If we frame the requested exercise of our judicial power in the present, the A.s' federal preemption argument can be understood as a request that we vacate a state final adoption order on the ground that it interferes with a past, not present, federal interest arising out of a past, not present, bilateral agreement, with a past, not present, foreign government. We know of no logical or legal principle counseling, much less compelling, us to do so.[35]

To be clear, we fully agree that "[t]he 'President has unique responsibility' for 'foreign and military affairs,'" Appellee Br. at 41-42 (citation omitted), and that "the Constitution 'vests the residual foreign affairs powers of the Federal Government — *i.e.*, those not specifically enumerated in the Constitution — in the President,'" *Trump v. Vance*, 591 U.S. 786, 821-22 (2020). We do not believe, however, that the final adoption order that the A.s collaterally challenge in this case jeopardizes or undermines the President's constitutional foreign-policy prerogatives.

---

[35] Given our ruling on this issue, we need not address in any further detail the circuit court's factual findings that call into question the factual predicates for the federal preemption claim.

42

Nor does the United States. The United States abandoned this theory on appeal based upon "current U.S. foreign-policy interests and intervening foreign-policy developments." *See* Mot. by U.S. Dep't of Just. to Withdraw Amicus Br. at 1 (Mar. 5, 2025). The brevity of this statement does not diminish its weight. The very doctrine we are applying, after all, insists that "[t]he political branches, not the Judiciary, have the responsibility and institutional capacity to weigh foreign-policy concerns." *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 265 (2018).

c.

We also cannot overlook that the A.s use the federal preemption argument not as a defense to the entry of a judicial decree but as a collateral attack seeking the vacatur of a final judicial order. This defend-attack distinction polices the line between voidable orders and void ab initio orders. We know of no authority for the A.s' unstated assumption that the U.S. Constitution implies an omnibus right of action to collaterally attack final judicial decrees that allegedly misapplied federal constitutional law. In various contexts, just the opposite assumption begins and often ends the analysis.[36] This "constitutional conclusion" follows from "[t]he interest in promoting the finality of judgments" and guards against "'inroads on the concept of finality [that] tend to undermine confidence in the integrity of our procedures' and inevitably

---

[36] *See, e.g.*, *Jones*, 293 Va. at 52 (stating that "Virginia law does not permit a motion to vacate that is filed in a trial court long after the court lost active jurisdiction over the criminal case to serve as an all-purpose pleading for collateral review of criminal convictions" and that "we have never held, nor are we aware of any court that has held, that a motion to vacate (rather than a petition for habeas corpus) is a proper vehicle under Virginia law to challenge a conviction or sentence based solely on a federal constitutional challenge"); *see also Johnson v. United States*, 544 U.S. 295, 303 (2005) ("We recognized [in prior cases] only one exception to this rule that collateral attacks were off-limits, and that was for challenges to state convictions allegedly obtained in violation of the right to appointed counsel, an exception we thought necessary to avoid undermining *Gideon* v. *Wainwright*, 372 U.S. 335 (1963)."); *Daniels v. United States*, 532 U.S. 374, 381-82 (2001) (observing that "only one exception" exists to the prohibition on collateral attacks: "[i]f an enhanced federal sentence will be based in part on a prior conviction obtained in violation of the right to counsel").

delay and impair the orderly administration of justice." *Custis v. United States*, 511 U.S. 485, 497 (1994) (citation omitted). Exceptions to this general principle exist but are rare.[37]

The A.s offer no justification for creating an exception in this case. The cases they cite involve federal preemption arguments raised as a defense to the application of a state statute, a state judicial decree, or a state-law doctrine in a then-pending case. None involve collateral attacks on final judicial decrees that allegedly violated the Supremacy Clause.[38] To be sure, their brief does not even address the difficult question whether the U.S. Constitution implies a right of action to assert a collateral attack on a final judicial decree claiming it to be a void ab initio order in violation of federal preemption principles.[39] Because the A.s fail "to provide

---

[37] *See, e.g.*, *supra* at 34-38 (reviewing the *Troxel* doctrine as a possible, but inapplicable, exception in the present case).

[38] *See* Appellee Br. at 41-42 (citing *Haaland*, 599 U.S. at 263-64 (holding that a federal statute concerning Indian adoption preempted state family law on adoption); *Hernandez v. Mesa*, 589 U.S. 93, 96 (2020) (declining to extend a cause of action to an area with "foreign relations and national security implications" when Congress had been reluctant to provide similar causes of action); *Medellin v. Texas*, 552 U.S. 491, 498-99 (2008) ("We conclude that neither *Avena* [an International Court of Justice decision] nor the President's Memorandum constitutes directly enforceable federal law that pre-empts state limitations on the filing of successive habeas petitions."); *American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 401, 405-08 (2003) (holding that an executive agreement settling liability claims preempted a state insurance statute because the statute "interfere[d] with the National Government's conduct of foreign relations"); *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 187-88 (1993) (holding that a congressional statute and ratified treaty involving immigration did not preempt a repatriation executive order that was consistent with the statute and treaty); *Zchernig v. Miller*, 389 U.S. 429, 432 (1968) (holding that Oregon's inheritance statute was "an intrusion by the State into the field of foreign affairs which the Constitution entrusts to the President and the Congress")).

[39] *Cf. People v. Thompson*, 43 N.E.3d 984, 990 (Ill. 2015) ("[T]his court has held that the void ab initio doctrine does *not* apply to an as-applied constitutional challenge." (emphasis in original)); *Berry v. Berry*, 786 S.W.2d 672, 673 (Tex. 1990) (rejecting a "collateral attack" on a final divorce decree that was violative of a federal statute "retroactively applied"). *See generally Foster v. Foster*, 949 N.W.2d 102, 117 (Mich. 2020) (Viviano, J., concurring) ("The preemption doctrine does not deprive state courts of subject matter jurisdiction over claims involving federal preemption unless Congress has given exclusive jurisdiction to a federal forum." (citation omitted)), *remanded to*, No. 324853, 2020 Mich. App. LEXIS 4880 (Mich. Ct. App. July 30, 2020) (per curiam) (unpublished) (stating that "[s]tate courts are deprived of subject-matter jurisdiction when principles of federal preemption are applicable"), *rev'd*, 983 N.W.2d 373, 376

44

sufficient legal reasoning, factual analysis, or citations to authority," *Amazon Logistics, Inc. v. Virginia Emp. Comm'n*, 304 Va. 107, 112 (2025) (citation omitted), in support of their assumption that such a right exists,[40] we offer no ruling on whether it does or not.

d.

We thus hold that the lower courts' vacatur of the final adoption order cannot be sustained on the right-result-different-reason doctrine based on the claim that the final adoption order violates the Supremacy Clause of the U.S. Constitution. Such a conclusion is not warranted by the facts, required by the law, or supported by the United States.

III.

In sum, the uncompromising text of Code § 63.2-1216 bars the A.s' collateral attack on the validity of the final adoption order. None of their efforts to exempt themselves from this statute of repose have the support of the circuit court's factual findings or our understanding of the governing legal principles. For these reasons, we reverse the opinion of the Court of Appeals and enter final judgment dismissing with prejudice the A.s' petition to vacate the final adoption order.

*Reversed and Final Judgment.*

---

(Mich. 2022) (holding that the "federal preemption at issue in this case does not deprive state courts of subject-matter jurisdiction" and that the "challenge to enforcement of the provision at issue is an improper collateral attack on a final judgment"); *Parish v. Parish*, 991 N.W.2d 1, 8 (Neb. 2023) ("It has been widely held, and we agree, that if the military benefits are initially divided by a state court in violation of federal preemption, but the service member fails to file a proper appeal, the decision is final and the benefits at issue are divided in accordance with the initial award.").

[40] Their argument on brief (under the heading, "The U.S. Supremacy Clause Voids the Final Adoption Order and Preempts Section 1216") consists of two paragraphs and a footnote. *See* Appellee Br. at 41-42 & n.28.

45

JUSTICE MANN, with whom JUSTICE POWELL and SENIOR JUSTICE MILLETTE join as to Part II, dissenting.

A dispassionate review of this case reveals a scenario suffused with arrogance and privilege.  Worse, it appears to have worked.  It would be naïve to expect that there would not be, sometimes, unintended consequences to legislation.  But here, the construction of the statute at play in this case legitimizes the manipulation and artifice employed by Appellants.  Put simply:  this is just wrong.

In summary, no valid process was undertaken that would have authorized the power of rendition over the adoption order in the first place.  This case exemplifies a *perfect voidness*, and we should vacate every single order entered by any court that, in any way, supported the entry of the final order in this case.

I appreciate that facts can be viewed through different lenses when it comes to the conduct of these parties.  But looking at what happened here through a pinhole exposes an incontestable truth:  The General Assembly, in thoughtful fashion, created a protective and comprehensive adoption process that requires strict adherence to avert pure voidness.

After all, we must recognize what an adoption really is:  the severance and termination of the rights naturally flowing to an otherwise legitimate claimant to parental authority.  Of course, the process must be impeccable.  An evolved society could not sanction anything less than that. And here, it was less; if this process was represented by a straight line, Appellants went above it, under it, around it, and then blasted right through it until there was no line at all—just fragments collapsing into a cavity.

Both the Juvenile and Domestic Relations District Court (JDR court) and circuit court below entered orders that they simply could not.  The JDR custody order was entered without subject-matter jurisdiction, and the circuit court order relied on that faulty order to later enter an

adoption order when it had no power to do so. Under these circumstances, we would hold that Code § 63.2-1216's time bar does not apply and affirm the judgment of the Court of Appeals.

I would also affirm the Court of Appeals on two other grounds. By intruding into an area of foreign affairs and military operations, the custody and adoption orders were preempted by the federal Constitution's Supremacy Clause. Finally, I would hold the application of Code § 63.2-1216's time bar unconstitutional because the A.s had no notice of the adoption proceedings.

For these reasons, I respectfully dissent.

I. BACKGROUND

A. The Record in Context

Adding to the challenging nature of this case, two judges (one retiring from the bench, one his replacement on the case) presided over successive stages of the litigation and made, at times, divergent factual findings before the case was certified for interlocutory appeal. Three of their orders principally memorialize the judicial findings of fact in this interlocutory appeal: (1) the first judge's "Findings and Rulings," (2) the first judge's "Order Denying [the Masts'] Pleas in Bar," and (3) the second judge's "Order Granting Summary Judgment [for the A.s]." Our survey of the record landscape, however, reveals additional factual findings. Specifically, I conclude that a general timeline of events prepared by the second judge contains factual findings that are entitled to deference on appeal. The timeline itself is a one-page table of dates alongside companion facts. Each of these factual findings is supported by a citation to the record.

At the close of argument on the A.s' motion for summary judgment, the second judge distributed this timeline to all parties present at the hearing. He remarked on its applicability to the proceedings, then immediately ruled in favor of the A.s:

47

THE COURT: Thank you. Would you pass these over to this side and this side. [Guardian Ad Litem], if you would pass that—you can keep one for yourself and then leave one for [Counsel for the Masts].

What you've just received a copy of is the court's timeline that, I've gone through and constructed my own timeline as to dates and facts. And what you can see is the file, page, or number where this particular date is taken from, so that you can see along the way where, as the court went through this, [it] tried to come to some understanding about what happened and when it happened and the order in which it happened.

I know that today and I noted today in some of the argument that some of the dates that are mentioned are different than the dates that the court has by a day or so, **but still the general timeline is applicable**. There are some things to be said about the nature of the case that's in front of you. There has never been a case that I can find that is like this case. . . .

(emphasis added).

Having just won their motion for summary judgment, the second judge asked the A.s to draft an order for his entry. The A.s did so and appended the second judge's timeline to their draft order. The Masts, however, objected to the A.s' summary of the facts, arguing that they were attempting to "whitewash and supersede" the first judge's factual findings. The Masts then drafted their own order, whose body was a near-verbatim transcription of the second judge's oral ruling from the summary judgment hearing. The Masts then attached their own timeline for the second judge's entry. The second judge ultimately declined to enter the A.s' proposed order and instead entered the Masts' version, and then it certified the case for interlocutory appeal. The second judge did not expressly attach or incorporate any timelines to his order.

Despite the facial irregularity of the Order Granting Summary Judgment, I think its entry makes intuitive sense: In what is universally regarded as a fiercely litigated contest, what could be less objectionable than an order that simply restates the judge's own words? I do not view the

48

adoption of the Masts' order under these circumstances, or the circuit court's omission of the timeline from the written order, as a disavowal by the second judge of his own factual findings.

Trial judges, of course, are not required to memorialize their findings of fact in an order or opinion unless there is some statutory mandate to do so. *See Bowman v. Commonwealth*, 290 Va. 492, 500 n.8 (2015) (quoting *Fitzgerald v. Commonwealth*, 223 Va. 615, 627 (1982)). Indeed, absent express disavowal by the second judge, our appellate standard of review compels us to consider the timeline when reviewing the second judge's findings of fact. As we have explained on review of a plea in bar—the evidentiary vehicle from which the predicate findings of fact in this appeal principally derive—"this Court's review 'is not limited to the evidence mentioned by a party in trial argument or by the trial court in its ruling,' [thus] the absence of any specific factual findings by the circuit court simply requires the Court to examine the evidence presented at the plea in bar hearing with the presumption that the circuit court relied on it and any inferences reasonably drawn from it." *Fines v. Rappahannock Area Cmty. Servs. Bd.*, 301 Va. 305, 312 (2022) (first quoting *Perry v. Commonwealth*, 280 Va. 572, 580 (2010), then citing *Commonwealth v. White*, 293 Va. 411, 421 n.4 (2017)). This Court's appellate function is to "presume that the trial court made the requisite findings of fact to support its decision." *Commonwealth v. Holland*, 304 Va. 34, 47 (2025).

Moreover, the first judge never intended to insulate his factual findings from later modification. In fact, the record confirms that he intended just the opposite: that whichever judge succeeded him should revise his findings however they saw fit. The very first page of his "Findings and Rulings" acknowledged as much and served as an express qualifier:

> While this Court believes that these findings and rulings might be helpful to the reviewing appellate Court and the new presiding judge, such may be considered or not considered as they deem

49

appropriate, and **any pre-trial finding or ruling may be revisited and modified by the [new presiding] trial judge at a later time**.

(emphasis added).

Even if the first judge had wanted to guard his rulings, it would have mattered little. True, the first judge, having presided over the evidentiary hearings, was closer to the evidence.[1] But it does not alter the law as I understand it: That "[t]he power to revise or modify prior orders within a court's jurisdiction is a truism that applies to all interlocutory orders." *Robbins v. Robbins*, 48 Va. App. 466, 474 (2006). Accordingly, to the extent that the second judge made different factual findings than the first, those second findings control, and I would accord those findings the "weight of a jury finding." *Hawthorne v. VanMarter*, 279 Va. 566, 577 (2010).

Guided by these principles, I next recite the relevant facts.

### B. Facts

This case concerns a child, orphaned in 2019 after a military strike in Afghanistan. After American soldiers found the child in the aftermath of the strike, the International Committee of the Red Cross ("ICRC") began its search to reunite the severely injured child with her family.[2] Days later, U.S. Department of Defense personnel transferred the child to Bagram Airfield in Kabul for medical treatment. Joshua Mast, then deployed in Afghanistan as a Marine Corps Judge Advocate, became preoccupied with the child's medical needs. Meanwhile, the child's

---

[1] In his "Findings and Rulings," however, the first judge shared misgivings about his ability to recollect all the evidence presented, explaining, "[w]ith all of the evidence in this case (hours of testimony and hundreds of pages of exhibits), the Court is not confident that it has remembered all of the evidence presented completely."

[2] With few exceptions, under the Fourth Geneva Convention, the ICRC alone cares for children who are orphaned during military conflicts and assists in the family-reunification process.

50

maternal uncle requested assistance from the ICRC to return the child to her extended family in Afghanistan.

On October 26, 2019, Afghan officials from the Afghan Ministry of Labor and Social Affairs ("MOLSA"), ICRC representatives, and U.S. officials met to discuss the ongoing family reunification search. Mast attended this meeting. There, the United States expressed its intent to place the child in the custody of the Afghan government, so that she could be reunified with her family. This was consistent with the United States' obligations under its bilateral security agreement with the Afghan government. Days after this meeting, a United States Colonel sent a memorandum to the ICRC and MOLSA to assist with the family-reunification process. The Colonel alleged that the child was likely the daughter of either Turkmen or Uighur fighters (*i.e.*, not Afghan), against whom the strike was executed. Disagreeing with the memo's conclusion, however, the Afghan government continued to search for the child's next of kin in Afghanistan.

Even though that process was unfolding in the ordinary course in Afghanistan, Mast and his wife petitioned the Fluvanna County, Virginia JDR court for custody of the child in November 2019. The Masts failed to inform the JDR court of the ongoing familial search or the United States' intent to deliver the child into Afghan custody. To the contrary, the Masts assured the JDR court that the Afghan government would issue a waiver within a matter of days to allow for the child's adoption in the United States. This was the prevarication which formed the basis of everything else to follow. Based on these misrepresentations, the JDR court found that the child was "a stateless minor" and granted the Masts sole legal custody over the child.

The State Department later criticized this court order in a cable transmission.

51

**UNCLASSIFIED**
SBU



| | |
|---|---|
| MRN: | 20 STATE 20556 |
| Date/DTG: | Feb 25, 2020 / 252325Z FEB 20 |
| From: | SECSTATE WASHDC |
| Action: | KABUL, AMEMBASSY *IMMEDIATE* |
| E.O.: | 13526 |
| TAGS: | CVIS, PGOV, PREL, AF |
| Captions: | SENSITIVE |
| Pass Line: | Pass to A/COM Donna Welton and Consul General Michael Katula |
| Subject: | Transfer of Afghan Child |

\*   \*   \*

**3. (SBU) Virginia custody order:** The Virginia custody order in favor of an individual U.S. servicemember and his wife, which was issued on November 6, 2019, is flawed in a number of respects. It relies in part on assertions that the baby was stateless and that the Government of Afghanistan was in the process of issuing a waiver to consent to the United States acting on behalf of the child. Yet MOLSA concluded that the child is Afghan, and no such waiver was issued by the Government of Afghanistan. In these circumstances, it is unclear on what basis the court had jurisdiction to adjudicate the custody claim. And although the couple has not sought to go through the inter-country adoption process, the requirements for U.S. prospective adoptive parents seeking to adopt a child from Afghanistan have not been met.

The cable ends with the State Department's recommendation to proceed with reunification of the child with her family in Kandahar.

Still, Mast persisted. He emailed the custody order to Foreign Service Officers stationed in Afghanistan, conceding that the order "'doesn't impact [the Afghan government's] decision but [it] does allow me to create a path to the U.S. as soon as we can secure a waiver.'" He acknowledged that "this path could only be used if the Government of Afghanistan gave formal consent and waived jurisdiction over the child." The United States thereafter "became concerned" that "Mast had diverged from" its position, largely because "he was attempting to

52

interfere inappropriately in decision-making regarding the child." As a result, the United States stopped including Mast in any deliberations or decision-making about the child.

The government's concerns proved well founded. On November 8, 2019, thousands of miles from Afghanistan, the Masts secured an interlocutory adoption order from the Fluvanna County Circuit Court, under Code § 63.2-1201,[3] relying on the nugatory custody order issued by the JDR court. Later, the circuit court approved a certificate of foreign birth.

Mast attempted to medically evacuate the child from Bagram Airfield in Afghanistan to the United States, but that was cancelled when the Afghan government successfully identified and verified the child's next of kin—her paternal uncle, H.I.—in Afghanistan and notified the United States State Department. A State Department official replied to the message, requesting that MOLSA "expedite" its request for custody "so that the infant can be reunited with her family members as soon as possible." After MOLSA transmitted its formal request for custody in February 2020, the State Department concluded that the child was an Afghan national (not

---

[3] Section 63.2-1201, which authorizes *only* domestic adoptions, reads:

> Proceedings for the adoption of a minor child and for a change of name of such child shall be instituted only by petition to a circuit court in the county or city in which the petitioner resides, in the county or city in which the child-placing agency that placed the child is located, or in the county or city in which a birth parent executed a consent pursuant to § 63.2-1233.

The interlocutory adoption order here was purportedly granted on an emergency basis for two reasons. First, the order stated that the search for the child's family was fruitless (it wasn't), and thus the child was "stateless" (she wasn't). But the Masts never disclosed this to the court. Second, the order stated that the child was in the "physical care and custody" of the Masts in Virginia, who were looking after her urgent medical needs. But the Masts did not have physical custody of the child at this point. The circuit court anticipated that the child would soon be arriving in the United States only due to the Masts' misrepresentations.

"stateless"), that no waiver of jurisdiction would issue from Afghanistan,[4] and that transfer of the child into Afghan custody was necessary.

When the Masts learned of the State Department's plans to reunite the child with her family in Afghanistan, they maneuvered around the government's plans. In February 2020, they sought a temporary restraining order ("TRO") in the United States District Court for the Western District of Virginia. When asked by the District Court whether they were ultimately seeking to adopt the child, the Masts falsely represented that they were not.

> The Court: How do you perceive – I mean, what – what are you asking for, ultimately? Your client is not asking to adopt the child.
>
> Mr. [Richard L.] Mast:[5] No, sir. [Joshua] wants to get her medical treatment in the United States because we dispute that [MOLSA] is Al-Qaeda. If it were family, Taliban knows how to immediately go and get their child back from US custody. . . . Her head is deformed. She has that massive scar on her leg. UVA is right here ready to treat her.

The District Court ultimately denied the Masts' request for a TRO. It ruled that the Masts failed to demonstrate "a likelihood of success on the merits" of their Fourteenth

---

[4] I note that the timeline includes an entry dated October 26, 2020 that reads "waiver by the Afghan government. File 145-149." This appears to be a clerical error rather than the circuit court's factual finding for four reasons. First, the Afghan government never waived jurisdiction over the child, and nothing in the record suggests otherwise. Second, the record cites expressly contradict any finding that the Afghan government waived jurisdiction. They instead describe the A.s' peaceful life and their intention to raise the child as their own—with the Afghan government's recognition—until the Masts persuaded the A.s to bring the child to Virginia. Third, the entry appears to be only a sentence fragment, as it begins with a lowercase letter. And fourth, the A.s alerted the trial court to this error and requested that it be corrected.

In their responses to interrogatories, the Masts stated that they "are still not aware of any declination to issue a waiver by the Government of Afghanistan." Therefore, I cannot conclude that any waiver was issued, notwithstanding this entry in the timeline.

[5] Richard Mast represented his brother Joshua and Joshua's wife, Stephanie, from the initial custody proceedings in JDR court to the TRO proceeding in federal district court. Like Joshua, Richard is a Virginia attorney. Even if the Masts were not *required* to apprise the district court of the interlocutory adoption order, entered three months before, this glaring omission by officers of the Court with a duty of candor to the tribunal is striking.

Amendment claim because of "their failure to proceed through proper channels" and "lack of service and notice upon [the Defense Department]." The District Court also found the Masts did not show that the "balance of equities . . . tip in [their] favor." In announcing the court's decision, the District Court judge remarked that he "cannot overlook the international ramifications of the Court granting the request for [a TRO]." "[The Masts] should have obtained the consent of the Afghan government to the transfer of [the child]. While plaintiff's counsel conceded both that it was required and they sought it, it ultimately was not obtained."

Consequently, the United States released the child to the director of MOLSA who transferred her to her uncle in Kandahar. Under Afghan law, her uncle subsequently delegated his guardianship of the child to his son, A.A., and his wife, F.A.

In March 2020, the Masts made efforts to contact the child's family in Afghanistan. The Masts employed Kimberly Motley, an American attorney based in Afghanistan, to reach out to the A.s and let them know that they wanted to help with the child's medical issues. Motley began requesting photographs of the child, telling the A.s that she knew "someone who would like to help [the child]." This turned out to be entirely pretextual.

Though the child had never stepped foot in the United States, the Masts obtained a final order of adoption in December 2020 and additionally obtained—using the photographs acquired by Motley—a Department of Defense beneficiary card for the child. In securing the final order of adoption, the Masts failed to apprise the circuit court of their earlier TRO filing in the District Court—or that it had been denied. The Masts made only one oblique reference to the TRO denial in a subsequent document filed with the circuit court, "which was being looked at for other reasons." The Masts failed to make the circuit court aware of any "actual court proceeding (in the Western District of Virginia or elsewhere) or any ruling by a court that addressed the

55

validity of the Juvenile Court's custody order or [the circuit court's] birth certificate order."  The Masts also failed to apprise the circuit court that the Afghan government had identified the child as Afghan, verified her next of kin, or had placed her with family.  Mast instead lied to the circuit court, testifying that he did not recollect whom the child had been placed with, and explaining that he had "no such specific identification information at that time," even though he was actively communicating with the A.s through Motley.

Thus, the final order of adoption falsely described the child as an "undocumented, orphaned, stateless minor subject to this court's jurisdiction pursuant to Virginia Code § 63.2-1201" and "suitable for adoption."  The order stated that "no further consent to adoption or notice of these proceedings is required and that all requirements of law have been met or have been waived by this [c]ourt."  The Masts then obtained an Afghan passport for the child after representing themselves as the legal guardians of an Afghan national.

Three months later, the Masts asked the A.s to send the child to the United States for medical treatment.  The A.s refused to send the child if they could not accompany her.  As the Afghan government began to collapse in August 2021, the A.s and the child fled to the United States.

On August 29, 2021, the three arrived at Dulles International Airport and were assigned refugee housing at Fort Pickett, Virginia.  F.A. was then roughly eight months pregnant.

Five days later, armed with the custody and adoption orders, the Masts took physical custody of the child for the first time on the U.S. military base.  On the afternoon of September 3, 2021, as F.A. was putting the child to sleep, two officers knocked at their front door.  With little explanation, the officers ordered the A.s to grab their belongings and brought them to a vehicle waiting outside their residence.  A woman emerged from the car and took the child from

F.A., placing her in a car seat.  When F.A. asked to be with the child, the woman refused, saying that they must go to an "interview."

At the "interview," the woman continued to hold the child.  The child tried to crawl to F.A., but the woman kept her in her arms.  Another woman, purporting to be from the State Department, told the A.s that they were not the legal parents of the child under U.S. law and thus must be separated from the child.  A.A. protested, questioning how they had lost custody after raising the child for two years.  Mast soon after entered the room.  When A.A. asked him what was happening, Mast said that he was "working in my job" and "just got an e-mail and I came here."  Mast threatened that he would either "take the baby" or "they will put her in the orphanage."  F.A. and the child began crying.  F.A. begged Mast and the woman to "[p]lease give me my daughter."  A.A. told the people taking custody of the child, "I respect the rules and laws of the United States, but if you are saying that this child does not belong to us, she should be separated either in front of a court or in front of the police or even in front of, like, an office. But there is no one.  It's like you are kidnapping her."  F.A. continued to cry as the group took the child.

The A.s have not seen the child since.

C.  Challenges to the Adoption Order

In March 2022, the A.s filed a petition in the Fluvanna County Circuit Court to vacate the Masts' final order of adoption, arguing that the order had been procured by fraud, and that the circuit court had no jurisdiction because the A.s never received notice of the proceedings, proper adoption procedures were not followed, and the child did not then reside in the United States. The United States filed a Statement of Interest in the case, under 28 U.S.C. § 517, to argue that the custody and adoption orders interfered with U.S. foreign policy and its commitment to

57

reunite the child with her family in Afghanistan. The Masts, in turn, filed pleas in bar challenging the A.s' standing to contest the adoption order and arguing that Code § 63.2-1216's time bar foreclosed the A.s' petition.

Our colleagues in the majority ably set forth the complex procedural posture in this case, including the holdings of the Court of Appeals, which I will not repeat here. That said, a few salient points bear mentioning. Consistent with Part I.A, I recite the circuit court's operative findings of fact and conclusions of law:

- The child was Afghan. ("There is some thought that the child might have been something else [with regard to citizenship]. . . . But in the end, it was determined that the child was an Afghan child. And this is important to the court.").

- The A.s effectively adopted the child under Afghan law and were thus legal guardians of a child subject to adoption.

- The final adoption order issued on December 3, 2020 is void because:

  - "There is some evidence of extrinsic fraud as it relates to this process and what was happening in Afghanistan at the same time the Court was issuing its final order;"

  - There is a federal due process basis to avoid the application of § 63.2-1216; and as the child's legal guardians, the A.s "were entitled to some process that they did not receive."

  - Afghanistan never waived jurisdiction over the child; and

  - The circuit court lacked jurisdiction to issue a final adoption order because the child was not "stateless."

In sum, the child, a citizen of Afghanistan, was in the custody of the A.s, who were her legal guardians under Afghan law. As well, Afghanistan never waived jurisdiction over the child to permit adoption by the Masts. The Masts brazenly misled the JDR and circuit court about the "stateless" child's legal status and coaxed the A.s into bringing the child to the United States to

58

finalize the adoption.[6]  With that factual background in mind, we next address the orders'

numerous infirmities.

## II.  THE CUSTODY AND ADOPTION ORDERS ARE VOID AB INITIO, AND CODE § 63.2-1216 DOES NOT APPLY TO SUCH JUDGMENTS

The A.s contend that they can collaterally challenge the custody and adoption orders,

notwithstanding Code § 63.2-1216, because the orders were void ab initio rather than merely

voidable.  We agree and would affirm the judgment of the Court of Appeals on this ground.

"The distinction between an action of the court that is void *ab initio* rather than merely

voidable is that the former involves the underlying authority of a court to act on a matter whereas

the latter involves actions taken by a court which are in error."  *Singh v. Mooney*, 261 Va. 48, 51

(2001).  This Court recognizes several ways in which an order is void ab initio, including:

> if [the order was] entered by a court in the absence of jurisdiction
> of the subject matter or over the parties, if the character of the
> order is such that the court had no power to render it, or if the
> mode of procedure used by the court was one that the court could
> 'not lawfully adopt.'

*Id.* at 51–52 (quoting *Evans v. Smyth-Wythe Airport Comm'n*, 255 Va. 69, 73 (1998)).  On the

other hand, "an order is merely voidable if it contains reversible error made by the trial court."

*Id.* at 52.

The difference is significant.  When a court simply makes reversible error and the court's

judgment is not appealed, the error becomes final under Rule 1:1 and cannot be challenged

collaterally in a later proceeding.  *See Kelley v. Stamos*, 285 Va. 68, 79 (2013).  In contrast, an

order that is void ab initio "is a complete nullity."  *Hicks v. Mellis*, 275 Va. 213, 219 (2008).

---

[6] The circuit court tempered much of its criticism of the Masts' fraud because it believed that their motives were noble.  ("Their failing to inform the [c]ourt appears to have been a misguided effort to hasten the child's transport to the U.S. where she could receive necessary medical care and be a part of their family.")

"[I]t is no order at all." *Cilwa v. Commonwealth*, 298 Va. 259, 266 (2019). An order void ab initio, therefore, may be challenged later in a valid collateral proceeding. *Bonanno v. Quinn*, 299 Va. 722, 736–37 (2021).

### A. The Custody and Adoption Orders Are Void Ab Initio

With those principles in mind, the Court of Appeals found that the custody and adoption orders were void ab initio because (1) the JDR court had no subject-matter jurisdiction to issue the custody order and (2) the circuit court had "no power to render" the adoption orders. We address each of these findings below and ultimately agree with both.

### 1. The JDR Court Lacked Subject-Matter Jurisdiction to Enter a Custody Order

"[S]ubject matter jurisdiction is unique." *Watson v. Commonwealth*, 297 Va. 347, 352 (2019). It "refers to a court's power to adjudicate a class of cases or controversies." *Cilwa*, 298 Va. at 266 (quoting *In re Commonwealth*¸ 278 Va. 1, 11 (2009)). That power "can only be acquired by virtue of the Constitution or of some statute." *Pure Presbyterian Church of Wash. v. Grace of God Presbyterian Church*, 296 Va. 42, 56 (2018). When a court issues an order without subject-matter jurisdiction, that order is void ab initio. *Hannah v. Commonwealth*, 303 Va. 106, 123 (2024).

The JDR court, extralegally, issued a custody order to the Masts granting them temporary custody over the child. JDR courts "are courts of limited jurisdiction and may exercise only such subject matter jurisdiction as has been expressly conferred by statute." *Parrish v. Fannie Mae*, 292 Va. 44, 49 (2016). Code § 20-146.12 grants JDR courts limited subject-matter jurisdiction over custody claims.[7]

---

[7] *See* Unif. Child Custody Jurisdiction and Enforcement Act art. 2, § 201 cmt. 2 (Nat'l Conf. of Comm'rs on Unif. State Laws 1997) ("[J]urisdiction to make a child custody

JDR courts have "jurisdiction to make an initial child custody determination only if the custody petition falls within one of four categories—with those four categories serving as "the exclusive jurisdictional basis for making a child custody determination by a court of this Commonwealth."  Code § 20-146.12(B).  In relevant part, the statute allows a JDR court to issue a custody order if:

> 1. This Commonwealth is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this Commonwealth but a parent or person acting as a parent continues to live in this Commonwealth;
>
> 2. A court of another state does not have jurisdiction under subdivision 1, or a court of the home state of the child has declined to exercise jurisdiction on the ground that this Commonwealth is the more appropriate forum under § 20-146.18 or § 20-146.19, and (i) the child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this Commonwealth other than mere physical presence and (ii) substantial evidence is available in this Commonwealth concerning the child's care, protection, training, and personal relationships;
>
> 3. All courts having jurisdiction under subdivision 1 or 2 have declined to exercise jurisdiction on the ground that a court of this Commonwealth is the more appropriate forum to determine the custody of the child under § 20-146.18 or § 20-146.19; or
>
> 4. No court of any other state would have jurisdiction under the criteria specified in subdivision 1, 2, or 3.

Code § 20-146.12(A).  As the Court of Appeals correctly held, "[n]one of these requirements is satisfied here."  *A.A. v. J.M.*, 81 Va. App. 213, 231 (2024).

The JDR court, however, wrongfully relied on Subsections (1) and (2) to establish its jurisdiction.  With respect to Subsection (1), Virginia was not "the home state of the child on the

---

determination is subject matter jurisdiction . . . .").  Virginia adopted and enacted the UCCJEA in 2001.  *Prashad v. Copeland*, 55 Va. App. 247, 260 (2009); *see* Code § 20-146.1 *et seq.*

date of the commencement of the proceeding," nor was it within the six months preceding the custody determination. *See* Code § 20-146.12(A)(1). In fact, the child remained in Afghanistan throughout the custody proceedings and did not enter the United States until some 21 months later.

As for Subsection (2), there are several problems. First, despite the Masts' contrary representations to the JDR court, Afghanistan "never actually formally waived jurisdiction" over the child. Even if Afghanistan had waived jurisdiction, no evidence showed that it waived jurisdiction "on the ground that this Commonwealth [was] the more appropriate forum." *See* Code § 20-146.12(A)(2). Second, although the custody order falsely stated that the Masts were "acting as [parents]," the child simply did not have the requisite "significant connection with this Commonwealth" required by the statute, let alone "mere physical presence." *Id.*

No other jurisdictional basis under Code § 20-146.12(A) applied either. Both Subsections (3) and (4) require as a precondition that no other court has jurisdiction, or that all other courts have declined to exercise jurisdiction because the Commonwealth is the better forum. *See* Code § 20-146.12(A)(3), (4). But again, Afghanistan never waived its jurisdiction over the child. And at the time the custody order was issued, the Masts were well aware that the United States military was working with Afghanistan's MOLSA to find the child's relatives in Afghanistan, where the child had been for months. Given that reality, Afghanistan was no doubt the more appropriate forum than Virginia for determining custody of the child.

Because Code § 20-146.12 is a subject-matter-jurisdiction statute, and the custody proceeding fell outside the statute's limited jurisdictional categories, the JDR court had no subject-matter jurisdiction to adjudicate the Masts' custody petition, thus rendering it void ab initio.

62

(Mis)using the JDR order as a pathway, the circuit court further compounded the error. The circuit court could not have relied on that void order to issue its interlocutory or final adoption orders. Like a house built on a rotten foundation, an order void for lack of subject-matter jurisdiction taints all subsequent orders based upon it. *See Morrison v. Bestler*, 239 Va. 166, 170 (1990) ("Any subsequent proceeding based on such a defective judgment is void or a nullity.").

2.  The Circuit Court Lacked the Power to Render the Adoption Orders

We next turn to the circuit court's interlocutory and final adoption orders and conclude that they, too, are void ab initio, but for a different reason.

The Court of Appeals correctly held that the circuit court had subject-matter jurisdiction to issue the adoption orders. Generally speaking, "circuit courts have subject-matter jurisdiction to adjudicate adoptions" and the "power to adjudicate adoption petitions under Code §§ 17.1-513 and 63.2-1201." *Bonanno v. Quinn*, 299 Va. 722, 735 (2021). But while the circuit court had subject-matter jurisdiction over the adoption generally, at every turn, the circuit court went on to adjudicate the Masts' adoption petition, though it fell completely outside the statutory adoption scheme. We therefore conclude that the circuit court lacked the power to render the interim and final adoption orders, making them void ab initio.

The power of Virginia's circuit courts "are entirely prescribed by statute." *Kelley v. Stamos*, 285 Va. 68, 75 (2013); *see also* Va. Const. art. VI, § 1 ("The judicial power of the Commonwealth shall be vested in a Supreme Court and in such other courts of original or appellate jurisdiction subordinate to the Supreme Court as the General Assembly may from time to time establish.").

Virginia law has long recognized that even when a court acts within its subject-matter jurisdiction, its action may still be void ab initio if it exceeds its grant of authority.[8]  Those cases hold that an order is void ab initio when the issuing court "had no power to render it" or adopted a "mode of procedure" that it "could 'not lawfully adopt.'"  *Singh*, 261 Va. at 51–52 (quoting *Evans v. Smyth-Wythe Airport Comm'n*, 255 Va. 69, 73 (1998)).  This principle is based on the longstanding maxim that a court cannot "transcend the limits of its authority."  *Windsor v. McVeigh*, 93 U.S. 274, 282 (1876), *cited with approval in Anthony v. Kasey*, 83 Va. 338, 340 (1887).  We would adhere to our holdings that a circuit court cannot enter orders that exceed its statutory authority.  But when a court does so it has, by definition, rendered a judgment that it had no power to render.

For example, in *Rawls v. Commonwealth*, we held that when a court imposes a sentence greater than the "prescribed statutory range of punishment," the sentence is "void *ab initio* because 'the character of the judgment was not such as the [c]ourt has the power to render.'"

---

[8] *Anthony v. Kasey*, 83 Va. 338, 340 (1887) ("Now it is essential to the validity of a judgment or decree, that the court rendering it shall have jurisdiction of both the subject matter and parties. But this is not all, for both of these essentials may exist and still the judgment or decree may be void, because the character of the judgment was not such as the court had the power to render, or because the mode of procedure employed by the court was such as it might not lawfully adopt."); *see also Windsor v. McVeigh*, 93 U.S. 274, 282 (1876) ("Though the court may possess jurisdiction of a cause, of the subject-matter, and of the parties, it is still limited in its modes of procedure, and in the extent and character of its judgments. . . . [A court] cannot then transcend the power conferred by the law."), *cited with approval in Anthony*, 83 Va. at 340; *Collins v. Shepherd*, 274 Va. 390, 402–03 (2007) (finding an order dismissing an action void ab initio because the dismissal "was done pursuant to a local rule that," by statute, the "circuit court was not authorized to adopt"); *Cabral v. Cabral*, 62 Va. App. 600, 608 (2013) ("[A]t some point, an unlawful exercise of judicial power becomes so palpable that it can be considered void *ab initio* . . . .").

64

278 Va. 213, 221 (2009) (quoting *Anthony*, 83 Va. at 340).[9]  And in *Evans v. Smith-Wythe Airport Commission*, we declared a circuit court's action void ab initio when it approved a settlement agreement that limited an airport authority's exercise of eminent domain.  255 Va. 69, 74 (1998).  Eminent domain "is an inherent and inseparable incident of the sovereignty of this Commonwealth," therefore the court "could not[] divest the Airport Commission, acting through its delegation of power from the General Assembly, of the power or right of eminent domain." *Id.* at 73.  In *Burrell v. Commonwealth*, we addressed a provision of a sentencing order that purported to reduce a defendant's conviction from a felony to a misdemeanor once the defendant completed his terms of incarceration and probation.  283 Va. 474, 476 (2012).  Yet we held that because no statute gave the circuit court the power to do so, the entire sentencing order was void ab initio.  *Id.* at 480.

Like those cases, the circuit court here strayed from its authority so completely that its actions were void ab initio.

First, no Virginia statute gives a court the power to adjudicate an adoption of this character, whether interlocutory or final.  Why would it?  Adoptions, as previously pointed out, require strict adherence to the Code to make sure of at least two things:  First, the severance of the parental ties must be as legally perfect as possible given the massive grant of power by the legislature to the courts when what was never designed to be severed is judicially severed.  Second, the process must be viewed as sacred given that the subject of the process is a child

---

[9] *See also Commonwealth v. Watson*, 297 Va. 355, 361 (2019) ("[O]nce a court has imposed the greatest sentence that the legislature has authorized, the court has exhausted all its power to punish and 'its further exercise [i]s prohibited.'  Thus, any excessive sentence is void 'because the power to render any further judgment did not exist.'" (second alteration in original) (quoting *Ex parte Lange*, 85 U.S. (18 Wall.) 163, 176 (1873))).

whose best interests is likely the most important consideration any trial judge may be called upon to adjudicate.

Of course, from start to finish, this adoption process bypassed all the protections placed by the legislature in the Virginia Code. And, unbelievably, orders were entered referencing statutory compliance when there was none. And this was not an artificial intelligence hallucination. This was an engineered scheme, and judges entered orders either in reliance on the scheme, or by not scrutinizing the facts before them—or both.

The Code authorizes only five categories of adoption: "agency, parental placement, stepparent, close relative, and adult adoption." Code §§ 63.2-1221 through -1244. The Masts' adoption petitions fit none of these categories. The interlocutory adoption order cited Code § 63.2-1221, which governs agency-placement adoptions. But the proceeding could not be an agency-placement adoption because no "licensed child-placing agency or local board" was facilitating the adoption, nor was the child "properly committed or entrusted to [an agency's] care." *See* Code § 63.2-1221. Instead, the child was in the temporary care of the United States military and was later placed by the Afghan government with people the Afghan government had determined were her family. The Masts' adoption petitions were effectively an attempt to adopt "a child who was born in a foreign country," "not a citizen of the United States at the time of birth," and who had not yet entered the United States. Yet Virginia recognizes such adoptions only if they are "finalized pursuant to the laws of the country from which the child was adopted" and if "the child was admitted to the United States with an IR-3 or IH-3 visa issued by the United States Citizenship and Immigration Services." *See* Code § 63.2-1200.1(A). The Masts never pursued this path for adopting the child. The adoption here represents a wholesale deviation from any species of adoption recognized by Virginia law.

66

Second, the circuit court had no power to issue an interlocutory adoption order.  Code § 63.2-1209 allows for the entry of an interlocutory adoption order in two very limited circumstances: (1) in a "direct personal placement adoption pursuant to § 63.2-1230" or (2) where "an interlocutory order is necessary in an agency adoption," assuming certain preconditions are met.  *See* Code § 63.2-1209.  Neither of those circumstances applied here because the proceedings were neither a personal-placement adoption nor an agency adoption.  Citing "emergency circumstances," the interlocutory adoption order ostensibly "waive[d] . . . all of the procedural requirements . . . set forth in Code § 63.2-1221, 63.2-1222, 63.2-1224, and 63.2-1225."  Yet no statute grants the circuit court such power.

Lastly, the circuit court also had no power to render the final order of adoption.  After an interlocutory order of adoption has been entered, a court may finalize an adoption after reviewing the required report on supervisory visits and concluding, based on that report, that the final adoption is in the child's best interests.  Code § 63.2-1213.  The supervisory-visit report, which is mandated by Code § 63.2-1212, must be conducted by the local social services director or the child-placing agency and requires "at least three" visits *with the child* "within a period of six months" by an agent of the relevant social services department or child-placing agency.  Code § 63.2-1212.  It is uncontested, however, that the child did not enter the United States until after the entry of the final adoption order, making any such report impossible.[10]  Instead, the

---

[10] The final adoption order states that the circuit court ordered the Fluvanna County Department of Social Services to "conduct an investigation and file a report in this matter in accordance with . . . § 63.2-1208 and [§] 63.2-1228."  But a final order of adoption requires a "report made pursuant to § 63.2-1212 or as permitted pursuant to § 63.2-1210."  Code § 63.2-1213.

circuit court "waived" the requirements of "multiple home visits" and "home visits with the child," even though no statute allows such a waiver.[11]

The circuit court effectively ignored the statutory limits on its power to adjudicate adoptions by ordering an adoption of a character it had no authority to render. And in doing so, it failed at every turn to comply with the requirements for issuing an interlocutory or final adoption order. In effect, the circuit court simply made up the procedure as it went.[12] This was more than a procedural failure but rather a full-blown lack of compliance with the adoption statutes which categorically undermined the legitimacy of the orders, thus the "character of the judgment was not such as the [c]ourt has the power to render.'" *See Rawls*, 278 Va. at 221. We would therefore conclude that the circuit court had no power to render the adoption orders, making them void ab initio.

### B. Code § 63.2-1216 Does Not Apply to Void Ab Initio Orders

Having determined that the custody and adoption orders were void ab initio, we must next determine whether Code § 63.2-1216 nevertheless barred the A.s' collateral challenge to the orders. Code § 63.2-1216 states in full:

---

[11] It appears the circuit court attempted to finalize the adoption under Code § 63.2-1208(G), which allows a court to partially waive that statute's visitation requirement under certain circumstances. But the court could not lawfully proceed under that subsection because the statute allows for a final adoption only where the "child has been placed in the physical custody of the petitioner." Code § 63.2-1208(G)(1), (2). And as previously explained, any custody order entered in this case was void. This child's custody was not adjudicated. This little girl was taken: by force on a military base and through duplicity in two courts.

[12] Also jarring is the circuit court's oversight of the A.s' relationship to the child as legal guardians from the adoption order. The A.s stood *in loco parentis* to the child, meaning that they stand "in the place of a parent" and are accorded "all or some of the responsibilities of a parent." *In loco parentis*, Black's Law Dictionary (12th ed. 2024). An adoption permanently terminates parental rights by operation of law. The circuit court's adoption order, though, does not identify the A.s, H.I., or the child's ostensibly deceased parents. The involuntary termination of parental rights cannot be haphazard or hasty; our process demands accuracy and diligence even in the face of unusual circumstances.

68

> After the expiration of six months from the date of entry of any final order of adoption from which no appeal has been taken to the Court of Appeals, the validity thereof shall not be subject to attack in any proceedings, collateral or direct, for any reason, including but not limited to fraud, duress, failure to give any required notice, failure of any procedural requirement, or lack of jurisdiction over any person, and such order shall be final for all purposes.

"The primary purpose of statutory interpretation 'is to ascertain and give effect to legislative intent.'" *Botkin v. Commonwealth*, 296 Va. 309, 314 (2018). We do that by looking to the plain language of the statute, mindful of the fact that "the legislature chose its words with care" and that "we are bound by those words." *Chesapeake Hosp. Auth. v. State Health Comm'r*, 301 Va. 82, 95 (2022) (first quoting *Simon v. Forer*, 265 Va. 483, 490 (2003); then quoting *Anderson v. Commonwealth*, 182 Va. 560, 566 (1944)). "Indeed, as we have observed, we regularly reject invitations to 'read into [a] statute language that is not there,' because of the long-established rule that '[c]ourts cannot add language to [a] statute the General Assembly has not seen fit to include.'" *Va. Elec. & Power Co. v. State Corp. Comm'n*, 300 Va. 153, 163 (2021) (quoting *Wakole v. Barber*, 283 Va. 488, 495-6 (2012)).

Here, the plain language of Code § 63.2-1216 creates a time bar to all challenges to the "validity" of a "final order of adoption." That is, six months after its entry, all attacks on the entry of that order, such as "fraud," "duress," or "lack of jurisdiction over any person," are barred. But nowhere by its plain language does the statute purport to either retroactively confer, nor retroactively waive, what is at all other times an *unwaivable* requirement for court action: lawful authority.

To conclude otherwise requires an impermissible judicial rewriting of the statute, one that goes well beyond its plain meaning. *Chesapeake Hosp. Auth.*, 301 Va. at 95. Indeed, unlike the defects listed in the statute, lack of subject-matter jurisdiction and lack of power to render are so fundamental that they undermine a court's legitimacy. Subject-matter jurisdiction goes to

"whether a court has authority to enter judgment, and a judgment will always be void without it." *Id.* Likewise, power-to-render analysis looks at whether a court has gone beyond its statutory authority to enter a judgment, regardless of subject-matter jurisdiction. *Anthony v. Kasey*, 83 Va. 338, 340 (1887). It too concerns a court's "authority," and whether the court "transcend[ed] the limits of [that] authority." *Windsor*, 93 U.S. at 282.

Significantly—and unlike the defects listed in Code § 63.2-1216—neither a lack of subject-matter jurisdiction nor a lack of the power to render is waivable. *Morrison v. Bestler*, 239 Va. 166, 169-70 (1990) ("Subject matter jurisdiction alone cannot be waived or conferred on the court by agreement of the parties."); *see Evans*, 255 Va. at 71-72, 74 (invalidating for lack of power to render a court-approved settlement agreement between the parties after one party, the Airport Commission, later challenged the agreement in a collateral proceeding). Because these concepts address the fundamental authority of a court to act, any trespass of that authority makes the resulting ruling cancerous. We believe the General Assembly did not intend to *impliedly* forgive such fundamental defects in a court's authority through its enactment of Code § 63.2-1216 and accordingly would find that the statute does not apply when a court lacks subject-matter jurisdiction or the power to render the judgment in question.[13]

In sum, the custody order and both adoption orders were "null from the beginning." *Nelson v. Warden of the Keen Mt. Corr. Ctr.*, 262 Va. 276, 285 (2001). And they remain null now. We would therefore affirm the Court of Appeals and vacate all three as void ab initio.

---

[13] Although it is not necessary to explore the issue in depth here, we question whether the legislature could ever cure a void order without raising separation of powers concerns. Va. Const. Art. III, § 1. A void order is no order at all. It does not exist. We are skeptical that the legislature's authority to define the contours of Virginia courts' jurisdiction extends to blessing a legal fiction, especially where the legislative action seeks to validate a violation of rights or invalidate vested rights.

III.  THE CUSTODY AND ADOPTION ORDERS ARE PREEMPTED BY FEDERAL LAW

Notwithstanding our conclusions that the custody and adoption orders were void ab initio and that Code § 63.2-1216 does not apply here, I would also vacate the custody and adoption orders for an additional reason:  The orders are preempted under the foreign affairs preemption doctrine.

Under our system of federalism, state law exists in comity with federal law.  First principles under the Constitution's Supremacy Clause tell us that.[14]  But the Supreme Court of the United States has been clear that state law "must give way if [it] impair[s] the effective exercise of the Nation's foreign policy."  *Zschernig v. Miller*, 389 U.S. 429, 440 (1968).  Here, undisputed facts in the record show that the issuance of the custody and adoption orders interfered with the federal government's efforts to provide for the safe transfer of a child out of a warzone.  And the application of Code § 68.2-1216 interfered with the federal government's constitutional powers over foreign relations.  I would countenance neither.

A.  Foreign-Affairs Preemption

Even before the founding, it was universally agreed that the powers of foreign affairs lay with national governments, not local ones.  *See* 1 William Blackstone, Commentaries *245 ("With regard to foreign concerns, the king is the delegate or representative of his people.").  Underlying that longstanding allocation of power is the premise that those "decision[s]" that "touch on foreign relations . . . must be made with one voice."  *See Arizona v. United States*, 567

_____

[14] U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."); *see Printz v. United States*, 521 U.S. 898, 918-19 (2007) (discussing the "dual sovereignty" between the states and federal government).

71

U.S. 387, 409 (2012).  That voice is singular, and it is the federal government's.  The founders understood this vital principle.  *See, e.g.*, The Federalist No. 42, at 199 (Madison) (Timeless Publ'ns 2022) ("If we are to be one nation in any respect, it clearly ought to be in respect to other nations. . . ."); The Federalist No. 44, *supra*, at 213 (Madison) (crediting "the advantage of uniformity in all points which relate to foreign powers"); *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 317 (1936) ("The Framers' Convention was called and exerted its powers upon the irrefutable postulate that though the states were several their people in respect of foreign affairs were one.").  Thus, the founders designed our Constitution to "commit manners of foreign policy and military affairs to the exclusive control of the National Government." *Perpich v. Dep't of Def.*, 496 U.S. 334, 353 (1990).

"The Supremacy Clause provides that the Constitution, federal statutes, and treaties constitute 'the supreme Law of the Land.'"  *Kansas v. Garcia*, 589 U.S. 191, 202 (2020) (quoting U.S. Const. art. VI, cl. 2)).  This Court has recognized that Virginia laws preempted by federal laws are "without effect."  *Maretta v. Hillman*, 283 Va. 34, 40 (2012), *aff'd*, 569 U.S. 483 (2013).  Invoking the Supremacy Clause, the U.S. Supreme Court has invalidated state action that interferes with the federal government's power to dictate foreign policy—a doctrine called "foreign-affairs preemption."[15]  There are two principal forms of foreign-affairs preemption: narrower "conflict preemption" and broader "field preemption."[16]  As the custody and adoption

---

[15] *See generally* Anagha Sundararajan, *Foreign Affairs Federalism: The Doctrine of Foreign Affairs Preemption and State Regulation in Light of the Paris Agreement*, 55 U.S.F. L. Rev. 363, 363 (2021) (surveying the doctrine); Joseph B. Crance, Jr., *Gara-Mending the Doctrine of Foreign Affairs Preemption*, 90 Cornell L. Rev. 203 (2004) (same).

[16] *See American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 419 n. 11 (2003) (noting that conflict preemption and field preemption in the context of foreign affairs preemption "can be seen as complementary"); *Cassirer v. Thyssen-Bornemisz Collection Found.*, 737 F.3d 613, 617 (9th Cir. 2013) ("Under foreign affairs preemption there are two grounds for preemption: (1) conflict preemption and (2) field preemption."); *Alario v. Knudsen*, 704 F. Supp. 3d 1061, 1082

orders in this case, however, violate broader field preemption principles, I limit my discussion accordingly.

*Zschernig v. Miller* is the starting point for the modern doctrine of foreign affairs preemption. 389 U.S. 429 (1968). In that case, an Oregon citizen died intestate and left her property to heirs living in East Germany. *Id.* at 430. Yet the Oregon legislature, through its probate scheme, prohibited transfers to non-resident foreign nationals except in narrow circumstances. *Id.* at 430-31. As the U.S. Supreme Court remarked, the statutory scheme indirectly required Oregon state courts to discern the credibility of diplomatic statements and compare rights accorded in both the United States and East Germany—activity that "make[s] unavoidable judicial criticism of nations established on a more authoritarian basis than our own." *Id.* at 440. The statute, therefore, inappropriately authorized state courts to reach results that conflict with the Executive Branch's ability to—even potentially—negotiate or deal with a foreign power. *See id.*

The U.S. Supreme Court held that, while states traditionally regulate family law, "those regulations must give way if they impair the effective exercise of the Nation's foreign policy." *Id.* at 440. The U.S. Supreme Court dismissed any need for a direct conflict with federal law, explaining that "even in the absence of a treaty, a state's policy may disturb foreign relations." *Id.* at 441. The Oregon statute was preempted because it had "more than some incidental or indirect effect" on foreign relations and carried "great potential for disruption or embarrassment" for the United States. *Id.* at 434-35 (internal quotation marks omitted). There is no disputing

---

(D. Mont. 2023) ("[T]he foreign affairs field preemption doctrine straddles both the conflict preemption and field preemption doctrines. . . ."); *Kyocera Document Sols. Am., Inc. v. Div. of Admin.*, 708 F. Supp. 3d 531, 544-547 (D.N.J. 2023) (discussing both field and conflict preemption in the context of foreign-affairs preemption).

that most all family law matters are within the state's ambit.[17] But "[t]he relative importance to the state of its own law is not material when there is a conflict with valid federal law . . . ." *Ridgway v. Ridgway*, 454 U.S. 46, 54 (1981). After all, "the Framers of our Constitution provided that the federal law must prevail." *Id.*

Because the state law in *Zschernig* had a "direct impact upon foreign relations and may well adversely affect the power of the central government," state law was preempted by the federal foreign relations power. *Zschernig*, 389 U.S. at 441.

### B. Applying *Zschernig*

In this case, viewed through the lens of field preemption, the custody and adoption orders interfered with federal foreign policy and thus cannot stand. That is, the orders below "must give way" because they "impair[ed] the effective exercise of the Nation's foreign policy." *Zschernig*, 389 U.S. at 440. And here, the JDR and circuit courts could not even consider the issue of field preemption because the activities of Afghan officials from MOLSA, ICRC representatives, and U.S. officials were hidden by the Masts.

*Zschernig* demonstrates that "even in the absence of any express federal policy, a state law may be preempted under the foreign affairs doctrine if it intrudes on the field of foreign

---

[17] I say "most all" because this power is not exclusive, but increasingly shared, as history shows. Congress has, for years, used its spending and commerce powers to legislate in the traditional state area of family law. *See* Ann Laquer Estin, *Sharing Governance: Family Law in Congress and the States*, 18 Cornell J.L. & Pub. Pol. 298-305 (2009) (summarizing Congress' commerce power legislation to regulate family law). Consider also the overlay of the Immigration and Nationality Act, 8 U.S.C. §§ 1101-07, on international adoptions.

affairs without addressing a traditional state responsibility." *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1072 (9th Cir. 2012).

So too here. The custody and adoption orders entered in the case intruded into foreign policy and military involvement in a foreign country. The states—even ours—have "no serious claim" of authority to pass judgment on the custody or adoption of a non-citizen child on a United States military base in a foreign war zone. *See Garamendi*, 539 U.S. at 419 n.11. Extraterritorial custody determinations are quintessentially the federal government and the Executive's realm—not ours. *Cf.* Department of Defense Law of War Manual, U.S. Dep't of Def. Off. of Gen. Counsel, § 17.10.1 (2023), https://perma.cc/328W-8E6P [hereinafter Law of War Manual]; RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE U.S., § 1 cmt. 5 (AM. L. INST. 1987) ("A State of the United States is not a "state" under international law, since by its constitutional status it does not have capacity to conduct foreign relations. The United States alone, not any of its constituent States, enjoys international sovereignty and nationhood.") (citations omitted).

Here, the child was receiving medical care by the United States military in a foreign country. When United States military personnel found the child in the middle of a battlefield, the sensitive and immediate determination of *whom* she should go with, *where* to transport her, and *what* next steps needed to be taken was for the military and other governmental personnel on the ground in Afghanistan to determine. Consequently, the fate of the child fell squarely within the authority of the U.S. government against the backdrop of our then-existing diplomatic and military relationship with Afghanistan.

Further, the Virginia orders had "more than some incidental or indirect effect in [a] foreign countr[y]." *Zschernig*, 389 U.S. at 434 (internal quotation marks omitted). The custody

75

and adoption orders directly "affect[ed] the legal rights and responsibilities of . . . individuals [and a] foreign government[]" by attempting to override the A.s' putative rights as the child's guardians. *See Gingery v. City of Glendale*, 831 F.3d 1222, 1231 (9th Cir. 2016). In effect, the JDR court supplanted the Afghan government's claimed jurisdiction over the child. The Masts, indeed, used the Virginia custody orders to—unsuccessfully—attempt to persuade a federal court to issue a temporary restraining order to stop the United States from transferring custody of the child to the Afghan government. *See Doe v. Mast*, 741 F. Supp. 3d 409, 422-27 (2024). As that federal court succinctly observed:

> [B]ased on [the Masts'] representations, the Virginia family court awarded temporary custody to the Masts. . . . Then, the day before Baby Doe was to be reunited with her biological family in Afghanistan, the Masts came to this Court [the United States District Court for the Western District of Virginia] and sued the government, asking for an emergency order stopping the transfer.

*Id*. at 422.

The orders also went beyond the "traditional state responsibility" of custody and adoption. *See Movsesian*, 670 F.3d at 1072; *Haaland v. Brackeen*, 599 U.S. 255, 276 (2023) (recognizing that although "Congress lacks a general power over domestic relations" and the "responsibility for regulating . . . child custody remains primarily with the States," the "Constitution does not erect a firewall around family law"). By purporting to adjudicate the custody and adoption of a non-citizen child in a foreign war zone, the orders intruded on international relations and military affairs. As in *Zschernig*, where the Oregon law dealt strictly with probate, a "traditional" area of state regulation, the order purporting to deal only with adoption intruded on foreign relations in its application. *See* 389 U.S. at 440.

One need not go far to understand why and how these orders intruded on the federal foreign relations powers with respect to our relationship with Afghanistan. On September 30,

76

2014, the United States entered a bilateral security agreement with the Islamic Republic of Afghanistan.[18] As part of that agreement, the United States promised that its forces would operate "with due respect for applicable Afghan laws and regulations, and in accordance with applicable United States laws and regulations and applicable international agreements." Security Agreement, *supra* note 18, art. 7, § 6. A custody determination for a child in an Afghanistan warzone is certainly subject to "Afghan law and regulations." And any involvement by the United States in that determination would necessarily fall within the Executive's discretion. The Department of Defense's Law of War Manual is illustrative, mandating that "[a]ll appropriate steps shall be taken to facilitate the reunion of families temporarily separated." Law of War Manual, *supra*, § 17.10.1 (addressing the rules for non-international armed conflict, which includes "military operations against non-State armed groups").

Legitimizing the custody and adoption orders by reversing the judgment of the Court of Appeals creates "great potential for disruption or embarrassment" in United States foreign relations. *Zschernig*, 389 U.S. at 434-35. The State Department said as much in its diplomatic cable. After providing an update on the adoption process and expressing some confusion about how the custody order was obtained, the cable expressed "significant foreign policy concerns about any further delays in transferring the child to the Government of Afghanistan in response to its request." Its concerns "include[ed] security concerns and concerns about the perception of the U.S. government holding an Afghan child against the will of her extended family and the Afghan government." That "great potential" for a diplomatic cross-up exists even today. I fear reversal in this case implies that a foreign government's decision regarding the custody of its

---

[18] Security and Defense Cooperation Agreement Between the United States of America and the Islamic Republic of Afghanistan, Afg.-U.S., Sept. 30, 2014, T.I.A.S. No. 15-101, https://perma.cc/59FT-Q7BG [hereinafter Security Agreement].

children is tenuous or revokable by any American state court—solely because a U.S. citizen improperly obtained a domestic order to wrest custody of a foreign child without any input from the foreign government.

Some may argue that custody orders like this one are the norm for our state's courts: that the state's power to adjudicate adoptions is its normal business, domestic in nature. That is, one might be led to conclude that the JDR and circuit courts below did not purport to express any foreign policy stance at all. But that impression ignores all wider context. Even when state inheritance provisions or escheat schemes were only dimly related to diplomacy, as in *Zschernig*, state actions that had the potential to provoke international powers were invalidated under the Supremacy Clause. *Deutsch v. Turner Corp.*, 324 F.3d 692, 711 (2003) (remarking that "the inheritance provision at issue in *Zschernig*, although superficially unrelated to war, was seen by a Court operating at the height of the Cold War as a potential provocation to foreign powers").

The U.S. Supreme Court emphasized precisely this wider context when invalidating the state law in *Zschernig*: "Experience has shown that international controversies of the gravest moment, sometimes even leading to war, may arise from real or imagined wrongs to another's subjects inflicted, or permitted by a government." *Zschernig*, 389 U.S. at 441 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941)). The federal government must have the flexibility to prevent these types of international controversies without state interference. Yet the custody and adoption orders issued in the present proceedings undermined that foreign policy decision.

The United States' eleventh-hour change-of-heart in this appeal does not change my conclusion that the orders are preempted. We granted leave to the United States to present oral argument in support of Appellees as amicus. But on the morning of oral argument, the United States instructed its counsel not to present. The United States eventually withdrew its amicus

brief, citing "current U.S. foreign-policy interests and intervening foreign-policy developments." Mot. by U.S. Dep't of Just. to Withdraw Amicus Br. at 1 (Mar. 5, 2025).

A change in the government's position between administrations does not cure the overstep into the Executive branch function at issue here. It also does not sweep the cynical chicanery occurring years prior under the rug. After all, foreign affairs preemption broadly addresses a state's intrusion into the federal power of international relations. It does not require the government to say that the state law interfered with foreign affairs. *See Zschernig*, 389 U.S. at 434-35. As *Zschernig* demonstrates, State action may be preempted "*even in the absence of any express federal policy*." *Movsesian*, 670 F.3d at 1072 (emphasis added).[19]

In sum, the doctrine established by the U.S. Supreme Court in *Zschernig* necessitates a preemption holding. The custody and adoption orders issued in these proceedings interfered with the United States' foreign relations and military operations in a foreign war zone. The Constitution entrusts those areas to the federal government alone. Because of the orders' intrusion on those constitutional powers, I would find that these orders are preempted by the Supremacy Clause.

---

[19] *See also* Brannon P. Denning & Michael D. Ramsey, *American Insurance Association v. Garamendi and Executive Preemption in Foreign Affairs*, 46 Wm. & Mary L. Rev. 825, 855 & n.116 (2004) (describing *Zschernig* as holding that a law may be preempted for intruding on constitutional foreign affairs powers even "in the absence of a treaty provision, a  law, or even an executive branch policy" and citing the government's position in *Zschernig* as evidence).

IV. THE CUSTODY AND ADOPTION ORDERS VIOLATED THE A.S' FEDERAL CONSTITUTIONAL DUE PROCESS RIGHTS

Finally, I would affirm the judgment of the Court of Appeals on the ground that the custody and adoption orders, entered without the A.s' knowledge, violated their federal constitutional rights to notice of the proceedings.[20]

"The relationship between a parent and child is a constitutionally protected liberty interest under the Due Process Clause of the Fourteenth Amendment." *L.F. v. Breit*, 285 Va. 163, 182 (2013) (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). The federal constitutional rights of parents, however, do not hinge on the "mere existence of a biological link." *Lehr v. Robertson*, 463 U.S. 248, 259-60 (1983). That liberty interest also "stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in promoting a way of life through the instruction of children." *Id.* at 261 (cleaned up). Thus, when a biological parent has voluntarily relinquished their rights or is otherwise absent, legal custodians who stand in their stead assume the same federally protected liberty interest as the parent. *Cf. Denise v. Tencer*, 46 Va. App. 372, 393 (2005) ("[I]t surely does not follow that rights analogous to the constitutional rights enjoyed by a parent may not be established by other means, the most salient of which are court-adjudicated findings that . . . the non-parental party is a proper custodian."). Indeed, "[t]here is nothing in our jurisprudence that supports the

---

[20] Although at the time of the custody and adoption hearings, the A.s were neither American citizens nor physically present in the United States, I would nevertheless find that, for the purposes of these proceedings, they enjoyed federal constitutional due process protections to the same extent as a U.S. citizen. *See Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 232-33 (5th Cir. 2022) (en banc) (permitting a foreign corporation to assert constitutional due process rights in domestic litigation instituted by American victims who suffered injuries abroad).

conclusion that legal and/or physical custody placed in a non-parent is subject to diminished protection under the law." *Id.*

Consistent with these principles, Code § 63.2-1216's finality bar simply cannot apply when a parent or legal guardian has not received due process with respect to an adoption proceeding—particularly notice of the proceeding and an opportunity to object. *F.E. v. G.F.M.*, 35 Va. App. 648, 670 (2001) (en banc); *McCallum v. Salazer*, 49 Va. App. 51, 56-58 (2006); *Santosky v. Kramer*, 455 U.S. 745, 752-57 (1982). Even on a practical level, it cannot stand that *no* relevant party—the child or their custodians—receives notice of an ex parte adoption proceeding. Yet that is precisely what happened here.

The circuit court found that the A.s had effectively adopted the child under Afghan law, and were, in any case, her legal guardians. As such, the A.s were entitled to the same constitutional protections of that liberty interest as would have been the child's biological parents. *See Denise*, 46 Va. App. at 393 ("As a matter of legal definition and fact, according grandfather the status of custodian gave him precisely the same child-rearing autonomy as that enjoyed by a parent."). At the most fundamental level, before custody or adoption of the child could be awarded to the Masts by an American court, the A.s were constitutionally entitled to notice and an opportunity to object. *F.E.*, 35 Va. App. at 665. But they received neither. Accordingly—and notwithstanding my earlier conclusions regarding void ab initio judgments and foreign-affairs preemption—I would find that the application of Code § 63.2-1216's time bar is unconstitutional here and must yield to the guarantees of the Fourteenth Amendment.

CONCLUSION

Void is void. Wrong is wrong. The JDR and circuit courts exceeded their statutory authority to issue custody and adoption orders that they otherwise could not issue. From the very

81

beginning, those orders were void due to that fundamental lack of authority. Code § 63.2-1216 cannot be abused in the way Appellants attempt. It plainly does not forgive such fundamental defects with a court's attempted exercise of authority. Nor can it spirit away children from their recognized legal guardians' custody and then forbid any challenge to fundamental defects to judicial process. And yet, it has happened here.

Separately, I would also find the orders preempted under the foreign-affairs preemption doctrine articulated in *Zschernig*. Finally, even if Code § 63.2-1216 saves the void orders, and even if the orders were not preempted, I would—at the very least—find the time bar inapplicable in the face of the violations of the A.s' federal constitutional due process rights.

For the foregoing reasons, I respectfully dissent.

JUSTICE POWELL, with whom SENIOR JUSTICE MILLETTE joins, dissenting.

I join with Part II of Justice Mann's dissent. However, as the question of whether a Virginia court had the power to render an adoption decision in this case is a purely legal matter that may be decided independent of any factual disputes between the parties, I join with Justice Mann's factual analysis only with regard to those facts that are necessary to undergird his analysis of the procedure followed by the lower courts. As I agree with Justice Mann and the Court of Appeals that no Virginia court ever acquired the power to render a decision in the underlying cases, I believe that all Virginia custody and adoption orders issued in these cases should be vacated.